1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3          EASTERN DIVISION-RIVERSIDE

4                    - - -

5      HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

6                    - - -

7   UNITED STATES OF AMERICA,          )
                                       )
8                     Plaintiff,       )
                                       )
9          vs.                         )   No. EDCR 12-92 VAP
                                       )
10  SOHIEL OMAR KABIR,                 )
    RALPH KENNETH DELEON,              )
11                                     )
                                       )
12                    Defendants.      )
    _____)

13

14

15          REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

16                  Riverside, California

17                  Monday, June 9, 2014

18                      9:46 a.m.

19

20

21

22              PHYLLIS A. PRESTON, CSR, FCRR
                Federal Official Court Reporter
23               United States District Court
                    3470 Twelfth Street
24              Riverside, California 92501
                     (951) 205-7959
25                  stenojag@aol.com

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:

 4                         OFFICE OF THE UNITED STATES ATTORNEY
                           By:  SUSAN DEWITT
 5                              CHRISTOPHER GRIGG
                                ALLEN CHIU
 6                         Assistant United States Attorneys
                           3403 Tenth Street, Suite 200
 7                         Riverside, California 92501

 8

 9

10   For Defendant Kabir:

11                         OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           BY:  JEFFREY AARON
12                              ANGELA VIRAMONTES
                           Deputy Federal Public Defenders
13                         3801 University Avenue, Suite 150
                           Riverside, California  92501

14

15

16   For Defendant DeLeon:

17                         DAVID J. THOMAS
                           CJA  Appointed Counsel
18                         1500 Iowa Avenue, Suite 220
                           Riverside, California 92507

19

20

21

22

23

24

25
```

```
 1              MONDAY, JUNE 9, 2014; RIVERSIDE, CALIFORNIA

 2                            -o0o-

 3         THE CLERK:  Item No. 2, EDCR 12-092 VAP, United

 4   States of America v. Sohiel Omar Kabir and Ralph Kenneth

 5   DeLeon.                                                      09:46

 6         Counsel, please state your appearances.

 7         MS. DEWITT:  Good morning, Your Honor.  Susan DeWitt

 8   on behalf of the Government.  Also present at counsel table

 9   with me is Christopher Grigg and Allen Chiu.

10         THE COURT:  Thank you.  Good morning.               09:46

11         MR. GRIGG:  Good morning, Your Honor.

12         MR. CHIU:  Good morning.

13         MR. AARON:  Good morning, Your Honor.  Jeffrey Aaron

14   for the federal public defender for Mr. Sohiel Kabir who is

15   present in custody.  With me at counsel table is Ms. Angela  09:47

16   Viramontes.

17         THE COURT:  Thank you.  Good morning.

18         MR. THOMAS:  Good morning, Your Honor.  Dave Thomas

19   on behalf of Ralph DeLeon who is here and present with me at

20   counsel table.                                             09:47

21         THE COURT:  Thank you.  Good morning.

22         All right.  There are three motions on calendar this

23   morning in this case.  And we have distributed tentative

24   rulings on the motion to introduce at trial certain statements

25   by the defendant Ralph DeLeon; a tentative ruling on the    09:47
```

```
 1   Government's motion to preclude evidence of an entrapment

 2   defense; and I will take up -- there isn't a written tentative,

 3   but I will take up the motion to exclude testimony of the

 4   defendant's -- defendant Kabir's expert, Victoroff; and to

 5   compel further disclosure as to Sageman.                        09:47

 6          Starting with the motion to introduce certain

 7   statements given in a proffer session by defendant DeLeon,

 8   deputy clerk Ms. Dillard, just handed me the amended joinder in

 9   the opposition by Mr. DeLeon, which I had not seen; it hasn't

10   appeared on the docket.  The only thing that's appeared on the  09:48

11   docket is the notice of manual filing.  So I had not seen it

12   and had not seen the declaration of Mr. DeLeon.

13          But as you can see from the tentative ruling, the

14   original joinder by Mr. DeLeon -- although, I agree with the

15   Government's ex parte application that counsel's declaration,   09:48

16   strictly speaking, has to be stricken because it's hearsay, it

17   was sufficient, as I put it in the tentative, to alert the

18   Court that there was an issue, I thought, as to defendant

19   DeLeon's knowing, intelligent and voluntary waiver of his

20   rights with respect to Rule 410.                               09:49

21          So the -- I mean, I've just very quickly read the

22   amended joinder.

23          The amended joinder appears to take the position that

24   there isn't so much an issue with respect to the

25   attorney/client privilege, and so on, but it's really just an   09:49
```

1    issue as to what Mr. DeLeon's understanding was.  And again, I

2    think the defendant's position is somewhat the same as the

3    Court's, that given that there's an issue about that --

4    although, Mr. DeLeon's position seems to be that it's based on

5    what the Government's counsel or the agents told him during the          09:50

6    proffer session, more than perhaps what his former attorney,

7    Mr. Driggs, told him.

8            In any event, there needs to be probably a separate

9    hearing with -- again, I think, with respect to whether or not

10   there was a knowing, intelligent and voluntary waiver.                   09:50

11           So, Mr. Thomas, do you want to be heard further on

12   that?  And what is your proposal as to -- I am concerned about

13   -- well, there's a number of things to be concerned about:

14   Waiver of an attorney/client privilege and -- well, a number of

15   other issues.                                                            09:50

16           So how do you propose that we deal with what happened

17   at the proffer session?

18           MR. THOMAS:  Thank you, Your Honor.

19           For starters, I agree that we do need to have another

20   hearing on this issue.  I would like to -- and Government               09:51

21   suggested this, as well -- wait for us to get the transcript

22   from Mr. DeLeon's removal of his prior counsel.  I hadn't

23   gotten it.  Although it's been approved, we just don't have it

24   yet, and I would like to review that and discuss that with my

25   client before the hearing.                                              09:51

1          What I have in mind for the hearing on the issue, I

2    understand the attorney/client issue, the waiver issue, is

3    present for that issue.  I mean, I can't get into what my

4    client was told by his former counsel, without acknowledging

5    that those statements -- privilege is waived.  That's just the          09:51

6    minor port of my argument, though.  The larger portion of it

7    happened during the meeting with counsel present.  There was --

8          THE COURT:  You mean the proffer meeting?

9          MR. THOMAS:  During the proffer meeting with

10   Government counsel present and my client's former counsel.          09:51

11   There's obviously no privilege with respect to that statement

12   because there were other parties present.

13         So my client and I discussed this extensively about

14   what went on during the meeting, what was represented to him by

15   the Government.  It wasn't so much by his prior counsel; there          09:52

16   was very little from his prior counsel.  It was more by the

17   Government and his understanding of what happened at that

18   meeting.  My client -- we could conduct a limited evidentiary

19   hearing where my client takes the stand and answers the Court's

20   questions about that limited issue.          09:52

21         THE COURT:  About the proffer session?

22         MR. THOMAS:  Just about the proffer session and about

23   what was represented to him by the Government and/or his

24   counsel during and after the proffer.

25         THE COURT:  Well, wouldn't we need to have Mr. Driggs          09:52

 1   present?

 2          MR. THOMAS:  You know, yes, I believe so.  I

 3   specifically -- because of the strained nature of their

 4   relationship, I've followed my counsel's advice on probably

 5   that's not the best way to go with Mr. Driggs because I can't          09:52

 6   -- you know, Mr. Driggs is understandably going to be in a

 7   position to cover his own backside, for lack of a better term,

 8   so I don't think that's the proper truth-telling function on

 9   that issue.  I think it's more my client's statement, which I

10   proffered and signed a declaration to, and he'll swear under          09:53

11   oath and tell the Court.

12          THE COURT:  All right.  Mr. Grigg?

13          MR. GRIGG:  Thank you, Your Honor.

14          Your Honor, the attorney/client privilege is the

15   central issue here because the argument from defendant that,          09:53

16   well, what really matters is what he understood about the terms

17   governing his proffer session, which is what's at issue.  So

18   far, nobody has contested the facts as recited in the 302 that

19   the Court has before it and Exhibit B to the Government's

20   motion.                                                               09:53

21          The issue is what did DeLeon understand at the time

22   he began that proffer session?  And in order to get to that

23   issue, we must, therefore, have information about what

24   information was provided to him, and that necessarily requires

25   an inquiry of Mr. Driggs.                                             09:54

1          I've spoken to Mr. Driggs by phone about this issue.

2     I've alerted him to the fact that counsel's declaration placed

3     this matter at issue.

4          And the Court is aware that we filed a couple of

5     pleadings, including the ex parte to strike, and held off on

6     asking the Court to make a final determination about this

7     depending on whether defendant DeLeon withdrew that argument

8     and those representations and, therefore, had the opportunity

9     to preserve his privilege under *Bittaker*.

10          He's decided not to do that.  He's decided to press

11     the issue.  And now with the declaration the Court has before

12     it, the Court can clearly see that his arguments about what he

13     understood about the letter agreement that he signed and that

14     his counsel signed that govern the terms of that proffer

15     session are now squarely at issue.  And therefore, the Court

16     should act on the Government's ex parte application and find

17     that there has been a waiver -- a limited waiver, albeit -- but

18     for the purpose of understanding and seeking the truth about

19     what defendant DeLeon was told about the terms of his proffer.

20          In essence, where we are is, we've got a written

21     contract signed by DeLeon and signed by his counsel.  It's

22     presumed, in a fundamental basis of contract law, that someone

23     has read and understood a document they are signing.  It's hard

24     to get one's head around the idea that a defendant, who is

25     college educated and is being presented a written document in

09:54

09:54

09:54

09:55

09:55

```
 1   his first meeting with prosecutors and agents since his arrest,

 2   would not read the document that's placed in front of him in

 3   the first instance, which is, of course, what he says.

 4            Now, of course the Court has --

 5            THE COURT:  Wait a minute.  Wait a minute.  He says      09:55

 6   he -- I'm not sure I understood that last sentence.

 7            The defendant says he did not read the entire

 8   document?

 9            MR. GRIGG:  That's what he says, Your Honor.  And the

10   bottom line is --                                                  09:55

11            THE COURT:  That's not hard to believe.

12            MR. GRIGG:  Your Honor, as the Court is aware --

13            THE COURT:  Now, I'm not saying that legally that

14   absolves him of the consequences of signing it, but I just

15   don't find it hard to believe that someone doesn't read         09:56

16   everything, especially something that's pretty complex, like

17   that agreement.

18            MR. GRIGG:  Well, Your Honor --

19            THE COURT:  I mean, I can -- I hear that many times a

20   year in a civil context, in a criminal context.  People sign    09:56

21   things without reading them, all of it.  And that happens.

