1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION-RIVERSIDE

4                              - - -

5           HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

6                              - - -

7    UNITED STATES OF AMERICA,        )
                                      )
8                        Plaintiff,   )
                                      )
9            vs.                      )   No. EDCR 12-92 VAP
                                      )
10   SOHIEL OMAR KABIR,               )
     RALPH KENNETH DELEON,            )
11                                    )
                                      )
12                       Defendants.  )
     _____)
13

14

15             REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

16                       Riverside, California

17                      Tuesday, July 1, 2014

18                           9:36 a.m.

19

20

21

22                PHYLLIS A. PRESTON, CSR, FCRR
                  Federal Official Court Reporter
23                United States District Court
                       3470 Twelfth Street
24               Riverside, California 92501
                       (951) 205-7959
25                     stenojag@aol.com

```
 1  APPEARANCES:

 2

 3  For the Plaintiff:

 4                          OFFICE OF THE UNITED STATES ATTORNEY
                            By:  SUSAN DEWITT
 5                               CHRISTOPHER GRIGG
                                 ALLEN CHIU
 6                          Assistant United States Attorneys
                            3403 Tenth Street, Suite 200
 7                          Riverside, California 92501

 8

 9

10  For Defendant Kabir:

11                          OFFICE OF THE FEDERAL PUBLIC DEFENDER
                            BY:  JEFFREY AARON
12                               ANGELA VIRAMONTES
                            Deputy Federal Public Defenders
13                          3801 University Avenue, Suite 150
                            Riverside, California  92501
14

15

16  For Defendant DeLeon:

17                          DAVID J. THOMAS
                            CJA  Appointed Counsel
18                          1500 Iowa Avenue, Suite 220
                            Riverside, California 92507
19

20

21

22

23

24

25
```

1                       I N D E X

2


3

    WITNESS:                                      Page
4


5

    **EVAN KOHLMANN**
6   DIRECT EXAMINATION BY MS. DEWITT                5
    CROSS-EXAMINATION BY MS. VIRAMONTES            49
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              TUESDAY, JULY 1, 2014; RIVERSIDE, CALIFORNIA

 2                              -oOo-

 3         THE CLERK:  EDCR 12-092(A) VAP, United States of

 4   America v. Sohiel Omar Kabir and Ralph Kenneth DeLeon.

 5         Counsel, please state your appearances.            09:36

 6         MR. CHIU:  Good morning, Your Honor.  Allen Chiu on

 7   behalf of the United States.

 8         THE COURT:  Good morning.

 9         MS. DEWITT:  Good morning, Your Honor.  Susan DeWitt

10   on behalf of the Government.  Also present in the courtroom is  09:36

11   Mr. Evan Kohlmann.

12         MR. GRIGG:  Good morning, Your Honor.  Chris Grigg

13   for the United States.

14         THE COURT:  Thank you.  Good morning.

15         MR. THOMAS:  Good morning, Your Honor.  Dave Thomas  09:36

16   on behalf of Ralph DeLeon who is here present with me.

17         THE COURT:  Thank you.  Good morning.

18         MS. VIRAMONTES:  Good morning, Your Honor.  Angela

19   Viramontes on behalf of Sohiel Kabir who is present in custody.

20   Also seated with me at counsel table is Jeffrey Aaron.    09:36

21         THE COURT:  Thank you.  Good morning.

22         All right.  On the calendar this morning is the

23   hearing pursuant to Daubert with respect to the testimony at

24   trial of Mr. Evan Kohlmann.  And I have read the supplemental

25   filing submitted by the Government.                       09:37
```

```
 1              I think we should begin this morning with
 2    cross-examination -- excuse me, with direct examination by
 3    counsel for the Government.
 4              Is that acceptable to both sides?
 5              MS. DEWITT:  Yes, Your Honor.                        09:37
 6              MS. VIRAMONTES:  Yes, Your Honor.
 7              MR. THOMAS:  Yes, Your Honor.
 8              THE COURT:  All right.  Mr. Kohlmann, please come
 9    forward.
10              THE CLERK:  Please raise your right hand.            09:37
11        GOVERNMENT'S WITNESS, EVAN KOHLMANN, WAS SWORN.
12              THE CLERK:  Please be seated.  Please state your full
13    name and spell it for the record.
14              THE WITNESS:  My full name is Evan F. Kohlmann,
15    E-V-A-N, K-O-H-L-M-A-N-N-N.                                   09:37
16              THE COURT:  Thank you.
17              You may inquire.
18              MS. DEWITT:  Thank you, Your Honor.
19                         DIRECT EXAMINATION
20    BY MS. DEWITT:
21    Q.   Good morning, Mr. Kohlmann.
22    A.   Good morning.
23    Q.   What do you do for a living?
24    A.   I work as an international terrorism consultant, and I'm
25    chief information officer at Flashpoint Global Partners.      09:38
```

1  Q.    What does being an international terrorism consultant

2  entail?

3  A.    I provide a variety of services on the consulting end, as

4  well as software development end in terms of the dark web,

5  specifically looking at the use of the Internet by                    09:38

6  international terrorist organizations for communications, for

7  recruitment, and for financing.

8  Q.    When you refer to the *dark web*, what do you mean?

9  A.    I'm referring to the area of the Internet that is used for

10  illicit purposes that may not be accessible to the general           09:38

11  public but that is accessible to individuals that are seeking

12  to join terrorist organizations or other illicit organizations.

13  Q.    How long have you been an international terrorism

14  consultant?

15  A.    I have worked in this capacity since approximately 1998.       09:38

16  Q.    As an international terrorism consultant, by whom are you

17  currently employed?

18  A.    I am currently employed by my own company, Flashpoint

19  Global Partners, in which I am the CIO.  I am also employed by

20  *NBC News, MSNBC*, in which capacity I serve as on-air terrorism     09:38

21  analyst.  I also help NBC set up exclusive interviews with

22  representatives of terrorist organizations, representatives of

23  extremist groups, and others.

24  Q.    By whom are you usually employed to consult on behalf of?

25  A.    My consulting clients include everything from public          09:39

1  clients such as Government agencies and law enforcement, as

2  well as private clients, such as large banks, financial

3  institutions, private law firms, and others.

4  Q.   I'd like to talk a little bit about your background and

5  how you got into this field.

6        First of all, where did you go to college?

7  A.   I am a graduate of the Edmund A. Walsh School of Foreign

8  Service, at Georgetown University, in Washington, DC.

9        THE COURT:  Ms. DeWitt, if you'll excuse me for

10 interrupting.

11       I reviewed all the materials last night from the

12 original motion, as well as the supplement, so I'm familiar

13 with Mr. Kohlmann's resumé.  So --

14       MS. DEWITT:  Your Honor, some of this, if you'll

15 indulge the Government just a little bit, some of this will

16 lead into, I think, his expertise in terms of how he developed

17 his methodology and his expertise in social science.

18       THE COURT:  Let's just keep it short, though, because

19 I'm familiar with his resumé.

20       MS. DEWITT:  Sure.

21 BY MS. DEWITT:

22 Q.   Mr. Kohlmann, can you just briefly describe your

23 educational background for the Court?

24 A.    Yes.  I have a BSFS, for Bachelor in the Science of

25 Foreign Service from the Edmund A. Walsh School of Foreign

09:39

09:39

09:39

09:40

09:40

```
 1   Service, in which I graduated Magna Cum Laude.

 2            I also have a B.S. -- excuse me.  I also have a J.D.,

 3   or a Juris Doctorate, from the University of Pennsylvania Law

 4   School, in Philadelphia, Pennsylvania.

 5   Q.   And during the course of your education, did you also      09:40

 6   write thesis papers?

 7   A.   Yes.  As part of my undergraduate education, I applied and

 8   was approved to write an honors thesis, an undergraduate honors

 9   thesis, at Georgetown University.

10            I also again applied for and was approved to write a    09:40

11   capstone thesis, which allowed me to attain a degree in Islam

12   and Muslim Christian Understanding, or a certificate in Islam

13   and Muslim Christian Understanding.

14            And I also did a separate research seminar thesis as

15   part of my education at Georgetown.                             09:41

16   Q.   And were these theses that you prepared over the course of

17   your education peer reviewed?

18   A.   Two of them quite intensively, yes.  Both the capstone

19   thesis, as well as my honors thesis, required both me taking

20   class work on how to conduct proper research and how to conduct 09:41

21   proper analysis, as well as then commissioning a variety of

22   drafts, submitting those drafts to various different faculty

23   mentors, getting an honest feedback, et cetera, et cetera.

24   Q.   And did these experiences provide you with knowledge on

25   how to do research in a sphere of social science?               09:41
```

```
 1  A.   I think it's fair to say that the type of research that I
 2  conduct and the methods that I use to conduct them are exactly
 3  derived from the education that I received at Georgetown
 4  University.
 5  Q.   And what type of research methods do exist for social      09:41
 6  science?
 7  A.   There are a variety of different methods depending on what
 8  kind of research you're conducting.
 9          In the world of international terrorism, because of
10  the type of evidence that's out there, the kind of research     09:42
11  that can be gathered, I use a method that is commonly used by a
12  variety of other researchers in a similar capacity, which is
13  known as comparative analysis.
14  Q.   And within the field of social science, is this an
15  accepted method of research?                                    09:42
16  A.   Not only is it an accepted method, it's the method by
17  which all of my colleagues use as well.
18  Q.   So it's the most frequently used?
19  A.   That I've come across in the world of international
20  terrorism and studies of international terrorism, by far, yes.  09:42
21          THE COURT:  You need to speak more slowly.
22          THE WITNESS:  Excuse me, Your Honor, sorry.
23          MS. DEWITT:  Probably me too, as well.  Sorry.
24  BY MS. DEWITT:
25  Q.   Can you describe to the Court what that method involves?   09:42
```

1  A.   Yes.  Comparative analysis involves taking a variety of

2  sources and juxtaposing them together to try to determine which

3  sources are authentic and credible.  And then from those

4  variety of different sources deriving a common narrative.  In

5  other words, deriving a narrative that can be established on         09:42

6  what appear to be credible facts.

7  Q.   And what type of sources do you use in that analysis?

8  A.   There are three types of sources:  There are primary,

9  there are secondary, and there are tertiary sources.

10       In the world of international terrorism, obviously         09:43

11  primary sources would be the best, but they are quite difficult

12  to get your hands on.  A primary source in the world of

13  international terrorism would be actually witnessing a

14  terrorist attack live or interviewing personally the leader of

15  a terrorist organization.                                           09:43

16       Now, occasionally these opportunities do come up and

17  we certainly take them, but there is not enough of primary

18  source opportunities to fill out research, so we move to

19  secondary sources.

20       Secondary sources would be an authentic, credible,         09:43

21  legitimate video-recording put out by a terrorist organization;

22  a magazine, an official magazine of a terrorist organization;

23  an official communique issued by a terrorist organization.

24       While this is not quite the same thing as witnessing

25  something live, if something is credible and it's authentic,         09:43

1  then it is a valid document and a valid secondary source to

2  use.  And that is the most common source that is encountered

3  when it comes to the study of international terrorism.

4  Q.   And again, can I ask you to slow down a little bit?

5  A.   I apologize.  Yes.                                    09:44

6  Q.   And I will try to remind myself as well.

7       Now, you mentioned that you do have a post-graduate

8  degree?

9  A.   That's correct.

10 Q.   And that degree is in what?                           09:44

11 A.   I have a Juris Doctorate from the University of

12 Pennsylvania Law School.

13 Q.   While you were there, did you also take classes that

14 relate -- in addition to your law school classes, that relate

15 to this field of study?                                    09:44

16 A.   I did.

17 Q.   What are those?

18 A.   In the law school itself, I took classes on terrorism

19 democracy, legal loopholes in contemporary cyber terrorism law.

20 I also did a study of the death penalty as it applied to the   09:44

21 case of *Zacarias Moussaoui*, an alleged or a convicted failed

22 9/11 hijacker.

23       Separately from the law school, in the School of Arts

24 -- in the Graduate School of Arts and Sciences, I also did

25 course work in Afghanistan and Islamism, taught by Dr. Brian   09:44

1  Spooner.

2  Q.   And again in those, did you do papers in connection with

3  that?

4  A.   I did, yes.

5  Q.   And again, did you use the same social science method?                09:45

6  A.   Comparative analysis, that's correct.  Yes.

7  Q.   After college, where did you work?  Or during college, did

8  you also work?

9  A.   Starting in 1998 when I was a freshman in college, I began

10  working as an intern at the Investigative Project, which is a              09:45

11  Washington, DC,-based counterterrorism think tank and watchdog

12  group which was started in 1995 by a former *CNN* journalist.  I

13  started, obviously, as an intern, but by the time I left the

14  Investigative Project in 2003 I was a senior analyst.

15  Q.   Can you tell the Court what the Investigative Project did,            09:45

16  or at least during the time that you worked for them?

17  A.   Yes.  The Investigative Project was a nonprofit enterprise

18  seeking to collect and harvest information -- difficult-to-find

19  information about the recruitment, communications, and

20  financing of particular international terrorist organizations,            09:45

21  then taking this information, and both in its raw form and by

22  distilling it into unclassified memorandums, congressional

23  testimonies, and other documents, including media, media work,

24  we then provided this information to a variety of different

25  people, including, again, everyone from policymakers in                   09:46

1    Washington, DC, law enforcement, other academics, media, you

2    name it.

3    Q.    And you, in particular, what areas did you work on when

4    you were at the Investigative Project?

5    A.    When I was at the Investigative Project, I was responsible                09:46

6    for building their first digital database.  The reason why this

7    digital database was necessary was because I was in charge,

8    very centrally, of studying the communications and financing

9    and recruitment of particular groups such as Al-Qaida and

10   Hamas, looking at unusual sources, including online sources,                    09:46

11   which at the time were relatively new.

12   Q.    While you were there, were you also responsible for

13   creating written work?

14   A.    Yes.  While I was at the Investigative Project, I

15   personally coauthored at least two different congressional                     09:47

16   testimonies that were submitted before, I believe, both the

17   House and Senate subcommittees, on a variety of different

18   issues.

19          I also was responsible for producing articles and

20   treaties that were published in publications such as the                       09:47

21   *Journal of Counterterrorism.*

22          And I also produced numerous memorandums and others

23   that were used to educate, again, policymakers, law

24   enforcement, et cetera.

25   Q.    Did you apply the same social science methods to your                     09:47

1   analysis while you were there?

2   A.    I did.

3   Q.    During your work at the Investigative Project, did you

4   specifically do research and work on terrorist recruiting

5   methods?                                                        09:47

6   A.    Yes.  I did this in both using both primary, secondary,

7   and tertiary sources, meaning that I personally traveled

8   overseas and attended recruiting seminars for radical jihadist

9   groups.  I directly interviewed individuals who ran these

10  groups, and I conducted open-source research using the Internet  09:48

11  and other methods to gather additional information.

12  Q.    Mr. Kohlmann, have you also published any research works

13  or books?

14  A.    I have.

15  Q.    Can you please provide the Court with an overview of that?  09:48

16  A.    In 2004, I published the book, *Al-Qaida's Jihad in Europe:*

17  *The Afghan-Bosnia Network*.  It was initially published by Berg,

18  in the UK.  Later that year, it was published here in the

19  United States by Paul Grigg Macmillan.

20        The book is about the travel and activities of Arab-       09:48

21  Afghan jihadist fighters in Europe during the 1990's and the

22  relationship between those activities and the war in the

23  Balkans.

24  Q.    And has that book -- how has that book been used?

25  A.    The book was used as a cited source in the final report of  09:48

1    the bipartisan congressional 9/11 Commission.  It is also

2    regularly used as a teaching text in a variety of classes

3    dealing with international terrorism and terrorist recruitment,

4    both here in the United States as well as abroad, and such

5    institutions as Harvard Kennedy School of Government and Johns          09:49

6    Hopkins School of Advanced International Studies.

7    Q.   And as detailed in your C.V., have you also, over the last

8    -- over the course of your career, written additional papers

9    and articles?

10   A.   Yes, I have.  I have published both peer reviewed --             09:49

11   formally peer-reviewed articles or -- for instance, the most

12   recent of that was I coauthored a treaty that was published in

13   African security on *The Recruitment of Westerners, by Shaabab*

14   *al-Mujahideen*, in Somalia.  That was a formal peer-review

15   process.  So after me and my coauthor were finished writing it,       09:49

16   we had to submit the paper to an anonymous peer review board.

17   We were given comments, and we had to go back and then submit a

18   revised draft -- or I think several revised drafts.

19          I also have published materials in non-peer review

20   journals.                                                             09:49

21          Right now I'm working on a piece for the *West Point*

22   *Counterterrorism Center Sentinel Journal* which does not have

23   formal peer review, but which obviously anything that I'm

24   submitting has been carefully reviewed by both my colleagues at

25   Flashpoint, as well as other experts who I deem to have              09:50

1    sufficient knowledge and understanding to provide additional

2    insight into anything that I have neglected to address or

3    anything that I may have mistakenly addressed in my piece.

4    Q.   And you've also been involved in presentations; is that

5    correct?                                                          09:50

6    A.   I regularly present to both private as well as public

7    audiences, yes.

8    Q.   After you left the Investigative Project, you started your

9    own consulting company?

10   A.   That's correct, yes.                                         09:50

11   Q.   Can you tell us a little bit more about that consulting

12   company, what it does; how it's set up?

13   A.   Sure.  In 2003, I left the Investigative Project and I

14   formed my own consulting business.  At that point, I was doing

15   mostly work with, again, with both private and public clients,    09:50

16   about a 50/50 split.  Most of that work was consulting.  The

17   business at that point was known as GlobalTerrorAlert.com.

18         By 2010, the business had expanded.  We expanded into

19   something, again, known as Flashpoint Global Partners.

20   Flashpoint has a staff of approximately 13 people.  We have       09:51

21   translators, native language speakers of Arabic, Russian,

22   Mandarin, and very soon Farsi.  We also have people on contract

23   with us that also can translate Urdu and Somali.

24         We have analysts on staff that look at this stuff on

25   a regular basis and have experience doing this in the capacity    09:51

1    of both private and public institutions.

2    Q.   And is one of the things that Flashpoint does is maintain

3    a digital database?

4    A.   One of the big things that we're called upon is because of

5    the fact that we maintain a massive database of every single          09:51

6    message that's ever been posted on any jihadi web forum or

7    jihadi website.  We maintain copies of every single communique

8    and video-recording that has been issued by any major jihadi

9    organization.  All these items are organized into a careful set

10   of business records, very large database.  However, using            09:52

11   customized search tools, we are able to search through it using

12   LexisNexis, Boolean and SearchLogic.

13   Q.   Again, I'm going to ask you just to slow down a little

14   bit.

15   A.   I apologize.                                                     09:52

16           THE COURT:  Actually, slow down a lot.

17           THE WITNESS:  Sorry, Your Honor.

18   BY MS. DEWITT:

19   Q.   First of all, when did you start collecting this data?

20   A.   I began collecting this data when I began writing my            09:52

21   honors thesis, so approximately 2001, 2000.

22   Q.   How large is the database now, approximately?

23   A.   Approximately, the database right now is just over six

24   terabytes in size.

25   Q.   In addition to the open source type of material that you        09:52

1   just described, what else is contained in the database?

2   A.    The database also contains materials which are

3   unclassified but which are not public.  In other words, through

4   my work with law enforcement, both here in the United States as

5   well with foreign law enforcement, I'm occasionally given    09:52

6   access to documents that, again, are not classified -- because

7   I don't have the security clearance -- but that are sensitive

8   and that are nonpublic.  Although those materials are not used

9   or not cited in anything else, obviously, than the matter in

10  which we're given access to them, those materials are on our   09:53

11  systems and we do use -- obviously having reviewed them, the

12  knowledge of having reviewed them, that goes into our analysis.

13  Q.    Do you handle materials that are in a foreign language?

14  A.    I do.

15  Q.    Can you explain how you do that and whether or not you    09:53

16  have foreign language abilities yourself?

17  A.    Yes.  I myself speak English and French fluently.  I know

18  a little bit of Arabic, but I'm certainly not fluent in it.

19  However, we don't rely on our own translation, our own personal

20  translation abilities, because many of the people that we're   09:53

21  looking at are native language speakers of other languages.  In

22  order to best understand those individuals, it is helpful to

23  have native language speakers to do that.  So we -- since 2008,

24  I have worked side by side with an Arabic language analyst, a

25  native Arabic speaker from Jordan who actually right now is   09:54

1   trying to organize an interview with an Iraqi insurgent group

2   because I'm not there.  We also have others who speak Mandarin,

3   who speak Russian, Farsi, Urdu, et cetera.  We rely on native

4   -- we try to rely exclusively on native language translators,

5   if we can.                                                          09:54

6   Q.   Is your database regularly updated?

7   A.   It's updated almost every hour, if not more often.

8   Q.   Why do you maintain this database?

9   A.   I maintain this database because when I began studying

10  this field what I believe to be most lacking in the study of      09:54

11  international terrorist organizations were facts.  There were a

12  lot of people out there with ideas and theories, but very few

13  of these ideas and theories were backed up with actual evidence

14  or fact.  And that was because of the fact that before

15  terrorist organizations began using the Internet, it was          09:54

16  relatively difficult to get your hands on original pieces of

17  communiques or documentary evidence.  Because I was able to get

18  my hands on that documentary evidence, and because that

19  documentary evidence shed enormous new light on the activities

20  of these organizations, both in their online capacities as well    09:55

21  as their off-line capacities, I believe that it was very

22  necessary to harvest this information and distribute it so that

23  at least the factual basis for the discussion of international

24  terrorism would be accurate.

25  Q.   Can you slowly give the judge -- the Court, excuse me,         09:55

1   Your Honor -- just a brief overview of how you process this

2   huge amount of data in connection with your analysis?

3   A.   Yes.  First of all, the information is gathered.  The

4   information is gathered through either human analysts or it's

5   gathered through automated software packages that I have        09:55

6   personally developed.  The software -- when the information is

7   then harvested, it's stored in both the physical database in

8   our office, as well as Cloud-based databases in the Internet

9   ether.

10        We receive automatic notifications.  If there are        09:56

11   particular pieces of automated data that are gathered that

12   are -- based on our criteria -- are determined to be

13   significant and worth taking a closer look at, our analysts are

14   also responsible for bringing our attention to anything that

15   they see by hand.  The purpose of doing this is so that we have  09:56

16   coverage from both the human analyst's perspective as well as

17   the automated perspective.  We have double coverage so we're

18   not missing anything.

19   Q.   You mentioned -- you touched on briefly that you -- one of

20   the sources of the information you use is from primary sources.  09:56

21   Have you yourself been involved in collecting primary source

22   information?

23   A.   Yes.

24   Q.   Can you just provide the Court with a brief overview of

25   what that would have entailed?                                  09:56

1    A.    Yes.  I have traveled overseas to interview

2    representatives of extremist groups, individuals who have been

3    convicted of terrorism offenses.

4            I have interviewed individuals who are currently

5    incarcerated as a result of being convicted in terrorism          09:57

6    offenses.

7            I have interviewed the leaders of organizations

8    accused of international terrorist activities, including

9    individuals who have been designated as SDGTs, or Specially

10   Designated Global Terrorists, which is a designation from the     09:57

11   U.S. Government.

12           I also interviewed individuals who have, again, been

13   convicted of federal terrorism offenses here in the United

14   States.

15   Q.    And has the product of these interviews and your primary    09:57

16   source research, has that become part of your database as well?

17   A.    Yes, an essential part of it.

18   Q.    Now, sometimes -- you've mentioned that these interviews

19   are done in person.  Are they also sometimes done either

20   through telephone or email exchanges?                             09:57

21   A.    Correct.

22   Q.    Can you explain why you would sometimes use those sources

23   rather than a face-to-face interview?

24   A.    Yes.  For instance, today Flashpoint is in the process of

25   interviewing the Islamic Army of Iraq on behalf of *NBC News*.    09:57

1    The Islamic Army of Iraq is a Sunni insurgent group in the

2    Anbar region of Iraq.  It would be exceptionally dangerous for

3    either us or for them to try to meet some place in between in

4    person.  However, there is nothing stopping us from being able

5    to talk with these people or interview them via Skype or other      09:58

6    remote technology.

7           So when it comes to individuals who are located in

8    areas or countries in which there is a physical -- there is a

9    serious physical threat to actually traveling there, or there

10   is doubt on whether or not local authorities will allow us to       09:58

11   conduct such an interview, those interviews are then conducted

12   via telephone, via Skype, via remote video connection, however

13   we can arrange it so that the parties feel comfortable to ask

14   the questions.

15          We want to ask questions that are biting questions.          09:58

16   We don't want to ask softball questions.  And we want these

17   people to be able to give unfettered answers, and the only way

18   to do that sometimes is by doing it remotely.

19   Q.   When you use that approach, how do you verify or confirm

20   that the person that you're speaking to is the person who you       09:59

21   believe that person to be?

22   A.   Well, number one, we only contact these organizations via

23   their official contact information, i.e., their official

24   website, their official Facebook pages, et cetera, or their

25   official phone numbers.                                             09:59

1          In the case of, say, Abu Hamza Al-Masri, in London, I

2    called the cell phone number and I spoke to him directly.

3          But more importantly, we've seen that these

4    organizations afterwards will publicly acknowledge that they

5    have done an interview with us.                                    09:59

6          I have done interviews in the past with groups like

7    the Islamic Army of Iraq, Al Rashideen Army in Iraq, Hamas

8    Al-Iraq, and these organizations will then publish the fact

9    that we have done an interview with them afterwards through

10   their official media wings.                                        09:59

11   Q.   So some of these organizations have their own publishing

12   networks?

13   A.   Almost all of them have their own media wings.

14   Q.   Is that a relatively recent phenomenon?

15   A.   It's a phenomenon that began in approximately 2000 and has  09:59

16   picked up enormous amount of steam since about 2008 or 2009.

17   Q.   And based upon what you've seen over the course of your

18   consulting career, what is the reason for that phenomenon?

19   What caused that phenomenon to happen?

20   A.   The reason for that phenomenon is that in 2000 a variety    10:00

21   of jihadi groups, including Al-Qaida, came to the realization

22   that despite the fact that video propaganda is a very effective

23   recruitment tool, they had not issued any significant videos.

24   There were only two well-known jihadi propaganda videos that

25   existed prior to the year 2000.  As a result, there was a        10:00

1    concerted effort on the part of Al-Qaida and other groups to

2    start publishing more and more of these videos.

3          These videos were shown to individuals actually

4    physically at training camps in Afghanistan.  And after

5    observing the reaction of those watching the videos, Al-Qaida          10:00

6    and other groups realized that this was an opportunity for them

7    to recruit others besides, who were not Afghanistan, who would

8    be equally enthusiastic or jazzed up by watching these videos.

9    Q.   Did this phenomenon occur at the same time that there was

10   a shift from direct recruiting to indirect recruiting?          10:01

11   A.   Yeah.  It was -- that was the other part of it, really.

12   After 2001, Al-Qaida lost its training camps in Afghanistan.

13   It no longer had a physical base of operations.  It was very

14   difficult to have physical recruiters anymore because anyone

15   using a satellite phone, or whatnot, could be easily captured          10:01

16   and detected.  As a result, the recruitment pattern --

17   Al-Qaida's recruitment pattern changed.

18          While Al-Qaida continued to try to directly recruit

19   people covertly, it also realized the only way it could

20   generate enough recruits was to actually indirectly recruit          10:01

21   people by inspiring people to join the organization.

22          We know this because of the fact that Al-Qaida has

23   explicitly said this in videos such as, *You Are Only*

24   *Responsible For Yourself*, which is a video-recording produced

25   by Al-Qaida's central media wing, in which they explain that          10:01

1  the only way they can win is if individuals start following

2  this ideology and pursuing it, whether or not they have ever

3  made any direct contact with Al-Qaida.

4  Q.   And you mentioned that these groups put out different

5  types of information, both on the web and communiques and news

6  letters, and even write letters to the editor?

7  A.   Correct.

8  Q.   Does that information also become part of your database?

9  A.   All of it.

10 Q.   Have you published materials specifically on the topic of

11 homegrown extremism?

12 A.   I have, yes.

13 Q.   Can you describe for the Court, briefly, what that

14 material is?

15 A.   Yes.  Back in -- well, I published a number of different

16 things, but back in 2007 I was asked by former Whitehouse

17 counterterrorism czar Richard Clarke to write a chapter for an

18 edition of The ANNALS of The American Academy of Social and

19 Political Sciences, for which he had assigned the

20 responsibility of editing.  Essentially, he was serving as

21 editor for that particular set of The ANNALS.

22         That edition of The ANNALS was meant to be addressing

23 the issues of international terrorism, or contemporary issues

24 of international terrorism.

25         After talking with Mr. Clarke, I agreed that I would

10:02

10:02

10:02

10:02

10:03

