1      UNITED STATES OF AMERICA
      UNITED STATES DISTRICT COURT
2     CENTRAL DISTRICT OF CALIFORNIA
       EASTERN DIVISION
3
        - - -
4    HONORABLE VIRGINIA A. PHILLIPS
   UNITED STATES DISTRICT JUDGE PRESIDING
5        - - -

6

UNITED STATES OF AMERICA,   )
7           )
      PLAINTIFF,   )
8           )
  VS.         )  CASE NO.:
9           )  ED CR 12-00092(B)-VAP
  SOHIEL OMAR KABIR    )
10 RALPH KENNETH DeLEON,   )
           )
11     DEFENDANTS.   )
  _____)
12

13

14

    REPORTER'S TRANSCRIPT OF PROCEEDINGS
15      (P.M. SESSION)

16    FRIDAY, AUGUST 15, 2014

17     LOS ANGELES, CALIFORNIA

18

19

20

21

22

    LAURA MILLER ELIAS, CSR 10019
23   FEDERAL OFFICIAL COURT REPORTER
   312 NORTH SPRING STREET, ROOM 453
24   LOS ANGELES, CALIFORNIA 90012
     PH:  (213)620-0890

25

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFF:

       BY:  SUSAN DeWITT
           CHRISTOPHER GRIGG
           ALLEN CHIU
       ASSISTANT UNITED STATES ATTORNEYS
       1100 UNITED STATES COURTHOUSE
       312 NORTH SPRING STREET
       LOS ANGELES, CA 90012

ON BEHALF OF DEFENDANT KABIR:

       OFFICE OF THE FEDERAL PUBLIC DEFENDER
       BY: JEFFREY AARON
          ANGELA VIRAMONTES
          MATTHEW LARSEN
       DEPUTY FEDERAL PUBLIC DEFENDERS
       3801 UNIVERSITY AVENUE
       SUITE 700
       RIVERSIDE, CA 92501

ON BEHALF OF DEFENDANT DeLEON:

       HANNA BROPHY
       BY:  DAVID J. THOMAS, ESQ.
       1500 IOWA AVENUE
       RIVERSIDE, CA 92507

```
 1                              INDEX

 2    WITNESSES FOR
      THE GOVERNMENT:
 3
                      DIRECT     CROSS      REDIRECT
 4
      RODRIGUEZ-LOPEZ,
 5    XIOMARA
      BY:  MS. DeWITT   4                      34
 6    BY:  MR. VIRAMONTES        20
      BY:  MR. THOMAS            29, 83
 7
      GOLDSMITH, CRAIG
 8    BY:  MR. CHIU    38                      114
      BY:  MR. AARON             90
 9    BY:  MR. THOMAS            105

10    EDWARDS, PATRICE
      BY:  MR. CHIU    116
11    BY:  MS. VIRAMONTES        130

12
         EXHIBITS      ADMITTED     EXHIBITS      ADMITTED
13       185-A            14
         5032             25
14       5028             26
         5029             27
15       5030             28
         5031             29
16       86               81
         172             121
17       173             124
         173-A/173-B     124
18       174             127

19

20

21

22

23

24

25
```

```
 1    RIVERSIDE, CALIFORNIA; FRIDAY, AUG. 15, 2014; 1:15 P.M.
 2                          - - -
 3              THE COURT:  Good afternoon.  Let the record reflect
 4    the presence of all members of the jury, all counsel and the
 5    defendants present.  You may continue.
 6              MS. DeWITT:  Thank you, Your Honor.
 7                    DIRECT EXAMINATION (CONTINUED)
 8    BY MS. DeWITT:
 9    Q.   Good afternoon, Officer.  I think where we left off just
10    before lunch was you were talking about there was close to
11    somehow 500 individuals or so at any given time that worked
12    at Port San Yisidro on any given day.  If I could sort of
13    move you back in time, you left working there in
14    approximately August of 2012?
15    A.   Yes, ma'am.
16    Q.   About two years ago.
17    A.   Yes, ma'am.
18    Q.   And were you working at that location in January of
19    2012?
20    A.   Yes, ma'am.
21    Q.   And what was your position at that time?
22    A.   I was working at the port enforcement unit at the port
23    of entry, and I conducted secondary inspections.
24    Q.   Okay.  And we talked a little bit before lunch about the
25    process that Customs and Border Protection uses when people
```

```
 1    come into the country at JFK.  Is the process somewhat
 2    similar in San Yisidro?
 3    A.   Yes, ma'am.
 4    Q.   And by that I mean so would people actually come into
 5    the border -- come across the border at San Yisidro, some of
 6    them come in as pedestrians?
 7    A.   Yes, ma'am.
 8    Q.   So they go to a pedestrian entrance as opposed to flying
 9    in an airplane and walk in.  And is there also an entrance
10    for people that are in vehicles?
11    A.   Yes, ma'am.
12    Q.   And did you work with the vehicles or did you work with
13    the people walking in?
14    A.   Pedestrian.
15    Q.   Okay.  And you mentioned that you were primarily
16    involved with secondary.  Is it correct at that time, you
17    would primarily be involved at sometime after they went
18    through the primary inspection?
19    A.   Yes, ma'am.
20    Q.   Okay.  So people would come in -- so if I understand it
21    correctly, people who would come in would initially go
22    through some kind of primary inspection, and then some of
23    them would get to go through and go to the United States, and
24    some of them would be referred for some secondary inspection?
25    A.   Yes, ma'am.
```

```
1   Q.   Okay.  And for secondary inspection, if you found
2   contraband or if you found something that they're involved
3   in, something illegal, those people would be detained or
4   arrested?
5   A.   Yes, ma'am.
6   Q.   And there's a middle category where secondary involves
7   some further interviews.
8   A.   Yes, ma'am.
9   Q.   At that time, what was your -- you're sort of involved
10  in that secondary area, not the final area where you're
11  arresting people, not the initial review, but you're involved
12  in the secondary area.  What were your responsibilities?
13  What would you do on a day-to-day basis?
14  A.   Well, the area that I was in in the port enforcement, we
15  were with processing people that entered illegally or those
16  who had false documents and minor children.
17  Q.   So your responsibility was essentially to process
18  people?
19  A.   Yes, ma'am.
20  Q.   Okay.  And at the end of your process, you would make a
21  decision about whether somebody needed to go into further
22  proceedings?
23  A.   Yes, ma'am.
24  Q.   Or be turned away?  Sent back out of the country.
25  A.   Yes, ma'am.
```

1    Q.   Or maybe eventually let into the country.

2    A.   Yes, ma'am.

3    Q.   So basically the three options are referred to somebody

4    else to be detained and arrested or some further proceeding?

5    A.   Yes, ma'am.

6    Q.   Is that a fair statement?

7    A.   Yes, ma'am.

8    Q.   Typically, when people were coming over the border from

9    Mexico into the United States, what would the typical things

10   people would get stopped for for a secondary inspection?

11   A.   Um, documents, lack of documents, um . . . drugs.  And

12   if the primary inspection wasn't satisfactory or if the

13   officer felt that the person needed to be inspected a little

14   bit further, they would be referred to secondary.

15   Q.   Okay.  And that could be for whatever reason they

16   wanted.

17   A.   Yes, ma'am.

18   Q.   Now, on January 13, 2012, were you working in

19   San Yisidro on the border?

20   A.   Yes, ma'am.

21   Q.   On that day, were you involved in any secondary

22   inspections?

23   A.   Yes, ma'am, I was.

24   Q.   And is there one in particular that you distinctly

25   remember from that day?

1    A.    Yes, ma'am.

2    Q.    Okay.  And can you describe to the jury what it is you

3    remember about that day?  First of all, how did the person

4    come to your attention?

5    A.    The person was referred to secondary inspection based on

6    lookout, and that's when I got involved.

7    Q.    Okay.  And when you got involved, do you remember the

8    name of the individual that you did the secondary for?

9    A.    Yes, ma'am.  Santana Vidriales Miguel.

10   Q.    And when that person was first referred to you, what did

11   you do?

12   A.    Um, he was brought inside.  Um, everyone that enters

13   that area since it was a secure area gets processed, gets

14   patted down for weapons.  And we brought him in.  He was

15   fingerprinted to make sure there were no wants or warrants,

16   and then I conducted an interview with him after a while.

17   Q.    So the first thing you did was you interviewed him.  Did

18   you ask him some questions about where he was coming from?

19   A.    Yes, ma'am.

20   Q.    And what else did you ask him?

21   A.    I asked him if he was working, if, um -- what type of

22   work did he do, um, why was he -- where was he coming from

23   and how long was he in Mexico.

24   Q.    Why did you care how long he might have been in Mexico?

25   A.    To determine if he was admissible into the United

1    States.

2    Q.   So did you at some point determine what his legal status

3    was?

4    A.   Yes, ma'am.

5    Q.   What did you determine his legal status to be?

6    A.   He was a legal permanent resident.

7    Q.   And he was coming back into the United States.  And how

8    with respect to being a legal permanent resident does the

9    length of time you're out of country affect that?

10   A.   If they're out of the country for more than 180 days,

11   it's considered abandonment of residency.

12   Q.   And had he been out of the country for more than

13   180 days?

14   A.   No.

15   Q.   Approximately how long if you recall had he been out of

16   the country?

17   A.   About two months.

18   Q.   And you said that you asked him why he had been in

19   Mexico.  What did he tell you?

20   A.   He told me that he went to get dental work done.

21   Q.   And when you asked whether he was employed, what did he

22   tell you?

23   A.   He told me that at this time, he wasn't.

24   Q.   Did you ask him anything else?  Did you ask him if he

25   needed anything?

```
 1    A.    Yes, ma'am, I did.

 2    Q.    And what did he tell you?

 3    A.    I asked him if he wanted to eat, and he requested to use

 4    his prayer rug, that he wanted to pray.

 5    Q.    Did you grant him that request?

 6    A.    Yes, ma'am.

 7    Q.    Can you explain what you did in order to comply with

 8    that request?

 9    A.    In order for him to pray, he needed his prayer rug so I

10    had to go inside his luggage to get his prayer rug so he

11    could use it.

12    Q.    Just to back up, when he came across the border and was

13    initially referred to you for a secondary inspection, he had

14    luggage with him?

15    A.    Yes, ma'am.

16    Q.    Was he also with somebody?

17    A.    Yes, ma'am.

18    Q.    Who was that?

19    A.    He was with his grandmother.

20    Q.    You mentioned that he requested an opportunity to pray.

21    A.    Yes, ma'am.

22    Q.    And you granted that request.

23    A.    Yes, ma'am.

24    Q.    And one of the things he requested in order to do that

25    was a prayer rug?
```

1    A.   Yes, ma'am.

2    Q.   And was that in his luggage?

3    A.   Yes, ma'am.

4    Q.   Okay.  Did you go in his luggage to get his prayer rug?

5    A.   Yes, ma'am, I did.

6    Q.   What did you see when you got into his luggage?

7    A.   Um he had paperwork in there and books besides clothing.

8    Q.   Was there something about the books and paperwork that

9    was significant to you?

10   A.   Yes, ma'am.

11   Q.   And why is that?

12   A.   Because he had things that referred to 9/11, and, uh, it

13   was based on basically trying to go and, uh . . . I forgot

14   what I was going to say, excuse me.  It was based on having

15   to deal with people that were at war with Muslim countries.

16   Q.   And just to back up a minute.  Is the Customs and Border

17   Protection service legally authorized to inspect people's

18   luggage when they first come into the country?

19   A.   Yes, ma'am.

20   Q.   And are they also authorized when they deem it

21   appropriate to make photocopies of items that are in people's

22   possession?

23   A.   Yes, ma'am.

24   Q.   In this instance, did you make a determination that you

25   should -- did you, in fact, copy some items that were in his

```
 1   possession?

 2   A.   Yes, I did.

 3   Q.   And is the reason you did this because of what you just

 4   testified about, that they were somewhat alarming to you?

 5   A.   Yes, ma'am.

 6   Q.   And at this time I would ask you to look at the binder

 7   that's placed in front of you, witness binder, and the Court

 8   should have a copy of this as well.  And if you could look at

 9   what's been marked as -- you can skip 185 and go to 185 A.

10   Do you recognize the documents that are contained in

11   Government's Exhibit 185 A?

12   A.   Yes, ma'am.

13   Q.   And how do you recognize those documents?

14   A.   That's one of the documents that was inside his

15   suitcase.

16   Q.   These are documents that you copied that day --

17   A.   Yes, ma'am.

18   Q.   -- on January 13tg, 2012.

19   A.   Yes, ma'am.

20   Q.   There's in that exhibit approximately 25 pages.  Did

21   you, in fact, copy more pages that day?

22   A.   Yes, ma'am.

23   Q.   So this is a subset of the items that you copied that

24   day when Mr. Santana went through customs?

25   A.   Yes, ma'am.
```

```
 1    Q.   And if I could direct your attention to page 21 of that.
 2    What is depicted on that page?
 3    A.   His California driver's license and his permanent
 4    resident card.
 5    Q.   And by he, who do you mean?
 6    A.   Mr. Santana's.
 7    Q.   Miguel Alejandro Santana Vidriales.
 8    A.   Yes, ma'am.
 9    Q.   So this is a California driver's license and a copy of
10    his legal permanent residence card?
11    A.   Yes, ma'am.
12    Q.   If you could turn to the next page, page 22 of that
13    exhibit, what's shown there?
14    A.   It's a copy of his Mexican passport.
15    Q.   And again in the name of Santana -- Miguel Alejandro
16    Santana Vidriales?
17    A.   Yes, ma'am.
18         MS. DeWITT:  At this time, Your Honor, the
19    government would move to admit Government's Exhibit 185 A.
20         THE COURT:  Any objections?
21         MS. VIRAMONTES:  Your Honor, could we have a
22    moment?
23         THE COURT:  As to 185 A-21, you'll redact the
24    address.
25         MS. DeWITT:  I do have it in the copy, and I'm
```

```
 1    going to publish it, Your Honor.
 2              THE COURT:  Thank you.
 3              MS. VIRAMONTES:  I'm sorry, could you repeat the
 4    exhibit number?
 5              MS. DeWITT:  185 A.
 6              MS. VIRAMONTES:  Thank you.  Your Honor, no
 7    objection.
 8              MR. THOMAS:  No objection, Your Honor.
 9              THE COURT:  Thank you.  185 A is ordered admitted.
10    You may publish.
11                    (Exhibit 185 A admitted.)
12    BY MS. DeWITT:
13    Q.   Officer, is this what you were referring to earlier as a
14    driver's license for the individual you did a secondary
15    inspection on on that day?
16    A.   Yes, ma'am.
17    Q.   Again, that's Miguel Alejandro Santana Vidriales?
18    A.   Yes, ma'am.
19    Q.   And is this the permanent residence card that he had in
20    his possession that day?
21    A.   Yes, ma'am.
22    Q.   In name of Santana Vidriales Miguel?
23    A.   Yes, ma'am.
24    Q.   I always get the order of the names mixed up of how they
25    are appropriately ordered.  So on that day, in addition to
```

```
1    copying some of the items of paperwork that he had in his
2    luggage, you also copied his identification.
3    A.   Yes, ma'am, I did.
4    Q.   And showing you the next page, is that a photocopy of
5    the passport he was carrying that day?
6    A.   Yes, ma'am.
7    Q.   Again, in the name of Miguel Alejandro Santana
8    Vidriales.
9    A.   Yes, ma'am.
10   Q.   And you mentioned that there were some additional
11   documents that you copied, and I'd like to direct your
12   attention to the first page in Government's Exhibit 185 A.
13   Is this one of the documents that you copied that day?
14   A.   Yes, ma'am, it is.
15   Q.   And you mentioned that one of the things that was
16   significant to you about these documents was their content.
17   And just to direct your attention to the first page, if you
18   could read that for the record?
19   A.   Targeting the populations of countries that are at war
20   with the Muslims.
21   Q.   And what's the name under that?
22   A.   Anwar al-Awlaki.
23   Q.   So when you mentioned that one of the things that you
24   saw was documents about people at war with Muslims and
25   countries at war with Muslims, is this what you were
```

```
 1   referring to?

 2   A.    Yes, ma'am.

 3   Q.    And is this the second page in this exhibit?

 4   A.    Yes, ma'am, it is.

 5   Q.    Which -- and what does this appear to be depict?

 6   A.    It depicts a person on the side, and it looks like a war

 7   scene.

 8   Q.    Just to go through a couple of the examples you saw that

 9   day, is this another item that's contained within

10   Government's Exhibit 185 A?

11   A.    Yes, ma'am.

12   Q.    Okay.  And what does this appear to be depict?

13   A.    That's looks like the Pentagon and the Twin Towers.

14   Q.    And this document?

15   A.    Yes, ma'am.

16   Q.    What does this appear to depict?

17   A.    That's the Twin Towers burning up.

18   Q.    And this page?

19   A.    I can't see that one too clearly.  It looks like a

20   vehicle burning on the side.  Yes, it's a vehicle burning.

21   Q.    Does that appear to be a roadside bombing?

22   A.    Yes, ma'am.

23   Q.    And page 17 of this document.

24   A.    The RPGs.

25   Q.    It appears to represent individuals holding RPGs?
```

```
 1    A.    Yes, ma'am.

 2    Q.    And perhaps bazookas in the back?

 3    A.    Yes, ma'am.

 4    Q.    And showing you page 18 of this exhibit, what does that

 5    appear to depict?

 6    A.    That's an airplane.  An airplane.

 7    Q.    As a New Yorker, do you recognize that?

 8    A.    That's Time Square.

 9    Q.    Okay.  Are you aware of a recent incident that happened,

10    a terrorist attack, in Times Square?

11    A.    Yes ma'am.

12    Q.    And was that an attack involving --

13          MR. THOMAS:  Objection, relevance.

14          THE COURT:  Sustained.

15    BY MS. DeWITT:

16    Q.    And just one last image.  This is one that I showed you

17    before, but I'd like to draw your attention in particular to

18    what's written in the lower corner.  If you could for the

19    record just read what's written on this page?

20    A.    The 9/11 operations are the greatest operations in the

21    history of mankind.  19 muhadeen succeeded in inflicting

22    human and financial losses against the enemy in a way that's

23    unprecedented.  Ten years we look into some of the direct and

24    indirect consequences of this glorious event.

25    Q.    And Officer, is it your understanding that these are
```

1   images from a magazine called Inspire?

2   A.   Yes, ma'am.

3   Q.   Now, in addition to the images that we've just seen from

4   Inspire magazine and the photographs and photocopies of

5   Mr. Santana's identification, were there some other items

6   that would tend to establish that these possessions were his?

7   A.   Uh, yes, ma'am.

8   Q.   And if I could direct your attention to page 23 of this

9   exhibit.  Is this an item that you copied that day that was

10  in his possession?

11  A.   Yes, ma'am.

12  Q.   What is on this page?

13  A.   It's phone numbers.

14  Q.   And directing your attention to the one at the top, what

15  does that say?

16  A.   Rafiq.

17  Q.   And what is the number?

18  A.   626-589, and it looks like 2068.

19  Q.   If I could direct your attention to the next page in

20  this exhibit which is page number 24 at the bottom, what does

21  this appear to be?

22  A.   That's a copy of the bus ticket coming from Mexico.

23  Q.   And when you interviewed him that day, is that where he

24  indicated he was coming from?

25  A.   Yes, ma'am.

1    Q.    Directing your attention to the next page, page 25, are

2    those some additional items that you copied that were in his

3    possession that day?

4    A.    Yes, ma'am.

5    Q.    Now, Officer, after you completed your interview of

6    Mr. Santana, as you indicated, you copied some items that

7    were in his luggage.  What did you do with Mr. Santana?

8    A.    Mr. Santana went -- he left.  He entered the United

9    States.

10   Q.    So you determined that he had a legal right to reenter.

11   A.    Yes, ma'am.

12   Q.    His legal permanent residence card was in order.  You

13   had conducted the follow-up interview, copied documents.

14   Then you made a determination that he was to be released or

15   allowed to proceed into the United States.

16   A.    Yes, ma'am.

17         MS. DeWITT:  I have nothing further at this time,

18   Your Honor.

19         THE COURT:  Thank you.

20         Ms. Viramontes, cross-examination.

21         MS. VIRAMONTES:  I have an exhibit binder and

22   copies for the Court.  May I approach?

23         THE COURT:  You may.

24

25

```
 1                          CROSS-EXAMINATION
 2    BY MS. VIRAMONTES:
 3    Q.   Good afternoon, Officer Rodriguez Lopez.
 4    A.   Good afternoon.
 5    Q.   Um, so you testified that you interviewed Mr. Santana;
 6    correct?
 7    A.   Yes, ma'am.
 8    Q.   And you also interviewed his grandmother.
 9    A.   Yes, ma'am.
10    Q.   Did you interview anyone else?  Were they traveling with
11    anyone else?
12    A.   No, ma'am, they weren't.
13    Q.   When you stopped Mr. Santana, was there an alert
14    attached to him?  I know sometimes there's TECS, T-E-C-S or
15    ATS, VTS alerts attached to individuals?
16    A.   Yes, ma'am.
17    Q.   Do you recall if there was an alert attached to him?
18    A.   He was referred from primary to me.
19    Q.   Okay.  And at what point did you call the FBI?
20             MS. DeWITT:  Objection.  Relevance, beyond the
21    scope.
22             THE COURT:  Sustained.
23    BY MS. VIRAMONTES:
24    Q.   You were informed that you needed to interview
25    Mr. Santana; correct?
```

1  A.   Yes, ma'am.

2  Q.   And who informed you that you needed to interview

3  Mr. Santana?

4  A.   As per the lookout.  He said to interview him.

5  Q.   Were you given specific instructions on what to talk to

6  him about?

7  A.   Ask where he's coming from, who was he traveling with,

8  why was he gone.

9  Q.   Do you remember receiving an email from Richard

10 Lottenberger about what to ask him?

11          MS. DeWITT:  Objection, Your Honor.  Beyond the

12 scope.

13          THE COURT:  It's beyond the scope of the direct

14 examination.

15          MS. VIRAMONTES:  Thank you, Your Honor.

16 Q.   So you were given -- you just testified you were given

17 questions to ask him; correct?

18 A.   Just the five Ws.

19 Q.   And when you interviewed Mr. Santana, he told you that

20 he was 20 years old; correct?

21 A.   Yes, ma'am.

22          MS. DeWITT:  Objection, hearsay.

23          THE COURT:  Overruled.

24          Go ahead.

25          THE WITNESS:  Yes, ma'am.

1    BY MS. VIRAMONTES:

2    Q.    And he was unemployed; correct?

3    A.    Yes, ma'am.

4    Q.    And you talked to his grandmother.

5    A.    Yes, ma'am.

6    Q.    And his grandmother told you that she had taken

7    Mr. Santana to Mexico for dental work; correct?

8    A.    Yes, ma'am.

9    Q.    And they couldn't afford to have the dental work done in

10   the United States.

11   A.    Yes, ma'am.

12   Q.    And she was traveling to the U.S. with him because she

13   didn't want him to travel by himself.

14   A.    Yes, ma'am.

15   Q.    When you interviewed Mr. Santana, he didn't tell you who

16   converted him to Islam, did he?

17   A.    No, ma'am.

18   Q.    He downloaded a copy of Inspire magazine; correct?

19   A.    Yes, ma'am.

20   Q.    But he didn't tell you that Mr. Kabir gave it to him,

21   did he?

22   A.    No, ma'am.

23   Q.    You looked through, um, the items that were in his

24   pocket; correct?

25   A.    Yes, ma'am.

1    Q.    Um, and you saw that he had some phone numbers.

2    A.    Yes ma'am.

3    Q.    He didn't have a phone number for Sohiel Kabir, did he?

4    A.    Not that I'm aware of, ma'am.

5    Q.    In addition to the items that you just discussed with

6    the prosecutor, he had other books with him; correct?

7    A.    Yes, ma'am.

8    Q.    And one of the books that he had was called Los

9    Terroristas Secretos.  Do you recalling seeing that book?

10   And I know I just totally butchered the name.

11   A.    Los Terroristas Secretas?

12   Q.    Yes.

13   A.    Yes, ma'am.

14   Q.    Do you recall seeing that book?

15   A.    Yes, ma'am.

16   Q.    Are you aware that this is a book written by Bill

17   Hughes?

18   A.    I believe the copy, that it was -- the front page that

19   was photocopied, it tells who wrote the book.

20   Q.    Are you aware that Bill Hughes is a Seventh Days

21   Adventist pastor?

22   A.    No, ma'am.

23   Q.    Are you aware that the secret terrorist are Jesuit

24   priests?

25   A.    No.

```
 1              MS. DeWITT:  Objection, Your Honor.  No foundation.

 2              THE COURT:  Sustained.

 3   BY MS. VIRAMONTES:

 4   Q.   There was another book as well in his luggage; correct?

 5   There was another book.

 6   A.   Yes, ma'am.

 7   Q.   And I'm gonna butcher this, too.  The other one was

 8   called Grande Mysteries -- you know what?  Why don't I show

 9   this to you as an exhibit.  I think that would be much more

10   efficient.

11              THE COURT:  Is that the copy for the witness?

12              MS. VIRAMONTES:  I gave her a binder, and I think

13   she has it in front of her.

14              THE WITNESS:  No ma'am, I don't.

15              MS. VIRAMONTES:  Okay.

16              THE COURT:  Oh, I might have both copies.  These

17   are the witness's copies.

18   BY MS. VIRAMONTES:

19   Q.   Could I ask you to turn to Defendant's Exhibit 5032.  Do

20   you recognize this copy?

21   A.   Yes, ma'am.

22   Q.   And could you -- is it a true and accurate copy of the

23   book you saw that day?

24   A.   Yes, ma'am.

25   Q.   Would you mind reading the title out loud?
```

```
 1   A.    Los Terroristas Secretos.

 2   Q.    Thank you.

 3         MS. VIRAMONTES:  Your Honor, the defense moves to

 4   move Exhibit 5032 into evidence.

 5         THE COURT:  Any objection?

 6         MS. DeWITT:  No objection, Your Honor.

 7         THE COURT:  Mr. Thomas?

 8         MR. THOMAS:  No objection, Your Honor.

 9         THE COURT:  All right.  5032 is ordered admitted.

10              (Exhibit 5032 admitted.)

11         THE COURT:  You may publish.  I think the

12   government has to turn off your display.

13   BY MS. VIRAMONTES:

14   Q.    This is the book; correct?

15   A.    Yes, ma'am.

16   Q.    Thank you.  And you found other books, too; correct?

17   A.    Yes, ma'am.

18   Q.    Could you I ask you to please to turn Exhibit 5028?  Do

19   you recognize this book?

20   A.    Yes, ma'am.

21   Q.    Is this a true and accurate copy of what you saw that

22   day?

23   A.    Yes, ma'am.

24   Q.    Could you read the title out loud?

25   A.    Historia Secretas de la Masoneria.
```

```
 1    Q.   And this was a book from the title for the movie that is
 2    about the secrete history of the masons.
 3    A.   Yes, ma'am.
 4         MS. VIRAMONTES:  Your Honor, I would like to move
 5    Exhibit 5028 into evidence and request permission to publish?
 6              THE COURT:  Any objection?
 7              MS. DeWITT:  No objection.
 8              MR. THOMAS:  No objection.
 9              THE COURT:  Ordered admitted, and you may publish.
10                   (Exhibit 5028 admitted.)
11    BY MS. VIRAMONTES:
12    Q.   And this is a copy of the book?
13    A.   Yes, ma'am.
14    Q.   And he had another book with him, too; correct?
15    A.   Yes, ma'am.
16    Q.   Okay.  Could I direct your attention to Exhibit 5029?
17    Do you recognize this copy?
18    A.   Yes, ma'am.
19    Q.   Is it a true and accurate copy of what you saw that day?
20    A.   Yes, ma'am.
21    Q.   Would you read the title out loud.
22    A.   Escuelas Secretas de la Masoneria.
23    Q.   So another book about the secrecy of the masons.
24    A.   Yes.
25              MS. VIRAMONTES:  Your Honor, I move to move Defense
```

1    Exhibit 5029 into evidence and request to publish.

2              THE COURT:  Any objection?

3              MS. DeWITT:  No objection.

4              MR. THOMAS:  No objection.

5              THE COURT:  Thank you.  5029 ordered admitted, and

6    you may publish.

7                        (Exhibit 5029 admitted.)

8    BY MS. VIRAMONTES:

9    Q.   And I realize this is a bad copy, but this is a copy of

10   what you saw.

11   A.   Yes, ma'am.

12   Q.   Thank you.  And there was another book, too, as well.

13   Could I turn your attention to Exhibit 5030?  Do you

14   recognize this document?

15   A.   Yes, ma'am.

16   Q.   Is it a true and accurate copy of what you saw that day?

17   A.   Yes, ma'am.

18   Q.   Could you read the title out loud, please?

19   A.   Grandes Mysterios de los -- de los Tiempos.

20   Q.   Um --

21   A.   De toda los Tiempos.

22   Q.   And this is another book about sort of the grand

23   mysteries or conspiracies; is that correct?

24   A.   It's just, uh, grand mysteries.

25   Q.   And when you --

```
1    A.    Of all time.  It says grand mysteries of all times.

2    Q.    And in the subheading beneath it, it discusses Stone

3    Heng; correct?

4    A.    Yes.

5    Q.    And Bermuda Triangle; correct?

6    A.    Correct.

7              MS. VIRAMONTES:  Your Honor, the defense moves

8    Exhibit 5030 into evidence and requests permission to

9    publish.

10             THE COURT:  Any objection?

11             MS. DeWITT:  No, Your Honor.

12             MR. THOMAS:  No, Your Honor.

13             THE COURT:  Ordered admitted.  You may publish.

14                   (Exhibit 5030 admitted.)

15   BY MS. VIRAMONTES:

16   Q.    So this is the book that you saw.

17   A.    Yes, ma'am.

18   Q.    Thank you.  And there was yet another book; is that

19   correct?

20   A.    I believe so.

21   Q.    Could I turn your attention to Exhibit 5031?  Do you

22   recognize this book?

23   A.    Yes, ma'am.

24   Q.    Is it a true and accurate copy of what you saw that day?

25   A.    Yes, ma'am.
```

```
 1    Q.   I'd ask you to read the title out loud.
 2    A.   Martires Mexicanos Soldatos de Cristo Rey De Mexico
 3    Glorioso.
 4    Q.   And based on the title, this seems to be a book about
 5    Christian Mexican martyrs?
 6    A.   Yes, ma'am.
 7              MS. VIRAMONTES:  Thank you.  Your Honor, the
 8    defense would move Exhibit 5031 into evidence and request
 9    permission to publish.
10              THE COURT:  Any objection?
11              MS. DeWITT:  No objection.
12              MR. THOMAS:  No objection.
13              THE COURT:  It's ordered admitted, and you may
14    publish.
15                   (Exhibit 5031 admitted.)
16              MS. VIRAMONTES:  Thank you, your Honor.
17              I have no further questions.
18              THE COURT:  Okay, Mr. Thomas.
19              MR. THOMAS:  Thank you, Your Honor.
20                       CROSS-EXAMINATION
21    BY MR. THOMAS:
22    Q.   Afternoon, Ms. Rodriguez-Lopez.  How are you?
23    A.   Oh, I'm fine, thank you.
24    Q.   Good.  During your direct testimony, you were asked
25    about what is involved in a secondary inspection; correct?
```

```
 1   A.   Yes, sir.
 2   Q.   And some of the reasons why you would do a secondary
 3   inspection --
 4   A.   Yes, sir.
 5   Q.   -- right?  And one of those reasons is because the first
 6   person that did the primary inspection determined further
 7   investigation was needed.
 8   A.   Yes, sir.
 9   Q.   Right?  Did the person that did the primary inspection,
10   in this case, Mr. Santana, tell you why or what he felt
11   needed further investigation?
12   A.   No, sir.  All they put is lookout.
13   Q.   What does lookout mean?  You said that before.  I don't
14   know what that means.
15   A.   Means that a person entering the United States needs
16   some further inspection.
17   Q.   Okay.  So it wasn't your primary inspector that told you
18   he needed further inspection.  It was some other agency that
19   put a lookout for Mr. Santana?
20            MS. DeWITT:  Objection.  No foundation.
21            THE COURT:  Overruled.
22            You may answer.
23            THE WITNESS:  That is correct, sir.
24   BY MR. THOMAS:
25   Q.   So you didn't have a discussion with your primary
```

1    investigator.  You were just told to be on the lookout for

2    the person.

3    A.   No, sir.

4    Q.   Okay.  Could you explain the lookout again?

5    A.   Okay.  The person entering the United States, when they

6    enter and they present themselves for inspection, when the

7    primary officer's conducting their inspection, if the person

8    is determined -- if the person has a lookout or the person

9    needs further inspection, they refer the person in.

10   Q.   Now I understand what a need for a further inspection

11   might entail, but what does the lookout mean?

12   A.   It's exactly what I said, sir.  The primary officer,

13   when the person -- when Mr. Santana, for example, entered the

14   United States, when they were conducting the primary

15   inspection on Mr. Santana, he was -- there was a lookout

16   saying that he needed a secondary inspection so primary

17   inspections refers the person to secondary.

18   Q.   Well, what kind of things would trigger a lookout?  Like

19   if someone's name pops up on a list?

20   A.   Excuse me, sir?

21        MS. DeWITT:  Objection.  No foundation, beyond the

22   scope.

23        MR. THOMAS:  She hasn't answered the question yet.

24        THE COURT:  Well, usually I rule on the objection

25   before the witness answers.  The objection is sustained.

1   BY MR. THOMAS:

2   Q.   Ms. Rodriguez, there are certain things that

3   automatically make someone move to the detention or arrest

4   category, correct.  Such as having contraband?

5              THE COURT:  This is beyond the scope, Mr. Thomas.

6              This question, too, is beyond the scope.

7              MR. THOMAS:  But Your Honor, this was actually said

8   during her direct exam from a question from Ms. DeWitt.

9              THE COURT:  Well, don't argue it in front of the

10  jury.

11             MR. THOMAS:  Certainly.  Should I approach?

12             THE COURT:  No.  Move on to your next subject.

13             MR. THOMAS:  Okay.

14  Q.   In response to one of Ms. DeWitt's questions about what

15  you look for in secondary inspections, one thing you said is

16  lack of documents; correct?

17  A.   Yes, sir.

18  Q.   Another thing you said is drugs.

19  A.   Yes, sir.

20  Q.   Or if they had failed a primary inspection.

21  A.   Failed a primary inspection?

22  Q.   Or if the primary inspector told you they needed further

23  investigation; correct?

24  A.   Yes, sir.

25  Q.   Now, why is it that if someone possesses drugs, that's

```
 1    automatically something you're to look for and ask further
 2    about?
 3    A.   Uh, for drugs?
 4    Q.   Sure.
 5    A.   Because the agents come in to process the person for
 6    drugs because they're going to be arrested.
 7    Q.   Why are they going to be arrested?  What is it about
 8    drugs that makes someone subject to arrest?
 9    A.   I mean, if they're bringing drugs into the United
10    States, it's harmful.
11    Q.   Drugs are illegal to possess.
12    A.   Yes, sir.
13    Q.   Okay.  And fake documents are illegal to possess.
14    A.   Yes, sir.
15    Q.   Inspire magazines are not illegal to possess.
16    A.   No, sir.
17    Q.   And that's why you let Mr. Santana into the country.
18    A.   Mr. Santana was released into the United States because
19    he satisfied his admission requirements.
20    Q.   Well, he wasn't arrested or further subject to detention
21    simply because he had an Inspire magazine.
22    A.   Exactly, yes, sir.
23    Q.   Or any other material that some people might consider
24    offensive.
25    A.   Yes, sir.
```

```
 1    Q.   Okay.  It was the fact that he had proper documentation,

 2    and he did not possess contraband that allowed you to let him

 3    come into the country.

 4    A.   Yes, sir.

 5              MR. THOMAS:  Thank you.  No further questions.

 6              THE COURT:  Ms. DeWitt.

 7                         REDIRECT EXAMINATION

 8    BY MS. DeWITT:

 9    Q.   Just one question.  You referred in cross-examination to

10    what you call the five Ws.

11    A.   Yes, ma'am.

12    Q.   Can you explain what that means?

13    A.   It's who, what, where, how and why.

14    Q.   Is that a standard set of questions that you use in

15    following up doing a secondary?

16    A.   Yes, ma'am.

17              MS. DeWITT:  Nothing further, Your Honor.

18              THE COURT:  Thank you.  You may step down.

19              The government's next witness.

20              MR. CHIU:  Your Honor, as I indicated to the Court

21    this morning --

22              THE COURT:  Oh, you want to read the stipulation?

23              MR. THOMAS:

24              MR. CHIU:  Yes.  Before we get to the next witness,

25    defense requests that this witness be subject to recall.
```

```
 1            THE COURT:  She can remain until the end of the
 2   day, and I'll take this up at the recess.
 3            MR. THOMAS:  Certainly.
 4            MR. CHIU:  Your Honor, and i just want to inquire
 5   of the Court's practice.  Is it to read the actual name of
 6   the exhibit or just the exhibit number?  I just want it to be
 7   clear for the record.
 8            THE COURT:  So you're reading a stipulation about
 9   admissibility?
10            MR. CHIU:  The documents pursuant to 90211,
11   Your Honor.
12            THE COURT:  It's whichever you prefer.  If you want
13   to read the title of the document, that's fine.
14            MR. CHIU:  For ease, if I can read just the exhibit
15   numbers that it would be faster.
16            THE COURT:  That's fine.  If that's sufficient for
17   your purposes, that's fine.
18            MR. CHIU:  Thanks, Your Honor.
19            The following exhibits are accompanied by
20   certifications which satisfy the requirements of Rules 90211
21   and 8036, and therefore, it's not required to subpoena the
22   record custodians to testify at trial about these records.
23            The following records should be admitted,
24   Your Honor, to -- according to the following exhibit numbers,
25   and I'll state the organization and the exhibit numbers.
```

1          The first organization is LAX Firing Range related

2    Exhibit Numbers 106, 127, 125.

3          Second organization is AT&T related to number

4    626-589-2068 related to Exhibit Number 475.

5          Third one is Tumblr related to Exhibit Number 482.

6          Fourth organization is Facebook following Exhibits

7    Numbers 195, 196 and 198.

8          Next exhibit would be the T-Mobile phone records

9    for 909-647-5061, Exhibit Number 478.

10          Next Exhibit is 24 Hour Fitness related to Exhibit

11    No. 44.

12          Next organization is Skype related to records for

13    (only_n_cali and juan.ton21), and that's related to Exhibit

14    No. 702.

15          The organization next is Cheapoair related to

16    Exhibit Number 192.

17          Next organization is Google related to the emails

18    101mesr@gmail.com, blackflagbanner@gmail.com,

19    blackflagbanner1400@gmail.com) related to Exhibit 479.

20          Next organization is Facebook related to the user

21    name arifeeng, a-r-i-f-e-e-n-g, and that's Exhibit Number

22    197.

23          Next organization is SC Village Paintball, Exhibit

24    Numbers 150, 153, 154, 155.

25          Next organization is Los Angeles Gun Club.  It's

1  Exhibit Numbers 130, 131, 132, 144 and 146.

2          Next organization is Western Union related to the

3  following transaction records:  230113, 230114 and 218909

4  related to Exhibits 466, 467, 468.

5          Next organization is Yahoo! related to the email

6  address simsjessica41@yahoo.com, and that's

7  s-i-m-s-j-e-s-s-i-c-a-41@yahoo.com, Exhibit Number 472.

8          Next one is also Yahoo! with the following email

9  addresses: who_m_i66@yahoo.com and app1821@yahoo.com related

10  to Exhibit Number 471.

11          Next organization is Sprint related to the phone

12  numbers 318-820-4287, 909-753-7300, Exhibit Number 481.

13          Next organization again is Google for the email

14  address sk.tefl.g@gmail.com, Exhibit Number 473.

15          Next one is Green Dot Bank, Exhibit 474.

16          Next organization is Time Warner related to the IP

17  address 76.167.167.83 related to Exhibit 480.

18          Next organization is Google related to the email

19  address feen13@gmail.com related to Exhibit 477.

20          I have two more, Your Honor.

21          Next organization is Wells Fargo Bank related to

22  records for Ralph K. DeLeon, Exhibit Numbers 191 and.

23          Finally, FBI Los Angeles Passport Office TD related

24  to Exhibit Numbers 175 and 176.

25          Your Honor, to the extent those exhibits have not

```
 1    already admitted into evidence, the government formally moves
 2    those into evidence at this time.
 3              THE COURT:  All right.  I take it this is by
 4    stipulation?
 5              MR. THOMAS:  That's correct, Your Honor.
 6              MR. AARON:  That's correct.
 7              THE COURT:  All ordered admitted.
 8              MR. CHIU:  Thank you, Your Honor.
 9              The next witness is the United States calls
10    Investigator Craig Goldsmith.
11              THE COURT:  Thank you.
12              THE CLERK:  Please raise your right hand.
13                        (Witness sworn.)
14              THE CLERK:  Thank you.  You may be seated.
15              Please state your full name and spell it for the
16    record.
17              THE WITNESS:  My name is Craig Goldsmith spelled
18    G-o-l-d-s-m-i-t-h.  First of Craig, C-r-a-i-g.
19              THE COURT:  Thank you.  You may inquire.
20                      DIRECT EXAMINATION
21    BY MR. CHIU:
22    Q.   What do you do for a living?
23    A.   I'm an investigator with the Orange County Sheriff's
24    Department.
25    Q.   And how long have you been an investigator with the
```

```
 1   Orange County Sheriff's Department?

 2   A.   I've been employed by the Orange County Sheriff's

 3   Departments for 24 years.  I've been an investigator for

 4   14 years.

 5   Q.   Can you describe some of your responsibilities as an

 6   investigator?

 7   A.   As an investigator, my responsibility is to investigate

 8   complex crimes that are ongoing and follow up to what's done

 9   on patrol.  Specifically, for the last seven years, I have

10   been assigned to our computer forensics unit.

11   Q.   And can you describe a little bit about what the

12   computer forensic unit does?

13   A.   Computer forensics unit is a support unit for other

14   investigative units within my department.  We analyze digital

15   media which is to say computers, cell phones, loose media

16   such as thumb drives, CDs, DVDs, memory cards, et cetera.

17   The --

18   Q.   Okay.  Why don't we do this.  Can you slow down a tad

19   bit?  The court reporter has to write everything down so it

20   gives her an opportunity for a break and me an opportunity

21   for a break as well.

22   A.   All right.

23   Q.   So can you briefly describe again what the laboratory

24   does?

25   A.   Yes.  As our computer forensics unit, we are tasked with
```

 1    providing support for other investigative units within our

 2    department.  Specifically, we perform digital analysis or

 3    computer analysis on digital media that's brought into our

 4    lab.  Examples to that would be computers, cell phones,

 5    memory cards, CDs, DVDs, et cetera.

 6    Q.   And is there a formal name for the laboratory that you

 7    work for?

 8    A.   Yes.

 9    Q.   And what is that formal name?

10    A.   I'm currently assigned to the OC RCFL.  That's OC RCFL,

11    and that stands for Orange County Regional Computer Forensics

12    Laboratory.

13    Q.   And your formal title at OC RCFL is what?

14    A.   I'm a task force officer.

15    Q.   And you often referred to as well as a forensic

16    examiner?

17    A.   Yes.

18    Q.   Can you generally describe your training and experience

19    as a forensic examiner?

20    A.   Yes.  For the last seven years, I have been specifically

21    assigned to be a forensic examiner first for the Sheriff's

22    Department and then as a task force officer for the OC RCFL.

23    That's involving training that I have attended, formalized

24    training, over 1100 hours worth of training in how to perform

25    computer forensics, specific types of file systems and

1    operating systems, how to collect and analyze digital media.

2    Q.   And approximately how many computers or digital media

3    have you examined in your career as a forensic examiner?

4    A.   It's been -- an approximate number would be over 500.

5    Q.   Let's explore that a little bit.  Can you explain what

6    digital media is?  Can you give some examples of the

7    different types of digital media?  I think you mentioned some

8    before, but if you could just make that clear.

9    A.   Yes.  Digital media is just a fancy way of saying

10   information that is stored on digital material.  It's either

11   stored magnetically or by a laser or mechanical means and is

12   retrieved in that same manner by a computer reading

13   information from a hard drive, reading information from flash

14   media in order that it can pull up the word document or the

15   picture file or the audio file that's been saved to that

16   particular piece of media such as a thumb drive or an MP-3

17   player, something along those lines.

18   Q.   And in your experience with digital media, is it

19   possible these days for a small piece of digital media to

20   contain a lot of information?

21   A.   Absolutely.

22   Q.   For example, if we were talking about a SIM card, that

23   is two gigabytes.  Could that contain a lot of information?

24   A.   Yes.

25   Q.   And maybe you can explain what a gigabyte is.

```
 1    A.    Okay.  We'd have to actually take a step back to go over
 2    it.  And speaking computer-ease, a byte is a single
 3    character.  A byte is a unit of measure when defining
 4    computer jargon.  And one byte, b-y-t-e, is what is needed to
 5    define a single character such as a letter or a number or an
 6    alpha numeric character.
 7            There are approximately 1000 characters that can
 8    fit on a page.  That would be one kilobyte.  A kilobyte is
 9    1000 bites.  A megabyte is 1000 kilobytes.  So you would
10    have -- if you had a one-megabyte size book, that would be a
11    thousand page book.  A gigabyte is 1000 megabytes.  If you
12    had a gigabyte worth of information, you potentially could
13    have one thousand 1,000-page books worth of characters.
14    Q.    So my math is terrible so I'm gonna ask you a simpler
15    question.  Today's iPods have how many gigabytes?
16    A.    It depends on the make and model.
17    Q.    Okay.  The most basic model of an iPod is how many
18    gigabytes?  Do you know?
19    A.    Absolutely.  Today, right now, I don't know.  I would
20    guess it would be between 8 and 16 gigabytes in size.
21    Q.    How many songs can fit in an iPod that is eight
22    gigabytes now?
23    A.    Thousands.
24    Q.    And if we were to expand that to computers, how many
25    songs or lectures or images can fit on a computer?
```

1    A.    Quite a few.  Probably in the hundreds of thousands

2    because just by their very nature, computers with their

3    installed operating system and a system file is going to be

4    well over a hundred thousand files just to get the computer

5    up and running.

6    Q.    And is the nature of digital media today where you can

7    transport it from one place to another without much

8    detection?

9    A.    Yes.

10   Q.    Are you able to put a SIM card in your pocket and walk

11   through say a metal detector?

12   A.    That would be my guess, yes.

13   Q.    Now, are you able to transport digital media to various

14   places without drawing a lot of attention?

15   A.    Yes.

16   Q.    You were able to fit small pieces of digital media that

17   contain a lot of information to virtually anywhere without

18   people knowing?

19            MR. AARON:  I'll object, Your Honor.  It's leading.

20            THE COURT:  Overruled.

21            You may answer.

22            THE WITNESS:  Yes, you could.

23   BY MR. CHIU:

24   Q.    Now let's talk a little bit about your work with the

25   forensic laboratory.  Can you walk us through how you examine

1    a piece of digital media that comes through the laboratory?

2    A.   Yes.   The first introduction that we have to someone

3    wanting to use our service is they must submit a service

4    request.   That's basically just a form that we have, and we

5    ask that the submitting person we refer to a case agent fill

6    out the form basically identifying who they are, what agency

7    they work for, what is it they are requesting us to do.

8         Do they want us to assist them going out on a

9    search?   Do they want us to look at digital media that they

10   have in their possession?   What is the nature of the request.

11        We also ask that they provide us in addition to the

12   digital media they want us to look at legal authority, a

13   search warrant, a consent form, something that gives us legal

14   authorization to look at whatever it is they want us to look

15   at.

16   Q.   So in that first step of the process when a special

17   agent or law enforcement officer wants a piece of digital

18   media reviewed, how -- when do you first see that

19   application?

20   A.   To clarify, as a forensic examiner?

21   Q.   As a forensic examiner, yes.

22   A.   The first step that happens is they must submit the

23   paperwork.   The case agent books in the digital media they

24   want examined to our evidence technician.   The evidence

25   technician takes that digital media and stores it in our own

```
 1    in-house evidence control center at the laboratory.

 2              The service request itself is reviewed by the lab's

 3    administration to make sure that we as a lab can fulfill the

 4    service request.  It is then assigned to one of our three

 5    teams of forensic examiners to have someone actually perform

 6    the work.  Each team is headed up by a team leader.  That

 7    team leader takes a look at the service request and then

 8    assigns it to a particular examiner to actually fulfill the

 9    service request.

10    Q.   So when a law enforcement officer brings you a piece of

11    digital media, is it kept in a place that is controlled?

12    A.   Yes.

13    Q.   And why is it kept in a place that's controlled?

14    A.   For purposes of chain of custody, to show who had it at

15    a particular time.

16    Q.   And who had particular access to the digital media; is

17    that correct?

18    A.   Correct.

19              MR. AARON:  Leading.

20              THE COURT:  Sustained.

21              Refrain from leading questions.

22    BY MR. CHIU:

23    Q.   What's the next step that occurs?

24    A.   After it's been assigned to a specific examiner, the

25    examiner needs to review the service request.  He needs to
```

1  review the legal authority and also get the evidence from the

2  evidence control center that's at the laboratory.

3  Q.   Can you explain a little bit more about what you mean by

4  saying review the legal authority?

5  A.   Basically to look at the search warrant, look at the

6  consent form, make sure it actually covers the information or

7  the data that we're supposed to be examining.  If it doesn't

8  mention anything about examining digital media, we are not

9  going to be conducting an examination on that particular

10  piece of submitted media until we get that legal authority.

11  Q.   So once you've determined that you do have the legal

12  authority, what do you do next?

13  A.   Next step would be basically to get the evidence from

14  the evidence control center, and the individual examiner

15  would then take control of it.  And each examiner at the lab

16  has their own evidence locker in their work area, we refer

17  them to as pods, and that evidence is maintained in there for

18  the duration of the examination.

19  Q.   And what's the purpose of keeping the digital media in

20  that pod?

21  A.   Basically so only the examiner has control of that piece

22  of media.

23  Q.   What happens next?

24  A.   Next the examiner actually looks at the piece of media.

25  And if we're talking about a computer, we want to remove

1    whatever media is within the computer, usually a hard drive.

2    And then we turn on the computer with the hard drive removed

3    because we want to make sure that the computer actually

4    starts --

5    Q.   Okay, stop there.  Let's take that step by step.  So

6    what's the first thing you do -- well, let's take an example

7    of a computer.  When you get a computer, how do you begin to

8    review that computer to conduct a forensic examination?

9    What's the first step that you take?

10   A.   The first step is to actually look at the computer, make

11   sure that's in a sealed condition.  It should be in a sealed

12   bag or sealed container of some sort.  Remove it from the bag

13   or the container.  Physically inspect it.  In the case of a

14   computer, we would want to remove the hard drive.  That's the

15   storage compartment.  Um --

16   Q.   Okay.  Why do you do that?

17   A.   Because at some point, we want to attempt to turn on the

18   computer.  If we have the hard drive removed, no changes will

19   be made to the data that's on that hard drive.

20   Q.   Does the -- uh, does the act of just turning on a

21   computer, uh -- does the just the act of turning on the

22   computer alter the hard drive in some way?

23   A.   Potentially, yes.

24   Q.   And is that the purpose for removing the hard drive

25   before inspecting it?

1    A.    One of several reasons, yes.

2    Q.    So after you remove the hard drive from the computer,

3    what do you do next?

4    A.    The next step is to connect the computer to a power

5    source, connect it to a monitor and turn it on and look at

6    its settings.  We refer to that as the BIOS settings,

7    B-I-O-S, Basic Input Output System.

8    Q.    And just to be clear, at this point, is the hard drive

9    out?

10   A.    Yes.  The hard drive has been removed at this point.

11   Q.    You can boot up the computer without the hard drive.

12   A.    That is not the way it's always done, but primarily,

13   yes.

14   Q.    After booting up the computer itself, what do you do?

15   A.    We check the time and date settings, look for any system

16   information such as how much memory is on the computer, look

17   for any passwords that might be installed on the computer

18   system.  We're looking for anything that potentially could

19   affect our ability to look at the data on the hard drive that

20   we removed.

21   Q.    Now, if the service request is to create a forensic

22   image of the digital media, what do you do?

23   A.    Going back to the example of a computer, we connect that

24   hard drive to what we refer to as a write blocker.  That's

25   w-r-i-t-e blocker.  And that's either a physical or a

1    software device that's designed to allow our forensic

2    software to look at the data on the hard drive without

3    causing any changes to the data.

4    Q.    And when you say not cause any changes on to the hard

5    drive, what exactly do you mean?  Can you give an example?

6    A.    If I were to have a computer that has a Windows

7    operating on it, and I was just to turn on the computer and

8    do a regular start-up of that computer, the mere act of

9    turning it on will cause changes to the data on that hard

10   drive.  Systems files are being updated.  Database files

11   referred to as a registry are being updated.  You're causing

12   changes to system related files on that.  That potentially

13   could overwrite or obliterate data that's been deleted from

14   that computer that is potentially recoverable.

15   Q.    And what's the purpose of having it write block only?

16   A.    Our goal is to look at the information on that piece of

17   media and make a copy of it without doing any of those

18   changes I've just described.

19   Q.    So after the hard drive is plugged into the write block

20   system, hardware system, what happens next?

21   A.    The next step is to actually make a copy of all of the

22   data, all of the user accessible data from the hard drive to

23   basically a hard drive belonging to the lab.  So we're making

24   a bit for bit cop of user accessible data from what we call

25   the target hard drive or the source hard drive, that's the

```
 1    hard drive that was in the computer, and that's going to what
 2    we refer to as the staging media, basically a temporary
 3    holding location.
 4    Q.   And before you do that, do you insure that the staging
 5    media is, uh, wiped or clean?
 6    A.   Yes.  We -- um under optimal conditions, what we wish to
 7    do is have that data transferred to essentially a clean
 8    slate.  So the hard drives that we use to receive the data,
 9    they have been previously wiped or the data that was on that
10    hard drive before has been overwritten.  So it's as if you're
11    at blackboard and you use an eraser and completely wiped it
12    clean before we put new information on that blackboard.
13    Q.   Will you describe the process of making a duplicate
14    copy?
15    A.   I refer to it as an exact bit for bit copy also known as
16    a forensic image.
17    Q.   How do you insure that the staging media is an exact
18    copy of the digital media that you've taken the data off of?
19    A.   There is a process called hashing.  During the
20    acquisition of the data from the target hard drive, the data
21    on that hard drive is being calculated using a mathematical
22    algorithm, that's just a fancy way of saying a calculation,
23    and that generates a number which is referred to as a hash,
24    and that's essentially a digital fingerprint for that piece
25    of media.  Once we make the copy, a calculation is made on
```

1    the data from that copy.  And ideally, the hash from the copy

2    should match the original, and if it doesn't, then you've had

3    hiccup somewhere, and you need to find out what went wrong.

4    Q.   So you run that hash -- or, excuse me, that calculation

5    on the original media, correct, and you get a number or an

6    identification?

7    A.   Correct.

8    Q.   And you do the same for the staging media?

9    A.   Correct, after it's been generated well before the image

10   file that is now on the staging media, yes.

11   Q.   And by matching up those two, are you able to determine

12   then that you've made a duplicate copy?

13   A.   Yes.

14   Q.   Or, excuse me, what you say, a bit for bit copy?

15   A.   Yes.  We made a forensic image of the data from the

16   source piece of media.

17   Q.   So what happens after you've now determined that you've

18   made a bit for bit copy on your staging media?

19   A.   After we have successfully made a copy of it, now it's

20   time to actually process, uh, the data that's on the

21   duplicate copy, and we use forensic software to basically

22   analyze and compartmentalize the information.  PDF files are

23   sorted with other PDFs files.  Picture files are sorted with

24   picture files.  Word documents, Excel spreadsheets, which

25   have you, they're all sorted and categorized together.

```
 1            The forensic software also does a process which is
 2     known as indexing.  It's basically making a directory of all
 3     the word strings that are on that media, all the various word
 4     lists that are on there and compiles essentially a table of
 5     contents or an index for that information.
 6            So, for example, once it's been processed, if a
 7     case agent was interested in looking for the word Goldsmith
 8     which just happens to be my last name, they could type in
 9     Goldsmith, and fairly instantaneously, the results of how
10     many instances of the word Goldsmith appears on that piece of
11     media would be available for the case agent to review and
12     make a determination if those instances of that key word
13     Goldsmith, if that's relevant to their case.
14     Q.   What is the purpose of having this index and search
15     function?
16     A.   If there are particular phrases or a combination of
17     words that are significant to a case agent or to the person
18     conducting the examination, this allows them to quickly look
19     through all of the data which there are billions and billions
20     of pieces of data on any given piece of hard drive or any
21     piece of media and allows them to quickly narrow down and
22     locate the requested information.
23     Q.   Approximately in a normal computer, just a standard if
24     you went to the store and bought a computer, how many
25     files -- how many directories or files would a computer have?
```

UNITED STATES DISTRICT COURT

1  A.   It would minimally be for a new computer in the hundreds

2  of thousands range.

3  Q.   And would it be possible to hide or to put a document in

4  any of those files?  Any of those files or directories, I'm

5  sorry.

6  A.   Some of the files or directories might actually be

7  protected by the system that would prevent a user from

8  accessing them, at least not without some additional

9  administrative privileges on that computer.  But for the most

10  part, it's wide open and fair game for someone to place a

11  file in any given location.

12  Q.   Would it be possible as the person who bought a computer

13  to write homework on and create a new file called homework?

14  Would it be possible?

15  A.   Yes, depending on what software they have installed on

16  it.

17  Q.   And would it be possible to put any type of file in a

18  folder or directory called Homework?

19  A.   Absolutely.

20  Q.   And is that the purpose of having a search function that

21  you placed onto the media that you've discussed?

22  A.   Yeah.  The purpose of the index is to allow for a rapid

23  search of the data on there, wherever it might be.  Because

24  of the indexing function, whether a file is hidden or not,

25  whether a file is in a particular directory or not, its core

1    information that makes up that file has been analyzed, and

2    it's available to be searched.

3           The one exception that I can think of off the top

4    of my head is if a file is encrypted by some kind of

5    encryption algorithm that would basically make the data

6    within that file to be -- to appear to be nonsensical, not

7    make any sense so therefore, there'd be nothing for the

8    software to index.  It would just appear to be gobbledegook

9    until that particular file or group of files were decrypted

10   by whatever means.

11   Q.   Now, what happens after you install that search -- let

12   me back up.  Installing that search function and table of

13   contents, does that alter the digital media on the

14   destination device or the bit by bit copy that you've

15   created?

16   A.   No, it does not.

17   Q.   And how do you know that?

18   A.   There are number of reasons.  The way that we make our

19   copies, essentially, they have some built-in integrity

20   functions within the image file that we've created that if

21   the data somehow is altered, it's essentially brought to the

22   examiner's attention, and we essentially know that we have a

23   corrupted image file.  That would be the very first initial

24   step.

25          The fail safe method that we employ after an

1    examination is complete, after either I or the case agent has

2    conducted all the searches and located all the files he or

3    she is interested in, we run another hash against the image

4    file, and that hash if nothing has changed should be the same

5    as when it was originally generated.

6    Q.   And a hash would be, again, like a digital fingerprint?

7    A.   Yes, except far more precise.

8    Q.   When you say far more precise, how precise?

9    A.   The odds of two files or two pieces of media having the

10   same MD5 hash -- and there are different sorts of hashes, but

11   the one we commonly use is called an MD 5 hash.  That stands

12   for Method Digest 5.  The possibility of two files having the

13   exact same MD5 hash with different data within them randomly

14   occurring is 340 billion billion billion billion to 1 against

15   such an occurrence.

16   Q.   I really can't even do that.

17              THE COURT:  In your -- in your head?

18              MR. CHIU:  I learned on a calculator, Your Honor.

19              THE WITNESS:  Let's -- your odds are better in

20   Vegas.

21              MR. CHIU:  I'll move on, Your Honor.

22   Q.   What happens after, uh -- what happens after you've

23   loaded this software into the destination media?

24   A.   After we've processed the information and it's

25   essentially ready to analyzed, in this particular case, the

 1    examiner is going to be conducting the examination.  We refer

 2    to that as a directed examination.  An examiner would

 3    actually start looking at the media based on what was in the

 4    service request.

 5              The other way that we go about doing it is referred

 6    to as a CAIR, C-A-I-R.  That stands for Case Agent

 7    Investigative Review.  And all that data that's now been

 8    processed and separated and identified, that is now going to

 9    be made available for the case agent to review using the

10    forensic software so they -- he or she can make a

11    determination whether individual files or anything on that

12    piece of media is relevant to their case.

13    Q.   And so at some point, do you hand the destination media

14    or the bit by bit hard drive to the case agent?

15    A.   We make it available for them to review.  It remains --

16    the actual hard drive itself containing the image file unless

17    it's truly extraordinary circumstances remain under our

18    control.

19    Q.   And when you say make it available, it's for the law

20    enforcement to look for pertinent information; correct?

21    A.   Correct.

22    Q.   Now, what happens when the law enforcement officer has

23    completed the review?

24    A.   The law enforcement officer informs the examiner that

25    the review is done.  They're saying their CAIR has been

1    completed.  It's now essentially back in the hands of the

2    examiner to take that process case with any files that's been

3    noted as significant by the case agent, we refer to those as

4    bookmarked files so they've been placed in bookmarks, and

5    it's up to the examiner to look at those bookmarks to verify

6    that one, items were bookmarked, and that those files that

7    were bookmarked actually are things, tangible things that are

8    gonna be understandable to the end user when they get the

9    file report.

10   Q.   When you say bookmarked, is it -- is it -- can you just

11   describe that a little more in maybe simpler terms?

12   A.   Sure.  If I'm a person looking through the data, and I

13   come across a picture file, and this picture file is

14   significant to the case I'm investigating, I want to

15   essentially mark that in some way so I know later on that

16   that can become part of a final report.

17        The way that our forensic software does that is

18   referred to as bookmarking, and using the forensic software,

19   we can highlight that file and essentially tag it so it goes

20   into a special category.  And in this case, I'm talking about

21   a picture file.  I could give that bookmark a name such as

22   Pictures of Interest or Picture of Interest.  And within that

23   bookmark title, that particular picture file that I was

24   interested in is going to be -- have a place holder.

25   Q.   Is it a way to keep documents that might be relevant as

```
 1    to an investigation in one area that you can easily look at

 2    it?

 3    A.   Yes, that's the purpose.

 4    Q.   So once you receive the forensic image or the bit by bit

 5    hard drive back with the bookmarks, what do you do?

 6    A.   Well, first and foremost, the forensic image never left

 7    our possession.  But once we're informed by the case agent

 8    that they're done doing their review, the examiner now looks

 9    at it, makes sure the bookmarks are in order.  We generate an

10    electronic report from those items that were bookmarked by

11    the case agent.

12         That electronic report is then saved to some

13    optical media such as a CD or DVD or if there's enough -- so

14    much data that it's so big, maybe a Blue Ray disk.  And the

15    purpose of that is then the case agent now has the

16    information that that case agent saved that's available for

17    them to review.

18    Q.   And so is the bookmarks that the law enforcement officer

19    reviewed on the disk or the CD or the DVD that you've

20    created?

21    A.   Correct.

22    Q.   And how do you know that you've created that disk?

23    A.   After we create the CD, DVD, Blue Ray disk, what have

24    you, we refer to that as Derivative Evidence or DE for short.

25    That's, uh, our lingo for it inside the lab.  It's also known
```

1    as Results Media.  Basically, it's gonna be the thing that

2    the officer or agent picks up at the end, and that's what's

3    gonna be what they bookmarked.

4            In order to identify that, we have two methods.

5    One is digital evidence or anything that comes into the lab

6    for that matter gets its own unique bar code so it's an alpha

7    numeric identifier that's specific to that particular piece

8    of media, and that's actually imprinted on the CD cover

9    itself.  It's embedded on it.  We also initial the CD or DVD

10   or Blue Ray disk with our initials to show that we're the

11   ones that created this disk.

12   Q.   Once you've created that disk, is there a way to compare

13   that disk back to the original digital media that you

14   received into evidence to make sure that it is, um -- that

15   they match?

16   A.   I'm not sure I understand your question.

17   Q.   Okay.  Is there a way to determine the Derivative

18   Evidence is truly from the digital media that it was taken

19   from?

20   A.   Well, it's up to the examiner to place it on there.

21   When the CD, for example is made, another examiner takes a

22   look at it just to verify that it works, and that, in fact,

23   there's data on it.

24           Within the report itself, any files that have been

25   bookmarked, those files are referenced back to the their

```
 1   source media where it came from.  And any piece of media that
 2   we get in the lab, we assign it an identifier, that bar code
 3   I was telling you about.
 4            So, for instance, if I have bookmarked a picture
 5   file that happens to be called Picture.Jpeg, and I create a
 6   bookmark and put that on the CD, when I look at that, I'll be
 7   able to look at the picture.jpeg file, but it'll also say
 8   this file came from this piece of media, this what we refer
 9   to as an ORC number, O-R-C number, uh, which is that barcoded
10   number I make reference to.
11   Q.   Are you able to compare the digital fingerprint or the
12   MD5 hash from the Derivative Evidence back to the original
13   media?
14   A.   That would be possible, yes.
15   Q.   And if those two matched, would you be able to determine
16   that the Derivative Evidence came from the digital media that
17   was originally provided to you?
18   A.   Yes.  Individual files will have their own hash values,
19   and we could look back at our original process case and
20   compare those individual hash values with what's in the
21   process case versus what's on the Derivative Evidence, the
22   results media, and verify that they are one in the same file.
23            MR. CHIU:  Your Honor, is this a good time for a
24   break?
25            THE COURT:  I think so.  All right.
```

```
 1              Ladies and gentlemen, we'll be in recess for

 2    15 minutes.  Remember don't discuss the case, don't

 3    communicate about it, don't research any of the issues or

 4    anything about the evidence, the participants, anything

 5    related to the case, and don't form any opinions on any of

 6    the issues.  Thank you.

 7                        (Jury not present.)

 8              THE COURT:  We're on the record outside the members

 9    of the jury.  All counsel and the defendants present.

10              What's the issue with respect to Ms. Rodriguez

11    Lopez that you wanted to have her subject to recall?

12              Ms. Viramontes?

13              MS. DeWITT:  I think it was actually Mr. Thomas.

14              MR. THOMAS:  Yes, Your Honor.  I got -- I asked

15    some questions where I got an objection beyond the scope, and

16    I know there were maybe technical details beyond the scope,

17    but, you know, the witness is from New York, and I don't want

18    to have to bring her back out here for our case.  So I was

19    asking for some, you know, leniency for --

20              THE COURT:  That's fine, but what is the subject

21    that you want to inquire about?

22              MR. THOMAS:  Well, there are a couple questions

23    about the original interest in Mr. Santana that were beyond

24    the scope because the government just kind of brushed past

25    it, and I wanted to explore that.
```

```
 1            THE COURT:  So what's the relevance of that?

 2            MR. THOMAS:  Well, there's a lot of reasons.

 3   Number one is whether there was something Mr. Santana was

 4   doing at the airport itself -- or at the border stop itself

 5   that drew attention or whether he was already on some kind of

 6   list or under some suspicions for some other reason.  We

 7   never got an answer to that because --

 8            THE COURT:  But let's say it's the latter.  What's

 9   the relevance of that?  What's the relevance either way?

10            MR. THOMAS:  There shouldn't be any, you know,

11   guess that -- it's our main argument is that the government

12   targeted this individual.  And this is the individual from

13   which they sent the informant in to the mosque that Santana

14   worships at, and that's how he found Mr. DeLeon and these

15   other people.

16            So to show in our minds what evidence there was of

17   agreement or conspiracy or predisposition.  And a lot of

18   these things go to the entrapment instruction as to what

19   information the government knew about Mr. Santana or any of

20   the other individuals before they sent the informant.  That's

21   been a large focus of Your Honor's with respect to our

22   entrapment --

23            THE COURT:  Right.  Except in terms of the timing,

24   at the time that he went to Mexico and was coming back --

25   well, at the time he was stopped at the border, he was
```

```
 1    already emailing with his -- well, with the other defendants
 2    in this case about his -- at least, I can't remember if it
 3    was right before he went or after he came back or both, about
 4    his plans to go down there to, um, you know, have weapons
 5    practice or weapons training so this --
 6            MR. THOMAS:  Well, that's not in evidence yet.
 7    That's why --
 8            THE COURT:  It's not in evidence yet, but it
 9    doesn't -- that doesn't really matter.  I mean, you all have
10    the discovery on it.  I mean, so in terms of whether this
11    evidence that you're trying to introduce about why he was --
12    why that witness got information, it's irrelevant.
13            MR. THOMAS:  Well, Your Honor, the jury -- I'm
14    assuming that when we get to the point of instructions and
15    whether we're gonna be able to get entrapment instruction,
16    it's gonna be based on what's come into court as evidence,
17    not just what's in the discovery because it's only the
18    information the jury heard.
19            THE COURT:  Exactly.
20            MR. THOMAS:  Right.  And so at this point, there's
21    been no connection or no evidentiary connection of
22    Mr. Santana to any of the defendants.  And I'm trying to
23    explore the basis of that connection because I want to know
24    if the one existed in January of 2012 was a month prior to
25    them sending the informant out to the mosque.
```

```
 1              THE COURT:  All right, Ms. DeWitt?

 2              MS. DeWITT:  Your Honor, the witness said that

 3    there was a lookout, and that he was referred to her because

 4    of that.

 5              What he's talking about is somehow suggesting that

 6    she's gonna be able to provide information about what the FBI

 7    was or wasn't doing or somehow connect that to the

 8    confidential source.  The only way that they're going to be

 9    able make that argument is if they can, in fact, introduce

10    evidence that would suggest that there was something else

11    that would connect somehow the FBI's actions to somehow some

12    kind of entrapment or some kind of chain there.

13              And so I would respectfully submit that what she

14    did that day is irrelevant in that connection because they

15    would have to prove what happened before, and they'd have to

16    prove what happened afterwards.

17              The fact is that she was, in fact, sent to

18    secondary and was interviewed at that time and that documents

19    were copied from him.  She's already testified about that and

20    what's within her knowledge.  And that before and after in

21    trying to suggest that this particular witness is somehow the

22    connector there, one, any connection that is there has

23    already been established and two, it's not -- it's not a --

24    it's not a -- it's not a meaningful connector, not from her.

25              THE COURT:  Well, not -- in other words, your
```

```
 1    argument is not from her because she's already testified to
 2    the extent she has any knowledge that he was referred to --
 3    it's Ms. Viramontes' witness so she's gonna have to respond
 4    so I'll give her a chance to do that.  I mean, you were the
 5    one who examined her.
 6              MS. VIRAMONTES:  That's correct, Your Honor.
 7              THE COURT:  Correct.  All right, I'm sorry.  But
 8    she can't testify -- well, I think she's already testified to
 9    the extent that she had any knowledge or was allowed to
10    testify about what she was told which was just, um, he's
11    being referred to secondary, ask the five Ws.  So how can she
12    be examined any further about why a third person, the person
13    who referred, what the motive was for that or the basis for
14    that?
15              MR. THOMAS:  Well, Your Honor, I don't think she's
16    totally answered the question because I asked her what a
17    lookout meant, and her explanation wasn't much assistance so
18    I suggested something, and that was beyond the scope, and
19    that's as far as the inquiry went.  You had me go on to my
20    next question.
21              THE COURT:  So how can she testify about -- I mean,
22    she did -- someone asked her, and she did testify, I think it
23    was you, but she did testify as to what she was told to ask.
24              MR. THOMAS:  No, I understand.  I think that was
25    co-counsel's questions.  What I was asking her is what drew
```

```
 1    the secondary inspection, and she said it was a lookout.

 2              THE COURT:  Right.

 3              MR. THOMAS:  And I asked her what a lookout was,

 4    and that's where it kind of ground to a halt.

 5              THE COURT:  And someone asked her what did the

 6    lookout tell you to ask, and she said just the five Ws.

 7              MR. THOMAS:  It wasn't what the lookout told to ask

 8    that I'm interested in.  I'm looking at what was the lookout?

 9    What does that mean?

10              THE COURT:  First of all, it would be hearsay;

11    right?  If the lookout told her why he was referring

12    Mr. Santana to secondary.  That would be hearsay.

13              MR. THOMAS:  In some degree, but it's not really

14    whether it's true or not that I'm concerned with.  It's what

15    drew the secondary inspection, what was the reason.

16              THE COURT:  Well, that is truth of the matter,

17    isn't it?  You want to know why.  You want to know why --

18              MR. THOMAS:  I'll give you an example.  If the

19    reason why is because they thought he was terrorist, it's not

20    whether or not he thought he was a terrorist is true or not.

21    That's not what I need to know.  I need to know the existence

22    of what that reason was.  What was the reason?  What

23    information did they have before?

24              THE COURT:  Well, how can she testify to that?

25              MR. THOMAS:  Well, I don't know that she can.
```

```
 1   Until I ask the question, we won't know.
 2             THE COURT:  Right.
 3             MR. THOMAS:  Maybe she doesn't know.
 4             MS. DeWITT:  It's not relevant.
 5             THE COURT:  Ms. Viramontes.
 6             MS. VIRAMONTES:  I don't think her testimony today
 7   was accurate and I would have impeached her because I don't
 8   think what she said about the chain of what happened is
 9   consistent with her report.  I think that got a little
10   muddled between me getting flustered and her getting
11   flustered.  The lookout telling her to ask five questions I
12   don't think is consistent with what she wrote in her report.
13             THE COURT:  You don't get to recall her because you
14   think you messed up in your cross-examination.
15             MS. VIRAMONTES:  I have one other thing.  The other
16   is that we don't know the scope of Mr. Santana's activities.
17   We don't know if he was engaged in activities that drew
18   attention to her outside what is being alleged by the scope
19   of conspiracy.
20             MS. DeWITT:  Your Honor, to the extent that there
21   was some other reason for them to do a secondary given the
22   fact that there was a lookout, they could have asked those
23   questions.  I mean she said exactly what happened.  There was
24   a lookout for him, he was referred to her, and she did the
25   follow-up that she does as part of her regular job.
```

1          You know whether it was because somebody thought he

2     was a terrorist or for some other reason, the facts are that

3     she did a secondary and that has already been established.

4          MR. THOMAS:  Your Honor, the best way for me to say

5     this is if Mr. Santana's behavior or what he possessed in

6     that port or terminal was the first time that the FBI drew

7     any suspicion to him, that's an important fact.

8          THE COURT:  That may be, but I don't think this

9     witness can testify to that because all she knows is what she

10    testified to that the -- he was referred to her and she was

11    told to ask those five questions.  That's my problem with

12    what you're suggesting.

13         MR. THOMAS:  Right, Your Honor, but you see how

14    it's not what the primary inspector thought was whether it

15    was true or not that is important.  It's the timing of it.

16    Did Santana act in some way that drew their attention for the

17    first time?  Was there something that he did or were they

18    already looking for him?

19         And when she said lookout, I know what I think that

20    means be on the look out that there are already suspicions

21    raised that's an important fact with respect to entrapment.

22    There's like one or two questions I only planned to ask after

23    I got cut off.  I don't have, you know, a whole ten minutes

24    worth.

25         THE COURT:  Well, nobody gets to do a do over so to

```
 1    the extent I'll let you reopen to ask a limited question and
 2    the only thing that's really persuasive to me at this point
 3    is that -- and I do think that she can testify as to anything
 4    that she was told -- anything other than what she was told to
 5    do because that's an exception to the rule against hearsay
 6    because that goes to, you know, future action.  That's the
 7    exception to the rule against hearsay that that would fall
 8    into.
 9              If you want to ask her that, I'll allow you to ask
10    her that as to what she was told.  If there's something in
11    the report that goes directly to that, you then can follow-up
12    with that.  I'll allow you to do that, Ms. Viramontes, but it
13    has to be on that one limited point.
14              MS. VIRAMONTES:  Thank you.
15              THE CLERK:  This court's in recess.
16                        (Recess taken)
17              THE COURT:  Let the record reflect the presence of
18    all members of the jury, all counsel and the defendants
19    present.  You may continue.
20              MR. CHIU:  Thank you, Your Honor.
21    Q.   Investigator Goldsmith, I think we left off at is it
22    possible to prepare a digital fingerprint from the derivative
23    evidence you create with the original media that you were
24    given to conduct a forensic examination?
25    A.   To clarify it is possible to compare individual files
```

1    that are on that results media, also known as derivative

2    evidence, to the files that are from the original source

3    media to confirm that they have not been tampered with or

4    somehow altered.

5    Q.   Are you familiar with -- actually, let me take a step

6    back.  How long does that entire process take?  If I am a law

7    enforcement officer and I'm interested in having a piece of

8    digital media examined, how long does that entire process

9    takes?

10   A.   It varies from case to case depending on a number of

11   factors.  How many pieces of media are in the case to be

12   examined?  There can be multiple computer systems or just a

13   single computer system.  How much time the case agent has to

14   review the data that's being put up for review.  How complex

15   the case is.  Are we looking for just specific directed

16   things or is it more of a global review of an all

17   encompassing look at all the data.  It's really quite

18   variable depending upon a number of factors.  So it could be

19   as little as a few hours.  It could take months.

20   Q.   And I'm just gonna remind you to slow down that would be

21   appreciated.

22            Are you familiar with what's called a loose media

23   kiosk?

24   A.   Yes, I am.

25   Q.   And what is a loose media kiosk?

A.    A loose media kiosk is a console or a piece of equipment that was created by the FBI and it is placed in various computer forensic labs that the FBI has a partnership with. It's designed to allow the rapid review of loose media such as thumb drives, memory cards, CDs, DVDs.  It's not designed to do an exhaustive examination of a hard drive of a computer.  It's basically designed to allow a user with a limited amount of computer training to be able to, if you will, plug the thumb drive into this loose media kiosk and be able to look at the data in a forensically sound manner.

Q.    And are you able to make a copy of the digital media through the loose media kiosk?

A.    You are able to extract individual files from the digital media that's being reviewed and copy out those individual files to a blank CD or DVD.

Q.    Is this also called a self-service kiosk?

A.    That's it's nickname, yes, but it's officially called the loose media kiosk.

Q.    And are agents or law enforcement officers able to just walk up to this loose media kiosk and use it?

A.    They're able to use it pretty much as they would like. We have examiners available to assist them, but it is primarily designed for a case agent to use on their own.

Q.    Have you used the loose media kiosk?

A.    Yes, I have.

Q.   And approximately how many times?

A.   Approximately 25 times.

Q.   Are you familiar with how it works?

A.   Yes, I am.

Q.   What are the different components of the loose media kiosk?

A.   Well, at the risk of dating myself, the loose media kiosk is basically just a traditional computer tower, but it's housed within a console that looks like an arcade video game from the '80s.  It's got a keyboard in front of it, it has a screen and a track ball.  The screen itself is actually a touch screen so that the user can give the loose media kiosk commands by just touching the screen or using the keyboard or track ball combination.

Q.   Are you able to plug digital media into the loose media kiosk?

A.   Yes, you are.

Q.   And what happens when you plug digital media into the loose media kiosk?

A.   Just as in a forensic examination, the computer that's the heart of the loose media kiosk has its ports, the connections that the thumb drive, for example, goes into.  They are write blocked.  So while the computer is able to read the information from that thumb drive, the computer that's doing the reading cannot change or alter the data

1    that's on that thumb drive.

2    Q.   And what's, again, what's the purpose of having the

3    kiosk by write blocked?

4    A.   The purpose is to allow a user to see the data that's

5    on, for example, the thumb drive without altering that data

6    or causing any changes to the source digital media.

7    Q.   So walk me through the process.  If I am a law

8    enforcement agent and I have a two gigabyte SIM drive, can I

9    plug it into the loose media kiosk?

10   A.   You cannot plug in a SIM card.  A SIM card is

11   proprietary to a cell phone, but such as a micro SD card, an

12   SD card, any sort of other memory card, a thumb drive, a CD,

13   a DVD all of those items can be plugged into the loose media

14   kiosk.

15   Q.   What about a cell phone?

16   A.   The cell phone is actually we use a different process

17   for that.  We do essentially have a self-serve station for

18   that, but that does not involve the loose media kiosk.  Other

19   than if that particular cell phone has a micro SD card in it,

20   then we could process that independent through the loose

21   media kiosk.

22   Q.   So for the cell phone and the other digital media, the

23   kiosk, the purpose is the same which is to create a --

24   extract files that are inside those items; is that correct?

25   A.   That is the purpose, yes.

Q.   And both of them are write blocked?

A.   Not for the cell phones, no.

Q.   Now, how is a copy of the items that you wish to extract off the item that is placed in the kiosk made?

A.   The loose media kiosk essentially reads the directory information from the thumb drive, for example, that was placed in the loose media kiosk and it essentially puts up a map of where those files are.  Additionally, it categorizes the files by the type of files they are.  For instance it will inform you there are 35 picture files on this thumb drive.  They're also four Word documents and six PDF files and X number of spreadsheet files.  It allows, the loose media kiosk allows you then to preview those files on the loose media kiosk to make a determination if that is something that you as the case agent feel is relevant to your case.

Q.   Are you able to once the agent has or the law enforcement officer has selected the items that it wants to make a copy of, is it possible to insure that the copies created on to the disk are forensically sound and accurate as compared to what was on the digital media?

A.   Yes.

Q.   How do you do that?

A.   Just as you can make an MD 5 hash or make a hash of an entire piece of media, individual files can be hashed as

```
 1   well.  When the report is generated from the loose media
 2   kiosk, it should contain a hash value of all the files that
 3   are being exported from the loose media kiosk to the CD or
 4   DVD, whatever media that's being used to store that.
 5   Q.    And so if I was an agent and I made the copy and placed
 6   the files I identified and burned it on to a disk, is it
 7   possible to compare the digital fingerprint on the individual
 8   file with the file on the original piece of evidence?
 9   A.    Yes.
10   Q.    And the cell phone tool that you discussed earlier,
11   what's the name of that kiosk?
12   A.    We have multiple cell phone tools, but one that is
13   primarily used in the kiosk is referred to as a Cellebrite
14   device that's C-e-l-l-e-b-r-i-t-e.
15   Q.    And is it possible using that machine as well to create
16   the copy of digital data that is forensically sound and that
17   is a true and accurate copy?
18   A.    No.
19   Q.    Not possible.
20   A.    Cellebrite is designed to extract information from cell
21   phones primary.  Cell phones by their nature contain what is
22   known as volatile memory.  The volatile memory, the fact that
23   the time is constantly being updated on the phone when you
24   turn it on prevents essentially a static snap shot of all of
25   the media that can then be considered forensically sound.
```

```
 1    The mere act of turning on a phone, you are causing changes
 2    to the data on that phone.
 3    Q.   Are you able to extract the contacts from that?
 4    A.   Yes.
 5    Q.   And would you be able to compare the list of contacts
 6    that you extract from that with the cell phone to compare
 7    that it's accurate?
 8    A.   Yes.
 9    Q.   And do you once an agent makes the copy of the digital
10    media, do you personally often check to make sure that the
11    documents or items placed on the disk are in fact what was on
12    the original drive?
13    A.   If I am the person assisting the case agent in these
14    with the loose media kiosk, I always recommend, strongly
15    recommend to the case agent that after the files they have
16    have been burned to the CD, to take that CD assuming it is a
17    CD over to a computer that's completely different.  Let's put
18    the CD in that other computer.  Make sure it runs.  Make sure
19    the files that they've burned or saved to that CD are there
20    and essentially visually inspect them to see if they appear
21    to be identical.
22    Q.   Whether it's a cell phone contacts or digital media
23    photographs or videos on the cell phone, you're able to
24    compare what you have taken off of it with the contents on
25    the original cell phone; correct?
```

1    A.    Certainly.

2    Q.    And by doing that are you able to determine whether they

3    are true and accurate copies?

4    A.    To the best of visually examining it, yes.

5    Q.    And just to be clear that's both for the loose media

6    kiosk and the Cellebrite cell phone extraction?

7    A.    Correct.

8    Q.    Just one last question on this.  What if a cell phone

9    has a micro SD card in it?

10   A.    Okay.

11   Q.    Where would you plug the micro SD card?

12   A.    The micro SD card could be processed by the Cellebrite.

13   It is our recommendation that it be processed separately

14   through the loose media kiosk.

15   Q.    And is the reason for that because you can do the

16   digital fingerprint?

17   A.    That is one of the reasons, yes.

18   Q.    What's the other reasons?

19   A.    Other reasons is by processing the micro SD card through

20   the loose media kiosk, it allows the case agent more control

21   over previewing particular files that the case agent might be

22   interested in.  Cellebrite tends to give you an all or

23   nothing approach.  It will export all of the files or

24   sometimes none of the files, and if you make a determination

25   that maybe two-thirds of the files are not relevant to your

1    case, it's a great time saver to be able to preview them

2    through the loose media kiosk.

3    Q.   Okay.  So turning to your investigation in this case,

4    were you asked to conduct a forensic examination of certain

5    digital media?

6    A.   Yes, I was.

7    Q.   Can you describe the items of evidence that you were

8    asked to review?

9    A.   There were actually two separate examinations that I was

10   asked to do.  The first one occurred in December 2012, that

11   was to extract data from an iPod Nano and also an iPad

12   device.

13   Q.   Do you know just off the top of your head how many

14   gigabytes of data or gigabytes does the iPod Nano hold?

15   A.   Yes.

16   Q.   How many?

17   A.   Eight gigabytes.

18   Q.   And as you were saying earlier, one iPod Nano could hold

19   thousands of songs; is that correct?

20   A.   Yes, depending upon the size of the songs.

21   Q.   Now, I'm gonna show you what has been admitted as

22   Government's Exhibit 10-A35 if you could talk at look at

23   this.  Do you it that in front of you?

24   A.   Yes, I do.

25   Q.   Do you want to pull it out?

A.    There are two separate folders.

Q.    Can you take a look inside them and do you recognize the item that you were asked to examine in this case?

A.    Yes, I do.

Q.    And is this consistent with the item that you reviewed?

A.    Yes, it is.

Q.    How do you know that?

A.    It has on it a bar code that was assigned to it when it was first introduced to the RCFL.  It's consistent with what I reviewed when I looked at the piece of media.  When I returned it back to the evidence control center, I initialed the bag that was sealed and returned to the evidence control center.

Q.    Is there a serial number on the back of that?

A.    There is.

Q.    I won't bother you with reading it.  But have you since conducting the review, have you looked at that serial number and compared it with your reports?

A.    Yes, I have.

Q.    Is it the same iPod?

A.    Yes, it is.

Q.    Were you able to conduct a forensic examination undergoing the process you described earlier to this iPod?

A.    Yes, I did.

Q.    Now, I'm going to show you what has been marked for

```
 1    identification as Government's Exhibit 86.  If you could look
 2    at that yourself because that has not been admitted into
 3    evidence at this time.
 4    A.    Okay.
 5    Q.    Do you recognize that item?
 6    A.    Yes, I do.
 7    Q.    What is it?
 8    A.    It is an -- I believe it's a Blu-Ray disk.  It's what I
 9    produced as a result of doing my examination of the iPod and
10    the iPad.
11    Q.    And does that contain the derivative evidence that you
12    were able to place on to the Blu-Ray disk from the iPod?
13    A.    Just for correction, I'm looking at the service request
14    number.  This is actually for the second service request I
15    did for the computer.  I apologize.
16    Q.    Do you want to look at the other item?  Thank you.
17    A.    Yes.  I have now the derivative evidence from the
18    iPod/iPad examinations.
19    Q.    Does it have your initials on it?
20    A.    Yes, it does.
21    Q.    And does it have a bar code that you recognize?
22    A.    Yes, it does.
23    Q.    Is that the disk where you put the derivative evidence
24    on?
25    A.    Yes.
```

1        MR. CHIU:  Your Honor, at this time the government

2   moves into evidence Government's 86.

3        THE COURT:  Any objection?

4        MR. AARON:  No objection.

5        THE COURT:  Thank you.

6        MR. THOMAS:  No objection, Your Honor.

7        THE COURT:  86 is ordered admitted.  You may

8   publish.

9              (Exhibit 86 was admitted.)

10  BY MR. CHIU:

11  Q.   I'm gonna show you what has been marked as Government's

12  Exhibit 705 or what has already been admitted into evidence.

13  It might be a little heavy so if you could put it to the

14  right of you.  Do you recognize that item?

15  A.   Yes, I do.

16  Q.   What is it?

17  A.   It is an EMachines tower computer.

18  Q.   Is there a serial number on that machine?

19  A.   Yes, there is.

20  Q.   And without having to read it, have you had a chance to

21  review the serial number on that EMachine?

22  A.   Yes, I have.

23  Q.   Is that the item that you performed a forensic

24  examination on or were asked to?

25  A.   Yes, it is.

```
 1    Q.   And in undergoing or conducting the forensic
 2    examination, did you go through the process which we
 3    discussed earlier?
 4    A.   Yes, I did.
 5    Q.   And were you able to create a disk that had the
 6    derivative evidence from that EMachine?
 7    A.   Yes, I did.
 8    Q.   And is that disk in front of you as well?  You know
 9    what, strike that.  I don't think it's in front of you.
10         Do you recall creating a disk with the digital
11    evidence?
12    A.   Yes, I do.
13    Q.   Did it have the bar code?
14    A.   Yes, it did.
15    Q.   And did it have your initials on it?
16    A.   Yes, it did.
17         MR. CHIU:  Your Honor, I have no further questions
18    for this witness.
19         THE COURT:  Thank you.  Before we have
20    cross-examination of this witness, do we want to go back to
21    the last witness and take her out of order?
22         MS. DeWITT:  I think that would be fine,
23    Your Honor.
24         THE COURT:  So ladies and gentlemen, there were
25    some additional questions for Ms. Rodriguez-Lopez and so
```

```
 1    although this witness hasn't been cross-examined yet, we're
 2    gonna put a witness on in what's called out of order.  So
 3    we're gonna recall Ms. Rodriguez-Lopez at this time.
 4            Thank you.  Please come forward.  You don't need to
 5    be resworn as you were previously sworn and your testimony is
 6    still given under penalty of perjury.  You understand that?
 7            THE WITNESS:  Yes.
 8            THE COURT:  All right.  Ms. Viramontes or
 9    Mr. Thomas, who wants to go first?
10            MS. DeWITT:  I thought the questions were only
11    going to be a couple follow-ups from Mr. Thomas.
12            THE COURT:  No.  I said then I'd let Ms. Viramontes
13    follow-up with that so go ahead.
14            MR. THOMAS:  Thank you, Your Honor.
15                        CROSS-EXAMINATION
16    BY MR. THOMAS:
17    Q.   Afternoon again, Ms. Rodriguez-Lopez.
18    A.   Good afternoon.
19    Q.   A couple questions I had to follow-up from what we were
20    talking about before, and I want to direct your attention to
21    our conversation about the lookout you were informed of.
22    A.   Yes, sir.
23    Q.   Who was the primary inspector for Mr. Santana?
24    A.   I don't remember who was the primary inspector, sir.
25    Q.   Who informed you of the lookout?
```

1   A.   When Mr. Santana came in to primary, once the lookout

2   was established, I was told by my supervisor to do the

3   secondary.

4   Q.   All right.  So it was your supervisor that told you the

5   lookout not the primary inspector?

6   A.   Exactly.

7   Q.   All right.  Who was your supervisor's name?

8   A.   It was Mr. Croston.

9   Q.   Can you spell that?

10   A.   It's C-r-o-s-t-o-n.

11   Q.   And is it Mr. ?

12   A.   Yes, sir.  Supervisory Customs and Border Protection

13   Officer Croston.

14   Q.   Thank you.  And what did Mr. Croston tell you

15   specifically?

16   A.   That there was a person coming in with a lookout.

17   That's all.

18   Q.   And did you already know what to do based on that or did

19   he give you more instruction?

20   A.   Basically, the person comes in and you start doing

21   your -- preparing for your interview.

22   Q.   Did he tell you what reason Mr. Santana drew the lookout

23   was?

24   A.   No, sir.  He just told me that Mr. Santana had a

25   lookout.

```
 1   Q.   Did he tell you what questions to ask Mr. Santana?

 2   A.   No, my supervisor did not tell me.

 3   Q.   All right.  All he told you was you need to do a

 4   secondary inspection and then you did your thing?

 5   A.   Yes, sir.

 6   Q.   All right.  There was testimony you gave during direct

 7   that at some point Mr. Santana asked you if he could pray?

 8   A.   Yes, sir.

 9   Q.   And in response to that, you went and got his prayer

10   rug?

11        MS. DeWITT:  Objection, Your Honor.  This is beyond

12   what we had agreed on.

13        THE COURT:  Well, it's not beyond the scope of

14   direct, but it is beyond what I said I would permit so make

15   it very short.

16        MR. THOMAS:  I will, Your Honor.  Thank you.

17   Q.   You said that Mr. Santana asked you to retrieve his

18   prayer rug?

19   A.   Yes, sir.

20   Q.   Was that the first time you went into Mr. Santana's

21   suitcase or had you already gone through Mr. Santana's

22   suitcase?

23   A.   Yes.

24   Q.   Are you sure about that?

25   A.   Yes, sir.
```

```
 1   Q.   Are you sure you didn't already go through the
 2   belongings and make copies of the books before he asked you
 3   to pray?
 4   A.   No, sir, I did not.
 5          MR. THOMAS:  Okay.  I'm going to have an exhibit
 6   marked, Your Honor.
 7          THE COURT:  Ms. Viramontes, is this the area that
 8   you brought up at the recess with respect to the report?
 9          MS. VIRAMONTES:  I believe so, Your Honor.
10          THE COURT:  All right.  That's fine.
11          MR. THOMAS:  Your Honor, since I only have one
12   copy, I'll show it to the government first before I give it
13   to you.
14          THE COURT:  That's fine.
15          So Ms. Viramontes, does this mean you're not going
16   to want to get into that?
17          MS. VIRAMONTES:  That's correct.  Mr. Thomas will
18   be doing that.  Thank you, Your Honor.
19          MR. THOMAS:  May I approach the witness,
20   Your Honor?
21          THE COURT:  Yes, you may.
22   BY MR. THOMAS:
23   Q.   Ms. Rodriguez-Lopez, I'm handing you what's been
24   previously marked as Defendant's 6001 for identification.
25   Can you take a look at that, please?  It's a five-page
```

1    document and let me know when you've reviewed that.

2              In particular there is a part on the third page

3    that has some red brackets around it.  Can you take a look at

4    that?

5    A.   Yes, sir.

6    Q.   And let me know when you're finished reading that.

7    A.   Yes, sir.

8    Q.   Okay.  Does that refresh your memory as to whether or

9    not you had opened the suitcase prior to him asking you about

10   praying?

11   A.   No.  No, sir.

12   Q.   Doesn't it say that --

13             MS. DeWITT:  Objection, Your Honor.  Improper.

14             THE COURT:  You can't read the contents of it in.

15             MR. THOMAS:  That's fine, Your Honor.  I can mark

16   just on page 3 of that document.

17             MS. DeWITT:  Objection, Your Honor.

18             THE COURT:  What is it you're trying to do?

19             MR. THOMAS:  Well, it didn't refresh her memory so

20   now I'm gonna admit it to impeach her.

21             THE COURT:  How are you gonna do that?

22             MR. THOMAS:  Well, I'm gonna ask her to focus on

23   page 3, that it's her summary and have her admit the document

24   as foundation.

25             THE COURT:  Foundation for what?

```
 1                    MR. THOMAS:  Foundation for her statement.

 2                    MS. DeWITT:  Improper impeachment, Your Honor.

 3                    THE COURT:  Sustained.

 4    BY MR. THOMAS:

 5    Q.   Ms. Rodriguez-Lopez, that five-page document, can you

 6    tell the Court what that is?

 7    A.   That's the summary --

 8                    MS. DeWITT:  Objection, Your Honor.  Calls for

 9    hearsay.

10                    THE COURT:  All right.  The document itself can't

11    come into evidence because it's hearsay.  Do you want to

12    approach the witness and point her to a particular section?

13                    MR. THOMAS:  I certainly will.

14                    THE COURT:  Go ahead.  Why don't you do that.

15    BY MR. THOMAS:

16    Q.   Ms. Rodriguez-Lopez, there's on page 3 of that document

17    I've circled and underlined two consecutive paragraphs.  One

18    that contained a time and the next a time a little bit later.

19    A.   Yes, sir.

20    Q.   Did you review those paragraphs?

21    A.   Yes.

22    Q.   Do you see in either of paragraph whether or not the

23    order of your testimony is consistent with what you said

24    before?

25    A.   Yes, sir.
```

Q.   Would you agree with me that Mr. Santana asked you to
pray after you had already made copies of the books that were
in his luggage?

A.   Yes, sir.

Q.   Okay.  So that was -- you had obviously already opened
the suitcase to see that there were books and copied them
before he asked you to pray.

A.   It was all during the same time, sir.

Q.   No, I know, but the original question was which happened
first, and you said you had never been in his suitcase until
he asked you for the prayer rug.

A.   Yes, sir.

Q.   But according to that statement, you had actually gone
through the suitcase and cataloged and copied his books a
minute before he asked you for his prayer rug.

A.   It's all in the same time line, sir.

Q.   Well, the original question is the first time you went
in his suitcase when he asked you for the prayer rug, that is
incorrect; right?  Because you had already copied the books
before he asked you for the prayer rug?

A.   Yes, sir.

          MR. THOMAS:  Okay.  I have no further questions,
Your Honor.

          THE COURT:  Ms. Viramontes.

          MS. VIRAMONTES:  Nothing further, Your Honor.

```
 1                THE COURT:  Ms. DeWitt.
 2                MS. DeWITT:  May I have one moment, Your Honor?
 3           I have nothing further, Your Honor.  Thank you.
 4                THE COURT:  All right.  Thank you.  You may step
 5    down.  You are excused.
 6                If the last witness could retake the witness stand,
 7    Mr. Aaron, you may cross-examine.
 8                MR. AARON:  Yes, Your Honor.
 9                          CROSS-EXAMINATION
10    BY MR. AARON:
11    Q.   Mr. Goldsmith.
12    A.   Hello.
13    Q.   Good afternoon, sir.
14    A.   Good afternoon.
15    Q.   You were at the Orange County Sheriff's Office beginning
16    in 1990?
17    A.   Correct.
18    Q.   And from 1990 to 2001, what was your assignment?
19    A.   From 1990 to 2001, I was a deputy sheriff, that's a rank
20    within our department.
21    Q.   And as part of your duties, you did not do computer
22    forensic examinations; correct?
23    A.   That is correct.
24    Q.   Then you transferred to the economics crime unit;
25    correct?
```

1   A.   Yes.

2   Q.   And you were in that unit for two years?

3   A.   Uh, closer to five.

4   Q.   Well, that would be -- fraud would be a subset of that

5   unit?

6   A.   Correct, yes, sir.

7   Q.   All right.  So you were in the broader economics crime

8   unit from 2001 to 2003.  2003 to 2006 you were in the fraud

9   unit.

10  A.   Actually, the chronology is I was promoted to

11  investigator in 2001.  My initial stop, if you will, was at

12  background/professional standards, Internal Affairs.  I

13  worked that for a year-and-a-half before being transferred to

14  economic crimes.

15  Q.   So you were at IA for a year-and-a-half and then you

16  went to economic crimes?

17  A.   Yes, sir.

18  Q.   In all three of those assignments or all two of those

19  assignments, however we categorize it, economic crimes,

20  fraud, internal affairs, you did you not do computer forensic

21  examinations; is that correct?

22  A.   That is correct.

23  Q.   The first time you started doing such examinations is

24  when you went into the computer forensic unit in 2006; right?

25  A.   Correct.

 1    Q.    During the time before you were investigator -- I'm not
 2    sure of the ranks in the Orange County Sheriff's Office.  Is
 3    it deputy, detective, investigator, sergeant or is it deputy,
 4    investigator, sergeant?
 5    A.    The rank structure is Deputy Sheriff I, you're out of
 6    the academy.  After certain amount of time and experience,
 7    you can promote to Deputy Sheriff II.  Generally speaking,
 8    Deputy Sheriff IIs move from jail to whatever their initial
 9    assignment is to patrol.  Deputy Sheriffs II may promote to
10    other ranks one of which is investigator or they can promote
11    directly to sergeant which is a supervisor position within
12    our department.  In other words, you do not have to go from
13    deputy to investigator to sergeant.
14    Q.    I see.  You do not have any master's degree, any
15    graduate degree in computer science?
16    A.    I do not.
17    Q.    You do have any bachelor degree in computer science or
18    computer engineering?
19    A.    I do not.
20    Q.    No associate of arts degree in those subjects?
21    A.    No, I do not.
22    Q.    You do have according to your curriculum vitae, you do
23    have 1100 hours of training?
24    A.    Over 1100 hours, yes, sir.
25    Q.    And much of that training is by private vendors?

1    A.   I would say a good percentage of it is.  Much of it was

2    also provided by California DOJ, California Department of

3    Justice which they have their own hi-tech crime unit where

4    they actually train forensic examiners, that's part of the

5    program.  And they have a whole curriculum that law

6    enforcement officers can go through to learn how to be

7    forensic examiners.

8    Q.   Right.  So most of -- all of your training is either

9    from private vendors or through law enforcement?

10   A.   That would be a fair statement, yes, sir.

11   Q.   You don't have any training or certifications from like

12   U.C. Berkeley or Stanford or anything like that in computer

13   forensics?

14   A.   I do not.

15   Q.   And 1100 hours works out to about 28 weeks of 40 hours a

16   week?

17   A.   That sounds approximately correct, yes, sir.

18   Q.   Before you started as a deputy sheriff in 1990, had you

19   ever worked for a non-law enforcement computer company?

20   A.   No, I did not.

21   Q.   Or an Internet company?

22   A.   No, I did not.

23   Q.   Or a telecommunications company?

24   A.   No, sir.

25   Q.   Since that time, since 1990, have you ever worked for a

```
 1    company like that?

 2    A.    I haven't worked for a company.  I am an instructor of

 3    computer forensics at Fullerton College.

 4    Q.    I'm sorry.  I couldn't hear that answer.

 5    A.    I have not worked for a company in that capacity.  I do

 6    teach classes through Fullerton College on a computer

 7    forensics workshop.  I also teach various computer forensics

 8    related classes through our advanced officer training course

 9    that is put on through the Sheriff's Department.

10    Q.    My question was working as an employee or as a computer

11    engineer you have not done that.

12    A.    That is correct.

13    Q.    All right.  Thank you.  One of the certifications you

14    had was from a private vendor called Encase; right?

15    A.    The vendor is actually Guidance Software.  They make the

16    software called Encase E-n-c-a-s-e.

17    Q.    Right.  You're an Encase certified examiner in '08 and

18    then again in 2010.

19    A.    Correct.

20    Q.    And that's Encase is a product, a software which is

21    designed by Guidance Software or marketed by them?

22    A.    Produced and marketed by them, yes.

23    Q.    Now, the classes that you teach are you at the professor

24    level, adjunct professor?

25    A.    Adjunct instructor that is for Fullerton College.  At
```

```
 1    Advanced Officers Training, I'm just an instructor.
 2    Q.    And that Fullerton College is a community college?
 3    A.    Yes, sir.
 4    Q.    And that's a part-time job you have?
 5    A.    Correct.
 6    Q.    Have you published any papers on computer forensics?
 7    A.    I have not.
 8    Q.    And in this case did you use Encase to create the images
 9    of the drives?
10    A.    No, I did not.
11    Q.    Did you use it to search the drives?
12    A.    No, I did not.
13    Q.    If the -- when you're obtaining data, when you're
14    creating a forensic copy of the source drive, you're not
15    vouching for the truthfulness of any of the data that you're
16    making a copy of; correct?
17    A.    I'm not sure I understand when you say the truthfulness
18    of the data.  I'm not quite sure I understand.
19    Q.    Let me be more clear.  What you're saying, what you're
20    telling the jury is you made a true and accurate copy, but
21    whether what's in that file or that drive you don't know if
22    it's true or not.
23            For example, if there's an email dated January 13,
24    2012, you don't know if the correct date is January 13, 2012
25    or some other date?
```

```
 1    A.    No, I do not.

 2    Q.    And in fact speaking of dates, on computers it's

 3    possible to change the date on a computer to a different date

 4    than the date that it actually is; correct?

 5    A.    Yes, that is possible.

 6    Q.    So in other words, one can write an email and it could

 7    go out, but it would have a different date.  You could write

 8    it on January 1st, but you could have changed the date so

 9    that it reads July 1st?

10    A.    Well, that is possible.  There are markers within the

11    email that would most likely show what the true date is.

12    Q.    In this case did you personally wipe all of the staging

13    media?

14    A.    No, I did not.

15    Q.    So you relied on another person to do that.

16    A.    That is correct.

17    Q.    If the staging media is not wiped or is only partially

18    wiped, then there can be data which corrupts the forensic

19    image; correct?

20    A.    Well, I would never say it's impossible.  I'm unaware of

21    that occurring.  The mechanism that's used to create the

22    forensic image, which is referred as to an EO-1 file that

23    essentially has within it self-contained verification markers

24    to insure the integrity of the information that's being

25    captured by the image regardless of what media it's being
```

1    copied to.

2    Q.    But that's one of the reasons why you wipe the staging

3    media is to avoid corruption or so you can get an accurate --

4    a true and accurate forensic copy; right?

5    A.    It's more or less designed to be a fail safe mechanism,

6    but yes, you're correct.

7    Q.    You said that once you create the -- you've gotten the

8    staging media, you've created the forensic image and then you

9    put on the index search function and index.  Where do you get

10   those from?

11   A.    The forensic software that we used to do the processing

12   at least in this particular case is referred to as FTK that

13   stands for Forensic Tool Kit that is manufactured by Axis

14   Data.

15   Q.    And Axis Data again is a private vendor?

16   A.    Yes, sir.

17   Q.    It's not a law enforcement company?

18   A.    Correct.

19   Q.    Or an academic enterprise?

20   A.    Correct.

21   Q.    Do you yourself write code?

22   A.    A very limited amount, yes, sir.

23   Q.    Are you familiar with the programming behind FTK?

24   A.    No, I'm not.

25   Q.    The MD-5 hash value does not show you the contents of a

```
 1   drive; correct?  It's a digital fingerprint identifying the

 2   drive; right?

 3   A.   Yes, sir.

 4   Q.   So in other words, you can have -- you could tell us

 5   what the MD-5 hash value is for a drive, but from what you

 6   told us, we wouldn't be able to know what's actually on that

 7   drive.

 8   A.   Yes, that is accurate.

 9   Q.   Two drives can have different MD-5 hash value numbers,

10   drive A and drive B, but they can share files; right?

11   A.   Yes, sir.

12   Q.   So those two computers could be completely dissimilar or

13   they could be similar in whole or in part?

14   A.   Yes, sir.

15   Q.   When you do the search function, you use that to create

16   the bookmarks; true?

17   A.   You can create a bookmark a number of different ways.

18   For instance, if you're just browsing the directory, the

19   folder structure, and you happen to run across a particular

20   file that you find to be of interest, you can just bookmark

21   it on the spot.  The purpose of performing an index search is

22   to hopefully quickly find files that have the terms that

23   you're interested in, review those files, and then if those

24   files are relevant to your case, then you can bookmark them.

25   So the book marking process is not limited solely to the
```

```
 1    index search, no, sir.
 2    Q.   But you can run searches for individual terms like
 3    Al Qa'ida?
 4    A.   Absolutely.
 5    Q.   Or Xbox?
 6    A.   Yes.
 7    Q.   Or the Masons or UFOs or anything you like?
 8    A.   Yes.
 9    Q.   And you can run a search, whatever that search may be,
10    picks up say one percent of that drive; right?
11    A.   I'm not sure I follow you on that one.
12    Q.   Let's say you come up with a search term and it's found
13    in one percent of the files of that drive.  It would pick up
14    that one percent?
15    A.   Yes.
16    Q.   So if you pick certain search terms, you may get some or
17    all of the entire file; right, depending on what search terms
18    you use?
19    A.   The way it works is for instance if I'm conducting the
20    search for the world Goldsmith and the word Goldsmith appears
21    in 25 different files on the hard drive that we're looking
22    at, the software will essentially highlight those 25 files
23    and illustrate that the word Goldsmith appears up here in
24    this file, down here in this file.  And then it's up to
25    reviewer to make a determination of those 25 files that have
```

```
1   been identified is this relevant to your case based on the
2   content.
3   Q.   Exactly.  So you can cherry pick the type of information
4   that you want by selecting the search term.
5   A.   Yes, absolutely.
6   Q.   So in other words, there may be other data on the drive
7   other than what was revealed in the search terms.
8   A.   Oh, yes, absolutely.
9   Q.   Counsel was asking you some questions about comparing
10  one digital device from one drive to another drive and you
11  said you can do a file-by-file comparison.  Do you recall
12  that testimony?
13  A.   Yes, I do.
14  Q.   So in other words, you could say I want to make sure I
15  made a true and accurate copy of the file on the forensic
16  image.  I can compare that to the source drive; right?
17  A.   Correct.
18  Q.   You can't compare it drive to drive, but you can compare
19  it as many individual files as you want to?
20  A.   You can compare as many individual files as you want and
21  you can also compare the source drive and MD-5 hash with
22  another drive to make the determination if they contain the
23  exact same data.  So yes, you can compare one specific drive
24  to another and compare their respective hashes.
25  Q.   Right.  But their respective hashes won't tell you the
```

```
 1   content that's on the drive.  It will only tell you the hash
 2   value number.
 3   A.   Well, if the hash values are identical on both drives,
 4   then the data within those drives will be identical which
 5   would mean all the files would be identical.
 6   Q.   But if you do a file-by-file comparison, there can be a
 7   difference between one file and another; correct?
 8   A.   Not if the MD-5 hash is matched.  There shouldn't be.
 9   Q.   Right, but just using the comparison we have drive A and
10   drive B; right?
11   A.   Yes.
12   Q.   They can, the two separate drives, they can have one or
13   more or none of the same files; right?
14   A.   Oh, absolutely.  I misunderstood you, but if the two
15   drives that you're talking about drive A has an MD-5 has of
16   123 as an example and drive B has a hash of 123, all of the
17   files on drive A should be identical to all the files on
18   drive B.  If they're not, they should have completely
19   different MD-5 hash values.
20   Q.   Understood.  The computer, the searches that you're
21   talking about, they cannot tell you who put the information
22   on the computer; correct?
23   A.   That is correct.
24   Q.   Whether it was put on through a Trojan horse or spyware,
25   you would not be able to tell that from your type of
```

1    examination?

2    A.   Despite performing a search, no, I would not.  That

3    would require additional analysis.

4    Q.   Let me ask you a question.  What type of materials would

5    be picked up when you make a complete copy of another hard

6    drive?  Would you pick up documents that are saved?

7    A.   You make an exact copy of the contents of a hard drive,

8    we're talking about a hard drive in this particular example

9    everything should be picked up.  Incapped files, deleted

10   files, remnants of deleted files that are in what we refer to

11   as unallocated space.

12        That's a way of saying the unused portion of the

13   hard drive.  Maybe there was a file saved in a particular

14   portion of the hard drive at one point.  It has since been

15   deleted, but the information that the file contains could

16   still be present.  That should be picked up --

17   Q.   Let me stop you right there.  That's a lot of

18   information.

19   A.   I'm sorry.

20   Q.   Let me go back for just a minuted to unallocated space.

21   When we save something on a computer, obviously, that's

22   something that we can retrieve right away unless it's

23   encrypted; right?

24   A.   You can still recover it.  It's just it would remain

25   encrypted thus what the file actually is would be not

1    readable.

2    Q.    But if we delete something on our computer, it goes into

3    unallocated space unless it's written over; correct?

4    A.    For the most part, yes, sir.

5    Q.    All right.  So you would pick up documents that are

6    saved, fragments of documents that are in unallocated space

7    and have not been written over; correct?

8    A.    Yes, that is correct.

9    Q.    And by documents we mean not just like Word or Word

10   Perfect documents, we mean emails that are saved, PDFs,

11   Internet chats, things like that.

12   A.    Right.  Internet browsing history, pictures, remnants of

13   pictures.  You name it.  Text strings.

14   Q.    So if you ran a search for Windows or Lakers or whatever

15   it may be, you would pick up not only documents that were

16   purposefully saved, but documents that were deleted but are

17   still in unallocated space.

18   A.    Correct.

19   Q.    Just one question on the Cellebrite and the loose media

20   kiosks.  On those devices you can compare actual files;

21   correct?

22   A.    If you have the original source media, for example, a

23   thumb drive and the case agent uses the loose media kiosk to

24   copy out some files from that thumb drive, we will now have

25   some MD-5 hashes associated with those files.  If we have the

1    original source thumb drive independent of that, we can look

2    at that thumb drive get -- make MD-5 hash files, calculate

3    MD-5 hash values of the individual files on that thumb drive

4    to do a comparison, yes.

5    Q.   You also talked about doing a file-by-file comparison.

6    I think you said it's possible to do a visual inspection?

7    A.   Correct.

8    Q.   And that's a fancy way of saying looking at the source

9    file and the copy file?

10   A.   It's just eyeballing it if you will.  What we're doing

11   is attempting to make sure that if a picture file was copied

12   over, we see what the picture file is.  If we now have the CD

13   that we made the copy to and we put it in another machine,

14   look at that, does that represent the picture file that was

15   on the thumb drive.  So it's not a scientific method by any

16   means.  It's a just a quick visual verification.

17   Q.   In this case when the index searchs were done, did you

18   pick the search terms or did someone else pick the search

19   terms?

20   A.   The case agent did.

21   Q.   Were you even involved in that process at all?

22   A.   No, I was not.

23            MR. AARON:  Thank you.  Nothing further.

24            THE COURT:  Thank you.  Mr. Thomas.

25            MR. THOMAS:  Yes, Your Honor.

1                              CROSS-EXAMINATION

2     BY MR. THOMAS:

3     Q.   Good afternoon, Investigator Goldsmith.

4     A.   Good afternoon.

5     Q.   If I'm a computer user and I go to a website like

6     cnn.com, that website contains pictures of things.  Those

7     pictures are written to my hard drive; correct?

8     A.   Under most circumstances, yes.

9     Q.   I don't have to right click on a picture and hit save as

10    in order for it to get to my computer.  Just as soon as it

11    hits my screen, it's written somewhere on my hard drive.

12    A.   That is accurate, yes.

13    Q.   If you're using the Internet Explorer in a folder called

14    temporary Internet files?

15    A.   Yes, that is accurate.

16    Q.   So just by going to a newspaper website, I'm

17    automatically downloading every image from that website into

18    my computer.

19    A.   For the most part, yes, that is correct.

20    Q.   And even though all those images are in my computer, you

21    can't tell whether I the user actually read the article.  You

22    just have pictures in my hard drive.

23    A.   We could show that a particular user of the computer

24    went to a particular website.  We could show most likely the

25    contents of that website.  As far as someone actually reading

1    the article on the website, no, absolutely not.

2    Q.   Right.  So if I go to a newspaper website and there's 20

3    articles, it might download 20 articles worth of pictures in

4    a fraction of a second and I have read none of them.

5    A.   It would essentially give you the front page of the

6    article we're talking about.  If there are any pictures

7    associated with that front page, yes, those pictures would be

8    downloaded automatically without any additional input by the

9    user.  The text from that front page would be downloaded as

10   well.  Basically, as a labor saving device on part of the

11   computer.

12   Q.   Okay.  So if I go to that cnn.com and all those images

13   go to my hard drive, and then someone seizes my computer and

14   runs a search like you did and extracts all the images,

15   you'll have all the images from my computer, but you can't

16   tell whether or not the user viewed the images or read the

17   articles?

18   A.   Depending upon the location of where the pictures were

19   saved that is accurate.  If for instance, we're talking about

20   Internet Explorer and pictures are found in the temporary

21   internet file folders of that computer, then that's done most

22   likely automatically by the user.  Now, if those same

23   pictures are say found in a different place a downloads

24   folder found on the desk top, then it's open to

25   interpretation whether the user consciously downloaded that

1    particular picture or file.

2    Q.    Right.  So like if I go to a dog website and I right

3    click on a bunch of dog pictures and save them to a folder

4    called dogs, then that's what you're talking about.  Then you

5    can make some inferences I actually viewed the pictures.

6    A.    That is correct.

7    Q.    But if all the files are found in temporary Internet

8    files, all I had to do was access the website and all the

9    pictures are there.

10   A.    That is primarily the way it works, yes, sir.

11   Q.    All right.  Back in December of 2012, you did forensic

12   investigations of an iPod Nano and an iPad.

13   A.    Yes.

14   Q.    Do you know who the iPod Nano belonged to?

15   A.    I do not.

16   Q.    Do you know who the iPad belonged to?

17   A.    I do not.

18   Q.    And you extracted the images from both of those devices;

19   correct?

20   A.    No.

21   Q.    I believe you said on a Blu-Ray disk you put --

22   extracted images from both of those devices.  Was I

23   incorrect?

24   A.    If I said that, I misspoke.

25   Q.    Okay.

1    A.    What I extracted from the iPod at the request of the

2    case agent audio files.  I believe 229 to be specific audio

3    files from the iPod Nano.

4    Q.    Okay.  So the iPod Nano you were just looking for audio.

5    You weren't looking for pictures or any other kind of file?

6    A.    Right.  The iPad was essentially the direction was we

7    want everything.  So any content from the iPad that was

8    retrievable by the software that I was using was essentially

9    dumped to that disk, the Blu-Ray disk for review by the case

10    agent whether it be pictures, whether it be chat, text

11    messages, whether it be email, et cetera.

12    Q.    Okay.  Now, let's take the iPod Nano that you just

13    extracted the audio files for.  You at the direction of the

14    case agent put all the audio files from that iPod Nano on a

15    Blu-Ray?

16    A.    Correct.

17    Q.    Did you observe any of the data or the metadata with the

18    song files such as whether they were listened to?

19    A.    No.  Well, any metadata that absolutely that was

20    preserved and should be in the report that accompanied the

21    file extraction.  There are individual hash values, creation

22    times, there are path meaning where they were located on the

23    iPod Nano that should have been preserved.  As far as whether

24    they were listened to or not that was not captured.

25    Q.    So I could have an iPod with 5,000 songs.  You would

```
 1   have extracted all of that and put it on a Blu-Ray, but you
 2   can't tell the jury, the Judge or anybody whether I listened
 3   to the songs?
 4   A.   No, I could not.
 5   Q.   And if I listened to one song more than another song,
 6   you couldn't tell us that either?
 7   A.   Not with the software that's being used, no.
 8   Q.   Now, with respect to the iPad, did you extract audio
 9   filed and video files?
10   A.   I would have to look at the results media myself to
11   refresh my memory.  I do not recall that any audio or video
12   files were in fact extracted.
13   Q.   If there were video files or image files extracted from
14   the IPad, they would have probably used a Safari browser or
15   maybe a Google, Chrome browser, some browser on the iPad;
16   correct to get those images?
17   A.   Not for a video file or an audio file not necessarily.
18   Q.   Well, if they got them from the Internet from the iPad,
19   the browser that comes on the iPad is Safari?
20   A.   That is the native browser, yes, sir.
21   Q.   And if you're a Google person, you can download from
22   Chrome.
23   A.   Right.
24   Q.   Can you download the Internet Explorer on an iPad?
25   A.   Not the latest version, no.
```

1    Q.   So there wouldn't be a temporary Internet files folder

2    on your iPad because you can't use Internet Explorer on your

3    iPad?

4    A.   To the best of my knowledge, no.

5    Q.   Is there a temporary Internet like folder for Safari and

6    for Google Chrome?

7    A.   Yes.

8    Q.   And the extraction or the analysis that you did of the

9    iPad, would it have captured where the image files were on

10   that iPad?

11   A.   Yes, it would.

12   Q.   All right.  Are they in a report somewhere or are they

13   attached to the picture?

14   A.   The report itself should give a listing of where a

15   picture or a video originated.  We refer to it as the path

16   and that would give you an indication of how it originated on

17   that device.  So unlike the temporary Internet files folder

18   for Internet Explorer, both Safari and Google Chrome use

19   something called a cache c-a-c-h-e and that's where that

20   information is stored.  So if I find a file that's in a cache

21   folder, that's consistent a little bit being downloaded from

22   the Internet.

23   Q.   And what if I have my privacy setting such that I have

24   either gone incognito on Google Chrome or I set it for erase

25   the cache on Safari, there would be no record of the path?

1    A.    That is correct.

2    Q.    Now, the Blu-Ray that you created with the images and

3    audio, perhaps video files from these devices, are they all

4    on the same Blu-Ray?

5    A.    Yes, they are.

6    Q.    Are they jumbled together or does it show what came from

7    the iPod and what came the iPad?

8    A.    They're differentiated by device so this stuff came from

9    the iPad.  This stuff came from the iPod.

10    Q.    But what's not on the Blu-Ray is the path name for the

11    file structure where the image or audio file was found?

12    A.    I would have to review the Blu-Ray disk which I have not

13    done so to give you a definitive answer about that.

14    Q.    All right.  Well, assuming just for argument's sake that

15    the Blu-Ray just contains an iPod folder and an iPad folder

16    with images and files in it.  Okay.  If I open an image from

17    one of those two files, just by looking at the image can you

18    tell where it is imputed from?

19    A.    No, I cannot.

20    Q.    All right.  And you can't tell when the image was

21    imputed?

22    A.    There should be what's referred to as a last access date

23    and a last written date, as well as a creation date.

24    Assuming the date time settings on the device being viewed

25    are accurate, that would give at least an initial indication

1    of when that file was created or last accessed on that

2    device.

3    Q.   Would that be on the image itself or that would be in a

4    separate report that's not on a Blu-Ray disk?

5    A.   That should be on the Blu-Ray disk, but again that

6    depends on which software was used to create report.  For the

7    iPod I believe that Decay was used to create the report.

8    That information should be on the FTK report.  For the iPad a

9    different piece of software was used.  I do not believe that

10   information is captured using that different piece of

11   software.

12   Q.   All right.  So if there's a song or a lecture or a

13   Podcast for some type of speaking image or speaking file on

14   the Blu-Ray, you can't tell the jury or anyone in here

15   whether someone listened to it.

16   A.   No, I cannot.

17   Q.   And if they listened to it a bunch of times, you

18   couldn't tell us that either?

19        MR. CHIU:  Objection, Your Honor.  Asked and

20   answered.

21        THE COURT:  Sustained.

22   BY MR. THOMAS:

23   Q.   With respect to the video files or the image files, you

24   may be able to show when it was last opened, but you can't

25   tell us how many times it was opened?

```
 1              MR. CHIU:  Objection, Your Honor.  Asked and
 2    answered.
 3              THE COURT:  Sustained.
 4              MR. THOMAS:  I'm almost positive I never asked that
 5    question.
 6              THE COURT:  All right.  You may answer.
 7              THE WITNESS:  I'm sorry.  Can you repeat the
 8    question?
 9              MR. THOMAS:  Yes.
10    Q.   I believe you said there's certain information captured
11    such as last time that it was accessed.  But is there any
12    information captured to say how many times someone looked at
13    a particular image or viewed a particular video file?
14    A.   For those particular devices using the software at the
15    time, the answer is no.
16              MR. THOMAS:  Just one moment.  I have nothing
17    further.
18              THE COURT:  Redirect.
19              MR. CHIU:  Your Honor, before I ask a few
20    questions, I have my next witness who I would like to take
21    out of order because it was her day off today and I would
22    like to see if we could -- she is a short witness.  Would it
23    be okay to put her on after this?
24              THE COURT:  What do you mean?
25              MR. CHIU:  After Mr. Goldsmith and it will be
```

```
 1   short.
 2              THE COURT:  Yes, all right.
 3                      REDIRECT EXAMINATION
 4   BY MR. CHIU:
 5   Q.   Investigator Goldsmith, how many computers have you
 6   looked at?
 7   A.   Over 500.
 8   Q.   How many have you examined?
 9   A.   Over 500.
10   Q.   How many pieces of digital media have you examined?
11   A.   It's more than 1,000.
12   Q.   What was the number that you gave me or you stated that
13   if you compare one file with an MD-5 hash digital fingerprint
14   with the original media with that MD-5 hash, what was the
15   number that you gave?
16   A.   As far as them having the same MD-5 hash value if in
17   fact they're different files?
18   Q.   Right.  What was that number?
19   A.   340 billion, billion, billion, billion to one against
20   such a random occurrence.
21   Q.   Investigator Goldsmith, you were asked questions about
22   looking at someone's temporary Internet history.
23   A.   Correct.
24   Q.   And that if you just browse, you can see images that
25   were collected by going to the website; right?
```

A.   The way that a web browser works if it's at its default

settings, if one person goes to cnn.com, automatically,

pictures from that website, the text from that website is

downloaded automatically by the web browser without any

further interaction by the user.  Now, the user by changing

the default settings can prevent that from happening, but

that's the default.

Q.   If you were able to look at somebody's temporary

Internet history, can you see certain browsing patterns?

A.   Yes.

Q.   And if you saw an image that came up over and over and

over and over again, would that indicate anything about how

many times somebody visited a website?

A.   To further answer that question, you do not have to look

at the files that are being saved to the computer.

Independent of files being downloaded to the computer when

someone goes to the website, browsers retain what's called a

web browsing history.  It's essentially a database of

websites that the user has visited that has nothing to do

with files being downloaded to the computer.

      For instance if I go to Google.com and I've gone

through 50 times, that number will be recorded in the web

browsing history of the computer unless I as the user do

something to delete that number or reset that number, that's

the default setting.  Now, after a certain number of days

```
 1    depending upon what web browser one is using, that is
 2    essentially emptied out.
 3              So one can track how many times one has gone to a
 4    particular website by looking at the web browsing history and
 5    that is completely independent of what's found in the
 6    temporary Internet file folders.  So yes, tracking of
 7    someone's web browsing history through the web browser is
 8    highly possible.
 9              MR. CHIU:  No further questions for this witness,
10    Your Honor.
11              THE COURT:  Thank you.  You may step down.
12              All right.  Your next witness.
13              MR. CHIU:  Your Honor, the United States calls
14    Ms. Patrice Edwards.
15              THE CLERK:  Please raise your right hand.
16                        (Witness sworn.)
17              THE CLERK:  Thank you.  You may be seated.  Please
18    state your full name and spell it for the record.
19              THE WITNESS:  Patrice Renee Edwards.  P-a-t-r-i-c-e
20    R-e-n-e-e E-d-w-a-r-d-s.
21              THE COURT:  Thank you.  You may inquire.
22                        DIRECT EXAMINATION
23    BY MR. CHIU:
24    Q.   Ms. Edwards, who are you employed by?
25    A.   Um, the Department of State.
```

```
1   Q.   What do you do for a living?

2   A.   I'm a passport specialist.

3   Q.   Where do you work?

4   A.   The Los Angeles Passport Agency.

5   Q.   And where is the Los Angeles Passport Agency?

6   A.   It's in the federal building located off of Wilshire and

7   Veteran.

8   Q.   How long have you been a passport processor?

9   A.   About seven years.

10  Q.   Do you like what you do?

11  A.   I do.  It's interesting.

12  Q.   Do you meet different kind of people?

13  A.   Yes.

14  Q.   They're all going somewhere?

15  A.   Yes.

16  Q.   Can you briefly describe your training and experience as

17  a passport processor?

18  A.   Yes.  I issue passports and I review the application and

19  the citizenship evidence and the ID to make sure everything

20  is consistent.

21  Q.   Now, are there different ways to get a passport?

22  A.   There are.

23  Q.   And I'm sorry, just to be clear, this is to get a U.S.

24  passport; right?

25  A.   That is correct.
```

1    Q.    And are there different ways to get a U.S. passport?

2    A.    Yes.

3    Q.    And what are the different ways to get a passport?

4    A.    You can get an expedited passport, which is at my agency

5    or you can get a routine passport which is done at the Post

6    Office acceptance facilities.

7    Q.    So focusing just on your agency, what type of passports

8    does your agency at the federal building give out?

9    A.    We give out U.S. passports and we have an expedited

10   service.

11   Q.    Is there way to get a regular passport meaning

12   non-expedited from your office?

13   A.    No.

14   Q.    So a customer wanting a U.S. passport in a regular

15   amount of time wouldn't go through your office; correct?

16   A.    One more time.

17   Q.    Is it possible to get a standard business waiting time

18   passport through applying at the federal office?

19   A.    Expedite, yes, but routine, no.

20   Q.    And expedited how many days would it take to get an

21   expedited passport?

22   A.    In our office three business days.

23   Q.    And what's the fastest somebody could get a passport if

24   they wanted to?

25   A.    You can get it the same day depending on your travel.

1    Q.   How much does it cost to get an expedited passport?

2    A.   The total for an adult is 195.

3    Q.   Can you describe generally how the inside of the

4    passport office is laid out?

5    A.   It's a big lobby area and we have a check-in window, and

6    there is about 17 windows where we accept the passport

7    applications.

8    Q.   And where do you sit?

9    A.   I can sit at any seat that's available at the time.

10   Q.   Do you have a favorite window?

11   A.   I do.

12   Q.   What favorite window is that?

13   A.   16.

14   Q.   Were you working on November 13, 2012?

15   A.   Yes.

16   Q.   At some point did you encounter two men who came and

17   applied for a passport?

18   A.   Yes.

19   Q.   Can you describe those two men?

20   A.   Um, one man was Vietnamese and the other one was

21   Hispanic.

22   Q.   And what happened when you encountered these men?

23   A.   I took the passport application and I reviewed the

24   evidence, the birth certificate and the ID to make sure it

25   was consistent.  I asked the applicant what was the purpose

```
 1    of his travel.  He told me he was seeing his grandfather and
 2    he was going to Mexico to see a cousin.
 3    Q.   Did he tell you anything about his grandfather?
 4    A.   He said he was sick, he was ill.
 5    Q.   Who was telling you this?
 6    A.   This was the applicant.
 7    Q.   And just to be clear how many men did you say you saw?
 8    A.   Two.
 9    Q.   And so what happened after -- and was this at the window
10    where you work?
11    A.   Yes.
12    Q.   And at some point was there an application submitted for
13    a passport?
14    A.   Yes.
15    Q.   Did you receive that application?
16    A.   Yes.
17    Q.   Did you review the contents of that application?
18    A.   Yes.
19    Q.   Did you accept money for payment for the passport
20    application?
21    A.   Yes.
22    Q.   Now, you should have in front of you a few exhibits in
23    blue.  Can you first take a look at Exhibit 172 and when
24    you're ready look up at me.  Do you recognize this
25    photograph?
```

1    A.    Yes.

2    Q.    And where is this -- what is this photograph depict?

3    Where does it depict?

4    A.    This is in our lobby near the check-in window area.

5    Q.    And are you familiar with this -- with where this

6    photograph is taken?

7    A.    Yes.

8    Q.    And is there anybody inside the photograph?

9    A.    Yes.  I see the two gentlemen that I had at my window

10   and I see my co-workers on the other side of the window.

11   Q.    And are these the two men you encountered on

12   November 13, 2012?

13   A.    The Vietnamese guy here and the Hispanic guy there.

14   Q.    Yes.  Does that accurately depict who you saw at the

15   window?

16   A.    Yes.

17            MR. CHIU:  Your Honor, at this time the government

18   would move into evidence Exhibit 172.

19            THE COURT:  Any objection to 172?

20            MS. VIRAMONTES:  No, Your Honor.

21            MR. THOMAS:  No objection.

22            THE COURT:  All right.  172 is ordered admitted you

23   may publish.

24                  (Exhibit 172 was admitted.)

25   BY MR. CHIU:

1    Q.   And just to be clear, you indicated there were two men

2    and one man who you dealt with at the window applying for the

3    passport; correct?

4    A.   Yes.

5    Q.   And if you could identify an article of clothing of the

6    man who was applying for the passport.

7    A.   An article of clothing?

8    Q.   In the photograph.  I'm sorry.  Is it -- which person

9    was it that applied for the passport?

10   A.   I'm sorry.  The one with the black shirt and the gray

11   vest, looking vest, yes.

12   Q.   If you look directly at the photo, it would be the

13   person on the right; correct?

14   A.   Yes.

15   Q.   And is that the person who you identified previously as

16   the Vietnamese individual?

17   A.   Yes.

18   Q.   And if you could zoom in and is that the person on the

19   left, is the person on the left the person you saw along with

20   the person who applied for the passport?

21   A.   Yes.

22   Q.   Was there anybody else with these two men?

23   A.   No.

24   Q.   Now, at some point you accepted an application for

25   passport correct?

```
 1    A.    Yes.

 2    Q.    I'm going to have you look at what's been marked for

 3    Government's Exhibit 172, 173 A, 173 B and 174 as well.  When

 4    you're done, look up at me.

 5          Ms. Edwards, are these the documents you received

 6    from the individual who applied for the passport that day?

 7    A.    Yes.

 8    Q.    And how do you know that you had received these

 9    materials?

10    A.    How do I know?  It was given to me at the window.

11    Q.    Is there some indication that you personally reviewed

12    these documents?

13    A.    I do.

14    Q.    Just to be clear, you received 172 and 173 A and B;

15    correct?

16    A.    Yes.

17    Q.    And you recall receiving these at the window?

18    A.    Yes.

19          MR. CHIU:  Your Honor, the government would move

20    Exhibit 172, 173A, 173B into evidence at this time.

21          THE COURT:  Any objection to any of those?

22          MS. VIRAMONTES:  No, Your Honor.

23          MR. THOMAS:  No, Your Honor.

24          THE COURT:  They're ordered admitted and you may

25    publish.
```

1            (Exhibits 172, 173, 173A and 173B were admitted.)

2            MR. CHIU:  Your Honor, just to be clear that's 172,

3    173, 173A and 173B.

4            THE COURT:  All right.

5            MR. CHIU:  Thank you, Your Honor.

6    Q.   Ms. Edwards, is this the application you received?

7    A.   Yes.

8    Q.   I'm gonna direct your attention to the lower part of the

9    screen here where I'm circling.  Is that a stamp of your

10   name?

11   A.   Yes.

12   Q.   Does that indicate you received this application?

13   A.   Yes, I received it and executed it, yes.

14   Q.   What's the date of that application?

15   A.   November 13, 2012.

16   Q.   And if I could just focus on this, what's the last name

17   of the individual for the person who applied for the

18   passport?

19   A.   Gojali.

20   Q.   Now, I'm gonna direct your attention to the next page.

21   If we can focus on the middle here where it says travel

22   plans, at the time when you take this application in, do you

23   ask the individual why they're traveling?

24   A.   Yes.

25   Q.   And do you recall the story that was given to you by

1    this individual who applied for the passport?

2    A.   Yes.

3    Q.   And what was that story?

4    A.   I remember him saying he was gonna go see his sick

5    grandfather and he said while he was in Mexico, he was gonna

6    go visit a cousin that I remember.

7    Q.   And does it indicate on the travel plans and part of the

8    application that says countries to be visited Mexico UAE?

9    A.   Uh-huh.

10   Q.   And the date of departure, what's the date of departure?

11   A.   Looks like November 16, 2012.

12   Q.   And these if we zoom out a little bit and you look at

13   some handwriting, whose handwriting is that?

14   A.   That's mine.

15   Q.   And that indicates that you input this information on to

16   the application; correct?

17   A.   Yes.

18   Q.   In connection with this application, were you provided

19   with some travel documents?

20   A.   Yes.

21   Q.   I'm gonna direct your attention to 173-B.1.  In

22   connection with the application, were you provided with an

23   itinerary of plans for departure?

24   A.   Yes.

25   Q.   And oftentimes in your experience when people are

```
 1    applying for a passport do they submit an itinerary to back
 2    up or to validate their travel plans?
 3    A.    Yes.
 4    Q.    And is that what happened here?
 5    A.    Yes.
 6    Q.    Did you make a copy of the itinerary in support of the
 7    passport application?
 8    A.    I did.
 9    Q.    And if you could read what, I know it's hard to see, but
10    if you can read what the destination departure city is, could
11    you read it for the members of the jury?
12    A.    Mexico City.
13    Q.    And if you could read the final inbound destination,
14    could you read that to members of the jury?
15    A.    I see Dubai that's what I see.
16    Q.    Again, this was provided to you at the Los Angeles
17    Passport Agency when you were working that day; correct?
18    A.    Yes.
19            MR. CHIU:  Your Honor, I don't recall whether I
20    moved 174 in.
21            THE COURT:  I don't think so.
22    BY MR. CHIU:
23    Q.    Ms. Edwards, can you please take a look at Exhibit 174.
24    Ms. Edwards, who was it that paid for the passport?
25    A.    I remember the Hispanic guy helped pay for the passport.
```

1    Q.    So the person who applied for the passport was that the

2    person who paid for the passport?

3    A.    The person who applied?

4    Q.    The person you identified as the Vietnamese individual.

5    A.    Well, cause I was given a cash payment and a credit card

6    payment and I remember receiving a credit card payment from

7    the Hispanic guy.  I can't remember who gave me the cash,

8    though, but I do remember taking cash from them as well.

9    Q.    And taking a look at Government's Exhibit 174, does that

10   appear to be the receipt that you gave to the individuals?

11   A.    Yes.

12         MR. CHIU:  Your Honor, at this time the government

13   will move Exhibit 174 in.

14         THE COURT:  Any objections to 174?

15         MS. VIRAMONTES:  No, Your Honor.

16         MR. THOMAS:  No, Your Honor.

17         THE COURT:  Ordered admitted.  You may publish.

18              (Exhibit 174 was admitted.)

19         MR. CHIU:  Thank you, Your Honor.

20   Q.    If we can zoom in on the left-hand corner, the first

21   receipt to the left.  Are you able to make out what the

22   signature of that is?

23   A.    Not really, no.

24   Q.    Can you make out the first letter?

25   A.    Looks like an R.

1    Q.   Any other letters you can make out?

2    A.   Looks like I see an L in there, a P.

3    Q.   Anything else?

4    A.   In the signature an A, that's about it.

5    Q.   And is this the -- looking at the right side of the same

6    exhibit, you recall receiving some cash as well from one of

7    the men; correct?

8    A.   Yes.

9    Q.   But you don't recall specifically who you received the

10   cash from; right?

11   A.   No.

12   Q.   Ms. Edwards, directing your attention to Government's

13   Exhibit 191 in front of you.  Do you have that which has

14   already been admitted as a business record?

15   A.   Okay.

16   Q.   Do you have that in front of you?

17   A.   Yes.

18   Q.   What does that document appear to be?

19   A.   It looks like a bank statement.

20   Q.   Are you able to determine who the bank statement is for

21   by flipping through the pages?

22   A.   I see customer name Ralph K. DeLeon.

23   Q.   I'd like you to turn now to the last second to last

24   statement November 10, 2012 to December 11, 2012.  It's near

25   the back if you can take a quick look at it.

1    A.    Okay.

2    Q.    One page before that.  If you look at the name on the

3    left-hand corner to who this statement is addressed to just

4    read the name?

5    A.    Ralph K. DeLeon.

6    Q.    Turn to the next page after that.  Can you look at an

7    entry on November 14, 2012?

8    A.    Yes.

9            MS. VIRAMONTES:  Objection, Your Honor.  Relevance.

10           MR. CHIU:  Your Honor, this is relevant to show

11   that Mr. DeLeon paid for the passport.

12           THE COURT:  Overruled.

13   BY MR. CHIU:

14   Q.    Directing your attention to November 14, 2012, do you

15   see an entry there that says check card purchase 11-13?

16   A.    Yes.

17   Q.    Are you able to see that on the screen in front of you?

18   A.    Yes.

19   Q.    Now, was there, in looking at these records, was there a

20   cash debit for $95 on 11-13, November 13th, the same day that

21   you received an application?

22   A.    Yes.

23   Q.    And what's the remaining balance on that day?

24   A.    $100.

25   Q.    I'm sorry.  Next to the 95 is there a balance?

1    A.   Oh, I'm sorry.  Oh, yeah, $5,860.19.

2            MR. CHIU:  I have no further questions, Your Honor.

3            THE COURT:  Ms. Viramontes, cross-examination.

4                        CROSS-EXAMINATION

5    BY MS. VIRAMONTES:

6    Q.   Good afternoon, Ms. Edwards.

7    A.   Good afternoon.

8    Q.   You testified that they paid for the passport in cash

9    and with a credit card.

10   A.   Yes.

11   Q.   And they just put up a bank statement of Mr. DeLeon's;

12   correct?

13   A.   Uh-huh.

14   Q.   You don't normally look at Mr. DeLeon's bank statements,

15   do you?

16   A.   No.

17   Q.   And you don't know if the money he withdrew was the

18   money used to pay for passport; correct?

19   A.   It was his credit card.

20   Q.   I'm talking about the cash.

21   A.   Oh, I'm sorry.  That I don't know, no.

22           MS. VIRAMONTES:  No further questions.

23           THE COURT:  Thank you.

24           Mr. Thomas?

25           MR. THOMAS:  I have nothing.

```
 1              THE COURT:  Any redirect?

 2              MR. CHIU:  One moment, Your Honor.

 3              I have no further questions, Your Honor.

 4              THE COURT:  All right.  Thank you.  You may step

 5    down.  You're excused.

 6              All right.  Ladies and gentlemen, thank you for

 7    your patience and attention this week.  Remember we don't

 8    need you here on Monday so we'll see you back on Tuesday no

 9    later than 9:00.  Remember over the next three days don't

10    discuss the case, anything about the case, anything about the

11    testimony, the witnesses, lawyers, participants in the trial

12    or anyone connected to the case.  Don't do any research,

13    don't Google, don't tweet.  Don't do any research in any

14    fashion about anyone.  Don't make up your minds about the

15    case or any issue in the case or what your verdict should be

16    or anything else.  We'll see you back on Tuesday at

17    9 o'clock.

18                        (Jury not present.)

19              THE COURT:  On the record outside the presence of

20    the members of the jury.  I had a couple of small

21    observations or suggestions.  First of all, I think it does

22    help to have the notebooks for the witnesses.  Just to save

23    some expense and trouble, I don't need a notebook unless you

24    have a lot of exhibits for a particular witness.  It's fine

25    to give it to me in a manila folder to save the expense of
```

1    the notebook.  And probably the same thing applies to a

2    witness.  If you've just got one or two exhibits or just a

3    few for a witness, you can put them in a manila folder.  If

4    you've got several, I think a notebook is helpful so nothing

5    gets lost.

6            I really don't want to try to micromanage the way

7    anybody tries their case, but it seems to me we would have

8    saved a considerable amount of time the last couple of days,

9    at least an hour or so, if there had been some conferring

10   among counsel about what exhibits could be stipulated to

11   because the amount of time we waste when there's a lot of

12   exhibits that you may -- I know you think that you have to

13   wait until the foundation is laid by the witness testifying

14   on the stand, but we spent a whole lot of time on really

15   noncontroversial exhibits today going one-by-one and then,

16   you know, everybody standing up and saying no objection.  So

17   we could save a lot of time I think if by Tuesday you could

18   come up with a list that there really is no objection to and

19   we could pre-admit those.

20           In the alternative let me suggest at this point it

21   would be government counsel, although the same thing would

22   apply in the defense case, if you move in groups at a time.

23   I mean you did that a little bit today near the end, but if

24   you know want to move 4, 5, 10 exhibits at a time and then

25   publish them that would speed things along.  What would

 1   really speed things along as to a lot of the exhibits if they

 2   could be pre-admitted so please give that some consideration.

 3          MR. THOMAS:  On that issue if we got a list of

 4   exhibits for each one of the witnesses they're planning to

 5   call, we could probably tell them ahead of time that we don't

 6   object to any of them.

 7          THE COURT:  So let's see if you can work something

 8   like that out.  Back to the videos and the motion to strike

 9   the videos.  The Federal Rule of Evidence at issue is it's

10   901 B(1) not 902.  And I read the case that was cited the

11   Stearns case.  There's also a more recent case, although it

12   is an unpublished case from this circuit United States versus

13   Payton P-a-y-t-o-n 92 F3d 1195 which is a 1996 case so that

14   was before unpublished cases could even be cited.  But it

15   relies upon Stearns and holds that the, you know, along with

16   the Stearns that the authentication requirement is satisfied

17   by evidence sufficient to support a finding that the matter

18   in question is what its proponent claims.

19          And in that case what's strikingly similar to our

20   case is that the videotapes that were introduced at trial

21   were made by an undercover informant just like the tape at

22   issue here.  The informant in that case was unavailable to

23   testify at trial because he had died in the meantime, but the

24   trial court having admitted the tape was, the videotapes was

25   upheld on appeal on the basis of the holding that the court

1    could find foundation by looking to external and internal

2    circumstantial evidence of authenticity.

3           And so I think that's what we have here and, of

4    course, that's to a certain extent, although it's photographs

5    that's involved, that is what the Stearns case holds as well.

6    We have the direct evidence in the form of the testimony by

7    the witness Mr. Avery Nelson, the first witness this morning

8    because he was present during the events that are pictured at

9    the beginning and the end.

10          And then I think that the circumstantial or

11   external evidence is that the testimony and the evidence by

12   viewing the videotapes and the stills produced from it that

13   the persons pictured on it were wearing the same clothing,

14   they were firing the same weapons that he testified to and

15   that are shown -- not that it would be what he testified to

16   and I think that's sufficient.  So I'm inclined to deny the

17   request to strike.  You may argue, Mr. Larsen.

18          MR. LARSEN:  Thank you, Your Honor.

19          I think Your Honor was correct earlier today when

20   you were inclined to grant our motion because here we have a

21   situation where the witness first told the jury that these

22   videos were true and correct depictions of what happened.  He

23   then admitted on cross-examination that he hadn't actually

24   witnessed all of what was happening.

25          He, I think we agreed that he knew they came in,

1    they gave their IDs and even when they left, they checked out

2    and he gave them back their IDs so the stills depicting that

3    we have no problem with.  But we do have a problem with the

4    videos showing the guns being fired because he said he never

5    witnessed it.  He has no knowledge.  He has no basis to tell

6    the jury that this was a true and accurate depiction of what

7    happened.  And for the reasons Your Honor articulated earlier

8    today, I think our motion should be granted.

9              THE COURT:  All right.  Was it Mr. Grigg?

10             MR. GRIGG:  Yes, Your Honor.

11             Your Honor, as the court in Stearns in an opinion

12   written by then Circuit Judge Kennedy now Supreme Court

13   Justice Kennedy indicated the circumstantial evidence and the

14   external evidence as the Court stated, however, earlier this

15   morning and I didn't mean to do this when I was arguing about

16   the testimony that directly corroborates the depictions in

17   the videos, I neglected to also mention that Mr. Avery

18   testified that he directed Mr. DeLeon and Mr. Santana and the

19   CHS to use lane three.

20             And as the videos internally show, just like they

21   show that the subjects were wearing the same clothing and so

22   on, they are directed in their firing in the exact same lane,

23   lane three and that's evident from the videos for each of the

24   individuals firing both the AR-15 and the handgun.  And

25   that's one additional factor of the internally consistent and

1    corroborative evidence aside from the Dodger hats, the

2    clothing, the actual firearms.

3         I might have taken quite a long time and I

4    recognize doing that in having him describe the layout of the

5    firing range, but, of course, the layout of the firing range

6    is exactly accurate to his description and they ended up

7    going to the exact same lane he directed them to and he

8    received the weapons back before they left.

9         THE COURT:  I mean inconsistency is exactly the

10   right word.  The problem here is not so much the videos.

11   It's the testimony that was given when the government was

12   laying the foundation that I think was misleading which was

13   to the effect that -- and I'm not saying it was intentionally

14   misleading.  I'm just saying it was misleading because he

15   testified as Mr. Larsen pointed out that he had reviewed the

16   video and it was a true and accurate depiction.

17        That's not correct because he wasn't there for all

18   of the time that the three persons shown on the video were at

19   the firing range.  So that's I think what I found difficult

20   when I was first facing this question and thinking about

21   whether to grant the motion to strike.  And that may have

22   remained a problem, you know, as to the credibility of the

23   witness, I'm sure, well, I suspect the defense will argue

24   that in closing.  But under the case law, I do think that

25   piece of testimony does not affect ultimately the

1    admissibility of the video.

2           Mr. Thomas, did you wish to be heard?

3           MR. THOMAS:  I did, Your Honor.  There's one thing

4    that my colleague neglected to mention.  It came out in my

5    cross-exam that the witness only saw the video for the first

6    time today.  It wasn't something that he saw a year ago and

7    went through his closed camera circuit TV and then made sure

8    it verified what we saw in the store.  He just saw it today.

9    So he really -- and it was two years ago when this happened.

10   So for him to be able -- he's just simply not in a position

11   to say whether it's accurate depiction because he had never

12   seen it before today and he never matched it up to the closed

13   circuit TV and he wasn't watching it all.  He was attending

14   to other people in the store and he saw them at the beginning

15   and at the end and not during the middle.

16          You know quite frankly I don't understand why the

17   government, you know, the government's just going to call the

18   CI.  They can just authenticate it through the CI.  I don't

19   understand -- I think the Court should hold it in abeyance

20   and wait until the end of the government's case to move it

21   and by then the CI will have testified and we could have laid

22   it through him.

23          THE COURT:  All right.  Mr. Grigg.

24          MR. GRIGG:  Your Honor, there is no cause or any

25   reason to hold any decision in abeyance.  The circumstantial

```
 1   evidence and the internal and external corroborating evidence
 2   meets the standard which is sufficient to allow a reasonable
 3   juror to infer the item is what it purports to be and that
 4   standard has been met.
 5        Now, whether or not this individual compared it to
 6   other video that he also did not take is not required and
 7   it's of no moment for the purpose of analyzing the
 8   foundation.  Whether he took the video is also irrelevant and
 9   in the Stearns matter, there was this random, random is my
10   word, but there's this photograph of a ship that had some
11   indicia of some pieces that were similar to the same ship as
12   it existed at a different point in time.
13        And it was located near a particular boat and had
14   certain rigging and so on.  Even though there was no
15   corroboration for it, any other aspect of the photograph of
16   the ship, I think the description in the opinion was that the
17   shoreline was not identifiable.  It was in the middle of the
18   water and so on and that's still sufficient.  And that's
19   arguably we could have one or both of the participants who
20   are available to us to come in and say this is me, I was
21   here, that's me at the firing range or that's me watching the
22   people at the firing range, but none of those things are
23   required and we've met standard for admissibility.
24        THE COURT:  All right.
25        MR. LARSEN:  Your Honor, on that point just first
```

1    as to the Payton decision Your Honor mentioned and I haven't

2    had the opportunity to look it up.  Your Honor mentioned it

3    was unpublished.  There is a circuit rule in the 9th Circuit

4    saying unpublished decisions prior to January 2007 are not

5    citable.

6            Stearns I did look at the during the lunch break I

7    think is very distinguishable.  There was critical question

8    in Stearns and that was whether the boats at issue were

9    photographed going to or returning from the harbor in

10   question.  That was only thing that was disputed and there

11   photographs were entered in which a very distinctive red

12   netting which had originally been on one boat had been

13   transferred to the other boat and therefore that established

14   the fact that the photographs were taken when the boats were

15   on their return voyage as opposed to going to the island.

16           Here we're not dealing with the very specific

17   question of when.  We're dealing with arguably very

18   inflammatory material picturing one of the defendants firing

19   an assault rifle.  And a number of videos were played to the

20   jury today each one about a minute long.  And it's not a

21   matter of a photograph depicting where a boat is.  It's a

22   matter of a video depicting to the jury individuals firing

23   machine guns, and the witness who was called to authenticate

24   this to the jury admitted on cross-examination that the video

25   he told them was accurate and the events that he said were

```
 1    accurately depicted he had never witnessed himself.

 2              THE COURT:  Well, some of them he had.

 3              MR. LARSEN:  He had witnessed them coming in and

 4    leaving.

 5              THE COURT:  Well, more than that.  Not that he just

 6    witnessed them walking into the business and leaving the

 7    business.  He witnessed them signing the documents.  He

 8    explained things so I think you're understating.

 9              MR. LARSEN:  Fair enough, but I think the material

10    that prompted this objection is the material depicting the

11    defendants firing assault rifles, and the witness admitted

12    that he had not personally observed all of the actions that

13    he was telling the jury were in fact --

14              THE COURT:  But the distinction is important

15    because he had the opportunity to see the two persons

16    pictured for long enough to give a description of what they

17    were wearing and so forth which is enough to create enough

18    evidence for a reasonable jury to draw an inference that the

19    video is accurate, which is the amount of time that he had to

20    observe them makes a difference.

21              MR. LARSEN:  I would say they could draw an

22    inference as to identity, but not as to activity.  Right?

23    Imagine two people come into a bowling alley and they check

24    in and the guy says go to lane 20 and go have your bowling

25    game.  They bowl for two hours and secretly the videotape of
```

1    this is taken.  And then guy who checks them at the alley

2    says everything in that video is accurate, but then admits he

3    hadn't actually watched it.

4              THE COURT:  Yes, but as I said, that's a separate

5    issue from whether the video is admissible under the

6    authorities even if we overlook the unpublished decision, the

7    commentaries and authorities from other circuits whether or

8    not that goes to his, what you may argue about his

9    credibility, but there is other circumstantial evidence that

10   I think goes to the admissibility of the video.

11             MR. LARSEN:  In Stearns the items admitted were

12   still photographs offered to prove one specific disputed

13   point.  Here we have moving pictures a number of which were

14   shown to the jury at length depicting activities of one or

15   more of the defendants.  I think on that point, there is no

16   authority.  Moreover Stearns may sanction or may permit a

17   court to admit that evidence and 9th Circuit will say it's

18   not error when reviewing for abuse of discretion, but I think

19   Stearns certainly doesn't say that Your Honor has to admit

20   that evidence.  I think Your Honor's inclination this morning

21   to exclude it was the correct one.

22             THE COURT:  All right.  What's the line-up of

23   witnesses for next week?

24             MR. CHIU:  Your Honor, the government didn't get to

25   call two of its witnesses today so we'll be calling those two

1    witnesses Nguyen, Garcia -- excuse me.  Three.  Nguyen,

2    Garcia, Rivera and we have Bowens, Mueller and Spoda.

3             MR. AARON:  Your Honor, do we have from the

4    government any greater or more accurate estimate of when

5    Mr. Santana and Mr. Gojali might testify?  I bring that up

6    because we're not making much headway or not making much

7    headway yet with the 220 some calls from Mr. Santana and 70

8    plus I think from Mr. Gojali.

9             MR. GRIGG:  Although I'm not claiming Mr. Gojali

10   for purposes of this proceeding, the government can work as

11   hard as possible to delay calling Mr. Gojali until sometime

12   after next week.  So it would be the third week of trial.

13            THE COURT:  All right.  And what about Mr. Santana?

14            MR. GRIGG:  Same.

15            THE COURT:  So not next week.

16            MR. AARON:  Thank you very much.  I'm kind of

17   puzzled.  I didn't understand Mr. Grigg's comment that he's

18   not claiming Mr. Gojali.

19            THE COURT:  Meaning one of the other people on your

20   team might do the direct.

21            MR. GRIGG:  Yes, Your Honor.

22            MR. AARON:  I'm sorry.  I thought they wanted to

23   remove him from their witness list because we could shorten

24   this proceeding.

25            THE COURT:  Anything else?

1          MR. THOMAS:  Your Honor, just one quick issue.  I

2   didn't want to draw attention to it with the jury in the

3   room, but when the government displayed my client's bank

4   records, they had his address and his account number all over

5   the screen.

6          THE COURT:  You really need to be more careful

7   about it.

8          MR. CHIU:  Your Honor, I will do that.  I

9   apologize.

10          MR. THOMAS:  They were so small I don't think

11   anyone could read it, but it was there.

12          THE COURT:  I certainly couldn't read it, but

13   that's certainly not the standard by the end of the week.

14          All right.  Thank you.

15          MR. CHIU:  Thank you, Your Honor.

16          MR. AARON:  Thank you, Your Honor.

17          MR. THOMAS:  Thank you, Your Honor.

18          (Proceedings were concluded at 5:00 p.m.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    COUNTY OF LOS ANGELES     )

4                              )  SS.

5    STATE OF CALIFORNIA       )

6

7    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

8    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

9    DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

10   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

11   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

12   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

13   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

14   OF MY STENOGRAPHIC NOTES.

15

16

17   DATE:  AUGUST 19, 2014

18

19      /s/  LAURA MILLER ELIAS

20   LAURA MILLER ELIAS, CSR 10019

21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**$**

**$100** [1] - 129:24
**$5,860.19** [1] - 130:1
**$95** [1] - 129:20

**'**

**'08** [1] - 94:17
**'80s** [1] - 72:10

**/**

**/s** [1] - 144:19

**1**

**1** [1] - 55:14
**1,000** [1] - 114:11
**1,000-page** [1] - 42:13
**10** [2] - 128:24, 132:24
**10-A35** [1] - 78:22
**1000** [4] - 42:7, 42:9, 42:11
**10019** [2] - 1:22, 144:20
**101mesr@gmail. com** [1] - 36:18
**105** [1] - 3:9
**106** [1] - 36:2
**11** [1] - 128:24
**11-13** [2] - 129:15, 129:20
**1100** [5] - 2:5, 40:24, 92:23, 92:24, 93:15
**114** [1] - 3:8
**116** [1] - 3:10
**1195** [1] - 133:13
**12-00092(B)-VAP** [1] - 1:9
**121** [1] - 3:16
**123** [2] - 101:16
**124** [2] - 3:17, 3:17
**125** [1] - 36:2
**127** [2] - 3:18, 36:2
**13** [6] - 7:18, 95:23, 95:24, 119:14, 121:12, 124:15
**130** [2] - 3:11, 37:1
**131** [1] - 37:1
**132** [1] - 37:1
**13tg** [1] - 12:18
**13th** [1] - 129:20
**14** [4] - 3:13, 39:4, 129:7, 129:14
**144** [1] - 37:1
**146** [1] - 37:1
**15** [3] - 1:16, 4:1, 61:2
**150** [1] - 36:24
**1500** [1] - 2:15

**153** [1] - 36:24
**154** [1] - 36:24
**155** [1] - 36:24
**16** [3] - 42:20, 119:13, 125:11
**17** [2] - 16:23, 119:6
**172** [11] - 3:16, 120:23, 121:18, 121:19, 121:22, 121:24, 123:3, 123:14, 123:20, 124:1, 124:2
**173** [6] - 3:17, 123:3, 123:14, 124:1, 124:3
**173-A/173-B** [1] - 3:17
**173-B.1** [1] - 125:21
**173A** [3] - 123:20, 124:1, 124:3
**173B** [3] - 123:20, 124:1, 124:3
**174** [8] - 3:18, 123:3, 126:20, 126:23, 127:9, 127:13, 127:14, 127:18
**175** [1] - 37:24
**176** [1] - 37:24
**18** [1] - 17:4
**180** [2] - 9:10, 9:13
**185** [10] - 12:9, 12:11, 13:19, 13:23, 14:5, 14:9, 14:11, 15:12, 16:10
**185-A** [1] - 3:13
**19** [2] - 17:21, 144:17
**191** [2] - 37:22, 128:13
**192** [1] - 36:16
**195** [2] - 36:7, 119:2
**196** [1] - 36:7
**197** [1] - 36:22
**198** [1] - 36:7
**1990** [5] - 90:16, 90:18, 90:19, 93:18, 93:25
**1996** [1] - 133:13
**1:15** [1] - 4:1
**1st** [2] - 96:8, 96:9

**2**

**20** [5] - 3:6, 21:20, 106:2, 106:3, 140:24
**2001** [4] - 90:18, 90:19, 91:8, 91:11
**2003** [2] - 91:8
**2006** [2] - 91:8, 91:24
**2007** [1] - 139:4
**2010** [1] - 94:18
**2012** [17] - 4:14, 4:19, 7:18, 12:18, 63:24, 78:10, 95:24, 107:11, 119:14,

**121:12, 124:15, 125:11, 128:24, 129:7, 129:14
**2014** [3] - 1:16, 4:1, 144:17
**2068** [1] - 18:18
**21** [1] - 13:1
**213)620-0890** [1] - 1:24
**218909** [1] - 37:3
**22** [1] - 13:12
**220** [1] - 142:7
**229** [1] - 108:2
**23** [1] - 18:8
**230113** [1] - 37:3
**230114** [1] - 37:3
**24** [3] - 18:20, 36:10, 39:3
**25** [7] - 3:13, 12:20, 19:1, 72:2, 99:21, 99:22, 99:25
**26** [1] - 3:14
**27** [1] - 3:14
**28** [2] - 3:15, 93:15
**29** [2] - 3:6, 3:15

**3**

**3** [3] - 87:16, 87:23, 88:16
**312** [2] - 1:23, 2:6
**318-820-4287** [1] - 37:12
**34** [1] - 3:5
**340** [2] - 55:14, 114:19
**35** [1] - 74:10
**38** [1] - 3:8
**3801** [1] - 2:11

**4**

**4** [2] - 3:5, 132:24
**40** [1] - 93:15
**44** [1] - 36:11
**453** [1] - 1:23
**466** [1] - 37:4
**467** [1] - 37:4
**468** [1] - 37:4
**471** [1] - 37:10
**472** [1] - 37:7
**473** [1] - 37:14
**474** [1] - 37:15
**475** [1] - 36:4
**477** [1] - 37:19
**478** [1] - 36:9
**479** [1] - 36:9
**480** [1] - 37:17
**481** [1] - 37:12
**482** [1] - 36:5

**5**

**5** [4] - 55:11, 55:12, 74:24, 132:24
**5,000** [1] - 108:25
**50** [1] - 115:22
**500** [4] - 4:11, 41:4, 114:7, 114:9
**5028** [4] - 3:14, 25:18, 26:5, 26:10
**5029** [5] - 3:14, 26:16, 27:1, 27:5, 27:7
**5030** [4] - 3:15, 27:13, 28:8, 28:14
**5031** [4] - 3:15, 28:21, 29:8, 29:15
**5032** [5] - 3:13, 24:19, 25:4, 25:9, 25:10
**5:00** [1] - 143:18

**6**

**6001** [1] - 86:24
**626-589** [1] - 18:18
**626-589-2068** [1] - 36:4

**7**

**70** [1] - 142:7
**700** [1] - 2:12
**702** [1] - 36:14
**705** [1] - 81:12
**76.167.167.83** [1] - 37:17

**8**

**8** [1] - 42:20
**8036** [1] - 35:21
**81** [1] - 3:16
**83** [1] - 3:6
**86** [5] - 3:16, 80:1, 81:2, 81:7, 81:9

**9**

**9** [1] - 131:17
**9/11** [2] - 11:12, 17:20
**90** [1] - 3:8
**90012** [2] - 1:24, 2:6
**901** [1] - 133:10
**902** [1] - 133:10
**90211** [2] - 35:10, 35:20
**909-647-5061** [1] - 36:9
**909-753-7300** [1] - 37:12
**92** [1] - 133:13

**92501** [1] - 2:12
**92507** [1] - 2:16
**95** [1] - 129:25
**9:00** [1] - 131:9
**9th** [2] - 139:3, 141:17

**A**

**A-21** [1] - 13:23
**Aaron** [1] - 90:7
**AARON** [13] - 2:9, 3:8, 38:6, 43:19, 45:19, 81:4, 90:8, 90:10, 104:23, 142:3, 142:16, 142:22, 143:16
**abandonment** [1] - 9:11
**abeyance** [2] - 137:19, 137:25
**ability** [1] - 48:19
**able** [35] - 43:10, 43:13, 43:16, 51:11, 60:7, 60:11, 60:15, 63:15, 64:6, 64:9, 71:8, 71:10, 71:11, 71:13, 71:19, 71:21, 72:15, 72:23, 74:17, 76:3, 76:5, 76:23, 77:2, 78:1, 79:22, 80:12, 82:5, 98:6, 101:25, 112:24, 115:8, 127:21, 128:20, 129:17, 137:10
**absolutely** [9] - 41:21, 42:19, 53:19, 99:4, 100:5, 100:8, 101:14, 106:1, 108:19
**abuse** [1] - 141:18
**academic** [1] - 97:19
**academy** [1] - 92:6
**accept** [2] - 119:6, 120:19
**acceptance** [1] - 118:6
**accepted** [1] - 122:24
**access** [3] - 45:16, 107:8, 111:22
**accessed** [2] - 112:1, 113:11
**accessible** [2] - 49:22, 49:24
**accessing** [1] - 53:8
**accompanied** [2] - 35:19, 108:20
**according** [3] - 35:24, 89:13, 92:22
**account** [1] - 143:4
**accurate** [27] - 24:22,

25:21, 26:19, 27:16,
28:24, 67:7, 74:20,
75:17, 76:7, 77:3,
95:20, 97:3, 97:4,
98:8, 100:15,
105:12, 105:15,
106:19, 111:25,
135:6, 136:6,
136:16, 137:11,
139:25, 140:19,
141:2, 142:4
**accurately** [2] -
121:14, 140:1
**acquisition** [1] - 50:20
**act** [5] - 47:20, 47:21,
49:8, 68:16, 76:1
**action** [1] - 69:6
**actions** [2] - 64:11,
140:12
**activities** [3] - 67:16,
67:17, 141:14
**activity** [1] - 140:22
**actual** [4] - 35:5,
56:16, 103:20, 136:2
**addition** [4] - 14:25,
18:3, 23:5, 44:11
**additional** [7] - 15:10,
19:2, 53:8, 82:25,
102:3, 106:8, 135:25
**additionally** [1] - 74:8
**address** [6] - 13:24,
37:6, 37:14, 37:17,
37:19, 143:4
**addressed** [1] - 129:3
**addresses** [1] - 37:9
**adjunct** [2] - 94:24,
94:25
**administration** [1] -
45:3
**administrative** [1] -
53:9
**admissibility** [4] -
35:9, 137:1, 138:23,
141:10
**admissible** [2] - 8:25,
141:5
**admission** [1] - 33:19
**admit** [6] - 13:19,
87:20, 87:23,
132:19, 141:17,
141:19
**admits** [1] - 141:2
**ADMITTED** [2] - 3:12
**admitted** [33] - 14:9,
14:11, 25:9, 25:10,
26:9, 26:10, 27:5,
27:7, 28:13, 28:14,
29:13, 29:15, 35:23,
38:1, 38:7, 78:21,
80:2, 81:7, 81:9,

81:12, 121:22,
121:24, 123:24,
124:1, 127:17,
127:18, 128:14,
133:2, 133:24,
134:23, 139:24,
140:11, 141:11
**adult** [1] - 119:2
**advanced** [1] - 94:8
**Advanced** [1] - 95:1
**Adventist** [1] - 23:21
**Affairs** [1] - 91:12
**affairs** [1] - 91:20
**affect** [3] - 9:9, 48:19,
136:25
**afford** [1] - 22:9
**afternoon** [13] - 4:3,
4:9, 20:3, 20:4,
29:22, 83:17, 83:18,
90:13, 90:14, 105:3,
105:4, 130:6, 130:7
**afterwards** [1] - 64:16
**Agency** [3] - 117:4,
117:5, 126:17
**agency** [5] - 30:18,
44:6, 118:4, 118:7,
118:8
**Agent** [1] - 56:6
**agent** [31] - 44:5,
44:17, 44:23, 52:7,
52:11, 52:17, 55:1,
56:9, 56:14, 57:3,
58:7, 58:11, 58:15,
58:16, 59:2, 70:13,
71:23, 73:8, 74:15,
74:17, 75:5, 76:9,
76:13, 76:15, 77:20,
77:21, 103:23,
104:20, 108:2,
108:10, 108:14
**agents** [2] - 33:5,
71:19
**ago** [4] - 4:16, 137:6,
137:9
**agree** [1] - 89:1
**agreed** [2] - 85:12,
134:25
**agreement** [1] - 62:17
**ahead** [4] - 21:24,
83:13, 88:14, 133:5
**AIDED** [1] - 144:12
**airplane** [3] - 5:9, 17:6
**airport** [1] - 62:4
**al** [1] - 15:22
**AI** [1] - 99:3
**al-Awlaki** [1] - 15:22
**alarming** [1] - 12:4
**Alejandro** [4] - 13:7,
13:15, 14:17, 15:7
**alert** [2] - 20:13, 20:17

**alerts** [1] - 20:15
**algorithm** [2] - 50:22,
54:5
**alleged** [1] - 67:18
**ALLEN** [1] - 2:4
**alley** [2] - 140:23,
141:1
**allow** [8] - 49:1, 53:22,
69:9, 69:12, 71:4,
71:7, 73:4, 138:2
**allowed** [3] - 19:15,
34:2, 65:9
**allows** [5] - 52:18,
52:21, 74:12, 74:13,
77:20
**almost** [1] - 113:4
**alpha** [2] - 42:6, 59:6
**alter** [3] - 47:22,
54:13, 72:25
**altered** [2] - 54:21,
70:4
**altering** [1] - 73:5
**alternative** [1] -
132:20
**AMERICA** [2] - 1:1,
1:6
**amount** [7] - 71:8,
92:6, 97:22, 118:15,
132:8, 132:11,
140:19
**analysis** [4] - 40:2,
40:3, 102:3, 110:8
**analyze** [3] - 39:14,
41:1, 51:22
**analyzed** [2] - 54:1,
55:25
**analyzing** [1] - 138:7
**AND** [4] - 144:7,
144:10, 144:12,
144:13
**ANGELA** [1] - 2:10
**Angeles** [5] - 36:25,
37:23, 117:4, 117:5,
126:16
**ANGELES** [4] - 1:17,
1:24, 2:6, 144:3
**answer** [8] - 30:22,
43:21, 62:7, 94:4,
111:13, 113:6,
113:15, 115:14
**answered** [4] - 31:23,
65:16, 112:20, 113:2
**answers** [1] - 31:25
**Anwar** [1] - 15:22
**apologize** [2] - 80:15,
143:9
**app1821@yahoo.
com** [1] - 37:9
**appeal** [1] - 133:25
**appear** [11] - 16:5,

16:12, 16:16, 16:21,
17:5, 18:21, 54:6,
54:8, 76:20, 127:10,
128:18
**APPEARANCES** [1] -
2:1
**applicant** [2] - 119:25,
120:6
**application** [18] -
44:19, 117:18,
119:23, 120:12,
120:15, 120:17,
120:20, 122:24,
124:6, 124:12,
124:14, 124:22,
125:8, 125:16,
125:18, 125:22,
126:7, 129:21
**applications** [1] -
119:7
**applied** [8] - 119:17,
122:9, 122:20,
123:6, 124:17,
125:1, 127:1, 127:3
**applies** [1] - 132:1
**apply** [1] - 132:22
**applying** [4] - 118:18,
122:2, 122:6, 126:1
**appreciated** [1] -
70:21
**approach** [5] - 19:22,
32:11, 77:23, 86:19,
88:12
**appropriate** [1] -
11:21
**appropriately** [1] -
14:25
**approximate** [1] - 41:4
**AR-15** [1] - 135:24
**arcade** [1] - 72:9
**area** [11] - 6:10, 6:12,
6:14, 8:13, 46:16,
58:1, 86:7, 119:5,
121:4
**arguably** [2] - 138:19,
139:17
**argue** [4] - 32:9,
134:17, 136:23,
141:8
**arguing** [1] - 135:15
**argument** [3] - 62:11,
64:9, 65:1
**argument's** [1] -
111:14
**arifeeng** [1] - 36:21
**ARIFEENG** [1] - 36:21
**arrest** [2] - 32:3, 33:8
**arrested** [5] - 6:4, 7:4,
33:6, 33:7, 33:20
**arresting** [1] - 6:11

**article** [5] - 105:21,
106:1, 106:6, 122:5,
122:7
**articles** [3] - 106:3,
106:17
**articulated** [1] - 135:7
**arts** [1] - 92:20
**aside** [1] - 136:1
**aspect** [1] - 138:15
**assault** [2] - 139:19,
140:11
**assign** [1] - 60:2
**assigned** [6] - 39:10,
40:10, 40:21, 45:4,
45:24, 79:8
**assignment** [2] -
90:18, 92:9
**assignments** [2] -
91:18, 91:19
**assigns** [1] - 45:8
**assist** [2] - 44:8, 71:22
**assistance** [1] - 65:17
**ASSISTANT** [1] -
119:25
**assisting** [1] - 76:13
**associate** [1] - 92:20
**associated** [2] -
103:25, 106:7
**assuming** [4] - 63:14,
76:16, 111:14,
111:24
**AT** [1] - 144:10
**AT&T** [1] - 36:3
**ATS** [1] - 20:15
**attached** [4] - 20:14,
20:15, 20:17, 110:13
**attack** [2] - 17:10,
17:12
**attempt** [1] - 47:17
**attempting** [1] -
104:11
**attended** [1] - 40:23
**attending** [1] - 137:13
**attention** [25] - 8:4,
13:1, 15:12, 15:17,
17:17, 18:8, 18:14,
18:19, 19:1, 26:16,
27:13, 28:21, 43:14,
54:22, 62:5, 67:18,
68:16, 83:20, 124:8,
124:20, 125:21,
128:12, 129:14,
131:7, 143:2
**ATTORNEYS** [1] - 2:5
**audio** [11] - 41:15,
108:2, 108:4,
108:13, 108:14,
109:8, 109:11,
109:17, 111:3,
111:11
**AUG** [1] - 4:1

**AUGUST** [2] - 1:16, 144:17
**August** [1] - 4:14
**authenticate** [2] - 137:18, 139:23
**authentication** [1] - 133:16
**authenticity** [1] - 134:2
**authorities** [2] - 141:6, 141:7
**authority** [6] - 44:12, 46:1, 46:4, 46:10, 46:12, 141:16
**authorization** [1] - 44:14
**authorized** [2] - 11:17, 11:20
**automatically** [7] - 32:3, 33:1, 105:17, 106:8, 106:22, 115:2, 115:4
**available** [9] - 52:11, 54:2, 56:9, 56:15, 56:19, 58:16, 71:22, 119:9, 138:20
**AVENUE** [2] - 2:11, 2:15
**Avery** [2] - 134:7, 135:17
**avoid** [1] - 97:3
**aware** [5] - 17:9, 23:4, 23:16, 23:20, 23:23
**Awlaki** [1] - 15:22
**Axis** [2] - 97:13, 97:15

**B**

**B(1** [1] - 133:10
**bachelor** [1] - 92:17
**background/ professional** [1] - 91:12
**bad** [1] - 27:9
**bag** [3] - 47:12, 79:12
**balance** [2] - 129:23, 129:25
**ball** [2] - 72:11, 72:14
**Bank** [2] - 37:15, 37:21
**bank** [5] - 128:19, 128:20, 130:11, 130:14, 143:3
**bar** [5] - 59:6, 60:2, 79:8, 80:21, 82:13
**barcoded** [1] - 60:9
**based** [8] - 8:5, 11:13, 11:14, 29:4, 56:3, 63:16, 84:18, 100:1
**basic** [1] - 42:17

**Basic** [1] - 48:7
**basis** [5] - 6:13, 63:23, 65:13, 133:25, 135:5
**bazookas** [1] - 17:2
**become** [1] - 57:16
**begin** [1] - 47:7
**beginning** [3] - 90:15, 134:9, 137:14
**BEHALF** [3] - 2:2, 2:8, 2:13
**behavior** [1] - 68:5
**behind** [1] - 97:23
**belonged** [2] - 107:14, 107:16
**belonging** [1] - 49:23
**belongings** [1] - 86:2
**beneath** [1] - 28:2
**Berkeley** [1] - 93:12
**Bermuda** [1] - 28:5
**best** [3] - 68:4, 77:4, 110:4
**better** [1] - 55:19
**between** [3] - 42:20, 67:10, 101:7
**beyond** [13] - 20:20, 21:11, 21:13, 31:21, 32:5, 32:6, 61:15, 61:16, 61:23, 65:18, 85:11, 85:13, 85:14
**big** [2] - 58:14, 119:5
**Bill** [2] - 23:16, 23:20
**billion** [2] - 55:14, 114:19
**billions** [1] - 52:19
**binder** [4] - 12:6, 12:7, 19:21, 24:12
**BIOS** [2] - 48:6, 48:7
**birth** [1] - 119:24
**bit** [25] - 4:24, 7:14, 39:11, 39:19, 41:5, 43:24, 46:3, 49:24, 50:15, 51:14, 51:18, 54:14, 56:14, 58:4, 88:18, 110:21, 125:12, 132:23
**bites** [1] - 42:9
**black** [1] - 122:10
**blackboard** [2] - 50:11, 50:12
**blackflagbanner 1400@gmail.com** [1] - 36:19
**blackflagbanner@ gmail.com** [1] - 36:18
**blank** [1] - 71:15
**block** [2] - 49:15, 49:19
**blocked** [2] - 72:23, 73:3, 74:1

**blocker** [2] - 48:24, 48:25
**Blu** [14] - 80:8, 80:12, 107:21, 108:9, 108:15, 109:1, 111:2, 111:4, 111:10, 111:12, 111:15, 112:4, 112:5, 112:14
**Blu-Ray** [14] - 80:8, 80:12, 107:21, 108:9, 108:15, 109:1, 111:2, 111:4, 111:10, 111:12, 111:15, 112:4, 112:5, 112:14
**Blue** [3] - 58:14, 58:23, 59:10
**blue** [1] - 120:23
**boat** [4] - 138:13, 139:12, 139:13, 139:21
**boats** [2] - 139:8, 139:14
**bombing** [1] - 16:21
**book** [22] - 23:9, 23:14, 23:16, 23:19, 24:4, 24:5, 24:23, 25:14, 25:19, 26:1, 26:12, 26:14, 26:23, 27:12, 27:22, 28:16, 28:18, 28:22, 29:4, 42:10, 42:11, 98:25
**bookmark** [6] - 57:21, 57:23, 60:6, 98:17, 98:20, 98:24
**bookmarked** [8] - 57:4, 57:6, 57:7, 57:10, 58:10, 59:3, 59:25, 60:4
**bookmarking** [1] - 57:18
**bookmarks** [6] - 57:4, 57:5, 58:5, 58:9, 58:18, 98:16
**books** [12] - 11:7, 11:8, 23:6, 23:8, 25:16, 42:13, 44:23, 86:2, 89:2, 89:6, 89:14, 89:19
**boot** [1] - 48:11
**booting** [1] - 48:14
**Border** [4] - 4:25, 11:16, 84:12
**border** [7] - 5:5, 7:8, 7:19, 10:12, 62:4, 62:25
**bother** [1] - 79:16
**bottom** [1] - 18:20
**bought** [2] - 52:24,

53:12
**Bowens** [1] - 142:2
**bowl** [1] - 140:25
**bowling** [2] - 140:23, 140:24
**brackets** [1] - 87:3
**break** [4] - 39:20, 39:21, 60:24, 139:6
**briefly** [2] - 39:23, 117:16
**bring** [2] - 61:18, 142:5
**bringing** [1] - 33:9
**brings** [1] - 45:10
**broader** [1] - 91:7
**BROPHY** [1] - 2:14
**brought** [5] - 8:12, 8:14, 40:3, 54:21, 86:8
**browse** [1] - 114:24
**browser** [9] - 109:14, 109:15, 109:19, 109:20, 115:1, 115:4, 116:1, 116:7
**browsers** [1] - 115:17
**browsing** [7] - 98:18, 103:12, 115:9, 115:18, 115:23, 116:4, 116:7
**brushed** [1] - 61:24
**building** [2] - 117:6, 118:8
**built** [1] - 54:19
**built-in** [1] - 54:19
**bunch** [2] - 107:3, 112:17
**burned** [3] - 75:6, 76:16, 76:19
**burning** [3] - 16:17, 16:20
**bus** [1] - 18:22
**business** [5] - 118:17, 118:22, 128:14, 140:6, 140:7
**butcher** [1] - 24:7
**butchered** [1] - 23:10
**BY** [45] - 2:3, 2:9, 2:15, 3:5, 3:6, 3:6, 3:8, 3:8, 3:9, 3:10, 3:11, 4:8, 14:12, 17:15, 20:2, 20:23, 22:1, 24:3, 24:18, 25:13, 26:11, 27:8, 28:15, 29:21, 30:24, 32:1, 34:8, 38:21, 43:23, 45:22, 81:10, 83:16, 86:22, 88:4, 88:15, 90:10, 105:2, 112:22, 114:4, 116:23, 121:25,

126:22, 129:13, 130:5, 144:12
**byte** [3] - 42:2, 42:3, 42:4
**BYTE** [1] - 42:4

**C**

**C-A-I-R** [1] - 56:6
**C-e-l-l-e-b-r-i-t-e** [1] - 75:14
**C-r-a-i-g** [1] - 38:18
**C-r-o-s-t-o-n** [1] - 84:10
**CA** [3] - 2:6, 2:12, 2:16
**cache** [3] - 110:19, 110:20, 110:25
**CACHE** [1] - 110:19
**CAIR** [2] - 56:6, 56:25
**calculate** [1] - 104:2
**calculated** [1] - 50:21
**calculation** [3] - 50:22, 50:25, 51:4
**calculator** [1] - 55:18
**CALIFORNIA** [6] - 1:2, 1:17, 1:24, 4:1, 144:5, 144:8
**California** [4] - 13:3, 13:9, 93:2
**camera** [1] - 137:7
**cannot** [5] - 72:25, 73:10, 101:21, 111:19, 112:16
**capacity** [1] - 94:5
**captured** [6] - 96:25, 108:24, 110:9, 112:10, 113:10, 113:12
**card** [21] - 13:4, 13:10, 14:19, 19:12, 41:22, 43:10, 73:10, 73:11, 73:12, 73:19, 77:9, 77:11, 77:12, 77:19, 127:5, 127:6, 129:15, 130:9, 130:19
**cards** [3] - 39:16, 40:5, 71:5
**care** [1] - 8:24
**career** [1] - 41:3
**careful** [1] - 143:6
**carrying** [1] - 15:5
**case** [71] - 30:10, 44:5, 44:23, 47:13, 52:7, 52:11, 52:13, 52:17, 55:1, 55:25, 56:9, 56:12, 56:14, 57:2, 57:3, 57:14, 57:20, 58:7, 58:11, 58:15, 58:16, 60:19, 60:21,

61:2, 61:5, 61:18, 63:2, 70:10, 70:11, 70:13, 70:15, 71:23, 74:15, 74:16, 76:13, 76:15, 77:20, 77:21, 78:1, 78:3, 79:3, 95:8, 96:12, 97:12, 98:24, 100:1, 103:23, 104:17, 104:20, 108:2, 108:9, 108:14, 131:10, 131:12, 131:15, 132:7, 132:22, 133:10, 133:11, 133:12, 133:13, 133:19, 133:20, 133:22, 134:5, 136:24, 137:20

**CASE** [1] - 1:8
**Case** [1] - 56:6
**cases** [1] - 133:14
**cash** [8] - 127:5, 127:7, 127:8, 128:6, 128:10, 129:20, 130:8, 130:20
**cataloged** [1] - 89:14
**categorize** [1] - 91:19
**categorized** [1] - 51:25
**categorizes** [1] - 74:8
**category** [3] - 6:6, 32:4, 57:20
**causing** [4] - 49:3, 49:11, 73:6, 76:1
**CD** [16] - 58:13, 58:19, 58:23, 59:8, 59:9, 59:21, 60:6, 71:15, 73:12, 75:3, 76:16, 76:17, 76:18, 76:19, 104:12
**CDs** [3] - 39:16, 40:5, 71:5
**cell** [18] - 39:15, 40:4, 73:11, 73:15, 73:16, 73:19, 73:22, 74:2, 75:10, 75:12, 75:20, 75:21, 76:6, 76:22, 76:23, 76:25, 77:6, 77:8
**Cellebrite** [6] - 75:13, 75:20, 77:6, 77:12, 77:22, 103:19
**center** [5] - 45:1, 46:2, 46:14, 79:11, 79:13
**CENTRAL** [2] - 1:2, 144:8
**certain** [9] - 32:2, 78:4, 92:6, 99:16, 113:10, 115:9,

115:25, 134:4, 138:14
**certainly** [7] - 32:11, 35:3, 77:1, 88:13, 141:19, 143:12, 143:13
**CERTIFICATE** [1] - 144:1
**certificate** [1] - 119:24
**certifications** [3] - 35:20, 93:11, 94:13
**certified** [1] - 94:17
**CERTIFY** [2] - 144:9, 144:13
**cetera** [3] - 39:16, 40:5, 108:11
**chain** [3] - 45:14, 64:12, 67:8
**chance** [2] - 65:4, 81:20
**change** [2] - 72:25, 96:3
**changed** [2] - 55:4, 96:8
**changes** [8] - 47:18, 49:3, 49:4, 49:9, 49:12, 49:18, 73:6, 76:1
**changing** [1] - 115:5
**character** [3] - 42:3, 42:5, 42:6
**characters** [2] - 42:7, 42:13
**chat** [1] - 108:10
**chats** [1] - 103:11
**Cheapoair** [1] - 36:15
**check** [6] - 48:15, 76:10, 119:5, 121:4, 129:15, 140:23
**check-in** [2] - 119:5, 121:4
**checked** [1] - 135:1
**checks** [1] - 141:1
**cherry** [1] - 100:3
**children** [1] - 6:16
**CHIU** [44] - 2:4, 3:8, 3:10, 34:20, 34:24, 35:4, 35:10, 35:14, 35:18, 38:8, 38:21, 43:23, 45:22, 55:18, 55:21, 60:23, 69:20, 81:1, 81:10, 82:17, 112:19, 113:1, 113:19, 113:25, 114:4, 116:9, 116:13, 116:23, 121:17, 121:25, 123:19, 124:2, 124:5, 126:19, 126:22, 127:12,

127:19, 129:10, 129:13, 130:2, 131:2, 141:24, 143:8, 143:15
**Christian** [1] - 29:5
**CHRISTOPHER** [1] - 2:4
**Chrome** [5] - 109:15, 109:22, 110:6, 110:18, 110:24
**chronology** [1] - 91:10
**CHS** [1] - 135:19
**CI** [3] - 137:18, 137:21
**circled** [1] - 88:17
**circling** [1] - 124:9
**circuit** [4] - 133:12, 137:7, 137:13, 139:3
**Circuit** [2] - 135:12, 139:3, 141:17
**circuits** [1] - 141:7
**circumstances** [2] - 56:17, 105:8
**circumstantial** [5] - 134:2, 134:10, 135:13, 137:25, 141:9
**citable** [1] - 139:5
**cited** [2] - 133:10, 133:14
**citizenship** [1] - 117:19
**city** [1] - 126:10
**City** [1] - 126:12
**claiming** [2] - 142:9, 142:18
**claims** [1] - 133:18
**clarify** [1] - 44:20, 69:25
**classes** [3] - 94:6, 94:8, 94:23
**clean** [3] - 50:5, 50:7, 50:12
**clear** [10] - 35:7, 41:8, 48:8, 77:5, 95:19, 117:23, 120:7, 122:1, 123:14, 124:2
**clearly** [1] - 16:19
**CLERK** [5] - 38:12, 38:14, 69:15, 116:15, 116:17
**click** [2] - 105:9, 107:3
**client's** [1] - 143:3
**close** [1] - 4:10
**closed** [2] - 137:7, 137:12
**closer** [1] - 91:3
**closing** [1] - 136:24
**clothing** [6] - 11:7, 122:5, 122:7,

134:13, 135:21, 136:2
**Club** [1] - 36:25
**cnn.com** [3] - 105:6, 106:12, 115:2
**co** [2] - 65:25, 121:10
**co-counsel's** [1] - 65:25
**co-workers** [1] - 121:10
**code** [6] - 59:6, 60:2, 79:8, 80:21, 82:13, 97:21
**colleague** [1] - 137:4
**collect** [1] - 41:1
**collected** [1] - 114:25
**College** [4] - 94:3, 94:6, 94:25, 95:2
**college** [1] - 95:2
**combination** [2] - 52:16, 72:14
**coming** [10] - 7:8, 8:18, 8:22, 9:7, 18:22, 18:24, 21:7, 62:24, 84:16, 140:3
**commands** [1] - 72:13
**comment** [1] - 142:17
**commentaries** [1] - 141:7
**commonly** [1] - 55:11
**communicate** [1] - 61:3
**community** [1] - 95:2
**company** [7] - 93:19, 93:21, 93:23, 94:1, 94:2, 94:5, 97:17
**compare** [17] - 59:12, 60:11, 60:20, 69:25, 75:7, 76:5, 76:6, 76:24, 100:16, 100:18, 100:20, 100:21, 100:23, 100:24, 103:20, 114:13
**compared** [3] - 74:21, 79:18, 138:5
**comparing** [1] - 100:9
**comparison** [5] - 100:11, 101:6, 101:9, 104:4, 104:5
**compartment** [1] - 47:15
**compartmentalize** [1] - 51:22
**compiles** [1] - 52:4
**complete** [2] - 55:1, 102:5
**completed** [1] - 19:5, 56:23, 57:1
**completely** [5] -

50:11, 76:17, 98:12, 101:18, 116:5
**complex** [2] - 39:8, 70:14
**comply** [1] - 10:7
**components** [1] - 72:5
**COMPUTER** [1] - 144:12
**computer** [85] - 39:10, 39:12, 39:13, 39:25, 40:3, 40:25, 41:12, 42:2, 42:4, 42:25, 43:4, 46:25, 47:1, 47:2, 47:3, 47:7, 47:8, 47:10, 47:14, 47:18, 47:21, 47:22, 48:2, 48:4, 48:11, 48:14, 48:16, 48:17, 48:23, 49:6, 49:7, 49:8, 49:14, 50:1, 52:23, 52:24, 52:25, 53:1, 53:9, 53:12, 70:12, 70:13, 71:3, 71:7, 71:8, 72:8, 72:20, 72:23, 72:24, 76:17, 76:18, 80:15, 81:17, 90:21, 91:20, 91:24, 92:15, 92:17, 92:18, 93:12, 93:19, 94:3, 94:6, 94:7, 94:10, 95:6, 96:3, 101:20, 101:22, 102:21, 103:2, 105:5, 105:10, 105:18, 105:20, 105:23, 106:11, 106:13, 106:15, 106:21, 115:15, 115:16, 115:20, 115:23
**Computer** [1] - 40:11
**COMPUTER-AIDED** [1] - 144:12
**computer-ease** [1] - 42:2
**computers** [8] - 39:15, 40:4, 41:2, 42:24, 43:2, 96:2, 98:12, 114:5
**concerned** [1] - 66:14
**concluded** [1] - 143:18
**condition** [1] - 47:11
**conditions** [1] - 50:6
**conduct** [4] - 47:8, 69:24, 78:4, 79:22
**conducted** [4] - 4:23, 8:16, 19:13, 55:2
**conducting** [8] - 31:7, 31:14, 46:9, 52:18,

56:1, 79:17, 82:1, 99:19
**conferring** [1] - 132:9
**confidential** [1] - 64:8
**confirm** [1] - 70:3
**connect** [5] - 48:4, 48:5, 48:23, 64:7, 64:11
**connected** [1] - 131:12
**connection** [7] - 63:21, 63:23, 64:14, 64:22, 125:18, 125:22
**connections** [1] - 72:22
**connector** [2] - 64:22, 64:24
**consciously** [1] - 106:25
**consecutive** [1] - 88:17
**consent** [2] - 44:13, 46:6
**consequences** [1] - 17:24
**consider** [1] - 33:23
**considerable** [1] - 132:8
**consideration** [1] - 133:2
**considered** [2] - 9:11, 75:25
**consistent** [9] - 67:9, 67:12, 79:5, 79:9, 88:23, 110:21, 117:20, 119:25, 135:25
**console** [2] - 71:1, 72:9
**conspiracies** [1] - 27:23
**conspiracy** [2] - 62:17, 67:19
**constantly** [1] - 75:23
**contacts** [3] - 76:3, 76:5, 76:22
**contain** [7] - 41:20, 41:23, 43:17, 75:2, 75:21, 80:11, 100:22
**contained** [4] - 12:10, 16:9, 88:18, 96:23
**container** [2] - 47:12, 47:13
**containing** [1] - 56:16
**contains** [3] - 102:15, 105:6, 111:15
**content** [4] - 15:16, 100:2, 101:1, 108:7
**contents** [8] - 52:5,

54:13, 76:24, 87:14, 97:25, 102:7, 105:25, 120:17
**continue** [2] - 4:5, 69:19
**CONTINUED** [1] - 4:7
**contraband** [3] - 6:2, 32:4, 34:2
**control** [9] - 45:1, 46:2, 46:14, 46:15, 46:21, 56:18, 77:20, 79:11, 79:12
**controlled** [2] - 45:11, 45:13
**conversation** [1] - 83:21
**converted** [1] - 22:16
**cop** [1] - 49:24
**copied** [15] - 12:16, 12:23, 15:2, 15:11, 15:13, 18:9, 19:2, 19:6, 19:13, 64:19, 89:6, 89:14, 89:19, 97:1, 104:11
**copies** [8] - 19:22, 24:16, 24:17, 54:19, 74:19, 77:3, 86:2, 89:2
**copy** [54] - 11:25, 12:8, 12:21, 13:9, 13:14, 13:25, 18:22, 22:18, 23:18, 24:11, 24:20, 24:22, 25:21, 26:12, 26:17, 26:19, 27:9, 27:16, 28:24, 49:17, 49:21, 50:14, 50:15, 50:18, 50:25, 51:1, 51:12, 51:14, 51:18, 51:19, 51:21, 54:14, 71:11, 71:14, 74:3, 74:19, 75:5, 75:16, 75:17, 76:9, 86:12, 95:14, 95:16, 95:20, 97:4, 100:15, 102:5, 102:7, 103:24, 104:9, 104:13, 126:6
**copying** [1] - 15:1
**core** [1] - 53:25
**corner** [3] - 17:18, 127:20, 129:3
**CORRECT** [1] - 144:13
**correct** [95] - 5:16, 20:6, 20:25, 21:17, 21:20, 22:2, 22:7, 22:18, 22:24, 23:6, 24:4, 25:14, 25:16, 26:14, 27:23, 28:3, 28:5, 28:6, 28:19,

29:25, 30:23, 32:4, 32:16, 32:23, 38:5, 38:6, 45:17, 45:18, 51:5, 51:7, 51:9, 56:20, 56:21, 58:21, 65:6, 65:7, 73:24, 76:25, 77:7, 78:19, 86:17, 90:17, 90:22, 90:23, 90:25, 91:6, 91:21, 91:22, 91:25, 93:17, 94:12, 94:19, 95:5, 95:16, 95:24, 96:4, 96:16, 96:19, 97:6, 97:18, 97:20, 98:1, 100:17, 101:7, 101:22, 101:23, 103:3, 103:7, 103:8, 103:18, 103:21, 104:7, 105:7, 105:19, 107:6, 107:19, 108:16, 109:16, 111:1, 114:23, 117:25, 118:15, 122:3, 122:13, 122:25, 123:15, 125:16, 126:17, 128:7, 130:12, 130:18, 134:19, 134:22, 136:17, 141:21
**correction** [1] - 80:13
**correctly** [1] - 5:21
**corroborates** [1] - 135:16
**corroborating** [1] - 138:1
**corroboration** [1] - 138:15
**corroborative** [1] - 136:1
**corrupted** [1] - 54:23
**corruption** [1] - 97:3
**corrupts** [1] - 96:18
**cost** [1] - 119:1
**COUNSEL** [1] - 2:1
**counsel** [6] - 4:4, 61:9, 69:18, 100:9, 132:10, 132:21
**counsel's** [1] - 65:25
**countries** [4] - 11:15, 15:19, 15:25, 125:8
**country** [10] - 5:1, 6:24, 7:1, 9:9, 9:10, 9:12, 9:16, 11:18, 33:17, 34:3
**COUNTY** [1] - 144:3
**County** [6] - 38:23, 39:1, 39:2, 40:11, 90:15, 92:2
**couple** [6] - 16:8,

61:22, 83:11, 83:19, 131:20, 132:8
**course** [3] - 94:8, 134:4, 136:5
**court** [6] - 39:19, 63:16, 133:24, 133:25, 135:11, 141:17
**Court** [7] - 12:7, 19:22, 34:20, 88:6, 135:12, 135:14, 137:19
**COURT** [134] - 1:1, 1:23, 4:3, 13:20, 13:23, 14:2, 14:9, 17:14, 19:19, 19:23, 20:22, 21:13, 21:23, 24:2, 24:11, 24:16, 25:5, 25:7, 25:9, 25:11, 26:6, 26:9, 27:2, 27:5, 28:10, 28:13, 29:10, 29:13, 29:18, 30:21, 31:24, 32:5, 32:9, 32:12, 34:6, 34:18, 34:22, 35:1, 35:8, 35:12, 35:16, 38:3, 38:7, 38:11, 38:19, 43:20, 45:20, 55:17, 60:25, 61:8, 61:20, 62:1, 62:8, 62:23, 63:8, 63:19, 64:1, 64:25, 65:7, 65:21, 66:2, 66:5, 66:10, 66:16, 66:24, 67:2, 67:5, 67:13, 68:8, 68:25, 69:17, 81:3, 81:5, 81:7, 82:19, 82:24, 83:8, 83:12, 85:13, 86:7, 86:10, 86:14, 86:21, 87:14, 87:18, 87:21, 87:25, 88:3, 88:10, 88:14, 89:24, 90:1, 90:4, 104:24, 112:21, 113:3, 113:6, 113:18, 113:24, 114:2, 116:11, 116:21, 121:19, 121:22, 123:21, 123:24, 124:4, 126:21, 127:14, 127:17, 129:12, 130:3, 130:23, 131:1, 131:4, 131:19, 133:7, 135:9, 136:9, 137:23, 138:24, 140:2, 140:5, 140:14, 141:4, 141:22, 142:13, 142:15, 142:19,

142:25, 143:6, 143:12, 144:8, 144:21
**court's** [1] - 69:15
**Court's** [1] - 35:5
**COURTHOUSE** [1] - 2:5
**cousin** [2] - 120:2, 125:6
**cover** [1] - 59:8
**covers** [1] - 46:6
**CR** [1] - 1:9
**Craig** [3] - 38:10, 38:17, 38:18
**CRAIG** [1] - 3:7
**create** [16] - 48:21, 53:13, 58:23, 60:5, 69:23, 73:23, 75:15, 82:5, 95:8, 96:21, 97:7, 98:15, 98:17, 112:6, 112:7, 140:17
**created** [11] - 54:15, 54:20, 58:20, 58:22, 59:11, 59:12, 71:2, 74:20, 97:8, 111:2, 112:1
**creating** [2] - 82:10, 95:14
**creation** [2] - 108:21, 111:23
**credibility** [2] - 136:22, 141:9
**credit** [4] - 127:5, 127:6, 130:9, 130:19
**crime** [3] - 90:24, 91:7, 93:3
**crimes** [4] - 39:8, 91:14, 91:16, 91:19
**Cristo** [1] - 29:2
**critical** [1] - 139:7
**cross** [10] - 19:20, 34:9, 67:14, 82:20, 83:1, 90:7, 130:3, 134:23, 137:5, 139:24
**CROSS** [7] - 3:3, 20:1, 29:20, 83:15, 90:9, 105:1, 130:4
**cross-exam** [1] - 137:5
**cross-examination** [7] - 19:20, 34:9, 67:14, 82:20, 130:3, 134:23, 139:24
**CROSS-EXAMINATION** [6] - 20:1, 29:20, 83:15, 90:9, 105:1, 130:4
**cross-examine** [1] - 90:7

**cross-examined** [1] - 83:1
**Croston** [3] - 84:8, 84:13, 84:14
**CSR** [2] - 1:22, 144:20
**curriculum** [2] - 92:22, 93:5
**custodians** [1] - 35:22
**custody** [1] - 45:14
**customer** [2] - 118:14, 128:22
**Customs** [3] - 4:25, 11:16, 84:12
**customs** [1] - 12:24
**cut** [1] - 68:23

**D**

**data** [47] - 46:7, 47:19, 48:19, 49:2, 49:3, 49:9, 49:13, 49:22, 49:24, 50:7, 50:8, 50:9, 50:18, 50:20, 51:1, 51:15, 51:20, 52:19, 52:20, 53:23, 54:5, 54:21, 55:13, 56:7, 57:12, 58:14, 59:23, 70:14, 70:17, 71:10, 72:25, 73:4, 73:5, 75:16, 76:2, 78:11, 78:14, 95:13, 95:15, 95:18, 96:18, 100:6, 100:23, 101:4, 108:17
**Data** [2] - 97:14, 97:15
**database** [2] - 49:10, 115:18
**DATE** [1] - 144:17
**date** [16] - 48:15, 95:24, 95:25, 96:3, 96:4, 96:7, 96:8, 96:11, 111:22, 111:23, 111:24, 124:14, 125:10
**dated** [1] - 95:23
**dates** [1] - 96:2
**dating** [1] - 72:7
**DAVID** [1] - 2:15
**day-to-day** [1] - 6:13
**Days** [1] - 23:20
**days** [8] - 9:10, 9:13, 41:19, 115:25, 118:20, 118:22, 131:9, 132:8
**De** [1] - 29:2
**de** [6] - 25:25, 26:22, 27:19, 27:21, 29:2
**DE** [1] - 58:24
**deal** [1] - 11:15
**dealing** [1] - 139:16,

139:17
**dealt** [1] - 122:2
**debit** [1] - 129:20
**Decay** [1] - 112:7
**December** [3] - 78:10, 107:11, 128:24
**decision** [4] - 6:21, 137:25, 139:1, 141:6
**decisions** [1] - 139:4
**decrypted** [1] - 54:9
**deem** [1] - 11:20
**default** [4] - 115:1, 115:6, 115:7, 115:25
**DEFENDANT** [2] - 2:8, 2:13
**Defendant's** [2] - 24:19, 86:24
**defendants** [8] - 4:5, 61:9, 63:1, 63:22, 69:18, 139:18, 140:11, 141:15
**DEFENDANTS** [1] - 1:11
**DEFENDER** [1] - 2:9
**DEFENDERS** [1] - 2:11
**defense** [6] - 25:3, 28:7, 29:8, 34:25, 132:22, 136:23
**Defense** [1] - 26:25
**define** [1] - 42:5
**defining** [1] - 42:3
**definitive** [1] - 111:13
**degree** [6] - 66:13, 92:14, 92:15, 92:17, 92:20
**delay** [1] - 142:11
**DeLeon** [8] - 1:10, 2:13, 37:22, 62:14, 128:22, 129:5, 129:11, 135:18
**DeLeon's** [2] - 130:11, 130:14
**delete** [2] - 103:2, 115:24
**deleted** [5] - 49:13, 102:9, 102:10, 102:15, 103:16
**dental** [3] - 9:20, 22:7, 22:9
**deny** [1] - 134:16
**Department** [6] - 38:24, 39:1, 40:22, 93:2, 94:9, 116:25
**department** [4] - 39:14, 40:2, 90:20, 92:12
**Departments** [1] - 39:3
**departure** [4] - 125:10,

125:23, 126:10
**depict** [7] - 16:5, 16:12, 16:16, 17:5, 121:2, 121:3, 121:14
**depicted** [2] - 13:2, 140:1
**depicting** [5] - 135:2, 139:21, 139:22, 140:10, 141:14
**depiction** [3] - 135:6, 136:16, 137:11
**depictions** [2] - 134:22, 135:16
**depicts** [1] - 16:6
**DEPUTY** [1] - 2:11
**deputy** [6] - 90:19, 92:3, 92:9, 92:13, 93:18
**Deputy** [3] - 92:5, 92:7, 92:8
**Derivative** [5] - 58:24, 59:17, 60:12, 60:16, 60:21
**derivative** [6] - 69:22, 70:1, 80:11, 80:17, 80:23, 82:6
**describe** [12] - 8:2, 39:5, 39:11, 39:23, 40:18, 50:13, 57:11, 78:7, 117:16, 119:3, 119:19, 136:4
**described** [2] - 49:18, 79:23
**description** [3] - 136:6, 138:16, 140:16
**designed** [8] - 49:1, 71:4, 71:5, 71:7, 71:23, 75:20, 94:21, 97:5
**desk** [1] - 106:24
**despite** [1] - 102:2
**destination** [5] - 54:14, 55:23, 56:13, 126:10, 126:13
**details** [1] - 61:16
**detained** [2] - 6:3, 7:4
**detection** [1] - 43:8
**detective** [1] - 92:3
**detector** [1] - 43:11
**detention** [2] - 32:3, 33:20
**determination** [8] - 11:24, 19:14, 52:12, 56:11, 74:14, 77:24, 99:25, 100:22
**determine** [8] - 8:25, 9:2, 9:5, 51:1, 59:17, 60:15, 77:2, 128:20

**determined** [5] - 19:10, 30:6, 31:8, 46:11, 51:17
**device** [10] - 49:1, 54:14, 75:14, 78:12, 100:10, 106:10, 110:17, 111:8, 111:24, 112:2
**devices** [5] - 103:20, 107:18, 107:22, 111:3, 113:14
**DeWitt** [39] - 2:3, 3:5, 4:6, 4:8, 13:18, 13:25, 14:5, 14:12, 17:15, 19:17, 20:20, 21:11, 21:22, 24:1, 25:6, 26:7, 27:3, 28:11, 29:11, 30:20, 31:21, 32:8, 34:6, 34:8, 34:17, 61:13, 64:1, 64:2, 67:4, 67:20, 82:22, 83:10, 85:11, 87:13, 87:17, 88:2, 88:8, 90:1, 90:2
**DeWitt's** [1] - 32:14
**died** [1] - 133:23
**difference** [2] - 101:7, 140:20
**different** [21] - 41:7, 55:10, 55:13, 72:5, 73:16, 76:17, 96:3, 96:7, 98:9, 98:17, 99:21, 101:19, 106:23, 112:9, 112:10, 114:17, 117:12, 117:21, 118:1, 118:3, 138:12
**differentiated** [1] - 111:8
**difficult** [1] - 136:19
**Digest** [1] - 55:12
**digital** [54] - 39:14, 40:2, 40:3, 41:1, 41:2, 41:6, 41:7, 41:9, 41:10, 41:18, 41:19, 43:6, 43:13, 43:16, 44:1, 44:9, 44:12, 44:17, 44:23, 44:25, 45:11, 45:16, 46:8, 46:19, 48:22, 50:18, 50:24, 54:13, 55:6, 59:5, 59:13, 59:18, 60:11, 60:16, 69:22, 70:8, 71:11, 71:14, 72:15, 72:18, 73:6, 73:22, 74:21, 75:7, 75:16, 76:9, 76:22, 77:16, 78:5, 82:10, 98:1, 100:10,

114:10, 114:13
**direct** [18] - 13:1, 15:11, 15:17, 17:23, 18:8, 18:19, 21:13, 26:16, 29:24, 32:8, 83:20, 85:6, 85:14, 124:8, 124:20, 125:21, 134:6, 142:20
**DIRECT** [4] - 3:3, 4:7, 38:20, 116:22
**directed** [5] - 56:2, 70:15, 135:18, 135:22, 136:7
**directing** [4] - 18:14, 19:1, 128:12, 129:14
**direction** [2] - 108:6, 108:13
**directly** [4] - 69:11, 92:11, 122:12, 135:16
**directories** [3] - 52:25, 53:4, 53:6
**directory** [5] - 52:2, 53:18, 53:25, 74:5, 98:18
**discovery** [2] - 63:10, 63:17
**discretion** [1] - 141:18
**discuss** [2] - 61:2, 131:10
**discussed** [4] - 23:5, 53:21, 75:10, 82:3
**discusses** [1] - 28:2
**discussion** [1] - 30:25
**disk** [23] - 58:14, 58:19, 58:22, 58:23, 59:10, 59:11, 59:12, 59:13, 74:20, 75:6, 76:11, 80:8, 80:12, 80:23, 82:5, 82:8, 82:10, 107:21, 108:9, 111:12, 112:4, 112:5
**display** [1] - 25:12
**displayed** [1] - 143:3
**disputed** [2] - 139:10, 141:12
**dissimilar** [1] - 98:12
**distinction** [1] - 140:14
**distinctive** [1] - 139:11
**distinctly** [1] - 7:24
**distinguishable** [1] - 139:7
**DISTRICT** [5] - 1:1, 1:2, 1:4, 144:8
**DIVISION** [1] - 1:2
**DO** [2] - 144:9, 144:12

**document** [13] - 16:14, 16:23, 27:14, 35:13, 41:14, 53:3, 87:1, 87:16, 87:23, 88:5, 88:10, 88:16, 128:18
**documentation** [1] - 34:1
**documents** [31] - 6:16, 7:11, 12:10, 12:13, 12:14, 12:16, 15:11, 15:13, 15:16, 15:24, 19:13, 32:6, 33:13, 35:10, 51:24, 57:25, 64:18, 74:11, 76:11, 102:6, 103:5, 103:6, 103:9, 103:10, 103:15, 103:16, 123:5, 123:12, 125:19, 140:7
**Dodger** [1] - 136:1
**dog** [2] - 107:2, 107:3
**dogs** [1] - 107:4
**DOJ** [1] - 93:2
**done** [12] - 9:20, 22:9, 39:8, 48:12, 56:25, 58:8, 94:11, 104:17, 106:21, 111:13, 118:5, 123:4
**Dot** [1] - 37:15
**down** [11] - 8:14, 34:18, 39:18, 39:19, 52:21, 63:4, 70:20, 90:5, 99:24, 116:11, 131:5
**download** [3] - 106:3, 109:21, 109:24
**downloaded** [8] - 22:18, 106:8, 106:9, 106:25, 110:21, 115:4, 115:16, 115:20
**downloading** [1] - 105:17
**downloads** [1] - 106:23
**draw** [4] - 17:17, 140:18, 140:21, 143:2
**drawing** [1] - 43:14
**drew** [7] - 62:5, 65:25, 66:15, 67:17, 68:6, 68:16, 84:22
**drive** [84] - 41:13, 41:16, 47:1, 47:2, 47:14, 47:18, 47:19, 47:22, 47:24, 48:2, 48:8, 48:10, 48:11, 48:19, 48:24, 49:2,

49:5, 49:10, 49:19, 49:22, 49:23, 49:25, 50:1, 50:10, 50:20, 50:21, 52:20, 56:14, 56:16, 58:5, 71:6, 71:9, 72:22, 72:24, 73:1, 73:5, 73:8, 73:12, 74:6, 74:11, 76:12, 95:14, 95:21, 98:1, 98:2, 98:5, 98:7, 98:10, 99:10, 99:13, 99:21, 100:6, 100:10, 100:16, 100:18, 100:21, 100:22, 100:23, 101:1, 101:9, 101:10, 101:15, 101:16, 101:17, 101:18, 102:6, 102:7, 102:8, 102:12, 102:14, 103:23, 103:24, 104:1, 104:2, 104:3, 104:15, 105:7, 105:11, 105:22, 106:13
**driver's** [3] - 13:3, 13:9, 14:14
**drives** [10] - 39:16, 50:8, 71:5, 95:9, 95:11, 98:9, 101:3, 101:4, 101:12, 101:15
**drugs** [8] - 7:11, 32:18, 32:25, 33:3, 33:6, 33:8, 33:9, 33:11
**Dubai** [1] - 126:15
**dumped** [1] - 108:9
**duplicate** [3] - 50:13, 51:12, 51:21
**duration** [1] - 46:18
**during** [9] - 29:24, 32:8, 50:19, 85:6, 89:8, 92:1, 134:8, 137:15, 139:6
**duties** [1] - 90:21
**DVD** [7] - 58:13, 58:19, 58:23, 59:9, 71:15, 73:13, 75:4
**DVDs** [3] - 39:16, 40:5, 71:5

---

# E

**E-d-w-a-r-d-s** [1] - 116:20
**E-n-c-a-s-e** [1] - 94:16
**ease** [2] - 35:14, 42:2
**easily** [1] - 58:1

**EASTERN** [1] - 1:2
**eat** [1] - 10:3
**economic** [3] - 91:14, 91:16, 91:19
**economics** [2] - 90:24, 91:7
**ED** [1] - 1:9
**EDWARDS** [1] - 3:10
**Edwards** [9] - 116:14, 116:19, 116:24, 123:5, 124:6, 126:23, 126:24, 128:12, 130:6
**effect** [1] - 136:13
**efficient** [1] - 24:10
**eight** [2] - 42:21, 78:17
**either** [9] - 41:10, 48:25, 55:1, 62:9, 88:22, 93:8, 109:6, 110:24, 112:18
**electronic** [2] - 58:10, 58:12
**ELIAS** [4] - 1:22, 144:7, 144:19, 144:20
**EMachine** [2] - 81:21, 82:6
**EMachines** [1] - 81:17
**email** [9] - 21:9, 37:5, 37:8, 37:13, 37:18, 95:23, 96:6, 96:11, 108:11
**emailing** [1] - 63:1
**emails** [2] - 36:17, 103:10
**embedded** [1] - 59:9
**employ** [1] - 54:25
**employed** [3] - 9:21, 39:2, 116:24
**employee** [1] - 94:10
**emptied** [1] - 116:2
**Encase** [5] - 94:14, 94:16, 94:17, 94:20, 95:8
**encompassing** [1] - 70:17
**encounter** [1] - 119:16
**encountered** [2] - 119:22, 121:11
**encrypted** [3] - 54:4, 102:23, 102:25
**encryption** [1] - 54:5
**end** [9] - 6:20, 35:1, 57:8, 59:2, 132:23, 134:9, 137:15, 137:20, 143:13
**ended** [1] - 136:6
**enemy** [1] - 17:22
**enforcement** [16] -

4:22, 6:14, 44:17, 45:10, 56:20, 56:22, 56:24, 58:18, 70:7, 71:19, 73:8, 74:18, 93:6, 93:9, 93:19, 97:17
**engaged** [1] - 67:17
**engineer** [1] - 94:11
**engineering** [1] - 92:18
**entail** [1] - 31:11
**enter** [1] - 31:6
**entered** [4] - 6:15, 19:8, 31:13, 139:11
**entering** [2] - 30:15, 31:5
**enterprise** [1] - 97:19
**enters** [1] - 8:12
**entire** [4] - 70:6, 70:8, 74:25, 99:17
**entrance** [2] - 5:8, 5:9
**entrapment** [5] - 62:18, 62:22, 63:15, 64:12, 68:21
**entry** [3] - 4:23, 129:7, 129:15
**EO-1** [1] - 96:22
**equipment** [1] - 71:1
**erase** [1] - 110:24
**eraser** [1] - 50:11
**error** [1] - 141:18
**Escuelas** [1] - 26:22
**ESQ** [1] - 2:15
**essentially** [23] - 6:17, 50:7, 50:24, 52:4, 54:19, 54:21, 54:22, 55:25, 57:1, 57:15, 57:19, 73:17, 74:5, 74:7, 75:24, 76:20, 96:23, 99:22, 106:5, 108:6, 108:8, 115:18, 116:2
**establish** [1] - 18:6
**established** [4] - 64:23, 68:3, 84:2, 139:13
**estimate** [1] - 142:4
**et** [3] - 39:16, 40:5, 108:11
**event** [1] - 17:24
**events** [2] - 134:8, 139:25
**eventually** [1] - 7:1
**evidence** [58] - 25:4, 26:5, 27:1, 28:8, 29:8, 38:1, 38:2, 44:24, 45:1, 46:1, 46:2, 46:13, 46:14, 46:16, 46:17, 59:5, 59:14, 61:4, 62:16,

63:6, 63:8, 63:11, 63:16, 64:10, 69:23, 70:2, 75:8, 78:7, 79:11, 79:12, 80:3, 80:11, 80:17, 80:23, 81:2, 81:12, 82:6, 82:11, 88:11, 117:19, 119:24, 121:18, 123:20, 133:17, 134:2, 134:6, 134:11, 135:13, 135:14, 136:1, 138:1, 140:18, 141:9, 141:17, 141:20
**Evidence** [6] - 58:24, 59:18, 60:12, 60:16, 60:21, 133:9
**evident** [1] - 135:23
**evidentiary** [1] - 63:21
**exact** [7] - 50:15, 50:17, 55:13, 100:23, 102:7, 135:22, 136:7
**exactly** [9] - 31:12, 33:22, 49:5, 63:19, 67:23, 84:6, 100:3, 136:6, 136:9
**exam** [2] - 32:8, 137:5
**examination** [24] - 19:20, 21:14, 34:9, 46:9, 46:18, 47:8, 52:18, 55:1, 56:1, 56:2, 67:14, 69:24, 71:6, 72:20, 78:4, 79:22, 80:9, 81:24, 82:2, 82:20, 102:1, 130:3, 134:23, 139:24
**EXAMINATION** [11] - 4:7, 20:1, 29:20, 34:7, 38:20, 83:15, 90:9, 105:1, 114:3, 116:22, 130:4
**examinations** [5] - 78:9, 80:18, 90:22, 91:21, 91:23
**examine** [3] - 43:25, 79:3, 90:7
**examined** [9] - 41:3, 44:24, 65:5, 65:12, 70:8, 70:12, 83:1, 114:8, 114:10
**examiner** [22] - 40:16, 40:19, 40:21, 41:3, 44:20, 44:21, 45:8, 45:24, 45:25, 46:14, 46:15, 46:21, 46:24, 56:1, 56:2, 56:24, 57:2, 57:5, 58:8,

59:20, 59:21, 94:17
**examiner's** [1] - 54:22
**examiners** [4] - 45:5, 71:22, 93:4, 93:7
**examining** [3] - 46:7, 46:8, 77:4
**example** [15] - 31:13, 41:22, 47:6, 48:23, 49:5, 52:6, 59:21, 66:18, 72:22, 73:5, 74:6, 95:23, 101:16, 102:8, 103:22
**examples** [3] - 16:8, 40:4, 41:6
**Excel** [1] - 51:24
**except** [2] - 55:7, 62:23
**exception** [3] - 54:3, 69:5, 69:7
**exclude** [1] - 141:21
**excuse** [5] - 11:14, 31:20, 51:4, 51:14, 142:1
**excused** [2] - 90:5, 131:5
**executed** [1] - 124:13
**exhaustive** [1] - 71:6
**Exhibit** [55] - 12:11, 13:19, 14:11, 15:12, 16:10, 24:19, 25:4, 25:10, 25:18, 26:5, 26:10, 26:16, 27:1, 27:7, 27:13, 28:8, 28:14, 28:21, 29:8, 29:15, 36:2, 36:4, 36:5, 36:9, 36:10, 36:13, 36:16, 36:19, 36:21, 36:23, 37:1, 37:7, 37:10, 37:12, 37:14, 37:15, 37:17, 37:19, 37:22, 37:24, 78:22, 80:1, 81:9, 81:12, 120:23, 121:18, 121:24, 123:3, 123:20, 126:23, 127:9, 127:13, 127:18, 128:13
**exhibit** [17] - 12:20, 13:13, 14:4, 16:3, 17:4, 18:9, 18:20, 19:21, 24:9, 35:6, 35:14, 35:24, 35:25, 36:8, 86:5, 128:6
**Exhibits** [3] - 36:6, 37:4, 124:1
**EXHIBITS** [2] - 3:12
**exhibits** [11] - 35:19, 37:25, 120:22, 131:24, 132:2,

132:10, 132:12, 132:15, 132:24, 133:1, 133:4
**existed** [2] - 63:24, 138:12
**existence** [1] - 66:21
**expand** [1] - 42:24
**expedite** [1] - 118:19
**expedited** [6] - 118:4, 118:9, 118:12, 118:20, 118:21, 119:1
**expense** [2] - 131:23, 131:25
**experience** [5] - 40:18, 41:18, 92:6, 117:16, 125:25
**explain** [6] - 10:7, 31:4, 34:12, 41:5, 41:25, 46:3
**explained** [1] - 140:8
**explanation** [1] - 65:17
**explore** [3] - 41:5, 61:25, 63:23
**Explorer** [5] - 105:13, 106:20, 109:24, 110:2, 110:18
**export** [1] - 77:23
**exported** [1] - 75:3
**extent** [6] - 37:25, 65:2, 65:9, 67:20, 69:1, 134:4
**external** [4] - 134:1, 134:11, 135:14, 138:1
**extract** [8] - 71:13, 73:24, 74:3, 75:20, 76:3, 76:6, 78:11, 109:8
**extracted** [7] - 107:18, 107:22, 108:1, 108:13, 109:1, 109:12, 109:13
**extraction** [3] - 77:6, 108:21, 110:8
**extracts** [1] - 106:14
**extraordinary** [1] - 56:17
**eyeballing** [1] - 104:10

**F**

**F3d** [1] - 133:13
**Facebook** [2] - 36:6, 36:20
**facilities** [1] - 118:6
**facing** [1] - 136:20
**fact** [17] - 11:25, 12:21, 34:1, 59:22,

64:9, 64:17, 67:22, 68:7, 68:21, 75:22, 76:11, 96:2, 109:12, 114:17, 139:14, 140:13
**factor** [1] - 135:25
**factors** [2] - 70:11, 70:18
**facts** [1] - 68:2
**fail** [2] - 54:25, 97:5
**failed** [2] - 32:20, 32:21
**fair** [4] - 7:6, 53:10, 93:10, 140:9
**fairly** [1] - 52:9
**fake** [1] - 33:13
**fall** [1] - 69:7
**false** [1] - 6:16
**familiar** [5] - 70:5, 70:22, 72:3, 97:23, 121:5
**fancy** [3] - 41:9, 50:22, 104:8
**far** [6] - 55:7, 55:8, 65:19, 105:25, 108:23, 114:16
**Fargo** [1] - 37:21
**fashion** [1] - 131:14
**faster** [1] - 35:15
**fastest** [1] - 118:23
**favorite** [2] - 119:10, 119:12
**FBI** [6] - 20:19, 37:23, 64:6, 68:6, 71:2, 71:3
**FBI's** [1] - 64:11
**FEDERAL** [4] - 1:23, 2:9, 2:11, 144:21
**Federal** [1] - 133:9
**federal** [3] - 117:6, 118:8, 118:18
**feen13@gmail.com** [1] - 37:19
**felt** [2] - 7:13, 30:10
**few** [5] - 43:1, 70:19, 113:19, 120:22, 132:3
**file** [66] - 40:25, 41:15, 43:3, 51:10, 53:11, 53:13, 53:17, 53:24, 53:25, 54:1, 54:4, 54:6, 54:9, 54:20, 54:23, 55:4, 56:16, 57:9, 57:13, 57:19, 57:21, 57:23, 60:5, 60:7, 60:8, 60:22, 75:8, 95:21, 96:22, 98:20, 99:17, 99:24, 100:11, 100:15, 101:6, 101:7,

102:13, 102:15, 102:25, 104:5, 104:9, 104:11, 104:12, 104:14, 106:21, 107:1, 108:5, 108:21, 109:17, 110:20, 111:11, 112:1, 112:13, 113:13, 114:13, 116:6
**file-by-file** [3] - 100:11, 101:6, 104:5
**filed** [1] - 109:9
**files** [91] - 43:4, 49:10, 49:12, 51:22, 51:23, 51:24, 52:25, 53:4, 53:6, 54:9, 55:2, 55:9, 55:12, 56:11, 57:2, 57:4, 57:6, 59:24, 59:25, 60:18, 69:25, 70:2, 71:13, 71:15, 73:24, 74:8, 74:9, 74:10, 74:11, 74:12, 74:13, 74:25, 75:2, 75:6, 76:15, 76:19, 77:21, 77:23, 77:24, 77:25, 98:10, 98:22, 98:23, 98:24, 99:13, 99:21, 99:22, 99:25, 100:19, 100:20, 100:20, 101:5, 101:13, 101:17, 102:9, 102:10, 103:20, 103:24, 103:25, 104:2, 104:3, 105:14, 107:7, 107:8, 108:2, 108:3, 108:13, 108:14, 108:18, 109:9, 109:12, 109:13, 110:1, 110:9, 110:17, 111:3, 111:16, 111:17, 112:23, 114:17, 115:15, 115:16, 115:20
**fill** [1] - 44:5
**final** [2] - 6:10, 57:16, 126:13
**finally** [1] - 37:23
**financial** [1] - 17:22
**fine** [10] - 29:23, 35:13, 35:16, 35:17, 61:20, 82:22, 86:10, 86:14, 87:15, 131:24
**fingerprint** [8] - 50:24, 55:6, 60:11, 69:22, 75:7, 77:16, 98:1, 114:13
**fingerprinted** [1] -

8:15
**finished** [1] - 87:6
**firearms** [1] - 136:2
**fired** [1] - 135:4
**Firing** [1] - 36:1
**firing** [11] - 134:14, 135:22, 135:24, 136:5, 136:19, 138:21, 138:22, 139:18, 139:22, 140:11
**first** [39] - 8:3, 8:10, 8:17, 11:18, 15:12, 15:17, 30:5, 36:1, 38:18, 40:21, 44:2, 44:16, 44:18, 44:22, 47:6, 47:9, 47:10, 54:23, 58:6, 66:10, 68:6, 68:17, 78:10, 79:9, 83:9, 85:20, 86:12, 89:10, 89:17, 91:23, 120:23, 127:20, 127:24, 131:21, 134:7, 134:21, 136:20, 137:5, 138:25
**fit** [4] - 42:8, 42:21, 42:25, 43:16
**Fitness** [1] - 36:10
**five** [9] - 21:18, 34:10, 65:11, 66:6, 67:11, 68:11, 86:25, 88:5, 91:3
**five-page** [2] - 86:25, 88:5
**flash** [1] - 41:13
**flipping** [1] - 128:21
**flustered** [2] - 67:10, 67:11
**flying** [1] - 5:8
**focus** [4] - 62:21, 87:22, 124:16, 124:21
**focusing** [1] - 118:7
**folder** [13] - 53:18, 105:13, 106:24, 107:3, 110:1, 110:5, 110:17, 110:21, 111:15, 131:25, 132:3
**folders** [3] - 79:1, 106:21, 116:6
**follow** [8] - 19:13, 39:8, 67:25, 69:11, 83:11, 83:13, 83:19, 99:11
**follow-up** [5] - 19:13, 67:25, 69:11, 83:13, 83:19

**follow-ups** [1] - 83:11
**following** [7] - 34:15, 35:19, 35:23, 35:24, 36:6, 37:3, 37:8
**FOR** [3] - 3:2, 144:7, 144:8
**force** [2] - 40:14, 40:22
**FOREGOING** [1] - 144:10
**foremost** [1] - 58:6
**Forensic** [1] - 97:13
**forensic** [41] - 39:12, 40:15, 40:19, 40:21, 41:3, 43:25, 44:20, 44:21, 45:5, 47:8, 48:21, 49:1, 50:16, 51:15, 51:21, 52:1, 56:10, 57:17, 57:18, 58:4, 58:6, 69:24, 71:3, 72:20, 78:4, 79:22, 81:23, 82:1, 90:22, 91:20, 91:24, 93:4, 93:7, 95:14, 96:18, 96:22, 97:4, 97:8, 97:11, 100:15, 107:11
**forensically** [4] - 71:10, 74:20, 75:16, 75:25
**forensics** [9] - 39:10, 39:13, 39:25, 40:25, 93:13, 94:3, 94:7, 95:6
**Forensics** [1] - 40:11
**forgot** [1] - 11:13
**form** [6] - 44:4, 44:6, 44:13, 46:6, 61:5, 134:6
**FORM** [1] - 144:12
**formal** [3] - 40:6, 40:9, 40:13
**formalized** [1] - 40:23
**formally** [1] - 38:1
**forth** [1] - 140:17
**FORTH** [1] - 144:11
**forward** [1] - 83:4
**foundation** [10] - 24:1, 30:20, 31:21, 87:24, 87:25, 88:1, 132:13, 134:1, 136:12, 138:8
**four** [1] - 74:11
**fourth** [1] - 36:6
**fraction** [1] - 106:4
**fragments** [1] - 103:6
**frankly** [1] - 137:16
**fraud** [3] - 91:4, 91:8, 91:20
**FRIDAY** [2] - 1:16, 4:1
**front** [15] - 12:7,

23:18, 24:13, 32:9, 72:10, 78:23, 82:8, 82:9, 106:5, 106:7, 106:9, 120:22, 128:13, 128:16, 129:17
**FTK** [3] - 97:12, 97:23, 112:8
**fulfill** [2] - 45:3, 45:8
**full** [2] - 38:15, 116:18
**Fullerton** [4] - 94:3, 94:6, 94:25, 95:2
**function** [6] - 52:15, 53:20, 53:24, 54:12, 97:9, 98:15
**functions** [1] - 54:20
**FURTHER** [1] - 144:13
**future** [1] - 69:6

## G

**G-o-l-d-s-m-i-t-h** [1] - 38:18
**game** [3] - 53:10, 72:10, 140:25
**Garcia** [2] - 142:1, 142:2
**generally** [3] - 40:18, 92:7, 119:3
**generate** [1] - 58:9
**generated** [3] - 51:9, 55:5, 75:1
**generates** [1] - 50:23
**gentlemen** [4] - 61:1, 82:24, 121:9, 131:6
**gigabyte** [4] - 41:25, 42:11, 42:12, 73:8
**gigabytes** [8] - 41:23, 42:15, 42:18, 42:20, 42:22, 78:14, 78:17
**given** [14] - 4:11, 4:12, 21:5, 21:16, 52:20, 53:11, 67:21, 69:24, 83:6, 123:10, 124:25, 127:5, 136:11
**global** [1] - 70:16
**Glorioso** [1] - 29:3
**glorious** [1] - 17:24
**goal** [1] - 49:16
**gobbledegook** [1] - 54:8
**Gojali** [5] - 124:19, 142:5, 142:8, 142:9, 142:11, 142:18
**Goldsmith** [13] - 38:10, 38:17, 52:7, 52:9, 52:10, 52:13, 69:21, 99:20, 99:23, 105:3, 114:5, 114:21

**GOLDSMITH** [1] - 3:7
**goldsmith** [2] - 90:11, 113:25
**gonna** [22] - 24:7, 42:14, 57:8, 59:1, 59:3, 63:15, 63:16, 64:6, 65:3, 70:20, 78:21, 81:11, 83:2, 83:3, 87:20, 87:21, 87:22, 124:8, 124:20, 125:4, 125:5, 125:21
**Google** [9] - 36:17, 37:13, 37:18, 109:15, 109:21, 110:6, 110:18, 110:24, 131:13
**Google.com** [1] - 115:21
**government** [18] - 13:19, 25:12, 38:1, 61:24, 62:11, 62:19, 81:1, 86:12, 121:17, 123:19, 127:12, 132:21, 136:11, 137:17, 141:24, 142:4, 142:10, 143:3
**GOVERNMENT** [1] - 3:2
**government's** [3] - 34:19, 137:17, 137:20
**Government's** [11] - 12:11, 13:19, 15:12, 16:10, 78:22, 80:1, 81:2, 81:11, 123:3, 127:9, 128:12
**graduate** [1] - 92:15
**grand** [3] - 27:22, 27:24, 28:1
**Grande** [1] - 24:8
**grandes** [1] - 27:19
**grandfather** [3] - 120:1, 120:3, 125:5
**grandmother** [4] - 10:19, 20:8, 22:4, 22:6
**grant** [3] - 10:5, 134:20, 136:21
**granted** [2] - 10:22, 135:8
**gray** [1] - 122:10
**great** [1] - 78:1
**greater** [1] - 142:4
**greatest** [1] - 17:20
**Green** [1] - 37:15
**GRIGG** [6] - 2:4, 135:10, 137:24, 142:9, 142:14, 142:21

**grigg** [2] - 135:9, 137:23
**grigg's** [1] - 142:17
**ground** [1] - 66:4
**group** [1] - 54:9
**groups** [1] - 132:22
**guess** [3] - 42:20, 43:12, 62:11
**Guidance** [2] - 94:15, 94:21
**Gun** [1] - 36:25
**guns** [2] - 135:4, 139:23
**guy** [6] - 121:13, 126:25, 127:7, 140:24, 141:1

## H

**half** [2] - 91:13, 91:15
**halt** [1] - 66:4
**hand** [5] - 38:12, 56:13, 116:15, 127:20, 129:3
**handgun** [1] - 135:24
**handing** [1] - 86:23
**hands** [1] - 57:1
**handwriting** [2] - 125:13
**HANNA** [1] - 2:14
**harbor** [1] - 139:9
**hard** [44] - 41:13, 47:1, 47:2, 47:14, 47:18, 47:19, 47:22, 47:24, 48:2, 48:8, 48:10, 48:11, 48:19, 48:24, 49:2, 49:4, 49:9, 49:19, 49:22, 49:23, 49:25, 50:1, 50:8, 50:10, 50:20, 50:21, 52:20, 56:14, 56:16, 58:5, 71:6, 99:21, 102:5, 102:7, 102:8, 102:13, 102:14, 105:7, 105:11, 105:22, 106:13, 126:9, 142:11
**hardware** [1] - 49:20
**harmful** [1] - 33:10
**hash** [30] - 50:23, 51:1, 51:4, 55:3, 55:4, 55:6, 55:10, 55:11, 55:13, 60:12, 60:18, 60:20, 74:24, 75:2, 97:25, 98:5, 98:9, 100:21, 101:1, 101:3, 101:8, 101:16, 101:19, 104:2, 104:3, 108:21, 114:13,

114:14, 114:16
**hashed** [1] - 74:25
**hashes** [4] - 55:10, 100:24, 100:25, 103:25
**hashing** [1] - 50:19
**hats** [1] - 136:1
**head** [3] - 54:4, 55:17, 78:13
**headed** [1] - 45:6
**headway** [2] - 142:6, 142:7
**hear** [1] - 94:4
**heard** [2] - 63:18, 137:2
**hearsay** [7] - 21:22, 66:10, 66:12, 69:5, 69:7, 88:9, 88:11
**heart** [1] - 72:21
**heavy** [1] - 81:13
**hello** [1] - 90:12
**help** [1] - 131:22
**helped** [1] - 126:25
**helpful** [1] - 132:4
**Heng** [1] - 28:3
**HEREBY** [1] - 144:9
**HEREINBEFORE** [1] - 144:10
**hi** [1] - 93:3
**hi-tech** [1] - 93:3
**hiccup** [1] - 51:3
**hidden** [1] - 53:24
**hide** [1] - 53:3
**highlight** [2] - 57:19, 99:22
**highly** [1] - 116:8
**himself** [2] - 22:13, 140:1
**Hispanic** [4] - 119:21, 121:13, 126:25, 127:7
**Historia** [1] - 25:25
**history** [9] - 17:21, 26:2, 103:12, 114:22, 115:9, 115:18, 115:23, 116:4, 116:7
**hit** [1] - 105:9
**hits** [1] - 105:11
**hold** [4] - 78:14, 78:18, 137:19, 137:25
**holder** [1] - 57:24
**holding** [3] - 16:25, 50:3, 133:25
**holds** [2] - 133:15, 134:5
**homework** [2] - 53:13
**Homework** [1] - 53:18
**Honor** [109] - 4:6,

13:18, 13:21, 14:1, 14:6, 14:8, 19:18, 21:11, 21:15, 24:1, 25:3, 25:6, 25:8, 26:4, 26:25, 28:7, 28:11, 28:12, 29:7, 29:16, 29:19, 32:7, 34:17, 34:20, 35:4, 35:11, 35:18, 35:24, 37:20, 37:25, 38:5, 38:8, 43:19, 55:18, 55:21, 60:23, 61:14, 63:13, 64:2, 65:6, 65:15, 67:20, 68:4, 68:13, 69:20, 81:1, 81:6, 82:17, 82:23, 83:14, 85:11, 85:16, 86:6, 86:9, 86:11, 86:18, 86:20, 87:13, 87:15, 87:17, 88:2, 88:8, 89:23, 89:25, 90:2, 90:3, 90:8, 104:25, 112:19, 113:1, 113:19, 116:10, 116:13, 121:17, 121:20, 123:19, 123:22, 123:23, 124:2, 124:5, 126:19, 127:12, 127:15, 127:16, 127:19, 129:9, 129:10, 130:2, 131:2, 131:3, 134:18, 134:19, 135:7, 135:10, 135:11, 137:3, 137:24, 138:25, 139:1, 139:2, 141:19, 141:24, 142:3, 142:21, 143:1, 143:8, 143:15, 143:16, 143:17
**Honor's** [2] - 62:21, 141:20
**HONORABLE** [1] - 1:4
**hopefully** [1] - 98:22
**horse** [1] - 101:24
**Hour** [1] - 36:10
**hour** [1] - 132:9
**hours** [7] - 40:24, 70:19, 92:23, 92:24, 93:15, 140:25
**house** [1] - 45:1
**housed** [1] - 72:9
**Hughes** [2] - 23:17, 23:20
**human** [1] - 17:22
**hundred** [1] - 43:4
**hundreds** [2] - 43:1,

53:1

# I

**IA** [1] - 91:15
**ID** [2] - 117:19, 119:24
**ideally** [1] - 51:1
**identical** [5] - 76:21, 101:3, 101:4, 101:5, 101:17
**identifiable** [1] - 138:17
**identification** [5] - 15:2, 18:5, 51:6, 80:1, 86:24
**identified** [5] - 56:8, 75:6, 100:1, 122:15, 127:4
**identifier** [2] - 59:7, 60:2
**identify** [2] - 59:4, 122:5
**identifying** [2] - 44:6, 98:1
**identity** [1] - 140:22
**IDs** [2] - 135:1, 135:2
**II** [2] - 92:7, 92:9
**IIs** [1] - 92:8
**ill** [1] - 120:4
**illegal** [4] - 6:3, 33:11, 33:13, 33:15
**illegally** [1] - 6:15
**illustrate** [1] - 99:23
**image** [28] - 17:16, 48:22, 50:16, 51:9, 51:15, 54:20, 54:23, 55:3, 56:16, 58:4, 58:6, 96:19, 96:22, 96:25, 97:8, 100:16, 105:17, 109:13, 110:9, 111:11, 111:16, 111:17, 111:20, 112:3, 112:13, 112:23, 113:13, 115:11
**images** [15] - 18:1, 18:3, 42:25, 95:8, 105:20, 106:12, 106:14, 106:15, 106:16, 107:18, 107:22, 109:16, 111:2, 111:16, 114:24
**imagine** [1] - 140:23
**impeach** [1] - 87:20
**impeached** [1] - 67:7
**impeachment** [1] - 88:2
**important** [4] - 68:7, 68:15, 68:21, 140:14

**impossible** [1] - 96:20
**imprinted** [1] - 59:8
**improper** [2] - 87:13, 88:2
**imputed** [2] - 111:18, 111:21
**IN** [1] - 144:7
**in-house** [1] - 45:1
**inbound** [1] - 126:13
**incapped** [1] - 102:9
**incident** [1] - 17:9
**inclination** [1] - 141:20
**inclined** [2] - 134:16, 134:20
**incognito** [1] - 110:24
**inconsistency** [1] - 136:9
**incorrect** [2] - 89:19, 107:23
**independent** [4] - 73:20, 104:1, 115:16, 116:5
**INDEX** [1] - 3:1
**index** [9] - 52:5, 52:14, 53:22, 54:8, 97:9, 98:21, 99:1, 104:17
**indexing** [2] - 52:2, 53:24
**indicate** [3] - 115:12, 124:12, 125:7
**indicated** [5] - 18:24, 19:6, 34:20, 122:1, 135:13
**indicates** [1] - 125:15
**indication** [3] - 110:16, 111:25, 123:11
**indicia** [1] - 138:11
**indirect** [1] - 17:24
**individual** [25] - 8:8, 14:14, 46:14, 56:11, 60:18, 60:20, 62:12, 69:25, 71:13, 71:15, 74:25, 75:7, 99:2, 100:19, 100:20, 104:3, 108:21, 122:16, 123:6, 124:17, 124:23, 125:1, 127:4, 138:5
**individuals** [7] - 4:11, 16:25, 20:15, 62:20, 127:10, 135:24, 139:22
**infer** [1] - 138:3
**inference** [2] - 140:18, 140:22
**inferences** [1] - 107:5
**inflammatory** [1] - 139:18

**inflicting** [1] - 17:21
**inform** [1] - 74:10
**informant** [5] - 62:13, 62:20, 63:25, 133:21, 133:22
**information** [37] - 41:10, 41:13, 41:20, 41:23, 42:12, 43:17, 46:6, 48:16, 49:16, 50:12, 51:22, 52:5, 52:22, 54:1, 55:24, 56:20, 58:16, 62:19, 63:12, 63:18, 64:6, 66:23, 72:24, 74:6, 75:20, 96:24, 100:3, 101:21, 102:15, 102:18, 110:20, 112:8, 112:10, 113:10, 113:12, 125:15
**informed** [5] - 20:24, 21:2, 58:7, 83:21, 83:25
**informs** [1] - 56:24
**initial** [6] - 6:11, 54:23, 59:9, 91:11, 92:8, 111:25
**initialed** [1] - 79:11
**initials** [3] - 59:10, 80:19, 82:15
**input** [2] - 106:8, 125:15
**Input** [1] - 48:7
**inquire** [4] - 35:4, 38:19, 61:21, 116:21
**inquiry** [1] - 65:19
**inside** [8] - 8:12, 10:10, 12:14, 58:25, 73:24, 79:2, 119:3, 121:8
**inspect** [3] - 11:17, 47:13, 76:20
**inspected** [1] - 7:13
**inspecting** [1] - 47:25
**inspection** [27] - 5:18, 5:22, 5:24, 6:1, 7:10, 7:12, 8:5, 10:13, 14:15, 29:25, 30:3, 30:6, 30:9, 30:16, 30:18, 31:6, 31:7, 31:9, 31:10, 31:15, 31:16, 32:20, 32:21, 66:1, 66:15, 85:4, 104:6
**inspections** [4] - 4:23, 7:22, 31:17, 32:15
**inspector** [6] - 30:17, 32:22, 68:14, 83:23, 83:24, 84:5
**Inspire** [4] - 18:1,

18:4, 22:18, 33:21
**inspire** [1] - 33:15
**install** [1] - 54:11
**installed** [3] - 43:3, 48:17, 53:15
**installing** [1] - 54:12
**instance** [7] - 11:24, 60:4, 74:9, 98:18, 99:19, 106:19, 115:21
**instances** [2] - 52:10, 52:12
**instantaneously** [1] - 52:9
**instruction** [3] - 62:18, 63:15, 84:19
**instructions** [2] - 21:5, 63:14
**instructor** [3] - 94:2, 94:25, 95:1
**insure** [4] - 50:4, 50:17, 74:19, 96:24
**integrity** [2] - 54:19, 96:24
**intentionally** [1] - 136:13
**interaction** [1] - 115:5
**Interest** [1] - 57:22
**interest** [2] - 61:23, 98:20
**interested** [7] - 52:7, 55:3, 57:24, 66:8, 70:7, 77:22, 98:23
**interesting** [1] - 117:11
**Internal** [1] - 91:12
**internal** [3] - 91:20, 134:1, 138:1
**internally** [2] - 135:20, 135:25
**Internet** [18] - 93:21, 103:11, 103:12, 105:13, 105:14, 106:20, 107:7, 109:18, 109:24, 110:1, 110:2, 110:5, 110:17, 110:18, 110:22, 114:22, 115:9, 116:6
**internet** [1] - 106:21
**interpretation** [1] - 106:25
**interview** [8] - 8:16, 19:5, 19:13, 20:10, 20:24, 21:2, 21:4, 84:21
**interviewed** [7] - 8:17, 18:23, 20:5, 20:8, 21:19, 22:15, 64:18
**interviews** [1] - 6:7

**introduce** [2] - 63:11, 64:9
**introduced** [2] - 79:9, 133:20
**introduction** [1] - 44:2
**investigate** [1] - 39:7
**investigating** [1] - 57:14
**investigation** [5] - 30:7, 30:11, 32:23, 58:1, 78:3
**investigations** [1] - 107:12
**investigative** [2] - 39:14, 40:1
**Investigative** [1] - 56:7
**Investigator** [2] - 38:10, 105:3
**investigator** [15] - 31:1, 38:23, 38:25, 39:3, 39:6, 39:7, 69:21, 91:11, 92:1, 92:3, 92:4, 92:10, 92:13, 114:5, 114:21
**involve** [1] - 73:18
**involved** [11] - 5:16, 5:17, 6:2, 6:9, 6:11, 7:21, 8:6, 8:7, 29:25, 104:21, 134:5
**involves** [1] - 6:6
**involving** [2] - 17:12, 40:23
**IOWA** [1] - 2:15
**IP** [1] - 37:16
**IPad** [1] - 109:14
**iPad** [19] - 78:11, 80:10, 107:12, 107:16, 108:6, 108:7, 109:8, 109:15, 109:18, 109:19, 109:24, 110:2, 110:3, 110:9, 110:10, 111:7, 111:9, 111:15, 112:8
**iPod** [22] - 42:17, 42:21, 78:11, 78:14, 78:18, 79:20, 79:23, 80:9, 80:12, 107:12, 107:14, 108:1, 108:3, 108:4, 108:12, 108:14, 108:23, 108:25, 111:7, 111:9, 111:15, 112:7
**iPod/iPad** [1] - 80:18
**iPods** [1] - 42:15
**irrelevant** [3] - 63:12, 64:14, 138:8
**IS** [1] - 144:13

**Islam** [1] - 22:16
**island** [1] - 139:15
**issue** [9] - 61:10, 117:18, 131:15, 133:3, 133:9, 133:22, 139:8, 141:5, 143:1
**issues** [2] - 61:3, 61:6
**it'll** [1] - 60:7
**item** [10] - 16:9, 18:9, 74:4, 79:3, 79:5, 80:5, 80:16, 81:14, 81:23, 138:3
**items** [18] - 11:21, 11:25, 12:23, 15:1, 18:5, 19:2, 19:6, 22:23, 23:5, 57:6, 58:10, 73:13, 73:24, 74:3, 74:18, 76:11, 78:7, 141:11
**itinerary** [3] - 125:23, 126:1, 126:6
**itself** [11] - 45:2, 48:14, 56:16, 59:9, 59:24, 62:4, 72:11, 88:10, 110:14, 112:3

**J**

**jail** [1] - 92:8
**January** [8] - 4:18, 7:18, 12:18, 63:24, 95:23, 95:24, 96:8, 139:4
**jargon** [1] - 42:4
**JEFFREY** [1] - 2:9
**Jesuit** [1] - 23:23
**JFK** [1] - 5:1
**job** [2] - 67:25, 95:4
**juan.ton21** [1] - 36:13
**JUDGE** [1] - 1:4
**Judge** [2] - 109:2, 135:12
**July** [1] - 96:9
**jumbled** [1] - 111:6
**juror** [1] - 138:3
**Jury** [1] - 131:18
**jury** [23] - 4:4, 8:2, 32:10, 61:7, 61:9, 63:13, 63:18, 69:18, 95:20, 109:2, 112:14, 126:11, 126:14, 131:20, 134:21, 135:6, 139:20, 139:22, 139:24, 140:13, 140:18, 141:14, 143:2
**Justice** [2] - 93:3, 135:13

**K**

**Kabir** [2] - 22:20, 23:3
**KABIR** [2] - 1:9, 2:8
**keep** [1] - 57:25
**keeping** [1] - 46:19
**Kennedy** [2] - 135:12, 135:13
**KENNETH** [1] - 1:10
**kept** [2] - 45:11, 45:13
**key** [1] - 52:12
**keyboard** [2] - 72:10, 72:14
**kilobyte** [2] - 42:8
**kilobytes** [1] - 42:9
**kind** [11] - 5:22, 31:18, 54:4, 61:24, 62:5, 64:12, 66:4, 108:5, 117:12, 142:16
**kiosk** [36] - 70:23, 70:25, 71:1, 71:9, 71:12, 71:16, 71:18, 71:20, 71:24, 72:6, 72:8, 72:13, 72:16, 72:19, 72:21, 73:3, 73:9, 73:14, 73:18, 73:21, 73:23, 74:4, 74:5, 74:7, 74:13, 74:14, 75:2, 75:3, 75:11, 75:13, 76:14, 77:6, 77:14, 77:20, 78:2, 103:23
**kiosks** [1] - 103:20
**Kit** [1] - 97:13
**knowing** [1] - 43:18
**knowledge** [5] - 64:20, 65:2, 65:9, 110:4, 135:5
**known** [5] - 50:15, 52:2, 58:25, 70:1, 75:22
**knows** [1] - 68:9

**L**

**lab** [7] - 40:4, 45:3, 46:15, 49:23, 58:25, 59:5, 60:2
**lab's** [1] - 45:2
**labor** [1] - 106:10
**laboratory** [6] - 39:23, 40:6, 43:25, 44:1, 45:1, 46:2
**Laboratory** [1] - 40:12
**labs** [1] - 71:3
**lack** [2] - 7:11, 32:16
**ladies** [3] - 61:1, 82:24, 131:6
**laid** [3] - 119:4, 132:13, 137:21

**Lakers** [1] - 103:14
**lane** [5] - 135:19, 135:22, 135:23, 136:7, 140:24
**large** [1] - 62:21
**LARSEN** [7] - 2:10, 134:18, 138:25, 140:3, 140:9, 140:21, 141:11
**Larsen** [2] - 134:17, 136:15
**laser** [1] - 41:11
**last** [16] - 17:16, 39:9, 40:20, 52:8, 77:8, 82:21, 90:6, 111:22, 111:23, 112:1, 112:24, 113:11, 124:16, 128:23, 132:8
**latest** [1] - 109:25
**latter** [1] - 62:8
**LAURA** [4] - 1:22, 144:7, 144:19, 144:20
**law** [15] - 44:17, 45:10, 56:19, 56:22, 56:24, 58:18, 70:6, 71:19, 73:7, 74:17, 93:5, 93:9, 93:19, 97:17, 136:24
**lawyers** [1] - 131:11
**LAX** [1] - 36:1
**laying** [1] - 136:12
**layout** [2] - 136:4, 136:5
**leader** [2] - 45:6, 45:7
**leading** [3] - 43:19, 45:19, 45:21
**learn** [1] - 93:6
**learned** [1] - 55:18
**least** [5] - 53:8, 63:2, 97:12, 111:25, 132:9
**leaving** [2] - 140:4, 140:6
**lecture** [1] - 112:12
**lectures** [1] - 42:25
**left** [12] - 4:9, 4:13, 19:8, 58:6, 69:21, 122:19, 127:20, 127:21, 129:3, 135:1, 136:8
**left-hand** [2] - 127:20, 129:3
**legal** [13] - 9:2, 9:5, 9:6, 9:8, 13:10, 19:10, 19:12, 44:12, 44:13, 46:1, 46:4, 46:10, 46:11
**legally** [1] - 11:17
**length** [2] - 9:9,

141:14
**leniency** [1] - 61:19
**less** [1] - 97:5
**letter** [2] - 42:5, 127:24
**letters** [1] - 128:1
**level** [1] - 94:24
**license** [3] - 13:3, 13:9, 14:14
**likely** [3] - 96:11, 105:24, 106:22
**limited** [5] - 69:1, 69:13, 71:8, 97:22, 98:25
**line** [2] - 89:16, 141:22
**line-up** [1] - 141:22
**lines** [1] - 41:17
**lingo** [1] - 58:25
**list** [6] - 31:19, 62:6, 76:5, 132:18, 133:3, 142:23
**listened** [6] - 108:18, 108:24, 109:2, 109:5, 112:15, 112:17
**listing** [1] - 110:14
**lists** [1] - 52:4
**living** [2] - 38:22, 117:1
**loaded** [1] - 55:23
**lobby** [2] - 119:5, 121:4
**locate** [1] - 52:22
**located** [4] - 55:2, 108:22, 117:6, 138:13
**location** [4] - 4:18, 50:3, 53:11, 106:18
**locker** [1] - 46:16
**look** [55] - 12:6, 12:8, 17:23, 32:15, 33:1, 44:9, 44:12, 44:14, 45:7, 46:5, 47:10, 48:5, 48:15, 48:16, 48:19, 49:2, 49:16, 52:18, 56:20, 57:5, 58:1, 59:22, 60:6, 60:7, 60:19, 68:20, 70:17, 71:10, 78:22, 79:2, 80:1, 80:16, 86:25, 87:3, 104:1, 104:14, 109:10, 115:8, 115:14, 120:23, 120:24, 122:12, 123:2, 123:4, 125:12, 126:23, 127:9, 128:25, 129:2, 129:6, 130:14, 139:2, 139:6

**looked** [5] - 22:23, 79:10, 79:17, 113:12, 114:6
**looking** [19] - 48:18, 52:7, 56:3, 57:12, 66:8, 68:18, 70:15, 80:13, 99:21, 104:8, 108:4, 108:5, 111:17, 114:22, 116:4, 122:11, 128:5, 129:19, 134:1
**lookout** [30] - 8:6, 21:4, 30:12, 30:13, 30:19, 31:1, 31:4, 31:8, 31:11, 31:15, 31:18, 64:3, 65:17, 66:1, 66:3, 66:6, 66:7, 66:8, 66:11, 67:11, 67:22, 67:24, 68:19, 83:21, 83:25, 84:1, 84:5, 84:16, 84:22, 84:25
**looks** [11] - 16:6, 16:13, 16:19, 18:18, 46:24, 58:8, 72:9, 125:11, 127:25, 128:2, 128:19
**loose** [33] - 39:15, 70:22, 70:25, 71:1, 71:4, 71:9, 71:12, 71:18, 71:20, 71:24, 72:5, 72:7, 72:12, 72:15, 72:19, 72:21, 73:9, 73:13, 73:18, 73:20, 74:5, 74:7, 74:12, 74:14, 75:1, 75:3, 76:14, 77:5, 77:14, 77:20, 78:2, 103:19, 103:23
**LOPEZ** [1] - 3:4
**Lopez** [9] - 20:3, 29:22, 61:11, 82:25, 83:3, 83:17, 86:23, 88:5, 88:16
**Los** [7] - 23:8, 23:11, 36:25, 37:23, 117:4, 117:5, 126:16
**LOS** [4] - 1:17, 1:24, 2:6, 144:3
**los** [4] - 25:1, 27:19, 27:21
**losses** [1] - 17:22
**lost** [1] - 132:5
**Lottenberger** [1] - 21:10
**loud** [5] - 24:25, 25:24, 26:21, 27:18, 29:1
**lower** [2] - 17:18, 124:8

**luggage** [10] - 10:10, 10:14, 11:2, 11:4, 11:6, 11:18, 15:2, 19:7, 24:4, 89:3
**lunch** [3] - 4:10, 4:24, 139:6

## M

**ma'am** [111] - 4:15, 4:17, 4:20, 5:3, 5:7, 5:11, 5:19, 5:25, 6:5, 6:8, 6:19, 6:23, 6:25, 7:2, 7:5, 7:7, 7:17, 7:20, 7:23, 8:1, 8:9, 8:19, 9:4, 10:1, 10:6, 10:15, 10:17, 10:21, 10:23, 11:1, 11:3, 11:5, 11:10, 11:19, 11:23, 12:5, 12:12, 12:17, 12:19, 12:22, 12:25, 13:8, 13:11, 13:17, 14:16, 14:18, 14:21, 14:23, 15:3, 15:6, 15:9, 15:14, 16:2, 16:4, 16:11, 16:15, 16:22, 17:1, 17:3, 17:11, 18:2, 18:7, 18:11, 18:25, 19:4, 19:11, 19:16, 20:7, 20:9, 20:12, 20:16, 21:1, 21:21, 21:25, 22:3, 22:5, 22:8, 22:11, 22:14, 22:17, 22:19, 22:22, 22:25, 23:2, 23:4, 23:7, 23:13, 23:15, 23:22, 24:6, 24:14, 24:21, 24:24, 25:15, 25:17, 25:20, 25:23, 26:3, 26:13, 26:15, 26:18, 26:20, 27:11, 27:15, 27:17, 28:17, 28:23, 28:25, 29:6, 34:11, 34:16
**machine** [4] - 75:15, 81:18, 104:13, 139:23
**magazine** [4] - 18:1, 18:4, 22:18, 33:21
**magazines** [1] - 33:15
**magnetically** [1] - 41:11
**main** [1] - 62:11
**maintained** [1] - 46:17
**man** [3] - 119:20, 122:2, 122:6
**manila** [2] - 131:25, 132:3
**mankind** [1] - 17:21

**manner** [2] - 41:12, 71:10
**manufactured** [1] - 97:13
**map** [1] - 74:8
**mark** [2] - 57:15, 87:15
**marked** [6] - 12:9, 79:25, 81:11, 86:6, 86:24, 123:2
**markers** [2] - 96:10, 96:23
**marketed** [1] - 94:21, 94:22
**marking** [1] - 98:25
**Martires** [1] - 29:2
**martyrs** [1] - 29:5
**Masoneria** [2] - 25:25, 26:22
**Masons** [1] - 99:7
**masons** [2] - 26:2, 26:23
**master's** [1] - 92:14
**match** [2] - 51:2, 59:15
**matched** [3] - 60:15, 101:8, 137:12
**matching** [1] - 51:11
**material** [5] - 33:23, 41:10, 139:18, 140:9, 140:10
**materials** [2] - 102:4, 123:9
**math** [1] - 42:14
**mathematical** [1] - 50:21
**matter** [7] - 59:6, 63:9, 66:16, 133:17, 138:9, 139:21, 139:22
**MATTHEW** [1] - 2:10
**MD** [2] - 55:11, 74:24
**MD-5** [13] - 97:25, 98:5, 98:9, 100:21, 101:8, 101:15, 101:19, 103:25, 104:2, 104:3, 114:13, 114:14, 114:16
**MD5** [3] - 55:10, 55:13, 60:12
**mean** [21] - 5:4, 13:5, 30:13, 31:11, 33:9, 46:3, 49:5, 63:9, 63:10, 65:4, 65:21, 66:9, 67:23, 86:15, 101:5, 103:9, 103:10, 113:24, 132:23, 135:15, 136:9
**meaning** [3] - 108:22,

118:11, 142:19
**meaningful** [1] - 64:24
**MEANS** [1] - 144:12
**means** [7] - 30:14, 30:15, 34:12, 41:11, 54:10, 68:20, 104:16
**meant** [1] - 65:17
**meantime** [1] - 133:23
**measure** [1] - 42:3
**mechanical** [1] - 41:11
**mechanism** [2] - 96:21, 97:5
**media** [121] - 39:15, 40:3, 41:1, 41:2, 41:6, 41:7, 41:9, 41:14, 41:16, 41:18, 41:19, 43:6, 43:13, 43:16, 44:1, 44:9, 44:12, 44:18, 44:23, 44:25, 45:11, 45:16, 46:8, 46:10, 46:19, 46:22, 46:24, 47:1, 48:22, 49:17, 50:2, 50:5, 50:17, 50:18, 50:25, 51:5, 51:8, 51:10, 51:16, 51:18, 52:3, 52:11, 52:21, 53:21, 54:13, 55:9, 55:23, 56:3, 56:12, 56:13, 58:13, 59:8, 59:13, 59:18, 60:1, 60:8, 60:13, 60:16, 60:22, 69:23, 70:1, 70:3, 70:8, 70:11, 70:22, 70:25, 71:1, 71:4, 71:9, 71:11, 71:12, 71:14, 71:18, 71:20, 71:24, 72:5, 72:7, 72:12, 72:15, 72:18, 72:19, 72:21, 73:6, 73:9, 73:13, 73:18, 73:21, 73:22, 74:5, 74:7, 74:13, 74:14, 74:21, 74:25, 75:1, 75:3, 75:4, 75:25, 76:10, 76:14, 76:22, 77:5, 77:14, 77:20, 78:2, 78:5, 79:10, 96:13, 96:17, 96:25, 97:3, 97:8, 103:19, 103:22, 103:23, 109:10, 114:10, 114:14
**Media** [1] - 59:1
**meet** [1] - 117:12
**meets** [1] - 138:2
**megabyte** [2] - 42:9, 42:10
**megabytes** [1] - 42:11

**members** [6] - 4:4, 61:8, 69:18, 126:11, 126:14, 131:20
**memory** [10] - 39:16, 40:5, 48:16, 71:5, 73:12, 75:22, 87:8, 87:19, 109:11
**men** [8] - 119:16, 119:19, 119:22, 120:7, 121:11, 122:1, 122:22, 128:7
**mention** [3] - 46:8, 135:17, 137:4
**mentioned** [8] - 5:15, 10:20, 15:10, 15:15, 15:23, 41:7, 139:1, 139:2
**mere** [2] - 49:8, 76:1
**messages** [1] - 108:11
**messed** [1] - 67:14
**met** [2] - 138:4, 138:23
**metadata** [2] - 108:17, 108:19
**metal** [1] - 43:11
**method** [2] - 54:25, 104:15
**Method** [1] - 55:12
**methods** [1] - 59:4
**Mexican** [2] - 13:14, 29:5
**Mexicanos** [1] - 29:2
**Mexico** [12] - 7:9, 8:23, 8:24, 9:19, 18:22, 22:7, 29:2, 62:24, 120:2, 125:5, 125:8, 126:12
**micro** [6] - 73:11, 73:19, 77:9, 77:11, 77:12, 77:19
**micromanage** [1] - 132:6
**middle** [4] - 6:6, 124:21, 137:15, 138:17
**might** [14] - 8:24, 24:16, 31:11, 33:23, 48:17, 53:6, 53:23, 57:25, 77:21, 81:13, 106:3, 136:3, 142:5, 142:20
**Miguel** [6] - 8:9, 13:7, 13:15, 14:17, 14:22, 15:7
**MILLER** [3] - 1:22, 144:19, 144:20
**mind** [1] - 24:25
**minds** [2] - 62:16, 131:14
**mine** [1] - 125:14
**minimally** [1] - 53:1

**minor** [1] - 6:16
**minute** [3] - 11:16, 89:15, 139:20
**minuted** [1] - 102:20
**minutes** [2] - 61:2, 68:23
**misleading** [3] - 136:12, 136:14
**misspoke** [1] - 107:24
**misunderstood** [1] - 101:14
**mixed** [1] - 14:24
**Mobile** [1] - 36:8
**model** [2] - 42:16, 42:17
**moment** [5] - 13:22, 90:2, 113:16, 131:2, 138:7
**Monday** [1] - 131:8
**money** [3] - 120:19, 130:17, 130:18
**monitor** [1] - 48:5
**month** [1] - 63:24
**months** [2] - 9:17, 70:19
**moreover** [1] - 141:16
**morning** [4] - 34:21, 134:7, 135:15, 141:20
**mosque** [2] - 62:13, 63:25
**most** [9] - 42:17, 53:9, 93:8, 96:11, 103:4, 105:8, 105:19, 105:24, 106:21
**motion** [4] - 133:8, 134:20, 135:8, 136:21
**motive** [1] - 65:13
**move** [17] - 4:13, 13:19, 25:4, 26:4, 26:25, 29:8, 32:3, 32:12, 55:21, 92:8, 121:18, 123:19, 127:13, 132:22, 132:24, 137:20
**moved** [1] - 126:20
**moves** [4] - 25:3, 28:7, 38:1, 81:2
**movie** [1] - 26:1
**moving** [1] - 141:13
**MP-3** [1] - 41:16
**MR** [136] - 3:6, 3:6, 3:8, 3:8, 3:9, 3:10, 14:8, 17:13, 25:8, 26:8, 27:4, 28:12, 29:12, 29:19, 29:21, 30:24, 31:23, 32:1, 32:7, 32:11, 32:13, 34:5, 34:20, 34:23,

34:24, 35:3, 35:4, 35:10, 35:14, 35:18, 38:5, 38:6, 38:8, 38:21, 43:19, 43:23, 45:19, 45:22, 55:18, 55:21, 60:23, 61:14, 61:22, 62:2, 62:10, 63:6, 63:13, 63:20, 65:15, 65:24, 66:3, 66:7, 66:13, 66:18, 66:25, 67:3, 68:4, 68:13, 69:20, 81:1, 81:4, 81:6, 81:10, 82:17, 83:14, 83:16, 85:16, 86:5, 86:11, 86:19, 86:22, 87:15, 87:19, 87:22, 88:1, 88:4, 88:13, 88:15, 89:22, 90:8, 90:10, 104:23, 104:25, 105:2, 112:19, 112:22, 113:1, 113:4, 113:9, 113:16, 113:19, 113:25, 114:4, 116:9, 116:13, 116:23, 121:17, 121:21, 121:25, 123:19, 123:23, 124:2, 124:5, 126:19, 126:22, 127:12, 127:16, 127:19, 129:10, 129:13, 130:2, 130:25, 131:2, 133:3, 134:18, 135:10, 137:3, 137:24, 138:25, 140:3, 140:9, 140:21, 141:11, 141:24, 142:3, 142:9, 142:14, 142:16, 142:21, 142:22, 143:1, 143:8, 143:10, 143:15, 143:16, 143:17
**MS** [70] - 3:5, 3:11, 4:6, 4:8, 13:18, 13:21, 13:25, 14:3, 14:5, 14:6, 14:12, 17:15, 19:17, 19:21, 20:2, 20:20, 20:23, 21:11, 21:15, 21:22, 22:1, 24:1, 24:3, 24:12, 24:15, 24:18, 25:3, 25:6, 25:13, 26:4, 26:7, 26:11, 26:25, 27:3, 27:8, 28:7, 28:11, 28:15, 29:7, 29:11, 29:16,

30:20, 31:21, 34:8, 34:17, 61:13, 64:2, 65:6, 67:4, 67:6, 67:15, 67:20, 69:14, 82:22, 83:10, 85:11, 86:9, 86:17, 87:13, 87:17, 88:2, 88:8, 89:25, 90:2, 121:20, 123:22, 127:15, 129:9, 130:5, 130:22
**muddled** [1] - 67:10
**Mueller** [1] - 142:2
**muhadeen** [1] - 17:21
**multiple** [2] - 70:12, 75:12
**Muslim** [1] - 11:15
**Muslims** [3] - 15:20, 15:24, 15:25
**must** [2] - 44:3, 44:22
**MY** [1] - 144:14
**Mysteries** [1] - 24:8
**mysteries** [3] - 27:23, 27:24, 28:1
**Mysterios** [1] - 27:19

## N

**name** [25] - 8:8, 13:15, 14:22, 15:7, 15:21, 23:10, 31:19, 35:5, 36:21, 38:15, 38:17, 40:6, 40:9, 52:8, 57:21, 75:11, 84:7, 103:13, 111:10, 116:18, 124:10, 124:16, 128:22, 129:2, 129:4
**names** [1] - 14:24
**Nano** [10] - 78:11, 78:14, 78:18, 107:12, 107:14, 108:3, 108:4, 108:12, 108:14, 108:23
**narrow** [1] - 52:21
**native** [1] - 109:20
**nature** [4] - 43:2, 43:6, 44:10, 75:21
**near** [4] - 121:4, 128:24, 132:23, 138:13
**necessarily** [1] - 109:17
**need** [9] - 31:10, 51:3, 66:21, 83:4, 85:3, 131:8, 131:23, 143:6
**needed** [12] - 6:21, 7:13, 9:25, 10:9, 20:24, 21:2, 30:7, 30:11, 30:18, 31:16,

32:22, 42:4
**needs** [4] - 30:15, 31:9, 45:25
**neglected** [2] - 135:17, 137:4
**Nelson** [1] - 134:7
**netting** [1] - 139:12
**never** [9] - 58:6, 62:7, 89:10, 96:20, 113:4, 135:4, 137:11, 137:12, 140:1
**new** [3] - 50:12, 53:1, 53:13
**New** [1] - 17:7, 61:17
**newspaper** [2] - 105:16, 106:2
**Next** [1] - 36:23
**next** [44] - 13:12, 15:4, 18:19, 19:1, 32:12, 34:19, 34:24, 36:8, 36:10, 36:12, 36:15, 36:17, 36:20, 36:25, 37:2, 37:5, 37:8, 37:11, 37:13, 37:15, 37:16, 37:18, 37:21, 38:9, 45:23, 46:12, 46:13, 46:23, 46:24, 48:3, 48:4, 49:20, 49:21, 65:20, 88:18, 113:20, 116:12, 124:20, 129:6, 129:25, 131:9, 141:23, 142:12, 142:15
**Nguyen** [2] - 142:1
**nickname** [1] - 71:17
**NO** [1] - 1:8
**nobody** [1] - 68:25
**non** [2] - 93:19, 118:12
**non-expedited** [1] - 118:12
**non-law** [1] - 93:19
**noncontroversial** [1] - 132:15
**none** [4] - 77:24, 101:13, 106:4, 138:22
**nonsensical** [1] - 54:6
**normal** [1] - 52:23
**normally** [1] - 130:14
**NORTH** [2] - 1:23, 2:6
**notebook** [3] - 131:23, 132:1, 132:4
**notebooks** [1] - 131:22
**noted** [1] - 57:3
**NOTES** [1] - 144:14
**nothing** [12] - 19:17, 34:17, 54:7, 55:4,

77:23, 89:25, 90:3, 104:23, 113:16, 115:19, 130:25, 132:4
**November** [8] - 119:14, 121:12, 124:15, 125:11, 128:24, 129:7, 129:14, 129:20
**number** [35] - 14:4, 18:17, 18:20, 23:3, 35:6, 36:3, 41:4, 42:5, 50:23, 51:5, 54:18, 60:9, 60:10, 62:3, 70:10, 70:18, 74:12, 79:14, 79:17, 80:14, 81:18, 81:21, 98:17, 101:2, 114:12, 114:15, 114:18, 115:22, 115:24, 115:25, 139:19, 141:13, 143:4
**Number** [9] - 36:4, 36:5, 36:9, 36:16, 36:21, 37:7, 37:10, 37:12, 37:14
**numbers** [7] - 18:13, 23:1, 35:15, 35:24, 35:25, 37:12, 98:9
**Numbers** [6] - 36:2, 36:7, 36:24, 37:1, 37:22, 37:24
**numeric** [2] - 42:6, 59:7

## O

**o'clock** [1] - 131:17
**object** [2] - 43:19, 133:6
**Objection** [1] - 24:1
**objection** [40] - 14:7, 14:8, 17:13, 20:20, 21:11, 21:22, 25:5, 25:6, 25:8, 26:6, 26:7, 26:8, 27:2, 27:3, 27:4, 28:10, 29:10, 29:11, 29:12, 30:20, 31:21, 31:24, 31:25, 61:15, 81:3, 81:4, 81:6, 85:11, 87:13, 87:17, 88:8, 112:19, 113:1, 121:19, 121:21, 123:21, 129:9, 132:16, 132:18, 140:10
**objections** [2] - 13:20, 127:14

**obliterate** [1] - 49:13
**observations** [1] - 131:21
**observe** [2] - 108:17, 140:20
**observed** [1] - 140:12
**obtaining** [1] - 95:13
**obviously** [2] - 89:5, 102:21
**OC** [4] - 40:10, 40:13, 40:22
**occurred** [1] - 78:10
**occurrence** [2] - 55:15, 114:20
**occurring** [2] - 55:14, 96:21
**occurs** [1] - 45:23
**odds** [2] - 55:9, 55:19
**OF** [15] - 1:1, 1:2, 1:6, 1:14, 2:1, 2:2, 2:8, 2:9, 2:13, 144:1, 144:3, 144:5, 144:8, 144:12, 144:14
**offensive** [1] - 33:24
**offered** [1] - 141:12
**Office** [4] - 37:23, 90:15, 92:2, 118:6
**office** [5] - 118:12, 118:15, 118:18, 118:22, 119:4
**OFFICE** [1] - 2:9
**Officer** [5] - 4:9, 17:25, 19:5, 20:3, 84:13
**officer** [14] - 7:13, 14:13, 31:12, 40:14, 40:22, 44:17, 45:10, 56:22, 56:24, 58:18, 59:2, 70:7, 74:18, 94:8
**officer's** [1] - 31:7
**officers** [2] - 71:19, 93:6
**Officers** [1] - 95:1
**OFFICIAL** [3] - 1:23, 144:7, 144:21
**officially** [1] - 71:17
**often** [2] - 40:15, 76:10
**oftentimes** [1] - 125:25
**old** [1] - 21:20
**OMAR** [1] - 1:9
**ON** [3] - 2:2, 2:8, 2:13
**once** [10] - 46:11, 50:25, 52:6, 58:4, 58:7, 59:12, 74:17, 76:9, 84:1, 97:7
**one** [94] - 7:24, 10:24, 12:14, 15:13, 15:15,

15:23, 16:19, 17:16, 18:14, 23:8, 24:7, 30:5, 32:14, 32:15, 34:9, 36:5, 37:8, 37:15, 42:4, 42:8, 42:10, 42:13, 43:7, 45:4, 48:1, 54:3, 55:11, 57:6, 58:1, 59:5, 60:22, 62:3, 63:24, 64:22, 65:5, 67:15, 68:22, 69:13, 75:12, 77:8, 77:17, 78:10, 78:18, 86:11, 88:17, 90:2, 92:10, 94:13, 96:6, 97:2, 99:10, 99:11, 99:13, 99:14, 100:10, 100:23, 101:7, 101:12, 102:14, 103:19, 109:5, 111:17, 113:16, 114:13, 114:19, 115:2, 116:1, 116:3, 118:16, 119:20, 122:2, 122:10, 128:6, 129:2, 131:2, 132:2, 132:15, 133:4, 135:25, 137:3, 138:19, 139:12, 139:18, 139:20, 141:12, 141:14, 141:21, 142:19, 143:1
**one-by-one** [1] - 132:15
**one-megabyte** [1] - 42:10
**ones** [1] - 59:11
**ongoing** [1] - 39:8
**only_n_cali** [1] - 36:13
**open** [3] - 53:10, 106:24, 111:16
**opened** [4] - 87:9, 89:5, 112:24, 112:25
**operating** [3] - 41:1, 43:3, 49:7
**operations** [2] - 17:20
**opinion** [2] - 135:11, 138:16
**opinions** [1] - 61:5
**opportunity** [5] - 10:20, 39:20, 139:2, 140:15
**opposed** [2] - 5:8, 139:15
**optical** [1] - 58:13
**optimal** [1] - 50:6
**options** [1] - 7:3
**Orange** [6] - 38:23, 39:1, 39:2, 40:11,

90:15, 92:2
**ORC** [2] - 60:9
**order** [13] - 10:7, 10:9, 10:24, 14:24, 19:12, 41:14, 58:9, 59:4, 82:21, 83:2, 88:23, 105:10, 113:21
**ordered** [12] - 14:9, 14:25, 25:9, 26:9, 27:5, 28:13, 29:13, 38:7, 81:7, 121:22, 123:24, 127:17
**organization** [17] - 35:25, 36:1, 36:3, 36:6, 36:12, 36:15, 36:17, 36:20, 36:23, 36:25, 37:2, 37:5, 37:11, 37:13, 37:16, 37:18, 37:21
**original** [16] - 51:2, 51:5, 59:13, 60:12, 60:19, 61:23, 69:23, 70:2, 75:8, 76:12, 76:25, 89:9, 89:17, 103:22, 104:1, 114:14
**originally** [3] - 55:5, 60:17, 139:12
**originated** [2] - 110:15, 110:16
**Output** [1] - 48:7
**outside** [3] - 61:8, 67:18, 131:19
**overlook** [1] - 141:6
**overruled** [4] - 21:23, 30:21, 43:20, 129:12
**overwrite** [1] - 49:13
**overwritten** [1] - 50:10
**own** [6] - 44:25, 46:16, 59:6, 60:18, 71:23, 93:3

**P**

**P.M** [2] - 1:15, 4:1
**p.m** [1] - 143:18
**page** [33] - 13:1, 13:2, 13:12, 15:4, 15:12, 15:17, 16:3, 16:18, 16:23, 17:4, 17:19, 18:8, 18:12, 18:19, 18:20, 19:1, 23:18, 42:8, 42:11, 86:25, 87:2, 87:16, 87:23, 88:5, 88:16, 106:5, 106:7, 106:9, 124:20, 129:2, 129:6
**pages** [2] - 12:20, 12:21, 128:21
**paid** [4] - 126:24,

127:2, 129:11, 130:8
**Paintball** [1] - 36:23
**papers** [1] - 95:6
**paperwork** [4] - 11:7, 11:8, 15:1, 44:23
**paragraph** [1] - 88:22
**paragraphs** [2] - 88:17, 88:20
**part** [13] - 53:10, 57:16, 67:25, 87:2, 90:21, 93:4, 95:4, 98:13, 103:4, 105:19, 106:10, 124:8, 125:7
**part-time** [1] - 95:4
**partially** [1] - 96:17
**participants** [3] - 61:4, 131:11, 138:19
**particular** [31] - 7:24, 17:17, 41:16, 45:8, 45:15, 45:16, 46:9, 52:16, 53:25, 54:9, 55:25, 57:23, 59:7, 64:21, 73:19, 77:21, 87:2, 88:12, 97:12, 98:19, 102:8, 102:13, 105:23, 105:24, 107:1, 113:13, 113:14, 116:4, 131:24, 138:13
**partnership** [1] - 71:3
**passport** [40] - 13:14, 15:5, 117:2, 117:8, 117:17, 117:21, 117:24, 118:1, 118:3, 118:4, 118:5, 118:11, 118:14, 118:18, 118:21, 118:23, 119:1, 119:4, 119:6, 119:17, 119:23, 120:13, 120:19, 122:3, 122:6, 122:9, 122:20, 122:25, 123:6, 124:18, 125:1, 126:1, 126:7, 126:24, 126:25, 127:1, 127:2, 129:11, 130:8, 130:18
**Passport** [4] - 37:23, 117:4, 117:5, 126:17
**passports** [3] - 117:18, 118:7, 118:9
**passwords** [1] - 48:17
**past** [1] - 61:24
**pastor** [1] - 23:21
**path** [4] - 108:22, 110:15, 110:25,

111:10
**patience** [1] - 131:7
**PATRICE** [2] - 3:10, 116:19
**Patrice** [1] - 116:14
**patrice** [1] - 116:19
**patrol** [2] - 39:9, 92:9
**patted** [1] - 8:14
**patterns** [1] - 115:9
**pay** [2] - 126:25, 130:18
**payment** [4] - 120:19, 127:5, 127:6
**Payton** [2] - 133:13, 139:1
**PAYTON** [1] - 133:13
**PDF** [1] - 51:22, 74:11
**PDFs** [2] - 51:23, 103:10
**pedestrian** [2] - 5:8, 5:14
**pedestrians** [1] - 5:6
**penalty** [1] - 83:6
**Pentagon** [1] - 16:13
**people** [23] - 4:25, 5:4, 5:10, 5:13, 5:20, 5:21, 6:3, 6:11, 6:15, 6:18, 7:8, 7:10, 11:15, 15:24, 33:23, 43:18, 62:15, 117:12, 125:25, 137:14, 138:22, 140:23, 142:19
**people's** [2] - 11:17, 11:21
**per** [1] - 21:4
**percent** [2] - 99:10, 99:13, 99:14
**percentage** [1] - 93:1
**Perfect** [1] - 103:10
**perform** [3] - 40:2, 40:24, 45:5
**performed** [1] - 81:23
**performing** [2] - 98:21, 102:2
**perhaps** [2] - 17:2, 111:3
**perjury** [1] - 83:6
**permanent** [6] - 9:6, 9:8, 13:3, 13:10, 14:19, 19:12
**permission** [3] - 26:5, 28:8, 29:9
**permit** [2] - 85:14, 141:16
**person** [41] - 7:13, 8:3, 8:5, 8:10, 16:6, 30:6, 30:9, 30:15, 31:2, 31:5, 31:7, 31:8, 31:9, 31:13, 31:17,

33:5, 44:5, 52:17, 53:12, 57:12, 65:12, 76:13, 84:16, 84:20, 96:15, 109:21, 115:2, 122:8, 122:13, 122:15, 122:18, 122:19, 122:20, 124:17, 127:1, 127:2, 127:3, 127:4

**personally** [4] - 76:10, 96:12, 123:11, 140:12

**persons** [3] - 134:13, 136:18, 140:15

**persuasive** [1] - 69:2

**pertinent** [1] - 56:20

**PH** [1] - 1:24

**PHILLIPS** [1] - 1:4

**phone** [21] - 18:13, 23:1, 23:3, 36:8, 37:11, 73:11, 73:15, 73:16, 73:19, 73:22, 75:10, 75:12, 75:23, 76:1, 76:2, 76:6, 76:22, 76:23, 76:25, 77:6, 77:8

**phones** [5] - 39:15, 40:4, 74:2, 75:21

**photo** [1] - 122:12

**photocopied** [1] - 23:19

**photocopies** [2] - 11:21, 18:4

**photocopy** [1] - 15:4

**photograph** [8] - 120:25, 121:2, 121:6, 121:8, 122:8, 138:10, 138:15, 139:21

**photographed** [1] - 139:9

**photographs** [6] - 18:4, 76:23, 134:4, 139:11, 139:14, 141:12

**phrases** [1] - 52:16

**physical** [1] - 48:25

**physically** [1] - 47:13

**pick** [8] - 99:13, 99:16, 100:3, 102:6, 103:5, 103:15, 104:18

**picked** [3] - 102:5, 102:9, 102:16

**picks** [2] - 59:2, 99:10

**picture** [16] - 41:15, 51:23, 51:24, 57:13, 57:21, 57:23, 60:4, 74:10, 104:11, 104:12, 104:14,

105:9, 107:1, 110:13, 110:15

**Picture** [1] - 57:22

**Picture.Jpeg** [1] - 60:5

**picture.jpeg** [1] - 60:7

**pictured** [3] - 134:8, 134:13, 140:16

**pictures** [18] - 103:12, 103:13, 105:6, 105:7, 105:22, 106:3, 106:6, 106:7, 106:18, 106:20, 106:23, 107:3, 107:5, 107:9, 108:5, 108:10, 115:3, 141:13

**Pictures** [1] - 57:22

**picturing** [1] - 139:18

**piece** [26] - 41:16, 41:19, 44:1, 44:17, 45:10, 46:10, 46:21, 46:24, 49:16, 50:24, 51:16, 52:10, 52:20, 52:21, 56:12, 59:7, 60:1, 60:8, 70:7, 71:1, 74:25, 75:8, 79:10, 112:9, 112:10, 136:25

**pieces** [6] - 43:16, 52:20, 55:9, 70:11, 114:10, 138:11

**PLACE** [1] - 144:10

**place** [8] - 43:7, 45:11, 45:13, 53:10, 57:24, 59:20, 80:12, 106:23

**placed** [8] - 12:7, 53:21, 57:4, 71:2, 74:4, 74:7, 75:5, 76:11

**places** [1] - 43:14

**PLAINTIFF** [2] - 1:7, 2:2

**planned** [1] - 68:22

**planning** [1] - 133:4

**plans** [5] - 63:4, 124:22, 125:7, 125:23, 126:2

**played** [1] - 139:19

**player** [1] - 41:17

**plug** [6] - 71:9, 72:15, 72:18, 73:9, 73:10, 77:11

**plugged** [2] - 49:19, 73:13

**plus** [1] - 142:8

**pocket** [2] - 22:24, 43:10

**pod** [1] - 46:20

**Podcast** [1] - 112:13

**pods** [1] - 46:17

**point** [21] - 9:2, 20:19, 47:17, 48:8, 48:10, 56:13, 63:14, 63:20, 69:2, 69:13, 85:7, 88:12, 102:14, 119:16, 120:12, 122:24, 132:20, 138:12, 138:25, 141:13, 141:15

**pointed** [1] - 136:15

**pops** [1] - 31:19

**populations** [1] - 15:19

**Port** [1] - 4:12

**port** [4] - 4:22, 6:14, 68:6

**portion** [2] - 102:12, 102:14

**ports** [1] - 72:21

**position** [3] - 4:21, 92:11, 137:10

**positive** [1] - 113:4

**possess** [4] - 33:11, 33:13, 33:15, 34:2

**possessed** [1] - 68:5

**possesses** [1] - 32:25

**possession** [7] - 11:22, 12:1, 14:20, 18:10, 19:3, 44:10, 58:7

**possessions** [1] - 18:6

**possibility** [1] - 55:12

**possible** [19] - 41:19, 53:3, 53:12, 53:14, 53:17, 60:14, 69:22, 69:25, 74:19, 75:7, 75:15, 75:19, 96:3, 96:5, 96:10, 104:6, 116:8, 118:17, 142:11

**Post** [1] - 118:5

**potentially** [5] - 42:12, 47:23, 48:18, 49:12, 49:14

**power** [1] - 48:4

**practice** [2] - 35:5, 63:5

**pray** [7] - 10:4, 10:9, 10:20, 85:7, 86:3, 89:2, 89:7

**prayer** [11] - 10:4, 10:9, 10:10, 10:25, 11:4, 85:9, 85:18, 89:11, 89:15, 89:18, 89:20

**praying** [1] - 87:10

**pre** [2] - 132:19, 133:2

**pre-admit** [1] - 132:19

**pre-admitted** [1] - 133:2

**precise** [3] - 55:7, 55:8

**predisposition** [1] - 62:17

**prefer** [1] - 35:12

**prepare** [1] - 69:22

**preparing** [1] - 84:21

**presence** [3] - 4:4, 69:17, 131:19

**present** [8] - 4:5, 31:6, 61:7, 61:9, 69:19, 102:16, 131:18, 134:8

**preserved** [2] - 108:20, 108:23

**PRESIDING** [1] - 1:4

**pretty** [1] - 71:21

**prevent** [2] - 53:7, 115:6

**prevents** [1] - 75:24

**preview** [2] - 74:13, 78:1

**previewing** [1] - 77:21

**previously** [4] - 50:9, 83:5, 86:24, 122:15

**priests** [1] - 23:24

**primarily** [4] - 5:15, 5:17, 48:12, 71:23, 75:13, 107:10

**primary** [21] - 5:18, 5:22, 7:12, 20:18, 30:6, 30:9, 30:17, 30:25, 31:7, 31:12, 31:14, 31:16, 32:20, 32:21, 32:22, 68:14, 75:21, 83:23, 83:24, 84:1, 84:5

**privacy** [1] - 110:23

**private** [4] - 92:25, 93:9, 94:14, 97:15

**privileges** [1] - 53:9

**problem** [5] - 68:11, 135:3, 136:10, 136:22

**proceed** [1] - 19:15

**proceeding** [3] - 7:4, 142:10, 142:24

**PROCEEDINGS** [2] - 1:14, 144:10

**proceedings** [2] - 6:22, 143:18

**process** [22] - 4:25, 5:1, 6:17, 6:20, 33:5, 44:16, 50:13, 50:19, 51:20, 52:1, 57:2, 60:19, 60:21, 70:6, 70:8, 73:7, 73:16, 73:20, 79:23, 82:2,

98:25, 104:21

**processed** [6] - 8:13, 52:6, 55:24, 56:8, 77:12, 77:13

**processing** [3] - 6:15, 77:19, 97:11

**processor** [2] - 117:8, 117:17

**produced** [3] - 80:9, 94:22, 134:12

**product** [1] - 94:20

**professor** [2] - 94:23, 94:24

**program** [1] - 93:5

**programming** [1] - 97:23

**promote** [3] - 92:7, 92:9, 92:10

**promoted** [1] - 91:10

**prompted** [1] - 140:10

**proper** [1] - 34:1

**proponent** [1] - 133:18

**proprietary** [1] - 73:11

**prosecutor** [1] - 23:6

**protected** [1] - 53:7

**Protection** [3] - 4:25, 11:17, 84:12

**prove** [3] - 64:15, 64:16, 141:12

**provide** [2] - 44:11, 64:6

**provided** [5] - 60:17, 93:2, 125:18, 125:22, 126:16

**providing** [1] - 40:1

**PUBLIC** [2] - 2:9, 2:11

**publish** [16] - 14:1, 14:10, 25:11, 26:5, 26:9, 27:1, 27:6, 28:9, 28:13, 29:9, 29:14, 81:8, 121:23, 123:25, 127:17, 132:25

**published** [1] - 95:6

**pull** [2] - 41:14, 78:25

**purchase** [1] - 129:15

**purports** [1] - 138:3

**purpose** [15] - 46:19, 47:24, 49:15, 52:14, 53:20, 53:22, 58:3, 58:15, 73:2, 73:4, 73:23, 73:25, 98:21, 119:25, 138:7

**purposefully** [1] - 103:16

**purposes** [3] - 35:17, 45:14, 142:10

**pursuant** [1] - 35:10

**put** [23] - 30:12, 30:19,

43:10, 50:12, 53:3,
53:17, 60:6, 70:14,
76:17, 80:23, 81:13,
83:2, 94:9, 97:9,
101:21, 101:24,
104:13, 107:21,
108:14, 109:1,
113:23, 130:11,
132:3
**puts** [1] - 74:7
**puzzled** [1] - 142:17

**Q**

**Qa'ida** [1] - 99:3
**questions** [27] - 8:18,
21:17, 29:17, 32:14,
34:5, 34:14, 45:21,
61:15, 61:22, 65:25,
67:11, 67:23, 68:11,
68:22, 82:17, 82:25,
83:10, 83:19, 85:1,
89:22, 100:9,
113:20, 114:21,
116:9, 130:2,
130:22, 131:3
**quick** [3] - 104:16,
128:25, 143:1
**quickly** [3] - 52:18,
52:21, 98:22
**quite** [5] - 43:1, 70:17,
95:18, 136:3, 137:16

**R**

**Rafiq** [1] - 18:16
**raise** [2] - 38:12,
116:15
**raised** [1] - 68:21
**Ralph** [3] - 37:22,
128:22, 129:5
**RALPH** [1] - 1:10
**ran** [1] - 103:14
**random** [3] - 114:20,
138:9
**randomly** [1] - 55:13
**range** [6] - 53:2,
136:5, 136:19,
138:21, 138:22
**Range** [1] - 36:1
**rank** [2] - 90:19, 92:5
**ranks** [2] - 92:2, 92:10
**rapid** [2] - 53:22, 71:4
**Ray** [17] - 58:14,
58:23, 59:10, 80:8,
80:12, 107:21,
108:9, 108:15,
109:1, 111:2, 111:4,
111:10, 111:12,
111:15, 112:4,

112:5, 112:14
**RCFL** [5] - 40:10,
40:13, 40:22, 79:9
**read** [25] - 15:18,
17:19, 25:24, 26:21,
27:18, 29:1, 34:22,
35:5, 35:13, 35:14,
72:24, 81:20, 87:14,
105:21, 106:4,
106:16, 126:9,
126:10, 126:11,
126:13, 126:14,
129:4, 133:10,
143:11, 143:12
**readable** [1] - 103:1
**reading** [8] - 24:25,
35:8, 41:12, 41:13,
72:25, 79:16, 87:6,
105:25
**reads** [2] - 74:5, 96:9
**ready** [2] - 55:25,
120:24
**realize** [1] - 27:9
**really** [12] - 55:16,
63:9, 66:13, 69:2,
70:17, 127:23,
132:6, 132:14,
132:18, 133:1,
137:9, 143:6
**reason** [12] - 7:15,
12:3, 62:6, 66:15,
66:19, 66:22, 67:21,
68:2, 77:15, 84:22,
137:25
**reasonable** [2] -
138:2, 140:18
**reasons** [10] - 30:2,
30:5, 48:1, 54:18,
62:2, 77:17, 77:18,
77:19, 97:2, 135:7
**recalling** [1] - 23:9
**receipt** [2] - 127:10,
127:21
**receive** [3] - 50:8,
58:4, 120:15
**received** [10] - 59:14,
123:5, 123:8,
123:14, 124:6,
124:12, 124:13,
128:9, 129:21, 136:8
**receiving** [4] - 21:9,
123:17, 127:6, 128:6
**recent** [2] - 17:9,
133:11
**recess** [5] - 35:2, 61:1,
69:15, 69:16, 86:8
**recognize** [14] - 12:10,
12:13, 17:7, 24:20,
25:19, 26:17, 27:14,
28:22, 79:2, 80:5,

80:21, 81:14,
120:24, 136:4
**recommend** [2] -
76:14, 76:15
**recommendation** [1] -
77:13
**record** [12] - 4:3,
15:18, 17:19, 35:7,
35:22, 38:16, 61:8,
69:17, 110:25,
116:18, 128:14,
131:19
**recorded** [1] - 115:22
**records** [8] - 35:22,
35:23, 36:8, 36:12,
37:3, 37:22, 129:19,
143:4
**recover** [1] - 102:24
**recoverable** [1] -
49:14
**red** [2] - 87:3, 139:11
**redact** [1] - 13:23
**redirect** [2] - 113:18,
131:1
**REDIRECT** [3] - 3:3,
34:7, 114:3
**REDUCED** [1] -
144:11
**reenter** [1] - 19:10
**refer** [13] - 31:9, 44:5,
46:16, 48:6, 48:24,
50:2, 50:15, 56:1,
57:3, 58:24, 60:8,
102:10, 110:15
**reference** [1] - 60:10
**referenced** [1] - 59:25
**referred** [24] - 5:24,
7:3, 7:14, 8:5, 8:10,
10:13, 11:12, 20:18,
34:9, 40:15, 49:11,
50:23, 56:5, 57:18,
64:3, 65:2, 65:11,
65:13, 67:24, 68:10,
75:13, 96:22, 97:12,
111:22
**referring** [3] - 14:13,
16:1, 66:11
**refers** [1] - 31:17
**reflect** [2] - 4:3, 69:17
**refrain** [1] - 45:21
**refresh** [3] - 87:8,
87:19, 109:11
**regardless** [1] - 96:25
**Regional** [1] - 40:11
**registry** [1] - 49:11
**regular** [4] - 49:8,
67:25, 118:11,
118:14
**related** [25] - 36:1,
36:3, 36:4, 36:5,

36:10, 36:12, 36:13,
36:15, 36:17, 36:19,
36:20, 37:2, 37:4,
37:5, 37:9, 37:11,
37:16, 37:17, 37:18,
37:19, 37:21, 37:23,
49:12, 61:5, 94:8
**released** [2] - 19:14,
33:18
**relevance** [6] - 17:13,
20:20, 62:1, 62:9,
129:9
**relevant** [9] - 52:13,
56:12, 57:25, 67:4,
74:15, 77:25, 98:24,
100:1, 129:10
**relied** [1] - 96:15
**relies** [1] - 133:15
**remain** [3] - 35:1,
56:17, 102:24
**remained** [1] - 136:22
**remaining** [1] - 129:23
**remains** [1] - 56:15
**remember** [15] - 7:25,
8:3, 8:7, 21:9, 61:2,
63:2, 83:24, 125:4,
125:6, 126:25,
127:6, 127:7, 127:8,
131:7, 131:9
**remind** [1] - 70:20
**remnants** [2] - 102:10,
103:12
**remove** [5] - 46:25,
47:12, 47:14, 48:2,
142:23
**removed** [4] - 47:2,
47:18, 48:10, 48:20
**removing** [1] - 47:24
**Renee** [1] - 116:19
**RENEE** [1] - 116:20
**reopen** [1] - 69:1
**repeat** [2] - 14:3,
113:7
**report** [17] - 57:9,
57:16, 58:10, 58:12,
59:24, 67:9, 67:12,
69:11, 75:1, 86:8,
108:20, 110:12,
110:14, 112:4,
112:6, 112:7, 112:8
**REPORTED** [1] -
144:9
**REPORTER** [4] - 1:23,
144:1, 144:7, 144:21
**reporter** [1] - 39:19
**REPORTER'S** [1] -
1:14
**reports** [1] - 79:18
**represent** [2] - 16:25,
104:14

**request** [19] - 10:5,
10:8, 10:22, 26:5,
27:1, 29:8, 44:4,
44:10, 45:2, 45:4,
45:7, 45:9, 45:25,
48:21, 56:4, 80:13,
80:14, 108:1, 134:17
**requested** [4] - 10:3,
10:20, 10:24, 52:22
**requesting** [1] - 44:7
**requests** [2] - 28:8,
34:25
**require** [1] - 102:3
**required** [4] - 35:21,
138:6, 138:23
**requirement** [1] -
133:16
**requirements** [2] -
33:19, 35:20
**research** [3] - 61:3,
131:12, 131:13
**reset** [1] - 115:24
**residence** [3] - 13:10,
14:19, 19:12
**residency** [1] - 9:11
**resident** [3] - 9:6, 9:8,
13:4
**respect** [9] - 9:8,
61:10, 62:21, 68:21,
86:8, 109:8, 112:23
**respectfully** [1] -
64:13
**respective** [2] -
100:24, 100:25
**respond** [1] - 65:3
**response** [2] - 32:14,
85:9
**responsibilities** [2] -
6:12, 39:5
**responsibility** [2] -
6:17, 39:7
**result** [1] - 80:9
**Results** [1] - 59:1
**results** [4] - 52:9,
60:22, 70:1, 109:10
**resworn** [1] - 83:5
**retain** [1] - 115:17
**retake** [1] - 90:6
**retrievable** [1] - 108:8
**retrieve** [2] - 85:17,
102:22
**retrieved** [1] - 41:12
**return** [1] - 139:15
**returned** [2] - 79:11,
79:12
**returning** [1] - 139:9
**revealed** [1] - 100:7
**review** [25] - 6:11,
45:25, 46:1, 46:4,
47:8, 52:11, 56:9,

56:15, 56:23, 56:25, 58:8, 58:17, 70:14, 70:16, 71:4, 78:8, 79:17, 81:21, 88:20, 98:23, 108:9, 111:12, 117:18, 120:17
**Review** [1] - 56:7
**reviewed** [10] - 44:18, 45:2, 58:19, 71:14, 79:5, 79:10, 87:1, 119:23, 123:11, 136:15
**reviewer** [1] - 99:25
**reviewing** [1] - 141:18
**Rey** [1] - 29:2
**Richard** [1] - 21:9
**rifle** [1] - 139:19
**rifles** [1] - 140:11
**rigging** [1] - 138:14
**risk** [1] - 72:7
**Rivera** [1] - 142:2
**RIVERSIDE** [3] - 2:12, 2:16, 4:1
**roadside** [1] - 16:21
**Rodriguez** [10] - 20:3, 29:22, 32:2, 61:10, 82:25, 83:3, 83:17, 86:23, 88:5, 88:16
**RODRIGUEZ** [1] - 3:4
**Rodriguez-Lopez** [7] - 29:22, 82:25, 83:3, 83:17, 86:23, 88:5, 88:16
**RODRIGUEZ-LOPEZ** [1] - 3:4
**room** [1] - 143:3
**ROOM** [1] - 1:23
**routine** [2] - 118:5, 118:19
**RPGs** [2] - 16:24, 16:25
**rug** [11] - 10:4, 10:9, 10:10, 10:25, 11:4, 85:10, 85:18, 89:11, 89:15, 89:18, 89:20
**rule** [4] - 31:24, 69:5, 69:7, 139:3
**Rule** [1] - 133:9
**Rules** [1] - 35:20
**run** [5] - 51:4, 55:3, 98:19, 99:2, 99:9
**running** [1] - 43:5
**runs** [2] - 76:16, 106:14

**S**

**s-i-m-s-j-e-s-s-i-c-a-41@yahoo.com** [1] -

37:7
**Safari** [5] - 109:14, 109:19, 110:5, 110:18, 110:25
**safe** [2] - 54:25, 97:5
**sake** [1] - 111:14
**SAME** [1] - 144:11
**San** [4] - 4:12, 5:2, 5:5, 7:19
**sanction** [1] - 141:16
**Santana** [43] - 8:9, 12:24, 13:7, 13:15, 13:16, 14:17, 14:22, 15:7, 19:6, 19:7, 19:8, 20:5, 20:13, 20:25, 21:3, 21:19, 22:7, 22:15, 30:10, 30:19, 31:13, 31:15, 33:17, 33:18, 61:23, 62:3, 62:13, 62:19, 63:22, 66:12, 68:16, 83:23, 84:1, 84:22, 84:24, 85:1, 85:7, 85:17, 89:1, 135:18, 142:5, 142:7, 142:13
**Santana's** [6] - 13:6, 18:5, 67:16, 68:5, 85:21, 88:21
**satisfactory** [1] - 7:12
**satisfied** [2] - 33:19, 133:16
**satisfy** [1] - 35:20
**save** [6] - 102:21, 105:9, 107:3, 131:22, 131:25, 132:17
**saved** [12] - 41:15, 58:12, 58:16, 76:19, 102:6, 102:13, 103:6, 103:10, 103:16, 106:19, 115:15, 132:8
**saver** [1] - 78:1
**saving** [1] - 106:10
**saw** [19] - 15:24, 16:8, 23:1, 24:23, 25:21, 26:19, 27:10, 27:16, 28:16, 28:24, 115:11, 120:7, 121:14, 122:19, 137:5, 137:6, 137:8, 137:14
**SC** [1] - 36:23
**scene** [1] - 16:7
**science** [2] - 92:15, 92:17
**scientific** [1] - 104:15
**scope** [13] - 20:21, 21:12, 21:13, 31:22, 32:5, 32:6, 61:15,

61:16, 61:24, 65:18, 67:16, 67:18, 85:13
**screen** [8] - 72:11, 72:12, 72:13, 105:11, 124:9, 129:17, 143:5
**SD** [7] - 73:11, 73:12, 73:19, 77:9, 77:11, 77:12, 77:19
**sealed** [4] - 47:11, 47:12, 79:12
**search** [26] - 44:9, 44:13, 46:5, 52:14, 53:20, 53:23, 54:11, 54:12, 95:11, 97:9, 98:15, 98:21, 99:1, 99:9, 99:12, 99:16, 99:17, 99:20, 100:4, 100:7, 102:2, 103:14, 104:18, 106:14
**searched** [1] - 54:2
**searches** [2] - 55:2, 99:2, 101:20
**searchs** [1] - 104:17
**seat** [1] - 119:9
**seated** [2] - 38:14, 116:17
**second** [5] - 16:3, 36:3, 80:14, 106:4, 128:23
**secondary** [29] - 4:23, 5:16, 5:24, 6:1, 6:6, 6:10, 6:12, 7:10, 7:14, 7:21, 8:5, 8:8, 10:13, 14:14, 29:25, 30:2, 31:16, 31:17, 32:15, 34:15, 64:18, 65:11, 66:1, 66:12, 66:15, 67:21, 68:3, 84:3, 85:4
**secrecy** [1] - 26:23
**secret** [1] - 23:23
**Secretas** [3] - 23:11, 25:25, 26:22
**secrete** [1] - 26:2
**secretly** [1] - 140:25
**Secretos** [2] - 23:9, 25:1
**section** [1] - 88:12
**secure** [1] - 8:13
**see** [28] - 11:6, 16:19, 44:18, 68:13, 73:4, 76:20, 88:22, 89:6, 92:14, 104:12, 113:22, 114:24, 115:9, 120:2, 121:9, 121:10, 125:4, 126:9, 126:15, 128:2, 128:22,

129:15, 129:17, 131:8, 131:16, 133:7, 140:15
**seeing** [3] - 23:9, 23:14, 120:1
**seizes** [1] - 106:13
**selected** [1] - 74:18
**selecting** [1] - 100:4
**self** [3] - 71:16, 73:17, 96:23
**self-contained** [1] - 96:23
**self-serve** [1] - 73:17
**self-service** [1] - 71:16
**sending** [1] - 63:25
**sense** [1] - 54:7
**sent** [4] - 6:24, 62:13, 62:20, 64:17
**separate** [5] - 78:9, 79:1, 101:12, 112:4, 141:4
**separated** [1] - 56:8
**separately** [1] - 77:13
**sergeant** [4] - 92:3, 92:4, 92:11, 92:13
**serial** [4] - 79:14, 79:17, 81:18, 81:21
**serve** [1] - 73:17
**service** [14] - 11:17, 44:3, 45:2, 45:4, 45:7, 45:9, 45:25, 48:21, 56:4, 71:16, 80:13, 80:14, 118:10
**SESSION** [1] - 1:15
**SET** [1] - 144:10
**set** [2] - 34:14, 110:24
**setting** [2] - 110:23, 115:25
**settings** [6] - 48:6, 48:15, 111:24, 115:2, 115:6
**seven** [3] - 39:9, 40:20, 117:9
**Seventh** [1] - 23:20
**several** [2] - 48:1, 132:4
**share** [1] - 49:19
**sheriff** [2] - 90:19, 93:18
**Sheriff** [3] - 92:5, 92:7, 92:8
**Sheriff's** [7] - 38:23, 39:1, 39:2, 40:21, 90:15, 92:2, 94:9
**Sheriffs** [1] - 92:9
**ship** [3] - 138:10, 138:11, 138:16
**shirt** [1] - 122:10
**shoreline** [1] - 138:17

**short** [4] - 58:24, 85:15, 113:22, 114:1
**shorten** [1] - 142:23
**shot** [1] - 75:24
**show** [17] - 24:8, 45:14, 59:10, 62:16, 78:21, 79:25, 81:11, 86:12, 96:11, 97:25, 105:23, 105:24, 111:6, 112:24, 129:10, 135:20, 135:21
**showed** [1] - 17:16
**showing** [3] - 15:4, 17:4, 135:4
**shown** [4] - 13:13, 134:15, 136:18, 141:14
**sick** [2] - 120:4, 125:4
**side** [4] - 16:6, 16:20, 121:10, 128:5
**signature** [2] - 127:22, 128:4
**significant** [5] - 11:9, 15:16, 52:17, 57:3, 57:14
**signing** [1] - 140:7
**SIM** [5] - 41:22, 43:10, 73:8, 73:10
**similar** [4] - 5:2, 98:13, 133:19, 138:11
**simpler** [2] - 42:14, 57:11
**simply** [2] - 33:21, 137:10
**simsjessica41@yahoo.com** [1] - 37:6
**single** [3] - 42:2, 42:5, 70:13
**sit** [2] - 119:8, 119:9
**situation** [1] - 134:21
**six** [1] - 74:11
**size** [2] - 42:10, 42:20, 78:20
**sk.tefl.g@gmail.com** [1] - 37:14
**skip** [1] - 12:9
**Skype** [1] - 36:12
**slate** [1] - 50:8
**slow** [2] - 39:18, 70:20
**small** [4] - 41:19, 43:16, 131:20, 143:10
**snap** [1] - 75:24
**Software** [2] - 94:15, 94:21
**software** [20] - 49:1, 49:2, 51:21, 52:1, 53:15, 54:8, 55:23,

56:10, 57:17, 57:18, 94:16, 94:20, 97:11, 99:22, 108:8, 109:7, 112:6, 112:9, 112:11, 113:14
**SOHIEL** [1] - 1:9
**Sohiel** [1] - 23:3
**Soldatos** [1] - 29:2
**solely** [1] - 98:25
**someone** [14] - 32:3, 32:25, 33:8, 44:2, 45:5, 53:10, 65:22, 66:5, 104:18, 105:25, 106:13, 112:15, 113:12, 115:17
**sometime** [2] - 5:17, 142:11
**sometimes** [2] - 20:14, 77:24
**somewhat** [2] - 5:1, 12:4
**somewhere** [4] - 51:3, 105:11, 110:12, 117:14
**song** [4] - 108:18, 109:5, 112:12
**songs** [6] - 42:21, 42:25, 78:19, 78:20, 108:25, 109:3
**soon** [1] - 105:10
**sorry** [13] - 14:3, 53:5, 65:7, 94:4, 102:19, 113:7, 117:23, 122:8, 122:10, 129:25, 130:1, 130:21, 142:22
**sort** [5] - 4:12, 6:9, 27:22, 47:12, 73:12
**sorted** [3] - 51:23, 51:25
**sorts** [1] - 55:10
**sound** [4] - 71:10, 74:20, 75:16, 75:25
**sounds** [1] - 93:17
**source** [13] - 48:5, 49:25, 51:16, 60:1, 64:8, 70:2, 73:6, 95:14, 100:16, 100:21, 103:22, 104:1, 104:8
**space** [5] - 102:11, 102:20, 103:3, 103:6, 103:17
**speaking** [5] - 42:2, 92:7, 96:2, 112:13
**special** [2] - 44:16, 57:20
**specialist** [1] - 117:2
**specific** [9] - 21:5,

40:25, 45:24, 59:7, 70:15, 100:23, 108:2, 139:16, 141:12
**specifically** [5] - 39:9, 40:2, 40:20, 84:15, 128:9
**speed** [2] - 132:25, 133:1
**spell** [3] - 38:15, 84:9, 116:18
**spelled** [1] - 38:17
**spent** [1] - 132:14
**Spoda** [1] - 142:2
**spot** [1] - 98:21
**spreadsheet** [1] - 74:12
**spreadsheets** [1] - 51:24
**SPRING** [2] - 1:23, 2:6
**Sprint** [1] - 37:11
**spyware** [1] - 101:24
**Square** [2] - 17:8, 17:10
**SS** [1] - 144:4
**staging** [10] - 50:2, 50:4, 50:17, 51:8, 51:10, 51:18, 96:12, 96:17, 97:2, 97:8
**stamp** [1] - 124:9
**stand** [2] - 90:6, 132:14
**standard** [7] - 34:14, 52:23, 118:17, 138:2, 138:4, 138:23, 143:13
**standards** [1] - 91:12
**standing** [1] - 132:16
**stands** [4] - 40:11, 55:11, 56:6, 97:13
**Stanford** [1] - 93:12
**start** [3] - 49:8, 56:3, 84:20
**start-up** [1] - 49:8
**started** [2] - 91:23, 93:18
**starts** [1] - 47:4
**state** [3] - 35:25, 38:15, 116:18
**State** [1] - 116:25
**STATE** [1] - 144:5
**statement** [9] - 7:6, 88:1, 89:13, 93:10, 128:19, 128:20, 128:24, 129:3, 130:11
**statements** [1] - 130:14
**STATES** [7] - 1:1, 1:1, 1:4, 1:6, 2:5, 2:5,

144:8
**States** [15] - 5:23, 7:9, 9:1, 9:7, 19:9, 19:15, 22:10, 30:15, 31:5, 31:14, 33:10, 33:18, 38:9, 116:13, 133:12
**static** [1] - 75:24
**station** [1] - 73:17
**status** [2] - 9:2, 9:5
**Stearns** [11] - 133:11, 133:15, 133:16, 134:5, 135:11, 138:9, 139:6, 139:8, 141:11, 141:16, 141:19
**STENOGRAPHIC** [1] - 144:14
**STENOGRAPHICALLY** [1] - 144:9
**step** [17] - 34:18, 42:1, 44:16, 44:22, 45:23, 46:13, 47:5, 47:9, 47:10, 48:4, 49:21, 54:24, 70:5, 90:4, 116:11, 131:4
**still** [6] - 83:6, 102:16, 102:24, 103:17, 138:18, 141:12
**stills** [2] - 134:12, 135:2
**stipulated** [1] - 130:10
**stipulation** [3] - 34:22, 35:8, 38:4
**Stone** [1] - 28:2
**stop** [4] - 47:5, 62:4, 91:11, 102:17
**stopped** [3] - 7:10, 20:13, 62:25
**storage** [1] - 47:15
**store** [4] - 52:24, 75:4, 137:8, 137:14
**stored** [3] - 41:10, 41:11, 110:20
**stores** [1] - 44:25
**story** [2] - 124:25, 125:3
**STREET** [2] - 1:23, 2:6
**strike** [4] - 82:9, 133:8, 134:17, 136:21
**strikingly** [1] - 133:19
**strings** [2] - 52:3, 103:13
**strongly** [1] - 76:14
**structure** [3] - 92:5, 98:19, 111:11
**stuff** [2] - 111:8, 111:9
**subheading** [1] - 28:2
**subject** [6] - 32:12, 33:8, 33:20, 34:25,

61:11, 61:20
**subjects** [2] - 92:20, 135:21
**submit** [4] - 44:3, 44:22, 64:13, 126:1
**submitted** [2] - 46:10, 120:12
**submitting** [1] - 44:5
**subpoena** [1] - 35:21
**subset** [2] - 12:23, 91:4
**succeeded** [1] - 17:21
**successfully** [1] - 51:19
**sufficient** [5] - 35:16, 133:17, 134:16, 138:2, 138:18
**suggest** [3] - 64:10, 64:21, 132:20
**suggested** [1] - 65:18
**suggesting** [2] - 64:5, 68:12
**suggestions** [1] - 131:21
**suitcase** [8] - 12:15, 85:21, 85:22, 87:9, 89:6, 89:10, 89:14, 89:18
**SUITE** [1] - 2:12
**summary** [2] - 87:23, 88:7
**supervisor** [4] - 84:2, 84:4, 85:2, 92:11
**supervisor's** [1] - 84:7
**supervisory** [1] - 84:12
**support** [4] - 39:13, 40:1, 126:6, 133:17
**supposed** [1] - 46:7
**Supreme** [1] - 135:12
**SUSAN** [1] - 2:3
**suspect** [1] - 136:23
**suspicion** [1] - 68:7
**suspicions** [2] - 62:6, 68:20
**sustained** [8] - 17:14, 20:22, 24:2, 31:25, 45:20, 88:3, 112:21, 113:3
**sworn** [3] - 38:13, 83:5, 116:16
**System** [1] - 48:7
**system** [9] - 43:3, 48:15, 48:18, 49:12, 49:20, 53:7, 70:13
**systems** [4] - 40:25, 41:1, 49:10, 70:12

**T**

**T-Mobile** [1] - 36:8
**table** [2] - 52:4, 54:12
**tad** [1] - 39:18
**tag** [1] - 57:19
**tampered** [1] - 70:3
**tangible** [1] - 57:7
**tape** [2] - 133:21, 133:24
**target** [2] - 49:25, 50:20
**targeted** [1] - 62:12
**targeting** [1] - 15:19
**task** [2] - 40:14, 40:22
**tasked** [1] - 39:25
**TD** [1] - 37:23
**teach** [3] - 94:6, 94:7, 94:23
**team** [4] - 45:6, 45:7, 142:20
**teams** [1] - 45:5
**tech** [1] - 93:3
**technical** [1] - 61:16
**technician** [2] - 44:24, 44:25
**TECS** [2] - 20:14
**telecommunications** [1] - 93:23
**temporary** [10] - 50:2, 105:14, 106:20, 107:7, 110:1, 110:5, 110:17, 114:22, 115:8, 116:6
**ten** [2] - 17:23, 68:23
**tend** [1] - 18:6
**tends** [1] - 77:22
**term** [2] - 99:12, 100:4
**terminal** [1] - 68:6
**terms** [10] - 57:11, 62:23, 63:10, 98:22, 99:2, 99:16, 99:17, 100:7, 104:18, 104:19
**terrible** [1] - 42:14
**terrorist** [5] - 17:10, 23:23, 66:19, 66:20, 68:2
**Terroristas** [3] - 23:9, 23:11, 25:1
**testified** [12] - 12:4, 20:5, 21:16, 64:19, 65:1, 65:8, 68:10, 130:8, 134:14, 134:15, 135:18, 136:15, 137:21
**testify** [11] - 35:22, 65:8, 65:10, 65:21, 65:22, 65:23, 66:24, 68:9, 69:3, 133:23,

142:5
**testifying** [1] - 132:13
**testimony** [12] - 29:24, 67:6, 83:5, 85:6, 88:23, 100:12, 131:11, 134:6, 134:11, 135:16, 136:11, 136:25
**text** [4] - 103:13, 106:9, 108:10, 115:3
**THAT** [3] - 144:9, 144:11, 144:13
**THE** [151] - 2:9, 3:2, 4:3, 13:20, 13:23, 14:2, 14:9, 17:14, 19:19, 19:23, 20:22, 21:13, 21:23, 21:25, 24:2, 24:11, 24:14, 24:16, 25:5, 25:7, 25:9, 25:11, 26:6, 26:9, 27:2, 27:5, 28:10, 28:13, 29:10, 29:13, 29:18, 30:21, 30:23, 31:24, 32:5, 32:9, 32:12, 34:6, 34:18, 34:22, 35:1, 35:8, 35:12, 35:16, 38:3, 38:7, 38:11, 38:12, 38:14, 38:17, 38:19, 43:20, 43:22, 45:20, 55:17, 55:19, 60:25, 61:8, 61:20, 62:1, 62:8, 62:23, 63:8, 63:19, 64:1, 64:25, 65:7, 65:21, 66:2, 66:5, 66:10, 66:16, 66:24, 67:2, 67:5, 67:13, 68:8, 68:25, 69:15, 69:17, 81:3, 81:5, 81:7, 82:19, 82:24, 83:7, 83:8, 83:12, 85:13, 86:7, 86:10, 86:14, 86:21, 87:14, 87:18, 87:21, 87:25, 88:3, 88:10, 88:14, 89:24, 90:1, 90:4, 104:24, 112:21, 113:3, 113:6, 113:7, 113:18, 113:24, 114:2, 116:11, 116:15, 116:17, 116:19, 116:21, 121:19, 121:22, 123:21, 123:24, 124:4, 126:21, 127:14, 127:17, 129:12, 130:3, 130:23, 131:1, 131:4, 131:19,

133:7, 135:9, 136:9, 137:23, 138:24, 140:2, 140:5, 140:14, 141:4, 141:22, 142:13, 142:15, 142:19, 142:25, 143:6, 143:12, 144:7, 144:8, 144:9, 144:10, 144:11
**themselves** [1] - 31:6
**there'd** [1] - 54:7
**THEREAFTER** [1] - 144:11
**therefore** [3] - 35:21, 54:7, 139:13
**they've** [2] - 57:4, 76:19
**thinking** [1] - 136:20
**third** [4] - 36:5, 65:12, 87:2, 142:12
**thirds** [1] - 77:25
**THIS** [1] - 144:13
**THOMAS** [70] - 2:15, 3:6, 3:9, 14:8, 17:13, 25:8, 26:8, 27:4, 28:12, 29:12, 29:19, 29:21, 30:24, 31:23, 32:1, 32:7, 32:11, 32:13, 34:5, 34:23, 35:3, 38:5, 61:14, 61:22, 62:2, 62:10, 63:6, 63:13, 63:20, 65:15, 65:24, 66:3, 66:7, 66:13, 66:18, 66:25, 67:3, 68:4, 68:13, 81:6, 83:14, 83:16, 85:16, 86:5, 86:11, 86:19, 86:22, 87:15, 87:19, 87:22, 88:1, 88:4, 88:13, 88:15, 89:22, 104:25, 105:2, 112:22, 113:4, 113:9, 113:16, 121:21, 123:23, 127:16, 130:25, 133:3, 137:3, 143:1, 143:10, 143:17
**Thomas** [10] - 25:7, 29:18, 32:5, 61:13, 83:9, 83:11, 86:17, 104:24, 130:24, 137:2
**thousand** [3] - 42:11, 42:13, 43:4
**thousands** [4] - 42:23, 43:1, 53:2, 78:19
**three** [9] - 7:3, 45:4, 91:18, 118:22,

131:9, 135:19, 135:23, 136:18, 142:1
**thumb** [17] - 39:16, 41:16, 71:5, 71:9, 72:22, 72:24, 73:1, 73:5, 73:12, 74:6, 74:10, 103:23, 103:24, 104:1, 104:2, 104:3, 104:15
**ticket** [1] - 18:22
**Tiempos** [2] - 27:19, 27:21
**TIME** [1] - 144:10
**timing** [2] - 62:23, 68:15
**title** [10] - 24:25, 25:24, 26:1, 26:21, 27:18, 29:1, 29:4, 35:13, 40:13, 57:23
**TO** [1] - 144:11
**toda** [1] - 27:21
**today** [3] - 42:19, 43:6, 67:6, 113:21, 132:15, 132:23, 134:19, 135:8, 137:6, 137:8, 137:12, 139:20, 141:25
**today's** [1] - 42:15
**together** [2] - 51:25, 111:6
**took** [2] - 119:23, 138:8
**Tool** [1] - 97:13
**tool** [1] - 75:10
**tools** [1] - 75:12
**top** [4] - 18:14, 54:3, 78:13, 106:24
**total** [1] - 119:2
**totally** [2] - 23:10, 65:16
**touch** [1] - 72:12
**touching** [1] - 72:13
**tower** [2] - 72:8, 81:17
**Towers** [2] - 16:13, 16:17
**track** [3] - 72:11, 72:14, 116:3
**tracking** [1] - 116:6
**traditional** [1] - 72:8
**train** [1] - 93:4
**Training** [1] - 95:1
**training** [12] - 40:18, 40:23, 40:24, 63:5, 71:8, 92:23, 92:25, 93:8, 93:11, 94:8, 117:16
**transaction** [1] - 37:3
**TRANSCRIPT** [1] -

1:14
**TRANSCRIPTION** [2] - 144:12, 144:13
**transferred** [4] - 50:7, 90:24, 91:13, 139:13
**transport** [2] - 43:7, 43:13
**travel** [7] - 22:13, 118:25, 120:1, 124:21, 125:7, 125:19, 126:2
**traveling** [4] - 20:10, 21:7, 22:12, 124:23
**trial** [6] - 35:22, 131:11, 133:20, 133:23, 133:24, 142:12
**Triangle** [1] - 28:5
**tries** [1] - 132:7
**trigger** [1] - 31:18
**Trojan** [1] - 101:24
**trouble** [1] - 131:23
**TRUE** [1] - 144:13
**true** [19] - 24:22, 25:21, 26:19, 27:16, 28:24, 66:14, 66:20, 68:15, 75:17, 77:3, 95:20, 95:22, 96:11, 97:4, 98:16, 100:15, 134:22, 135:6, 136:16
**truly** [2] - 56:17, 59:18
**truth** [1] - 66:16
**truthfulness** [2] - 95:15, 95:17
**try** [1] - 132:6
**trying** [5] - 11:13, 63:11, 63:22, 64:21, 87:18
**Tuesday** [3] - 131:8, 131:16, 132:17
**Tumblr** [1] - 36:5
**turn** [13] - 13:12, 24:19, 25:12, 25:18, 27:13, 28:21, 47:2, 47:17, 48:5, 49:7, 75:24, 128:23, 129:6
**turned** [1] - 6:24
**turning** [5] - 47:20, 47:21, 49:9, 76:1, 78:3
**TV** [2] - 137:7, 137:13
**tweet** [1] - 131:13
**Twin** [2] - 16:13, 16:17
**two** [38] - 4:16, 9:17, 37:20, 41:23, 51:11, 55:9, 55:12, 59:4, 60:15, 64:23, 68:22, 73:8, 77:25, 78:9, 79:1, 88:17, 91:2,

91:18, 98:9, 98:12, 101:12, 101:14, 111:17, 119:16, 119:19, 120:8, 121:9, 121:11, 122:1, 122:22, 132:2, 137:9, 140:15, 140:23, 140:25, 141:25
**two-thirds** [1] - 77:25
**type** [9] - 8:21, 52:8, 53:17, 74:9, 100:3, 101:25, 102:4, 112:13, 118:7
**types** [2] - 40:25, 41:7
**TYPEWRITTEN** [1] - 144:11
**typical** [1] - 7:9
**typically** [1] - 7:8

## U

**U.C** [1] - 93:12
**U.S** [5] - 22:12, 117:23, 118:1, 118:9, 118:14
**UAE** [1] - 125:8
**UFOs** [1] - 99:7
**ultimately** [1] - 136:25
**unallocated** [5] - 102:11, 102:20, 103:3, 103:6, 103:17
**unavailable** [1] - 133:22
**unaware** [1] - 96:20
**under** [8] - 15:21, 50:6, 56:17, 62:6, 83:6, 105:8, 136:24, 141:5
**undercover** [1] - 133:21
**undergoing** [2] - 79:23, 82:1
**underlined** [1] - 88:17
**understandable** [1] - 57:8
**understating** [1] - 140:8
**understood** [1] - 101:20
**unemployed** [1] - 22:2
**Union** [1] - 37:2
**unique** [1] - 59:6
**unit** [14] - 4:22, 39:10, 39:12, 39:13, 39:25, 42:3, 90:24, 91:2, 91:5, 91:8, 91:9, 91:24, 93:3
**UNITED** [7] - 1:1, 1:1, 1:4, 1:6, 2:5, 2:5,

144:7
**United** [15] - 5:23, 7:9, 8:25, 9:7, 19:8, 19:15, 22:10, 30:15, 31:5, 31:14, 33:9, 33:18, 38:9, 116:13, 133:12
**units** [2] - 39:14, 40:1
**UNIVERSITY** [1] - 2:11
**unless** [5] - 56:16, 102:22, 103:3, 115:23, 131:23
**unlike** [1] - 110:17
**unprecedented** [1] - 17:23
**unpublished** [5] - 133:12, 133:14, 139:3, 139:4, 141:6
**unused** [1] - 102:12
**up** [54] - 10:12, 11:16, 14:24, 16:17, 19:13, 31:19, 34:15, 35:2, 39:8, 41:14, 43:5, 45:6, 48:11, 48:14, 49:8, 51:11, 54:1, 54:12, 57:5, 59:2, 59:20, 67:14, 67:25, 69:11, 70:14, 71:20, 74:7, 83:13, 83:19, 86:8, 99:10, 99:12, 99:13, 99:23, 99:24, 102:5, 102:6, 102:9, 102:16, 103:5, 103:15, 115:11, 120:24, 123:4, 126:2, 130:11, 131:14, 132:16, 132:18, 136:6, 137:12, 139:2, 141:22, 142:5
**updated** [3] - 49:10, 49:11, 75:23
**upheld** [1] - 133:25
**ups** [1] - 83:11
**user** [19] - 36:20, 49:22, 49:24, 53:7, 57:8, 71:7, 72:12, 73:4, 105:5, 105:21, 105:23, 106:9, 106:16, 106:22, 106:25, 115:5, 115:19, 115:23
**uses** [2] - 4:25, 103:23

**V**

**validate** [1] - 126:2
**value** [6] - 75:2, 97:25, 98:5, 98:9, 101:2, 114:16

**values** [6] - 60:18, 60:20, 101:3, 101:19, 104:3, 108:21
**variable** [1] - 70:18
**varies** [1] - 70:10
**various** [4] - 43:13, 52:3, 71:2, 94:7
**Vegas** [1] - 55:20
**vehicle** [2] - 16:20
**vehicles** [2] - 5:10, 5:12
**vendor** [3] - 94:14, 94:15, 97:15
**vendors** [2] - 92:25, 93:9
**verdict** [1] - 131:15
**verification** [2] - 96:23, 104:16
**verified** [1] - 137:8
**verify** [3] - 57:5, 59:22, 60:22
**version** [1] - 109:25
**versus** [2] - 60:21, 133:12
**vest** [2] - 122:11
**Veteran** [1] - 117:7
**video** [21] - 72:9, 109:9, 109:11, 109:13, 109:17, 110:15, 111:3, 112:23, 113:13, 136:16, 136:18, 137:1, 137:5, 138:6, 138:8, 139:22, 139:24, 140:19, 141:2, 141:5, 141:10
**videos** [10] - 76:23, 133:8, 133:9, 134:22, 135:4, 135:17, 135:20, 135:23, 136:10, 139:19
**videotape** [1] - 140:25
**videotapes** [3] - 133:20, 133:24, 134:12
**Vidriales** [6] - 8:9, 13:7, 13:16, 14:17, 14:22, 15:8
**Vietnamese** [4] - 119:20, 121:13, 122:16, 127:4
**viewed** [4] - 106:16, 107:5, 111:24, 113:13
**viewing** [1] - 134:12
**Village** [1] - 36:23
**Viramontes** [10] - 19:20, 61:12, 67:5,

69:12, 83:8, 83:12, 86:7, 86:15, 89:24, 130:3
**VIRAMONTES** [38] - 2:10, 3:6, 3:11, 13:21, 14:3, 14:6, 19:21, 20:2, 20:23, 21:15, 22:1, 24:3, 24:12, 24:15, 24:18, 25:3, 25:13, 26:4, 26:11, 26:25, 27:8, 28:7, 28:15, 29:7, 29:16, 65:6, 67:6, 67:15, 69:14, 86:9, 86:17, 89:25, 121:20, 123:22, 127:15, 129:9, 130:5, 130:22
**Viramontes'** [1] - 65:3
**VIRGINIA** [1] - 1:4
**virtually** [1] - 43:17
**visit** [1] - 125:6
**visited** [3] - 115:13, 115:19, 125:8
**visual** [2] - 104:6, 104:16
**visually** [2] - 76:20, 77:4
**vitae** [1] - 92:22
**volatile** [2] - 75:22
**vouching** [1] - 95:15
**voyage** [1] - 139:15
**VS** [1] - 1:8
**VTS** [2] - 20:15

**W**

**wait** [2] - 132:13, 137:20
**waiting** [1] - 118:17
**walk** [5] - 5:9, 43:10, 43:25, 71:20, 73:7
**walking** [2] - 5:13, 140:6
**wants** [4] - 8:15, 44:17, 74:18, 83:9
**war** [5] - 11:15, 15:19, 15:24, 15:25, 16:6
**Warner** [1] - 37:16
**warrant** [2] - 44:13, 46:5
**warrants** [1] - 8:15
**WAS** [1] - 144:11
**waste** [1] - 132:11
**watched** [1] - 141:3
**watching** [2] - 137:13, 138:21
**water** [1] - 138:18
**ways** [4] - 98:17, 117:21, 118:1, 118:3

**weapons** [5] - 8:14, 63:4, 63:5, 134:14, 136:8
**wearing** [3] - 134:13, 135:21, 140:17
**web** [8] - 115:1, 115:4, 115:18, 115:22, 116:1, 116:4, 116:7
**website** [16] - 105:5, 105:6, 105:16, 105:17, 105:24, 105:25, 106:1, 106:2, 107:2, 107:8, 114:25, 115:3, 115:13, 115:17, 116:4
**websites** [1] - 115:19
**week** [7] - 93:16, 131:7, 141:23, 142:12, 142:15, 143:13
**weeks** [1] - 93:15
**Wells** [1] - 37:21
**Western** [1] - 37:2
**whichever** [1] - 35:12
**who_m_i66@yahoo. com** [1] - 37:9
**whole** [6] - 68:23, 93:5, 98:13, 132:14
**wide** [1] - 53:10
**Wilshire** [1] - 117:6
**window** [11] - 119:5, 119:10, 119:12, 120:9, 121:4, 121:9, 121:10, 121:15, 122:2, 123:10, 123:17
**Windows** [2] - 49:6, 103:14
**windows** [1] - 119:6
**wipe** [2] - 96:12, 97:2
**wiped** [5] - 50:5, 50:9, 50:11, 96:17, 96:18
**wish** [3] - 50:6, 74:3, 137:2
**withdrew** [1] - 130:17
**WITNESS** [9] - 21:25, 24:14, 30:23, 38:17, 43:22, 55:19, 83:7, 113:7, 116:19
**witness** [40] - 12:7, 24:11, 31:25, 34:19, 34:24, 34:25, 38:9, 38:13, 61:17, 63:12, 64:2, 64:21, 65:3, 68:9, 82:18, 82:20, 82:21, 83:1, 83:2, 86:19, 88:12, 90:6, 113:20, 113:22, 116:9, 116:12,

116:16, 131:24, 132:2, 132:3, 132:13, 134:7, 134:21, 136:23, 137:5, 139:23, 140:11, 142:23
**witness's** [1] - 24:17
**witnessed** [6] - 134:24, 135:5, 140:1, 140:3, 140:6, 140:7
**WITNESSES** [1] - 3:2
**witnesses** [6] - 131:11, 131:22, 133:4, 141:23, 141:25, 142:1
**Word** [3] - 74:11, 103:9
**word** [11] - 41:14, 51:24, 52:3, 52:7, 52:10, 52:12, 99:20, 99:23, 136:10, 138:10
**words** [7] - 52:17, 64:25, 92:12, 96:6, 98:4, 100:6, 100:14
**workers** [1] - 121:10
**works** [6] - 59:22, 72:3, 93:15, 99:19, 107:10, 115:1
**workshop** [1] - 94:7
**world** [1] - 99:20
**worships** [1] - 62:14
**worth** [5] - 40:24, 42:12, 42:13, 68:24, 106:3
**WRITE** [1] - 48:25
**write** [11] - 39:19, 48:24, 49:15, 49:19, 53:13, 72:23, 73:3, 74:1, 96:6, 96:7, 97:21
**written** [9] - 17:18, 17:19, 23:16, 103:3, 103:7, 105:7, 105:11, 111:23, 135:12
**wrote** [2] - 23:19, 67:12
**Ws** [4] - 21:18, 34:10, 65:11, 66:6

**X**

**Xbox** [1] - 99:5
**XIOMARA** [1] - 3:5

**Y**

**Yahoo** [2] - 37:5, 37:8

**year** [3] - 91:13, 91:15, 137:6

**year-and-a-half** [2] - 91:13, 91:15

**years** [10] - 4:16, 17:23, 21:20, 39:3, 39:4, 39:9, 40:20, 91:2, 117:9, 137:9

**Yisidro** [4] - 4:12, 5:2, 5:5, 7:19

**York** [1] - 61:17

**Yorker** [1] - 17:7

**yourself** [2] - 80:2, 97:21

## Z

**zoom** [3] - 122:18, 125:12, 127:20