22   That doesn't mean that they are not bound by what they sign.

23            MR. GRIGG:  Absolutely, Your Honor.

24            THE COURT:  But it doesn't mean that they are being

25   untruthful when they say, *I didn't read it.  I relied on what* 09:56
```

1    -- you know, *The escrow agent told me that it's all standard;*

2    *go ahead and sign it*, for example.

3              MR. GRIGG:  Fair enough.

4              THE COURT:  Which I probably have heard 100 times, if

5    not more.

6              MR. GRIGG:  Here, we've got someone who is in a

7    situation, with the background the defendant has, having his

8    first meeting, having a letter agreement placed in front of

9    him.  He also met with his counsel ten minutes to review the

10   letter, as was observed through the window at the conference

11   room, where counsel and he are going over the terms of the

12   letter.  Of course, nobody is privy to what was said.  And

13   that's all the more reason why his counsel and his counsel's

14   advice about the terms of the letter matters here.  And that's

15   exactly why the Court should find --

16             THE COURT:  As well as what Government counsel said.

17             MR. GRIGG:  I'm sorry, Your Honor?

18             THE COURT:  As well as what Government counsel said

19   to him during the proffer session.

20             MR. GRIGG:  Yes, absolutely, Your Honor.  And we

21   certainly want the opportunity to place all of this information

22   in front of the Court.

23             THE COURT:  Exactly.

24             MR. GRIGG:  And we intend to do that.  But as a

25   component of all the information, a necessary piece of that is

09:57
09:57
09:57
09:57
09:57

1  what did Mr. Driggs tell Mr. DeLeon about the terms of the

2  letter when he was observed reviewing the letter before the

3  proffer session started?

4          And quite frankly, Your Honor, I'm not arguing that

5  someone is being deceitful, necessarily, about a particular

6  meeting.  Because as the Court is aware, having read the

7  pleadings, there were two meetings with defendant DeLeon, one

8  that happened much later.  This could be a simple case of

9  confusion and misrecollection about what happened at what

10  meeting.  And that's why the input from Mr. Driggs is important

11  here.  And the Government, like counsel, would like to see the

12  transcript from the August 2013 hearing and have the

13  opportunity to have Mr. Driggs freely engage in this limited

14  issue without fear of consequences for him and for the client.

15          And so the Court, I think, has more than enough at

16  this point before it to declare the waiver so that the

17  Government can reengage with Mr. Driggs and get to the

18  substance of what happened.

19          THE COURT:  Well, I am inclined to declare a waiver,

20  but I want to be very specific about the limits on the waiver.

21  So I want to give that some further thought.

22          It's not a waiver of the entire privilege on the

23  entire relationship between Mr. DeLeon and Mr. Driggs, but it

24  -- and so it needs to be -- my order as to that waiver needs to

25  be -- I have to think about that some more.  And I'm going to

1    put it in writing because it really relates only, I think, to

2    the proffer session, the discussions regarding the proffer

3    session.

4            MR. GRIGG:  And Your Honor, within that, if the Court

5    in narrow detail -- obviously, we don't need to hear about how          09:59

6    much discovery was provided to DeLeon after he was arrested,

7    and so on, which are representations that were in counsel's

8    declaration, but if the Court can include, within the waiver,

9    the issues relating to the proffer session in April 2013 and

10   the meeting in July 2013 so that we can address both of those.          09:59

11   And if this is simply a case of DeLeon misrecollecting what

12   happened at which meeting, the Court will then have the ability

13   to make that assessment.

14           THE COURT:  Let me just say -- let's go off the

15   record.  Well, let's keep it on the record, that the court             10:00

16   reporter, I'm sure, will get that transcript to you right away.

17   There was a family emergency last week; otherwise, I think she

18   would have gotten it to you last week.

19           MR. GRIGG:  Your Honor, if I may on that point?

20           The Court has not ordered that unsealed as to the              10:00

21   Government.  The Court previously only ordered that unsealed as

22   to Mr. DeLeon.

23           THE COURT:  Well, first, I'd have to find a waiver.

24   First, I have to sign a waiver order before you could receive

25   that.                                                                  10:00

1          MR. GRIGG:  Right.

2          THE COURT:  But thank you for reminding about that

3   point.

4          So I am going to hold off ruling on that motion until

5   we resolve this issue, which is I think what my tentative says,      10:00

6   that we can't resolve this.  But I won't even issue this

7   ruling, I think, until we resolve the underlying issue of the

8   validity of the agreement.

9          MR. GRIGG:  And the Government is -- completely

10   understands that approach.  And just so I'm clear, the Court is     10:01

11   not going to hold off on deciding whether and to what extent

12   the waiver happened, and the Court will issue that order.  And

13   then we will reengage on --

14          THE COURT:  Oh, exactly, no.  I need to get to that.

15   But as to whether or not the Government is going to be able to      10:01

16   introduce these statements at trial, I can't rule on that,

17   obviously, until I make a decision about whether the terms of

18   the proffer -- whether the proffer agreement is valid.

19          MR. GRIGG:  And to a certain extent, Your Honor,

20   there is an overlap between the other motion for which the         10:01

21   Court has issued a tentative stay.  That's the entrapment

22   motion.  Because as the Court is aware, counsel has provided a

23   narrative of defendant's version of the facts.  And I'm sure

24   the Court has looked at the proffer statement, and those are

25   not consistent with each other.  They make diametrically           10:02

```
 1   opposed representations of time.  And so --
 2             THE COURT:  Well, let me ask this:  Is the
 3   Government's -- actually, there is a couple of -- well, before
 4   we move on to the entrapment motion, in terms of timing for a
 5   hearing -- and I think there's a question about whether counsel    10:02
 6   for Kabir could be present at that hearing because it depends
 7   on the extent of the waiver.  But let's -- I would like to have
 8   that hearing, at which Mr. Driggs would, I believe, have to be
 9   present as well, I would like to have it perhaps later this
10   week.  Let me think.                                               10:02
11             So maybe -- okay.  So Thursday of this week is
12   available.  So check your calendars.  We'll come back to that
13   at the end of the hearing today.
14             So moving on to the entrapment motion -- well,
15   Mr. Grigg, you were referring to -- well, the Government in the    10:03
16   entrapment motion, and I think mostly in the moving papers, to
17   a certain extent in the reply, a couple of times has listed
18   either a narrative or point-by-point evidence, and sometimes it
19   cites to the Complaint or even the Second Superseding
20   Indictment; sometimes it doesn't have a cite as to the source     10:04
21   of the facts.  Does that mean that sometimes are you referring
22   to that as something where the source is Mr. DeLeon's proffer?
23             MR. GRIGG:  Your Honor, if I may?
24             I didn't mean to take over the argument for the
25   entrapment motion; Ms. DeWitt will handle that.  But I just       10:04
```

1   meant to point out that they are interrelated.  And if it's

2   okay with the Court, Ms. DeWitt will address that issue.

3          THE COURT:  All right.  So as you can see from my

4   written tentative, while I appreciate getting a preview of --

5   and that's not facetious.  I spent a lot of time on this                10:05

6   motion, and I appreciate getting a preview of both sides' views

7   on this issue.  But I don't think it would be appropriate to

8   rule at this time that the defense is not entitled to an

9   instruction on entrapment.  I think, based on what both sides

10  have proffered at this point, that the defense, especially as          10:05

11  to the predisposition element but as to both elements, may not

12  even meet the very low standard of -- you know, the evidence

13  may be weak.  But it's certainly not to the level where I feel

14  that it would be appropriate to issue an order that they can't

15  introduce what evidence they have.                                     10:06

16          I think it would be argument for either side, but of

17  course it would be the defense who would probably say this, to

18  say in opening statement, that there's been entrapment.

19          I have a pretty vigilant standard for argument and

20  opening statement, and so I think both sides should be telling        10:06

21  their story to the jury of what they think the evidence will

22  be.  And so I don't think either side should use the word

23  *entrapped* during their opening statement, or a synonym for it.

24          But certainly the defense can, in their opening

25  statement, present their view of the evidence to the jury,            10:06

```
 1   including the evidence that they think will eventually lead to

 2   their request for an entrapment instruction.

 3           All right.  Ms. DeWitt.

 4           Ms. DEWITT:  First, just to answer the question that

 5   you posed to Mr. Grigg.                                          10:07

 6           The papers that the Government submitted in support

 7   of this motion and its reply, other than citing the fact of the

 8   charges, everything -- every cite in there is to specific

 9   evidence that's laid out and sworn to by an agent in the

10   Complaint.  So it's not --                                      10:07

11           THE COURT:  Okay.  I've reviewed the Complaint

12   several times.  Because as you can see from the tentative, I

13   could find a cite in the Complaint for almost everything that

14   the Government referred to.

15           MS. DEWITT:  So to get your -- to get to your, I        10:07

16   think, to your secondary point was, what, were we in any way

17   relying on our proffer statement?  No.

18           THE COURT:  All right.

19           MS. DEWITT:  But, Your Honor, by taking the position

20   that the defendant has in his opposition, it's the Government's 10:07

21   position that in this motion itself he has now put his proffer

22   statement at issue.

23           So this is not -- I mean, he's not allowed to take

24   contrary views to his proffer statement in proceedings before

25   trial.  So this isn't just an issue for trial.                  10:08
```

1        And, Your Honor, you know, I recognize that you

2   haven't made an ultimate decision about the proffer statement,

3   and I also recognize that defense counsel often -- defendants

4   often take different positions at trial and different theories.

5   But what they're not allowed to do is to submit oppositions          10:08

6   that are absolutely unsupported, not only by any evidence,

7   which is the case here, but also the --

8        THE COURT:  Are you talking about the entrapment

9   motion?

10        MS. DEWITT:  Yes.                                               10:08

11        And frankly, they're not given a blank slate.  They

12   don't get to just ignore the fact.  I mean, maybe at the end of

13   the day the Court will say they are not stuck with us being

14   able to use his own statements which he admits and doesn't

15   contest are true in his proffer statement, but that doesn't      10:08

16   mean he gets to come into court and say the exact opposite.  He

17   isn't given a blank slate to just make up a story.  And that's

18   the problem that we're faced with here, is that this motion is

19   based not only on nothing, but a made-up story.  But it is

20   directly in contradiction to his own words.                      10:09

21        THE COURT:  When you say *this motion,* you mean this

22   defense?

23        MS. DEWITT:  It's his opposition to the motion, Your

24   Honor.

25        THE COURT:  All right.  I'm sorry.                           10:09

1        MS. DEWITT:  So one, we are now in a position where

2   there is no evidence in support of his opposition to this

3   motion.  That evidence directly puts his proffer statement at

4   issue in this particular motion.

5            And then we get to the third point, which is the

6   Court sort of -- the Court is now -- okay.  I agree with the

7   conclusions of the Court, but what is the remedy?

8            So let me take it one by one.

9            The first issue relates to Mr. Kabir.  The Court has

10  already concluded, based on the evidence here, that he is not

11  entitled to an entrapment defense because there is no

12  derivative entrapment as a matter of law, but that you will --

13  essentially, you will let evidence in.

14           Well, my question to the Court is, because I'm

15  confused here is --

16           THE COURT:  You need to slow down.  Speak more

17  slowly.

18           MS. DEWITT:  I'm sorry.

19           My question to this Court is, given the facts that

20  are undisputed as to when Mr. Kabir first had any contact at

21  all with the confidential source here, what evidence -- and

22  anything else would be derivative entrapment -- what evidence

23  could Mr. Kabir admit at trial that wouldn't otherwise be

24  impermissible as a matter of law?

25           So the question becomes -- the remedy here, with

10:09

10:09

10:10

10:10

10:10

1   respect to Mr. Kabir is, it should be that there is nothing he

2   should be able to admit -- even at trial on this issue --

3   because it would all be precluded as a matter of law.

4              Now, with respect to Mr. DeLeon --

5              THE COURT:  Well, let's talk about Mr. Kabir a little     10:10

6   further.

7              If you look at just the timing of it, Mr. Kabir's

8   first interaction with the confidential source begins during a

9   phone -- a Skype conversation, and I believe it was August --

10             MS. DEWITT:  31st.                                        10:11

11             THE COURT:  -- 31st.  So the only contacts are from

12  that day -- between direct contacts between Mr. Kabir and the

13  confidential source are from that day forward until his arrest

14  in November.  So that's a period of maybe two months, two

15  months and ten days, something like that.  So that evidence is    10:11

16  limited to that period.

17             And during that period, and in those Skype

18  conversations, at most, the evidence would be the confidential

19  source saying things during his -- during the confidential

20  source's conversations with Mr. Kabir and other -- the other     10:12

21  defendants in this case, giving this the construction in favor

22  of the defense.

23             The confidential source saying things like, *I can*

24  *assist with getting the passports or the visas.  I can assist*

25  *with maybe loaning some money*.                                   10:12

1          I don't think the defense even set -- I think the

2    defense says that the airfare for one of the three

3    co-defendants, not Mr. Kabir, was paid for by a credit card of

4    the confidential source.  And that's about the extent of it, as

5    I recall.  I'm sure Mr. Aaron or Ms. Viramontes will correct          10:13

6    me, but it's those conversations.

7          MS. DEWITT:  I would submit, Your Honor, that the

8    conversations that the CHS was engaged in, however you want to

9    characterize them as in terms of their substance or their

10   extent, which we would submit was extremely limited, but those        10:13

11   are fair game.  There's no -- I don't have any dispute about

12   that.  But all the other things that you're pointing to, as far

13   as Mr. Kabir is concerned, they're irrelevant because they

14   would go, at most, to -- even if you accept them as true --

15   would go to an entrapment with a derivative entrapment defense.       10:13

16         THE COURT:  Everything before August 31st, correct?

17         MS. DEWITT:  Everything before August 31st and,

18   frankly, anything in the United States where he is not present.

19   He's in Afghanistan at this point.  So anything that the CHS is

20   doing with the other co-conspirators, that is -- that is true        10:13

21   derivative entrapment, however you want to be --

22         THE COURT:  Well, wouldn't you say -- I mean, the

23   fact that the other defendants are on the telephone -- I'm

24   calling it *telephone*, but on the Skype call -- the fact that

25   they're on the call and he's in Afghanistan doesn't mean that        10:14