```
 1   write a chapter for this, for The ANNALS, on the issue of
 2   homegrown terrorism and issues of evidence, and other factors
 3   which are relevant to homegrown terrorism or modern homegrown
 4   terrorism cases.
 5   Q.   Shifting gears now, have you testified in federal court    10:03
 6   before?
 7   A.   I have.
 8   Q.   Approximately how many times?
 9   A.   This is number 31.
10   Q.   Have you testified in other courts in the United States?   10:03
11   A.   I have, yes.
12   Q.   What are those?
13   A.   Aside from U.S. federal court, I've also testified in
14   civil court as well.
15   Q.   Have you also testified in military commissions?           10:03
16   A.   Yes.  Outside of the United States I've testified twice in
17   front of U.S. military commissions in Guantanamo Bay, Cuba, and
18   I was qualified for a third case.
19   Q.   And have you testified in other jurisdictions in other
20   countries as well?                                              10:03
21   A.   Yes.
22   Q.   Just some examples of those?
23   A.   I have testified at the Old Bailey, in London.  I have
24   testified at Woolwich Crown Court, in London.  I have testified
25   at a variety of Crown Courts in the London area.                10:04
```

```
 1              I have testified on behalf of the Central Criminal
 2    Court in Glasgow, Scotland.
 3              I have testified on behalf of the Central Criminal
 4    Court in Denmark, in Copenhagen, Denmark.
 5              I have testified twice before the Supreme Court of     10:04
 6    Bosnia-Herzegovina, in Sarajevo, Bosnia.
 7              I have testified on behalf of the Supreme Court of
 8    New South Wales, in Sydney, Australia.
 9              And I'm currently working on a case -- although, I
10    haven't testified yet -- in Switzerland.                        10:04
11    Q.   I'm going to ask you to slow down again.
12    A.   I apologize.
13    Q.   If I keep saying it, then both of us will do it.
14    A.   I apologize, yes.
15    Q.   In these instances that you've just described both in      10:04
16    federal court and overseas, did you testify as an expert?
17    A.   I did, yes.
18    Q.   In those instances, what was your area of expertise?
19    A.   The area of my expertise primarily was on terrorist use of
20    the Internet; however, it also included ancillary matters such  10:05
21    as Al-Qaida, the Taliban, Lashkar-e-Taiba, which is another
22    terrorist organization, as well as the recruitment and
23    financing and communications of said organizations.
24              MS. DEWITT:  We're going to offer after this, Your
25    Honor, to help the court reporter with some of the words as     10:05
```

```
 1  well.  I apologize because I was going to bring you a glossary,
 2  and I forgot.
 3  BY MS. DEWITT:
 4  Q.   In those cases that you described, did you testify
 5  specifically about what you describe as contemporary violent    10:05
 6  extremism or homegrown terrorism?
 7  A.   I have testified as such in at least three different
 8  cases, yes -- or four different cases.  Excuse me.
 9  Q.   And to put that into context, can you explain to the Court
10  what you mean by a "homegrown terrorist" or a "homegrown         10:05
11  terrorist group"?
12  A.   Yes.  A contemporary violent extremist, or a homegrown
13  terrorist group, refers to individuals, generally speaking, who
14  come from a jihadi mentality, who admire Al-Qaida and other
15  similar jihadi movements but do not have any direct contact, or  10:06
16  have not established any direct contact with said movements,
17  and instead are seeking to independently join or self-join
18  these organizations -- or self-recruit, I think is really the
19  word.
20  Q.   Have you previously testified about the factors and         10:06
21  commonalities that are part of your analysis in this case?
22  A.   I have, yes.
23  Q.   How many times, approximately?
24  A.   I have testified four times.
25  Q.   I'm going to ask you just a couple of preliminary           10:06
```

```
 1    questions now focusing specifically on those commonalities and
 2    the factors that you used in this case and in other cases.
 3              Are those commonalities or factors or indicators at
 4    all based on race?
 5    A.    Not at all.                                                    10:06
 6    Q.    Are they based on gender?
 7    A.    Not in the least.
 8    Q.    Are they based on religion?
 9    A.    Nope.
10    Q.    Are they based on ethnicity?                                   10:06
11    A.    Nope.
12    Q.    Are they based on immigration status?
13    A.    No.
14    Q.    Are they based on any kind of physical characteristics?
15    A.    No, not at all.                                               10:07
16    Q.    In the instances in which you previously testified, was
17    your testimony premised on the same methodology of research and
18    drawing of opinions as a compare and contrast that you've
19    described -- a type of methodology -- that you've used with
20    respect to your prior written work, your theses, and your          10:07
21    presentations?
22    A.    Yes, exactly.
23    Q.    And that's the same methodology that you applied in this
24    case?
25    A.    The same exact methodology, yes.                              10:07
```

1    Q.    With regard to this case, have you reviewed evidence?

2    A.    I have.

3    Q.    And can you just briefly explain to the Court or give the

4    Court an overview of what types of evidence?  You don't have to

5    list everything, but just a general overview.                    10:07

6    A.    I have reviewed evidence seized from USB drives and other

7    digital media from the defendants --

8                THE COURT:  Okay.  You need to please slow down.

9                THE WITNESS:  Sorry, Your Honor.

10                I have reviewed digital media and USB drives -- or    10:07

11    the contents of USB drives seized from the defendants.  I have

12    reviewed transcripts of covert recordings involving the

13    defendants.  I have reviewed summaries of interactions between

14    the defendants and the CHS.  And I have also reviewed FBI 302

15    documents involving the defendants.                              10:08

16    BY MS. DEWITT:

17    Q.    Have you reviewed all of the evidence in this case?

18    A.    No, not to my knowledge.

19    Q.    Have you also provided a preliminary expert report in this

20    matter?                                                          10:08

21    A.    I have, yes.

22    Q.    And was this report based upon your experience as

23    described today?

24    A.    It was.

25    Q.    Based on your experience, are you able to both define and   10:08

1    explain the global jihad movement?

2    A.    Yes.

3    Q.    Are you able to define and explain homegrown terrorism?

4    A.    Yes.

5    Q.    Would you include in that explanation -- be able to

6    include in that explanation an explanation of the structure of

7    those groups?

8    A.    Yes.

9    Q.    Would you be able to explain the jargon and the

10   terminology used by those groups?

11   A.    Yes.

12   Q.    And would you be able to explain the ideological context

13   in which those groups operate?

14   A.    Yes.

15   Q.    Would you be able to describe and explain the

16   geographical context in which these groups operate?

17   A.    Yes.

18   Q.    And would you also be able to explain the radicalization

19   process?

20   A.    Yes.

21   Q.    As part of your research, you have identified

22   commonalities or factors that emerge within these groups or

23   individuals; is that correct?

24   A.    That's correct.

25   Q.    How did you develop and identify these factors,

10:08

10:08

10:08

10:08

10:09

10:09

1  indicators, commonalities?

2  A.   These factors and commonalities were developed, number

3  one, from the basis of my experience of having personally sat

4  and observed homegrown extremists at rallies, at meetings.

5         When I was in the United Kingdom, I spent a number of

6  weeks, basically spending hours and hours with these

7  individuals under the premise that I might be sympathetic to

8  their abuse.  So I got an inside view into how exactly

9  homegrown extremist movements recruit people and incite people

10  to become extremists themselves.

11         Added to this information is all of the research that

12  I personally gather on the web.  I'm constantly looking to see

13  whether or not people are particularly focused on certain

14  aspects.  Are videos very important to people?  Are websites

15  important to people?  How about weapons?  Training?  Things

16  like that.

17         In trying to assess where people -- when people are

18  serious and when they start moving towards actually traveling

19  to a foreign conflict zone or carrying out an attack

20  themselves, what distinguishes those individuals in terms of

21  what they are saying online, in terms of what they are doing,

22  et cetera.  And we have the benefit of -- because we have all

23  the messages that are posted on these forums, we can see

24  retrospectively if someone is arrested or if someone is killed,

25  we can see what they were posting online, what they were

10:09
10:09
10:10
10:10
10:10

1    saying.  So we can see actually retrospectively what things

2    were most important to the people that actually went out and

3    did something.

4         And then combined into this is the experience -- the

5    wealth and experience that I've gained from having worked          10:10

6    directly with law enforcement and having worked directly with

7    prosecutors on these cases, not just here in the United States,

8    but in a variety of different jurisdictions, and being able to

9    see how -- despite different languages and different cultures

10   and different countries, the evidence is still the same.  The      10:11

11   evidence as you see it, it's almost exactly the same.  The only

12   difference is sometimes it's in a different language.

13   Q.   So just to put a final point on it and make sure I

14   understand, these commonalities are -- you've identified these

15   commonalities based on a combination of your personal              10:11

16   experience and a massive amount of data that you've collected

17   over the last decade?

18   A.   Yeah.  It's the product of my experience, my research, the

19   product of everything that I've done.  And the focus of most of

20   the work that I do is on this area.                                10:11

21   Q.   And the method that you've used for identifying, and from

22   that experience and that database, is a social-science method

23   of compare and contrast and analysis of a huge amount of data?

24   A.   Correct.  It's a Bayesian-style comparative analysis

25   method, correct.                                                   10:11

1    Q.    I'm not sure what Bayesian-style analysis is, so maybe you

2    can provide just a very, very brief explanation of that,

3    slowly?

4    A.    Of course.  Of course.  There are two different approaches

5    to conducting research.                                      10:12

6          There is the Fisherian analysis, which looks,

7    basically, at flat statistics, flat numbers.  And, you know,

8    you would look for things like an error rate, or whatnot.

9          And then there is a Bayesian analysis, which, when

10   you have a situation such as international terrorism where you   10:12

11   have a very small straw, straw number -- you have a small

12   sample pool -- simple statistics don't really work.  The reason

13   is because if you have one aberrant example in a small pool of

14   data, the entire results get radically thrown off.

15         I know this from personal experience because I have    10:12

16   conducted statistical analysis as it applies to particular

17   aspects of international terrorism.  And I have personally seen

18   how -- because the sample pool is so small, a strict

19   statistical analysis is not going to provide you reliable

20   results.  It's actually going to provide you misleading       10:12

21   results.

22         Bayesian analysis simply means that we look at the

23   cases from a larger perspective.  Rather than counting

24   individual cases, we look at the whole body of evidence and we

25   try to see what are the commonalities, not necessarily whether  10:13

1  or not something pops up in every single case, but whether in

2  70 or 80 percent of cases we see the same commonality

3  appearing.

4        It's not a strict statistical analysis.  It's a

5  social science analysis, but it's geared towards understanding        10:13

6  human behavior.  And it's very difficult to understand human

7  behavior through strict statistics.

8  Q.   And as they're relevant to this case, have you identified

9  some commonalities and factors that you believe are relevant to

10 your expert testimony in this case?        10:13

11 A.   I have.

12 Q.   And there are six of them, am I correct?

13 A.   That's correct.

14 Q.   Can you go through each one and identify what that factor

15 is and just give a very brief overview of what that particular        10:13

16 factor means?

17 A.   Sure.  One of the first factors we look for is evidence of

18 self-selecting plots or schemes.  In other words, is there

19 evidence that there are individuals who are actively and

20 meaningfully, seriously plotting to either travel abroad to        10:14

21 join a foreign terrorist organization, or someone who may be

22 trying to carry out an act of violence here in the United

23 States.

24        The second thing we look to is whether or not there

25 is actual capability of doing this.  The individuals who are        10:14

 1    making -- who are coming up with these plots or schemes, are

 2    they acquiring weapons?  Are they acquiring training?  Are they

 3    stockpiling equipment such as sniper or sniper scopes, or are

 4    they acquiring unusual amounts of firearms training?

 5            In other words, along with the self-selecting plots          10:14

 6    or schemes, is there evidence of having the actual capability

 7    to live or fulfill these schemes?

 8            We also look to see whether or not these individuals

 9    have adopted a radical sectarian religious ideology.

10            There is a particular ideology that is associated          10:15

11    with homegrown extremism.  It's known as the Salafi-Jihadi

12    Movement.  It means returning to a very puritanical view of

13    Islam where jihad, violent jihad, physical jihad, is an

14    integral part of the system of belief.

15            If someone fits that particular ideology and they are          10:15

16    following the proponents of that ideology, one of who most

17    significantly is Anwar al-Awlaki, that is very significant.

18            The next thing we look to is whether or not these

19    individuals -- or if there is evidence that these individuals

20    attempted to reach out to other known extremists, either          10:15

21    through email, or through physically going up and trying to

22    meet them.  In other words, is there evidence that these

23    individuals were trying to network with outsiders who are known

24    to be hubs or recruiters for international terrorist

25    organizations?          10:16

 1          The next thing we look to is whether or not there is

 2     evidence of logistical subterfuge.

 3          There is a lot of people who travel.  People

 4     certainly travel to all across the Muslim world from the United

 5     States.  But it's very rare when you see people attempting to          10:16

 6     encrypt or code their conversation when they're talking about

 7     traveling.  Or when they are traveling, engaging in travel that

 8     financially is very expensive, adds a tremendous amount of time

 9     to the journey, and doesn't seem to make any sense unless

10     you're deliberately attempting to obfuscate your route of entry       10:16

11     or exit from a particular country.

12          The next factor we would look to is whether or not

13     there is evidence that particular individuals have been

14     stockpiling or deliberately redistributing terrorist

15     propaganda, i.e., video recordings, audio recordings, and             10:16

16     communiques which are authentic productions of the media wings

17     of international terrorist organizations.

18          The fact that someone once saw a video on YouTube

19     that had a picture of Osama Bin Laden on it is not going to be

20     dispositive of whether or not someone is an extremist.                10:17

21          But if someone has a significant amount of original

22     video recordings from groups like Al-Qaida's Sahab Media,

23     S-A-H-A-B, or AQAP's al-Malahem Media, M-A-L-A-H-E-M, those are

24     the official media wings of terrorist organizations.  For

25     someone to have a significant amount of materials from those          10:17

```
 1    organizations, particularly training materials, is quite
 2    significant.
 3            And the final prong that we look to would be the
 4    issue of terrorist websites.  Are these individuals -- or is
 5    there evidence that these individuals have been browsing or      10:17
 6    regularly visiting forums or flat.com websites which are
 7    specifically and deliberately put out there in order to
 8    distribute and popularize terrorist propaganda, or to serve as
 9    hubs for people to network together to form homegrown terrorist
10    cells.                                                           10:18
11    Q.   Are the factors that you've identified a definitive set of
12    items?
13    A.   Certainly not.
14    Q.   Are the factors that you've identified present in every
15    case you've examined?                                           10:18
16    A.   Not at all.
17    Q.   Do all the factors need to be present, or do they need to
18    only be present in some combination?
19    A.   It's really the combination.  And again, this comes down
20    to a social science determination.                              10:18
21            When you see in a particular case four of six factors
22    appear, well, that's certainly worth taking a look at.  And my
23    response would be there is a significant reason or there is
24    significant evidence of homegrown extremist activity.  However,
25    the more factors you have, the increasingly confident you can   10:18
```

```
 1   be that there is evidence of homegrown extremist or homegrown
 2   terrorist activity.  That's because of the fact that when you
 3   have all six of these prongs, including self-selecting plots or
 4   schemes, attempts to acquire weapons and firearms and training,
 5   or tickets outside the United States, people that are following    10:19
 6   Anwar al-Awlaki, people that are downloading large amounts of
 7   terrorist propaganda, people that are attempting to hide their
 8   communications on the phone, there are very few people who fit
 9   all of these prongs and are not legitimately engaged in illicit
10   activity.  It's almost inherent in terms of what they are.         10:19
11   Q.   Those activities are based upon your data and your
12   experience representative of activities of homegrown violent
13   extremists?
14   A.   Correct, yes.
15   Q.   And consistent with?                                          10:19
16   A.   Correct.
17   Q.   Now, you've heard of the term, or the use of drug courier
18   profiles and similar investigative tools, have you?
19   A.   Yes, I have.
20   Q.   And that term obviously has different meanings in             10:19
21   different contexts.
22        In the context in which you are using these factors
23   and these commonalities, is your analysis similar to a drug
24   courier profile?
25   A.   Not to my knowledge, no, because it's not predicated on       10:19
```