```
 1   there's not a pos -- that doesn't make it derivative.  If he's
 2   on the phone call and he's having contact with the -- he
 3   meaning Mr. Kabir -- was having contact with the CS, that
 4   doesn't -- I mean, it's not derivative just because one's in
 5   Afghanistan and they're Skyping.                                  10:14
 6          MS. DEWITT:  To the extent that that comment is made
 7   to Mr. Kabir by the CS while he's on the phone, I agree that
 8   that's fair game.
 9          THE COURT:  All right.
10          MS. DEWITT:  What that means, what the significance     10:14
11   of that is, is a different issue.  What happens outside the
12   presence of those calls, his actions, his interactions, et
13   cetera, that all is --
14          THE COURT:  His meaning the CS or Kabir?
15          MS. DEWITT:  Anything that happens where it's outside   10:15
16   the presence of Mr. Kabir has to be derivative and, therefore,
17   should not be admissible from Mr. Kabir.
18          There may be some argument that some of that's
19   admissible as to Mr. DeLeon, but we can get to that in a
20   minute.                                                         10:15
21          But as to Mr. Kabir, in order to be induced, he has
22   to be induced by a government actor.  So it has to be something
23   that was said or done to him because he's not in the United
24   States.  It can't be done with him.  It has to be done by way
25   of Skype calls or other communications, which there aren't in  10:15
```

1  this case.  So the only thing that Mr. Kabir, at most, should

2  be allowed to introduce that might even arguably go to

3  entrapment would be those conversations.

4          THE COURT:  All right.  Before we move on to

5  Mr. DeLeon, although we've touched on that, let me let          10:15

6  Mr. Kabir's counsel respond.

7          MR. AARON:  Everything counsel is saying would be

8  fine if she were also saying evidence of acts and statements

9  before August, when Mr. Kabir was on the Skype call with the

10 confidential human source or the informant, everything before   10:16

11 then would not be admitted against him.

12         But what the Government is trying to do is to have

13 its cake and eat it too.  It's trying to say, *Mr. Kabir, you*

14 *cannot challenge those statements.  You cannot put on evidence*

15 *that they were a result of these young men, basically almost*    10:16

16 *teenagers, being entrapped.  You can't put on evidence of that,*

17 *but that evidence can come in against you.*

18         In other words, the statements, the acts, everything

19 that the informant helped these men to do, instructed them to

20 do, and rewarded them for doing, that will come in against      10:16

21 Mr. Kabir, but he won't have any opportunity, if the Government

22 has its way, he won't have any opportunity of showing that to

23 the jury, or of combatting it.  And I can't think of a greater

24 example of due process.  The Government might as well just

25 exclude all of the defense witnesses at that point.            10:17

1          I can't think of any greater example of a due process

2    violation.

3          THE COURT:  Well, aren't you -- let me make sure I

4    understand that argument, then.

5          If I understand -- if I understand you correctly,          10:17

6    what you're arguing is that the Government's position that the

7    statements of the defendants are admissible under the

8    co-conspirator exception to the rule against hearsay is somehow

9    implicated, that somehow should be voided by the application of

10   the entrapment defense?                                          10:18

11         MR. AARON:  No, Your Honor.

12         What I'm saying is that we should be entitled to show

13   all of the facts and circumstances surrounding each of the

14   statements and each of the acts that are going to be attributed

15   to our client.  And that results in us being able to show that  10:18

16   this was produced at the instigation of and with the guidance

17   of the informant.  And in each instance, there are statements

18   that have nothing to do with the informant.  There are acts

19   that have nothing to do with the informant.  There are acts

20   that do.  We should be entitled to show those.                  10:18

21         And what the Government would prefer us to do is to

22   just sit there, be quiet, and not say anything until they

23   decide to bring up some evidence of August and -- August 2013,

24   2012, and later.  Meanwhile, they would also be allowed to

25   bring in evidence of acts and statements before August.         10:18

1          So in other words, the Government is saying, *We want*

2     *to be able to bring in those acts and statements.  We want*

3     *those to come in against Mr. Kabir and against Mr. DeLeon, but*

4     *we don't want Mr. Kabir's team to be able to say anything about*

5     *that or to challenge them in any way.*                          10:19

6          And if the Court has any doubt about that, I think

7     the Court could ask the Government, and they would candidly

8     admit, yes, that's what they are trying to do.

9          THE COURT:  Well, if your suggestion is that the

10     Court -- that the Government would prefer that the defense not   10:19

11     put on a case, I think they probably would prefer that.  That's

12     not realistic.

13          But if what you're arguing is that, in part, you want

14     your right to put on an entrapment defense is to counter the

15     right of the Government to put on the statements of the         10:19

16     co-conspirators under that exception to the rule against

17     hearsay, that's not a reason to allow evidence of entrapment.

18          MR. AARON:  That's not what I said, Your Honor, and

19     that's not what we're implying.

20          We're not saying that because we get to go into the        10:20

21     source and the genesis and the development of each of the acts

22     and statements, that we get to put on an entrapment defense.

23     That's not what we're saying.

24          THE COURT:  Now I'm even more confused.  I'm sorry.

25          When you say you want to put on evidence of the            10:20

1    genesis and the background, for what?  I really am confused

2    about what you're trying to say.

3           MR. AARON:  We want to show the jury where these

4    facts and statements and acts came from.

5           I believe that the Government's -- what the                    10:20

6    Government's proposed relief will be, that the defense can talk

7    about, and they can question the informant about events that

8    happened after August but not about anything before.

9           So in other words --

10          THE COURT:  As to your client.                                 10:20

11          MR. AARON:  Right.  As to our client.

12          But the truth is they will also try and admit acts

13   and statements before August of 2012, against him.  So to admit

14   that evidence but not allow us to show, *Hey, this comes from*

15   *the informant.  This was produced by the informant.  This is*        10:21

16   *information that he gave, or that he distorted, or are funds*

17   *that he provided*, I think that deprives the defense of the

18   ability to defend Mr. Kabir against any of those acts or

19   statements that would come in under the co-conspirators

20   exception, for anything before August of 2012.                       10:21

21          I think also that the Court and the prosecution is

22   making a fundamental misunderstanding.

23          There's a difference between saying, *Hey, this*

24   *witness, Witness A, is responsible for these things*, and a

25   difference between that and saying, *Because of that, we get*        10:21

 1  *defense instructions of entrapment.*

 2          We're not even talking about that now.  We're talking

 3  about showing to the jury why this evidence shouldn't be

 4  trusted and why it is compromised.

 5          THE COURT:  Well, when you say why the evidence                      10:21

 6  shouldn't be trusted, by cross-examining the confidential

 7  source on what issues?

 8          MR. AARON:  Any evidence that's produced they are

 9  trying to use against Mr. Kabir.  Any evidence.  We intend to

10  cross-examine him vigorously on anything that they are                      10:22

11  intending to use against Mr. Kabir.

12          If the informant says, *I took these gentlemen to do*

13  *paint ball in June, before they met Mr. Kabir*, and that's going

14  to be an overt act or an act which is admitted against

15  Mr. Kabir, we intend to cross-examine the informant at great               10:22

16  length about that.

17          And, Your Honor, the informant is not our witness, so

18  we do not have to provide Jencks as to him.  But we have a lot

19  of information about the informant that is going to come in in

20  cross-examination.                                                         10:22

21          THE COURT:  All right.  So cross-examining him, for

22  example, about the interactions that he had with the other

23  defendants before Mr. Kabir met him is, in your view, relevant

24  to what?  His credibility?

25          MR. AARON:  It's relevant to his credibility and it's             10:23

1    relevant to the strength of the evidence against Mr. Kabir

2    because we're entitled to argue that that evidence is not

3    sufficient beyond a reasonable doubt.

4            We're also entitled to argue that they have --

5            THE COURT:  I'm sorry.  That what evidence?                    10:23

6            MR. AARON:  The evidence that they're going to

7    produce from the informant.

8            THE COURT:  Well, let's go with your example about

9    paint ball or going to the shooting ranges.  Although, that may

10   have happened after September.  Well, let's just -- either one   10:23

11   is fine.  That evidence is, as I understand it, and maybe it's

12   offered for another reason as well, but it's being offered to

13   show that the defendants engaged in these training exercises to

14   show their intent to join the Taliban or Al-Qaeda when they got

15   to Afghanistan, among other things.                              10:24

16           MR. AARON:  Among other things.

17           THE COURT:  All right.  So if you're going to cross-

18   examine, which is a scheme that the Government intends to show

19   that Mr. Kabir was involved in --

20           MR. AARON:  Correct.                                     10:24

21           THE COURT:  -- you're going to cross-examine the

22   confidential source because you say it goes to his credibility

23   and as to what conversations he may have had with the

24   co-defendants as to what their intent really was?

25           MR. AARON:  It goes to so much more than that, Your      10:24

1    Honor.  It goes to the integrity of the conspiracy.  It goes to

2    the making of the agreement.  Let's just use -- Let's stick to

3    -- it's a made-up example, but just let's stick to that, if we

4    could for just a moment, of going to paint ball in June 2012.

5    The Government, let's say --                                    10:25

6              THE COURT:  Well, that's not a made-up example.

7              MR. AARON:  I'm not sure about the date, either.

8    That's why I'm saying it's a made-up example.

9              THE COURT:  All right.

10             MR. AARON:  The Government will argue this shows that   10:25

11   not only was there an agreement between them, but there was

12   agreement to do some sort of violent jihad or military-type

13   act.

14             What we would do, by cross-examining the informant

15   is, one, show that he's a liar; two, show that he planted the   10:25

16   idea, that it did not originate with the other defendants, nor

17   did it originate with Mr. Kabir.

18             If we show that, then the jury would have to say, All

19   right.  That idea -- the jury could say, *We believe that those*

20   *gentlemen did engage in a paint ball afternoon.  But we also*    10:25

21   *believe that Mr. Aaron is correct, that the idea didn't*

22   *originate with Mr. DeLeon and Mr. Kabir.  It originated with*

23   *the informant.  Therefore, we're not going to consider that*