```
 1   anything to do with national origin.  It's not predicated to do
 2   with anything about gender or age.
 3           The cases that I have looked at and I have applied
 4   these factors to include both men and women, include
 5   individuals who are native-born U.S. citizens, as well as          10:20
 6   naturalized Americans, as well as immigrants.  It includes
 7   people who are older, up to age 60 -- 55, 60.  It includes
 8   people who are younger, all the way down to the age of 15.  It
 9   includes people of every skin color and background and language
10   you can think of.  So it has very little similarity, I think,      10:20
11   to it -- my understanding anyway, of what a drug profile is.
12   Q.  Can you explain how what you do is different from it, as
13   opposed to how it's not like it?
14   A.  Oh, sure.  I'm not looking at the individuals; I'm looking
15   at the evidence.  I'm looking at what an individual actually       10:20
16   said and did, not what they look like.
17   Q.  When you testify as an expert in a criminal case, you're
18   not predicting the future; is that correct?
19   A.  No, not at all.  I don't think that's possible.
20   Q.  So you look retrospectively to see does the evidence and       10:21
21   activities fit?
22   A.  Correct.  Correct.  I can't speak to events that did not
23   occur.
24   Q.  And your testimony is not intended to substitute for a
25   jury, for example, somebody's guilt or innocence?                  10:21
```

1  A.   Certainly not, no.

2  Q.   Turning back to the commonalities, just to flush that out

3  a little bit.

4       When you've done this analysis and you've looked at

5  this data, have you seen locations that homegrown violent                10:21

6  extremists generally attempt to travel to?

7  A.   Yes.

8  Q.   Where are those locations?

9  A.   Well, there are a variety of locations.  In the context of

10 the current case between approximately 2010 and 2012, the most            10:21

11 attractive locations for individuals, particularly here in the

12 United States, were Afghanistan/Pakistan, Somalia and Yemen.

13 Q.   Are you suggesting that that has changed over time or

14 changes over time?

15 A.   It does.  Currently, Syria.  And Syria and Iraqi, border            10:21

16 regions of Syria, are arguably number one.

17 Q.   And is that an example of -- an example of how you adapt

18 your analysis and your data based upon current events?

19 A.   Exactly.  We're paying attention to the stories and the

20 testimonials of foreign fighters who are leaving from the                 10:22

21 United States, as well as other countries, and traveling to

22 these conflict zones.  When all of a sudden you see a flurry of

23 individuals from the United States appear in a particular

24 conflict zone, out of the blue, that's a very strong indicator

25 that that country has become a very active recruitment hub for            10:22

```
 1  Westerners seeking to join jihadist groups.
 2  Q.   With respect to the adoption of hardline sectarian
 3  perspectives as one of the factors you identified, are there
 4  particular leaders or ideology that you've seen regularly
 5  adopted?                                                          10:22
 6  A.   Yes.  Again, this is almost invariably the Salafi/Jihadi
 7  philosophy.  In other words, referring to a puritanical view of
 8  Islam where violent jihad or physical jihad is an integral
 9  element of the faith.  And obviously, when it comes to the
10  Salafi/Jihadi philosophy or approach, the person that most --    10:23
11  the cleric that most routinely -- "cleric" is a nice way of
12  putting it -- but the person who most routinely comes up in
13  these discussions is Anwar al-Awlaki.
14  Q.   And with respect to coded language or efforts of
15  subterfuge, is that -- are there examples of that that you see   10:23
16  commonly?
17  A.   Yes.  Yes.
18  Q.   Both the use of coded language?
19  A.   Yeah.  I just -- I actually was just commissioned to write
20  an expert report on that by the Government of Switzerland.       10:23
21  Q.   With respect to the collection and redistribution of
22  terrorist propaganda, what types of terrorist propaganda
23  collection and redistribution have you seen?
24  A.   Most of the time the items that are redistributed are
25  things like video-recordings, audio recordings, magazines, and  10:23
```

1  communiques, actual, physical communiques.

2  Q.   And are there some specific websites or forums that you

3  have typically seen?

4  A.   Yes.  There are, number one, forums, which are social

5  networking forums which distribute these materials officially     10:24

6  on behalf of groups like Al-Qaida in the Arabian Peninsula.

7  And then you also have support websites which are exclusive

8  hubs for this material if you don't have access to a forum.

9        So for instance, there is a website called

10 *theunjustmedia.com* which has a direct relationship with the     10:24

11 Taliban media wing and which publishes all the Taliban's

12 official communiques as they receive them directly from the

13 Taliban.  If you don't have access to a password protected web

14 forum and you want to get access to the latest propaganda from

15 the Taliban, *theunjustmedia* is a very frequent location for     10:24

16 homegrown extremists to seek out.

17 Q.   You mentioned that one of the leaders that you see often

18 is Anwar al-Awlaki.  Are there other well-known individuals

19 that you have seen as being typical as part of the propaganda

20 collection?                                                       10:25

21 A.   Yes.

22 Q.   And who are they?

23 A.   Individuals such as Abu Hamza Al-Masri.  Individuals such

24 as Shaykh Faisal.  There is a long list of these clerics.

25 Q.   Osama Bin Laden?                                             10:25

1   A.   Well, yeah, but he's not really -- he falls more into the

2   terrorist propaganda side that I think than the religious

3   sectarian side.

4   Q.   Based on your study and your experience, is there a

5   typical age for a homegrown terrorist?                        10:25

6   A.   Not necessarily, no.  Most of them tend to be younger, but

7   not always.  In fact, people can be -- I've seen individuals

8   try to get involved in this all the way up to the age of 55 or

9   60.

10  Q.   And as young as?                                          10:25

11  A.   As young as 15.

12  Q.   Is there a typical level of education?

13  A.   Nope.

14  Q.   Is there a typical level of sophistication?

15  A.   No.  It runs the gamut.                                   10:26

16  Q.   In doing your analysis and evaluating information in your

17  database, do you look at individuals that would be

18  characterized as nonviolent or nonterrorists?

19  A.   Occasionally I do, yes.

20  Q.   And do you only analyze individuals that you've been hired  10:26

21  to analyze?

22  A.   No.  In order to understand the difference between people

23  that are genuine threats versus people that we don't believe

24  are genuine threats, in comparative analysis you have to have

25  something to compare it to.  So we look to other places where   10:26

```
 1    individuals are gathering who might not be proponents of
 2    American foreign policy; they may not love the United States,
 3    but they are not jihadists, or they are not violent extremists.
 4    And by examining their conversations and what they're saying
 5    online, we can distinguish between individuals on, you know,      10:26
 6    terrorist web forums versus individuals who simply disagree
 7    with U.S. foreign policy.
 8    Q.   Can you provide the Court with just one example of
 9    somebody who you were not hired to look at that you looked at
10    as part of your analysis?                                         10:27
11    A.   Sure.  Well, there's dozens of individuals, but I think
12    the most obvious one would be an individual in Spain who was --
13    I can't remember his name offhand, but he actually was
14    eventually prosecuted for minor offenses.  But he was drawing
15    pictures of Hamas leaders online.  It was our estimation that    10:27
16    that was more of a creative instinct than anything else.
17    Q.   Mr. Kohlmann, what steps have you taken to validate the
18    findings that you just described and the findings in your
19    analysis that you've used in this case?
20    A.   I regularly consult with a variety of colleagues, both in   10:27
21    and outside of U.S. and foreign governments, including other
22    experts.
23         I routinely do co-projects with other colleagues of
24    mine.  For instance, last summer I worked with someone from the
25    Washington Institute for Near East Policy, a young researcher    10:27
```

1    named Aaron Zelin, who is now at King's College, to produce a

2    study of foreign fighters, the identities of foreign fighters

3    traveling to Syria.

4           As much as possible I try to share research with

5    others.  We just finished a massive project with a variety of        10:28

6    other researchers that was funded by the Government of Canada,

7    known as the Kanishka Project.  We just finished our final

8    report.

9           As much as possible, I try to make the work that I'm

10   doing the product of more than just one voice, the product of        10:28

11   having multiple people having reviewed it, multiple people

12   having given their opinion on it, having contrasting

13   discussions, having real debate over the content of what's in

14   there.

15   Q.   And when you've been asked to consult -- and without            10:28

16   actually naming the person by name or identifying the person by

17   name, have you ever reached a determination that the individual

18   was not a terrorist or was not a homegrown violent jihadist?

19   A.   Yes.  On at least one occasion, I have been asked to

20   review evidence by the U.S. Justice Department on a particular       10:28

21   individual, and I came back to them and I said to them, *Based

22   on the evidence you've provided, I do not believe this person*

23   *is a violent homegrown extremist, or I don't believe there is*

24   *evidence of violent homegrown extremist activity.*

25   Q.   And if you had evidence in your database that would tend        10:29

```
 1   to exonerate a person, would you bring that to the attention of
 2   the people that you are working with?
 3   A.    Immediately, yes.
 4   Q.    In this case, Mr. Kohlmann, you've been provided with
 5   specific evidence, correct?                                        10:29
 6   A.    Correct.
 7   Q.    And you've had an opportunity to review that evidence,
 8   correct?
 9   A.    Correct.
10   Q.    And based upon your review of that evidence in this case,    10:29
11   have you located evidence that is consistent with the
12   commonalities, indicators, and the factors that you've set
13   forth today during your testimony?
14   A.    Yes.
15         MS. DEWITT:  At this time, Your Honor, I will stand          10:29
16   down.
17         THE COURT:  All right.  Ms. Viramontes, are you going
18   to examine?
19         MS. VIRAMONTES:  Thank you, Your Honor.
20         THE COURT:  Maybe it would -- and maybe I should have        10:30
21   done this before the direct examination, but I think it was
22   helpful to have the Government elicit all the information.  I
23   think it helps to elicit before the jury -- or maybe not all of
24   it, but a summary of it.
25         But let me say that after reviewing, as I said, all         10:30
```

```
 1   the material that was submitted in connection with the motion,

 2   and in addition to that, having reviewed a number of the --

 3   either published or unpublished decisions from district courts

 4   -- and there's a few appellate decisions, I think, unpublished,

 5   mostly, with respect to this witness' testimony in other cases,      10:30

 6   with charges similar to the charges in this case, my

 7   inclination at this point is to allow, as I've said already in

 8   the written ruling, is to allow the witness to testify.  But in

 9   the areas that are under dispute, which primarily is the

10   application of the six factors or the profile to the facts in       10:31

11   this case, for the most part, not to allow that type of

12   testimony and to instead allow -- but to allow him to testify

13   about particular application of certain of the factors to the

14   evidence in this case to explain and give context, for example,

15   about the websites that -- about particular websites that the       10:31

16   defendants in this case visited, to explain what they are,

17   explain and testify about particular videos or recordings that

18   these defendants watched or listened to, and the significance

19   and the context of those, but not to attach a label or use a

20   term of contemporary -- either *homegrown terrorist* or             10:32

21   *contemporary extremist*.  I forget what the second one is.

22              So with that in mind, you might want to keep that in

23   mind before you cross-examine.

24              MS. VIRAMONTES:  Thank you, Your Honor.

25              THE COURT:  All right.  Go ahead.                        10:32
```

```
 1              MS. VIRAMONTES:  Thank you.

 2                     CROSS-EXAMINATION

 3   BY MS. VIRAMONTES:

 4   Q.    Mr. Kohlmann, as part of your thesis program you took a

 5   class on Research Practices, correct?                              10:32

 6   A.    Correct.

 7   Q.    That class lasted one semester, correct?

 8   A.    That's correct, yes.

 9   Q.    You never took a statistics class, did you?

10   A.    That's correct.                                              10:33

11   Q.    That class that you took, your Research Practices class,

12   you took that 14 years ago, correct?  Roughly 14 years ago?

13   A.    Actually -- well, yeah 13, 14 years ago, yeah.

14   Q.    In the past, you've claimed to have a degree in Islam,

15   correct?                                                           10:33

16   A.    No.  What I've said is that I have a certificate in Islam,

17   but most people don't understand what a certificate in Islam

18   is.  So in order to explain what it is, I've said it's the

19   equivalent of a minor, a minor degree, actual physical degree.

20   Q.    Do you recall testifying differently in United States v.     10:33

21   Barry Walter Bujol, B-U-J-O-L, Jr.?

22   A.    Not that I recall.

23   Q.    Mr. Kohlmann, I would like to direct your attention to the

24   binder that's in front of you.  If you could please turn to tab

25   Exhibit 209.  And then once you reach that, turn to page 548.      10:33
```

A.    Yup, I've got it right here.

Q.    And read lines 16 through 19 to yourself, and let me know

when you're done.

A.    Yes.

Q.    And that states, *I also have a second degree from*

*Georgetown, the Center for Muslim Christian Understanding, and*

*Islam and Muslim Christian Understanding*, correct?

A.    Well, it does, but on line 22 I say it's a certificate.

Q.    Right, after you were already impeached?

        MS. DEWITT:  Objection, Your Honor.

        MS. VIRAMONTES:  Let's move on.

BY MS. VIRAMONTES:

Q.    To get the certificate, you took two courses, correct?

A.    The certificate in Islam, yes, that's correct.  No, I'm

sorry.  No, that's not correct.  No.  I did three courses and a

semester-long thesis writing.  It was an open thing, so it

wasn't officially a class, but it was three classes.  It was a

year long divided into two classes on Middle Eastern and

Islamic History, and then it was a third class on Islamic

Modernism.  And then -- it was a two-year long program.

        THE COURT:  Well, are you saying it was two courses

or three courses?  Or two courses and a thesis?  Or three

courses and a thesis?

        THE WITNESS:  Your Honor, there was a year long -- it

wasn't really one course.  It was a course divided into two.

10:34

10:34

10:34

10:35

10:35

```
 1    It was two separate courses, like Middle Eastern History 1, and
 2    Middle Eastern History 2.  And then --
 3              THE COURT:  And that was one year?
 4              THE WITNESS:  That was a full year.
 5              And then I did Islamic Modernism, which was a full        10:35
 6    semester.  And then the semester after that, it was equivalent
 7    of a course, but because I was writing my thesis it was -- I
 8    was meeting with my mentor, my thesis mentor, outside of the
 9    classroom.
10    BY MS. VIRAMONTES:                                                   10:35
11    Q.   So three classes?
12    A.   No, I think it's four.  But however you want to count it.
13    Q.   Okay.  Three classes.
14         You graduated from this program 13 years ago,
15    correct?                                                             10:36
16    A.   That's correct.
17    Q.   And in 13 years you've been asked to speak at that program
18    one time, correct?
19    A.   No, I think actually twice.
20    Q.   Do you recall in March 2014 you stated that it had been        10:36
21    one time?
22    A.   I think there was two times.  But again, it's one, two.  I
23    keep in regular contact with my thesis mentor, Dr. John Gold.
24    Q.   And you have not been offered a job to teach there,
25    correct?                                                             10:36
```

1    A.    I have never applied for a job to teach there.

2    Q.    And you've not offered any articles, papers, or

3    dissertations, aside from your honors thesis and your capstone

4    thesis, for that program, correct?

5    A.    That's correct.                                          10:36

6    Q.    And is it fair to say that every year the Edmund A. Walsh

7    School of Foreign Service gives honors to undergraduates who

8    complete an honors thesis?

9    A.    I don't know if that's true or not.  You have to apply to

10   actually write the thesis, and then the thesis has to be      10:36

11   approved.  So I don't know if there's ever been an instance --

12   the number of people in my program who were approved to write

13   these theses were -- it was about six or seven people.  And I

14   know for a fact that at least two of those people had their

15   theses denied.                                                 10:37

16           So I don't know if there's ever been a year where

17   everyone had their thesis denied.  It's not just an automatic

18   approval process.

19   Q.    That's not the question that I asked you.  Maybe I should

20   rephrase it.                                                   10:37

21           Every year people apply to this program, correct?

22   A.    I'm sorry.  What's that?

23   Q.    Every year people apply to this program, correct?

24   A.    I believe so.

25   Q.    So there is the potential for the school to graduate    10:37

1    people every year with honors?

2    A.   I couldn't answer that question.  It's possible, but I

3    don't know how many people graduate per year with honors

4    because I'm not privy to that information.

5    Q.   In prior testimony, you frequently claimed that you took    10:37

6    classes in law school on Afghanistan and Islam, correct?

7    A.   I think it's a fact, but I have said that, yes.

8    Q.   But in fact, you only took one class on Afghanistan and

9    Islam, correct?

10   A.   I said *course work in Afghanistan and Islam*.  The course    10:37

11   title is *Afghanistan and Islamism*.

12   Q.   So you took one class?

13   A.   Correct.  Yes.

14   Q.   I would like to ask you some questions now about your

15   methodology.    10:38

16          You've previously testified that you've tracked

17   hundreds of people, roughly 300 to 350, correct?

18   A.   It's more than that, but approximately.

19   Q.   How many people would you say you've tracked?

20   A.   I couldn't give you a number offhand, but it's in the    10:38

21   hundreds.  I have -- we have charts of individuals where we

22   have photographs and names of people.  I can think of -- I can

23   think of hundreds of people, but I couldn't give you an exact

24   number offhand.  I would have to tally that up.

25   Q.   In analyzing whether someone is a homegrown terrorist,    10:38

1    what variables do you use in your analysis?

2    A.    The exact variables I was just discussing.  When I look to

3    determine whether or not someone is a violent homegrown

4    extremist, I look to six prongs.  I look to see whether or not

5    someone is -- there is evidence that someone is engaged in                10:38

6    self-selecting plots or schemes.

7          I look to see whether or not someone has been engaged

8    in either actively attempting to travel outside of the country,

9    or have been -- sorry.  Excuse me.  I've been looking to see

10   whether or not if someone has been actively attempting to          10:39

11   acquire weapons.

12         I look to see whether or not someone is following a

13   radical sectarian ideology, specifically Anwar al-Awlaki.

14         I look to see whether or not someone is stockpiling

15   and/or deliberately redistributing terrorist propaganda.           10:39

16         I look to see whether or not someone is regularly

17   visiting terrorist websites.

18         I look to see whether or not someone is engaged in a

19   particular level of logistical subterfuge.

20   Q.    What is your understanding of a variable in social science   10:39

21   research?

22   A.    It depends on exactly what context you're referring it to.

23   Q.    Well, could you define it for me?

24   A.    Again, it's in the context of -- there is no single

25   definition for a variable in social science.  It depends on how    10:39

1    you define -- the context you're using it.

2    Q.   Don't you think most social scientists agree upon a term

3    that's commonly used?

4    A.   Again, it's entirely in terms of the context it's used.

5    There's no -- a variable is depending on what kind of -- if          10:39

6    you're doing a statistical analysis versus a -- I don't even

7    understand exactly what you're asking.  But again, I think the

8    bottom line is you have to give me a context in which that's

9    relevant.

10   Q.   I'll just ask you one last time.                                10:40

11        Do you know what a variable is as it is used in

12   social science research?

13        MS. DEWITT:  Objection, Your Honor.  Asked and

14   answered, and argumentative at this point.

15        THE COURT:  Overruled.                                          10:40

16        THE WITNESS:  I believe I do, yes.

17   BY MS. VIRAMONTES:

18   Q.   Can you define it?

19   A.   A variable is a particular -- when you're looking at a

20   particular set of circumstances, when you're doing a                 10:40

21   comparative analysis, a variable would be something you're

22   looking at that changes between different people.  And whether

23   or not the changes are the same, that is relevant to the

24   analysis of whether or not two things are similar or different.

25   Q.   Would you be surprised if most social scientists don't          10:40

1    define it that way?

2    A.   Again, it's entirely in the context.  I'd have to know the

3    context you're referring to.  There may be a different

4    definition, but since you're not giving me a context it would

5    be impossible for me to respond to that question.          10:40

6    Q.   What attributes do you use in studying homegrown

7    terrorism?

8    A.   Attributes of what?

9    Q.   Attributes of variables?

10            THE WITNESS:  Your Honor, I can't answer these        10:41

11   questions because --

12            THE COURT:  Well, if you can't answer the question,

13   say you can't.

14            THE WITNESS:  I can't answer the question.

15   BY MS. VIRAMONTES:                                             10:41

16   Q.   What is your understanding of an attribute in social

17   science research?

18            THE WITNESS:  I don't understand the question, Your

19   Honor.

20   BY MS. VIRAMONTES:                                             10:41

21   Q.   I think the question speaks for itself.  If you don't know

22   the answer, you don't know.

23   A.   I don't know the answer.

24   Q.   Okay.  What operational definitions do you use?

25   A.   Operational definitions of what?                          10:41

1   Q.   Your variables?

2   A.   I can't answer that question as it's phrased.

3   Q.   Okay.  What's your understanding of an operational

4   definition?

5   A.   I can't answer that question without some context.  You're      10:41

6   asking me to define things that have no definition.  You have

7   to give me context to where this is relevant.

8            If you ask me a variable in a particular study --

9   what is a variable of a particular study, I can tell you.  But

10  you're asking me questions that don't really have answers.      10:41

11  Q.   I'm asking you how most social scientists would define

12  what is an operational definition.  Operational definitions is

13  something that --

14  A.   An operational definition --

15           THE COURT:  Okay.  Wait until the question is      10:42

16  finished before you begin your answer.

17           You can state the question again.

18           MS. VIRAMONTES:  Sure.  Thank you, Your Honor.

19  BY MS. VIRAMONTES:

20  Q.   My question to you is, how do social scientists define      10:42

21  operational definition?

22  A.   An operational definition would be the explanation of a

23  term as it is used in operation.

24  Q.   Would you be surprised that most social scientists do not

25  define it that way?      10:42

1    A.    Again, not knowing what the context of what you're asking

2    me, it's very, very difficult for me to give you any reliable

3    answers to the questions you're asking me.

4    Q.    In this case, you've identified factors that show someone

5    is a homegrown terrorist, correct?                                    10:42

6    A.    Correct.

7    Q.    And those factors differ from factors you've identified in

8    other cases, correct?

9    A.    Not significantly.  In some other cases, I have only cited

10   the particular factors that are present.  However, then I have        10:42

11   also noted in those cases that there is a varying degree of

12   confidence because of the fact that only four of six factors.

13            In more recent cases, I've actually been also

14   identifying factors that are not present so that I can -- I

15   didn't know that that was necessarily relevant, but in more           10:43

16   recent cases I've been identifying factors that are not present

17   as well, to allow for people to understand in the terms of the

18   context which factors are most relevant.

19   Q.    So your profile is fluid?

20   A.    I would say it has to be, yeah.  Not every one is the           10:43

21   exact same.

22   Q.    Let's talk about one of the factors that you've

23   identified:  The formulation of self-selecting schemes and

24   traveling abroad to foreign terrorist organizations, attending

25   training camps, and/or achieving imminent acts of physical           10:43

```
 1  violence.
 2            How do you measure that?
 3  A.    How do I measure that?  I look to see whether or not
 4  individuals are talking about traveling abroad to a foreign
 5  conflict zone, whether or not individuals are actively scheming    10:43
 6  to carry out an act of violence inside the United States or in
 7  another country.
 8            I look to see whether or not these conversations are
 9  sustained, whether they are specific, whether they refer to
10  specific countries, specific means of entering those countries,    10:44
11  specific means of carrying out a violent attack, specific means
12  of obtaining the means to carry out the violent attack.  I look
13  at all those different things.
14  Q.   Is talk just enough?  Someone talking about doing things,
15  is that enough?                                                    10:44
16  A.   If there is sustained discussion, absent someone actually
17  booking a ticket to travel abroad, or absent someone actually
18  taking physical steps to fulfill that fantasy, that alone
19  probably would not be enough.
20  Q.   How many times do they have to talk about it?                 10:44
21  A.   Again, it's looking in the totality.  If you have
22  sustained series of conversations where there is very specific
23  discussions, and which -- in which there are physical steps
24  that have been taken to fulfill these steps, i.e., not only are
25  you talking about traveling, but you book a ticket, or you get     10:44
```