24   *piece of evidence as evidence showing the existence of an*

25   *illegal agreement and a conspiracy to materially assist or to*   10:26

1  *engage in terrorist acts in Afghanistan.*

2       That's essential to the defense case.  That's

3  defending the case.  That's the only way we can defend it.

4       THE COURT:  Well, the Government's case is -- well,

5  among many things in the Government's case is that -- just to      10:26

6  go with this example -- and there, I think, are many others --

7  is that Kabir was -- Mr. Kabir was counseling the other

8  defendants while he was in -- most of while he was in

9  Afghanistan but perhaps while he was in Germany as well, on how

10 to prepare.                                                       10:26

11      And so if I understand your argument correctly, if

12 the confidential source is testifying that the -- he went with

13 the defendants, the U.S.-based defendants, to a paint ball

14 range or a shooting range because they had said *the defendant*

15 *Kabir told us we needed to do this to prepare*, you want to      10:27

16 cross-examine that.  And that really has nothing to do with

17 entrapment.  Well, it may have something to do with entrapment,

18 but it doesn't have to do with entrapment of Kabir.  It has to

19 do with whether or not the confidential source is being

20 truthful about whose idea it was, for example.                    10:27

21      MR. AARON:  Correct.  There are a lot of things which

22 look like they could serve the purposes of both an entrapment

23 defense and the discrediting of the informant and the proof

24 that the acts and statements supposed to be attributed to

25 Mr. Kabir or affirmed by Mr. Kabir should not be, that that's     10:27

 1    correct.

 2            THE COURT:  Because I -- all right.  I think I

 3    understand your position.

 4            On that point, did you want to add anything,

 5    Ms. DeWitt?                                                    10:28

 6            MS. DEWITT:  I think Mr. Grigg does.  He's so much

 7    more eloquent than me.

 8            Your Honor, the bottom line here is we're not arguing

 9    that the defendant cannot challenge the sufficiency of the

10    evidence.  We are not arguing that he can't put on a defense.  10:28

11    What we're saying is that he can't put on an entrapment

12    defense, and he cannot put on evidence that in this case would

13    clearly go only to --

14            THE COURT:  Only to.

15            MS. DEWITT:  -- a derivative entrapment defense.       10:28

16            THE COURT:  But there's a lot of evidence -- and I

17    think the example that we just explored is one where it could

18    be interpreted as going to more than one type of defense.

19            MS. DEWITT:  There certainly are instances, Your

20    Honor, where you're going to have to make those calls at trial, 10:28

21    where it could go to the sufficiency of the evidence.  But

22    there is also -- I would submit there is going to be instances

23    where this is clearly an effort by the defense to backdoor an

24    entrapment defense and to backdoor evidence that is not

25    relevant, that is confusing to the jury, and then is aimed,    10:29

1    essentially, at jury nullification or to inflame the jurors.

2            So all I'm saying is there does not appear to be --

3    other than strictly challenging the evidence and the

4    sufficiency of the evidence -- much ground here; although,

5    there may be some where there's an overlap, in introducing        10:29

6    evidence by Mr. Kabir that really isn't, truthfully, an effort

7    to get in derivative entrapment defense.

8            THE COURT:  But there is -- the Government's case --

9    well, you both know your cases, and I don't -- I'm never

10   comfortable saying, *I think this is what your case is*, but my    10:29

11   understanding is that the Government is taking the position

12   that Mr. Kabir was the leader of this conspiracy.  And so to

13   the extent that the Government is trying to prove that at

14   trial, and the confidential source -- and my understanding is

15   the Government hasn't even made a decision if he's going to        10:30

16   testify.  Have you yet?

17           MS. DEWITT:  No, Your Honor.

18           THE COURT:  So if he testifies, he's going to be

19   subject to cross-examination as to that principle, that

20   Mr. Kabir was the leader and was guiding the co-defendants.        10:30

21   And I don't think that goes only to entrapment.

22           MS. DEWITT:  It may not in certain instances, Your

23   Honor, but it also -- whether or not the defendant is guilty of

24   a conspiracy has -- the evidence relating to what the CHS did

25   separate and apart from him is not relevant to the issues of       10:30

1  guilt.

2          THE COURT:  I think I understand both sides'

3  positions.

4          Did you wish to be heard further on this point --

5  well, not this point, but this motion?                    10:31

6          MR. AARON:  Yes, Your Honor.

7          Your Honor, I object to the Government's argument

8  that this is an attempt by the defense to backdoor an

9  impermissible defense.  I object to the delig --

10          THE COURT:  Delegitimization.                     10:31

11          MR. AARON:  Thank you.  Of the defense --

12          THE COURT:  Don't ask me to do that again.  I'm not

13  sure I could pronounce that word again.

14          MR. AARON:  Once was enough.

15          I object to that in this motion, and we've seen it   10:31

16  throughout this entire case.

17          We're entitled to defend him.  It's our

18  responsibility to defend him.  There is nothing that is

19  improper in us saying, *We want to challenge this evidence and*

20  *refute it,* and to show that the informant, or any other    10:31

21  Government witness, is a liar.

22          Your Honor, I would also point out that on Point 2 of

23  my opposition to the Government's motion in limine I had a

24  section entitled, *Mr. Hammad's entrapment of Mr. DeLeon makes*

25  *the alleged co-conspirator statements of Mr. DeLeon admissible*   10:31

1    *against Mr. Kabir.*

2          I don't believe that the Court issued a tentative on

3    that.  And basically, the problem that we have is if Mr. DeLeon

4    is entrapped, then he's not a conspirator, so he can't conspire

5    with Mr. Kabir.                                                    10:32

6          I'm aware of *Peralta* and the cases that say if you

7    have conspirators on trial and one is acquitted, you don't go

8    backwards and say, *Because Joe was acquitted, Bill, that he*

9    *conspired with, Bill can't have the statements that Joe made*

10   *introduced against him*.                                         10:32

11         Because that would basically mean anytime you had a

12   conspiracy trial and any defendant was acquitted, that you'd

13   have to go back and unravel the entire thing and see that each

14   conviction did not rest on that acquitted individual's

15   statements.                                                       10:32

16         The difference between an acquittal and entrapment is

17   of moment here.

18         If you have an acquittal, you don't know why that

19   person was acquitted.  There could have been strong evidence,

20   there could have been clear and convincing evidence of guilt,    10:33

21   and the jury could have decided it's just not sufficient.

22   There could have been any number of reasons.

23         THE COURT:  But if you -- and I thought I had cited

24   this case in my tentative, but it looks like I didn't.  But if

25   you look at *United States v. Gurrola,* which is 333 F.3d 944,   10:33

1    that's a case that was tried in front of Judge Baird.  And one

2    of the defendants was convicted; one, the Court denied a -- let

3    me see if I have the facts right -- denied a -- Labrada was, I

4    believe, convicted.  Ortega was denied and -- maybe both of

5    them were denied an entrapment defense.  But the Ninth Circuit        10:34

6    reversed as to Ortega and sent it back for retrial, saying

7    that, you know, the evidence -- well, in that case, saying

8    there was no evidence of predisposition.  But in any event,

9    that there should have been an entrapment defense.

10           And I think that the outcome in that case shows that        10:34

11   even if you have one defendant who was potentially entrapped

12   and another who was not, your argument that that means that the

13   statements of one are not admissible against the other would

14   fail.

15           MR. AARON:  Your Honor, I'm sorry.  What's the case?        10:34

16           THE COURT:  *Gurrola*, G-u-r-r-o-l-a.

17           But I'll look at -- I will address that further.

18           MR. AARON:  And the reason I wanted to bring that to

19   the Court's attention is because the difference between an

20   acquittal and entrapment is different.                               10:35

21           Entrapment is kind of like a -- it's like a

22   suppression issue.  The whole point of it is to punish the

23   Government for its improper actions.  It's not simply a

24   sentencing mitigator.  It's a complete defense, and it's

25   designed to punish the Government.                                   10:35

1          Unlike an acquittal, which is just -- if someone is

2     acquitted, that vindicates the Government's role in bringing

3     the case.  The Government's role, whether or not someone is

4     acquitted, is that justice be done.  And we can't speculate as

5     to the reasons of an acquittal, and it is not as punitive as          10:35

6     entrapment is.

7          That's all the argument I have on that motion, Your

8     Honor.  Thank you.

9          THE COURT:  Do you wish to address the *Peralta* or

10    *Gurrola* issue?          10:35

11         MS. DEWITT:  Yes.

12         As we already have set forth in our reply brief, his

13    argument here, essentially, it basically turns the law on its

14    head because the whole presumption behind an entrapment defense

15    is that the person is admitting that they were a          10:36

16    co-conspirator.  And by doing so, essentially they are

17    admitting that statements made during the course of that

18    conspiracy are co-conspirator statements.

19         And putting his equitable argument aside, there is

20    simply no case law that suggests that that's an appropriate          10:36

21    remedy in terms of how one treats those statements that are

22    made during the course of that conspiracy.

23         In fact, you could never do that because you'd have

24    to wait until the end of the trial to decide whether or not a

25    jury came to a conclusion about one -- the guilt of someone.          10:36

1          And even in those cases where a jury comes to the

2     conclusion that there is not an entrapment defense, there is

3     not even enough evidence of guilt, the courts have found that

4     the co-conspirator statements still come in.

5          So I'm not familiar with the case that you're citing,     10:36

6     but it sounds like it further supports the conclusion that

7     these are co-conspirator statements.  And those issues as to

8     whether there is or isn't an entrapment defense, whether

9     they're even charged in the conspiracy or not, whether there is

10    sufficient evidence of guilt, they're simply not relevant to    10:37

11    that analysis, to the analysis of whether -- to the

12    admissibility of those statements.

13         MR. AARON:  Your Honor, I believe that the Government

14    chose a fundamental misunderstanding of the law.

15         You can deny committing an offense and have an             10:37

16    entrapment defense at the same time.

17         For example, in this case you could say, *Hey, there*

18    *was no agreement to conduct a conspiracy, but if you find such*

19    *an agreement, we were entrapped into doing it by the informant.*

20    It's not mutually exclusive.  I -- yes, that is true.  You can  10:37

21    run an entrapment defense while you are admitting the guilt for

22    the substantive offense; that part is correct.

23         THE COURT:  All right.  Let's move to the last

24    motion.

25         On Friday afternoon, the defense --                        10:37