```
 1   a passport, or you make an itinerary, things like that.  Once
 2   you start taking physical steps to turn language into action,
 3   that's when that becomes significant and meaningful.
 4   Q.   So that's also fluid?  It's not concrete?
 5   A.   It's a behavioral analysis, a social science analysis.
 6   Q.   You also mentioned physical violence.  Would a punch
 7   constitute physical violence?
 8   A.   When I'm talking about physical violence here, I'm talking
 9   about physical violence that is generally caused by firearms or
10   explosives.
11   Q.   When something is "imminent," what does that mean?
12   A.   My definition of imminent, again, is when someone is
13   taking significant physical steps to put a plan into action.
14   If the plan is to travel abroad, someone purchasing a ticket,
15   getting a passport, setting up an itinerary, making a plan to
16   leave, that's quite significant.  Someone actually traveling to
17   the airport, that's even more significant.
18            When someone that's actually planning on carrying out
19   an act of violence, say here in the United States or in another
20   country, well, look, if someone is not just scheming to carry
21   out the plot, that they've acquired the weapons, they've
22   acquired the means to do it, they've laid out a plan of
23   operation, they've selected a date, these are all significant.
24   Q.   Mr. Kohlmann, I asked you about imminency.  So when you
25   say something is imminent, does that mean tomorrow?  Does that
```

10:45

10:45

10:45

10:45

10:46

1  mean a month from now?  Does that mean a year from now?  Or is

2  that also fluid?

3  A.    Imminence means it's very likely to occur in the short

4  term.  But again, when you're talking about human beings, you

5  can't predict future events absolutely.                          10:46

6  Q.    Okay.  Another factor that you've identified is the

7  acquisition of weapons and paramilitary training manuals and

8  the establishment of makeshift training camps.  How is this

9  measured?

10  A.    This is measured often through whether or not individuals  10:46

11  are acquiring weapons, or attempting to acquire training in a

12  manner that is sufficiently distinct from their prior

13  activities and sufficiently distinct from normal activities.

14         In other words, if people are going to a gun range

15  and they're deliberately attempting to obfuscate their          10:46

16  identities, or they're deliberately attempting to obfuscate

17  what their purpose is there, if someone starts acquiring sniper

18  scopes, and things like that, if someone starts acquiring the

19  ingredients to produce explosives, that's all quite relevant.

20  Q.    How many weapons do they have to acquire?                  10:47

21  A.    Well, for someone to murder somebody else, you only need

22  one weapon.  But I think it's more about whether or not they're

23  acquiring the weapons that fit the plot that they are

24  describing, or the self-selecting scheme that they are

25  theorizing they are going to carry out.                         10:47

1    Q.   So the number of weapons also varies?

2    A.   It's not about number of weapons; it's about means to

3    carry out an attack.  If someone is talking about carrying out

4    a bombing and they've only managed to acquire a revolver, well,

5    that's significant, but it's certainly not dispositive of          10:47

6    whether or not there is imminency.

7            If someone is --

8    Q.   I asked you about the number of weapons --

9            MS. DEWITT:  Objection, Your Honor.  Interrupting the

10   witness.                                                           10:47

11           THE COURT:  You need to rise when you make your

12   objections.  And I didn't hear you.  I'm sorry.

13           MS. DEWITT:  I'm sorry, Your Honor.

14           I would ask that counsel allow the witness to

15   complete his answers.  When she doesn't like it, she speaks       10:47

16   over him.  I would ask she just wait until he finishes.

17           THE COURT:  All right.  The objection is sustained.

18   So let the witness finish.

19           MS. VIRAMONTES:  Thank you, Your Honor.

20           THE COURT:  Go ahead.  Were you done with your            10:48

21   answer?

22           THE WITNESS:  I think I was done.

23           THE COURT:  All right.  Ask your next question.

24           MS. VIRAMONTES:  Thank you, Your Honor.

25   BY MS. VIRAMONTES:                                                 10:48

1    Q.    My question to you was, how many weapons?

2    A.    Again, it has to do with -- it has entirely to do with the

3    context of the case.  These are all contextual questions that

4    are looking at the totality of the evidence and examining all

5    the evidence in totality.  If you take one piece or another          10:48

6    piece, it's not meaningful.

7    Q.    Okay.  So the number of manuals is also contextual?

8    A.    Yeah, it's contextual.  Again, someone might download 20

9    training manuals, but if none of them are actually relevant to

10   the self-selecting plot or scheme that someone is thinking           10:48

11   about carrying out, well, that's not necessarily as relevant.

12           If someone has one training manual, but it happens to

13   detail exactly what it is that they're talking about carrying

14   out, well, that's quite significant.

15   Q.    One of the other factors that you've identified is the         10:48

16   adoption of hardline sectarian religious perspective often

17   identified with Salafi-Jihadi -- and I know I completely

18   butchered that.  That's spelled S-A-L-A-F-I, hyphen,

19   J-A-H-A-D-I or Takfiri, T-A-K-F-I-R-I, School?

20   A.    You did pretty well, yes.                                      10:49

21   Q.    Thank you.  Earlier, you testified that your profile isn't

22   based on religion, correct?

23   A.    That's correct.  It's not based on religion, per se.

24   Q.    But these two sects are both Muslim, correct?

25   A.    The individuals who have joined this sect include              10:49

 1    individuals of both Muslim and non-Muslim background.  I've

 2    seen individuals who have very little religiosity, in the

 3    conventional sense, who have adopted this as a political

 4    philosophy.  It is a quasi-political religious philosophy.  But

 5    again, it's -- the people that join this particular sectarian        10:49

 6    ideology come from all sorts of different backgrounds, and I

 7    believe that's what I was referring to when I said that

 8    religion does not go into this.

 9            However, it's true that the prong is based on having

10    a sectarian view.  It's a sectarian political religious view,       10:49

11    though.

12    Q.   I'm afraid you lost me there with your answer.

13            So if someone belongs to the Takfiri School, they

14    can't also be a born-again Christian, correct?

15    A.   No.  What I'm suggesting is, is that they are individuals       10:50

16    who are born-again Christians who become radicalized and adopt

17    this particular philosophy.  Now, they don't always adopt the

18    religious parts of it, i.e., they may still smoke cigarettes.

19    They may still use drugs.  They may still drink alcohol.  But

20    they adopt the political aspects of this ideology.  It's            10:50

21    because of the fact that the ideology that they're adopting is

22    actually not really Islam; it's their own ideology, and they

23    are kind of making up things as they go along.

24    Q.   But the Salafi-Jihadi and the Takfiri, those ideologies

25    are rooted in religion?                                             10:50

1    A.    That's correct.   That's correct.

2    Q.    How do you measure whether someone has adopted this

3    hardline sectarian religious perspective?

4    A.    I look to see which particular clerics they are following,

5    and I look to see what they have said about those clerics.   And    10:51

6    I look to see specifically what sermons or what recordings of

7    those clerics that they have drawn significance to, and what

8    about those recordings that they find most compelling.

9    Q.    So it's focused on certain clerics and certain clerics'

10   teachings?    10:51

11   A.    That's correct, yes.

12   Q.    Another factor that you've identified is the collection

13   and/or redistribution of terrorist propaganda, correct?

14   A.    That's correct.

15   Q.    How is that measured?    10:51

16   A.    Whether or not -- again, if someone visits a YouTube video

17   that has a picture of Osama Bin Laden in it, that is not

18   dispositive of anything.

19         However, if someone has acquired a large quantity or

20   a significant quantity of propaganda videos, of original    10:51

21   propaganda videos produced by an official Al-Qaida media wing,

22   or if they are deliberately collecting training manuals or

23   magazines put out by a particular media wing of a terrorist

24   organization, and then they are deliberately attempting to

25   spread these training manuals and videos to other individuals    10:52

```
 1   who they perceive to be potentially sympathetic or might join

 2   this movement, that is demonstrative of that.

 3   Q.    This prong, then, is also contextual, correct?

 4   A.    Well, it's -- if you understand what real terrorist

 5   propaganda is, yes.  I guess you have to understand what real      10:52

 6   terrorist propaganda is to understand whether or not a

 7   particular piece of terrorist propaganda is relevant to whether

 8   someone has been radicalized or not.

 9         Again, I've seen people that are not radicalized view

10   Osama Bin Laden videos.  But very, very few individuals who are   10:52

11   not radicalized are regularly viewing every single video put

12   out by Al-Qaida in the Arabian Peninsula.

13         Inspire Magazine, someone might have one copy of

14   Inspire Magazine produced by Al-Qaida in the Arabian Peninsula.

15   But when someone has five or six different issues and is paying   10:53

16   particular attention to articles and is making notes and is

17   saying to people, *You should read this article or that article,*

18   that to me is demonstrative of a fact that, again, there is

19   evidence of significant existence of terrorist propaganda and

20   the redistribution of terrorist propaganda.                        10:53

21   Q.    In terms of what constitutes *collecting*, that's

22   contextual.  Whether someone has one publication, 10

23   publications, 100, that's not what you're measuring?

24   A.    I'm not necessarily measuring -- again, this is not a

25   statistical tally.  I'm not saying, *Well, he has a 100, so he's*  10:53
```

1    *a violent homegrown extremist.*

2            What I'm saying is is that this person has recordings

3    that are original propaganda recordings from a particular

4    terrorist group.  This has not been laundered.  This is not a

5    news recording.  This is an original recruitment video produced      10:53

6    by a terrorist group, and there are several of them.  That's

7    what I'm looking for.

8            I'm looking for original productions by terrorist

9    groups, and I'm looking for particular videos or particular

10   communiques or particular magazines that hold residence for       10:54

11   homegrown extremists.  There are particular videos, there are

12   particular magazines, there are particular media wings from

13   Al-Qaida that have particular residence among extremists that

14   are based in Western countries.

15   Q.   My question was, you're not looking at the units of           10:54

16   measurement?  You're not looking that someone has five

17   magazines, 10 magazines, correct?

18   A.   I'm looking at that, but I'm not using that as a

19   dispositive factor in my inquiry.

20   Q.   Another element or factor that you look at is the browsing    10:54

21   of Internet websites run by or on behalf of international

22   terrorist organizations, correct?

23   A.   Correct.

24   Q.   How is that measured?

25   A.   Again, that's measured in looking at, first of all, the       10:54

1    quality of the sites that someone is visiting.  Is someone

2    visiting a site which is very, very low tier on the totem pole?

3    Or are they visiting a site which is the official website of a

4    terrorist organization?

5          And in terms of the contents they're browsing on this    10:54

6    site, are they browsing a page that says, you know, *about us,*

7    so they are looking to see who put this website together?  Or

8    are they browsing terrorist propaganda that's on this website?

9    Are they regularly browsing this website?  Have they suggested

10   that others should view this website?  Have they told others    10:55

11   why they should be viewing this website?  Or what the

12   significance of this website is, in terms of international

13   terrorism.

14         I look for those kind of things.

15         So I look to see whether or not someone browsing    10:55

16   these sites was an incidental act of Internet curiosity or

17   whether this was the product of a deliberative effort to view

18   these sites and to get others to view these sites.

19   Q.   How do you define "regularly"?

20   A.   "Regularly" meaning that they visited more than once or    10:55

21   more than twice.

22   Q.   If someone is browsing at something, as opposed to

23   actually absorbing the information that they're looking at, how

24   do you measure that?

25   A.   I look to see whether or not an individual has taken    10:55

1  particular articles from terrorist websites and has posted them

2  to their Facebook profiles.

3          I look to see whether or not they've posted to their

4  Twitter profiles.

5          I look to see whether or not they have emailed copies

6  of those materials to others that they perceived to be

7  sympathetic with these ideas.

8          I look to see what kind of comments that they have

9  attached to these articles.  Are they saying, *This is*

10 *ridiculous.  These guys are full of it*?  Or are they saying,

11 *These guys are geniuses, and we should do exactly what they are*

12 *saying*?

13 Q.   One of the other factors that you've testified about is

14 associating with known terrorists or extremists.  How is that

15 factor measured?

16 A.   I look to see whether or not these individuals describe in

17 their conversations attempting to reach out to an individual or

18 individuals or an organization, that they perceive to be a

19 legitimate jihadi organization, in the hopes that this

20 organization or this individual can either give them advice

21 about how to proceed, or physically can actually refer them to

22 somebody who can bring them into the group.

23 Q.   When you talk about associating, how many calls does

24 someone have to make to be associating?

25 A.   If someone sends an email to Anwar al-Awlaki, a single

10:56

10:56

10:56

10:56

10:57

1    email to Anwar al-Awlaki would be pretty significant to me.

2            If someone happens to encounter someone in the street

3    and they say hello to them, that's not significant.

4            But if someone is routinely attending seminars, or is

5    routinely attempting to reach out to someone, or in their          10:57

6    discussions with other extremists has specifically identified

7    someone and said, *That person is a source of knowledge for us.*

8    *This person can help us*, that would indicate, yes, this is a

9    known extremist that these folks are gravitating towards.

10   Q.   When you say "known," known by whom?                           10:57

11   A.   Either known in the community or known at-large.

12           Obviously, Anwar al-Awlaki, who I've talked

13   frequently about today, is known at-large, and his reputation

14   is out there.

15           There are also within local communities particular         10:57

16   individuals who may not be known to the American public at-

17   large or may not be famous but, nonetheless, within radical

18   communities have a particular gnash.

19           Shaykh Abdulla el-Faisal is an example of that.

20   Shaykh Faisal is not a household name.  He's a Jamaican.  He        10:58

21   converted to Islam.  He's been kicked out of the United

22   Kingdom, and he's been kicked out of Kenya.  He's an extremely

23   radical individual.  When people follow him, it's usually local

24   people who are following him, but that's a very strong

25   dispositive note that these folks are following a very radical      10:58

 1    ideology, even though he's not a household name.

 2    Q.    When looking at communication, you're also looking at

 3    self-reporting in measuring this, correct?

 4    A.    Self-reporting from who?  Self-reporting from me or them?

 5    Q.    From them.                                                   10:58

 6    A.    That's correct.  Sure.

 7    Q.    Another factor that you've discussed is somebody who is

 8    engaging in logistical subterfuge, trying to anonymize their

 9    Internet communications or make them invisible from law

10    enforcement, or engage in coded language, correct?               10:59

11    A.    Correct.

12    Q.    When someone takes steps to anonymize their Internet

13    communications, how many steps do they have to take?

14    A.    What I usually look to is whether or not individuals are

15    attempting to use something like the Tor Browser.  I don't know   10:59

16    if you're familiar with Tor, but it's an anonymizer browser

17    that's very popularly used by people using the illicit parts of

18    the dark web.

19           I look to see whether or not people talk about

20    changing their IP addresses.                                     10:59

21           I look to see whether or not people are attempting to

22    encrypt their communications and specifically using coded

23    language.

24           Coded language is a very strong indicative piece of

25    evidence to this because it is very rare that someone will       10:59

1    engage in sustained coded language on a telephone unless they

2    are deliberately trying to hide something from law enforcement

3    or intelligence agencies.

4    Q.   When you're looking at something like coded language, part

5    of what you're basing your assessment on is people self-                    11:00

6    reporting about that factor, correct?

7    A.   Well, no.  The primary source of information I'm relying

8    on are training manuals that are put out by Al-Qaida, both for

9    individuals that are homegrown extremists, as well as people

10   that have deliberately been recruited by the organization.                  11:00

11   Both training manuals, training manuals for both homegrown

12   extremists, as well as people that are in the organization,

13   have entire sections dedicated to the need to engage in coded

14   communications and offer specific examples of how coded

15   communications can work and what kind of codes should be used.              11:00

16   Q.   So when you're identifying people using coded language,

17   you're looking to Al-Qaida publications for guidance?

18   A.   I'm looking to Al-Qaida publications for guidance in terms

19   of the significance of coded communications and the types of

20   coded communications people would use.  And then I'm comparing             11:00

21   that, then, to the actual context of communications between

22   individuals, and I'm trying to see whether or not those

23   communications seem to fit what is being described in the

24   training manual.

25   Q.   Which studies did you review in creating your profile?               11:01

1   A.   As far as I know, I'm not aware of any studies that have

2   looked at these various different factors.  So I guess the

3   answer is none.

4   Q.   Are you aware that others would disagree with you --

5   A.   Umm --                                                      11:01

6   Q.   -- in the antiterrorism communities?

7           THE COURT:  Make sure you wait until the question is

8   done before you answer.

9           THE WITNESS:  I apologize, Your Honor.  Sorry, Your

10  Honor.                                                           11:01

11          It's always good to have disagreement.  I have talked

12  about these prongs and these factors with a variety of

13  individuals.  I would say not everyone agrees with me, but I

14  would say a significant number of people would agree that when

15  someone is engaged in self-selecting plots or schemes, when    11:01

16  someone is attempting to stockpile weapons, or is making

17  immediate plans to travel abroad, when they are a follower of

18  Anwar al-Awlaki, when they're stockpiling terrorist propaganda,

19  when they're visiting terrorist websites, when they're engaged

20  in subterfuge, most terrorism experts that I know would tend to  11:01

21  agree that that's a pretty strong indicator of terrorist

22  activity.

23  BY MS. VIRAMONTES:

24  Q.   Mr. Kohlmann, my question was, are you aware of other

25  social scientists who disagree with your methodology?           11:02

1   A.    I think I answered the question.

2   Q.    I don't believe you did.  I would like to ask you --

3              THE WITNESS:  Your Honor, should I answer it again?

4              THE COURT:  No.  I think he did answer the question.

5   BY MS. VIRAMONTES:                                        11:02

6   Q.    What theories address your profile?

7   A.    I'm sorry.  I don't understand that question.

8   Q.    An example of a theory would be critical race studies.

9   What theories address your profile?

10  A.    I don't believe that there is a theoretical approach for    11:02

11  this profile.  Again, my understanding, it's comparing apples

12  and oranges.

13  Q.    Are you aware that other social scientists disagree with

14  you on that point?

15  A.    It's certainly possible.                            11:02

16  Q.    Do others in terrorism studies disagree with your

17  findings?

18  A.    It's possible, sure.  I'm aware of at least one individual

19  who disagrees -- or two individuals.  I'm aware of at least two

20  individuals who disagree with some of my findings.         11:02

21  Q.    Are you familiar with Professor David Miller's criticism

22  of your work?

23  A.    Not offhand, no.

24  Q.    He's been cited in expert reports in cases that you've

25  testified in.                                             11:03

 1  A.    I'm not familiar with his work.

 2  Q.    Are you aware that one of the criticisms about your work

 3  is that your focus on the Internet means that you have a very

 4  limited knowledge and understanding?

 5  A.    Well, I should clarify.  Though a lot of the research that     11:03

 6  I do is focused on the Internet, it's not at all the sole

 7  source of research.  I actually physically go out and I

 8  interview people in a primary source capacity.  So anyone that

 9  suspects or believes that all of my research is entirely

10  Internet based simply just doesn't under -- has never actually    11:03

11  taken a look at the research I'm conducting.

12  Q.    Did you do experiments in creating your profile?

13  A.    Yes.

14  Q.    What experiments did you do?

15  A.    I took the various different prongs that we had collected,    11:03

16  and I began applying it to actual case studies of individuals

17  that we were looking at.  And I began seeing whether or not

18  these prongs appeared to be -- appeared to apply correctly and

19  whether or not they appeared to be significant in the context

20  of the evidence.                                                   11:03

21  Q.    Did you have an experiment group and a control group?

22  A.    It's very, very difficult in this realm to have a control

23  group, so I guess the answer is no.

24  Q.    You've testified that you've tracked hundreds of people

25  online, correct?                                                   11:04

1    A.    That's correct.

2    Q.    Certainly, that's large enough to conduct experiments on,

3    isn't it?

4    A.    Not really.  You can conduct statistical analysis with

5    several hundred individuals.  But again, my personal experience        11:04

6    from having conducted that statistical analysis -- back when I

7    first started this, I did a statistical analysis of the

8    casualties of Westerners in terrorist attacks spread over 10

9    years.  And I did a statistical analysis looking at several

10   hundred different incidents.  And what I discovered was that --        11:04

11             THE COURT:  You do need to slow down.

12             THE WITNESS:  I apologize, Your Honor.

13             I discovered that one particular instance -- the

14   World Trade Center bombing in 1993 -- the numbers from that one

15   bombing radically threw off the entire statistical profile, and       11:04

16   it created unrealistic results, or results that were

17   misleading.

18             So I guess that's the answer to your question.

19   BY MS. VIRAMONTES:

20   Q.    You testified earlier that you've never taken a class in        11:04

21   statistics, correct?

22   A.    That's correct.

23   Q.    So you didn't use an experiment group; you didn't use a

24   control group, correct?

25   A.    I did use an experiment group.  I did not necessarily use       11:05

1    a control group, though.  Because again, it's very difficult to

2    -- well, I guess I did use a control group because I was

3    looking at individuals that I believed from the start -- my

4    assessment was that they were not extremists.  So I was taking

5    them and using them as the control, saying, *If these*                11:05

6    *individuals I don't believe are extremists, what is different*

7    *about these individuals from the individuals who might be*

8    *extremists?  What would distinguish someone from someone who is*

9    *simply, again, saying negative things about the United States*

10   *online versus someone who is actually engaged in disturbing*        11:05

11   *conduct?*

12   Q.   In selecting what you're now calling your experiment

13   group, did you use probability sampling?

14   A.   No, I did not.

15   Q.   Did you use randomization?                                      11:05

16   A.   No, I did not.

17   Q.   Did you use matching?

18   A.   Not that I can recall.

19   Q.   Have you testified that -- I'm sorry.

20        You have testified that you've conducted field                  11:05

21   research, correct?

22   A.   That's correct.

23   Q.   What method did you use in conducting your research?

24   A.   Direct observation.

25   Q.   You didn't use naturalism, correct?                             11:06

1    A.    I used direct observation.

2    Q.    Do you know what "naturalism" is?

3    A.    No, I don't.

4    Q.    Did you use ethnomethodology?

5    A.    Again, I just answered.  My method was direct observation.                    11:06

6          In the kind of research that I'm conducting, I'm

7    directly observing events, and I'm directly interviewing people

8    and collecting that information.  It's direct observation.

9    That's the method that I'm using.

10   Q.   Are you aware that in social sciences social scientists                        11:06

11   will use more than one method?

12   A.   By depending on what kind of study that they're doing or

13   depending on what kind of research they're conducting.

14         But again, terrorism research poses some very

15   significant obstacles to traditional social science research.                      11:06

16   So not all methods or approaches that are valid in social

17   science could necessarily apply to doing research in,

18   specifically in the area of terrorism.

19         Whether or not someone has done that or not, I don't

20   know.  It doesn't apply to my particular area of expertise, and                    11:06

21   it doesn't apply to my methodology of research.

22   Q.   And you're aware that others in terrorism studies disagree

23   with that?

24   A.   Again, depending on what they're studying.  Terrorism is a

25   very broad field.  You could be studying everything from hair                      11:07

1  color of suspected terrorists, to recruitment of terrorists,

2  terrorists financing.

3           When it comes to financing issues, I'm quite sure

4  that there is a statistical analysis that can be done that's

5  relevant.  And when it comes to looking at particular aspects,          11:07

6  there might be other approaches that are relevant.  With the

7  kind of research that I do, and the kind of analysis that I do,

8  direct observation is the best form of primary source research.

9  Q.   Going back to my question, you didn't use

10  ethnomethodology, correct?          11:07

11  A.   Not to my knowledge, no, I did not.

12  Q.   Do you know what that is?

13  A.   No, I don't.

14  Q.   You didn't use grounded theory, did you?

15  A.   Not to my knowledge.          11:07

16  Q.   Do you know what that is?

17  A.   That's not an area of research or methodology that I

18  employ.

19  Q.   You didn't use extended case method, did you?

20  A.   Not to my knowledge.          11:07

21  Q.   Do you know what that is?

22  A.   Again, this is not something that -- it's not part of my

23  research method or my methodology.

24  Q.   Did you use institutional ethno -- ethnography?

25  A.   Institutional ethnography?          11:08

1    Q.    Yes.

2    A.    No, I did not.

3    Q.    Do you know what that is?

4    A.    I have some idea of what it is, but I did not use it in

5    this study.                                                          11:08

6    Q.    Did you use participatory action research?

7    A.    I don't believe so, no.

8    Q.    Do you know what that is?

9    A.    I, honestly -- no, I don't.

10   Q.    In preparation for your field work, did you review         11:08

11   relevant literature?

12   A.    I did.

13   Q.    Which publications did you review?

14   A.    Because of the fact that I'm conducting primary research,

15   and because of the fact that I was personally observing things,   11:08

16   what I did was, I read all of the books that were written by

17   the individuals who I was interviewing.  I read other

18   interviews that had been conducted with these individuals.

19            THE COURT:  Slow down, please.

20            THE WITNESS:  I apologize, Your Honor.                    11:08

21            I read testimonials of others who knew these

22   individuals and had particular knowledge of these individuals

23   so that I was able to present the most effective series of

24   questions, and I could obtain information that was not already

25   available or not already known.                                   11:09