```
 1            MR. THOMAS:  Your Honor, did you want me to argue?
 2            THE COURT:  Oh, I'm sorry.
 3            MR. THOMAS:  And this is just to agree.
 4            THE COURT:  All right.  So are you just saying,
 5   Ditto?                                                        10:38
 6            MR. THOMAS:  No, Your Honor, because the analysis is
 7   different.  It's much more pointed with respect to Mr. DeLeon.
 8   And the Court hit the nail on the head with respect to both
 9   points I'm going to make.
10            Number one, it's too early to rule on this because    10:38
11   the evidence hasn't come in.  The Government gave its proffer
12   of what its evidence is.  I gave a proffer as to what we
13   believe the defense evidence is.  If the jury believes them,
14   they win.  If the jury believes me, we win.  That's why we have
15   trials, because jurors have to make determinations of fact.     10:38
16            An entrapment defense is an affirmative defense.  It
17   adds -- once we raise some evidence, it adds elements that the
18   Government can prove predisposition and lack of inducement
19   beyond a reasonable doubt.
20            THE COURT:  Right.                                     10:38
21            MR. THOMAS:  Those are factual issues.
22            THE COURT:  There are many -- I'm sorry for
23   interrupting you.
24            There are many cases that say that what the district
25   court should do once some evidence is introduced at trial, is   10:38
```

1    give an instruction -- excuse me, a special verdict for the

2    jury to decide both of those questions.

3            MR. THOMAS:  That's right.  And that's exactly what

4    we're going to propose.

5            Now, with respect to my second issue, the Court also          10:39

6    hit the nail on the head, and it is not the number of contacts

7    between my client and the CHS or what was said.  It's the

8    timing of it.  And the Government raises a whole long laundry

9    list of things that it thinks my client made admissions to or

10   acts that he did, but it is completely devoid of any argument          10:39

11   as to timing.

12           Mr. DeLeon met the CHS in February of 2012, and

13   99 percent of the things the Government cites happened after

14   that.  So for the Government to somehow argue that my client's

15   plan for terrorism was well in the works before he met the CHS,        10:39

16   they certainly haven't proffered any evidence of that.

17           As a matter of fact, the only thing that the

18   Government knew about my client, before he met the CHS, was

19   that he converted to Islam and he met Kabir.  Those are the

20   only two things they knew about him.  Everything else came from        10:40

21   the CHS.

22           So it's obvious --

23           THE COURT:  I think that the Government is about to

24   stand up and disagree with that, and I think that I set forth

25   in the tentative a number of things that the Government has            10:40

1  proffered evidence that they'll show at trial that took place

2  before your client met the CHS.

3         MR. THOMAS:  I highly doubt it, Your Honor.  They

4  might suggest it, but the timing is not going to bear itself

5  out with the evidence.  As a matter of fact, when the

6  Government sent their CHS to meet my client at the mosque, I

7  don't know if you saw the first report that the CHS gave the

8  Government about Mr. DeLeon some six or seven weeks after they

9  met my client.

10        *The CHS does not believe DeLeon possesses a threat of*

11 *violence to the U.S. or overseas.*

12        That sounds like lack of predisposition.

13        *While he's very religious, he's fairly new to the*

14 *religion.  His strict appearance is not uncommon.  He appears*

15 *to be rational, somewhat caring.  He's very career-minded and*

16 *focused on school and acquiring his degree, and then joining*

17 *the professional ranks in Saudi Arabia.*

18        The CHS's assessment was that DeLeon may be

19 sympathetic and supportive of those wishing to carry out Jihad,

20 but he does not currently aspire to be a Jihadist himself.

21        That is point-blank evidence of lack of

22 predisposition, and that came from the Government's agent to

23 his handler shortly after meeting Mr. DeLeon after February of

24 2012.  Everything else the Government cited happened after

25 that, and it's our argument that it happened at the behest of

10:40

10:40

10:41

10:41

10:41

1   the CHS:  The paint-balling, the going to the gun range, these

2   statements about Anwar al-Awlaki and the radical nature of his

3   lectures, the things about how this is offensive Jihad and not

4   a defensive Jihad, and, no, you have to drop out of school.

5   You don't need to have your degree to go to heaven or to

6   paradise.

7           All these things were at the behest of the CHS, and

8   he took -- he preyed upon the naiveté of Mr. DeLeon and his

9   desire to work off some charges for his drug dealing, and tried

10  to turn him into a terrorist for ten months, from February

11  until November -- nine months.

12          And so all of these acts that the Government pointed

13  to, and all these statements and things that were being

14  recorded by the CHS, that's all after Mr. DeLeon met the CHS.

15          So, you know, it almost defies credulity for the

16  Government to say that this was well in the works, when they

17  didn't know anything about him before they put the snitch in

18  place.  All they knew was that Santana had some problems at

19  LAX; they sent the snitch in to focus on Santana, and then the

20  snitch comes back and says, *Oh, there's this fresh meat,*

21  *DeLeon, in the mosque.  Maybe I can convert him,* and the

22  Government says, *Yeah, go ahead*, and they do.

23          That's our defense.  If the jury believes that, that

24  is point-blank entrapment.

25          So I can't really put it all in in a context before

10:42

10:42

10:42

10:43

10:43

1    the trial to get you to understand that that's what the jury

2    will find.  But if the jury does find that, I'm sure Your Honor

3    will agree that we have met some evidence for the entrapment.

4              THE COURT:  Right.  But I am concerned -- all right.

5    I understand your position.

6              Do you wish to respond?

7              MS. DEWITT:  Very briefly, Your Honor.

8              Again, my point in raising this here was simply to,

9    again, emphasize the fact that there is evidence that the

10   Government has submitted, contrary to the claims here.  There

11   is evidence, and it's sworn and it's supported, and it shows

12   the timeline.  It shows statements by his client in his own

13   words.  It shows that, clearly, the CHS, who was trying to be

14   honest and make an initial assessment of DeLeon, which, when he

15   learned more, learned that he was wrong, and that the evidence

16   clearly shows, by his client's own sworn and recorded words,

17   that he invited the CHS into a preexisting conspiracy.

18             But my concern that I'm raising here, Your Honor, is

19   that Mr. Thomas is making all these allegations about what he's

20   going to introduce at trial and what he's -- you know, he's put

21   his best foot forward here, in terms of opposing this motion in

22   limine.  All of these statements directly contradict what he

23   concedes is his client's honest statements at a proffer -- at a

24   proffer session.  His client directly contradicts all of the

25   things that he's saying in this unsupported opposition.

10:43

10:43

10:44

10:44

10:44

1          And, you know, again, defense attorneys get to make

2    arguments on behalf of their clients.  They get to use

3    evidence, and they get to make arguments about that evidence,

4    but they don't get a blank slate.  They don't get to say, *Black*

5    *is white* when they know that black is not white.                    10:45

6          And that's the point that I'm making here, is that

7    given that you have no actual evidence in support of the

8    opposition here, and given that we have now a proffer statement

9    that's put at issue that says exactly the opposite, you know,

10   the Government is in an impossible situation.                          10:45

11         There is no reason to allow an entrapment defense

12   based upon what's currently before the Court.

13         THE COURT:  In terms of what was said in the

14   proffer --

15         MS. DEWITT:  Exactly.                                           10:45

16         THE COURT:  -- session.  All right.

17         Well, before we move on to the last motion, I guess

18   it would be -- probably be best for the Government to contact

19   Mr. Driggs to see if he's available on Thursday.

20         MR. THOMAS:  I meant to.                                        10:45

21         THE COURT:  Are you available on Thursday?

22         MR. THOMAS:  I have two depositions on Thursday, a

23   morning and afternoon.  I'm wide open Friday.

24         THE COURT:  I have a motion to suppress hearing on

25   Friday that counsel thinks will take all day.                        10:45

1          MR. THOMAS:  Well, Your Honor, another issue is we

2     really wanted to wait for the transcript.  And we do, I think,

3     already have a hearing on the 23rd for the Daubert hearing.

4          THE COURT:  I really don't want to put this off that

5     long.  Let's go off the record for a moment.                    10:46

6               (Discussion was held off the record.)

7          THE COURT:  All right.  How about next Monday

8     afternoon?

9          MR. THOMAS:  That's open, Your Honor.

10         THE COURT:  At 2:30?  2:00 even?                            10:47

11         MS. DEWITT:  That's fine with us, Your Honor.

12         MR. AARON:  I have duty that day at 3:00, but if it's

13    at 2:00 I don't anticipate that it would be that long of a

14    hearing.

15         THE COURT:  No.  Maybe you can get somebody else in        10:48

16    your office to cover your duty if it does.

17              And will you contact Mr. Driggs?

18         MS. DEWITT:  We will call him as soon as we get out

19    of court, Your Honor, to confirm his availability.  2:00 on

20    Monday.                                                         10:48

21         THE COURT:  Monday, a week from today.

22         MS. DEWITT:  Maybe we will be able to submit a

23    declaration ahead of time, if we get one from the Court, and

24    that may expedite the hearing, as well.

25         THE COURT:  All right.  Thank you.                         10:48

1          So the last motion, and as I started to say, the

2     defense filed a supplemental -- I suppose the word *disclosure*

3     was meant to be in there -- regarding the testimony of

4     Victoroff and Sageman.

5          At this point, I'm inclined to grant the motion to          10:48

6     exclude the testimony of Dr. Victoroff.  The proposed testimony

7     of that witness goes to the defendant -- defendant Kabir's

8     seizure -- broadly speaking, the seizure disorder.  The

9     supplemental disclosure adds pretty much nothing other than to

10    say that, you know, there's been an examination late in May,     10:49

11    that the witness would like to do further testing.

12         But the original opposition to the motion, and I'm

13    very disturbed of the lateness of the supplemental disclosure;

14    although, on the other hand, it says so little.  But, you know,

15    the gist of the opposition -- and this is not the first time     10:49

16    this issue has come before the Court -- is that the Government

17    turned over its discovery in this case so late that the defense

18    has not been able to comply with the Court's orders and

19    designate its experts.  And then, to a certain extent, the lack

20    of a budget last year, until October, prevented the defense      10:50

21    from getting funding or making a decision.

22         You know, the argument about the discovery just has

23    no bearing on Dr. Victoroff.  The defense did not need the

24    Government's discovery in order for Dr. Victoroff to do an

25    assessment of Mr. Kabir's neurological issues.  So that's just   10:50

1   utterly non-persuasive.

2          And, you know, the timeline in this case is that

3   Kabir's first appearance in this Court was December 14th, 2012.

4   He was arraigned on the First Superseding Indictment

5   December 19th, 2012; trial was set for February 5th, 2012.          10:50

6   After many continuances and hearings, it was moved to July 1st,

7   and now it is set for August the 12th.

8          The first date, I think -- the very first date that

9   was set for defendants to disclose and file expert witness

10  designations was -- and I don't think this was the first date,     10:51

11  but was September the 30th, 2013, and there was no compliance.

12  And then that deadline was continued to February 2014, and the

13  notice of experts that was filed on 2/14/14 gave no information

14  about the nature of their anticipated testimony.

15         I ordered defendant Kabir to supplement that            10:51

16  disclosure on April 25th, and it wasn't done by that date.

17         A supplemental expert notice was filed on May 2nd,

18  but no further information was given.

19         Again, there were just complaints about the volume of

20  discovery.  But as to Victoroff, that does nothing to explain      10:51

21  why he needed the discovery to opine about the seizure

22  disorder.

23         So I am inclined to grant the motion as to Victoroff.

24         The supplemental disclosure that was filed last

25  Friday, which really gives the Government no opportunity to         10:52

1   respond, as well as, you know, assuming that the Court -- well,

2   it's just untimely.  Although, obviously, I reviewed it.

3          As to Sageman, says nothing other than Sageman will

4   respond to what the Government's expert will opine, and we

5   haven't seen his report yet.  So I will listen to argument as          10:52

6   to Sageman, but the trial date is not going to be moved again.

7   For a number of reasons, it cannot be moved again.  And I don't

8   see anything else in terms of a plausible remedy here but to

9   exclude Dr. Victoroff's testimony.

10         Mr. Aaron?                                                      10:53

11         MR. AARON:  Your Honor, the point of having these

12   trials is to determine justice, is to be fair to all parties.

13   It's not to accommodate the Government's calendar or the

14   defense calendar.  That's why we're here.  We're here to do

15   justice.  We're not here to make a calendar.                         10:53

16         THE COURT:  Mr. Aaron, I don't need a lecture about

17   my -- the purpose of trials.  But one of the things in

18   obtaining justice for both sides is to do things in a timely

19   manner, that, when those rules are enforced as to both sides

20   consistently, is a means of getting to justice.                      10:53

21         MR. AARON:  Absolutely, Your Honor.  And we wish very

22   much not for special treatment but for treatment that any other

23   litigant would get.  And if I can explain briefly what's going

24   on here.

25         Your Honor, we are not in the same position as the             10:54

1  Government.  We do not have the same resources.  We do not have

2  the same funding.  We do not have the same staffing.  We do not

3  have the same indulgence from law enforcement agencies or other

4  administrative agencies.  We do not have any of that.

5       I have one lawyer with me.  I have one lawyer who                10:54

6  does sometimes help with the filing of motions, particularly

7  the ones that might come up on appeal.  I have one investigator

8  on this case.

9       In the meantime, while all of this was going on, the

10  entire time that we've had this case, Your Honor, I've been       10:54

11  managing an office.  I've had two other trials, almost three.

12  I've had a full caseload.  We've had budget problems.  We did

13  not even have approval to hire these experts until January.

14       We do need -- despite what the Court may think, and I

15  don't know what experience the Court has had in working on the   10:54

16  defense side of the table or the Government has had working on

17  the defense side of the table, but I can tell you, and I can

18  get affidavits from other defense attorneys, because it's just

19  part of the standard practice that you look to see the evidence

20  the Government has, and you try and capture that evidence.         10:55

21       There has been a lot of evidence which we have

22  received from the Government that we have turned over to

23  Dr. Victoroff, which I believe he would say is essential.  And

24  the amount of discovery that we've had to deal with is vitally

25  important in this case because, Your Honor, we do not have the    10:55

1    resources to contact Dr. Victoroff, to go with him to MDC, to

2    send the material, when we are dealing with other things.

3            Just -- let's just consider what happened when the

4    Government filed its motion on May 12th.  Let's just consider

5    what happened since then.                                            10:55

6            On May 22nd, it told us -- it told us that it would

7    be using a new and different expert instead of one of its

8    previous experts.  So we had to deal with a new expert witness

9    disclosure by the Government after it had filed this motion to

10   exclude our expert witness disclosure.                               10:56

11           On that same day, they provided the new expert

12   witness's C.V. and the prior testimony.  That was a total of

13   57 pages.  On that date, and only on that date, despite all the

14   other orders from the Court, they finally said, *Yes, the*

15   *amounts so far that Dr. -- Mr. Coleman has been paid is over a*     10:56

16   *million dollars since 2003.*  We only discovered that then.

17           On that date, they told us that they would provide

18   another witness disclosure from Mr. Coleman.  They didn't know

19   when.  They thought it might be later in June, but they didn't

20   know when, and they didn't tell us what it would contain.           10:56

21           So when you're considering what happens with

22   Dr. Sageman and Dr. Victoroff, you need to remember, please,

23   these discovery problems.

24           But it doesn't end then.

25           On the 29th, just seven days later, the Government         10:56

1    provided a BluRay disk with more media discovery, discovery

2    that had been available to them since Mr. Santana's arrest in

3    November 2012.  It's vitally important to remember the dates

4    that they had this discovery because they've had it for over a

5    year.  They have been able to examine it for over a year.  They          10:57

6    give it to us when we're scrambling to get our experts prepared

7    for trial that starts in 58 days.  How unfair is that?  No

8    civil litigant would ever have to do that.

9            On the 29th, they provided digital discovery and a

10   forensic examination by the Government expert into Mr. DeLeon's          10:57

11   phone that, again, they had since November of 2012.

12           On the 29th of May, again they provided more

13   discovery related to the confidential informant.  This time,

14   Your Honor, this discovery they even had before that.  This

15   discovery they had from May -- I'm sorry, from June 2011 to             10:57

16   January 2012.  Even before then, they had that discovery, and

17   they didn't provide us more than 17 months later.

18           Then the next day, on the 30th, we receive almost 600

19   pages of discovery, records of the defendants that have been in

20   the Government's possession for some time, interviews of new            10:57

21   witnesses, and a CD of the jail calls of one of the defendants

22   from March 2013.  And, Your Honor, I have a copy of that

23   discovery letter, if the Court wants to see it.

24           Despite this massive onslaught of new discovery, I

25   made every effort to provide the Government new expert witness          10:58

1    information.  I talked with Dr. Sageman myself, and I told him,

2    *Even though you only have the preliminary notice*, because he

3    told me, *I need the final --*

4              THE COURT:  You need to speak more slowly.

5              MR. AARON:  *I need the final witness disclosure.  I*          10:58

6    *need to know what this guy is actually going to say before I*

7    *can rebut it.*

8              Well, that's just common sense.

9              I said, *Doctor, even though you only have the*

10   *preliminary notice, what could you say, knowing that they may*          10:58

11   *come up with additional information later on?  What could you*

12   *just say based on this*?

13             He told me, and I communicated that to the

14   Government.

15             Despite all this discovery that both Ms. Viramontes          10:58

16   and I have been wrestling with, she tried to contact

17   Dr. Victoroff several times.  I tried contacting him.  I didn't

18   know that he had actually seen Mr. Kabir on May 29th.  We

19   didn't know that because, unlike the Government witnesses, our

20   witnesses are not our employees, they're only our consultants.          10:59

21   They have other jobs, other teaching and other writing

22   commitments.  So he didn't contact us, for whatever reason,

23   until the 4th, and I personally spoke with him.

24             Once -- I'm sorry, it was the 5th.

25             Once I spoke with him, I prepared the expert witness          10:59

1   notice, and I provided that notice.  And I have a copy of that

2   notice, as well, if the Court needs it.  Although from the

3   Court's comments, I believe that the Court has already read it.

4          So in order for our experts to render their opinions,

5   in order for us to provide those opinions to the Government, we      10:59

6   need to have the discovery from the Government.  Just to say,

7   *You know what, Dr. Victoroff, go in there and do an*

8   *examination*, it's meaningless, Your Honor.

9          We have to say, *We think this is what the Government*

10  *will show.  We want you to go into an examination and see if*       11:00

11  *there is anything to support a defense to that.*

12          In order to --

13          THE COURT:  But the vast majority of the discovery in

14  this case, how could it relate to whether or not your client

15  has a seizure disorder?  And how does that relate to, for           11:00

16  example, his mens rea?

17          MR. AARON:  That's absolutely right, Your Honor.  The

18  vast majority of the discovery in this case does not relate to

19  that.  That's absolutely true.  But we don't know that until we

20  get it, and we don't know it until we've read it.  And             11:00

21  sometimes, Your Honor, it only takes one, two, three, four or

22  five pages.  And I will get to that in just a minute.

23          I have provided specific discovery to the request for

24  some time since January 17th of this year.  I've sent no less

25  than 16 requests for discovery productions to the Government,       11:00