```
 1    BY MS. VIRAMONTES:
 2    Q.   I should have clarified.  When I said "relevant
 3    literature," I meant other studies.
 4              Did you read other studies in preparation?
 5    A.   Again, direct observation is not the same thing as a          11:09
 6    study.  Direct observation is going and directly observing
 7    things and recording them.  It's a different type of social
 8    science research than what you're talking about.
 9    Q.   When you've interviewed people, have you used a standard
10    set of questions?                                                  11:09
11    A.   No.  There are some questions that I use that are
12    consistent, and there are some questions that, depending on who
13    I'm talking to, are subject-matter specific.
14              So in other words, if I'm interviewing someone
15    generally speaking about Al-Qaida, I certainly might ask them      11:09
16    their views on Osama Bin Laden or the split within Al-Qaida.
17    But if someone has a particular background in fighting in a
18    place like Bosnia or Herzegovina or Chechnya, or whatnot, my
19    questions are invariably going to be channeled towards the
20    areas that I believe are most relevant for the person that I'm     11:09
21    speaking to and in which case I'm going to get the most
22    relevant information.
23    Q.   Do you ask quantitative questions?
24    A.   Occasionally, I do.  But again, asking quantitative
25    questions to individuals who are the violent homegrown             11:10
```

1   extremists, you don't often get a reliable statistical answer.

2   Q.   Do you ask qualitative questions?

3   A.   Yes.

4   Q.   How do you code the responses that you get?

5   A.   I record everything that's being said.  I don't have to                    11:10

6   code anything.  I record it all.

7   Q.   Well, if you don't code it, how do you measure it then?

8   A.   I record all of the -- again, you're talking about two

9   different kinds of social science research.  Direct observation

10  simply involves recording something, and then afterwards                       11:10

11  breaking it down into facts.  This is different types of social

12  research that I -- social science research that I think you're

13  mixing together.

14  Q.   Are you aware that others would disagree with that?

15  A.   They're certainly within their right.                                      11:10

16  Q.   You've testified that you use comparative analysis,

17  correct?

18  A.   Correct.

19  Q.   Isn't the correct term "comparative research"?

20  A.   Not as was told to me or taught to me at Georgetown                        11:10

21  University.  If someone else chooses to refer to it with other

22  terminology, that's fine.  But as it was taught to me by

23  Dr. Joseph Lepgold who was at the time the Director of the

24  Department of Political Science at Georgetown Univers -- sorry,

25  the Department of Government at Georgetown University, it's                     11:11

1    comparative analysis.

2    Q.   Comparative research is appropriate methodology when

3    you're looking at patterns in a different culture or country

4    over time, correct?

5    A.   It's applicable in a variety of different contexts.    11:11

6    Q.   And it's appropriate because you're examining society's

7    culture units over time and in comparison with each other,

8    correct?

9    A.   It is applicable in a variety of different contexts.

10   Q.   What you're really doing with your research is content    11:11

11   analysis; isn't it?

12   A.   That's correct, yes.

13   Q.   When looking at materials produced by terrorist

14   organizations, how do you control for your own bias?

15   A.   How do I control for my own bias?  I speak to individuals    11:11

16   who are of Muslim background.  I speak to individuals who are

17   not proponents of American foreign policy.  I speak to

18   individuals who are living in countries where these factions

19   are active.  And I also speak to individuals who are considered

20   to be sympathetic.    11:12

21          So an example of that would be in Yemen, there is an

22   individual named Abdelelah Shaeya.  And for a while, he was

23   serving as an unofficial voice for Al-Qaida in the Arabian

24   Peninsula.  I began speaking to Abdelelah Shaeya privately, and

25   I began interviewing him and speaking to him on the phone, and    11:12

```
 1    also asking him about a variety of different facts or evidence

 2    that were coming out from Al-Qaida in the Arabian Peninsula.

 3              THE COURT:  All right.  Do you have a --

 4              MS. DEWITT:  I do, Your Honor.  Just because -- I

 5    don't mean to be presumptuous -- because I'm sitting right in      11:12

 6    front of your court reporter --

 7              THE COURT:  We need to take a break.  But the witness

 8    had lapsed into a narrative, so it's hard to do that.

 9              MS. DEWITT:  I understand.  That's why I was trying

10    to wait.                                                          11:12

11              THE WITNESS:  Sorry, Your Honor.

12              THE COURT:  Have you finished your --

13              THE WITNESS:  Yes, Your Honor.  I apologize.

14              THE COURT:  You need to slow down.  I mean, you're

15    not the first witness I've said that to, but you really need to   11:13

16    concentrate and slow down when we resume.

17              All right.  We'll take a recess for 15 minutes.

18                        (Recess)

19              THE COURT:  Ms. Viramontes, you may continue.

20              MS. VIRAMONTES:  Thank you, Your Honor.                 11:32

21    BY MS. VIRAMONTES:

22    Q.  Mr. Kohlmann, earlier you discussed that you've done

23    experiments with the different cases that are -- or the

24    different persons that you've tracked in your database,

25    correct?                                                          11:33
```

1  A.    When I can, yes.

2  Q.    When you created your experiment group, did you use simple

3  random sampling?

4  A.    Again, I used the Bayesian approach.  So what I did --

5  there really isn't enough of a sample pool to do that kind of                11:33

6  data sampling; otherwise, you wouldn't have a significant

7  number of -- or a sufficient amount of data.  What I did was, I

8  did a Bayesian approach in --

9            THE COURT:  When you say "Bayesian," B-A-Y-E-S-I-A-N,

10  correct?                                                                      11:33

11            THE WITNESS:  Correct.

12            -- in which I took examples that did not seem to fit

13  properly, and I said, *Look, that's going to produce an aberrant*

14  *result.  I need to remove that.*

15            But that is a valid approach to doing this.                        11:33

16  BY MS. VIRAMONTES:

17  Q.    You did not use simple random sampling, correct?

18  A.    Again, I don't believe there is enough of a sample pool of

19  data to do that.  But, no, I did not.

20  Q.    The question is, you used it or you didn't use it?                     11:34

21  A.    Again, I don't believe it was applicable, so I didn't use

22  it.

23  Q.    Did you use systematic sampling?

24  A.    Again, in the case of when you have a data sample that's

25  not sufficiently large, the techniques that you're talking                  11:34

1    about I don't belive are applicable.  Or at least they're not

2    applicable to the kind of data that I was collecting.

3              THE COURT:  I'm sorry.  Can you repeat that answer

4    much more slowly?

5              THE WITNESS:  Yes, Your Honor.  Sorry, Your Honor.            11:34

6              Can you repeat the question again?

7    BY MS. VIRAMONTES:

8    Q.   You did not use systematic sampling, correct?

9    A.   Sure.  I don't believe that the data sample that I was

10   dealing with was large enough to use those kind of methods.           11:34

11   But I did not use them.

12   Q.   And you did not use stratified sampling, did you?

13   A.   Once again, I don't believe the data sample was large

14   enough for that kind of method.

15   Q.   How did you control for your own bias in selecting the           11:34

16   population?

17   A.   Well, I didn't -- it wasn't just me who selected it.  I

18   relied on not just myself but my analysts, as well, to bring

19   forward examples, analysts who come from a variety of different

20   backgrounds and a variety of different educations and speak a        11:35

21   variety of different languages.  I also took those examples and

22   then actually presented them at conferences in front of other

23   academics.  And I began presenting them in explaining how a

24   particular example seemed to typify a certain element of what I

25   was looking at:  Terrorists use of the Internet, propaganda,          11:35

1    recruitment online, self-recruitment, that kind of thing.

2           So I think what it is, it was a process of presenting

3    this in front of others, both inside at Flashpoint, as well as

4    others at conferences that I encounter.

5    Q.   Mr. Kohlmann, do you understand how social scientists                    11:35

6    typically control for their own biases in selecting populations

7    to study?

8    A.   Yeah.  There are a variety of different methods.  The best

9    method is blind, blind selection.  But again, when you have a

10   very small sample pool of data, it's very difficult to do blind    11:35

11   selection because the individual pieces of data are not

12   anonymous to begin with.

13   Q.   What errors in your sampling might make your results

14   misleading?

15   A.   Well, there is a variety of different things that could        11:36

16   come up, and I think that's why I rely on a Bayesian analysis

17   to immediately discount things that I know are going to produce

18   aberrant results and that don't appear to be representative of

19   a trend.

20   Q.   What errors have you identified?                                11:36

21   A.   Well, I can give you an example in another comparative

22   analysis, which I think I just did, which was that in doing an

23   analysis of Western casualties from terrorist attacks between

24   1990 and 2000, what I determined was is that if you include the

25   World Trade Center bombing of 1993 in calculating those            11:36

1    statistics, what ends up happening is, you end up having wildly

2    off numbers.  The numbers make it look like the terrorist

3    threat during the 1990's was far higher and far more severe

4    than it actually was.

5            If you discount the World Trade Center bombing, the        11:37

6    numbers that you get are much closer to what the actual fact

7    line was of what actually happened.

8    Q.   In terms of your homegrown terrorist profile, what errors

9    in your sampling might make your results misleading?

10   A.   If the evidence that I was provided, or the evidence I'm       11:37

11   relying on is faulty.  So in other words, if I'm presented with

12   a transcript of a conversation, and the transcript was

13   incorrectly recorded, that's certainly would lead to aberrant

14   results.

15           If I was not presented with a -- or I was not aware        11:37

16   of a particular piece of evidence, which always can happen,

17   that had a direct impact on the significance of that data,

18   i.e., six months after downloading a tremendous amount of

19   terrorist propaganda someone then became a -- went to a

20   university to become an expert on terrorist propaganda.  Well,    11:37

21   the reason they did that probably had to do with their

22   university education.

23           So there are a variety of different things that can

24   happen.  I mean, there is a potential for error.  The more

25   factors there are, the relative confidence goes up and the        11:38

1  relative possibility for error goes down.

2  Q.   You've testified before that you've tracked hundreds of

3  people from the United States, United Kingdom, Saudi Arabia,

4  and Kuwait, correct?

5  A.   Also Bosnia, Herzegovina, Chechnya, a lot of different                11:38

6  countries, yes.

7  Q.   How do you control for culture in the application of your

8  profile?

9  A.   Culture is not necessarily relevant.  Actually, it's not

10 relevant at all.  And I'll give you an example.                            11:38

11          I worked on cases in Bosnia or Herzegovina of

12 individuals who fit very neatly within the profile or the

13 prongs that I've created, even though they come from a

14 completely different culture.  The only difference with them is

15 that their terrorist propaganda is in their local language.                11:38

16 It's in Bosnia or it's in Kosovar as opposed to English and

17 Arabic, but the underlying content is the exact same:  Anwar

18 al-Awlaki, the particular website, the particular videos.  It's

19 just in a different language.

20          So the answer is, is that after having looked at            11:39

21 cases such as these pop up -- not just in the United States and

22 not just in English speaking countries, but other countries

23 besides -- I can effectively say this is a phenomena that

24 applies not just to English speakers or not just to Arabic

25 speakers.  In fact, language is really a secondary part of          11:39

1    this.  It's really about the ideology.

2    Q.   You don't control for culture because you don't think it

3    applies?

4    A.   In my experience, I haven't seen -- in my experience, I've

5    seen that culture has only very small influence on these          11:39

6    prongs, that these prongs hold -- or this model holds for

7    individuals who come from drastically different cultures than

8    the United States.  So if the model holds for individuals who

9    come from different cultures, then cultural bias -- if you're

10   not taking about my cultural bias, you're talking about their      11:39

11   cultural bias -- it's deemed to be not relevant based on the

12   evidence.

13   Q.   Are you familiar with a code of conduct of the American

14   Association For Public Opinion Research?

15   A.   I'm sorry.  Not offhand, no.                                   11:40

16   Q.   You don't apply it in your research, then, I assume?

17   A.   I'm not even aware of it, to be honest.

18   Q.   It's widely accepted that social researchers have ethical

19   obligations to the community of researchers, isn't it?

20   A.   I would say that there are ethical obligations to the          11:40

21   community of researchers, sure.  Yes.

22   Q.   Ethical obligations such as disclosing errors, correct?

23   A.   I think the number one most important duty or

24   responsibility is disclosing your sources, disclosing your

25   sources and methods.  So in that vain, everything that I           11:40

```
 1   publish is heavily footnoted indicating all of my sources and

 2   methods.  If you have someone's sources and methods, it's very

 3   easy to figure out from that basis whether or not there is

 4   bias, whether or not there is error.  Once you have the

 5   underlying components of the analysis, then there is -- anyone        11:41

 6   can redo that analysis to see whether or not it fits.

 7            So when I do this analysis, what I attempt to do is,

 8   I attempt to provide all of my sources, all of my footnotes,

 9   all of that information, so that if someone has questions about

10   how I got to a particular conclusion, they can actually follow        11:41

11   it back through the actual raw evidence.

12   Q.   Mr. Kohlmann, my question is, do social science

13   researchers have ethical obligations to disclose errors in

14   their work?

15            THE WITNESS:  Your Honor, I think I answered that            11:41

16   question.

17            THE COURT:  No, I don't think you did.

18            THE WITNESS:  Well, the answer is yes.

19   BY MS. VIRAMONTES:

20   Q.   Do social science researchers have ethical obligations to       11:41

21   disclose limitations in their work?

22   A.   If those limitations are known, sure.

23   Q.   Do social science researchers have ethical obligations to

24   disclose shortcomings in their research?

25   A.   If those shortcomings are known, yes.                           11:41
```

1    Q.    What limitations have you disclosed?

2    A.    I have disclosed the fact that, number one, not all of

3    these -- not all of the prongs of my model appear in every

4    single case.

5          I have acknowledged the fact that just because you

6    have one or two prongs is certainly not enough to explain that

7    someone is a violent extremist or a radical extremist.

8          I have acknowledged that there is a very slim

9    possibility that someone could meet many of these prongs and

10   still not be an extremist, although it's highly unlikely.

11         I have disclosed all of this.

12         In my most recent expert reports, I've also been

13   individually highlighting any factors that I deem to be

14   relevant that are not found in the evidence, so that if anyone

15   is curious about whether or not there are particular factors

16   that I deem to be relevant that are not shown in the evidence,

17   I have also in my most recent reports, I've been highlighting

18   that as well.

19   Q.    What mistakes did you make that you think should be

20   corrected in the future?

21   A.    Well, I don't think there is any obvious mistakes in this

22   model.  It's constantly evolving.

23         I think in the past -- I think the only major thing

24   that I think I've adjusted is that at a certain point in time I

25   realized that people -- when I was talking about self-selecting

11:42
11:42
11:42
11:42
11:43

1   plots or schemes, that had to include both self-selecting plots

2   and schemes of people seeking to travel abroad to join a

3   foreign terrorist organization, as well as individuals seeking

4   to carry out a violent act here.  The reason for that is

5   because that was explicitly the advice given by Anwar al-Awlaki   11:43

6   to individuals following him, which was that either -- you have

7   two options:  Either go abroad and go fight in the foreign

8   front line, or you fight here.

9         So after acknowledging that and acknowledging that

10  Anwar al-Awlaki is a central figure in this, again, I had to   11:43

11  make the adjustment.

12  Q.   I should clarify.  My question is, what mistakes did you

13  make in your methodology that you think should be corrected in

14  the future?

15  A.   What part of the methodology?  You mean the overall   11:43

16  methodology?  You mean as it applies to this case?  You mean as

17  it applies to cases in general?

18  Q.   Well, we're here because the judge wants to know about

19  your methodology in creating the homegrown terrorist profile.

20  So my question is, what mistakes did you make in creating that   11:44

21  profile that you think should be corrected in the future, your

22  methodology?

23  A.   I think I just highlighted one of the errors, I think,

24  initially.  Initially, I was focused on individuals carrying

25  out attacks here in the United States.  And what I realized is,   11:44

1    is that when it comes to AQAP and Al-Qaida generally, they are

2    equally interested or it's an equal possibility to push people

3    to join foreign front lines.  I didn't think that was

4    necessarily accurate, but that's directly from the words of Al-

5    Qaida -- the words of Al-Qaida -- so I made that adjustment.          11:44

6    But that was made quite a long time ago.

7              I'm not aware of any particular mistakes, other than

8    that, offhand, that I would care to draw attention to right

9    now.

10   Q.   You've previously stated that you've interviewed two          11:44

11   people convicted of terrorism offenses in the United States

12   after their convictions, correct?

13   A.   Correct.

14   Q.   Approximately 24 people have been convicted of

15   terrorism-related cases in the United States, correct?           11:45

16   A.   Correct.

17   Q.   One of the two men you interviewed was Ismail Royer,

18   correct?

19   A.   Randall Royer.  That's correct, yes.

20   Q.   And you interviewed him for approximately three hours,          11:45

21   correct?

22   A.   Yeah, I'd say that's about accurate.

23   Q.   You interviewed -- and I forgot to write down his first

24   name -- Mr. Bilal, the Portland Seven case, the younger one,

25   correct?                                                         11:45

1   A.   Muhammad Bilal, that's correct.  Yes.

2   Q.   And you interviewed him for approximately three hours,

3   correct?

4   A.   Approximately, yeah.

5   Q.   You made an effort to interview the other two dozen or so,   11:45

6   but you did not interview them, correct?

7   A.   Unfortunately, either because their lawyers would not

8   allow them to speak with me, or because they were otherwise

9   unavailable I have not been able to interview them.

10  Q.   You testified earlier that you went to terrorist   11:46

11  recruitment camps, correct?

12  A.   I went to seminars put on by extremist groups designed to

13  recruit people into terrorist groups, yes.

14  Q.   When were these seminars?

15  A.   These were in the summer of 2002, in the United Kingdom,   11:46

16  as well as in the United Kingdom in 2006.

17  Q.   Where exactly in the UK?

18  A.   In Tottenham, in Dewsbury, in Central London,

19  Walthamstowe, and several other areas as well.

20  Q.   And who hosted or put on these seminars?   11:46

21  A.   These seminars were put on primarily by a group known as

22  Al-Muhajiroun, but they were also put on by ancillary groups

23  that support al-Muhajiroun, M-U-H-A-J-I-R-O-U-N.

24  Q.   In terms of --

25  A.   I'm sorry.  Excuse me.  I didn't fully answer that   11:47

```
 1   question.  My apologies.
 2              In 2006, it was put on by a group called Al-Ghuraba.
 3              THE COURT:  Could you spell that?
 4              THE WITNESS:  Yes, Your Honor.  G-H-U-R-A-B-A.
 5   BY MS. VIRAMONTES:                                              11:47
 6   Q.   In terms of people who possess things, such as
 7   instructional terrorist materials or terrorist propaganda, or
 8   even people who read such things, you don't know what the
 9   intent is of the viewer, do you?
10   A.   Well, sometimes I do.  It depends on whether or not I have  11:47
11   access to what their reactions were after reading.  If they
12   called somebody or they wrote an email to somebody, or they
13   wrote it up on Facebook and I have a copy of that, yes.
14              In the case of individuals who are not yet being
15   prosecuted or not yet in custody, I can see this because of the  11:47
16   fact that these individuals are posting their responses on
17   password protected web forums run by Al-Qaida, that I have
18   access to.
19   Q.   In terms of the total number of people who view things
20   that are instructional, terroristic, promoting one to jihad,    11:48
21   you do not know with certainty how many people in the world are
22   actually viewing such things, correct?
23   A.   I have a good statistical idea.  We track --
24   Q.   But you don't know with certainty, correct?
25   A.   I have personally developed proprietary technology which    11:48
```

1  is capable of tracking the identities and the numbers of people

2  that are accessing terrorist web forums to download terrorist

3  propaganda.

4         However, I cannot say that someone didn't download

5  another piece of terrorist propaganda from some other website    11:48

6  that's not a terrorist website.

7         So in other words, I can tell you at a minimum how

8  many people have viewed it or how many people have seen it or

9  downloaded it, but I can't give you a maximum number.

10 Q.   In terms of knowledge of people who have extensive        11:48

11 collections on their computers, and the absence of access to

12 those people's computers are browsing histories, you have no

13 idea how many people there are with extensive collections,

14 correct?

15 A.   Incorrect.                                                 11:49

16 Q.   Your testimony is that you know how many people have

17 extensive collections on their computer?

18 A.   Well, I don't know the total number, but I know of people

19 that do, and I know approximately how many people do because of

20 the fact that these folks are talking about that online and     11:49

21 they're sharing these videos with each other online.

22        So someone might say, *I need a copy of this video*,

23 and someone will say, *Oh, I have all of those here*.

24        Or there are specific people that are set out that

25 are designed -- that are basically ferrying this stuff out      11:49