```
 1   many of them containing numbered requests for various items.

 2   Some, the Government has complied with.  Some requests the

 3   Government has simply ignored.

 4           I wrote a 23-page letter detailing our requests, the

 5   outstanding requests, and setting forth a timeline from June --   11:01

 6   from January 17th, 2014 up to the present.

 7           And I have a copy of this letter, if the Court wants

 8   to review that as well.  I've even got a copy of the

 9   Government's response because I'm not trying to hide anything.

10   I just want fair and equal treatment.                            11:01

11           We're having continuing problems getting discovery.

12   And one of the things, Your Honor --

13           THE COURT:  Well, you're telling me you have too

14   much, and you're telling me you don't have enough.

15           MR. AARON:  Yes.  Yes.                                   11:01

16           THE COURT:  But you're not telling -- and you're

17   telling me that you have to review every single piece of paper

18   -- well, that's figuratively speaking since most of it is

19   electronic.  And until you've done that, you can't give --

20   Dr. Victoroff cannot be prepared to examine.                     11:01

21           That defies belief.  There are large quantities of

22   discovery in this case that I think you could easily perceive

23   at the outset are not going to relate to what Dr. Victoroff

24   would need before he examines your client.

25           MR. AARON:  You would think so, Your Honor.              11:02
```

```
 1              THE COURT:  I do think so.

 2              MR. AARON:  Much to my surprise -- and again, I have

 3    the discovery letter if the Court wants to see it.

 4              THE COURT:  I'm not going to review it now.  I've

 5    reviewed plenty in connection with today's hearing, and you          11:02

 6    could have submitted this in connection with your opposition,

 7    but you did not.

 8              MR. AARON:  I did not, Your Honor, because I was

 9    simply too busy trying to keep up with the massive onslaught of

10    discovery.  And one of the interesting things --                     11:02

11              THE COURT:  Well, this is not my only case, either.

12              MR. AARON.  I understand that.

13              THE COURT:  And I have been in -- I don't know --

14    trial a few times this year as well.

15              MR. AARON:  I understand that, Your Honor.                 11:02

16              THE COURT:  I understand that the role of a trial

17    judge is different than the role of the trial attorney, but I'm

18    just not inclined -- well, I'm just not necessarily persuaded

19    by the fact that you've had two trials this year.  I've

20    probably had ten.  I'm sure Government counsel have other            11:02

21    things to do as well.  And the Government bears the burden of

22    proof.

23              MR. AARON:  Your Honor, it's not just the two trials,

24    it's all of the other factors I mentioned as well.  And I

25    understand that the Court is overworked.  I know that the Court      11:03
```

```
 1   is --

 2            THE COURT:  We're all overworked.

 3            MR. AARON:  Right.

 4            THE COURT:  That's part of our jobs.

 5            MR. AARON:  Right.  And if I was defending the Court,      11:03

 6   I would certainly have many things to say on that point.  But

 7   I'm defending Mr. Kabir, and I have to --

 8            THE COURT:  I understand that, and I understand --

 9   well, the responsibilities that you bear, you know, is

10   incredibly brave, and I appreciate that.  And I appreciate that   11:03

11   the arguments you're making arise out of that profound

12   responsibility.

13            MR. AARON:  Your Honor, can I point out two specific

14   instances?