```
 1   every time someone sends out a request.
 2          So again, I can't put a maximum number, but I have a
 3   minimum number.
 4   Q.   You've testified before that you keep files on the people
 5   you track online, correct?                                          11:49
 6   A.   Correct.
 7   Q.   Have you ever produced those files in a case?
 8   A.   If they are relevant to the actual case, yes.  But
 9   otherwise, they are part of -- it's an enormous amount of data.
10   It's proprietary research, and no court has ever asked me to        11:50
11   turn over my entire database.
12   Q.   Can we review the ones that are relevant to this case?
13   A.   As far as I know, there is only one particular one that's
14   directly relevant to this case, in that I have saved messages
15   from a particular forum that I believe involved one of the         11:50
16   defendants from this case.  If you'd like copies of those
17   messages, I'm happy to turn them over.
18   Q.   Looking at your publications, you have not published an
19   article in *The Critical Studies on Terrorism*, have you?
20   A.   Not that I can recall, no.                                      11:50
21          THE COURT:  Is that a journal?
22          MS. VIRAMONTES:  That's correct, Your Honor.  Sorry.
23   BY MS. VIRAMONTES:
24   Q.   You have not published in *The Journal of Terrorism*
25   *Research*, have you?                                                11:50
```

1   A.   I'm not familiar with that particular journal offhand, but

2   the answer is no.

3   Q.   You have not published in *Perspectives on Terrorism*, have

4   you?

5   A.   I don't know.  I'm not sure offhand.  I don't think so,          11:50

6   but I'm not sure.

7   Q.   You have not published in *The Journal of Conflict*

8   *Resolution*, have you?

9   A.   No, I have not.

10  Q.   You have not published in *The Journal of Terrorism and*          11:51

11  *Political Violence*, have you?

12  A.   Not to my recollection.

13  Q.   This journal is one of the most preeminent research

14  journals in terrorism research, isn't it?

15  A.   To be perfectly honest with you, there's a whole bunch of         11:51

16  different journals that present themselves as the preeminent

17  journals.

18        My sense of it is, is it really depends what area of

19  terrorism research you're doing.  Again, saying "terrorism

20  research" is kind of like saying "an automobile."  There's a         11:51

21  variety of different kinds of terrorism research, and there's a

22  variety of different journals that apply.

23        Someone that would be writing in, like, say, *African*

24  *Security*, like a journal that I was writing in, which is

25  heavily substantive based, may not be publishing in a journal        11:51

1    that is heavily theoretically based.

2    Q.   You have not published in *Studies in Conflict in*

3    *Terrorism,* have you?

4    A.   Not that I can recall, no.

5    Q.   This journal is also one of the most preeminent research          11:51

6    journals in terrorism research, isn't it?

7    A.   Again, it really depends what area of terrorism research

8    you're talking about.  There are a variety of different

9    journals that are very prominent.  It just depends on what kind

10   of research you're conducting, what approaches you're using,          11:52

11   what kind of results you're seeking to produce.  It depends

12   from journal to journal.

13   Q.   You've testified about doing field work before, correct?

14   A.   I believe -- yes.  I believe we talked about that, yes.

15   Q.   And you speak English and French, correct?                       11:52

16   A.   Fluently, yes.

17   Q.   And you've testified before that you've never done field

18   work in a country where the native language is Arabic, correct?

19   A.   It depends what you mean by that.  I have done some field

20   work, in the sense that I've met with individuals from the            11:52

21   country who are responsible for doing the same kind of research

22   that I'm doing.  We have simply spoken in English.  That goes

23   for Saudi Arabia, Jordan, et cetera.  So it depends what kind

24   of field work.

25          If you're asking me have I actually gone out and               11:52

1    interviewed people on the street in Arabic, the answer is

2    certainly not, no.

3    Q.   Do you recall testifying in the United States v. Mehanna,

4    that you have never done field work in a country where the

5    native language is Arabic?                                        11:53

6    A.   Well, again, that's why I'm qualifying it by saying it

7    depends on what kind of field you're talking about.  If you're

8    talking about field work in the sense of going out and speaking

9    to people on the street, the answer is no.

10           But if you're talking about --                            11:53

11           THE COURT:  You need to slow down.

12           THE WITNESS:  I apologize, Your Honor.

13           If you're talking about field work in the sense of

14   speaking to people who are experts in this from the country and

15   sharing ideas, well, the answer is yes.  So it just depends,      11:53

16   you know, on the context.

17   BY MS. VIRAMONTES:

18   Q.   You've previously testified that you have not done field

19   work in a country where the native language is Arabic, correct?

20   A.   Again, that's why I'm qualifying it now.  I'm explaining     11:53

21   it depends how you're defining field work, or what you're

22   defining as field work.

23   Q.   You've also testified that you've done undercover work,

24   correct?

25   A.   Undercover work?  Yes, that's true.                          11:53

1  Q.   And an example of this would be that you went to a public

2  protest in Britain, correct?

3  A.   No.  A better example of that would be when I went to a

4  variety of different seminars put on by Al-Muhajiroun, and I

5  sat and I talked with the people there, and I listened to the          11:54

6  lecturers and they attempted to bring me into their group.  So

7  I think that's a better example.

8          Certainly, it's probably also true that when I was

9  participating in a rally, videotaping people from inside of the

10 rally, pretending to be part of the rally, that's, I would say,        11:54

11 probably defined as undercover work as well.

12 Q.   Do you recall testifying in United States v. Mehanna that

13 your undercover work was attending a public protest in Britain?

14 A.   Well, again, that's part of it.  That's not all of it.

15 Q.   I would like you to turn to Exhibit 207 in the binder in       11:54

16 front of you.  And when you've reached that tab, can you please

17 turn to the page that's labeled at the top 28 through 60?

18 A.   Sure.  You want me to read the whole page?

19 Q.   I would like you to read lines 15 through 22, to yourself.

20 A.   Yes.                                                          11:55

21 Q.   And you testified there that the undercover work you had

22 done was going to a public protest in Britain, correct?

23 A.   No.  I said that was one example, line 22.  That was one

24 example.

25 Q.   That's the example you gave in that case, correct?           11:55

1    A.    That was one example, but I'm giving you others, if you'd

2    like.  But I did give that example, that's correct.

3    Q.    You went to a public protest and you watched it, correct?

4    A.    No.  I was inside of the protester rally, and I was inside

5    of the core group of protesters where law enforcement and media    11:55

6    were not being allowed.

7    Q.    And you videotaped it, correct?

8    A.    I videotaped it.  I spoke with some of the protesters.  I

9    was, you know, I was basically trying to gain as much

10   information from inside of that rally as possible.    11:56

11   Q.    And at the time you attended the protest, your position

12   was no one else was doing what you were doing, correct?

13   A.    No one else was doing what?

14   Q.    That sort-of work, that sort of undercover work?

15   A.    Oh, no, no.  I'm sure Scotland Yard was probably doing it    11:56

16   as well, but they're not -- that's a government agency.  I'm a

17   private researcher.

18         As far as I could see, and I observed fairly

19   carefully, I did not see anyone else in that rally that I

20   recognized to be another academic or researcher or someone who    11:56

21   was not actually a jihadist.  I probably would have recognized

22   them if they had been someone within the field.

23   Q.    Do you recall testifying in United States v. Mehanna that

24   at the time no one else was doing it?

25   A.    Again, there was no other -- nobody else in my capacity    11:57

```
 1    but law enforcement.  I can't speak on behalf of law
 2    enforcement.  I don't know what law enforcement does or what
 3    they don't do, or intelligence agencies.
 4            But as far as, again, from researchers or academics
 5    or people like me, I don't think there was anybody else there,      11:57
 6    not anyone that I noticed.  And I was at the rally for upwards
 7    of five or six hours, and I videotaped the whole thing.  So
 8    presumably, even if I didn't notice somebody, afterwards, in
 9    watching this video, I would have seen them.  I would have
10    recognized somebody.  I didn't see anybody like that, not where    11:57
11    I was standing, anyway.
12    Q.   You've testified before that you know Rita Cass of the
13    site, Intel Group, correct?
14    A.   Well, I worked with her 15 years ago.  I don't stay in
15    regular contact with her, though.                                   11:57
16    Q.   You know she was born in Iraq, correct?
17    A.   Iraq.  Yeah, she was born in Iraq.
18    Q.   And you know that she's a native Arabic speaker, correct?
19    A.   That's correct.
20    Q.   And you've testified before that you know she's gone into    11:58
21    conferences in a berka, and fundraisers, correct?
22    A.   Well, I know this anecdotally through -- I believe through
23    news stories, and stuff like that.  But again, I haven't worked
24    with Rita Cass -- I haven't even worked in the same office with
25    her in over 15 years, so I may not be the best source of           11:58
```

1   knowledge on that.

2   Q.   Do you think there is the same level of risk involved with

3   going undercover, wearing a berka to a radical Islamic

4   conference, and attending a public protest where you talk to

5   some people?                                                    11:58

6   A.   Well, the guy next to me at the rally was dressed up as a

7   suicide bomber, and the guy to my left was setting flags on

8   fire.  So to be perfectly honest with you, did I feel like

9   there was danger at that rally?  Yeah, I did.  And as a result,

10  a number of the people who were at the rally were subsequently  11:58

11  prosecuted -- investigated and prosecuted by Crown Prosecution

12  Service in the UK, and by Scotland Yard.  So apparently, I was

13  not the only one that shared that perspective.

14  Q.   This was at a public rally in the United Kingdom?

15  A.   Yeah, it was.                                              11:59

16  Q.   You don't think British police forces are able to control

17  rallies?

18  A.   I'm not sure if you're aware of this, but last year a

19  British soldier was murdered in cold blood in the streets of

20  London by two individuals who ran him over with a car and       11:59

21  chopped his head off.  He was a British soldier raising money

22  outside the British military base, in Central London.  If they

23  can't stop that, how will they protect me?

24  Q.   That rally didn't get out of control, did it?

25  A.   I disagree.  Several of the individuals involved in the    11:59

```
 1  rally were arrested and prosecuted, specifically because it did

 2  go out of control.

 3  Q.   Mr. Kohlmann, you do not speak Arabic, do you?

 4  A.   Not fluently, no, definitely not.

 5  Q.   You do not speak Dari, correct?

 6  A.   Correct.

 7  Q.   You do not read Dari, correct?

 8  A.   Correct.

 9  Q.   You do not speak Farsi, correct?

10  A.   Correct.

11  Q.   You do not speak Urdu, correct?

12  A.   Correct.

13  Q.   You do not read Urdu, correct?

14  A.   That's correct.

15  Q.   You do not read Pashto, correct?

16  A.   That's correct.

17  Q.   You do not speak Pashto, correct?

18          THE COURT:  All right.  Ms. Viramontes --

19          MS. VIRAMONTES:  That's my last one about the

20  language.

21          THE COURT:  Okay.  Go ahead.

22  BY MS. VIRAMONTES:

23  Q.   You have not been to Afghanistan, correct?

24  A.   Correct.

25  Q.   You have not been to Pakistan, correct?
```

11:59

11:59

11:59

12:00

12:00

1    A.    That's correct.

2    Q.    You have not been to Iraq, correct?

3    A.    No.   I was supposed to go to Iraq earlier this year, but

4    because of events there, I did not go.

5    Q.    You have not been to Iran, correct?                        12:00

6    A.    Iran, no.

7    Q.    You have not been to Syria, correct?

8    A.    Syria, no.

9    Q.    You have not been to Lebanon, correct?

10   A.    Correct.                                                   12:00

11   Q.    You have not been to Egypt, correct?

12   A.    Correct.

13   Q.    You have not been to Palestine, correct?

14   A.    That's correct.

15   Q.    You have not been to Yemen, correct?                       12:00

16   A.    That's correct.

17   Q.    You have not been to Algeria, correct?

18   A.    Correct.

19   Q.    You have not been to Morocco, correct?

20   A.    Correct.                                                   12:00

21   Q.    You traveled to Turkey, correct?

22   A.    It's one of the places I've been, sure.

23   Q.    You have not been to Sudan, correct?

24   A.    Correct.

25   Q.    You have not been to Somalia, correct?                     12:00

1   A.   Correct.

2   Q.   You have traveled to Saudi Arabia?

3   A.   Correct.

4   Q.   How many times have you been to Saudi Arabia?

5   A.   Trying to get a visa to Saudi Arabia is not so easy.  I've    12:00

6   been there once.

7   Q.   When was that?

8   A.   That was in, I believe, 2011, January or February of 2011.

9   Q.   How many times have you been to Turkey?

10   A.   I think twice.    12:01

11   Q.   When was that?

12   A.   I think it was also 2011.  I was en route to Azerbaijan.

13   Q.   You have not been to Kuwait, correct?

14   A.   That's correct.

15   Q.   You have not traveled to Qatar, correct?    12:01

16   A.   I have been to Qatar.

17   Q.   That's right.  And when did you go?

18   A.   I was in Qatar in 2010.

19   Q.   You have not been to Bahrain, correct?

20   A.   Not Bahrain, that's correct.    12:01

21   Q.   You have not been to Tunisia, correct?

22   A.   To where?

23   Q.   Tunisia.

24   A.   That's correct.

25   Q.   You were in Jordan on one occasion, correct?    12:01

1   A.   For a week, yes.

2   Q.   And how many days were you in Turkey?

3   A.   I don't know.  Two or three.

4   Q.   So that's about a total of nine days?

5   A.   In those particular countries, yes.                    12:01

6   Q.   And how long were you in Qatar for?

7   A.   I think two days.

8   Q.   So we're up to roughly 11 days?

9   A.   Approximately.

10  Q.   And how many days did you spend in Saudi Arabia?       12:02

11  A.   Oh, about a week.

12  Q.   So it's fair to say that you've spent approximately

13  25 days in Middle Eastern countries, correct?

14  A.   You haven't counted all the Middle Eastern countries yet.

15  Q.   I've asked the ones that you've traveled to.           12:02

16  A.   Huh-uh.

17  Q.   There's additional ones you've traveled to?

18  A.   That's correct.

19  Q.   Would that be the United Arab Emirates?

20  A.   That's correct.                                        12:02

21  Q.   Any others?

22  A.   Depending on how you define the Middle East.  I've also

23  been to Azerbaijan.  And again, depending on how you define the

24  Middle East, Bosnia or Herzegovina is generally outside of the

25  Middle East, but it is in the --                           12:02

```
 1              THE COURT:  You need to slow down.

 2              THE WITNESS:  Excuse me, Your Honor.  I apologize.

 3              If you count Bosnia as part of the Muslim world, I've

 4   been there, but it's not part of the Middle East.

 5   BY MS. VIRAMONTES:                                              12:02

 6   Q.   Excluding Bosnia, which is not part of the Middle East,

 7   and I think Azerbaijan is arguably also not part of the Middle

 8   East, as it was part of Russia, putting those two countries

 9   aside, you've spent approximately 25 days in Muslim -- in

10   Middle Eastern countries, correct?                             12:02

11   A.   Did you count the days from Dubai?  Because I was there

12   for a week and a half.

13   Q.   Yes.

14   A.   I think it's about 30, but it's about a month.  Yeah,

15   sure, about a month.                                           12:03

16   Q.   So you've spent about a month over the last 13 years?

17   A.   That's correct, yes.

18   Q.   The common reason that you've traveled to these countries

19   was to speak at conferences, correct?

20   A.   Sometimes; sometimes for other reasons.                   12:03

21   Q.   I'm using "common" because that's the term you've used

22   before.

23   A.   I understand, but things change over time.

24              My most recent travel abroad when I was in Dubai was,

25   I was there to interview the former Taliban ambassador,        12:03
```

1    Tutu Damaritz, and I was there to interview individuals who had

2    information about the financing of the Taliban in the Arabian

3    Peninsula.

4    Q.   When you've testified before about when you go somewhere

5    for a conference, you primarily interact with conference          12:03

6    participants and hosting governments, correct?

7    A.   If I go somewhere for a conference, sometimes.  It depends

8    on what the itinerary is.

9    Q.   In terms of the book that you published, the publisher of

10   that book was Berg Press, correct?                               12:04

11   A.   Correct.

12   Q.   And at some point, Berg Press bought or merged with Oxford

13   International Press, correct?

14   A.   I think so, yeah.  I'm not privy to their business

15   decisions, but that's my general understanding, yes.             12:04

16   Q.   Do you recall testifying before that your book was

17   published by Oxford University Press?

18   A.   You know something, if I ever said that, it was

19   misspeaking.  I know exactly who published my book.  It's

20   Oxford International Press.  If I said Oxford University, it      12:04

21   was just misspeaking.

22   Q.   You didn't do that to exaggerate your credentials?

23   A.   I have no reason to do that.

24   Q.   You submitted your book to the University of Pennsylvania

25   Press, correct?                                                  12:04

1    A.   Hmm, when it was still in rough manuscript form, yeah.

2    Q.   And you're aware that the University of Pennsylvania sent

3    your book out for a formal peer-review process, correct?

4    A.   I'm vaguely aware of that.  I've heard about that.  They

5    didn't tell me that, but I'm vaguely aware of it.                  12:04

6    Q.   And you learned that your book was rejected as unworthy of

7    publication, correct?

8    A.   No, I never learned that.

9    Q.   Have you testified before that you heard rumors to that

10   effect?                                                            12:05

11   A.   I heard rumors to that effect, but the person that I heard

12   rumors to that effect, I no longer consider to be a trustworthy

13   source of information about that.  So I honestly -- the answer

14   is, I don't have any direct knowledge of whether or not that is

15   in fact the case.                                                  12:05

16   Q.   Mr. Kohlmann, there have been cases where you've described

17   a peer-review process and then explained afterwards that you

18   were referring to an informal peer-review process, correct?

19   A.   I think you're going to have to give me an example of what

20   you're talking about.                                              12:05

21   Q.   Sure.  There have been cases where you've talked about

22   your work being peer reviewed, and then after being crossed by

23   it by a defense attorney, you've explained that you meant

24   informal peer review?

25   A.   No.  I think what I've explained is, is that I have --       12:05

1    some of my work is formally peer reviewed and some of it is

2    informally peer reviewed.  And what I've said is, is that no

3    matter what I do and no matter what work I produce, there is

4    some element of peer review.

5            Now, I certainly acknowledge there's a difference                12:05

6    between formal peer review and informal peer review.

7            But unfortunately, formal peer review is a very, very

8    long and laborious process.  And while I'd like to apply that

9    to all the research I do, it's just not possible or it would

10   take years to publish a single article.                                  12:06

11           So the answer is, is that I do engage in formal peer

12   review with some of the things that I publish.  For instance,

13   the most recent publication in African Security.  But when it

14   comes to say the West Point Counterterrorism Sentinel Journal,

15   this is a journal that doesn't offer formal peer review.  It's           12:06

16   still a very credible journal.  It's read by everyone in my

17   field.  It's heavily read and heavily -- everything is heavily

18   digested and debated.  If you're not going to contribute to

19   that, you're missing out on an opportunity.

20           So the answer is, is that there is formal peer review            12:06

21   and there is both informal peer review.  It just depends on

22   what the publication is and what the requirements of a given

23   publication are.

24   Q.   You've testified that your article in Foreign Affairs was

25   peer reviewed by the publication, correct?                               12:06

1    A.    If I did, I was mistaken.  But, yeah.

2    Q.    And that's because Foreign Affairs doesn't do

3    back-checking does it?

4    A.    No.  However, it is my understanding that Richard Clarke,

5    being the person that was editing that edition of The ANNALS,          12:07

6    did review all of the chapters that were submitted as him being

7    the editor of that.

8              So again, I don't know if there was formal peer

9    review.  There certainly was informal peer review.

10   Q.    Foreign Affairs' policy is that they rely on authors to          12:07

11   ensure the veracity of their statements, correct?

12   A.    Foreign Affairs and Foreign Policy, that's correct, they

13   do.  Yes.

14   Q.    Since October of 2002, the FBI has paid you $154,000 for

15   organizing and presenting open-source material for the FBI,            12:07

16   correct?

17   A.    Yeah, approximately that.

18   Q.    Your hourly rate now for the Government is 300 to $400 per

19   hour, correct?

20             MS. DEWITT:  Objection, Your Honor.  Relevance;              12:07

21   beyond the scope of this hearing.

22             THE COURT:  Sustained.

23   BY MS. VIRAMONTES:

24   Q.    You've never testified before on behalf of a criminal

25   defendant, have you?                                                   12:08

1  A.   No, I have not.

2  Q.   You've testified that only once in 15 years you came

3  across information that could help someone, correct?

4        THE COURT:  When you say "someone," you mean someone

5  charged with a crime?                                        12:08

6        MS. VIRAMONTES:  That's correct, Your Honor.

7        THE WITNESS:  I believe so, yeah.  I'm having trouble

8  recalling the details of it, but I do recall there was one

9  instance where I had information that was helpful, yeah.

10 BY MS. VIRAMONTES:                                           12:08

11 Q.   What evidence in your database would exonerate someone?

12 A.   If someone says, *He didn't do it; I did it.*

13        If someone comes online and says, *That wasn't a*

14 *jihadist group that did it.  It was somebody else who did it*,

15 things like that.                                            12:08

16        If there's a discounting of responsibility, sure.  Or

17 if somebody else identifies the person responsible, certainly.

18 Sure.  Yeah, I mean -- I mean, yeah, definitely.  That kind of

19 stuff would be relevant.

20 Q.   And you've testified before that in 15 years you've only  12:09

21 declined to testify on behalf of the Government once, correct?

22 A.   Actually, I think it's twice now.

23 Q.   Do you know of another terrorism expert who's testified

24 over 20 times for the Government in a terrorism case?

25 A.   Nope.                                                   12:09

1  Q.   What about 15 times?

2         MS. DEWITT:  Objection, Your Honor.  Relevance again.

3         THE COURT:  Sustained.

4  BY MS. VIRAMONTES:

5  Q.   Did you review the tactical interrogation reports in          12:09

6  preparing your report for this case?

7         MS. DEWITT:  Again, Your Honor.  Objection; beyond

8  the scope.

9         THE COURT:  Sustained.  Well, I just think it's

10 irrelevant, which is not the basis for the objection because      12:09

11 she's entitled to go beyond the scope for purposes of a Daubert

12 hearing, but I don't see the relevance.

13        MS. VIRAMONTES:  Your Honor, I think the relevance

14 goes to what information he has looked at in creating his

15 profile, and whether his profile is applicable in this case.     12:09

16        MS. DEWITT:  Again, Your Honor.  Object on the

17 grounds that it's not relevant to the proceedings here.  This

18 is appropriate -- may be appropriate for trial but not for the

19 issues before the Court.

20        THE COURT:  Sustained.                                     12:10

21        MS. VIRAMONTES:  I only intend to ask two questions,

22 Your Honor.

23        THE COURT:  I sustained the objection.

24 BY MS. VIRAMONTES:

25 Q.   Mr. Kohlmann, do you see yourself as an advocate?            12:10

```
1   A.    No, I do not.