15            THE COURT:  Yes.                                          11:03

16            MR. AARON:  Two specific instances:  We have asked

17   for the plea agreements for the cooperating witnesses.  We have

18   asked for that, I believe, in our original discovery demand

19   letter in December of 2012.  The Government has had -- the

20   Government negotiated those plea agreements.  They know exactly    11:04

21   what's in them.  They've had them, and they've kept them from

22   us for weeks.  I've ask them again and again and again.  And

23   each time, I've had to set aside attorney time for either

24   myself or Ms. Viramontes to ask them, to write them e-mails, to

25   call them up, whatever.  We've asked for weeks.  Only this last    11:04
```

1    Friday did they agree to provide them.

2         THE COURT:  But Mr. Aaron, that does not go to what

3    -- again, what Mr. -- what Dr. Victoroff needs to examine your

4    client.  Those plea agreements -- tell me how those go to what

5    Dr. Victoroff needs to conduct the examination of your client          11:04

6    and prepare a report.

7         MR. AARON:  That's correct, Your Honor.  That goes to

8    the delay in our being able to get this information to other

9    information to him and communicate with him.  The Court's

10   absolutely right.  Those plea agreements are not relevant, so          11:04

11   far as I know.  I haven't yet seen them, but they're not

12   relevant to Dr. Victoroff's examination.

13        What would be relevant might be his Army medical

14   records where they talk about his epilepsy.  We didn't get

15   those until May 30th from the Government.                               11:05

16        Your Honor, many times, many times we've requested

17   discovery again and again, and we've not gotten it.  So what

18   the Government does here is, they've given us discovery late,

19   they've ignored discovery requests.  I've even written to them

20   saying, what -- Allen Chiu, for example, will write and say,           11:05

21   *Here's a discovery production*.

22        I'll say, *Well, what request does that respond to?*

23        Mr. Chiu, no response.  Completely ignored.

24        Even the *Brady* material that the Court had said back

25   in May that we should have, I said, *When are we going to get*         11:05

 1   *all of it*?

 2          And they said, *We don't know.  We're still looking.*

 3   *You've gotten the vast majority of it, but we'll get it to you.*

 4          And as I pointed out -- and you can see, if the Court

 5   wants to review the discovery letter from May 30th, you'll see          11:05

 6   that there's information there that they had from 2012 and

 7   2011, that they've had all this time.

 8          The advantage that the Government has is that they

 9   can look at information and evidence from 2012 and 2013 or

10   early in 2014.  They can look at it.  They can understand it.          11:06

11   They can give it to their experts.  And they can wait to

12   provide it to the defense until 58 days before trial.  And

13   that's exactly what they've done here.

14          And then when they do that, they say, you know what?

15   Because you didn't adequately process the information that          11:06

16   we've only given you 58 days before trial, or a month before

17   that, or two weeks before that, we're going to exclude your

18   expert.

19          And that's exactly what they're doing here.

20          THE COURT:  All right.  Let me let the Government          11:06

21   respond.

22          MR. GRIGG:  Thank you, Your Honor.

23          I'd like to sort of bring us back to the motions

24   before the Court on the experts.

25          Discovery has been voluminous since the beginning.          11:07

1    And as the Court may or may not be aware, even before the

2    detention hearing for this defendant, the magistrate judge

3    ordered the Government to have available discovery

4    pre-indictment, pre-detention hearing discovery.  The

5    Government had that available at the hearing.                    11:07

6          The defense has had more than substantial information

7    for a neurologist to make an assessment of the client and make

8    a report and make the finding.  And then for the defense to

9    explain to the Court -- so it can exercise its gatekeeping

10   function -- how the expert, the witness, arrived at his or her   11:07

11   opinions and how those opinions matter for the case.

12         And nothing that's been said today, as the Court has

13   noted, bears on Dr. Victoroff's ability or function in

14   preparing neurological assessment of Mr. Kabir.

15         Mr. Victoroff writes that -- excuse me.                    11:08

16         Defendant writes that Mr. Victoroff assesses that,

17   *After an unspecified head trauma, Mr. Kabir developed epilepsy.*

18         And we have no basis to understand when or how that

19   arose, or how that assessment was made.

20         *He appears to be someone who is hyperreligious, and*      11:08

21   *his interest in jihad seems to have increased.  He's a*

22   *psychotic.  He believes the West is responsible for all the*

23   *world's ills, and believes these things with absolute*

24   *certainty.*

25         Nothing about the contents of Ralph DeLeon's               11:08

1    cellphone, or the plea agreements for other defendants who are

2    not before the Court today, has any bearing on that

3    information.  Nor is there any basis to assess or understand

4    how Dr. Victoroff arrived at these decisions.  He talks about

5    tests but doesn't say what those tests were, what methods he          11:08

6    used to apply those tests, and he doesn't say what bearing that

7    has on any fact at issue in the case.

8            And all of the arguments about discovery don't matter

9    for Dr. Victoroff.

10           What seems to be the argument is that Dr. Sageman          11:09

11   can't do his function and therefore allow the Court to exercise

12   its gatekeeping role with respect to him because there is more

13   information that keeps coming forth.

14           The problem is, initially when Mr. Kabir made his

15   first filing that he styled as an expert notice, he indicated          11:09

16   that Dr. Sageman would testify -- I'm quoting from page 5 of 9

17   of Document No. 208 that's Mr. Kabir's filing on February 14th,

18   line 23:  *It's anticipated that Dr. Sageman will testify as to*

19   *the political, sociocultural and security aspects of terrorism*

20   *and terror networks in Afghanistan.  It is also anticipated*          11:09

21   *that he will testify as to the psychology of terrorists and*

22   *terror networks*.

23           On Friday, the filing by defendant Kabir said merely,

24   in essence, that Dr. Sageman was going to be an expert on Evan

25   Coleman.                                                            11:10

1          THE COURT:  That he's going to rebut the Coleman

2    testimony.

3          MR. GRIGG:  Without an explanation of how, without an

4    explanation of what the purported scientific analysis that

5    allows him to make a, quote, *review and assessment* of                    11:10

6    Mr. Coleman, how that functions, whether that's a valid,

7    applicable scientific test.  We have no basis to understand how

8    Dr. Sageman is making these assessments that obviously he's

9    already provided to defendant Kabir.

10          So the Government, with respect to Dr. Sageman, is           11:10

11    asking that the Court order defendant Kabir to make full Rule

12    16 disclosures.

13          Rule 16 doesn't just require the identification by

14    C.V. and generic statements that he's only a rebuttal witness,

15    it requires an explanation of the bases and the reasons on        11:11

16    which the expert arrives at his or her opinion.  And merely

17    calling Dr. Sageman on rebuttal is kind of hiding what it is

18    he's doing and how he's doing it, which is exactly the aspect

19    of his work the Court needs to assess to determine whether it's

20    admissible.                                                       11:11

21          As the Court may or may not be aware, this is a

22    witness who, as listed in some of the C.V. materials for

23    Dr. Sageman, has written various things about various aspects

24    of being an expert witness, about theories with respect to

25    individuals that were the subject of an assessment ten years       11:11

1   ago.  But there's no explanation of how any of those pieces of

2   information bear on this case.  And that's the problem.  We

3   don't know how this bears on this case.

4            And to a certain extent, if we want to call

5   Dr. Sageman a rebuttal witness, then he should be ordered                        11:11

6   excluded unless and until Evan Coleman testifies.  And then he

7   should only be permitted to testify as to the specific subjects

8   that Coleman testifies about.  And he should not be allowed to

9   opine independently about evidence in this case, except to the

10  extent that it is involved in Coleman's testimony.                               11:12

11           And the problem is, we have no information more than

12  we had earlier in this case.  We've gotten none.  And now we're

13  almost five months after Mr. Kabir represents that he's been

14  able to pay these experts.  We have nothing, no basis to

15  understand how Sageman will arrive at his conclusions.                           11:12

16           We expect he will sit here in trial and watch the

17  testimony and then say something when he's called, but we have

18  no basis to understand what scientific methods or what expert

19  methods he's using to make those assessments that he wants to

20  influence the jury with.  The point of having his testimony is                   11:12

21  to influence the jury to think about certain things.

22           Argument about that Dr. Sageman's view of the

23  relevance of some of the evidence in this case seems to be a

24  little bit improper and a little bit intruding on the function

25  of (A), the Court in determining what is relevant evidence, and                  11:13

1 (B), the province of the jury in assessing what weight to

2 assign to evidence.

3 The problem is we just don't know.  Neither the Court

4 nor the Government can say at this point what he will say, how

5 he got there, and what are the resources and materials on which

6 he relied to make his assessments.

7 For that reason, the Court should compel Rule 16

8 compliant disclosure.

9 And with respect to Dr. Victoroff, the Court should

10 exclude him as, (A), the defendant has not given a mental

11 health defense notice, within the meaning of Rule 12.2 and has

12 not provided any Rule 16 information with respect to

13 Dr. Sageman.  And even if he had, even if this Friday filing

14 qualifies, the information contained in there about Mr. Kabir's

15 psychoses and his current presentations, when it's assessed in

16 May 2014, almost a year and a half after this case ended, how

17 that's relevant in any way to an issue of fact before the jury,

18 is unclear.  There is no explanation in that.  And we'd submit

19 it's not.

20 And the problem here is the Court has already ruled

21 that a certain aspect of Mr. Kabir's treatments -- treatment,

22 excuse me, after his capture is not a proper subject matter for

23 the jury.

24 A neurologist assessing him now, of course, is

25 necessarily going to say, *Well, I don't know how he was before*

11:13

11:13

11:13

11:14

11:14

1   *I met him on May 29th* -- or whatever the date was.  Even

2   counsel wasn't aware when it was.

3          How does the present-sense impression that he gets

4   from a four-hour interview have anything to do with what

5   happened back in 2010 when Kabir first met DeLeon or Santana?          11:14

6   How does that have anything to do with Kabir's decision to

7   leave the United States in December of 2011?  How does it have

8   anything to do with Kabir's decision to go to Afghanistan in

9   July 2012?

10          I mean, there is no issue of fact for which the          11:15

11   assessments that he believes the West is responsible for all

12   the world's ills and believes that with absolute certainty,

13   where he is increasingly interested in jihad now, there is no

14   correlation to the evidence in this case.

15          And with that, the Government would submit, Your          11:15

16   Honor.

17          MR. AARON:  Your Honor, the sufficiency, or the lack

18   of sufficiency, of the proffer as to Mr. Sageman or

19   Dr. Victoroff, many of those things can be handled in

20   cross-examination.  That's what cross-examination is for.          11:15

21          In terms of the mental defense, I have not had

22   sufficient time to talk to Dr. Victoroff about that.  And the

23   Government is correct.  We have not, at this point, put notice

24   of the mental defense.

25          In terms of the Government's argument that our          11:15

```
 1    actions or anticipated use of Dr. Sageman is improper or that
 2    we're hiding what he's doing, again, that's a delegitimization
 3    -- I'm pleased I did manage to finally say that word -- it's a
 4    delegitimization of the defense again, and it's an ad hominem
 5    argument.                                                        11:16
 6            Your Honor, I would ask the Court, lastly, to
 7    consider this:  If the Court excludes two crucial defense
 8    expert witnesses, what is the harm to the Government versus the
 9    defense?
10            The harm to the Government is that they may have to    11:16
11    file a Daubert motion, if indeed they do file one a little bit
12    later.
13            The harm to the defense?  Mr. Kabir may spend life in
14    prison.
15            THE COURT:  I'm going to take -- well, I'm not going    11:16
16    to take under submission the DeLeon motion because I have to
17    have that hearing.  So that's essentially continued until next
18    Monday.
19            I will take under submission the motion as to the
20    entrapment defense.  I'm not inclined to change my mind, but I  11:17
21    just want to make a few changes in the order.
22            And I will take under submission the motion as to the
23    two experts.  But as to the defense counsel's last argument,
24    the Government isn't seeking an order excluding Mr. Sageman.
25            But I am -- I am just not persuaded by the argument     11:17
```

1   that has been presented as to Dr. Victoroff.  That motion is

2   under submission.  I'll issue a written order.

3            Anything else we need to take up this morning?

4            MS. DEWITT:  One quick issue, Your Honor.

5            It's come to our attention that Mr. Kabir's                11:18

6   investigator has gone to the house of the CHS in order to serve

7   a subpoena, which we understand is a subpoena for the pretrial

8   conference date.  And in the process of doing so, because the

9   CHS was not at home, the investigator went to the door, banged

10  on the door.  When he got no response, went to the windows and    11:18

11  banged on the windows, went away, and then came back later and

12  repeated this action.  Which, needless to say, because the CHS

13  was not home, was very frightening to his family who was at

14  home, his wife who was at home.

15           So I raise this because, one, I think the actions --      11:18

16  and I have no reason to disbelieve them -- are both

17  inappropriate, in terms of how the effort was made to serve the

18  subpoena.  But I query the propriety of even serving a trial

19  subpoena for a pretrial conference date.  And I don't know why

20  that would be appropriate or why that would be happening.         11:18

21           So I'm raising this with the Court to see if there is

22  some clarity that I can get on this issue.

23           THE COURT:  Mr. Aaron, do you know anything about

24  this?

25           MR. AARON:  I do.  We went and we served it, and the      11:19