2   Q.    How do you view your position?

3   A.    I view my position --

4         THE COURT:  Ms. Viramontes, you need to wrap up.  I

5   think again this is not appropriate for the purposes of a          12:10

6   Daubert hearing.

7         MS. VIRAMONTES:  Thank you, Your Honor.

8   BY MS. VIRAMONTES:

9   Q.    Do you believe -- this is my last question.

10        Do you believe that it's up to the adversarial               12:10

11  process and defense attorneys to bring out facts that don't

12  support your position?

13        MS. DEWITT:  Objection, Your Honor.  Not relevant.

14        THE COURT:  Sustained.

15        MS. VIRAMONTES:  Thank you, Your Honor.  That's it at        12:10

16  this time.

17        THE COURT:  All right.  I take it you have redirect?

18  I would suggest we take a lunch break, and then you can do

19  whatever redirect, and then the parties can argue.

20        MS. DEWITT:  Thank you, Your Honor.                          12:11

21        THE COURT:  So we'll break for an hour.  So that

22  would be 1:10.  We'll see you back at 1:10.  Thank you.

23        Oh, and just one minor thing before I forget.  The

24  last -- I don't know if it was the last time you were here, but

25  I think it was the last time you were here, Mr. Aaron, you        12:11
```

1   asked me, with respect to the process that we're using to

2   summons jurors, how many summons we were sending out.  And the

3   answer to that question is I think we already have sent out

4   3,000 summons for the time qualifying.  And out of that, we're

5   hoping to get eventually 120 time-qualified jurors.                12:11

6            Thank you.

7            MR. AARON:  Thank you, Your Honor.

8                      (Lunch Recess)

9            THE COURT:  So sorry to keep you waiting.

10           Ms. DeWitt?                                                01:29

11           MS. DEWITT:  Your Honor, unless the Court has any

12   further questions, I don't have any further questions at this

13   time.

14           THE COURT:  All right.  Then would you like to argue?

15           MS. DEWITT:  Yes, Your Honor.                             01:29

16           THE COURT:  I'm sorry.  You can step down.

17           THE WITNESS:  Thank you, Your Honor.

18           MS. DEWITT:  Your Honor, before I begin, I'm assuming

19   Mr. Kohlmann is no longer needed.  And if so, I'm going to

20   allow him to go back to his hotel room.                           01:30

21           THE COURT:  You can be excused.

22           THE WITNESS:  Thank you.

23           MS. DEWITT:  As the Court is aware, the purpose of

24   this hearing is to determine the appropriateness of this

25   testimony in the context of Rule 702.  And I believe that the    01:30

1    evidence that's been submitted, both through the combination of

2    the filings by the Government and the testimony today, fairly

3    clearly establishes that this individual has the expertise and

4    specialized knowledge necessary to help the trier of facts in

5    this case.  His testimony is clearly based upon sufficient data          01:30

6    -- facts and data, including two terabytes of data that he's

7    collected, as well as his personal --

8            THE COURT:  I think he said six terabytes.

9            MS. DEWITT:  Six terabytes.  Sorry.  I was thinking

10   about what we've produced in this case versus what he has.               01:30

11           Terabytes of data that he has collected, gathered,

12   analyzed over more than a decade of his work as a consultant in

13   doing social science research and methodology.  And his

14   testimony is the product of reliable principles and methods.

15           He's established that while the defense may disagree           01:31

16   as to which approach is better -- and they may eventually be

17   able to cross-examine him on those issues, or even present some

18   alternative theory of what's the most appropriate -- social

19   science methodology is well-accepted and particularly in this

20   realm.                                                                    01:31

21           So what we heard today was a lot of questions about

22   his ability to quantify.  And as Mr. Kohlmann has explained, in

23   this realm and in this type of testimony, it simply is not an

24   area or a subject matter.  Human behavior is not simply

25   reducible to quantifiable statistical analysis, and                      01:31

1    particularly when you have the type of sample size of

2    individuals that you're looking at.

3          So I would submit, Your Honor, that -- and he's taken

4    that information that he's had, and he's applied it to an

5    analysis of homegrown terrorist extremists.  So he's clearly                    01:32

6    fit all the parameters of Rule 702.

7          And as the Court is aware, the courts have always

8    fairly liberally interpreted 702 in its application,

9    particularly in nonscientific realms.

10         THE COURT:  But this isn't -- this isn't, strictly                         01:32

11   speaking, a nonscientific realm.

12         You know, I agree with you in part, in a sense that I

13   think the case law clearly sets forth that there are different

14   kinds of expertise for this purpose.  And the Court should not

15   always -- well, should not strictly apply the same sets of                       01:32

16   standard for different kinds of expertise.  So the example --

17   well, and I've had this actual example come up in a case.  So

18   the example I often use, in terms of pointing out that

19   peer-reviewed articles or publications, while applicable as to

20   some types of experts, won't always be used for all kinds of                     01:33

21   experts.

22         So in a construction defect case, if you have a

23   question about the quality of the installation of plumbing and

24   you have a proposed expert with 25 years of experience in

25   plumbing installation, with a high school education, he's not                    01:33

1    going to have published articles in peer-reviewed journals, but

2    he is qualified to testify as an expert in the particular field

3    of expertise, which is plumbing installation.

4            So the Court has to look at the particular field of

5    expertise and look at the different kinds of qualifications

6    that apply for that field.

7            But this is a scientific field.  I think Mr. Kohlmann

8    is a social scientist.  I think he describes himself, to a

9    certain degree, that way.

10           MS. DEWITT:  I agree with Your Honor, and I don't

11   mean to suggest that he's not a person of --

12           THE COURT:  He's not a chemist.

13           MS. DEWITT:  He's a person with both specialized

14   knowledge and also with specialized knowledge in training in

15   social science.

16           What I mean by what I said was, to suggest that this

17   is not a technical field, this is not, you know, medicine that

18   can be reduced to numbers or that can be profiled on a blood

19   test result.  It's not scientific in that sense.  It's a

20   different kind -- it's a different kind of testimony, and

21   there's no -- we don't dispute that.

22           But I would submit that based upon his considerable

23   experience and the considerable case law that says that exactly

24   that kind of specialized knowledge, and specialized knowledge

25   in the field of social science, is exactly the type of

```
 1    knowledge and the type of testimony that is permissible under

 2    the interpretation and the application in the Ninth Circuit and

 3    Supreme Court of expert testimony.

 4          THE COURT:  Well, I don't -- you know, the

 5    difference, I think, is that social scientists, such as, for      01:35

 6    example -- and that's a wide field, but, for example, a trained

 7    sociologist would be expected to publish in peer-review

 8    journals.  And there is no such thing, to my knowledge, as

 9    informal peer review.  There is peer review, period.  And he

10    has, I think, only one article in a peer-reviewed journal,        01:36

11    maybe two.

12          So you know, to call -- for him to claim credentials

13    as a social scientist, I think, is very questionable.  And on

14    cross-examination, you know, his lack of knowledge of very

15    basic terms in that field, I think, was revealing.                01:36

16          I think he falls into a category -- I mean, he

17    certainly has expertise, but I think that it's more analogous

18    to the expertise of, say, a law enforcement agent who testifies

19    in a trial involving someone who's accused of drug trafficking.

20    And the case law in this circuit is clear that someone with       01:36

21    that type of expertise can -- it's both relevant and helpful to

22    the jury, under Rule 702, for someone with that type of

23    expertise to explain to the jury the coded language, what the

24    coded language that the defendants were using means.  That what

25    the -- I'm sorry -- the techniques of the -- I can't remember     01:37
```

```
 1    what it's called now.  The driving techniques that they use to

 2    evade --

 3              MS. DEWITT:  Counter surveillance.

 4              THE COURT:  Counter surveillance.  Thank you.

 5              Those kinds of things.  I mean, Mr. Kohlmann           01:37

 6    certainly, with six terabytes of collected information, that

 7    may be more information than someone who's qualified to testify

 8    in a drug trafficking case about his observations, but, you

 9    know, Mr. Kohlmann repeatedly referred to his methodology as

10    "direct observation."  And that's why it occurs to me that it's  01:38

11    most analogous to what that type of an expert in a drug

12    trafficking case bases his expertise on: direct observation.

13    Much more so than what is, in my experience, classically, an

14    academic expert.

15              And so working from that theoretical framework,        01:38

16    that's where I would -- that's how I would frame what I would

17    allow him to testify.

18              I do think he's qualified to testify.  I think he has

19    specialized knowledge that would assist the jury in

20    understanding a lot of the other evidence that would come in in  01:38

21    this case.

22              I didn't mean to cut off your argument, but what I

23    would suggest is, if you go back to the Government's

24    designation and the topics that the Government wants to offer

25    him to testify to, and you look at what he testified to today    01:38
```

1    in both direct and cross as to his credentials and his

2    methodology, and you apply that to the topics that are on pages

3    18 and 19 of the Government's designation, the first two I

4    don't think require his testimony.  That is, it wouldn't be

5    particularly helpful to the jury.  It may be relevant, but it          01:39

6    wouldn't be particularly helpful to the jury to have an expert

7    explain to them that there was evidence of a plan to travel to

8    Afghanistan, or that the defendants went to a shooting range,

9    and so forth.  Because that just doesn't require the testimony

10   of an expert.                                                          01:40

11          But the next four topics, as I said at the beginning

12   this morning, at that point what I was sort of inclined to do,

13   I think they do, to a certain extent most of them, do lend

14   themselves to his expertise.  That is, they would be, under

15   Rule 17, helpful to the -- 702, I'm sorry -- helpful to the            01:40

16   jury to understand the evidence.  In other words, another way

17   of putting it is they go to subjects that are beyond the

18   knowledge of a lay juror, a layperson, and they're relevant to

19   the case.

20          So as I said earlier, testimony from him based on his           01:40

21   knowledge as sort of an archivist of all this information that

22   he's collected.

23          The third topic that you have listed that he would

24   testify to would be evidence -- Well, the way the Government

25   designated it was, *Evidence that the defendants have adopted a*       01:41

1    *radical sectarian ideology.*

2             I would not necessarily let him testify that the

3    defendants have adopted it, but I would allow him to testify

4    about the clerics, the spiritual guides, and all of that, that

5    there is evidence that they had contact with, were interested                      01:41

6    in, listened to -- or watched videos or listened to tapes of

7    including al-Awlaki.

8             And the same thing with all of the other topics:  The

9    subterfuge, the significance of attempts to use coded language,

10   the context of the publications, and the websites that were                        01:42

11   consulted, those are the topics that you have.

12            The difference is, and what I wouldn't allow, is that

13   you've listed those and you want him also to take the next

14   step, which would be to testify that those -- that that

15   evidence is part of a -- it's a set of factors to which he                         01:42

16   would attach the label meaning that they were *homegrown*

17   *terrorists*.

18            And I wouldn't allow that last step to be taken

19   because I think as some other courts who have considered this

20   have shown that to be evidence of predisposition, for example.                     01:42

21   And I don't think his methodology, as he described it, is sound

22   enough to allow that next step to be taken, both in terms of

23   the sample size and the expertise that he has.

24            MS. DEWITT:  Let me address a couple of those issues.

25            First, Your Honor, with respect to peer review, I                         01:43

1    mean, it's clear that all of his educationally related theses

2    were formally peer reviewed, and that at least some of his

3    later work was peer reviewed.

4         Also, I would submit that this is an area in which --

5    and I don't think there's any case law to suggest that even          01:43

6    formal peer review is required.

7         THE COURT:  Well, it's never required.  It's one

8    factor to look at.  But there are an awful lot of journals, and

9    on cross-examination Ms. Viramontes named a few, but there are

10   an awful lot of journals, academic journals that are                 01:43

11   well-regarded that require the articles to be peer reviewed,

12   and he's not published in any of them.

13        MS. DEWITT:  He is, however, published, and he is,

14   however, subject to peer review in every single -- or review in

15   every single case in which he testifies in.  He's subject to        01:44

16   review every time he publishes anything because he has people

17   who can criticize it and give him feedback.  And listens to

18   those people, and he takes that feedback into consideration.

19   That's what he testified to.  So there's both a quasi-formal, a

20   formal, and an informal process for feedback from peers within      01:44

21   his area of expertise.

22        THE COURT:  That's not what peer review is.  Peer

23   review is -- academic work is a term of art, and his work is

24   not peer reviewed.  His published work is not published in

25   peer-reviewed journals, with maybe one exception that I think       01:44

1    he testified to.

2            MS. DEWITT:  Well, I think his educational pieces

3    were, with all due respect, I think those are considered peer

4    reviewed.

5            But my point, Your Honor, is that not all areas and          01:44

6    not all topics are susceptible to --

7            THE COURT:  Like my plumbing, my plumbing --

8            MS. DEWITT:  Right.  And as he testified, it's very

9    difficult in this field because the nature of the information

10   that you have is changing on a daily basis.  And the underlying    01:44

11   data, you know, for example, the example he gave us, Syria,

12   where, you know, a year ago Syria may not have been all that

13   relevant as a location to which people were intending to

14   travel, but now it is.  And peer review, as he explained, in

15   this field is difficult because it can require literally years    01:45

16   to get things through a peer-review process.

17           So he's testifying in a field and he is an expert in

18   the field but is not necessarily susceptible to that kind of

19   formal peer review that you're referring to.

20           But to not belabor that point, you've mentioned also       01:45

21   that he said his method was through direct observation.  With

22   all due respect, I don't think that's what he said.

23           I think what he said was, is that part of the method

24   by which he collects data is through direct observation.  And

25   then he explained that he takes not only that information, but     01:45

1    also literally six terabytes of data that he's collected, and

2    he subjects that to further analysis and further review.  And

3    he's constantly updating his analysis and review of those

4    things and trying to adapt them to changing factors and to

5    changing data and to changing information.                                01:46

6           So I think it's a little bit unfair to say that his

7    method is based solely upon direct observation.

8           I think it's fair to say that, as not unusual in a

9    social science context, his method is based on comparing and

10   contrasting and continually ensuring that you're getting new             01:46

11   data and comparing it and analyzing it, and making sure that

12   your assumptions and your conclusions are correct by a

13   continual process of review, new input, and talking to your

14   peers, whether it's formally or informally, to make sure that

15   you're not missing anything, and by continually getting new             01:46

16   data and new information to make sure that your information --

17   that you have good information in to get good answers and good

18   conclusions coming out.

19          So again, he's not a plumber.  He may not be a rocket

20   scientist that can be reduced to numbers and statistics and             01:47

21   statistical analysis, but he clearly has spent more than a

22   decade studying this phenomena, looking at this phenomena,

23   reading about this phenomena, and analyzing this phenomena.

24          And with all due respect, I would say, Your Honor,

25   that he falls maybe -- yes, he's unusual.  There is not a lot           01:47

1    of experts like him; there are some, but he falls squarely

2    within the four corners of those types of experts in this area,

3    and he falls squarely within the four corners of Rule 702.

4              To address what the Court has indicated its inclined

5    to do, I just want to make sure I understand what the Court is        01:47

6    -- so I want to make sure that however we end up at the end of

7    this day that we are within compliance --

8              THE COURT:  Well, I'm going to issue a written ruling

9    to assist everyone.

10             MS. DEWITT:  So I'm assuming that the Court is in           01:47

11   agreement that it is appropriate for the Government to ask

12   about the four items, the four factors areas to use as possible

13   areas --

14             THE COURT:  Yes.

15             MS. DEWITT:  -- to ask questions that would elicit          01:48

16   things like, *What is this?  What is the significance of this*

17   *particular item?  Where have you seen this before?  And have*

18   *you seen it in this case?*

19             So you could say, *Yes, I saw that on his website*, or

20   whatever.                                                            01:48

21             Then the question becomes, you know, is he entitled

22   to render an opinion?  And his opinion may be -- I understand

23   that the Court is not inclined to allow him to say, *These six*

24   *things equal this,* but he should be, based upon his experience

25   and his, you know, his review of literally terabytes of data,       01:48

1    be able to reach some opinion about whether this particular

2    activity is consistent with activity that he's seen in other

3    contexts so that he can set it into a contextual framework.

4              And as long as he's allowed to do that, Your Honor,

5    that's really what he's here to do.  If the Court has an          01:48

6    objection to the combination, or the Court has an objection to

7    saying, *These factors, you know, quid pro quo, equal homegrown*

8    *violent extremists*, I understand that concern, and we can stay

9    away from that formulation.

10             But I think he should be allowed, because he's got      01:49

11   the basis of knowledge, he's got the basis of having reviewed

12   the information, to at least be able to say, *Yes, I've seen*

13   *this before.  I've seen it before, you know* --

14             THE COURT:  In recruiting, in a recruiting context?

15             MS. DEWITT:  -- *in the recruiting context.  I've seen*   01:49

16   *it before in defendants that I've testified about in other*

17   *cases.  I've seen it before in terrorist* -- you know, whatever

18   context is appropriate.  But he's seen it before.  That's the

19   whole point of having his testimony, is to put it into some

20   kind of context.                                                   01:49

21             So in that sense, you know, if he's allowed -- if

22   he's allowed to testify --

23             THE COURT:  Wouldn't it be -- wouldn't it be unduly

24   prejudicial to say, *I've seen it before in other cases*?

25   Because, essentially, what you're at least implying to the jury    01:49

1   is other cases where the defendants have been convicted of

2   similar charges.

3          MS. DEWITT:  There has to be some context, Your

4   Honor, as to where he's seen it.  And he's seen it through his

5   -- as a part of his consulting.  He's seen it as a part of his          01:50

6   testimony.  He's seen it as a part of his research.  He's seen

7   these things exhibited in terrorists or violent extremists.  I

8   mean, there has to be some context.

9          If the context is not in a convicted defendant, which

10  I would submit, frankly, is the best evidence ever, because          01:50

11  that person has been essentially proven to be accurate and

12  viable, at least from the perspective of a judicial system.

13         But whatever the Court's parameters are and how we

14  word that, we will defer to the Court on that.  But I think

15  even that would be appropriate.          01:50

16         But he does need to be able to -- I would submit --

17  be able to render some type of opinion.  And if the opinion

18  that the Court is concerned about is, is literally these six

19  things, if they're present, you then have a violent extremist,

20  which I guess the Court's concern here is that that sort of is          01:50

21  getting to the ultimate conclusion and it gets a little too

22  close to that.  I understand that and respect that, and we can

23  stay away from that particular formulation.

24         THE COURT:  All right.  Ms. Viramontes.

25         And I'm so sorry.  I didn't give you the chance to          01:51

1    cross-examine.

2            MR. THOMAS:  That's okay, Your Honor.  I just wanted

3    to argue.

4            THE COURT:  Okay.  I will make sure that you get the

5    chance to do that.                                          01:51

6            Ms. Viramontes.

7            MS. VIRAMONTES:  Thank you, Your Honor.

8            I only have one point, and that is that we agree with

9    the Court that we do think it would be unduly prejudicial to

10   allow Mr. Kohlmann to testify about other cases.  That seems a  01:51

11   way of backdooring in profile evidence.

12           I would like to reserve the right to submit

13   additional briefing upon receiving the transcript, if it's so

14   called for.

15           THE COURT:  Well, I think I'm going to issue an order  01:51

16   in the next -- I hope before the -- well, it's a short week.

17   So I don't really think any additional briefing will be needed.

18   I think I intend to issue, like I said, a written order, in

19   order to make it clear to both sides what is permitted and

20   what's not permitted.                                       01:52

21           If you have further questions at the time of the

22   pretrial conference about the order that I issue, I will be

23   happy to entertain it.

24           MS. VIRAMONTES:  Thank you, Your Honor.

25           THE COURT:  All right.  Mr. Thomas?                 01:52

```
 1            MR. THOMAS:  Thank you, Your Honor.

 2            Your Honor, I'll start with the point the Government

 3       ended with, which is, just because Mr. Kohlmann saw a certain

 4       behavior before doesn't mean he was right.  Doesn't mean he was

 5       right then; doesn't mean he's right now.                           01:52

 6            And the concessions that Mr. Kohlmann made affect

 7       whether or not he should even be allowed to testify.

 8            You know, for example, we know he conceded off the

 9       bat he's a social scientist not a hard scientist.  And that was

10       a given because he can't apply statistical analysis to anything   01:53

11       he does.  He doesn't follow any controls.  He doesn't adjust

12       any variables.  He can't predict future.  He can't repeat his

13       results.  All those things are what is science.  I mean, if you

14       can predict a result, then it's not reliable.  It's not

15       scientific.                                                        01:53

16            If I mix two parts hydrogen and one part oxygen and I

17       don't get water every time, there's a problem.  If I only get

18       it two out of six times or five out of six times, that's not

19       even statistically significant.  You have to have a 95 percent

20       of significance in order to have any scientific results.  And     01:53

21       he concedes that you can have all six of his factors and still

22       not be a homegrown terrorist.