```
 1   informant has served.  And one of the reasons is, we do
 2   anticipate motions on that date.  And if there are no motions,
 3   we would like him to be ordered back.  But we do anticipate
 4   that there's going to be motions on that date.
 5            THE COURT:  On the pretrial conference date?          11:19
 6            MR. AARON:  Correct.
 7            THE COURT:  That will require the presence of -- tell
 8   me what those motions would be.
 9            MR. AARON:  Well, we believe that there may be
10   additional motions regarding the entrapment defense and the   11:19
11   statements that he made to the other witnesses.
12            And if not, we wanted to make sure -- well, if there
13   are no motions, then obviously the informant can go on his way.
14   But if there are motions, we wanted to make sure that the
15   informant is going to be there.                               11:19
16            THE COURT:  Well, even if there's a motion by the --
17   first of all, I don't know -- I intend to rule that your client
18   is not entitled to raise an entrapment defense based on the
19   derivative entrapment issue.
20            So that would be my ruling.                          11:20
21            So I don't know what other motion there could be with
22   respect to that.  And I don't know what motion there could be
23   as to your client, that you would be subpoenaing the
24   confidential source to appear at the pretrial conference.
25            But if there is a need, can Government counsel accept 11:20
```

 1  a subpoena for the confidential source?

 2          MS. DEWITT:  Your Honor, if that will prevent the

 3  family from being harassed by defense counsel's investigator,

 4  we will absolutely accept service on his behalf.

 5          THE COURT:  All right.  Then let's do it that way.      11:20

 6  If you feel there's a need, on the basis of any motions that

 7  you file, then give the subpoena to Government counsel.

 8          MR. AARON:  Your Honor, again, I object to the

 9  Government's characterization of the defense as harassing,

10  improper, or being illegitimate in any way.                    11:21

11          THE COURT:  Well, Mr. Aaron, if an investigator is

12  banging on the windows, that doesn't sound appropriate to me.

13          MR. AARON:  We don't have any proof of that.

14          THE COURT:  We don't.  And I said *if*.  If that's

15  happening, I don't think it's appropriate.  So that's --      11:21

16  there's an easy solution here.  Rather than -- don't you agree,

17  and isn't it easier and cheaper for the public defender's

18  office, rather than having an investigator spend the time to go

19  to the house, whatever he or she is doing, to give the subpoena

20  to the Government?                                             11:21

21          MR. AARON:  Your Honor, I'm grateful that the

22  Government is willing to cooperate on that, and I wish they

23  were willing to cooperate on the other matters that I set forth

24  on my June 4th letter and my 16 discovery requests since

25  January 17 of 2014.                                            11:22

1          THE COURT:  These hearings would be a lot shorter if

2    we could, as Judge Takasugi used to say, take the mustard off

3    the hot dog.  Thank you.

4          MR. AARON:  Your Honor, I had a couple more matters.

5          THE COURT:  What else?                                11:22

6          MR. AARON:  My client is being held at CDC

7    temporarily now.  But one of the problems that he has is when

8    he's being taken to CDC, he's not given a kosher diet.  And as

9    a result, he doesn't eat.  And he hasn't eaten for, what he

10   said, I think, four days.                                   11:22

11         So we would like, when he is brought to CDC, if the

12   marshal's office could contact and make sure that he gets the

13   kosher diet there.

14         THE COURT:  All right.  I'll follow up on that.

15         MS. DEWITT:  Your Honor, I don't want to interrupt.    11:22

16   I generally tend to try to not get involved in those kinds of

17   issues, but the Bureau of Prisons has informed me, and they

18   actually asked if we would make sure that the Court know that

19   at MDC the reason Mr. Kabir's kosher -- his request for kosher

20   felafel food was denied is because he violated their rules in  11:23

21   the commissary, in ordering food that was prohibited for him

22   when he was on that diet.  He not only did that once, but then

23   was warned, but then apparently did it repeatedly.

24         So I bring this to the Court's attention only because

25   before we just, you know, immediately assume that they're     11:23

```
 1   somehow denying a defendant --
 2           THE COURT:  Well, I don't think it's a problem at the
 3   MDC anymore.  I don't think that's been the problem.
 4           MR. AARON:  Your Honor, we don't think that they're
 5   doing this intentionally.  We're not saying -- we're not          11:23
 6   accusing them of any bad faith doing this intentionally.  They
 7   just don't know that he should be getting a kosher diet.
 8           THE COURT:  This is at the CD -- this is at San
 9   Bernardino?
10           MR. AARON:  Correct.                                      11:23
11           MS. DEWITT:  But my point, Your Honor, is that it
12   actually is intentional.  It's intentional by the defendant
13   because he is not following the rules, and he himself is not
14   keeping himself to that diet and, therefore, expects to be able
15   to break the rules of the institution.                           11:24
16           I can't speak to CDC, but I know that that's true --
17           THE COURT:  That may have been -- I just need to
18   focus on what I need to focus on.
19           That may have been an issue in the past.  That issue
20   has now been resolved, and he is getting the kosher diet.  And   11:24
21   I don't think there have been any more reports of rule
22   violations for some time.
23           Are you talking about something that's happened
24   recently?
25           MS. DEWITT:  I'm not sure what the Court means by        11:24
```

1    *recently*, but I can say that it happened after the Court issued

2    an order.

3              THE COURT:  Oh, it did?

4              MS. DEWITT:  It issued an order for them to give

5    him -- and my understanding is, and I can get that further          11:24

6    information for the Court, or you can request it, but --

7              THE COURT:  I will follow up on that.  But I think

8    the issue right now is whether he's getting the kosher diet in

9    San Bernardino.  And this doesn't relate to what's going on in

10   San Bernardino, does it?                                            11:24

11             MS. DEWITT:  I can't speak to San Bernardino, except

12   I will say if he isn't willing and able to follow a kosher diet

13   at MDC, I'm not sure why he would be entitled to that at CDC.

14             But again, I don't really have a dog in this fight.

15   I just want to make the Court aware that that's -- that that's   11:25

16   why these actions have been taken, and it may be why it's been

17   taken at CDC too.

18             THE COURT:  All right.  What's the other issue?

19             MR. AARON:  The other issue, Your Honor, is that I

20   had talked to the Government about this.  I tried to reach some   11:25

21   sort of agreement with the Government, and the Government

22   suggested that we bring this issue to the Court.

23             The Government's estimate is 20 court days of trial.

24   So if we start on August 12th, that would be five weeks.  That

25   would mean that the Government --                                 11:25

```
 1              THE COURT:  Six weeks.  Four day trial weeks.

 2              MR. AARON:  Twenty court days.

 3              THE COURT:  Oh, I thought you said 24.

 4              MR. AARON:  I apologize.  So that would mean that it

 5    would end approximately on the 16th.                          11:25

 6              What I would like, Your Honor, is a date certain by

 7    which I could subpoena witnesses for the defense because we

 8    have some witnesses that may be coming from out of the country

 9    or from out of state.  And to have them come on August 12th and

10    have them wait five or six weeks is not reasonable.           11:26

11              THE COURT:  I can give you a date certain that the

12    trial will start.  I've done that.

13              In terms of when the Government's case would end, I

14    would suggest -- and I know you want to give your witnesses as

15    much notice as possible, but I would suggest that two weeks    11:26

16    into the Government's case, which would still give you about

17    three weeks notice for your witnesses, we'll probably be in a

18    better position to determine if the case is going more quickly

19    than expected.

20              MR. AARON:  There's some out-of-state witnesses that 11:26

21    that would not be a problem, a witness notice that short.

22    There is some witnesses that are out of the country that we may

23    have to arrange with foreign governments where we won't have

24    that luxury.  We would need more lead time than that.

25              THE COURT:  How long do you think it's going to take 11:27
```

1    you to put on your case?  A week?  Two weeks?

2              MR. AARON:  One week, four days.

3              THE COURT:  Okay.  Well, I don't know what to say,

4    other than your witnesses -- if you want to be on the safe

5    side, get them here a week before we think the Government's          11:27

6    case is going to end, in case it ends early.

7              MR. AARON:  What I don't want to have happen is the

8    Government's case ends dramatically early and the Court says,

9    *You're not ready to proceed; you rest.*

10             The problem that we have is that some of these             11:28

11   witnesses are refugees from Afghanistan.  They don't yet --

12   they are not yet nationals of any other country.  They don't

13   have the same travel documents that a -- some of our foreign

14   witnesses have European union travel documents, and they can

15   get here in as short as two weeks notice.  And others are          11:28

16   refugees, and I believe that we're going to have to talk to the

17   embassy and probably the host country to see if they will be

18   allowed to testify and return.  But if so, I am certain we will

19   need more lead time.

20             THE COURT:  Well, how --                                  11:28

21             MR. AARON:  We probably need 30 days.

22             THE COURT:  Then, you know, the best -- I mean, I

23   know that there is a lot of strategy in which order you put on

24   your witnesses.  And if you think you're going to finish your

25   case in a week, that doesn't give you a lot of flexibility         11:28

```
 1    about the order in which you call your witnesses to fill up
 2    time.  But --
 3              MR. AARON:  I would propose the following, Your
 4    Honor --
 5              THE COURT:  Well, Ms. DeWitt, what's the shortest at       11:29
 6    this point -- do you have any new information or a new estimate
 7    as to the length of your case in chief?
 8              MS. DEWITT:  Unfortunately, Your Honor, I do not.
 9              THE COURT:  So your estimate is still 20 days?
10              MS. DEWITT:  We're still going to make every effort        11:29
11    to make it shorter, but I think that's our best estimate at
12    this time.
13              THE COURT:  Do you think there is any chance it's
14    going to be less than three weeks?
15              MS. DEWITT:  No.                                           11:29
16              THE COURT:  All right.  So why don't you figure three
17    weeks, given it's probably going to take us a day -- well, it
18    probably won't take us more than a day to select a jury, given
19    that the parties have agreed for time qualification ahead of
20    time.  So the panel that we get should more or less be time        11:29
21    qualified.  There's still a lot of other issues, but I'm
22    optimistic we can pick the jury in a day, a full day.
23              So that gives us -- starting on maybe the second day
24    of the first week, why don't you plan for about three weeks,
25    Mr. Aaron.  At the worst, then you'd have your witnesses            11:30
```

```
 1   waiting around for a few days in Riverside, in August.

 2              MR. AARON:  So three weeks would be --

 3              THE COURT:  Early September.

 4              MR. AARON:  -- September 3rd.  Would it make sense,

 5   then, Your Honor, to have them come back that Monday,                11:30

 6   September 9th?

 7              THE COURT:  I'm not --

 8              MR. AARON:  To have the witnesses available on

 9   September 9th?

10              THE COURT:  Because that would be three weeks?           11:30

11              MR. AARON:  That would be three weeks and two days.

12              THE COURT:  That sounds about right.

13         I mean, I'm not -- I'm not going to say you've

14   rested.  I mean, if we have to take a couple of days off in the

15   middle of a long trial because there's an issue with witnesses     11:30

16   who -- well, I wouldn't do that to either side, if there are

17   issues with witnesses traveling who don't have -- who are

18   refugees.

19              MS. DEWITT:  We're not going to object.

20              THE COURT:  I've never done that, and I don't think     11:31

21   this is the trial where I'm going to begin.

22              MS. DEWITT:  I would ask, Your Honor, though, that if

23   they are planning on these witnesses coming and they are going

24   to all this trouble, that maybe we can get some discovery as to

25   who they are and what they plan to testify to.                     11:31
```

1          THE COURT:  That sounds like a reasonable request.

2          MR. THOMAS:  Your Honor, just one quick thing.

3          THE COURT:  Yes.

4          MR. THOMAS:  Your Honor, when Mr. DeLeon is

5    transported -- and, granted, this time they brought Mr. Kabir          11:31

6    to CDC and not my client, which was the opposite last time,

7    they don't let him travel with his discovery, and they don't

8    let him travel with his Quran.  I e-mailed the marshals this

9    week about the proposed transport.  They consented to allow

10   Mr. DeLeon to carry up to a couple inches worth of discovery,          11:31

11   so I got that issue covered.  But for some reason, he still

12   can't carry the Quran.  And I'm not aware of any of my

13   Christian clients that can't carry a Bible.  So I'm just not

14   sure of the rationale behind a Muslim not being able to carry a

15   Quran.          11:32

16          THE COURT:  I'll look into that.

17          MR. THOMAS:  All right.  Thank you.

18          THE COURT:  Thank you for bringing that to my

19   attention.

20          All right.  Thank you.          11:32

21                    (Proceedings concluded)

22                         -o0o-

23

24

25

1                        C E R T I F I C A T E

2

3                    DOCKET NO. EDCR 12-92 VAP

4

5            I hereby certify that pursuant to Section 753,
    Title 28, United States Code, the foregoing is a true and
6   accurate transcript of the stenographically reported
    proceedings held in the above-entitled matter and that the
7   transcript page format is in conformance with the regulations
    of the Judicial Conference of the United States.

8

9

10

11   /S/ Phyllis A. Preston        DATED:  June 12, 2014

12  Federal Official Court Reporter

13  CSR, FCRR

14

15

16

17

18

19

20

21

22

23

24

25