23            In fact, I submit that his own field of study he

24       meets all six of the criteria.  With his database and his

25       fishing the dark web and his covert operations and posing in      01:54
```

1    rallies in London, you know, and he's not a terrorist.

2            So it was very telling, when Ms. Viramontes was

3    cross-examining him about the fluidity of every one of his six

4    factors, that we're unable to determine if he's ever right.

5    And more than that, he's unable to determine if he was ever

6    wrong.

7            You know, that was a very good question that

8    Ms. Viramontes asked him.  *Well, how do you know if you're*

9    *wrong?  What are you going to do better next time?  What are*

10   *the weaknesses in your field that you can attempt to work on*

11   *and get better with*?

12           He didn't have any answer to that, because in his

13   mind he's always right, you know, because there's never really

14   any result.  You can have all six factors and not be a

15   terrorist.  And you can have one of the six factors and maybe

16   be a terrorist.  But there is no one to tell us whether he was

17   right or tell us whether he was wrong.

18           Even a conviction in a criminal context doesn't

19   necessarily tell us his particular part of the testimony was

20   right or wrong.

21           So without any statistical ability to measure what he

22   does and quantify what he does, there is no way to predict the

23   reliability of what he's talking about, because that is the

24   hallmark of a Daubert hearing and of fleshing out scientific or

25   technical expertise under 702.  We're talking about

01:54

01:54

01:54

01:55

01:55

reliability, repeatability, the ability to predict. He conceded right off the bat he can't predict future results. So what he's saying is you can see all six patterns --

THE COURT: It's reproducibility of results --

MR. THOMAS: That's right. 01:55

THE COURT: -- proves the scientific method.

MR. THOMAS: That's right.

And if it's not -- if you can't reproduce it, if you can't start with a hypothesis, control some variables, and repeatedly predict your results and get it every time, that's 01:55 not science. It's something else.

Really what he is, is he has a lot of information and he has a lot of knowledge, but he can't give a reliable opinion because we have no way of determining whether he's right. He's looking at epidemiological information from people who are 01:56 already determined to have been terrorists or already been investigated as terrorists. And then he goes through the six factors and says, *Yup, we got one*.

But there's nothing to determine whether he was accurate. And that's the problem with letting an expert like 01:56 that testify in front of a jury. Because, you know, he sounds very good. You probably could tell the tenor in the room change between his direct and his cross because he was very polished on direct. And when he couldn't even say what a variable was or a statistic, or all of these basic scientific 01:56

1    fundamentals, the air let out of his balloon.  And I hope that

2    happens in court in front of the jury, but it would be better

3    if he's not even testifying because what he has to say is just

4    going to confuse the jury.

5         If we can't -- if he can't testify with any reliable     01:57

6    measure or predictable measure of whether he's right, or

7    concede when he's wrong, then how can we put in context what he

8    says?

9         I mean, I could say what he said, you know.  And I

10   never went to, you know, U-Penn for law school, you know.      01:57

11   THE COURT:  As I recall, your academic credentials

12   don't leave much to be desired, Mr. Thomas.  I mean, I think

13   most people have heard of Princeton.

14   MR. THOMAS:  No, I understand, Your Honor.  I mean,

15   here's the thing -- I'm saving it for trial.  But, you know, I  01:57

16   was a social psychology major at Princeton and I did

17   statistical analysis all the time.  And for him to say that you

18   can't apply statistics to social science is ludicrous.  Because

19   if you can't predict human behavior, then how do you have any

20   study?  You can say, *Well, sometimes they do this; sometimes*  01:57

21   *they do that.*

22        That's not reliable.  You know, I would go -- it was

23   always blind participants, always.  It was random samples.

24   They didn't know it.  Sometimes it was double-blind.  Sometimes

25   I didn't even know.  And when you control certain variables     01:58

```
1    like that, yet still reach the same result, then you can be

2    guaranteed that your hypothesis is correct.

3              That's the hallmark of science.

4              He doesn't do any of that with this.  He doesn't have

5    any blind samples.  He doesn't do any randomization.  There is    01:58

6    no -- what he conceded was the field is too small.

7              THE COURT:  Well, all of this, and many of the cases

8    discussing Mr. Kohlmann's testimony, say this very thing:  That

9    there will be -- and they say it with varying degrees of

10   creativity that I'm sure I won't reach, but this will be a ripe   01:58

11   ground for cross-examination.

12             You know, I still think, and I agree with you on what

13   you're saying about some of the grounds for cross-examination

14   here about his methodology, but I think, within limits, that he

15   has the expertise to testify.  And somewhere between the         01:59

16   plumbing example I gave and the rocket scientist example that

17   Ms. DeWitt provided, he falls somewhere in between those two.

18   And I still think that the place in between that's -- that I

19   can come up with as the best example, is someone who is allowed

20   to testify as an expert in a drug trafficking case on the        01:59

21   methods used by people accused of that crime.

22             I mean, not everything that's in here in the

23   Government's designation is directly analogous, but most of it

24   is.

25             MR. THOMAS:  And perhaps what certain jargon means.     02:00
```

1    Like certain drug couriers use certain jargon.  He's very much

2    like a law enforcement expert in that type of comparison.

3           THE COURT:  There are some things that are different,

4    and I think those things are admissible too, about the -- well,

5    explaining to the jury about the significance of a lot of the      02:00

6    publications and the websites, and so forth.

7           MR. THOMAS:  Well, that's right.  And the fact that

8    there is a dark web and that there is these encrypted websites.

9    And all of this is stuff that not everyone knows until they

10   hear it.  So I understand that that is a certain expertise and    02:00

11   technical knowledge that he has.

12          But for him to draw any kind of conclusion that

13   anyone that goes to an encrypted password-protected website

14   and, you know, searches for Inspire Magazine back issues is a

15   terrorist, there is absolutely no science with that.              02:01

16          THE COURT:  Well, that's why I'm suggesting that I

17   will not allow the opinion to be given that meeting any of

18   these criteria, or all of them, allows a label to be attached.

19          But Ms. DeWitt's question is, then what opinions can

20   he, if any, can he give as a result of the defendants using       02:01

21   coded language, using subterfuge, collecting or viewing certain

22   types of websites or recordings?

23          Is your position that he can't make any conclusions?

24          MR. THOMAS:  Your Honor, he certainly did not point

25   to any journal that he wrote, certainly not a peer review, but    02:01

```
 1    not a journal peer exhibit, or any scientific study that tells
 2    us or the world when he's right on his opinion.
 3              So for example, if you fish for, you know, the dark
 4    web for a certain amount of articles and you use subterfuge
 5    with making your travel plans, you are, you know, this percent      02:02
 6    likely to be a terrorist.
 7              There is nothing even close to that.
 8              The fluidity with which he explained every one of
 9    those six factors, during Ms. Viramontes' cross-examination,
10    gave us no idea of whether or not he is willing to concede that     02:02
11    he's ever wrong, nor a way of determining whether he's correct.
12              So for him to give an opinion that someone that
13    trolls these websites or, you know, fires at a gun range, or
14    uses covert language when they make their travel plans is more
15    likely to be a terrorist than not, there is no science of that     02:02
16    either.
17              You know, everything that he's looked at is just
18    factors.
19              I use this in the medical context because that's what
20    I do when I'm not in federal court.  You talk about medicine.       02:03
21    If someone has a stroke, was it caused by the fact that they
22    had diabetes?  Was it caused by the high blood pressure?  Was
23    it caused by the fact that they were a male between the age of
24    40 and 45?  That they were black?  That they don't exercise?
25    That they're overweight?  All of these things are factors.  But     02:03
```

1    you can't determine with any reliability or predictability

2    which one of these or how many of these will lead to the

3    stroke.

4           You know, you can have all six of those and not have

5    a stroke, or you can have one of those and have a stroke.          02:03

6           So you can never have a doctor say, *The stroke was*

7    *caused by...*  And then the inverse of that is you can't say, *If*

8    *you have high blood pressure and you're a male and you're black*

9    *and you have diabetes that you're going to have a stroke.*

10           There is no reliability with that either.                   02:03

11           So with that analogy, that's basically what he's

12    doing in the context of terrorism.  There are a lot of factors

13    that terrorists have in common.  I understand that.  But there

14    is no -- there is no method, there is no calculus with which he

15    can derive any kind of conclusion, either based on this case or   02:04

16    any similar case.  Because you can have none of the factors and

17    be a terrorist or all of the factors and not be a terrorist.

18           So that's the problem, Your Honor.  It's not

19    reliable.  And it's just going to mislead the jury into

20    thinking that there is some scientific result behind it just      02:04

21    because he's seen it in the past or just because he said it in

22    a case that led to convictions.  That doesn't mean he was

23    right.

24           THE COURT:  Okay.  I understand your position.

25           Ms. DeWitt?                                                 02:04

```
 1              MS. DEWITT:  Just very briefly, Your Honor.

 2              I want to just make it clear, from the Government's

 3    perspective, that Mr. Kohlmann testified that he is not going

 4    to testify about a prediction of the future.  He may very well

 5    be able to predict whether somebody is going to commit

 6    terrorist acts, but the point is that's not the purpose of his

 7    testimony in this trial.

 8              The purpose of his testimony in this trial, as an

 9    expert, is not to predict, and that's not what he's going to

10    purport to do.

11              The purpose of his testimony is to provide the

12    context and analysis of what has happened, not to predict what

13    would have happened if they hadn't been arrested as they were

14    trying to leave for Mexico, not what would have happened if we

15    hadn't been able to arrest Mr. Kabir in Afghanistan.  So let's

16    just put that aside because that's not what the Government is

17    attempting to do here.  And what he said is not that he can't

18    do it, but he's not going to be doing it.  That's not his role.

19    That's not the purpose of his expert testimony.

20              Mr. Thomas keeps harping on that he should not be

21    able to say, *If X, Y and Z exist, then therefore you are a*

22    *terrorist*.

23              That's never been what the testimony was going to be

24    of Mr. Kohlmann.

25              The testimony of Mr. Kohlmann is that these things
```

```
 1   that he's seen here that the evidence shows, that the evidence

 2   that exists in this case that he's reviewed, is consistent with

 3   other things that he's seen.  And that's no different than -- I

 4   mean, I don't agree, necessarily, with this Court's analogy to

 5   him being like a law enforcement expert, but that's no              02:06

 6   different than a law enforcement expert saying, you know, *Using*

 7   *counter surveillance is consistent with what I've seen in other*

 8   *similar types of situations*.

 9          And you could use -- that applies for all of these

10   factors.                                                           02:06

11          So again, he's not saying it makes it more likely

12   than not.  He's not saying that X, Y, Z equals a terrorist.

13   He's saying -- he's saying that, *These are things that I have*

14   *seen based on 15 years of experience and reviewing literally*

15   *hundreds of thousands of pages of testimony and other research,*   02:06

16   *that these are things that I have seen that are evidence of and*

17   *consistent with activities of people who are terrorists*.

18          And that's all the Government is attempting do here.

19          And all the other things that Mr. Thomas has raised

20   are exactly what the Court has characterized them as, and that      02:07

21   they're simply cross-examination.  They can cross him on these

22   things.  They can make all those arguments before the jury.

23   And that's what they go to.  They go to weight, not the

24   methodology, not the reliability, and not for the

25   appropriateness of the expert testimony that we are proffering      02:07
```

1    to introduce in this trial.

2           THE COURT:  I'm going to take the matter under

3    submission and I'll issue a written order.

4           There is one other thing I wanted to mention.  There

5    are now 14 motions that have been filed for hearing at the          02:07

6    pretrial conference.

7           MS. DEWITT:  Fifteen, Your Honor.  In fact, I was

8    hoping to address this issue ourself.

9           THE COURT:  Did you file one more?  You filed one and

10   they filed 13, by my last count.                                    02:07

11          MS. DEWITT:  By my last count, they filed 15, Your

12   Honor, and we filed two, three.  Three, sorry.  Three.

13          THE COURT:  So that means 18.

14          MS. DEWITT:  Yes.

15          THE COURT:  Okay.  By my last count, which was first         02:08

16   thing this morning, I had 14.

17          My concern, before the motions were filed -- most of

18   them were filed yesterday; I guess a couple more were filed

19   this morning, or showed up this morning -- was too many things

20   have been filed under seal on the docket.  Well, the least of       02:08

21   the problems is that makes it very hard to find things on the

22   docket.  More importantly, filing things under seal should be

23   the exception, and I have filed a lot of the orders on the

24   under seal motions under seal.

25          Now, some things in this case have to be filed under         02:09

seal, including, I think, of the 14 motions that I knew about

when I took the bench this morning, only one of them had been

filed under seal.  So that was a little less of a concern.  And

that one, from my -- just my glance at it looked as though it

seemed very appropriately filed under seal, so I wasn't                    02:09

concerned.

I just wanted to say, including the order that I

issued yesterday on the entrapment --

MS. DEWITT:  The proffer statement.

THE COURT:  -- the proffer statement --- well, I        02:09

think that order probably did also have to be filed under seal.

But in general, I think we should, in the future on any of

these motions, I think we need to think more carefully about

what is filed under seal because it's become a little bit too

much of a habit in this case.                                              02:10

MR. AARON:  I just -- sorry, Your Honor.

I just wanted to correct the Court's understanding.

There is actually two of the 14 motions that we filed

yesterday, there is two which were filed under seal.  Both

involve statements by cooperating witnesses, so we filed them    02:10

under seal to protect their safety.

THE COURT:  All right.  Maybe one of the ones -- the

other one that was under seal is not one of the ones that's on

my list yet.  But that's appropriate.  That's fine.

MS. DEWITT:  It's entirely possible that I've lost my    02:10

1    ability to count to 15, Your Honor, but I will double-check

2    that.  But actually, I regret to say I actually have the

3    opposite concern, which is that there was a number of motions

4    that were filed that referenced documents that are covered by

5    the protective order that should not have been filed without          02:10

6    being under seal.  So I will --

7              THE COURT:  Do you know the docket numbers of those?

8              MS. DEWITT:  I don't, Your Honor, with me.  And I'm

9    happy to bring those to the attention of Mr. Aaron to see if we

10   can work something out with regard to those.  Maybe ask to have      02:11

11   them put under seal or have some discussion about those.  I

12   don't have the list in front of me.  Apparently, I don't even

13   have the right number, 14 versus 15.

14             THE COURT:  Well, let's hope it's 14.  But in any

15   event --                                                              02:11

16             MR. AARON:  Your Honor, I'm certain that if counsel

17   can give me her list, I'm certain -- if that happened, that

18   happened inadvertently.  We have no desire to divulge any

19   information that shouldn't be divulged.  And I'm certain that

20   we can work that out.                                                 02:11

21             THE COURT:  Well, one thing that I might suggest to

22   you is that certain -- it may not be workable.  I was going to

23   -- I was about to suggest that if it's just some documents,

24   some of the exhibits that need to be filed under seal, then you

25   can file them separately from the motion, with an application        02:11

1   to file them under seal.  But then, of course, if you've

2   referred to them in the papers in a way that you've discussed

3   the contents, then the motions will probably have to be filed

4   under seal, as well.  But to the extent that that can be

5   minimized, I would request that you do that.                    02:12

6           But if you're in agreement on anything, I think what

7   has to -- I think what has to happen -- I don't know if they

8   can be sealed after the fact.  They may have to be stricken and

9   then re-filed.

10          But if you're in agreement on something that needs to   02:12

11  be filed under seal, I'll certainly consider what you have to

12  say about it and follow up as necessary.

13          MS. DEWITT:  Give us an opportunity to meet and

14  confer with counsel on that.  I just wanted to let you know

15  that that happened.                                             02:12

16          THE COURT:  All right.

17          MS. DEWITT:  I will also say, Your Honor, although

18  Government counsel is more than willing and able to work very,

19  very hard, responding to 15 motions over a three -- with a

20  three-day holiday in between, these would all be due on Monday,  02:12

21  is a little bit daunting.  And I would request, if the Court is

22  willing, to allow us a little bit more time to file our

23  oppositions to some or all of these motions.

24          THE COURT:  I'll tell you what.  Let me look -- I

25  just right now have -- there is only one or two that I've       02:13

1  looked at, the one that was filed -- the one that I knew about

2  that was filed under seal.  So let me do that.  Let me look at

3  them.  And then if I decide which ones would be appropriate for

4  that, and if I do, I will give the defense more time to reply.

5          MR. AARON:  Your Honor --                              02:13

6          THE COURT:  Go ahead.

7          MR. AARON:  I don't have any objection to giving the

8  Government more time to respond, but if we are pushing the

9  deadlines back as the Government had requested earlier in the

10 case, we would like to push all the deadlines back, including   02:13

11 the trial.  Because I don't want to be coming up against trial

12 and having to respond to -- to have a shortened period of time

13 --

14         THE COURT:  I'm going to leave the hearing date the

15 same.  I'm going to push back -- essentially, I'm going to      02:14

16 shorten myself so that your reply is going to be due closer to

17 the hearing date.

18         MR. AARON:  I see.

19         MS. DEWITT:  Your Honor, I don't mean to be -- to

20 sound sort of petulant about this, but many of these motions -- 02:14

21 I don't know if you've had an opportunity to look at them --

22 are sort of -- are motions that could have been filed sometime

23 ago.

24         THE COURT:  Okay.  Well, let's not get into the

25 merits of them.  I'll issue an order by the end of the day      02:14

1  today as to the timing of the hearing, the timing of

2  oppositions.  The hearing date will remain the same, all right.

3  The timing of when your opposition is due, and then the timing

4  for the reply.

5          MS. DEWITT:  Thank you, Your Honor.                    02:14

6          THE COURT:  You're welcome.

7          MS. DEWITT:  I appreciate that.

8          And one final issue I just wanted to bring to the

9  Court's attention is that we did get, on Thursday, a fairly

10  substantial number of documents and a supplemental filing with   02:14

11  respect to the defendants' expert witnesses, and we wanted to

12  let the Court know that we do intend to file a motion with

13  respect to those documents.  We literally were not able to

14  because of when we got that information to be able to --

15          THE COURT:  When did you get that information?         02:15

16  Yesterday, did you say?

17          MS. DEWITT:  Thursday.  I'm not even sure -- I don't

18  know how -- whether the Court even got this information because

19  some of it wasn't filed.

20          THE COURT:  Well, it wouldn't be filed with the        02:15

21  Court.

22          MR. AARON:  That's correct, Your Honor.  It wouldn't

23  be filed with the Court.

24          I did file a notice explaining why I wasn't filing it

25  publicly, and that all information was hand-delivered to the    02:15

1    Government the day that we were required to deliver it,

2    according to the Court order.

3              MS. DEWITT:  I'm sorry.  Can I --

4              THE COURT:  Which was something like June 26th?

5              MR. AARON:  That's correct.                          02:15

6              THE COURT:  All right.

7              MS. DEWITT:  Can I allow Mr. Chiu to --

8              THE COURT:  Mr. Chiu?

9              MR. CHIU:  Your Honor, the Court's order, ordering

10   defense counsel to provide the Government with expert          02:16

11   testimony, was to file it with the Court and to provide it to

12   Government counsel.

13             On June 24th, we received a substantial amount of

14   expert reports from defense, which had a two-page notice to the

15   Court that it was given to us, and that's when we received it.  02:16

16   We discussed it, and we do need more time to file a motion to

17   exclude and/or for a Daubert hearing on those two experts, Your

18   Honor.

19             THE COURT:  I had forgotten that -- I do recall that

20   I wanted to be notified that the material -- that the deadline  02:16

21   had been met, but I would not have expected to have the

22   information filed with the Court because it's discovery

23   information, which isn't usually filed with the Court.

24             So what are you proposing in terms of a motion for a

25   Daubert hearing, or to otherwise attack the expert testimony?   02:17

1            MS. DEWITT:  Some of the information is their expert

2    notice; some of it is discovery.  So it sort of falls into the

3    two categories, just for the Court's awareness.

4            THE COURT:  Okay.  But usually even expert notice or

5    designation isn't filed with the Court; it is served on each            02:17

6    other.  I don't usually get those.

7            MS. DEWITT:  I do it both ways.  I'm just trying to

8    be in compliance with the Court here.

9            Mr. Grigg is handling this motion, so I wanted to

10   give him an opportunity.                                                 02:17

11           MR. GRIGG:  Your Honor, with respect to the timing of

12   filing the motions, that can be done probably middle of next

13   week.  The question I have is what date does the Court wish

14   that if we're going to notice hearings?  Because we're already

15   stacked up for the pretrial conference date.  We wouldn't be           02:18

16   doing this if we'd had this information earlier, but we are,

17   so --

18           THE COURT:  Well, the middle of next week would be a

19   week from tomorrow, or the 9th.  The pretrial conference is the

20   28th.                                                                    02:18

21           MR. AARON:  That's correct.

22           THE COURT:  File the motion by the 9th, the

23   opposition by the 16th, the reply by the 23rd.

24           I have reviewed the defense version or additions, et

25   cetera, to the jury questionnaire, the Government's sort of            02:18

1   informal objections, et cetera, to the defense version, and I

2   am going to finalize the questionnaire.

3           Just to review the way we're operating here, as I

4   said earlier today, 3,000 summons will be sent out.  Anyone who

5   is -- for those who respond, anyone who responds by saying they          02:19

6   are entitled to one of the statutory bases, that is, they are

7   not a citizen, they have a felony conviction, et cetera, the

8   clerk's office is empowered to excuse them.

9           And we've added a special question to the regular

10  summons that says we are looking for those who could -- who are          02:20

11  available to serve on a trial of the estimated length of this

12  trial.  And anyone who claims that they are not available for

13  that can explain why.  And then the magistrate judges -- of

14  those who responded that they are not available to serve on a

15  trial of this length, those excuses will be reviewed by the             02:20

16  magistrate judges.  And if they think it's a close call,

17  they'll bring it to me.

18          And of those who we decide are time qualified, then

19  we'll -- it's those to whom we will send out this case-specific

20  questionnaire.  And then the responses to those, all counsel           02:20

21  will get those.  Once we get -- I think we'll give them to you

22  in rolling batches as we get a critical number, and we'll

23  notify you that they're available to be picked up.

24          All right.  Thank you very much.

25          MR. AARON:  Your Honor, I'm sorry.  I have two                   02:21

1  matters.

2          When will the questionnaires be sent to the

3  time-qualified jurors?  In other words, when will we start

4  getting notifications?

5          THE COURT:  When will we start getting them back?          02:21

6          MR. AARON:  Yes.

7          THE COURT:  Well, I think -- I mean, I'm hoping that

8  they'll start sending them out now.  I think we've started

9  getting in the -- I'm not sure if we started getting in the

10 time qualified ones yet.  But I hope that we will have them at          02:21

11 least a week before the trial, before trial starts.  I hope at

12 least maybe two weeks.

13         MR. AARON:  Thank you.  Just one more matter, Your

14 Honor.

15         I just wanted to respond to the remarks of Mr. Chiu.          02:21

16 My understanding is the same as the Court's.  The Court had

17 said it wanted notification that it met the discovery deadline,

18 which we did file.  But the Court had said that we were

19 supposed to meet the criteria and satisfy all the requirements

20 of Rule 16, which we did.  Nothing in Rule 16 says it has to be          02:21

21 filed with the Court, and nothing that I recall in the Court's

22 order said it had to be filed with the Court.

23         THE COURT:  I don't have the order in front of me, so

24 I don't know what it -- all I remembered was the date and that

25 we were to be notified.  That was my intent.  I'm not sure          02:22

1   exactly what it said.  But as long as the material was turned

2   over to the prosecutor's office, in terms of the substance of

3   it, that was my major concern.

4           So we'll go from there.  And if the Government files

5   its motion, I will consider the merits of the motion.                02:22

6           MR. AARON:  Thank you, Your Honor.

7           THE COURT:  Thank you very much.

8                       (Proceedings Concluded)

9                              -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3                   DOCKET NO. EDCR 12-92 VAP

4

5           I hereby certify that pursuant to Section 753,
    Title 28, United States Code, the foregoing is a true and
6   accurate transcript of the stenographically reported
    proceedings held in the above-entitled matter and that the
7   transcript page format is in conformance with the regulations
    of the Judicial Conference of the United States.

8

9

10

11    /S/ Phyllis A. Preston        DATED:  July 15, 2014

12   Federal Official Court Reporter

13   CSR, FCRR

14

15

16

17

18

19

20

21

22

23

24

25