1           UNITED STATES OF AMERICA
            UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
                 EASTERN DIVISION
3
                    - - -
4         HONORABLE VIRGINIA A. PHILLIPS
        UNITED STATES DISTRICT JUDGE PRESIDING
5                   - - -

6

   UNITED STATES OF AMERICA,        )
7                                    )
                 PLAINTIFF,          )
8                                    )
   VS.                               )   CASE NO.:
9                                    )   ED CR 12-00092(B)-VAP
   SOHIEL OMAR KABIR                 )
10 RALPH KENNETH DeLEON,             )
                                     )
11               DEFENDANTS.         )
   _____)
12

13

14

            REPORTER'S TRANSCRIPT OF PROCEEDINGS
15                   (P.M. SESSION)

16          WEDNESDAY, AUGUST 20, 2014

17             LOS ANGELES, CALIFORNIA

18

19

20

21

22
            LAURA MILLER ELIAS, CSR 10019
23          FEDERAL OFFICIAL COURT REPORTER
           312 NORTH SPRING STREET, ROOM 453
24          LOS ANGELES, CALIFORNIA 90012
                 PH:  (213)620-0890
25

```
 1
       APPEARANCES OF COUNSEL:
 2
       ON BEHALF OF PLAINTIFF:
 3
                   BY:  SUSAN DeWITT
 4                      CHRISTOPHER GRIGG
                        ALLEN CHIU
 5                 ASSISTANT UNITED STATES ATTORNEYS
                   1100 UNITED STATES COURTHOUSE
 6                 312 NORTH SPRING STREET
                   LOS ANGELES, CA 90012
 7

 8     ON BEHALF OF DEFENDANT KABIR:

 9                 OFFICE OF THE FEDERAL PUBLIC DEFENDER
                   BY: JEFFREY AARON
10                     ANGELA VIRAMONTES
                       MATTHEW LARSEN
11                 DEPUTY FEDERAL PUBLIC DEFENDERS
                   3801 UNIVERSITY AVENUE
12                 SUITE 700
                   RIVERSIDE, CA 92501
13
       ON BEHALF OF DEFENDANT DeLEON:
14
                   HANNA BROPHY
15                 BY:  DAVID J. THOMAS, ESQ.
                   1500 IOWA AVENUE
16                 RIVERSIDE, CA 92507

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2   WITNESSES FOR
     THE GOVERNMENT:
 3
                      DIRECT    CROSS    REDIRECT    RECROSS
 4
     NADER, MICHAEL
 5   BY:  MR. GRIGG     4

 6
        EXHIBITS       ADMITTED        EXHIBITS       ADMITTED
 7
        91                7           91A                9
 8      92, 92A          15           371               26
        461              29           375               33
 9      376              33           380               33
        382              33           383               33
10      384              33           385               33
        386              42           420               46
11      443              48           487               58
        429              66           434               68
12      440              70           426               75
        427              75           430               75
13      431              75           432               75
        437              75           438               75
14      441              75           445               75
        446              75           448               75
15      449              75           450               75
        433              78           435               80
16      439              81           462               84
        460              95
17

18

19

20

21

22

23

24

25
```

```
 1   RIVERSIDE, CALIFORNIA; WEDNESDAY, AUG. 20, 2014; 1:15 P.M.
 2                              - - -
 3            THE COURT:  Good afternoon.  Let the reflect the
 4   presence of all members of the jury, all counsel, defendants
 5   are present, and the witness again is on the witness stand.
 6            You may continue.
 7            MR. GRIGG:  Thank you, Your Honor.
 8                   DIRECT EXAMINATION (CONTINUED)
 9   BY MR. GRIGG:
10   Q.   Good afternoon, Special Agent Nader.
11   A.   Good afternoon.
12   Q.   Before the break, we were talking about you recovering
13   devices from the CHS?
14   A.   Yes.
15   Q.   I forgot to ask you about a particular date.  Did you
16   also meet with the CHS in October of 2012 to collect a device
17   from him?
18   A.   Yes, I did.
19   Q.   What date was that?
20   A.   October 6th.
21   Q.   Now, you described the procedure before about what you
22   would do with the device and downloading and so on, did you
23   follow that procedure with this device on October 6th?
24   A.   Yes, I did.
25   Q.   Did you, in fact, make a disk of the recording that you
```

1    recovered from the device?

2    A.    Yes.

3    Q.    Did that disk -- as you testified with the others, did

4    that disk have a 1D number?

5    A.    It did.

6    Q.    What was the 1D number for that?

7    A.    My recollection is that it was 1D-44.

8    Q.    All right.  And earlier in your testimony, you mentioned

9    that you had also recovered from the CHS a thumb drive.  Do

10   you recall that testimony?

11   A.    Yes.

12   Q.    And I believe that's exactly the point where we left off

13   before the break; is that right?

14   A.    I believe so.

15   Q.    Turning your attention to the binder in front of you,

16   the exhibit marked 91 which is roughly a little bit more than

17   halfway through your tabs there, can you take a moment to

18   open that binder, please?  Do you see Exhibit 91 in front of

19   you?

20   A.    I do.

21   Q.    All right.  What is Exhibit 91?  Do you recognize it?

22   A.    Yes.  Exhibit 91 is a photograph.

23   Q.    Is that a single page document or is there multiple

24   pages?

25   A.    There's multiple pages.

```
 1   Q.   Turning your attention to page two, is that a photograph
 2   as well?
 3   A.   Yes.
 4   Q.   And page three?
 5   A.   Page three as well.
 6   Q.   Do you recognize these photographs?
 7   A.   I do.
 8   Q.   What are they?
 9   A.   These are photographs of a USB thumb drive that I had
10   previously received from the informant.
11   Q.   Did you take these photographs?
12   A.   I did.
13   Q.   All right.  I think perhaps the best one in your binder
14   is page two, is that correct, of this one?
15   A.   That's correct.  That's what appears to be the clearest
16   photograph.
17   Q.   Did these photographs accurately depict the thumb drive
18   that you recovered from the CHS?
19   A.   Yes.
20           MR. GRIGG:  At this point, Your Honor, the
21   government moves to admit Exhibit 91 into evidence.
22           THE COURT:  Any objection?
23           MR. AARON:  None, Your Honor.
24           MR. THOMAS:  No, Your Honor.
25           THE COURT:  Thank you.  It's ordered admitted.
```

```
 1                    (Exhibit 91 admitted.)
 2              THE COURT:  You may publish.
 3   BY MR. GRIGG:
 4   Q.   Sir, I'm going to display for you page two of this
 5   exhibit.  Do you see that photograph?
 6   A.   I do.
 7   Q.   Is that, in fact, Government's Exhibit 91?
 8   A.   Yes, it is.
 9   Q.   What is this item here depicted along the bottom
10   parallel to my blue line?
11   A.   It is a ruler.
12   Q.   And then this item here, what is that?
13   A.   That is the USB thumb drive that I had previously
14   received from the informant.
15   Q.   And is this a zoomed-in image of the thumb drive itself?
16   A.   Yes, it is.
17   Q.   All right.  Did you do anything with this thumb drive
18   when you received from the informant?
19   A.   Yes, I did.
20   Q.   What did you do with it?
21   A.   Once I had received that thumb drive from the informant
22   and received an explanation of where he had received it, I
23   took that thumb drive to the Orange County Regional Computer
24   Forensic Lab and entered it into a loose media kiosk, and the
25   loose media kiosk generated a report with the contents of
```

```
 1    that USB thumb drive.
 2    Q.   Okay.  That's the same loose media kiosk we've heard
 3    about a number of times; correct?
 4    A.   That's correct.
 5    Q.   And is that the kiosk that makes a true and accurate
 6    copy of the contents of loose media?
 7    A.   Yes.
 8    Q.   Turning your attention to what's been marked as 191 A,
 9    that should be the next tab in your binder, do you recognize
10    that document?
11    A.   Yes, I do.
12    Q.   What is this?
13    A.   This is the report that was generated by the loose media
14    kiosk after I had inserted that USB device into the loose
15    media kiosk.
16    Q.   Does this report indicate a date?
17    A.   Yes, it does.
18    Q.   And is that date consistent with when you received and
19    then took this device to the loose media kiosk in the OCR
20    CFL?
21    A.   To my recollection, yes, it does.
22              MR. GRIGG:  Your Honor, at this point, the
23    government would move to admit Government's Exhibit 91 A.
24              THE COURT:  Any objection?
25              MR. AARON:  None, Your Honor.
```

UNITED STATES DISTRICT COURT

```
 1              MR. THOMAS:  No, Your Honor.

 2              THE COURT:  Ordered admitted.

 3                   (Exhibit 91A admitted.)

 4              THE COURT:  You may publish.

 5   BY MR. GRIGG:

 6   Q.   Sir, displayed on the screen in front of you, is that

 7   the first page of Government's Exhibit 91 A?

 8   A.   Yes, it is.

 9   Q.   And if we can focus up here, the date we referenced a

10   minute ago, um, you see that date indicated here?

11   A.   Yes.

12   Q.   And, uh, what is that date?

13   A.   That is the date that I went to the -- the forensic lab

14   and put in the thumb drive into the loose media kiosk, and

15   the then the report was subsequently generated.

16   Q.   And we've seen similar reports like this already with

17   your testimony; is that correct?

18   A.   Yes.

19   Q.   All right.  And what are the items listed in this

20   report?

21   A.   The items listed within this report are files with their

22   file names.

23   Q.   And these are files that were on the thumb drive as you

24   received it from the CHS; is that correct?

25   A.   That's correct.
```

1    Q.   And I'm gonna turn your attention to the sixth page of

2    this exhibit.  This is several pages into the exhibit; is

3    that correct?

4    A.   Yes.

5    Q.   All right.  And you talked before about MP-3 files.  Are

6    those types of files some of the types of files listed in

7    this index of what was on the thumb drive?

8    A.   Yes, they are.

9    Q.   And did you have an opportunity to review some of these

10   MP-3 files?

11   A.   Yes, I did.

12   Q.   I'm gonna direct your attention, uh, to page 12.

13   Directing your attention down to the bottom left of this

14   page, do you see the MP-3 file listed as Items 485, 486, 487?

15   A.   Yes, I do.

16   Q.   What do those appear to be?

17   A.   Excuse me.  Those are MP-3 files.

18   Q.   Of -- and what's the title for 485?

19   A.   Anwar al-Awlaki.

20   Q.   Um, sorry, that's the first part of the title.  What's

21   the full title?

22   A.   I'm sorry.  484 is Anwar al-Awlaki.  Allah is preparing

23   us for victory, part one.

24   Q.   Sorry, did you say 484 or 485?

25   A.   484.

1    Q.    Okay.  And what is 485?

2    A.    485 is Anwar al-Awlaki.  Um, Allah is preparing us for

3    victory, part two.

4    Q.    Okay.  And then next is 486.  What is 486?

5    A.    486 is also an MP-3 audio file.  Excuse me.

6    Q.    I was asking about 486.  What is the title of 486?

7    A.    The title of 486 is Anwar al-Awlaki Ayat al Kursi.

8    Q.    And 487?

9    A.    487 is Anwar al-Awlaki.  44 ways to support jihad, PDF

10   file.

11   Q.    Okay.  In reviewing the audio files in this device, are

12   you familiar with those?

13   A.    Yes, I am.

14   Q.    Are those lectures by Anwar al-Awlaki?

15   A.    The -- the files contain, uh -- there's several files on

16   this device.  A large, um, part of them are lectures from

17   Anwar al-Awlaki.

18   Q.    Is every Anwar al-Awlaki file fully named with a label

19   like this or are there some that just have a number, and you

20   don't recognize what they are?

21   A.    Some of them just have a number, yes.

22   Q.    And are you familiar with 44 ways to support jihad?

23   A.    Yes, I am.

24   Q.    What's that?

25   A.    44 ways to support jihad, um, in this PDF format is

```
 1    essentially ways and manners prescribed by Anwar al-Awlaki in
 2    which an individual may support, uh, jihad, um, ranging
 3    anywhere from --
 4    Q.   Sorry, let me stop you right there.  Are you saying it's
 5    an article or text by al-Awlaki?
 6    A.   It's attributed to Anwar al-Awlaki, yes.
 7    Q.   But this is not an audio file; is that correct?
 8    A.   That's correct, it's a PDF.
 9    Q.   And after you made this forensic image of the contents
10    of the thumb drive that you received from the CHS, what did
11    you do with the thumb drive?
12    A.   As soon as I had made a -- a copy of the thumb drive, as
13    soon as I was able to and as soon as the informant was able
14    to, I met up with him once again and gave him the thumb
15    drive.
16    Q.   You gave it back to him?
17    A.   I did.
18    Q.   Why did you do that?
19    A.   Because, um, as the informant had instructed me or had
20    told me, he had received the thumb drive from Mr. DeLeon on
21    loan, and I wanted to make sure that the informant had the
22    thumb drive back in case Mr. DeLeon had asked about it.
23              MR. THOMAS:  Your Honor, I'm gonna object as to
24    hearsay and move to strike that answer.
25              THE COURT:  The objection's overruled, and the
```

1   motion to strike is denied.

2   BY MR. GRIGG:

3   Q.   Sir, directing your attention to what's in the binder in

4   front of you marked Exhibit 92.

5           MR. GRIGG:  And Your Honor, this may be a situation

6   where we need to get another clearer version of this item,

7   but I'll inquire about it, and then we'll provide a clearer

8   image.

9   Q.   Uh, Agent Nader, Exhibit 92, do you have that in front

10  of you?

11  A.   Yes, I do.

12  Q.   What is Exhibit 92?

13  A.   Exhibit 92 is a photograph that I also have taken of the

14  USB thumb drive.

15  Q.   Did you take this on the same date in June when you

16  first took the photographs from the last exhibit?

17  A.   No, I did not.

18  Q.   All right.  Did you take this at a later point in time?

19  A.   I did.  I believe --

20  Q.   How did you come to possess the thumb drive again?

21  A.   The informant had instructed me --

22  Q.   I'm sorry.  Did you meet with him again and again

23  retrieve the same thumb drive back?

24  A.   Yes, I did.

25  Q.   Okay.  And did you follow the same procedure that you

1  described before?  Did you take photographs?

2  A.   I did.

3  Q.   And are those the photographs depicted in 92?

4  A.   Yes, they are.

5  Q.   Did you follow the same procedure and take it to the OCR

6  CFL?

7  Q.   What did you do with it there?

8  A.   I did -- I followed the same procedure I had done

9  before.  I took the USB thumb drive to the center, entered it

10 into the loose media kiosk.  The kiosk generated a report

11 with the contents of the USB thumb drive.

12 Q.   Turning your attention to 92 A in the binder in front of

13 you, do you recognize 92 A?  It should be the next tab.

14 A.   Yes.

15 Q.   What is 92 A?  How do you recognize it?

16 A.   92 A is the report that was generated on that day when I

17 took the USB thumb drive to the loose media kiosk so it's a

18 report of the contents of the -- that USB thumb drive.

19 Q.   And the top right page of this exhibit, does it indicate

20 a date?

21 A.   It does.

22 Q.   Is that date an approximate date for when you received

23 the device and then took it back to the OCR CFL?

24 A.   Yes.

25          MR. GRIGG:  Your Honor, at this point, the

1    government moves to admit Exhibits 92 and 92A.

2              THE COURT:  All right.  Any objections?

3              MR. AARON:  None, Your Honor.

4              MR. THOMAS:  No, Your Honor.

5              THE COURT:  Thank you.  92 and 92A are ordered

6    admitted, and you may publish.

7                   (Exhibits 92 and 92A admitted.)

8    BY MR. GRIGG:

9    Q.   I'm gonna show you, Special Agent Nader, what's been

10   admitted as 92A on the first page.  Directing your attention

11   to the top of the first page, um, what's the date of this

12   report?

13   A.   The date of this report is September 10th of 2012.

14   Q.   Is that consistent with the date you took the device

15   back to the OCR CFL to make this report with the loose media

16   kiosk?

17   A.   Yes, I believe it is.

18   Q.   And is this another multi-page report containing files

19   from the MP-3 player?

20   A.   Uh, it wasn't the MP-3 player.

21   Q.   Right.

22   A.   It was from the USB --

23   Q.   I'm sorry.

24   A.   -- thumb drive.

25   Q.   USB drive.

```
 1    A.    Yes.
 2    Q.    And does this contain the same kinds of files we saw
 3    before?
 4    A.    It -- it does.
 5    Q.    By type.  Does it have --
 6    A.    By type of files, yes.
 7    Q.    Sorry.  I apologize.  Does it have audio files?
 8    A.    It does.
 9    Q.    Does it also have lectures by al-Awlaki?
10    A.    Yes, it does.
11    Q.    Does it have PDFs and other types of files as well?
12    A.    Yes, it does.
13    Q.    All right.  We talked about recording devices.  At a
14    certain point in time, did the FBI also set up recording
15    devices in the apartment in Chino we've heard testimony
16    about?
17    A.    Yes, it did.
18    Q.    Were you present when that happened?
19    A.    I was.
20    Q.    And was that in September 2012?
21    A.    Yes, it was.
22    Q.    Did you observe the installation of the devices there?
23    A.    Yes, I did.
24    Q.    Uh, were there microphones?
25    A.    There were microphones, yes.
```

UNITED STATES DISTRICT COURT

```
 1   Q.   Was there, uh -- aside from something that captured

 2   sound, was there something that captured video, too?

 3   A.   Yes.

 4   Q.   If we refer to that as the audio video device, will you

 5   know what I'm referring to?

 6   A.   Yes, I will.

 7   Q.   Was there an audio video device also installed?

 8   A.   There was.

 9   Q.   Okay.  You were present for the installation of those

10   devices.

11   A.   Yes, I was.

12   Q.   Was anything done to test those devices to see whether

13   they were working?

14   A.   Yes.

15   Q.   What happened?

16   A.   So they were tested, um -- first they were tested within

17   the apartment with one individual being within the apartment

18   and the other individual outside of the apartment --

19   Q.   Sorry, before we get too far in the abstract about

20   individuals, were you one of those individuals?

21   A.   Yes, I'm sorry.  I was one of those individuals, and

22   there was -- there was a technician or another FBI employee

23   with me.

24   Q.   Okay.  So go ahead, tell us how those Mikes were tested.

25   A.   So they were tested.  For example, the -- myself would
```

1    be inside the apartment.  The technician or FBI employee

2    would be outside of the apartment with a laptop and testing

3    the integrity or the quality of both the audio and the

4    microphone as well as the audio video device.  And then we

5    switched where I went outside with the laptop, the technician

6    was within the apartment, and I verified that the audio and

7    the -- both the microphone and the audio video device were

8    functioning appropriately, correctly.

9    Q.   We've heard testimony about recordings and so on and the

10   systems they're stored on.  Um, was the -- was the microphone

11   set up in a way to record what happened, the audio recording?

12   That was a very poor way of putting it.  The microphones were

13   set up.  Did the microphones record -- or was there a

14   recording of what the microphones heard?

15   A.   I'm sorry, you're gonna have to repeat the question.

16   Q.   Forgive me for stumbling.  The microphones.

17   A.   Mm-hmm.

18   Q.   You said they were set up in the apartment, and you were

19   able to test them.

20   A.   Yes.

21   Q.   Was there a recording of what was captured on the

22   microphones?

23   A.   Yes.

24   Q.   Were the microphones -- was that audio typed into Red

25   Tiger?

1    A.   Yes, it was.

2    Q.   And can you describe the process, if any, that you took

3    to test whether the audio video device was working correctly?

4    A.   Yes.  After -- after myself and the technician tested

5    the audio video device inside the apartment and directly

6    outside of the apartment, myself and the technician returned

7    back to our office, the FBI office, and we tested once again

8    that the audio video device was functioning correctly.

9    Q.   And how did you do that?

10   A.   The -- the information from the -- the audio video

11   device, the recordings or the feed, and I'm gonna use the

12   term that you used, was piped back to our office where we had

13   a computer and the server that was basically recording what

14   was happening within the apartment.

15   Q.   Was the audio video recording piped directly into the

16   server?

17   A.   Yes, it was.

18   Q.   Okay.  So the recording is stored on the server.  How

19   were you able to verify that it was working correctly?

20   A.   So we were able to -- we were able to verify that.

21   Prior to the defendants entering into the apartment, you

22   could hear the air conditioning unit that was within the

23   apartment as well as sun-up and sundown so we knew that the

24   audio quality was good as was the video quality.  And, of

25   course, once the defendants entered the apartment, we also

1    verified that the audio and video quality was good.

2    Q.   Before anybody involved in the investigation aside from

3    yourself entered the apartment at all, whether it's the

4    persons you mentioned or anybody else, did you do something

5    to test the recording and the audio video device before any

6    of that happened?

7    A.   Yes.

8    Q.   What did you do?

9    A.   So before -- uh, before any other individuals had

10   entered the -- the apartment, um, when the technician and

11   myself were within the apartment, we were able to see that

12   recording back at the office when we were reviewing it on the

13   server.

14   Q.   So you mentioned that the recording is stored directly

15   in a server at your office.  Does that mean you have the

16   ability to play it back?

17   A.   Yes.

18   Q.   And were you able to play back portions of things that

19   you observed in the apartment, uh, from the playback I

20   guess -- is that a computer?

21   A.   Yes.

22   Q.   Were you -- using that computer, were you able to play

23   back and see the things that had happened in the apartment?

24   A.   Yes.

25   Q.   Who had access to the server where the audio video was

1    piped at your office?

2    A.    The technician.

3    Q.    Is that the only person who had access?

4    A.    Agents that would be reviewing the -- the audio, the

5    microphones or the -- I'm sorry.  Agents that would be

6    reviewing the audio video feed from the device would have

7    access to that computer, the review function.  They didn't

8    have direct access to the server meaning they couldn't log on

9    as an -- as an administrator and manipulate information.

10   Q.    So another way of saying that is you limited access only

11   to the viewer?

12   A.    Yes.

13   Q.    Now, you mentioned feed.  Was it possible given the way

14   it was set up in the computers you had to watch a real time

15   feed as it was happening?

16   A.    Yes.  There was -- there's essentially two functions to

17   the -- to the recorder.  You can watch a live feed, and you

18   can also go back in time and watch a recording, and it has

19   that function.

20   Q.    And did you make copies of the entire recording?

21   A.    Yes, we did.

22   Q.    Why did you do that?

23   A.    We made copies -- well, we always -- what we try to do

24   is -- and not just for audio video devices but similarly as

25   we discussed earlier with recordings that we received from

```
 1    the informant or other types of evidence, we always make
 2    copies so we don't have to always rely on the original in
 3    case, um -- in case some issue arises.
 4    Q.   So you make backups?
 5    A.   Backups.
 6    Q.   And did you make backups in this case for any other
 7    reason of the audio video recording?
 8    A.   Any other reason?
 9    Q.   Yeah.
10    A.   We made, uh, backups or we made copies in order to
11    provide, uh, to the defense.
12    Q.   Uh, as an agent with access to the reviewer or the
13    reviewing function on the computer, were you able to alter in
14    any way the underlying recording?
15    A.   No.
16    Q.   Were you able to access or alter or change in any way
17    the recording as it existed on the server what you referenced
18    of the original recording?
19    A.   No.
20    Q.   So when you back the backups, are those true and correct
21    copies of what's on the original server?
22    A.   Yes, they are.
23    Q.   And you said the technical agent or the technician was
24    the only one who had full access to the entire system?
25    A.   Yes.  Let me also clarify, if I may.  The system has a
```

1    password basically to let you in.  The technician is an

2    administrator so he has a special password in order to access

3    that system.  As reviewers, agents have different passwords

4    or different password access so there's no way that an agent

5    would be able to tamper or mess with the original feed that's

6    coming in or the original audio video recordings that are

7    coming in.

8    Q.   Agent Nader, before we started talking about recording

9    devices and cell phones and thumb drives, we were talking

10   about social media, and I'd like to focus back for a while on

11   some Facebook activities.  Turning to the next tab in front

12   of you to what's been marked as Exhibit 371, do you see that

13   in the binder in front of you?

14   A.   Yes, I do.

15   Q.   What is 371?

16   A.   371 is a -- it's a screen capture of Mr. Santana's

17   Facebook page, his front page on his Facebook profile.

18   Q.   You testified earlier that you viewed his Facebook page

19   multiple times just like his Tumblr page; is that correct?

20   A.   That's correct.

21   Q.   Is this image a true and correct screen capture or

22   screen shot of Mr. Santana's Facebook page?

23   A.   Yes, it is.

24   Q.   And specifically, this shows -- we talked about

25   different parts of his Facebook page.  Does this show the

```
 1    wall or the status or the profile?  What does this show?

 2    A.   This -- this particular portion shows his profile, his

 3    profile information.

 4    Q.   And turning to the second page, can you see that item?

 5    A.   Yes.

 6    Q.   All right.  And do you recognize that item as well?

 7    A.   I do.

 8    Q.   What is that?

 9    A.   This is a screen capture what appears to be at a later

10    date of Mr. Santana's Facebook page.

11    Q.   Okay.  And is there anything else displayed on this

12    screen capture besides the profile?

13    A.   I'm sorry, can you be a little bit more specific?

14    Besides comments or besides --

15    Q.   Do you see comments in this image?

16    A.   I do.

17    Q.   All right.  And who are the people involved in the

18    comments?  Let me put that a different way.  Are any of other

19    suspects in this case the people involved in the comments

20    that are on page two of 371?

21    A.   I'm sorry, I think we were looking at -- um, you said

22    the next tab.  I'm looking at --

23    Q.   I'm sorry, I went to the next page.  So if you can go

24    back to 371 and look at page two.

25    A.   Then I apologize.
```

1    Q.    Do you recognize this page?

2    A.    Yes, I do.

3    Q.    All right.  Do you see anything other than the profile

4    on page two of 371?

5    A.    Yes.  I see individuals who had liked a particular post

6    that Mr. Santana had made on his Facebook page.

7    Q.    Are any of the other subjects in this case one of the

8    people who liked the posts?

9    A.    Yes.

10   Q.    Which -- which subjects?

11   A.    Mr. DeLeon.

12   Q.    And is this page a true and accurate image of

13   Mr. Santana's Facebook page showing the likes including the

14   like by Mr. DeLeon?

15   A.    Yes, it is.

16   Q.    And turning your attention to page three, do you

17   recognize the image depicted in this page three of this

18   exhibit?

19   A.    I do.

20   Q.    What is this?

21   A.    This is a screen capture from Mr. Santana's Facebook

22   page, specifically a picture or a photograph that he had

23   posted on his Facebook page.

24         MR. GRIGG:  Your Honor, at this point, the

25   government moves to admit Government's Exhibit 371.

```
 1              THE COURT:  Any objections?
 2              MR. AARON:  None, Your Honor.
 3              MR. THOMAS:  No, Your Honor.
 4              THE COURT:  371 is ordered admitted.
 5                   (Exhibit 371 admitted.)
 6              THE COURT:  You may publish.
 7    BY MR. GRIGG:
 8    Q.   Okay.  Sir, directing your attention to the screen in
 9    the front of you, do you see, uh, what is the first page of
10    Exhibit 371?
11    A.   Yes, I do.
12    Q.   All right.  And you mentioned this is a screen shot so
13    what are we looking at in the top left corner?
14    A.   Top left-hand corner, we're looking at the website
15    address which indicates Facebook dot com and then me5r1.
16    Q.   And then directing your attention to this material here,
17    do you recognize the person in that photograph?
18    A.   Yes, I do.
19    Q.   Who is that?
20    A.   Mr. Santana.
21    Q.   And you testified previously about the name -- one of
22    the vanity names.  You see that vanity name in this image,
23    too?
24    A.   Yes, I do.
25    Q.   What's the vanity name indicated by the blue?
```

1    A.    The vanity name here is Mikaeel MK.

2    Q.    Okay.  You referenced the Facebook address for this.  Is

3    that indicated in the, uh, zoom in here?  Just for ease of

4    reference.  Down here?

5    A.    Yes.  Thank you.  The -- yes.  The Facebook address that

6    we referenced previously, this is the same one,

7    facebook.com@me5r1.

8    Q.    And for contact information, is an email address listed?

9    A.    Yes, there is.

10   Q.    And is that email address one of the ones we talked

11   about before?

12   A.    Yes, it is.

13   Q.    What is that email address?

14   A.    101mesr@gmail.com.

15   Q.    Turning your attention to page two, is this also a page

16   that indicates Mr. Santana's Facebook profile?

17   A.    Yes, it does.

18   Q.    And you referenced earlier in your testimony about a

19   liking activity.  Do you see the person -- the reference to

20   Mr. DeLeon that you mentioned about people who liked this?

21   A.    Yes, I do.

22   Q.    Can you use the Telestrator in front of you to draw a

23   circle around that?  And I'm trying to zoom in.  And what's

24   the reference to Mr. DeLeon in the zoomed-in feature that you

25   just circled?

```
1    A.    The reference is Rafiq Abdul Raheem, California State
2    University, San Bernardino.
3    Q.    Now, you testified earlier that individual Facebook
4    users could like and share and comment.  Is this an example
5    of one of those activities?
6    A.    Yes, it is.
7    Q.    All right.  Did you also look at Mr. Santana's Facebook
8    profile again in August of 2012?
9    A.    Yes.
10   Q.    And did you take more screen shots of it?
11   A.    I did.
12   Q.    All right.  Directing your attention to what's been
13   marked as Government's Exhibit 461, do you have that in front
14   of you?
15   A.    I do.
16   Q.    Do you recognize that exhibit?
17   A.    Yes, I do.
18   Q.    What is it?
19   A.    It's a screen shot of Mr. Santana's Facebook page, his
20   front page.
21   Q.    Now, you mentioned earlier that individual Facebook
22   users can change their profile, their pictures, their vanity
23   names and so on.  Does this exhibit indicate that such a
24   change has been made?
25   A.    Yes, it does.
```

```
 1    Q.    What's different about it?
 2    A.    The -- the picture or the vanity or the profile picture
 3    has changed.  Or had changed.
 4    Q.    Has changed?
 5    A.    Sorry, had changed.
 6    Q.    Had changed, I'm sorry.  Do you recognize the individual
 7    depicted in this photograph?
 8    A.    Yes, I do.
 9    Q.    Who is that?
10    A.    Mr. Santana.
11    Q.    It's just a different picture?
12    A.    It's just a different picture.
13    Q.    Is this exhibit a true and accurate depiction of the
14    screen capture that you made of Mr. Santana's Facebook page?
15    A.    Yes, it is.
16              MR. GRIGG:  Your Honor, at this point, the
17    government moves to admit Government's Exhibit 461.
18              THE COURT:  Any objection?
19              MR. AARON:  No, Your Honor.
20              MR. THOMAS:  No objection.
21              THE COURT:  Ordered admitted.
22                   (Exhibit 461 admitted.)
23              THE COURT:  You may publish.
24    BY MR. GRIGG:
25    Q.    All right.  Do you see the first page of 461 displayed
```

1    on your screen?

2    A.    Yes.

3    Q.    You mentioned profile.  We'll just focus only on that

4    part of it.  Zooming in to the top center of the page, the

5    user name, sir, does that appear to be the same?  The vanity

6    name, excuse me.

7    A.    It does.  The vanity name appears to be the same.

8    Q.    And the change in the profile picture, is this the

9    reference you have here?

10   A.    Yes.

11   Q.    The new profile picture?

12   A.    Correct, the new profile picture.

13   Q.    And who is this person?

14   A.    Mr. Santana.

15   Q.    Now, when reviewing Mr. Santana's Facebook page, did you

16   notice any references or interaction with other suspects or

17   subjects in this case?

18   A.    Yes, I did.

19   Q.    In particular, did you notice any interaction with

20   Mr. DeLeon?

21   A.    Yes.

22   Q.    Via Facebook?

23   A.    Via his Facebook.

24   Q.    I'm gonna do several in order, sir.  In the binder in

25   front of you, the next exhibits should be 375, 376, 380, 382,

1   383, 384, 385, 386, 387, 388.  Do you have those in front of

2   you?

3   A.   Yes, I do.

4   Q.   Do you recognize each of these exhibits?

5   A.   I do.

6   Q.   What are they?

7   A.   These are all screen captures that I had done from a

8   Facebook page called Inspire the Believers.

9   Q.   Are each and every one of these true and accurate

10  depictions of the Facebook page Inspire the Believers that

11  you made?

12  A.   Yes.

13  Q.   Do any of these indicate interaction with Mr. Santana

14  and Mr. DeLeon?

15  A.   Yes, they do.

16  Q.   All of them?

17  A.   Not all of them but -- not all of them.

18  Q.   Let's start with 375 through 385.  Do those indicate

19  interaction with both Mr. Santana and Mr. DeLeon?

20  A.   Sorry, which numbers?  375?

21  Q.   And 376, 380 through 385.  That would be the first seven

22  in the binder.

23  A.   Yes.  Each one of those exhibits depicts interactions

24  between both Mr. DeLeon and Mr. Santana.

25  Q.   Okay.  And how does it do that?  How do they do that?

1    A.   Both Mr. Santana and Mr. DeLeon liked the same post that

2    occurred on this Facebook page called Inspire the Believers.

3    Q.   In each of the exhibits, they -- it indicates they liked

4    the same posts?

5    A.   Yes.

6             MR. GRIGG:  Your Honor, starting with 375, 376,

7    380, 382, 383, 384 and 385, the government moves to admit

8    each of those into evidence.

9             THE COURT:  Any objections?

10            MR. AARON:  Uh, Your Honor, just to make sure that

11   I have this correct, that's 376, 377, 380, 382, 383 and 384?

12            MR. GRIGG:  Uh, no, Your Honor.  Actually, it's

13   375, 376, 380, 382, 383 and 384 and 385.

14            MR. AARON:  Yes, Your Honor.  We would make the

15   objection we made earlier, and we'd make a different

16   objection that it's even less relevance.  A third party

17   maintained website that's supposedly Mr. Santana and

18   Mr. DeLeon went on, there's no connection whatsoever to

19   Mr. Kabir.

20            THE COURT:  Do you wish to respond?

21            MR. GRIGG:  Uh, yes, Your Honor.  Each of these

22   exhibits -- does the Court wish to address this at side bar?

23            THE COURT:  Well, just as to the objection about

24   Mr. Kabir having no connection.

25            MR. GRIGG:  These pages in these exhibits, they do

1    not indicate likes by Mr. Kabir.  There are other exhibits

2    that will come in the days addressing more of his Facebook

3    pages.  But for purposes of these exhibits, they indicate

4    both Mr. Santana and Mr. DeLeon visiting the pages and

5    interacting with them through Facebook by liking these posts.

6           THE COURT:  Okay.  Did you have any objections?

7           MR. THOMAS:  Nothing additional on top of what

8    Mr. Aaron said, and, of course, I don't have the same

9    objection about Mr. Kabir.

10          THE COURT:  And the other objections that you

11   referred to, that's the 403 objection and the cumulative

12   objection; correct?

13          MR. AARON:  Um, it was hearsay, relevance, 403

14   coconspirator, lake of foundation.

15          THE COURT:  All right.  Well, they're not being

16   offered for the truth of the matter so they're not hearsay,

17   and I've addressed all of the other objections previously so

18   the objections are overruled.

19          It's 375, 376 and 380 through 385, I believe.

20          MR. GRIGG:  That's correct, Your Honor.

21          THE COURT:  Ordered admitted.

22     (Exhibits 375, 376, 380, 382, 383, 384 and 385 admitted.)

23          THE COURT:  You may publish.

24          MR. GRIGG:  Thank you, Your Honor.

25          THE COURT:  With the same limiting instruction I've

1  given you before, ladies and gentlemen.  In fact, I'm going

2  to read the whole thing again which is these exhibits which

3  have just been admitted consist of evidence that persons

4  listened to, viewed, commented on or disseminated materials

5  available from various Internet sites.  Such activity even if

6  the sites contained materials some people may find offensive

7  is not itself a crime.

8          I instruct you that this evidence is admitted only

9  for the limited purpose of showing whether or not an

10  agreement to commit the charged crimes existed or whether or

11  not Mr. Kabir or Mr. DeLeon or both had an intent to commit

12  those crimes, and therefore, you must consider this evidence

13  only for, uh, those limited purposes and not for any other

14  purpose.

15          All right.  Go ahead.

16  BY M. GRIGG:

17  Q.   All right.  Sir, do you recognize this is the first page

18  of what's been admitted as Government's Exhibit 375?

19  A.   Yes, I do.

20  Q.   An is this an image you took of this page?

21  A.   It is.

22  Q.   All right.  Directing your attention to the top right,

23  you indicated this is a page called Inspire the Believers; is

24  that correct?

25  A.   That's correct.

1  Q.   All right.  And is this the Facebook name of the

2  person -- the page you just referenced, Inspire the

3  Believers?

4  A.   Yes.

5  Q.   All right.  And, uh, do you recognize the image depicted

6  to the left of that Facebook page name?

7  A.   Yes.  The -- the image depicted is the front page of the

8  Inspire magazine, one of the editions of the Inspire

9  magazine.

10  Q.   And that's a poor zoom-in, but can you read that on the

11  exhibit which edition is this?

12  A.   It is.  It's hard to read, but I believe this is a

13  depiction of Summer 2010, Inspire magazine edition.

14  Q.   And does this include articles listed on the front page

15  or the cover page?

16  A.   Yes, it does.

17  Q.   Okay.  What's the name of the main article in the

18  largest type on the page?

19  A.   May our Souls be Sacrificed for You, Sheik Anwar

20  al-Awlaki.

21  Q.   And in the middle of the page, there's another article

22  listed.  Do you see that?

23  A.   Yes.

24  Q.   What's that article?

25  A.   Make a Bomb in the Kitchen of your Mom.  The AQ chef.

1    Q.   And in the bottom left, there are additional articles

2    listed?

3    A.   Yes, there are.

4    Q.   And the first one on the left?

5    A.   The first one says What to Expect in Jihad.

6    Q.   All right.  Now, earlier, you testified about the fact

7    that these -- each of these exhibits indicates that

8    Mr. DeLeon and Mr. Santana interacted with this page, but can

9    you using the illustrator highlight where that indication is?

10   A.   Yes.

11   Q.   Okay.  You've circled what appears to be a black box.

12   If I can try to zoom in on that.  And what does this depict?

13   A.   This depicts both Ya Seen and Mikaeel MK liking this

14   particular post.

15   Q.   And earlier, you testified that Ya Seen is the -- one of

16   the vanity names for who?

17   A.   For Mr. DeLeon.

18   Q.   And Mikaeel MK, is that same vanity name for

19   Mr. Santana?

20   A.   Yes.

21   Q.   This black box that's popped up here, how does that --

22   uh, how did that come to appear on the screen?

23   A.   If -- if you take a mouse cursor and scroll over the

24   thumb's up depiction where it says two people like this, that

25   black box will automatically appear basically indicating who

1    are those two people that liked that particular post.

2    Q.    Showing you what's been admitted as Government's

3    Exhibit 376, is this another screen shot of the Inspire the

4    Believers page or posting on Inspire the Believers page?

5    A.    Yes, it is.

6    Q.    And by the way, what is the date of this posting?

7    A.    August 22nd.

8    Q.    And is this the same issue that we just saw or a

9    different issue?

10   A.    No, this is a different issue of Inspire magazine.

11   Q.    This may be better to read.  What issue is this?

12   A.    This is the Fall 2010 edition.

13   Q.    And there are two articles on the bottom aside from the

14   main article.  What's this article listed first on the left?

15   A.    Samir Khan.  I am Proud to be a Traitor to America.

16   Q.    And the other article listed to the right of that in the

17   bottom right-hand corner of the page?

18   A.    Exclusive.  The new Marvin declaration by Anwar

19   al-Awlaki.

20   Q.    And directing your attention to that same spot that we

21   saw on the last exhibit and zooming in on this, does this

22   also indicate a like by DeLeon and Santana's Facebook

23   accounts?

24   A.    Yes, it does.

25   Q.    And showing you what's been admitted as Government's

```
 1    Exhibit 380, do you recognize this as the same Inspire the
 2    Believers Facebook page?
 3    A.    Yes.
 4    Q.    And the date of this post is what date?
 5    A.    It is also August 22nd.
 6    Q.    And there appears to be a ribbon here in the middle.
 7    What does that indicate?
 8    A.    The ribbon indicates that this particular issue is a
 9    special issue of the Inspire magazine.
10    Q.    And what was the date of this issue?
11    A.    November 2010.
12    Q.    All right.  And directing your attention to the upper
13    right corner, does this also indicate likes by Mr. Santana
14    and Mr. DeLeon's Facebook?
15    A.    Yes.
16    Q.    Showing you what's been admitted as Government's 382,
17    sir, is this another, uh, Inspire magazine posted on Inspire
18    the Believers page?
19    A.    Yes, it is.
20    Q.    Same page?
21    A.    Same page.
22    Q.    The posting date?
23    A.    Posting date is August 22nd.
24    Q.    And the issue?
25    A.    Spring of 2011, Issue Number five.
```

1    Q.   All right.  Below the sort of lead article here is a

2    Tsunami of Change, there is a subtitle.  What is the

3    subtitle?

4    A.   It says the unfolding revolution has brought with it a

5    wave of change.  Sheik Anwar explains.

6    Q.   And then moving back up to the top right, does this have

7    the same indication of likes by Santana and DeLeon's Facebook

8    page?

9    A.   Yes.

10   Q.   Directing your attention to the projector in front of

11   you, is this the first page of what's been admitted as

12   Government's Exhibit 383?

13   A.   Yes, it is.

14   Q.   Does this also depict an Inspire magazine?

15   A.   It does.

16   Q.   What issue is this?

17   A.   Fall of 2011, Issue Number seven.

18   Q.   And does this also indicate the same likes by DeLeon and

19   Santana's Facebook?

20   A.   Yes, it does.

21   Q.   All right.  Showing you what's been admitted as

22   Government's 384, is this the first page of that exhibit?

23   A.   Yes.

24   Q.   Same Facebook account?

25   A.   Yes, the same Facebook account.

```
 1    Q.   And the date of this post?

 2    A.   August 22nd.

 3    Q.   Is this also an Inspire the Believers magazine page?

 4    A.   Yes, it is.

 5    Q.   What date?

 6    A.   Fall of 2011.

 7    Q.   And there's a title at the bottom center of this.  Um,

 8    what is the title?

 9    A.   The title says Targeting Dar Al-Harb populations.

10    Q.   Is there a subtext for this one?

11    A.   Yes.

12    Q.   What does the subtext say?

13    A.   Sheik Anwar expounds on the ruling of targeting

14    populations of the countries that are at war with the

15    Muslims.

16    Q.   And in the upper right corner, again, the same likes as

17    before?

18    A.   Yes.

19    Q.   Showing you what's been previously admitted as

20    Government's Exhibit 385, do you recognize that on the

21    projector?

22    A.   Yes, I do.

23    Q.   Same Inspire the Believers Facebook page?

24    A.   Same page.

25    Q.   Same postdate, August 22nd?
```

```
 1    A.    Yes.

 2    Q.    What issue of Inspire is this one?

 3    A.    This is Issue nine, Winter of 2012.

 4    Q.    Directing your attention to the upper right corner, same

 5    indication of likes by Ya Seen and Mikaeel MK?

 6    A.    Yes.

 7    Q.    Sir, directing your attention to the next exhibit in

 8    your binder, Exhibit 386, do you recognize that?

 9    A.    Yes, I do.

10    Q.    What is that?

11    A.    This is a screen capture from the same Facebook page,

12    Inspire the Believers.

13    Q.    And does this have an image depicted on it as well?

14    A.    It does.

15    Q.    Now, does this also indicate a like by the subjects in

16    this case?

17    A.    It does.

18    Q.    Which subjects?

19    A.    Mr. DeLeon.

20    Q.    Is this a true and correct copy of an image from Inspire

21    the Believers Facebook page for the posting of August 25th?

22    A.    Yes.

23          MR. GRIGG:  And Your Honor, at this time, the

24    government moves to admit Exhibit 386.

25          THE COURT:  Any objection?
```

```
1              MR. AARON:  Same objections we made before.

2              MR. THOMAS:  Likewise.

3              THE COURT:  Objection's overruled.  And Exhibit 386

4     is ordered admitted.

5                        (Exhibit 386 admitted.)

6              THE COURT:  You may publish.

7              MR. GRIGG:  With the same instruction as before.

8              THE COURT:  Yes.  They're being admitted for the

9     same limited purposes.

10    BY MR. GRIGG:

11    Q.   All right.  Sir, showing you what's been admitted as

12    Government's 386, is this the depiction of the other posts on

13    August 25th from Inspire the Believers that you just

14    testified about?

15    A.   Yes, it is.

16    Q.   And is that information indicated in the upper right?

17    A.   It is.

18    Q.   And there appears to be an image different than the

19    images we've seen before.  What is this image in the middle?

20    A.   It's a -- this is an image of, um,

21    Sheik Abdullah Azzam.

22    Q.   Now, do you recall, sir, during the video we watched

23    this morning, I paused, and there was a reference to Sheik

24    Azzam, and I asked you about the word elm?

25    A.   Yes.
```

```
 1    Q.    Is that the same person depicted here?

 2    A.    Yes, it is.

 3    Q.    Directing your attention to the right of this image, do

 4    you see a quote listed here?

 5    A.    I do.

 6    Q.    What is that quote?

 7    A.    The quote says death is only but once so let it be in

 8    the path of Allah.  Sheik Abdullah Azzam.

 9    Q.    And you indicated that this shows a like by Mr. DeLeon

10    or did you by Ya Seen or by Mr. DeLeon?

11    A.    Sorry.  I did say by Mr. DeLeon, but it's Ya Seen here

12    which is attributed to Mr. DeLeon.

13    Q.    Can you circle where that is?  Because it's in a

14    different spot than the others.  And you have drawn a circle

15    approximately halfway down the page on the right-hand side;

16    is that correct?

17    A.    That's correct.

18    Q.    And is this the like activity by Ya Seen?

19    A.    Yes.

20              MR. GRIGG:  Can I have a moment, Your Honor?

21              THE COURT:  Yes, you may.

22              MR. CHIU:  Your Honor, in the meantime, can I

23    confer with counsel?

24              THE COURT:  Certainly.  Feel free to stand up and

25    stretch, ladies and gentlemen.
```

```
 1              All right, go ahead.
 2              MR. GRIGG:  Thank you, Your Honor.
 3   Q.   Special Agent Nader, aside from the posts and things you
 4   were able to access directly from the social media in this
 5   case, you indicated earlier that the FBI also received
 6   messages and information straight from some of the providers
 7   like straight from Facebook and straight from Gmail and so
 8   on.  Do you recall that testimony?
 9   A.   Yes.
10   Q.   In reviewing the material for Mr. Santana and his
11   Facebook account that was sent directly to the FBI, was that
12   done under court authorization?
13   A.   Yes, it was.
14   Q.   And we just saw a post of the quote by Sheik Abdullah
15   Azzam.  In Mr. Santana's messaging and information provided
16   directly to the FBI, did you see anything relating to
17   Mr. Santana about Abdullah Azzam?
18   A.   I'm sorry, can you repeat the first part?
19   Q.   In reviewing the messaging that came from Facebook to
20   the FBI about Mr. Santana's Facebook account, did you see
21   references in there about Mr. Santana and Sheik Abdullah
22   Azzam?
23   A.   Yes.
24   Q.   Sir, directing your attention to Exhibit 420, if you
25   flip forward approximately . . .  approximately six tabs
```

```
1    forward, you see the exhibit tab marked 420?

2    A.   Yes, I do.

3    Q.   All right.  Do you recognize this item?

4    A.   I do.

5    Q.   What is this item?

6    A.   This is information provided to the FBI through a court

7    order for Mr. Santana's Facebook account.

8    Q.   And does it indicate on here something to do with

9    Mr. Santana and Sheik Abdullah Azzam?

10   A.   Yes.  It depicts activity of Mr. Santana on his Facebook

11   page, but specifically, there is a message attributed to

12   Abdullah Azzam that Mr. Santana liked.

13   Q.   And when you say activity, is the liking the activity

14   this item reflects?

15   A.   Yes.  The liking is the activity.

16   Q.   All right.  And is this exhibit a true and correct copy

17   of the information that the FBI received directly from

18   Facebook about Mr. Santana's Facebook page?

19   A.   Yes.

20            MR. GRIGG:  Your Honor, at this point, the

21   government moves to admit a single-page document,

22   Exhibit 420.

23            THE COURT:  Any objection?

24            MR. AARON:  None, Your Honor.

25            THE COURT:  Any objection?
```

```
 1              MR. THOMAS:  No, Your Honor.

 2              THE COURT:  420 is ordered admitted.

 3                   (Exhibit 420 admitted.)

 4              THE COURT:  You may publish.

 5  BY MR. GRIGG:

 6  Q.   Sir, depicted on the screen in front of you, we will

 7  zoom in a minute, is that the item you just referenced on

 8  Government's Exhibit 420?

 9  A.   Yes, it is.

10  Q.   And that's the top entry on that page?

11  A.   That's correct.

12  Q.   And first, with reference to the activity, does this

13  indicate the activity that you mentioned?

14  A.   Yes, it does.

15  Q.   And it says what?

16  A.   It says Miguel Santana likes a status.

17  Q.   And you said this was activity relating to a quote

18  attributed to Sheik Abdullah Azzam; is that correct?

19  A.   That's correct.

20  Q.   What does the quote say?

21  A.   The quote says jihad must not be abandoned until Allah

22  alone is worshipped.  Jihad continues until Allah's word is

23  raised high.  Jihad until all the oppressed people are free.

24  Jihad to protect our dignity and restore our occupied lands.

25  Jihad is the way of everlasting glory.  Sheik Abdullah Azzam
```

1    Rahlmullah.

2    Q.   All right.  Sir, directing your attention two tabs

3    forward to Exhibit 443, do you have that in front of you?

4    A.   Yes, I do.

5    Q.   Sorry, let me back up.  In reviewing the Facebook

6    information that came directly to the FBI about Mr. Santana's

7    Facebook page, did you see any Facebook messages between

8    Mr. Santana and the other suspects in the case?

9    A.   Yes, I did.

10   Q.   Did you see any specific messages between Mr. Santana

11   and Mr. DeLeon?

12   A.   Yes, I did.

13   Q.   Turning to Exhibit 443, do you recognize this exhibit?

14   A.   Yes, I do.

15   Q.   What is this exhibit?

16   A.   This is a -- this exhibit depicts a Facebook message

17   exchange between Mr. DeLeon and Mr. Santana provided to the

18   FBI by Facebook through a court order.

19   Q.   All right.  And earlier, you mentioned, and you

20   testified about the photographs involving paint ball

21   activity.  I think everyone will recall, and we don't need to

22   display those again.  Is there anything in this activity

23   relating to paint ball?

24   A.   Yes, there is.

25   Q.   And is this a true and correct copy of the messages back

```
 1   and forth between Mr. Santana and Mr. DeLeon on or about

 2   September 22, 2012?

 3   A.   Yes, it is.

 4        MR. GRIGG:  Your Honor, at this point, the

 5   government moves to admit what's been marked as 443.

 6        THE COURT:  Any objection to 443?

 7        MR. AARON:  No, Your Honor.

 8        MR. THOMAS:  No, Your Honor.

 9        THE COURT:  All right.  Ordered admitted, and you

10   may publish.

11                  (Exhibit 443 admitted.)

12   BY MR. GRIGG:

13   Q.   Okay.  Just to reorient people, we may have seen some of

14   these features before, but at the top of the page, you heard

15   testimony and you testified yourself about PIN numbers.  Do

16   you see a PIN number here that's a 575 number?

17   A.   Yes.

18   Q.   And the facility referenced here, what facility is that?

19   A.   The facility referenced is 101mesr@gmail.com.

20   Q.   And is that an email address associated with anybody's

21   Facebook account in particular?

22   A.   Yes.

23   Q.   Whose account?

24   A.   Mr. Santana.

25   Q.   And you mentioned that this is message exchange; is that
```

```
 1    correct?

 2    A.    Yes, that's correct.

 3    Q.    And so directing your attention to the first set of

 4    boxes on page one, just to orient viewers to what they're

 5    seeing, does this indicate who wrote the message?

 6    A.    Yes, it does.

 7    Q.    Now, there are a series of boxes on the left side over

 8    here if we can focus on these for a second.  Um, there's a

 9    list for author.  Is that, in essence, the from?

10    A.    In essence, yes, that's correct, the from.

11    Q.    And to the right of that, what name is that?

12    A.    DeLeon.

13    Q.    And to right of the name DeLeon in this area here that's

14    illustrated with the blue marking on the screen, there

15    appears to be a number in parentheses to the right of

16    Mr. DeLeon.  Do you see that?

17    A.    Yes, I do.

18    Q.    What is that number?

19    A.    That's the unique Facebook identifier number.

20    Q.    Okay.  And then the next line down on the column on the

21    left indicates what?

22    A.    It -- it represents the recipient.

23    Q.    So I believe you testified that Facebook messages

24    sometimes works like traditional email.  Can we shorten this

25    as author being from and recipient being to?
```

1    A.    Yes.

2    Q.    Okay.  And then to the right of that, do you see the

3    name indicated there?

4    A.    Yes.

5    Q.    All right.  And that indicates two names.  Can you read

6    those names?

7    A.    Miguel Santana and DeLeon.

8    Q.    All right.  Next line down, sent day, do you see that?

9    A.    I do.

10   Q.    Okay.  And the date for this post?

11   A.    September 22nd, 2012.

12   Q.    And, I'm sorry, I said post.  I meant message.  Okay.

13   There's a box down at the bottom here that has no label.

14   What is that?

15   A.    That is the actual content of the message or the message

16   itself.

17   Q.    Okay.  Going next in order down the page, the from line

18   up here indicates whom?

19   A.    The author would indicate from Miguel Santana.

20   Q.    And so, um, I think the rest of it sort of speaks for

21   itself.  Recipient is listed as whom?

22   A.    The recipient is listed as DeLeon.

23   Q.    And as well as Miguel Santana?

24   A.    Correct.

25   Q.    Does this appear to be a response to the previous

```
 1    message?
 2    A.    Yes, it does.
 3    Q.    And then content down the bottom, what's the response?
 4    A.    The response is what up.
 5    Q.    Moving down to the next in order, there is an author.
 6    Who's the author of this piece?
 7    A.    DeLeon.
 8    Q.    And the to address or the recipient?
 9    A.    Miguel Santana and DeLeon.
10    Q.    And then the content down the bottom, it's a little big
11    to blow up.  It's all in one line for everybody to see so
12    I'll take it in half.  The half that's displayed here, can
13    you read that?
14    A.    You down to go check out the 24 Fitness.
15    Q.    And I believe what's projected on the screen has a
16    couple more words.  What are those words?
17    A.    Plus I need.
18    Q.    And I'll try and cover those words in this next zoom in
19    just for context.
20    A.    I need to go to Walmart to buy paint balls.
21    Q.    All right.  Turning to page two, it appears the message
22    exchange continues at the top so let's take a look at that.
23    All right.  Does this indicate a response to Mr. Santana?
24    A.    Yes, it does.
25    Q.    And what's the response?
```

1    A.    The response is yeah.  What time you trying to go.

2    Q.    And next in order, does Mr. DeLeon reply?

3    A.    Yes.

4    Q.    And what's the reply?

5    A.    The reply is whenevers man.  Whenever you want, I'm

6    free.

7    Q.    And then Mr. Santana responds, is that correct, next in

8    order?

9    A.    Yes.

10   Q.    And the response?

11   A.    Let's go right now.

12   Q.    And does DeLeon respond again?

13   A.    Yes.

14   Q.    What is DeLeon's response to this last one where

15   Mr. Santana says let's go right now?

16   A.    You down to go maybe after the dhur.  I kind of just

17   ate, and I feel full.

18   Q.    And for those of us who may not have looked at our

19   glossary yet, what is this word dhur in the middle?

20   A.    Dhur is prayer or prayer time in the Islamic faith.

21   Q.    All right.  This is an example of message exchange

22   between Mr. DeLeon and Mr. Santana.  Were there message

23   exchanges between Mr. Santana and other persons in this case?

24   A.    Yes, there were.

25   Q.    Were there any exchanges between Mr. Santana and

```
1    Mr. Kabir?

2    A.   Yes, there were.

3    Q.   Turning your attention to what's been marked as

4    Government's 487, it should be the next in the binder in

5    front of you.

6              MR. GRIGG:  Your Honor, before we get to this

7    exhibit, could the Court take a break at this time or am I

8    early?

9              THE COURT:  Uh, you're a little early, but if now's

10   a good time.  You're ready?  That's fine.  Seeing no

11   objection and seeing some likes, we'll take our break for

12   15 minutes with all the usual admonitions that are just as

13   important -- they're more important every time I give them.

14             Don't research anything, don't discuss the case,

15   anything about the case, even my bad jokes and don't make up

16   your minds about anything.  Thank you.  You're excused.

17                       (Recess taken.)

18             THE COURT:  Let the record reflect the presence of

19   all members of the jury, all counsel and the defendants are

20   present.  You may examine.

21             MR. CHIU:  Your Honor, I recognize that I am not

22   and nor can I ever be AUSA Chris Grigg, but the parties have

23   reached a stipulation as to foundational -- for foundational

24   purposes for one of yesterday's witnesses, witness Patrick

25   Bowens if I could read that into the record.
```

```
 1            THE COURT:  Go ahead.
 2            MR. CHIU:  Mr. Bowens has reviewed all of the
 3   exhibits containing audio from microphones in the
 4   government's second exhibit list.  He was able to confirm
 5   that all of the recordings are true and accurate copies of
 6   excerpts on the Red Tiger system.  Therefore the parties
 7   stipulate that the audio recordings are authentic for
 8   foundational purposes.  And they specifically relate to the
 9   following exhibits:
10            Exhibit 519 apartment audio dated 10-17-2012.
11            Exhibit 526 apartment audio dated 10-20-2012.
12            Exhibit 528 apartment audio dated 10-22-2012.
13            Exhibit 529 apartment audio dated 10-26-2012.
14            Exhibit 532 apartment audio dated 10-27-2012.
15            Exhibit 534 apartment audio dated 10-31-2012.
16            Exhibit 536 apartment audio dated 11-02-2012.
17            Exhibit 540 apartment audio dated 11-02-2012.
18            Exhibit 541 apartment audio dated 11-03-2012.
19            Exhibit 542 apartment audio dated 11-03-2012.
20            Exhibit 545 apartment audio dated 11-06-2012.
21            Exhibit 546 apartment audio dated 11-06-2012.
22            Exhibit 547 apartment audio dated 11-06-2012.
23            Exhibit 548 apartment audio dated 11-06-2012.
24            Exhibit 549 apartment audio dated 11-07-2012.
25            Exhibit 550 apartment audio dated 11-07-2012.
```

```
 1                    Exhibit 551 apartment audio dated 11-08-2012.

 2                    Exhibit 555 apartment audio dated 11-14-2012.

 3                    Exhibit 557 apartment audio dated 11-15-2012.

 4                    Exhibit 558 apartment audio dated 11-15-2012.

 5                    Exhibit 559 apartment audio dated 11-16-2012.

 6                    Exhibit 560 apartment audio dated 11-16-2012.

 7                    Exhibit 563, 563A apartment audio dated 11-14-2012.

 8                    Exhibit 565 apartment audio dated 11-15-2012.

 9              And finally, Your Honor, Exhibit 567 apartment

10    audio dated 11-16-2012.

11              Thank you, Your Honor.

12              THE COURT:  Thank you.  So stipulated?

13              MR. AARON:  So stipulated.

14              MR. THOMAS:  Your Honor, with one small caveat.  I

15    don't think they read all of the exhibits that contain

16    excerpts from the audio.  And I wanted to make sure that the

17    stipulation covered all the exhibits whether they intend to

18    use them or not because to the extent we use them, I don't

19    want to have recall Bowens to lay foundation for them.

20              MS. DeWITT:  For the record, Your Honor, I believe

21    that is all of the audio that we intend to introduce that's

22    from the microphones.  And the gaps that Mr. Thomas may be

23    noticing are because those are audio recordings came from the

24    audio visual and so foundation for those particular

25    recordings is different.
```

1           For the record, there are some that are indicated

2      on the exhibit list that have been combined.  It does include

3      those that have been combined.  I think 519 is a particular

4      example.

5           THE COURT:  Let's do this.  After we finish with

6      the jury today, we can check and make sure that if there are

7      any that weren't listed that you intend to use that the

8      government didn't that they're included.

9           MS. DeWITT:  We're certainly not going to take any

10     issue with authenticity.  If there were some that were

11     missing, we'd be happy to know about it and happy to reach a

12     stipulation.

13          THE COURT:  All right.  Thank you very much.

14          MR. AARON:  As for foundation purposes, those are

15     just excerpts from the apartment audio.  They're not all of

16     the apartment audio.

17          THE COURT:  Exactly.  All right.  Thank you.

18          Now you may continue.

19          MR. GRIGG:  I thought I was covering a lot of

20     exhibits in a very quick period of time.

21          Thank you, Your Honor.

22     Q.   Sir, we were discussing whether there are Facebook

23     message exchanges between Mr. Santana and Mr. Kabir.  Do you

24     recall that before the break?

25     A.   Yes, I do.

```
 1    Q.   And in the binder in front of you there should be an
 2    exhibit marked 487.  Do you have that in front of you?
 3    A.   Yes.
 4    Q.   What is that?
 5    A.   This is a Facebook message exchange between Mr. Santana
 6    and Mr. Kabir.  This was provided to the FBI by Facebook
 7    through a court order.
 8    Q.   And is this a similar exhibit in format to the previous
 9    exhibit, the message exchange about 24-Hour Fitness and paint
10    balls?
11    A.   Yes, it is.
12    Q.   Is this a true and correct copy of the information
13    provided from Facebook to the FBI?
14    A.   Yes.
15    Q.   And is this a true and correct copy of message exchanges
16    beginning on or about June 30, 2012 between Mr. Santana and
17    Mr. Kabir?
18    A.   Yes, it is.
19              MR. GRIGG:  Your Honor, at this time the government
20    moves to admit Government Exhibit 487.
21              THE COURT:  Any objections?
22              MR. AARON:  Yes, Your Honor.  The entire emails
23    are --
24              THE COURT:  Could you repeat that more slowly
25    please for the court reporter.
```

1          MR. AARON:  Sorry about that.  This excerpt

2     distorts there being 80 text messages.  We would object on

3     those grounds.

4              THE COURT:  Mr. Thomas.

5              MR. THOMAS:  Same objection, Your Honor.

6              THE COURT:  The objection is overruled.  This goes

7     to the rule of completeness I think an objection which was

8     raised before trial.  So the objection is overruled and 487

9     is ordered admitted.  You may publish.

10                   (Exhibit 487 was admitted.)

11              MR. GRIGG:  Thank you, Your Honor.

12     Q.   Special Agent Nader, we're going to talk about certain

13     topics.  Can I direct your attention to the first page of

14     487, please.  Is that what's displayed on the screen?

15     A.   Still waiting on the screen.

16     Q.   Thank you.  Is that what's now displayed on the screen?

17     A.   Yes.

18     Q.   Directing your attention to the middle of the page is

19     this the same format of message that we saw earlier with

20     author, recipient and then the content at the bottom?

21     A.   Yes, it is.

22     Q.   And in this situation where this conversation picks up,

23     who is the author?

24     A.   The author is Mikaeel MK or Mr. Santana.

25     Q.   And the recipient listed here is?

1    A.   Juan Ton Amaara or Mr. Kabir.

2    Q.   And then content listed at the bottom, what does

3    Mr. Santana write?

4    A.   Have you seen mag no. 8 and 9.

5    Q.   Are you familiar with the reference to mag 8 and 9?

6    A.   Yes.  I believe it is a reference to Inspire Magazine

7    Issue No. 8 and Issue No. 9.

8    Q.   And were those issues of Inspire Magazine among the

9    images posted on inspire the believer that we looked at

10   earlier?

11   A.   Yes, I believe they were.

12   Q.   And continuing on does, Mr. Kabir respond?

13   A.   Yes, he does.

14   Q.   And what does he say?

15   A.   Naa can you email it to me.

16   Q.   And although this bleeds off at the bottom of the page,

17   does the exchange continue?

18   A.   Yes.

19   Q.   And to be clear, beginning at the top is half of the

20   message continuing from the previous page, the bottom of page

21   1.  Who is the sender at the bottom of page 1?

22   A.   The sender is Mr. Kabir.

23   Q.   And is the message content that he sends?

24   A.   Yes.

25   Q.   It just spans two pages?

```
 1    A.   Yes.

 2    Q.   All right.  What is his response?

 3    A.   It appears to be an email address sk.tefl.g@gmail.com.

 4    Q.   Mr. Santana responds?

 5    A.   He responds, it's on the Unjust.  I don't know how to

 6    email those things from my phone.

 7    Q.   And the reference to the Unjust, what is that?

 8    A.   It's a reference to the Unjust Media website.

 9    Q.   Are those similar to the links that we saw earlier for

10    unjustmedia.com?

11    A.   Yes.

12    Q.   And Mr. Kabir responds?

13    A.   K.

14    Q.   Is that -- what do you understand K to be?

15    A.   I understand that to mean okay.

16    Q.   And then does he send a follow-up to that, his own

17    response?

18    A.   And then Mr. Kabir follows up by responding I'll check

19    it out then.

20    Q.   Sir, if you can flip ahead to page 3 and page 4, is

21    there a discussion of using Skype in this exchange?

22    A.   Yes, there is.

23    Q.   And is there a reference to Mr. Kabir's Skype name,

24    screen name?

25    A.   Yes, there is.
```

1    Q.   All right.  Specifically directing your attention to the

2    bottom of page 3 is that another message that spans both

3    pages?

4    A.   Yes, it is.

5    Q.   Who is author of that message?

6    A.   The author is Mr. Kabir.

7    Q.   And turning your attention to the top of page 4, is this

8    the message that Mr. Kabir sends and then begins on the

9    previous page?

10   A.   Yes, it is.

11   Q.   What's the text entered there?

12   A.   Juan or juan.ton21.

13   Q.   And is that a Skype handle for Mr. Kabir?

14   A.   Yes, it is.

15   Q.   Directing your attention to the bottom of page 5, you

16   testified earlier about recovering Mr. Santana's passport.

17   Do you recall that testimony?

18   A.   Yes, I do.

19   Q.   Directing your attention to a message in this back and

20   forth exchange, second from the bottom on this page, do you

21   see that message?

22   A.   Yes, I do.

23   Q.   Who is the sender?

24   A.   Mr. Kabir.

25   Q.   Is it to Mr. Santana?

```
1    A.   It is.

2    Q.   And what does Mr. Kabir say?

3    A.   Mr. Kabir says in a question u handle your business.

4    Q.   And does the response span the next two pages?

5    A.   It does.

6    Q.   When I say the next two pages, does the response begin

7    at the bottom of this page and get cut off?

8    A.   Yes.

9    Q.   And the author for the response is whom?

10   A.   Mr. Santana.

11   Q.   So does the actual contents appear at the top of the

12   next page; is that correct?

13   A.   Yes.

14   Q.   Do you see that response there?

15   A.   Yes.

16   Q.   What Mr. Santana's response?

17   A.   Mr. Santana responds yea I got it for six years.

18   Q.   Now, sir, when you discussed Mr. Santana's passport, you

19   testified about the date of issue and date of expiration.  Do

20   you recall that?

21   A.   I do recall that.

22   Q.   Do you recall the year being 2012 for the date of issue?

23   A.   Yes.

24            MR. AARON:  Leading.

25            THE COURT:  Sustained.  Refrain from leading
```

```
 1    questions.
 2    BY MR. GRIGG:
 3    Q.   Sir, showing you what's been previously marked 164 and
 4    admitted into evidence, this is the photocopy inside of the
 5    passport?
 6    A.   Yes, it is.
 7    Q.   What does it indicate the date of issue?
 8    A.   The date of issuance appears to be July 12, 2012.
 9    Q.   And the expiration date listed in this exhibit?
10    A.   The expiration date July 12th of 2018.
11    Q.   How many years is that?
12    A.   Six years.
13    Q.   Now, sir, you testified earlier about changes to vanity
14    names and profile information and so on.  Do you recall that
15    testimony?
16    A.   Yes, I do.
17    Q.   In the information that the FBI obtained straight from
18    Facebook about Mr. Santana's account were those changes
19    reflected in the information provided?
20    A.   Yes, they were.
21    Q.   Sir, showing you what's been marked as Exhibit 427, you
22    have that in front of you in the binder?
23    A.   Yes, I do have that in front of me.
24    Q.   Do you recognize that exhibit?
25    A.   I do.
```

```
 1    Q.   What is that exhibit?

 2    A.   This is information provided to the FBI from Facebook

 3    through a court order.

 4    Q.   And is this a true and correct copy of the information

 5    provided about activity on Mr. Santana's Facebook account?

 6    A.   Yes, it is.

 7    Q.   Does this reference any of the other suspects in this

 8    case?

 9    A.   Yes.

10    Q.   Who?

11    A.   Mr. Kabir.

12            MR. GRIGG:  Your Honor, at this point the

13    government moves to admit what's been marked as 427.

14            THE COURT:  Any objection to 427?

15            MR. AARON:  I'm sorry, Your Honor.  Could I just

16    have one moment, please?

17            THE COURT:  Certainly.

18            MR. AARON:  We would object as hearsay.  I think

19    it's being offered for the truth.

20            THE COURT:  What is it being offered for?

21            MR. GRIGG:  Your Honor, this is, if I may, this is

22    offered to indicate that the account between Mr. Santana and

23    Mr. Kabir were linked in such --

24            THE COURT:  So I would sustain the objection, and

25    if you want to be heard further on it, we can do it at the
```

1    end of the day outside the presence of the jury, but at this

2    point the objection is sustained.

3              MR. GRIGG:  Thank you, Your Honor.

4    Q.   Sir, directing your attention to what's been marked as

5    Exhibit 429, do you have that in front of you?

6    A.   Yes, I do.

7    Q.   Do you recognize this exhibit?

8    A.   I do.

9    Q.   What is this?

10   A.   This is a Facebook message exchange between Mr. Kabir

11   and Mr. Santana.

12   Q.   Is this an item that the FBI received directly from

13   Facebook?

14   A.   Yes, it is.

15   Q.   And does it relate to a particular date in time?

16   A.   It does.

17   Q.   What date is that?

18   A.   August 26th of 2012.

19             MR. GRIGG:  Your Honor, at this point, the

20   government would move to admit Exhibit 429.

21             THE COURT:  Any objection to 429?

22             MR. AARON:  None except as previously stated.

23             MR. THOMAS:  Same, Your Honor.

24             THE COURT:  The objections are overruled and 429 is

25   ordered admitted.  You may publish.

```
 1                    (Exhibit 429 was admitted.)
 2   BY MR. GRIGG:
 3   Q.   Sir, directing your attention to the message in the
 4   middle of the page here, who is the author?
 5   A.   Sorry.  It's not yet up on the screen.  Apologize.
 6   Q.   Is it on the screen now?
 7   A.   Yes.
 8   Q.   Who is the author?
 9   A.   Mr. Kabir.
10   Q.   And who is it to?
11   A.   Mr. Santana.
12   Q.   The date?
13   A.   August 26th, 2012.
14   Q.   And the message that Mr. Kabir sends?
15   A.   Mr. Kabir sends everything's set up for you guys out
16   here.  Now you just gotta come.
17   Q.   Is there another message by Mr. Kabir in the same
18   exchange?
19   A.   Yes.
20   Q.   And is this the message indicated on the screen here
21   with the Ys and As?
22   A.   Yes.
23   Q.   At this point in time where was Mr. Kabir?
24   A.   At this point in time Mr. Kabir was in Afghanistan.
25   Q.   Did you see records that indicate an additional attempt
```

1    to communicate directly with Mr. Kabir in the messages and

2    other items provided directly from Facebook to the FBI?

3    A.   Yes.

4    Q.   Showing what's been marked as Exhibit 434 as the next in

5    the your binder, do you have that exhibit in front of you?

6    A.   Yes, I do.

7    Q.   Do you recognize this exhibit?

8    A.   I do.

9    Q.   What is this exhibit?

10   A.   It's similar to the previous.  This is a Facebook

11   message exchange between Mr. Kabir and Mr. Santana provided

12   by Facebook through a court order.

13   Q.   On what day?

14   A.   On August 31st of 2012.

15   Q.   And to be clear when I said what day, I followed that

16   question with your statement that it was provided to

17   Facebook.  My question was not when did Facebook provide it,

18   but when did the message happen?

19   A.   Yes.  The date of the message happened on August 31st,

20   2012.

21   Q.   And in this message exchange does Mr. Santana discuss

22   with Mr. Kabir setting up a call on Skype?

23   A.   Yes.

24        MR. GRIGG:  Your Honor, the government move to

25   admit Government's 434.

```
 1              THE COURT:  Any objection to 434?
 2              MR. AARON:  None except as previously stated.
 3              MR. THOMAS:  Likewise.
 4              THE COURT:  All right.  It's ordered admitted.  You
 5     may publish and the objections are overruled.
 6                      (Exhibit 434 was admitted.)
 7     BY MR. GRIGG:
 8     Q.   Now, do you see 434 projected on the screen in front of
 9     you?
10     A.   Yes, I do.
11     Q.   The first message from Mr. Kabir, what's the message?
12     A.   The message says yea can you get on now.
13     Q.   And does Mr. Santana respond?
14     A.   He does.
15     Q.   What's his response?
16     A.   Mr. Santana says yea I'm on video call me.
17     Q.   Does the exchange continue?
18     A.   It does.
19     Q.   Is that on the next page?
20     A.   It continues on the next page, yes.
21     Q.   Mr. Santana responds beginning on the bottom of the
22     first page continuing on the second page.  What's his
23     response?
24     A.   His response is I'm at the gas station give me a min.
25     Q.   The response from Mr. Kabir?
```

```
1    A.   K.

2    Q.   Does Mr. Santana reply again?

3    A.   He does.

4    Q.   What does he say?

5    A.   I'll video call you.

6    Q.   And Mr. Kabir's final response?

7    A.   K.

8    Q.   Sir, in reviewing the audio and video recordings from

9    the apartment are you aware of whether a video call took

10   place on that day between Mr. Kabir and Mr. Santana?

11   A.   Can you repeat the question?

12   Q.   From the recordings -- excuse me.  Are you aware of

13   whether a video call took place between Mr. Santana and

14   Mr. Kabir on August 31st?

15   A.   Yes, I am aware.

16   Q.   After that call were there additional communication

17   between Mr. Santana and Mr. Kabir relating to logistics for

18   travel?

19   A.   Yes, there were.

20   Q.   And, sir, turning your attention to 440, do you have

21   that in front of you?

22   A.   Yes, I do.

23   Q.   Do you recognize that exhibit?

24   A.   I do.

25   Q.   What is it?
```

```
 1    A.    It's a Facebook message exchange between Mr. Santana and

 2    Mr. Kabir provided by Facebook through a court order.

 3    Q.    Does that relate to a message exchange on or about

 4    September 17th, 2012 between Mr. Santana and Mr. Kabir?

 5    A.    Yes, it does.

 6    Q.    Is this a true and correct copy of the information

 7    provided from Facebook to the FBI?

 8    A.    Yes, it is.

 9            MR. GRIGG:   The government moves to admit Exhibit

10    440, Your Honor.

11            THE COURT:   Any objection to 440?

12            MR. AARON:   None except as previously stated.

13            MR. THOMAS:   Same objection, Your Honor.

14            THE COURT:   Overruled and ordered admitted and you

15    may publish.

16                  (Exhibit 440 was admitted.)

17    BY MR. GRIGG:

18    Q.    You see the first page of 440 on the screen?

19    A.    Yes, I do.

20    Q.    And this is the beginning of a message exchange?

21    A.    Yes.

22    Q.    Directing your attention to message on the second page,

23    second message beginning on this page, it's a message from

24    who?

25    A.    From Mr. Kabir to Mr. Santana.
```

```
 1    Q.   Did you already answer the to whom part?
 2    A.   Yes.  Mr. Kabir to Mr. Santana.
 3    Q.   And what's the message?
 4    A.   The message is wuz new.
 5    Q.   Does Mr. Santana respond?
 6    A.   He does.
 7    Q.   And the response?
 8    A.   His response is not much.  Just waiting on time to pass.
 9    Smiley face emoticon.
10    Q.   Is that a smiley face or a slash?
11    A.   I'm -- I don't know my emoticons all that well.  Sorry.
12    Looks like a face.
13    Q.   How about this is it a colon and a slash?
14    A.   A colon and a slash, yes.
15    Q.   Does Mr. Santana then ask a question of Mr. Kabir?
16    A.   Yes, he does.
17    Q.   What's the question?
18    A.   Hey random question.  Do you need a visa to travel
19    there?
20    Q.   And what's the reference to there?
21    A.   I'm assuming he's referring --
22             THE COURT:  Don't assume.
23    BY MR. GRIGG:
24    Q.   Your understanding with this exchange is that Mr. Kabir
25    is not located where Mr. Santana is; correct?
```

```
 1    A.    Correct.
 2    Q.    And is the "there" a reference to the place where
 3    Mr. Kabir is?
 4    A.    Yes.
 5    Q.    And does Mr. Kabir respond to this question?
 6    A.    Yes, he does.
 7    Q.    And this response begins on the same page and spans the
 8    next page; correct?
 9    A.    That's correct.
10    Q.    And Mr. Kabir's response is?
11    A.    Uhhmm I think so.
12    Q.    What does Mr. Santana reply?
13    A.    Mr. Santana replies can you fins out and if we also need
14    them everywhere else we need to pass by.
15    Q.    And Mr. Kabir's response?
16    A.    K.
17    Q.    All right.  We've discussed communication between
18    Mr. Kabir and Mr. Santana relating to setting up Skype calls.
19    I'm gonna direct you to flip through the next several
20    exhibits in your binder beginning at 426, and while you're
21    doing that I'm going to tick them off one at a time.  426,
22    427, 430, 431, 432, 433, 435, 437, 438, 439, 441, 445, 446,
23    448, 449, 450.
24          Do you have those in front of you?
25    A.    Yes, I do.  The second exhibit you stated I believe it
```

```
1    was 427?

2    Q.   I said 426 then 428.

3    A.   Okay.  Yes, I do have all of those.

4    Q.   You've reviewed all of those?

5    A.   Yes.

6    Q.   What are each of these?

7    A.   Each of these are Facebook messages exchanges between

8    Mr. Santana and Mr. Kabir.

9    Q.   Are they all discussing setting up Skype conversations

10   or exchanges?

11   A.   Yes.

12   Q.   And are these true and correct copies of the messages --

13   I guess let me ask the question first.  Were each of these

14   messages provided to the FBI from Facebook?

15   A.   Yes, they were.

16   Q.   And are they true and correct copies of the messages

17   provided from Facebook to the FBI?

18   A.   Yes.

19           MR. GRIGG:  Your Honor, at this point, the

20   government moves to admit that list.

21           THE COURT:  All right.  Counsel, do you need it to

22   be recited again?

23           MR. AARON:  I do not.

24           THE COURT:  Any objections?

25           MR. AARON:  Yes, Your Honor.  The exact objections
```

1    I made previously and also that the exhibit is not what it

2    has been described to be by the witness.

3              THE COURT:  As to any particular ones?

4              MR. AARON:  Yes.  Exhibit No. 433 and I'm still --

5    I'm sorry.  I hadn't quite gotten up to the rest of them.

6              THE COURT:  433 appears to be an email thread.

7              MR. AARON:  That's correct.

8              THE COURT:  And so does 435.

9              MR. GRIGG:  Your Honor, I think I understand

10   counsel's point with respect to those two.

11             THE COURT:  And 438 or 439.

12             MR. AARON:  Yes.  439, yes.

13             MR. GRIGG:  I'm happy to proceed with the exception

14   of those three right now.

15             MR. AARON:  If I can have just one moment.

16             THE COURT:  I think 441 is as well.  It's one you

17   moved in.

18             MR. GRIGG:  It's in the list.  441 is exactly the

19   same as the rest.  I think that's consistent with what has

20   been stated so far.

21             THE COURT:  It's an email thread.

22             MR. GRIGG:  It's a message exchange, Your Honor.

23             THE COURT:  Oh, you're right.  All right.

24             MR. GRIGG:  On that one if I could direct the

25   Court's attention to the first question.

1          THE COURT:  All right.  Any objection to the

2     others?

3          MR. AARON:  None except as previously stated, but

4     the objection that the agent's testimony doesn't match the

5     exhibit applies only for 433 and 439.

6          MR. THOMAS:  Thank you, Your Honor.  I also wanted

7     to add and make it clear that based on the government

8     counsel's questions to the witness about conversations

9     relating to Skype, it appears that's it's the truth of what's

10    contained in the messages that the government's seeking to

11    introduce and so we want to repeat the hearsay objection on

12    that basis.

13         THE COURT:  The hearsay objection is overruled

14    because these are party admissions.  So the objections are

15    overruled and the exhibits are ordered admitted and you may

16    publish.

17         MR. GRIGG:  With the exception --

18         THE COURT:  Of the two.

19         MR. AARON:  The party admission should only come in

20    against the party and that would be Mr. Santana.

21         THE COURT:  Except it's within the conspirator

22    exception.

23         MR. GRIGG:  Are those ordered admitted, Your Honor?

24         THE COURT:  Yes.

25      (Exhibits 426, 427, 430, 431, 432, 437, 438, 441, 445, 446,

```
 1                    448, 449, 450 were admitted.)
 2            MR. GRIGG:  Let's take one of these as an example.
 3   Q.   Sir, I'm going to be showing you what's been admitted as
 4   Government's Exhibit 441.  Do you see the first question
 5   posed in this message exchange?
 6   A.   Yes, I do.
 7   Q.   Who poses the question?
 8   A.   Mr. Kabir.
 9   Q.   To whom is the question posed?
10   A.   To Mr. Santana.
11   Q.   What's the question?
12   A.   The question is Skype.
13   Q.   Mr. Santana responds?
14   A.   Yeah.
15   Q.   Is that yes he responds or that is his response?
16   A.   I'm reading and saying yeah.  Mr. Santana's response was
17   yea.
18   Q.   Does Mr. Kabir reply?
19   A.   Yes, he does.
20   Q.   And what is his reply?
21   A.   Mr. Kabir replies K get on.
22   Q.   And for the items that were just admitted excluding 433,
23   435 and I think 439, the remainder of the exhibits I tried to
24   handle in a lump list, other than the three numbers I just
25   ticked off, are the conversations similar where there was
```

```
 1    discussion about getting on on a Skype call?
 2    A.   Yes, they're similar in that either mention Skype or
 3    make a reference to getting on, getting on Skype.
 4    Q.   All right.  Focusing in on 433 marked but not yet
 5    admitted, are you familiar with this exhibit?
 6    A.   Yes.
 7    Q.   All right.  And what is this exhibit?
 8    A.   This is an exchange between Mr. Santana and Mr. Kabir, a
 9    Facebook exchange.
10    Q.   And I had previously lumped this into the Skype
11    references in the other list, but is there a reference
12    between to Mr. Santana and Mr. Kabir communicating in this
13    exhibit?
14    A.   Yes.
15    Q.   Is this an exhibit like the others that was a message?
16    It's not on the screen.  It wasn't on the screen before.  Is
17    this an exhibit that is a true and correct copy of a message
18    that or message exchange between Santana and Kabir the FBI
19    received from Facebook?
20    A.   Yes, it is.
21    Q.   Was this message exchange dated on or about August 30,
22    2012?
23    A.   Yes, it is.
24           MR. GRIGG:  Your Honor, at this point the
25    government move to admit Government's 433.
```

```
1              THE COURT:  Any objection to 433?

2              MR. AARON:  At this time, no.

3              MR. THOMAS:  No, Your Honor.

4              THE COURT:  Ordered admitted and you may publish.

5                   (Exhibit 433 was admitted.)

6    BY MR. GRIGG:

7    Q.   Do you see 433 on the screen, sir?

8    A.   Yes, I do.

9    Q.   Who initiated this brief exchange?

10   A.   Mr. Santana.

11   Q.   What does Mr. Santana say?

12   A.   When you're finished hit me up.  I really need to talk

13   to you.  It's important.

14   Q.   Who is he sending this message to?

15   A.   Mr. Kabir.

16   Q.   Does Mr. Kabir respond?

17   A.   Yes, he does.

18   Q.   What does he say?

19   A.   One minute or 1 min.

20   Q.   And Santana responds?  Yes or no.

21   A.   Yes, he does.

22   Q.   What is his response?

23   A.   His response is take your time, man.

24   Q.   Are you familiar with how Skype works?

25   A.   I am.
```

```
 1    Q.   Do you need an electronic device to access Skype?

 2    A.   Yes, you do.

 3    Q.   Like a phone?

 4    A.   That's one device you can use to access Skype, yes.

 5    Q.   What else can you use to access Skype?

 6    A.   You can use a computer as well.

 7    Q.   Sir, directing your attention to Exhibit 435 marked but

 8    not admitted, do you have that in front of you?

 9    A.   Yes, I do.

10    Q.   What is this?

11    A.   This is a Facebook exchange between Mr. Kabir and

12    Mr. Santana.

13    Q.   And does it reference getting online?

14    A.   It does.

15    Q.   And is this a true and correct copy of a message

16    exchange between Mr. Kabir and Mr. Santana that the FBI

17    received from Facebook?

18    A.   Yes, it is.

19    Q.   Does it reference a message exchange on or about

20    September 1, 2012?

21    A.   Yes.

22              MR. GRIGG:  Your Honor, at this point the

23    government moves to admit Government's Exhibit 435.

24              THE COURT:  Any objection 435?

25              MR. AARON:  No, Your Honor.
```

```
 1              MR. THOMAS:  No, Your Honor.

 2              THE COURT:  It's ordered admitted and you may

 3    publish.

 4                  (Exhibit 435 was admitted.)

 5    BY MR. GRIGG:

 6    Q.   And the first message who initiates the first message?

 7    A.   Mr. Santana initiates the first message.

 8    Q.   What does he say?

 9    A.   R u on.

10    Q.   Does Mr. Santana respond?

11    A.   Yes, he does.

12    Q.   What's he say?

13    A.   Mr. Santana responds I'm gotta get on right now from

14    Rafiq computer.

15    Q.   And Mr. Kabir's response?

16    A.   Mr. Kabir responds K.

17    Q.   Sir, turning your attention to 439 which has been marked

18    but not admitted, do you have that in front of you?

19    A.   Yes, I do.

20    Q.   Do you recognize this exhibit?

21    A.   I do.

22    Q.   What is this?

23    A.   This is a Facebook message exchange between Mr. Kabir

24    and Mr. Santana.

25    Q.   And is this a true and correct Facebook message exchange
```

1    that the FBI received from Facebook?

2    A.   Yes, it is.

3    Q.   Is it relating to a message exchange on or about

4    September 8th, 2012?

5    A.   Yes.

6    Q.   And in this exchange does Mr. Kabir make any requests of

7    Mr. Santana?

8    A.   Yes, he does.  Well, Mr. Kabir poses a question.

9    Q.   And does Mr. Santana respond?

10   A.   Yes, he does.

11          MR. GRIGG:  Your Honor, at this point the

12   government would move to admit Government's Exhibit 439.

13          THE COURT:  Any objection?

14          MR. AARON:  No, Your Honor.

15          MR. THOMAS:  No, Your Honor.

16          THE COURT:  Ordered admitted.  You may publish.

17              (Exhibit 439 was admitted.)

18   BY MR. GRIGG:

19   Q.   Before we get to the question that you referenced

20   earlier is there an introduction or salutation between

21   Mr. Santana and Mr. Kabir?

22   A.   Yes, there is.

23   Q.   Does that start the conversation?

24   A.   It does.

25   Q.   Turning to page 2 you mentioned a question posed by

```
 1    Mr. Kabir.  What's the question he poses?
 2    A.   Mr. Kabir poses this question to Mr. Santana.  Did u get
 3    funds.
 4    Q.   Does Mr. Santana respond?
 5    A.   He does.
 6    Q.   What's the response?
 7    A.   Mr. Santana responds we trying to get ahold of a couple
 8    ppl.
 9    Q.   All right.  Does he follow-up to his response with
10    another response?
11    A.   Yes.  Mr. Santana continues by saying soon Ia.
12    Q.   For those folks who might not yet have studied the
13    glossary, does the letters Ia referring to anything?
14    A.   Yes, it can refer to an abbreviation of In sha Allah
15    which is God willing in Arabic.
16    Q.   And in response to Mr. Santana's statement soon, does
17    Mr. Kabir reply?
18    A.   Yes, he does.
19    Q.   And does that reply span the bottom of page 2 and go to
20    the top of page 3?
21    A.   Yes, it does.
22    Q.   And what is Mr. Kabir's response to Mr. Santana's
23    response?
24    A.   Mr. Kabir's response is laggers.
25    Q.   Santana's reply?
```

1    A.    Mr. Santana replies yea I know my bad.

2    Q.    And Mr. Kabir's response?

3    A.    Iz not good ppl people out here depending on you guys.

4    Q.    What does Mr. Santana say?

5    A.    Mr. Santana says all right we will do ASAP.

6    Q.    Sir, you mentioned earlier that the profile information

7    for a Facebook user can be changed by the user.  We're now

8    getting to events happening in September 2012.  Did you

9    notice any change, particular change to Mr. Santana's

10   Facebook profile in September of 2012?

11   A.    Yes, I did.

12   Q.    Sir, turning your attention to what's been marked

13   Government's Exhibit 462, do you recognize Exhibit 462?

14   A.    I do.

15   Q.    What's that?

16   A.    This is a screen shot of Mr. Santana's Facebook page.

17   Q.    Is this picture taken in September of 2012?

18   A.    Yes, it is.

19   Q.    Is this a true and correct copy of Mr. Santana's

20   Facebook page as of September 2012?

21   A.    Yes.

22          MR. GRIGG:  Your Honor, at this point the

23   government would move to admit 462.

24          THE COURT:  All right.  Any objections?

25          MR. AARON:  No, Your Honor.

```
 1              MR. THOMAS:  No, Your Honor.

 2              THE COURT:  Ordered admitted.  You may publish.

 3                  (Exhibit 462 was admitted.)

 4   BY MR. GRIGG:

 5   Q.   Sir, directing your attention to the top of Government's

 6   Exhibit 462 on the first page, do you see the vanity name

 7   indicated now?

 8   A.   Yes, I do.

 9   Q.   As of the date of this -- by the way, do you recall the

10   date of this screen shot?

11   A.   I do not recall the exact date, but I do recall that it

12   occurred in September of 2012.

13   Q.   Was it late September or early September?

14   A.   It was later in September.

15   Q.   All right.  And the vanity name before read Mikaeel MK.

16   What does it read now?

17   A.   It reads Miguel Santana.

18   Q.   And the profile picture is now something different than

19   what we saw before.  Who's depicted in his profile picture?

20   A.   It is different and what is depicted is Mr. Santana and

21   what appears to be his family or his mother and his sister.

22   Q.   Now, we talked before about time line and there appears

23   to be not much activity displayed on the time line; is that

24   fair to say?

25   A.   That's fair to say.
```

```
 1    Q.    And the recent activity listed at the top, what does

 2    this exhibit indicate is the change to Mr. Santana's Facebook

 3    page?

 4    A.    It reads Miguel changed his religious views.

 5    Q.    Now, with respect to the Facebook activity, the FBI also

 6    received information directly from Facebook reflecting these

 7    changes?

 8    A.    That's correct.

 9    Q.    So, sir, directing your attention to the previous

10    exhibit in your binder 444, do you recognize that?

11    A.    I do.

12    Q.    What is that?

13    A.    This was provided -- this is a Facebook product that was

14    provided from Mr. Santana's Facebook page.

15    Q.    And does this indicate a change to Mr. Santana's

16    Facebook account towards the end of September 2012?

17    A.    Yes, it does.

18    Q.    Is this a true and correct copy of the information

19    provided by Facebook to the FBI reflecting that change?

20    A.    Yes, it is.

21              MR. GRIGG:  Your Honor, at the point the government

22    moves to admit what's been marked as 444?

23              THE COURT:  Any objections?

24              MR. AARON:  Cumulative and irrelevant.

25              THE COURT:  What's the relevance?
```

```
 1              MR. GRIGG:  Your Honor, this is the technical date
 2    that documents the date of the change.  The witness testified
 3    he believed it was towards the end and we have a date with
 4    this record.
 5              THE COURT:  Mr. Thomas.
 6              MR. THOMAS:  I join with counsel.
 7              THE COURT:  The objections are sustained.
 8    BY MR. GRIGG:
 9    Q.   Sir, during the course of this investigation, did you
10    also review Mr. DeLeon's Facebook page?
11    A.   Yes, I did.
12    Q.   Did you review that directly by accessing his page?
13    A.   Yes, I did.
14    Q.   Did you make screen shots of some of the things you saw
15    on his page as you have testified about with Mr. Santana?
16    A.   Yes, I did.
17    Q.   Sir, turning your attention to Government's Exhibit 328,
18    we'll skip 328 and we'll just go straight to 329.  It's the
19    next in your binder.  Do you recognize what's been marked as
20    Government's Exhibit 329?
21    A.   Yes, I do.
22    Q.   What is that exhibit?
23    A.   This is a screen capture of Mr. DeLeon's Facebook page.
24    Q.   And is this a true and correct depiction of the
25    information you saw on Mr. DeLeon's Facebook page?
```

1    A.   Yes, it is.

2    Q.   Does this show his account profile as of a certain date?

3    In other words, is this a true and correct depiction as of

4    the date you took this screen shot?

5    A.   I do recall taking this screen shot.  There is no date

6    on this so I wouldn't be able to definitively say exactly

7    what date I had taken this screen shot.

8    Q.   But this is a true and correct depiction of his Facebook

9    page as of a certain date?

10   A.   Yes.

11           MR. GRIGG:  Your Honor, at this point the

12   government would move to admit 329.

13           THE COURT:  Any objection?

14           MR. AARON:  Yes.  We would object as to relevance

15   and as for foundation, if there's no date on it, it could be

16   before the date of the alleged conspiracy.

17           THE COURT:  Mr. Thomas.

18           MR. THOMAS:  Join.

19           MR. GRIGG:  Your Honor, I believe there is a means

20   through which I could refresh the recollection of the

21   witness, but it would require some additional steps to bring

22   some information to the court that's not currently in the

23   courtroom.

24           THE COURT:  At this point I would sustain the

25   objection.

```
 1              MR. GRIGG:  And will I have a chance --
 2              THE COURT:  Yes.
 3              MR. GRIGG:  Okay.  Thank you.
 4    Q.   All right.  Sir, I'm going to move forward to a slightly
 5    different topic and that is we're not going to go through all
 6    the forensics for these items, but these searchs of the
 7    computers and some of the other devices seized on the day of
 8    the arrests.  In particular there was testimony and we've
 9    received Exhibit 504 that represents the bookmark searchs for
10    a Sony Viao laptop with an order number I believe testimony
11    was 8239.  Are you familiar with that device?
12    A.   Yes, I am.
13    Q.   And is that the exhibit that we discussed briefly
14    earlier this morning on the bookcase to your right?
15    A.   Yes, it is.
16    Q.   Sir, did you conduct the search to identify each of the
17    things bookmarked in that exhibit?
18    A.   Yes, I did.
19    Q.   How does one do a search using the technique of
20    bookmarking?
21    A.   There's a special software that's provided the reviewing
22    agent and the agent is able to view the contents of the
23    particular device.  In this instance, it was the Sony Viao
24    laptop.  The agent's able to look at the files which may
25    contain pictures, audio files, documents.
```

```
 1            If an agent finds something that's relevant per
 2   discovery, the agent can bookmark that item and it remains
 3   saved towards the time when the agent finishes his review.
 4   At the time the agent finishes his review, all those
 5   bookmarks are then produced.
 6   Q.   And is the result of producing those bookmarks what we
 7   see in 504?
 8   A.   Yes.
 9   Q.   Computer data can be quite vast; is that correct?
10   A.   Yes.
11   Q.   What are the ways in which you conduct your searchs to
12   look for relevant information?
13   A.   There was multiple ways.  One of the ways that I used
14   and agents have used is to do key word searchs.  Particular
15   to this investigation, examples would be travel, travel to
16   Afghanistan, jihad, tickets, paint ball, shooting, AK 47.
17   Q.   Let me stop you there.  Was your ability to search for
18   things controlled by any -- we heard I think Mr. Goldsmith
19   talk about legal authority.  Was there legal authority
20   governing your searchs in this case?
21   A.   Yes.
22   Q.   What was that authority?
23   A.   A search warrant.
24   Q.   Does the search warrant allow you just to search for
25   anything randomly?
```

```
 1    A.    No, it does not.

 2    Q.    What does it allow you to search for?

 3    A.    Within the search warrant, there is items that are

 4    outlined items to be seized and if those items fall outside

 5    those listed items, then they should not be searched.

 6    Q.    And are the key word terms that the FBI uses or that you

 7    used in this particular instance are they designed to find

 8    items inside or outside that list of items to be seized?

 9    A.    Yes.

10    Q.    Inside or outside?

11    A.    Inside.

12    Q.    Is that what you tried to do in this case?

13    A.    Yes.

14    Q.    Now, did you also do a search of the Toshiba laptop

15    recovered from the apartment?

16    A.    Yes, I did.

17    Q.    And to be precise since everybody was talking about ORC

18    numbers, I'm referring to the device ORC 8711.  Did you do

19    the searchs on that device?

20    A.    Yes, I did.

21    Q.    Did you use the same techniques?

22    A.    Yes, I did.

23    Q.    Were bookmarks generated?

24    A.    Bookmarks were generated, yes.

25    Q.    Now, during your search of those computers, did you find
```

1    records relating to Skype communications?

2    A.   Yes, I did.

3    Q.   Did you find records relating to Skype communications

4    involving any of the suspects in this case?

5    A.   Yes, I did.

6    Q.   Who in particular?

7    A.   In particular between Mr. Kabir and Mr. DeLeon.

8    Q.   And those were recovered on the Sony Viao?

9    A.   Yes.

10   Q.   And also on the apartment laptop 8711?

11   A.   Yes.  They were recovered, communications were recovered

12   on both devices the Sony Viao and the Toshiba laptop.

13   Q.   Sir, turning your attention to what's been marked

14   Government's 452, do you have that in the binder in front of

15   you?

16   A.   One minute, please.  452?

17   Q.   Yes.

18   A.   Yes, I have that.

19   Q.   Do you recognize this exhibit?

20   A.   Yes, I do.

21   Q.   What is this exhibit?

22   A.   This is an exhibit of Skype chat communications.

23   Q.   Now, you mentioned previously that Skype allows the user

24   to do video calls; is that correct?

25   A.   Sorry.  Can you repeat the question?

1    Q.   You mentioned previously that Skype allows one to do

2    video calls; is that correct?

3    A.   Yes, that's correct.

4    Q.   Does it also allow you to send text messages to other

5    Skype users?

6    A.   It does.

7    Q.   Is that what you were referencing with your reference to

8    chat messages?

9    A.   Yes, Skype chat messages.

10   Q.   And in this exhibit does it indicate these messages were

11   located on a particular computer?

12   A.   Yes, it does.

13   Q.   Is this information pulled from the forensic reports of

14   the searchs of those computers?

15   A.   Yes, they were.

16   Q.   What computer does this exhibit indicate it was located

17   on?

18   A.   This exhibit indicates that it was from ORC 008239 which

19   is the Sony Viao laptop.

20   Q.   And is this exhibit a true and correct depiction of some

21   of the Skype messages that were recovered from the Sony Viao?

22   A.   Yes.

23   Q.   And do they involve a particular person?

24   A.   In this particular exhibit, yes, Mr. DeLeon.

25            MR. GRIGG:  At this point the government moves to

```
 1    admit Government's Exhibit 452.
 2              THE COURT:  Any objections to 452?
 3              MR. AARON:  Yes, Your Honor.  There is no
 4    foundation.  I believe that the most this witness can say is
 5    it's a true and correct copy as to some of the Skype
 6    communications.  We don't know the source.  We don't know the
 7    means.  We don't know the reliability.
 8              THE COURT:  Mr. Thomas.
 9              MR. THOMAS:  I join in that, Your Honor.  Also
10    relevance.
11              THE COURT:  Well, it seems to me that this exhibit
12    is being offered as if I'm understanding correctly, it's
13    essentially a summary; is that right?
14              MR. GRIGG:  Your Honor, these are the Skype
15    messages on this particular day, the to and from with
16    Mr. DeLeon and the other communicant to offer context for
17    this particular passage.  Specifically, I'm directing the
18    Court's attention to the second line in this exhibit and,
19    again, these items were covered from the Sony Viao laptop.
20              THE COURT:  Well, I'm going to sustain the
21    objection at this point.  I'll let you argue it further
22    outside the presence of the jury, but the objections are
23    sustained.
24    BY MR. GRIGG:
25    Q.   Sir, directing your attention to 460, do you have that
```

```
 1    in front of you?
 2    A.   Yes.
 3    Q.   Do you recognize this exhibit?
 4    A.   Yes, I do.
 5    Q.   What is depicted in this exhibit?
 6    A.   A Skype chat communication between Mr. Kabir and
 7    Mr. DeLeon.
 8    Q.   Approximately what time frame?
 9    A.   November 16th of 2012.
10    Q.   And does this exhibit -- where is the Skype chat
11    reflected in this exhibit come from?
12    A.   The Skype chat reflected in this exhibit comes from ORC
13    008711 the Toshiba laptop.
14    Q.   And are these Skype chat messages that were recovered
15    during the search of the Toshiba laptop?
16    A.   That's correct.
17    Q.   Are these messages between Mr. DeLeon and Mr. Kabir true
18    and correct copies of the message exchange recovered from the
19    computer?
20    A.   Yes, they are.
21              MR. GRIGG:  Your Honor, at this point the
22    government moves to admit Exhibit 460.
23              THE COURT:  Any objection to 460?
24              MR. AARON:  None except as previously stated.
25              MR. THOMAS:  Your Honor, objection as to foundation
```

1    with respect to this witness for this document.

2            THE COURT:  Is this a document that was received

3    pursuant to -- has the witness testified as to where he

4    obtained this exhibit from?

5            MR. GRIGG:  Your Honor, I asked him where it was

6    obtained from a moment ago and I also at the beginning when

7    we started this section asked him whether he searched 8711.

8            THE COURT:  The Toshiba laptop.

9            MR. GRIGG:  That's correct, Your Honor.

10           THE COURT:  All right.  All the objections are

11   overruled and it's ordered admitted and you may publish.

12                   (Exhibit 460 was admitted.)

13   BY MR. GRIGG:

14   Q.   Directing your attention to the top of 460, the first

15   page upper left corner, do you see these exchanges here?

16   A.   Yes, I do.

17   Q.   This record is slightly different than the records we

18   have been looking at and with your permission, I'll take a

19   bit of time to understand what we're looking at.

20           The date time group listed on the left side of the

21   column, the second column from the left is that the date you

22   were referencing before about the time of this exchange?

23   A.   Yes.

24   Q.   And the next column over indicated here, does that

25   indicate the participants in the communication?

1    A.   Yes.

2    Q.   And, for example, in these first few that we've got

3    here, who are the participants?

4    A.   In this first example it's juanton.21.

5    Q.   And the next one below that?

6    A.   Rafiq Abdul Raheem.

7    Q.   And then there's a display name listed in the fourth

8    column here.  You see that?

9    A.   Yes.

10   Q.   Next to the display name for juanton.21, what's the name

11   listed there?

12   A.   Juan Ton.

13   Q.   And for the second message indicated by my arrow here,

14   what's the user name or sorry, the display name listed there?

15   A.   Ralph DeLeon.

16   Q.   All right.  And then just for reference are the ORC

17   numbers that we've been discussing listed in the second

18   column from the right for each of these messages?

19   A.   Yes.

20   Q.   And, for example, what's portrayed on the screen there

21   is the ORC number for the Toshiba laptop you mentioned

22   earlier?

23   A.   Yes, it is.

24   Q.   And for the directory listed underneath the ORC number,

25   does it indicate -- what does it indicate in the directory

1    starting at this sub-path entry?

2    A.   Says skype/rafiqabdulraheem/main.db.

3    Q.   All right.  Looking at the items beginning with a number

4    in the far left column 18829, do you see those items

5    displayed on the screen?

6    A.   Yes.

7    Q.   And are these messages from anybody in this case?

8    A.   Yes, they are.

9    Q.   Who are they from?

10   A.   From Mr. DeLeon.

11   Q.   Is that indicated by the name Rafiq Abdul Raheem?

12   A.   Yes.

13   Q.   And the Ralph DeLeon display name you mentioned earlier?

14   A.   Yes.

15   Q.   Turning to the subjects, what does Mr. DeLeon write or

16   type I suppose would be more accurate?

17   A.   There are other brothers here but mik told me so we got

18   our tickets already for Istanbul.

19   Q.   Does it appear to be all about the date and time you

20   mentioned before?

21   A.   Yes, that's correct.

22   Q.   Is there an indication about whether these are in West

23   Coast time or they're Pacific time or some other time?

24   A.   No, they're some other time.

25   Q.   And is that the same that we saw earlier the -- either

1    the East Coast time and I believe we heard reference to

2    Greenwich meantime?

3    A.   Correct.  I believe UTC is a reference to Greenwich

4    meantime.

5    Q.   Are you aware how many hours ahead of the west coast

6    Greenwich meantime is?

7    A.   I believe it's seven or eight.

8    Q.   Seven or eight.  So if these messages are listed as

9    5:27 a.m. on November 16th on the west coast, what time

10   approximately would that be?

11   A.   Approximately 10:30 or 10:27.

12   Q.   10:27 a.m. or p.m.?

13   A.   I'm sorry.  10:27 p.m. for November 15th, 2012 the

14   previous day.

15   Q.   And does Mr. Kabir respond to the last statement?

16   A.   Yes, he does.

17   Q.   And what is Mr. Kabir's response?

18   A.   He responds with K.

19   Q.   And then can you read the rest of this exchange between

20   Mr. DeLeon and Mr. Kabir just announcing who is saying what,

21   sir?

22   A.   Sure.  Mr. DeLeon says be in Turkey Ia or in sha Allah

23   Tuesday.  Mr. Kabir responds, Ia or in sha Allah.

24        Mr. DeLeon once we or we're with apostrophe there

25   we'll get ur ticket for u and come with us and from there we

1    can go where ever Allah wills.

2    Q.   The conversation continues?

3    A.   Yes, it does.

4    Q.   Can you read again announcing the names?

5    A.   Continuing.  Kabir:  1st find out the legal procedures

6    w/visa n stuff n scope it out n than lemme kno.

7           DeLeon:  Ok.  We will just be there and say we are

8    going for tourist visa see the city.  Its not hard to get a

9    tourist visa for turkey iA in sha Allah.

10          Kabir:  K.

11          DeLeon:  Yeah, so just try to be online every day

12   and we will iA in sha Allah keep in contact.  Sold my car

13   already yesterday.  So we got our tickets.

14          Kabir:  K.

15          DeLeon:  Everything is finalised iA or in sha

16   Allah.

17   Q.   And without going through every single one of these

18   messages, can you summarize is there a discussion about in

19   which Mr. Kabir suggests or says something about Palestine

20   going a couple lines down from where you left off?

21   A.   Yes.

22   Q.   What does he say there?

23   A.   Mr. Kabir says I think u guys should head 2 palestine.

24   Q.   And does Mr. DeLeon respond?

25   A.   Yes, he does.

1    Q.   What's the response?

2    A.   Mr. DeLeon responds we get to Turkey by Tuesday, yeah

3    Palestine sounds good.  You're coming with us iA in sha

4    Allah.

5    Q.   Is there a discussion about where Mr. DeLeon is during

6    this exchange?

7    A.   Yes, there is.

8    Q.   Does Mr. Kabir ask where are you?

9    A.   Yes, he does.

10   Q.   Where r u rite now?

11   A.   Yes, he does.

12   Q.   What did Mr. DeLeon respond?

13   A.   Mr. DeLeon responds at the apartment.  Leaving to Mexico

14   tomorrow.  Then from Mexico head to Turkey.  Flights on

15   Sunday.

16   Q.   And continuing on to the second page, does Mr. Kabir ask

17   Mr. DeLeon about where they're going to stay?

18   A.   Yes.

19   Q.   All right.  If you can read the exchange from the

20   question where are you going to stay at which is indicated

21   here and just pick up from there.

22   A.   Sure.

23        Kabir:  Were u guys gonna stayt at?  U kno ppl

24   people there?

25        DeLeon:  We'll look for a place.  We got enough

1    cash.  More than enough.

2         Kabir:  Iz not thaa easy.

3         DeLeon:  I know.  iA in sha Allah.  Allah will make

4    it easy.  We hav eour full faith and trust in Allah that

5    he'll make it easy on us.  We just wana leave this ocuntry

6    make hijra then head to a wedding where ever it is.  Israel

7    killed the head of hammas.  Its going crazy right now.

8         Kabir:  Yea iz all good.

9         MR. GRIGG:  Your Honor, I have several more

10   exhibits to deal with, but I was wondering if the Court would

11   be interested in recessing perhaps early.  This is a good

12   breaking point I think.

13        THE COURT:  All right.  Well, there was a number of

14   things we have to take up with respect to some of the

15   exhibits so all right.  Ladies and gentlemen, we'll recess

16   and we'll see you tomorrow morning no later than 9:00.  Thank

17   you for your patience and attention today.  I think there

18   were some flood warnings and it was hailing a little bit so

19   drive carefully home.

20        And remember don't discuss the case, don't Google,

21   tweet, chat, blog about anything having to do with the case,

22   participants, the testimony.  Don't make up your mind about

23   the case, the verdict or anything related to the case.  Don't

24   do any research, and I'll see you tomorrow morning.  Thank

25   you very much.

1                      (Jury not present.)

2           THE COURT:  You may be seated.  We're on the record

3    outside the presence of the members of the jury.  I did want

4    to tell counsel that one of the jurors, Juror No. 2 at the

5    last recess indicated to Ms. Rogers that he had a question.

6    I happened to come around the corner as he was talking to

7    her.  We told him, of course, to put it in writing and don't

8    discuss it with any of the other jurors and then Ms. Rogers

9    would bring it to me.  He later told her that he wanted to

10   think about it a little further, but he could give us a

11   question in writing so we may get something tomorrow.

12           All right.  Mr. Grigg.

13           MR. GRIGG:  Yes, Your Honor.  Your Honor, with

14   respect to the exhibits for refreshing recollection as to

15   dates, that information is something that the agent can

16   reference very easily.  It's just that with the enormous

17   amount of things and material we have to bring into the

18   court, I didn't bring the digital material that represents

19   his saved files that indicate exactly when those records were

20   saved.

21           THE COURT:  Well, you'll be beginning with him

22   again tomorrow I guess so you can go back to that.

23           MR. GRIGG:  So I'd like to take that opportunity to

24   address those matters.

25           With respect to the other sustained objection, I

1    think there were only a couple.  Your Honor, with respect to

2    427, which is an item reflecting the Facebook notification --

3    not notification.  That's a term of art we'll get to later.

4           THE COURT:  Is that the one about the linking that

5    you offered?

6           MR. GRIGG:  Yes, Your Honor.

7           THE COURT:  All right.  There was a hearsay

8    objection that I sustained.

9           MR. GRIGG:  And, Your Honor, with respect to the

10   hearsay objection, the first, you know, offering it to show

11   that Mr. Santana's account receives an automatic update about

12   the change in status or the change in activity of Mr. Kabir's

13   account shows a link such that it wouldn't even be offered

14   for a hearsay purpose.

15          THE COURT:  Well, excuse me, but aren't you

16   offering it to show -- you're offering that document, well,

17   really you're offering it, I suppose you're trying to offer

18   it as a business record, but this witness can't -- let me

19   sort this out in my own head.  It might be admissible as a

20   business record exception, but not through this witness.

21          MR. GRIGG:  Your Honor, I believe the foundation

22   for these exhibits with PIN numbers and so on was laid

23   through a different witness yesterday.  That individual

24   Mr. Mueller talked about the PIN numbers for each of these

25   types of the exhibits for the information typed directly from

1    Facebook to the FBI.  And this exhibit here is an automated

2    piece of data that the FBI received straight from Facebook

3    under that process, under the court order.  That is, I

4    believe, sufficient foundation to establish what this item is

5    and where it came from.  And again --

6              THE COURT:  All right.  But that goes to foundation

7    and that's not the objection.  As I understand it, you're

8    offering this document to show the truth of what's -- at

9    least one part of what it reads and that is the two accounts

10   were linked; right?

11             MR. GRIGG:  It shows they are linked because

12   Mr. Santana's Facebook account receives a notice about a

13   change to the Facebook account of another person.  What that

14   change is not necessarily --

15             THE COURT:  Right, you're not offering to show what

16   that change is, but you're offering this document to show the

17   linkage; correct?

18             MR. GRIGG:  Yes, for the non-hearsay purpose.

19             THE COURT:  But how is that a non-hearsay purpose

20   because the document shows the linkage and that's why you're

21   offering it.

22             MR. GRIGG:  Maybe I'm misunderstanding the hearsay

23   nature of this.  The statement contained in the exhibit is

24   that one name is deleted from Mr. Kabir's account, that's the

25   vanity name, and then another one is made new.  And so what

1    it's reflecting is when Mr. Kabir's name changes if the Court

2    recalls that exhibit that shows the activity for the vanity

3    name changes, what it shows is that when Mr. Kabir makes a

4    change to his page that information comes to Santana's

5    account automatically and that's not a hearsay purpose.

6    There's no statement there.

7           THE COURT:  I'm sorry.  All right.  What's the

8    exhibit number again?

9           MR. GRIGG:  It's 427, Your Honor.

10          THE COURT:  Since they're not in numerical order --

11          MR. GRIGG:  Forgive me, Your Honor.  I put them in

12   the order that the witness was going to testify.

13          THE COURT:  Oh, I know.  I'm not criticizing you

14   for that, in order for me to put my -- why don't you put it

15   on the screen because it might take me a few minutes to find

16   it.

17          MR. GRIGG:  Again, this is information about

18   Santana's Facebook account as indicated by the facility

19   associated with his Facebook account 101mesr.  There's a PIN

20   number at the top with reference to Mr. Mueller.

21          THE COURT:  I thought you were -- could you show me

22   the whole document again?  I thought you were offering it to

23   show that the linkage between Mr. Kabir . . .

24          MR. GRIGG:  And, Your Honor, if I may zoom in on

25   what is probably the most relevant portion of this.  This

```
 1    indicates the friend section just above the box.
 2                THE COURT:  All right.
 3                MR. GRIGG:  And what it's reflecting is the fact
 4    that one of Mr. Santana's Facebook friends made a change to
 5    his account and the change is the vanity name change that
 6    we've seen yesterday.
 7                THE COURT:  Okay.  Both of those names are
 8    Mr. Kabir; correct?
 9                MR. GRIGG:  Right, but if you see the information
10    about the name indicated in the column to the right, the old
11    name Sohiel Omar Kabir is deleted and the new name is
12    established as Juan Ton Amaara.
13                THE COURT:  I understand that.
14                MR. GRIGG:  It's being offered to simply show that
15    they're friends.  Mr. Kabir's activities are piped in essence
16    to Mr. Santana's Facebook account.
17                THE COURT:  When you say they are friends, you
18    mean?
19                MR. GRIGG:  Facebook friends, Your Honor.
20                THE COURT:  No, but I don't know who you mean by
21    they.
22                MR. GRIGG:  The user of the account for the record
23    this pertains to is Mr. Santana and it discusses his friend
24    Mr. Kabir.
25                THE COURT:  Okay.  I'm sorry.  So this is
```

1   Mr. Santana's page, a page from Mr. Santana's account?

2           MR. GRIGG:  This is a record of something affecting

3   Mr. Santana's account and what is affecting it is the change

4   of one of his Facebook friends.

5           THE COURT:  So in terms of relevance, you're

6   offering it just to show they were Facebook friends?

7           MR. GRIGG:  They are Facebook friends and they

8   receive automatic updates about the activity on each other's

9   account.

10          THE COURT:  All right.  Mr. Aaron.

11          MR. AARON:  Your Honor, the weird thing about that

12  is it's not a statement from Mr. Santana.  It's not a

13  statement from Mr. Kabir.  It's statement from Facebook so

14  it's not a party admission, it's not a coconspirator and at

15  this point it's not a business record.  So we would object in

16  addition to all of the other objections we made.  The Court

17  made the right ruling and we would hope that the Court would

18  make the same ruling.  Thank you.

19          MR. THOMAS:  Your Honor, I'd just add that the very

20  fact that Mr. Grigg referenced that they're friends is the

21  statement from Facebook that's being offered for the truth

22  because if they weren't friends, the accounts wouldn't be

23  linked and that's the whole purpose he's trying to create

24  with this document.

25          MR. AARON:  I meant to incorporate that as well,

1    Your Honor.  I thought that was a previous objection.  But

2    another thing that I would note I think counsel will agree

3    and I think even the government will agree, there's been

4    massive documentation that these two gentlemen are friends.

5    I think at this point it's clearly cumulative.

6            THE COURT:  All right.  I think that what

7    Mr. Thomas just said is what I was struggling to articulate

8    earlier that there is a, um, as to why in my view it is

9    hearsay because it's being offered for the truth of the

10   document.  So I'm gonna sustain the objection on the basis of

11   hearsay and cumulative.

12           I don't really think there's any doubt, there

13   couldn't be possibly any doubt at this point that Mr. Santana

14   and Mr. Kabir among others are communicating via Facebook.

15   So to the extent the government's offering it for the

16   additional fill up of information that they're automatically

17   updated with anything from each other's accounts, it's just

18   cumulative.

19           MR. GRIGG:  Very well.

20           THE COURT:  Thank you.

21           MR. GRIGG:  And I think with respect to 444, which

22   is a similar record about Mr. Santana changing his Facebook

23   profile.  And if the Court wishes, I can display that one?

24           THE COURT:  Would you please.

25           MR. GRIGG:  And, again, for the same information

```
 1    it's from Mr. Santana's Facebook account and the recent
 2    activity box here in the middle is what we're getting at.
 3              THE COURT:  All right.  That would be the same
 4    ruling.
 5              MR. GRIGG:  All right.  Thank you, Your Honor.
 6              THE COURT:  All right, thank you.  All right.
 7              Now, one thing.  How much longer do you think you
 8    have on direct?
 9              MR. GRIGG:  Depending on how quickly I can go with
10    these exhibits, Your Honor, maybe an hour or two.  We're
11    turning to the topic of the searchs of the electronic devices
12    we started with at the end here.
13              THE COURT:  Yesterday the idea was that we would
14    finish with this witness and maybe get through two others.
15              MS. DeWITT:  I don't think that's what we intended,
16    Your Honor.  I think we were just giving you the lineup of
17    the witnesses in order.  So if that's the impression you got,
18    that is my fault and I apologize.
19              MR. GRIGG:  I might have contributed to that when I
20    said I can't see beyond the three witnesses I listed.
21              THE COURT:  Fine.  It does seem to me that it took
22    longer with this witness than it need have so, and again, I
23    don't know your case, anyone here, I don't your case as well
24    as you do so there may be a reason that's not apparent to me
25    about some of the questioning.  But, for example, Mr. Grigg,
```

1   when you were showing the witness I think it was this morning

2   one of the pictures about the paint ball I want to say

3   studio.  I don't think it's really called a studio.  And you

4   went through with a lot of detail some of which I think was

5   unnecessary about, you know, while the picture was up on the

6   screen and it's gonna be -- it has been admitted into

7   evidence.

8          So having the witness identify it by the name of

9   the location and so forth, you know, I just think that that

10  kind of detail is really more than was necessary.  That's

11  just one example that came into my head.  But I hope that it

12  might go a little faster tomorrow because I don't think at

13  this point I understand even if there was a stipulation,

14  you'd still want to go through this and you'd want to show

15  the pictures of the defendants and so forth.  But, you know,

16  as to a lot of the issues in this case, I'm not asking for a

17  stipulation, but there's not much debate about, for example,

18  the defendants going to play paint ball so . . .

19         MR. GRIGG:  I understand and actually, Your Honor,

20  hopefully people enjoyed a break from some of the documentary

21  evidence with the photographs.  I anticipate moving a little

22  bit more quickly tomorrow.

23         THE COURT:  Well, like I said, I'm trying to give

24  everyone leeway to try the case they want to, but I'm

25  concerned about the time estimate.  So tomorrow the next

```
 1   witness then would be Agent Elias?
 2            MR. GRIGG:  Special Agent Lee is next, Your Honor.
 3            THE COURT:  Well, Mr. Aaron, you would be
 4   cross-examining Agent Nader.
 5            MR. AARON:  I do, Your Honor.  We expected him
 6   given what we know of the discovery, we expected Nader to be
 7   a long witness on direct.  We expect Elias also to be a long
 8   witness on direct.
 9            THE COURT:  Well, how long is your cross going to
10   be, an hour?
11            MR. AARON:  I think maybe longer.
12            THE COURT:  I'm sorry.  About half a day?
13            MR. AARON:  I don't know about that long, but
14   certainly I could explain it this way.  When we started the
15   day, I had written up my cross-examination last night and
16   that was 10 pages and that was before all the additional
17   information today so it's probably double.
18            THE COURT:  All right.  So two or three?
19            MR. AARON:  I think.
20            THE COURT:  That gives me an idea.  Yours would be
21   slightly less than that?
22            MR. THOMAS:  I imagine Mr. Aaron would cover a lot
23   of the questions.
24            THE COURT:  All right.  So we might get to Agent
25   Lee tomorrow.  We might or we might not.
```

```
1            MR. GRIGG:  I expect Agent Lee to be shorter than

2      Agent Nader.

3            MR. AARON:  Your Honor, one thing that the

4      government did do which actually did help a lot and avoided a

5      lot of interruption and did speed things along.  Mr. Grigg

6      gave us a list of the exhibits for Mr. Nader and that

7      actually helped a lot and it helped avoid a lot of

8      interruptions.  We were hoping to be able to get such a list

9      for Lee and Elias.

10            MR. GRIGG:  I'll get those to counsel.

11            THE COURT:  All right.  Thank you very much.

12            All right.  What other matter does we need to take

13      up?

14            MS. DeWITT:  Your Honor, it is late and I know it's

15      been a long day, but at some point I would like to have an

16      opportunity to address the issue of the proffer.

17            THE COURT:  Oh, now's fine if you want to go back

18      to that.

19            MS. DeWITT:  I don't need to do it right now,

20      but --

21            THE COURT:  Well, now is fine cause we did recess

22      with the jury a little bit early.  If you want to do it, now

23      is as good a time as any.

24            MS. DeWITT:  In response to a couple of comments

25      the Court made this morning, just a couple of things that I
```

1  wanted to point out that I thought were important.

2          THE COURT:  Could I interrupt you again because I

3  want to make sure I have my notes.  Go ahead.

4          MS. DeWITT:  The Court pointed out some issues in

5  the opening statement and there's just a couple of other

6  things I thought were important to point out.  Again, I think

7  it's important to keep in mind what the point of the opening

8  argument was.  The point being the whole entire argument was

9  to establish on his behalf, on his client's behalf that his

10  client's mindset was something other than to do what we're

11  accusing him of doing in this case.

12          And he specifically refers to, and I'm not sure if

13  your pages as lined up as the same as mine, but on page 45 he

14  specifically talks about it's important that you realize that

15  because of this is the mindset of these guys, and then he

16  proceeds to talk about this whole case to them was a game.

17  And that is directly contrary to what Mr. DeLeon said in his

18  proffer session.

19          And just a couple of other little things.  The

20  Court was focused on sort of a fact-for-fact response and I

21  think that's not a fair comparison because he's essentially

22  sort of trying to walk around pin pointing specific facts,

23  but the fact is what he said in its sum and substance was

24  contrary to his client's proffer, but there are also some

25  additional facts that are specifically contrary.

```
 1              One of them is he talks about the government
 2    introducing into his client and introducing into this
 3    investigation Anwar al-Awlaki.  His client very specifically
 4    said in his proffer session that he first listened to and
 5    became exposed to Anwar al-Awlaki when he was hanging out at
 6    the hookah bar with defendant Kabir.
 7              THE COURT:  What is the page reference?
 8              MS. DeWITT:  Are you talking about the page
 9    reference in the proffer or the page reference --
10              THE COURT:  In the transcript.
11              MS. DeWITT:  In the transcript he says, there's two
12    places.  First he says on page 46 that they talked about
13    religion.  They would talk about world events.  So he doesn't
14    talk about Anwar al-Awlaki there, but then he goes on to say
15    at page 49 Anwar al-Awlaki it's a term you'll hear a lot.
16    The government introduced it.
17              Now, that is directly contrary to what Mr. DeLeon
18    said in his proffer statement which is that he was introduced
19    to Anwar al-Awlaki long before he ever met the confidential
20    source.  And also this statement here that the government
21    that he makes in a number of places, but particularly at the
22    end, this case is going to show, ladies and gentlemen, that
23    but for the government and their involvement, we wouldn't be
24    here.  That's directly contrary to the statements made by
25    Mr. DeLeon in his proffer.  And it doesn't get around that
```

1    fact just by the fact that he was vague about it.

2           The facts that were stated in the proffer are quite

3    contrary to that.  They're quite contrary to that in that he

4    admitted in his proffer statement that there was a plan that

5    pre-existed the CHS.  That he himself took specific acts in

6    furtherance of that plan.  He recruited Gojali.  He bought

7    tickets.  He makes a number of statements that are directly

8    contrary to this concept that this was all initiated by the

9    government.  So I don't think it's fair to say they can just

10   talk in generalities and say something that is diametrically

11   opposed to the truth that was stated in the proffer session

12   and thereby get around, you know, being held to his own

13   words.

14          Your Honor also noted a couple of things.

15   Specifically on page 50, who do you want to be when you

16   fight?  What position do you want to be?  What do you want to

17   use?  The informant asked these questions.  Well, he

18   specifically answers these questions in his proffer session.

19   He says he wants to go fight.  He wants to take action.  He

20   wants to go to a Muslim land.  These are answers that he

21   gives in his proffer session.  And this whole line of

22   argument suggests it's the opposite.  That this is all the

23   government and that his mindset is completely different and

24   that's not square with his own statements.

25          THE COURT:  So, I'm sorry.  So your argument is

that by suggesting that the jury should focus on what the

evidence is as to what those questions -- how those questions

should be answered that contradicts the proffer statement?

MS. DeWITT:  If he just did that alone, no,

Your Honor, but he did that together with saying this was all

initiated by the government.  This is all not his mindset.

He made specific statements about that his client, his

client -- the government was responsible for initiating.  His

client was not.  His client all thought this was a big game.

It was all talk.  It was nothing more.

Those two things alone, Your Honor, are directly

inapposite to what he said in his proffer session.  What he

said in his proffer session is I was not all talk.  In fact I

didn't want to be all talk.  I had a very specific plan.  It

predated the CHS.  It wasn't initiated by the CHS.  It was my

plan, our plan and my mindset was to go fight and kill.

That's what he said in his proffer session.

And that is contrary to what was said in opening

argument which is it was all initiated by the government and

that Mr. DeLeon's mindset was that it wasn't serious, it was

all talk.  It was just a big game and that somehow all of

these other things were done by the CHS, which we know are

not true.  The CHS is not the person who first initiated code

words.  That again is contradicted by the proffer session

where he talked about professors and students.  That wasn't

1    the CHS.  That's a direct contradiction.

2          He talks about the government introducing Anwar

3    al-Awlaki.  That's a direct contradiction because Anwar

4    al-Awlaki was introduced -- he himself in his proffer session

5    said he listened to Anwar al-Awlaki long before he ever met

6    the CHS and he listened to Anwar al-Awlaki with Mr. Kabir, so

7    these are things that are directly inapposite.  And I think

8    you have to look at the main point which is what is his

9    mindset and what he says.  His mindset is that this is a

10   game.  It's all talk.  It's not serious.  What he says in his

11   proffer session is it's not all talk.  It's not a game.  I am

12   serious.  I want to fight.

13         He says in his opening argument it's all initiated

14   by the government.  If it weren't for the government, we

15   wouldn't be here.  He says in his proffer session no, we had

16   a plan.  I wanted to take action.  Here are actions that I

17   specifically took.  We were on the caravan to meet up with

18   Mr. Kabir.  I recruited people.  I bought tickets.  Very

19   specific actions that are directly inapposite to the

20   government initiated it which is I did nothing.  It was all

21   the government.

22         It's not all the government.  It was him that did

23   this and him who admitted doing these things.  Him who

24   admitted that he had a plan.  It was him that directly

25   contradicts the argument that this is all a

1    government-initiated plan that had nothing to do with the

2    defendants and that his mindset was anything other than dead

3    serious to go over and fight and kill.

4            THE COURT:  Well, looking at the proffer

5    statement...

6            MS. DeWITT:  I mean just some of the things that

7    jumped out at me, Your Honor, on page 2 DeLeon asked Gojali

8    to join the group.  Page 3 of the proffer, DeLeon often

9    talked about Islam and Kabir and they would play audio

10   lectures for DeLeon while the two of them were at the Velvet

11   Room.  He talks about how he gotten introduced in that same

12   paragraph to Anwar al-Awlaki in that way.  He talks about, he

13   says he specifically told the CHS about their plan.

14           THE COURT:  I'm sorry.  Could you go back to -- you

15   said that was on page 2?

16           MS. DeWITT:  Page 2 of the third full paragraph.

17           THE COURT:  Of the proffer statement?

18           MS. DeWITT:  I'm sorry.  Page 3, Your Honor.

19           THE COURT:  All right.  I'm with you.

20           MS. DeWITT:  And then on page 4, he tells -- DeLeon

21   tells the CHS about the plan.  He talks about who is part of

22   the plan.  On that same page is a reference to whose idea it

23   was to go join the Taliban and Al Qa'ida and that was

24   Mr. Kabir.  Obviously, that is not the government, not the

25   CHS.  He talks about how he's down with giving his life for

```
 1    religion.  That's not a mindset of a game in my world view.

 2    He talks about wanting to go there for -- talks about

 3    wanting --

 4              THE COURT:  Now we're on page 4.

 5              MS. DeWITT:  Yes, page 4.  He wants to go to the

 6    front lines.  He wants to go and fight.  He wanted to take

 7    initiative and not just talk.  These are very specific things

 8    that are completely diametrically opposed to the statements

 9    that were made in opening argument.  He didn't have a plan on

10    how to get training that plan became possible --

11              THE COURT:  When Mr. Kabir left.

12              Okay, Mr. Thomas.

13              MR. THOMAS:  Thank you, Your Honor.

14              Your Honor, I wanted to start globally, which is

15    the government has gotten so far away from the real issue

16    that I need to circle us back.  The government gave my client

17    testimonial immunity in a proffer letter and said his

18    statements will not be used against him in the case-in-chief,

19    but they can be used to impeach him if he testifies to the

20    contrary.

21              THE COURT:  Well, this is what it says.

22    Notwithstanding the above, the government may use statements

23    made, I'm skipping around, but this is in 4B on page 2 of the

24    letter, to refute or counter at any stage of the proceeding

25    including the government's case-in-chief at trial any
```

1   evidence, argument, statement or representation offered by or

2   on behalf of your client in connection with any proceeding so

3   that's very broad.

4          MR. THOMAS:  It's so broad it would apply to me

5   arguing in a motions hearing, which obviously we know isn't a

6   proper use.

7          THE COURT:  Well, we're not talking about a motions

8   hearing.

9          MR. THOMAS:  That's true, that's true, but I just

10   wanted to circle us back to the beginning, which is this is a

11   promise to my client that statements won't be used against

12   him unless there's something contrary.  Basically, that's the

13   gist of it.

14          THE COURT:  That's right.  So I think the

15   government's argument is what you said in your opening

16   statement is contrary in substance and detail from what's in

17   the proffer statement.

18          MR. THOMAS:  Well, Your Honor, I think the

19   government read off a bunch of things in the proffer

20   statement.  I didn't mention any of those in the opening.  I

21   mean I think we all know that I was well aware of the pink

22   elephant in the middle of the room and what I had to dance

23   around to use the government's term and that's why it was so

24   hard to do an opening without arguing because I wasn't -- I

25   was specifically not talking about anything in the proffer

```
 1    statement.  I didn't mention anything contrary to the proffer
 2    statement.
 3          I introduced terms.  I introduced concepts.  I
 4    talked about things to keep in mind as the evidence comes in.
 5    All deliberately vague terms so that I wouldn't invoke any
 6    contrary statements to what was said in the proffer.  Now,
 7    the government gave a couple of references.  One of them was
 8    to Anwar al-Awlaki and their reference that I said the
 9    government introduced it.  I said the government introduced
10    Anwar al-Awlaki in their opening statement.  It had nothing
11    to do with me suggesting that Anwar al-Awlaki was introduced
12    by the informant.
13          The rest of the paragraph is you're gonna hear
14    evidence from the defendant's family, the CHS, the informant
15    about the kinds of things they would listen to.  Anwar
16    al-Awlaki is a term you will hear a lot.  The government
17    introduced it.  The government introduced that Anwar
18    al-Awlaki term forever in its opening statement.  That's what
19    I was referring to.
20          With respect to the questions that I asked and
21    didn't answer, the government can't say there was anything
22    contrary because I didn't say anything.  I mentioned --
23          THE COURT:  Well, isn't it contrary if you say, if
24    you are suggesting during your opening that these are open
25    questions when in fact they're not because your client has
```

1    admitted in the proffer that, um, I'm trying to find the part

2    about the questions.  Who do you want to be when you fight?

3    Who do you want to attack?  What position do you want to be?

4    What do you want to use?  Where do you go want to go?  What

5    do you want to do?

6              MR. THOMAS:  All those questions are a very

7    specific transcript where the informant initiated every one

8    of those questions and that is not a reference at all to the

9    proffer statement.  You know the government asked my client a

10   lot of questions in the proffer, but they didn't ask him a

11   lot of the important questions which is what was your intent.

12   Did you want to kill Americans?  Were you trying to commit a

13   crime?

14             There are a lot of things that are left open from

15   the proffer and so my reference to, you know, focus on things

16   as evidence comes in for starters I didn't specifically

17   reference any conversation or any terms.  And the government

18   suggesting that my client's the first one that brought up

19   code words that's not even, I mean Taliban means student.

20   That's not even what I was talking about.

21             There was a specific reference in the informant --

22   in the recorded conversation where the informant mentioned

23   you need to stop using these words.  You need to infer -- you

24   need to use code words.  That's gonna come out in evidence

25   because it's in the transcripts.

```
 1            THE COURT:  Let's go back a moment.
 2            MR. THOMAS:  Sure.
 3            THE COURT:  On those questions that you asked him
 4    that's at page 50 of the transcript of the opening and if you
 5    compare that with what's on page 4 of the proffer statement
 6    or the interview, in the first full paragraph starting at the
 7    second sentence but if there was fighting to defend Muslims,
 8    then he would join the fight.  If there was an opportunity to
 9    fight to defend Muslims in their land, he would join the
10    fight.  So who do you want to be when you fight?  That was
11    the question you asked.  And then in the --
12            MR. THOMAS:  I can tell --
13            THE COURT:  Let me finish.  In the third full
14    paragraph DeLeon would like to join the fighting if the
15    opportunity was there to defend Ummah.  DeLeon wanted a role
16    on the front lines.  The general plan of the group was to go
17    and fight.  DeLeon was down with giving his life for religion
18    and so on.
19            And then to say, the next thing you said in your
20    argument these aren't conversations that the defendants
21    initiated.  And yet in the proffer statement it says the very
22    next thing after what I read is the idea of joining the
23    Taliban Al Qa'ida was from Kabir.
24            MR. THOMAS:  Your Honor, the proffer summary is
25    part of the picture.  Okay.  Where that comes from is an
```

```
 1    audio transcript where the CHS asks every one of those
 2    questions that are summarized in the proffer.  The CHS asks,
 3    you know, if you were to fight, where would you fight?  So
 4    the fact that the government didn't also mention in the
 5    proffer statement that the CHS initiated a conversation
 6    doesn't mean that what I said was contrary.  I mean if you
 7    look at the audio recording, which we're gonna see, you'll
 8    see what the questions are.
 9              THE COURT:  I've read that.
10              MR. THOMAS:  Right.  So the government's proffer is
11    just a summary of the answers.  What I was suggesting is see
12    who asks the question and that's not contrary because the
13    government nowhere in the proffer -- it's not like Mr. DeLeon
14    was it you or the CHS who first brought up the term of where
15    you were gonna go and he says it was me.  That's not what
16    happened in the proffer.  The proffer mentions the answers
17    and I told the jury to listen for the question.
18              THE COURT:  Well, what about the government's, I
19    think Ms. DeWitt's first point that taking the entire, well,
20    the overall gist of your opening was that this is
21    contradictory to the gist of the proffer because you're --
22    and I have to agree with her, your argument was that this was
23    the mindset of your client and the other defendants was this
24    was all a game and a fantasy.  You didn't use the word
25    fantasy, but that it was all talk and that's contradicted
```

 1    over and over again in the proffer.

 2              MR. THOMAS:  Your Honor, first of all, the

 3    statement I made was limited to the context in which I made

 4    it which is when I said when Mr. DeLeon was not in the mosque

 5    and he wasn't in the school, he was sitting with Mr. Kabir

 6    smoking pot and playing video games on their Xbox.  It's

 7    important you realize that because it's the mindset of these

 8    guys because they sat around and smoked pot and played video

 9    games.  There wasn't a reference at all to fighting.  It was

10    a reference to the mindset of Mr. Kabir and my client and

11    that's the same paragraph.

12              THE COURT:  Here's the problem with that.  That is

13    what you said, that's part of what you said.  If there is

14    evidence in the defense case, well, in anybody's case that

15    the defendants and I think there's already been evidence that

16    they visited the hookah lounge.  If there's evidence that

17    they in your words around smoked pot and played -- sat around

18    in a hookah lounge and smoked pot and played video games that

19    is not, well, it's not a defense and it's also not mutually

20    exclusive with conspiring as they're charged.  I mean there's

21    nothing that says you can't do both.

22              MR. THOMAS:  Your Honor, it was a reference to the

23    fact that they were young college kids playing video games.

24    It wasn't at all what the government suggests which is to be

25    contrary to be something said in the proffer.  It's so far

```
 1   apart from anything in the proffer I almost am confused how
 2   they can draw a parallel.
 3           THE COURT:  Because you say it was all talk.  Now,
 4   how is that not contradictory to what is in the proffer where
 5   he's saying that he wanted -- was going to join the fighting,
 6   he wanted a role in the front lines, the plan of the group
 7   was to go and fight, the idea of joining the Taliban and
 8   Al Qa'ida which means that they were going to join which is
 9   pretty parallel with at least one of the charges.  That the
10   idea of joining the Taliban and Al Qa'ida was from Kabir.
11   How is that not contradicted by you saying this was just
12   nothing but talk?
13           MR. THOMAS:  Your Honor, the reference to talk was
14   in the very first sentence of my opening which is this is not
15   a case about terrorist acts.  It's about talk.  It's about a
16   conspiracy.  It's about whether there was an agreement.
17   That's not a specific reference to anything that was said in
18   the proffer.
19           THE COURT:  Well, you don't have to be making a
20   specific reference to what's in proffer to violate the
21   agreement if you make. . .
22           MR. THOMAS:  Your Honor, under that agreement if I
23   get up there and say my client's not guilty, I violated the
24   proffer.  I mean it's so void and vague.  If I get up there
25   and say anything other than my client intended to do what the
```

1  government suggests, it would be contrary to what comes from

2  the proffer.  So that's why I wanted to circle us back to the

3  focus which is they told my client they won't use his

4  statements unless he testifies contrary to the statements or

5  I mention something that's contrary to the statements.  I

6  didn't even mention the statements.

7            THE COURT:  You don't want to mention the

8  statements.  There's nothing in the statements that's in the

9  proffer that's helpful to you.

10           MR. THOMAS:  I know, Your Honor, but my point is if

11  I raise defense, it's contrary to their version of what was

12  said in the proffer.  It's almost so void that it's

13  meaningless.

14           THE COURT:  Do you wish to respond?

15           MS. DeWITT:  Two brief things, Your Honor.

16            It is a fact that when a defendant comes in and

17  proffers that they do handcuff themselves to some extent.

18  That's just a reality.  This whole issue about what the

19  proffer agreement says and the consequences of it, this has

20  already been litigated.  The only question really for the

21  Court to decide is whether they've actually triggered it

22  being admissible.  So this circling back to his complaint

23  about not liking the proffer agreement is sort of it's water

24  under the bridge.  I know he doesn't like it, but he entered

25  into it voluntarily and he now has to be held accountable for

1    the terms of that contract that he entered into.

2            And he's wrong when he says that he doesn't have

3    any defense.  He does have a defense.  The most important

4    defense that most defendants use at trial is insufficiency of

5    the evidence.  It's not -- it doesn't, however, give him a

6    license to get up and lie.  It doesn't give him a license to

7    get up here and just make up stories that are contrary.  It

8    doesn't just give him or his client a license to just make up

9    out of hole cloth statements to put in front of the jury.

10           That's the whole point of a proffer session is that

11   if you do it, then you have to stick to it.  You don't get to

12   turn around in court and pretend like it never happened.

13   You're stuck with what you said and that's American

14   jurisprudence.  You have to be held accountable for your

15   statements and that's all I'm asking here is to have him

16   accountable for the statements he's made.  And now because

17   he's attempted to negate those and pretend like they never

18   happened, he doesn't get to do that.  That's the whole point

19   of a proffer agreement is that you don't get to come in and

20   tell the truth and then turn around and lie about it when you

21   go to trial.

22           THE COURT:  All right.

23           MR. AARON:  Could I be heard?

24           THE COURT:  Go ahead.  Well, the issue as far as

25   you're concerned is limited to the effect this would have on

```
1    sanitizing it as to your client; is that correct?

2            MR. AARON:  Right, that's our issue, but I think we

3    should be entitled to argue whether or not it's admissible at

4    all because we want to completely avoid the problem of trying

5    to sanitize it at all.

6            THE COURT:  Well, I've already ruled on the issue

7    of whether you have standing to argue it's admissible.

8            MR. AARON:  I'm sorry, Your Honor.  It's late.  I'm

9    getting confused.

10           THE COURT:  It's late and I hope, I may be

11   confused, but I don't think you have standing to argue that

12   it's not admissible at all.  You only have standing to argue

13   if it is admitted, how we deal with that insofar as it

14   affects your client and I've already ruled on that.

15           MR. AARON:  We've -- this is the third time that

16   we've addressed this issue.

17           THE COURT:  At least.

18           MR. AARON:  In total.  I'm getting really confused.

19   I did want to address the issue of admissibility.  The

20   Court's saying I cannot do that.  I can only address the

21   issue of what redactions would be made, I would object to

22   that, but I'll have to sit down because I want to address the

23   issue of admissibility.

24           THE COURT:  Like I said it's late and we may all be

25   confused, but I believe I've already ruled that you don't
```

```
 1   have the standing to do that because I think you're the one
 2   who originally filed the motion.
 3              MR. AARON:  To exclude --
 4              THE COURT:  The proffer.
 5              MR. AARON:  Correct.
 6              THE COURT:  And I think I ruled that you did not
 7   have standing to do that.
 8              MR. AARON:  I cannot remember, Your Honor.
 9              THE COURT:  Okay.  Well, if I didn't, if I haven't
10   already ruled on that, I'll let you argue that tomorrow
11   because I at this point wouldn't trust my memory.
12              MR. AARON:  Thank you, Your Honor.
13              THE COURT:  All right.  So I'll hold off on making
14   any ruling today until you've had the chance to do that.
15              All right.  I need to talk to Mr. Thomas and his
16   client on a matter outside the presence of all other counsel
17   unless anybody has anything else to bring up.
18              MR. GRIGG:  No, Your Honor.
19              THE COURT:  So let me do that quickly and you can
20   come back in because I think the marshals need to get the
21   defendants back to the jail.
22              (The following proceedings are under seal.)
23              (Proceedings were concluded at 5:10 p.m.)
24
25
```

1
2                          CERTIFICATE OF REPORTER
3
4    COUNTY OF LOS ANGELES        )
5                                 )  SS.
6    STATE OF CALIFORNIA          )
7
8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED
9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,
10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE
11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET
12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN
13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO
14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION
15   OF MY STENOGRAPHIC NOTES.
16
17
18   DATE:  AUGUST 21, 2014
19
20      /s/  LAURA MILLER ELIAS
21   LAURA MILLER ELIAS, CSR 10019
22   FEDERAL OFFICIAL COURT REPORTER
23
24
25

**/**

**/s** [1] - 131:20

**0**

**008239** [1] - 92:18
**008711** [1] - 94:13

**1**

**1** [4] - 59:21, 78:19, 79:20
**10** [1] - 111:16
**10-17-2012** [1] - 54:10
**10-20-2012** [1] - 54:11
**10-22-2012** [1] - 54:12
**10-26-2012** [1] - 54:13
**10-27-2012** [1] - 54:14
**10-31-2012** [1] - 54:15
**10019** [2] - 1:22, 131:21
**101mesr** [1] - 105:19
**101mesr@gmail. com** [2] - 27:14, 48:19
**10:27** [3] - 98:11, 98:12, 98:13
**10:30** [1] - 98:11
**10th** [1] - 15:13
**11-02-2012** [2] - 54:16, 54:17
**11-03-2012** [2] - 54:18, 54:19
**11-06-2012** [4] - 54:20, 54:21, 54:22, 54:23
**11-07-2012** [2] - 54:24, 54:25
**11-08-2012** [1] - 55:1
**11-14-2012** [2] - 55:2, 55:7
**11-15-2012** [3] - 55:3, 55:4, 55:8
**11-16-2012** [3] - 55:5, 55:6, 55:10
**1100** [1] - 2:5
**12** [2] - 10:12, 63:8
**12-00092(B)-VAP** - 1:9
**12th** [1] - 63:10
**15** [2] - 3:8, 53:12
**1500** [1] - 2:15
**15th** [1] - 98:13
**164** [1] - 63:3

**2**

**16th** [2] - 94:9, 98:9
**17th** [1] - 70:4
**18829** [1] - 97:4
**191** [1] - 8:8
**1:15** [1] - 4:1
**1D** [2] - 5:4, 5:6
**1D-44** [1] - 5:7
**1st** [1] - 99:5

**2** [8] - 81:25, 82:19, 99:23, 102:4, 118:7, 118:15, 118:16, 119:23
**20** [2] - 1:16, 4:1
**2010** [3] - 35:13, 37:12, 38:11
**2011** [3] - 38:25, 39:17, 40:6
**2012** [26] - 4:16, 15:13, 16:20, 28:8, 41:3, 48:2, 50:11, 57:16, 62:22, 63:8, 65:18, 66:13, 67:14, 67:20, 70:4, 77:22, 79:20, 81:4, 83:8, 83:10, 83:17, 83:20, 84:12, 85:16, 94:9, 98:13
**2014** [3] - 1:16, 4:1, 131:18
**2018** [1] - 63:10
**21** [1] - 131:18
**213)620-0890** [1] - 1:24
**22** [1] - 48:2
**22nd** [6] - 37:7, 38:5, 38:23, 40:2, 40:25, 50:11
**24** [1] - 51:14
**24-Hour** [1] - 57:9
**25th** [2] - 41:21, 42:13
**26** [1] - 3:8
**26th** [2] - 65:18, 66:13
**29** [1] - 3:8

**3**

**3** [5] - 60:20, 61:2, 82:20, 118:8, 118:18
**30** [2] - 57:16, 77:21
**312** [2] - 1:23, 2:6
**31st** [3] - 67:14, 67:19, 69:14
**328** [2] - 86:17, 86:18
**329** [3] - 86:18, 86:20, 87:12

**33** [7] - 3:8, 3:9, 3:9, 3:10
**371** [11] - 3:8, 23:12, 23:15, 23:16, 24:20, 24:24, 25:4, 25:25, 26:4, 26:5, 26:10
**375** [9] - 3:8, 30:25, 31:18, 31:20, 32:6, 32:13, 33:19, 33:22, 34:18
**376** [9] - 3:9, 30:25, 31:21, 32:6, 32:11, 32:13, 33:19, 33:22, 37:3
**377** [1] - 32:11
**380** [9] - 3:9, 30:25, 31:21, 32:7, 32:11, 32:13, 33:19, 33:22, 38:1
**3801** [1] - 2:11
**382** [7] - 3:9, 30:25, 32:7, 32:11, 32:13, 33:22, 38:16
**383** [7] - 3:9, 31:1, 32:7, 32:11, 32:13, 33:22, 39:12
**384** [7] - 3:10, 31:1, 32:7, 32:11, 32:13, 33:22, 39:22
**385** [9] - 3:10, 31:1, 31:18, 31:21, 32:7, 32:13, 33:19, 33:22, 40:20
**386** [7] - 3:10, 31:1, 41:8, 41:24, 42:3, 42:5, 42:12
**387** [1] - 31:1
**388** [1] - 31:1

**4**

**4** [7] - 3:5, 60:20, 61:7, 118:20, 119:4, 119:5, 123:5
**403** [2] - 33:11, 33:13
**42** [1] - 3:10
**420** [7] - 3:10, 44:24, 45:1, 45:22, 46:2, 46:3, 46:8
**426** [5] - 3:12, 72:20, 72:21, 73:2, 75:25
**427** [9] - 3:12, 63:21, 64:13, 64:14, 72:22, 73:1, 75:25, 103:2, 105:9
**428** [1] - 73:2
**429** [6] - 3:11, 65:5, 65:20, 65:21, 65:24, 66:1
**430** [3] - 3:12, 72:22,

75:25
**431** [3] - 3:13, 72:22, 75:25
**432** [3] - 3:13, 72:22, 75:25
**433** [11] - 3:15, 72:22, 74:4, 74:6, 75:5, 76:22, 77:4, 77:25, 78:1, 78:5, 78:7
**434** [6] - 3:11, 67:4, 67:25, 68:1, 68:6, 68:8
**435** [3] - 3:15, 72:22, 74:8, 76:23, 79:7, 79:23, 79:24, 80:4
**437** [3] - 3:13, 72:22, 75:25
**438** [4] - 3:13, 72:22, 74:11, 75:25
**439** [9] - 3:16, 72:22, 74:11, 74:12, 75:5, 76:23, 80:17, 81:12, 81:17
**44** [3] - 11:9, 11:22, 11:25
**440** [6] - 3:12, 69:20, 70:10, 70:11, 70:16, 70:18
**441** [6] - 3:14, 72:22, 74:16, 74:18, 75:25, 76:4
**443** [6] - 3:11, 47:3, 47:13, 48:5, 48:6, 48:11
**444** [3] - 85:10, 85:22, 108:21
**445** [3] - 3:14, 72:22, 75:25
**446** [3] - 3:14, 72:22, 75:25
**448** [3] - 3:14, 72:23, 76:1
**449** [3] - 3:15, 72:23, 76:1
**45** [1] - 113:13
**450** [3] - 3:15, 72:23, 76:1
**452** [4] - 91:14, 91:16, 93:1, 93:2
**453** [1] - 1:23
**46** [2] - 3:10, 114:12
**460** [6] - 3:16, 93:25, 94:22, 94:23, 95:12, 95:14
**461** [5] - 3:8, 28:13, 29:17, 29:22, 29:25
**462** [6] - 3:16, 83:13, 83:23, 84:3, 84:6
**47** [1] - 89:16

**48** [1] - 3:11
**484** [3] - 10:22, 10:24, 10:25
**485** [5] - 10:14, 10:18, 10:24, 11:1, 11:2
**486** [7] - 10:14, 11:4, 11:5, 11:6, 11:7
**487** [10] - 3:11, 10:14, 11:8, 11:9, 53:4, 57:2, 57:20, 58:8, 58:10, 58:14
**49** [1] - 114:15
**4B** [1] - 119:23

**5**

**5** [1] - 61:15
**50** [2] - 115:15, 123:4
**504** [2] - 88:9, 89:7
**519** [2] - 54:10, 56:3
**526** [1] - 54:11
**528** [1] - 54:12
**529** [1] - 54:13
**532** [1] - 54:14
**534** [1] - 54:15
**536** [1] - 54:16
**540** [1] - 54:17
**541** [1] - 54:18
**542** [1] - 54:19
**545** [1] - 54:20
**546** [1] - 54:21
**547** [1] - 54:22
**548** [1] - 54:23
**549** [1] - 54:24
**550** [1] - 54:25
**551** [1] - 55:1
**555** [1] - 55:2
**557** [1] - 55:3
**558** [1] - 55:4
**559** [1] - 55:5
**560** [1] - 55:6
**563** [1] - 55:7
**563A** [1] - 55:7
**565** [1] - 55:8
**567** [1] - 55:9
**575** [1] - 48:16
**58** [1] - 3:11
**5:10** [1] - 130:23
**5:27** [1] - 98:9

**6**

**66** [1] - 3:11
**68** [1] - 3:11
**6th** [2] - 4:20, 4:23

**7**

**7** [1] - 3:7

**70** [1] - 3:12
**700** [1] - 2:12
**75** [13] - 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15
**78** [1] - 3:15

## 8

**8** [3] - 59:4, 59:5, 59:7
**80** [2] - 3:15, 58:2
**81** [1] - 3:16
**8239** [1] - 88:11
**84** [1] - 3:16
**8711** [3] - 90:18, 91:10, 95:7
**8th** [1] - 81:4

## 9

**9** [4] - 3:7, 59:4, 59:5, 59:7
**90012** [2] - 1:24, 2:6
**91** [10] - 3:7, 5:16, 5:18, 5:21, 5:22, 6:21, 7:1, 7:7, 8:23, 9:7
**91A** [2] - 3:7, 9:3
**92** [13] - 3:8, 13:4, 13:9, 13:12, 13:13, 14:3, 14:12, 14:13, 14:15, 14:16, 15:1, 15:5, 15:7
**92501** [1] - 2:12
**92507** [1] - 2:16
**92A** [5] - 3:8, 15:1, 15:5, 15:7, 15:10
**95** [1] - 3:16
**9:00** [1] - 101:16

## A

**a.m** [2] - 98:9, 98:12
**Aaron** [4] - 33:8, 107:10, 111:3, 111:22
**AARON** [54] - 2:9, 6:23, 8:25, 15:3, 26:2, 29:19, 32:10, 32:14, 33:13, 42:1, 45:24, 48:7, 55:13, 56:14, 57:22, 58:1, 62:24, 64:15, 64:18, 65:22, 68:2, 70:12, 73:23, 73:25, 74:4, 74:7, 74:12, 74:15, 75:3, 75:19, 78:2, 79:25, 81:14, 83:25, 85:24, 87:14, 93:3, 94:24, 107:11, 107:25, 111:5, 111:11,

111:13, 111:19, 112:3, 128:23, 129:2, 129:8, 129:15, 129:18, 130:3, 130:5, 130:8, 130:12
**abandoned** [1] - 46:21
**abbreviation** [1] - 82:14
**Abdul** [3] - 28:1, 96:6, 97:11
**Abdullah** [9] - 42:21, 43:8, 44:14, 44:17, 44:21, 45:9, 45:12, 46:18, 46:25
**ability** [2] - 20:16, 89:17
**able** [18] - 12:13, 18:19, 19:19, 19:20, 20:11, 20:18, 20:22, 22:13, 22:16, 23:5, 44:4, 54:4, 87:6, 88:22, 88:24, 112:8
**abstract** [1] - 17:19
**access** [14] - 20:25, 21:3, 21:7, 21:8, 21:10, 22:12, 22:16, 22:24, 23:2, 23:4, 44:4, 79:1, 79:4, 79:5
**accessing** [1] - 86:12
**account** [27] - 39:24, 39:25, 44:11, 44:20, 45:7, 48:21, 48:23, 63:18, 64:5, 64:22, 85:16, 87:2, 103:11, 103:13, 104:12, 104:13, 104:24, 105:5, 105:18, 105:19, 106:5, 106:16, 106:22, 107:1, 107:3, 107:9, 109:1
**accountable** [3] - 127:25, 128:14, 128:16
**accounts** [4] - 37:23, 104:9, 107:22, 108:17
**accurate** [6] - 8:5, 25:12, 29:13, 31:9, 54:5, 97:16
**accurately** [1] - 6:17
**accusing** [1] - 113:11
**action** [2] - 115:19, 117:16
**actions** [2] - 117:16, 117:19
**activities** [3] - 23:11, 28:5, 106:15

**activity** [20] - 27:19, 34:5, 43:18, 45:10, 45:13, 45:15, 46:12, 46:13, 46:17, 47:21, 47:22, 64:5, 84:23, 85:1, 85:5, 103:12, 105:2, 107:8, 109:2
**acts** [2] - 115:5, 126:15
**actual** [2] - 50:15, 62:11
**add** [2] - 75:7, 107:19
**addition** [1] - 107:16
**additional** [8] - 33:7, 36:1, 66:25, 69:16, 87:21, 108:16, 111:16, 113:25
**address** [15] - 26:15, 27:2, 27:5, 27:8, 27:10, 27:13, 32:22, 48:20, 51:8, 60:3, 102:24, 112:16, 129:19, 129:20, 129:22
**addressed** [2] - 33:17, 129:16
**addressing** [1] - 33:2
**administrator** [2] - 21:9, 23:2
**admissibility** [2] - 129:19, 129:23
**admissible** [5] - 103:19, 127:22, 129:3, 129:7, 129:12
**admission** [2] - 75:19, 107:14
**admissions** [1] - 75:14
**admit** [23] - 6:21, 8:23, 15:1, 25:25, 29:17, 32:7, 41:24, 45:21, 48:5, 57:20, 64:13, 65:20, 67:25, 70:9, 73:20, 77:25, 79:23, 81:12, 83:23, 85:22, 87:12, 93:1, 94:22
**ADMITTED** [2] - 3:6
**admitted** [63] - 6:25, 7:1, 9:2, 9:3, 15:6, 15:7, 15:10, 26:4, 26:5, 29:21, 29:22, 33:21, 33:22, 34:3, 34:8, 34:18, 37:2, 37:25, 38:16, 39:11, 39:21, 40:19, 42:4, 42:5, 42:8, 44:11, 46:2, 46:3, 48:9, 48:11, 58:9, 58:10,

63:4, 65:25, 66:1, 68:4, 68:6, 70:14, 70:16, 75:15, 75:23, 76:1, 76:3, 76:22, 77:5, 78:4, 78:5, 79:8, 80:2, 80:4, 80:18, 81:16, 81:17, 84:2, 84:3, 95:11, 95:12, 110:6, 115:4, 117:23, 117:24, 122:1, 129:13
**admonitions** [1] - 53:12
**affecting** [2] - 107:2, 107:3
**affects** [1] - 129:14
**Afghanistan** [2] - 66:24, 89:16
**afternoon** [3] - 4:3, 4:10, 4:11
**agent** [11] - 22:12, 22:23, 23:4, 23:8, 88:22, 89:1, 89:2, 89:3, 89:4, 102:15
**Agent** [4] - 4:10, 13:9, 15:9, 44:3, 58:12, 111:1, 111:2, 111:4, 111:24, 112:1, 112:2
**agent's** [2] - 75:4, 88:24
**agents** [4] - 21:4, 21:5, 23:3, 89:14
**ago** [2] - 9:10, 95:6
**agree** [2] - 108:2, 108:3, 124:22
**agreement** [7] - 34:10, 126:16, 126:21, 126:22, 127:19, 127:23, 128:19
**ahead** [8] - 17:24, 34:15, 44:1, 54:1, 60:20, 98:5, 113:3, 128:24
**ahold** [1] - 82:7
**AIDED** [1] - 131:13
**air** [1] - 19:22
**AK** [1] - 89:16
**Al** [5] - 40:9, 118:23, 123:23, 126:8, 126:10
**al** [30] - 10:19, 10:22, 11:2, 11:7, 11:9, 11:14, 12:1, 12:5, 12:6, 16:9, 35:20, 37:19, 114:3, 114:5, 114:14, 114:15, 114:19, 117:3, 117:4, 117:5, 117:6, 118:12, 121:8, 121:10, 121:11,

121:16, 121:18
**al-Awlaki** [29] - 10:19, 10:22, 11:2, 11:7, 11:9, 11:14, 11:17, 11:18, 12:1, 12:5, 12:6, 16:9, 35:20, 37:19, 114:3, 114:5, 114:14, 114:15, 114:19, 117:3, 117:4, 117:5, 117:6, 118:12, 121:8, 121:10, 121:11, 121:16, 121:18
**Al-Harb** [1] - 40:9
**Allah** [15] - 10:22, 11:2, 43:8, 46:21, 82:14, 98:22, 98:23, 99:1, 99:9, 99:12, 99:16, 100:4, 101:3, 101:4
**Allah's** [1] - 46:22
**alleged** [1] - 87:16
**ALLEN** [1] - 2:4
**allow** [3] - 89:24, 90:2, 92:4
**allows** [2] - 91:23, 92:1
**almost** [2] - 126:1, 127:12
**alone** [3] - 46:22, 116:4, 116:11
**alter** [2] - 22:13, 22:16
**Amaara** [2] - 59:1, 106:12
**AMERICA** [2] - 1:1, 1:6
**America** [1] - 37:15
**American** [1] - 128:13
**Americans** [1] - 122:12
**amount** [1] - 102:17
**AND** [4] - 131:8, 131:11, 131:13, 131:14
**ANGELA** [1] - 2:10
**ANGELES** [4] - 1:17, 1:24, 2:6, 131:4
**announcing** [2] - 98:20, 99:4
**answer** [3] - 12:24, 71:1, 121:21
**answered** [1] - 116:3
**answers** [4] - 115:18, 115:20, 124:11, 124:16
**anticipate** [1] - 110:21
**Anwar** [29] - 10:19,

10:22, 11:2, 11:7,
11:9, 11:14, 11:17,
11:18, 12:1, 12:6,
35:19, 37:18, 39:5,
40:13, 114:3, 114:5,
114:14, 114:15,
114:19, 117:2, 117:3,
117:5, 117:6, 118:12,
121:8, 121:10,
121:11, 121:15,
121:17
**apart** [1] - 126:1
**apartment** [50] -
16:15, 17:17, 17:18,
18:1, 18:2, 18:6,
18:18, 19:5, 19:6,
19:14, 19:21, 19:23,
19:25, 20:3, 20:10,
20:11, 20:19, 20:23,
54:10, 54:11, 54:12,
54:13, 54:14, 54:15,
54:16, 54:17, 54:18,
54:19, 54:20, 54:21,
54:22, 54:23, 54:24,
54:25, 55:1, 55:2,
55:3, 55:4, 55:5, 55:6,
55:7, 55:8, 55:9,
56:15, 56:16, 69:9,
90:15, 91:10, 100:13
**apologize** [4] - 16:7,
24:25, 66:5, 109:18
**apostrophe** [1] -
98:24
**apparent** [1] - 109:24
**appear** [7] - 10:16,
30:5, 36:22, 36:25,
50:25, 62:11, 97:19
**APPEARANCES** [1] -
2:1
**applies** [1] - 75:5
**apply** [1] - 120:4
**appropriately** [1] -
18:8
**approximate** [1] -
14:22
**AQ** [1] - 35:25
**Arabic** [1] - 82:15
**area** [1] - 49:13
**argue** [6] - 93:21,
129:3, 129:7, 129:11,
129:12, 130:10
**arguing** [2] - 120:5,
120:24
**argument** [12] -
113:8, 115:22,
115:25, 116:19,
117:13, 117:25,
119:9, 120:1, 120:15,
123:20, 124:22
**arises** [1] - 22:3

**arrests** [1] - 88:8
**arrow** [1] - 96:13
**art** [1] - 103:3
**article** [8] - 12:5,
35:17, 35:21, 35:24,
37:14, 37:16, 39:1
**articles** [3] - 35:14,
36:1, 37:13
**articulate** [1] - 108:7
**ASAP** [1] - 83:5
**aside** [4] - 17:1, 20:2,
37:13, 44:3
**ASSISTANT** [1] - 2:5
**associated** [2] -
48:20, 105:19
**assume** [1] - 71:22
**assuming** [1] - 71:21
**AT** [1] - 131:11
**ate** [1] - 52:17
**attack** [1] - 122:3
**attempt** [1] - 66:25
**attempted** [1] -
128:17
**attention** [47] - 5:15,
6:1, 8:8, 10:1, 10:12,
10:13, 13:3, 14:12,
15:10, 25:16, 26:8,
26:16, 27:15, 28:12,
34:22, 37:20, 38:12,
39:10, 41:4, 41:7,
43:3, 44:24, 47:2,
49:3, 53:3, 58:13,
58:18, 61:1, 61:7,
61:15, 61:19, 65:4,
66:3, 69:20, 70:22,
74:25, 79:7, 80:17,
83:12, 84:5, 85:9,
86:17, 91:13, 93:18,
93:25, 95:14, 101:17
**ATTORNEYS** [1] -
2:5
**attributed** [4] - 12:6,
43:12, 45:11, 46:18
**audio** [64] - 11:5,
11:11, 12:7, 16:7,
17:4, 17:7, 18:3, 18:4,
18:6, 18:7, 18:11,
18:24, 19:3, 19:5,
19:8, 19:10, 19:15,
19:24, 20:1, 20:5,
20:25, 21:4, 21:6,
21:24, 22:7, 23:6,
54:3, 54:7, 54:10,
54:11, 54:12, 54:13,
54:14, 54:15, 54:16,
54:17, 54:18, 54:19,
54:20, 54:21, 54:22,
54:23, 54:24, 54:25,
55:1, 55:2, 55:3, 55:4,
55:5, 55:6, 55:7, 55:8,

55:10, 55:16, 55:21,
55:23, 55:24, 56:15,
56:16, 69:8, 88:25,
118:9, 124:1, 124:7
**AUG** [1] - 4:1
**August** [14] - 28:8,
37:7, 38:5, 38:23,
40:2, 40:25, 41:21,
42:13, 65:18, 66:13,
67:14, 67:19, 69:14,
77:21
**AUGUST** [2] - 1:16,
131:18
**AUSA** [1] - 53:22
**authentic** [1] - 54:7
**authenticity** [1] -
56:10
**author** [13] - 49:9,
49:25, 50:19, 51:5,
51:6, 58:20, 58:23,
58:24, 61:5, 61:6,
62:9, 66:4, 66:8
**authority** [3] - 89:19,
89:22
**authorization** [1] -
44:12
**automated** [1] -
104:1
**automatic** [2] -
103:11, 107:8
**automatically** [3] -
36:25, 105:5, 108:16
**available** [1] - 34:5
**AVENUE** [2] - 2:11,
2:15
**avoid** [2] - 112:7,
129:4
**avoided** [1] - 112:4
**aware** [5] - 69:9,
69:12, 69:15, 98:5,
120:21
**Awlaki** [29] - 10:19,
10:22, 11:2, 11:7,
11:9, 11:14, 11:17,
11:18, 12:1, 12:5,
12:6, 16:9, 35:20,
37:19, 114:3, 114:5,
114:14, 114:15,
114:19, 117:3, 117:4,
117:5, 117:6, 118:12,
121:8, 121:10,
121:11, 121:16,
121:18
**Ayat** [1] - 11:7
**Azzam** [10] - 42:21,
42:24, 43:8, 44:15,
44:17, 44:22, 45:9,
45:12, 46:18, 46:25

**B**

**backups** [5] - 22:4,
22:5, 22:6, 22:10,
22:20
**bad** [2] - 53:15, 83:1
**ball** [5] - 47:20,
47:23, 89:16, 110:2,
110:18
**balls** [2] - 51:20,
57:10
**bar** [2] - 32:22, 114:6
**based** [1] - 75:7
**basis** [2] - 75:12,
108:10
**became** [2] - 114:5,
119:10
**begin** [1] - 62:6
**beginning** [10] -
57:16, 59:19, 68:21,
70:20, 70:23, 72:20,
95:6, 97:3, 102:21,
120:10
**begins** [2] - 61:8,
72:7
**BEHALF** [3] - 2:2,
2:8, 2:13
**behalf** [2] - 113:9,
120:2
**believer** [1] - 59:9
**Believers** [14] - 31:8,
31:10, 32:2, 34:23,
35:3, 37:4, 38:2,
38:18, 40:3, 40:23,
41:12, 41:21, 42:13
**below** [2] - 39:1, 96:5
**Bernardino** [1] - 28:2
**best** [1] - 6:13
**better** [1] - 37:11
**between** [33] - 31:24,
47:7, 47:10, 47:17,
48:1, 52:22, 52:23,
52:25, 56:23, 57:5,
57:16, 64:22, 65:10,
67:11, 69:10, 69:13,
69:17, 70:1, 70:4,
72:17, 73:7, 77:8,
77:12, 77:18, 79:11,
79:16, 80:23, 81:20,
91:7, 94:6, 94:17,
98:19, 105:23
**beyond** [1] - 109:20
**big** [3] - 51:10,
116:9, 116:21
**binder** [18] - 5:15,
5:18, 6:13, 8:9, 13:3,
14:12, 23:13, 30:24,
31:22, 41:8, 53:4,
57:1, 63:22, 67:5,
72:20, 85:10, 86:19,

91:14
**bit** [6] - 5:16, 24:13,
95:19, 101:18,
110:22, 112:22
**black** [3] - 36:11,
36:21, 36:25
**bleeds** [1] - 59:16
**blog** [1] - 101:21
**blow** [1] - 51:11
**blue** [3] - 7:10,
26:25, 49:14
**Bomb** [1] - 35:25
**bookcase** [1] - 88:14
**bookmark** [2] - 88:9,
89:2
**bookmarked** [1] -
88:17
**bookmarking** [1] -
88:20
**bookmarks** [4] -
89:5, 89:6, 90:23,
90:24
**bottom** [20] - 7:9,
10:13, 36:1, 37:13,
37:17, 40:7, 50:13,
51:3, 51:10, 58:20,
59:2, 59:16, 59:20,
59:21, 61:2, 61:15,
61:20, 62:7, 68:21,
82:19
**bought** [2] - 115:6,
117:18
**Bowens** [3] - 53:25,
54:2, 55:19
**box** [6] - 36:11,
36:21, 36:25, 50:13,
106:1, 109:2
**boxes** [2] - 49:4,
49:7
**break** [6] - 4:12,
5:13, 53:7, 53:11,
56:24, 110:20
**breaking** [1] - 101:12
**bridge** [1] - 127:24
**brief** [2] - 78:9,
127:15
**briefly** [1] - 88:13
**bring** [5] - 87:21,
102:9, 102:17,
102:18, 130:17
**broad** [2] - 120:3,
120:4
**BROPHY** [1] - 2:14
**brothers** [1] - 97:17
**brought** [3] - 39:4,
122:18, 124:14
**bunch** [1] - 120:19
**business** [4] - 62:3,
103:18, 103:20,
107:15

**buy** [1] - 51:20
**BY** [28] - 2:3, 2:9, 2:15, 3:5, 4:9, 7:3, 9:5, 13:2, 15:8, 26:7, 29:24, 34:16, 42:10, 46:5, 48:12, 63:2, 66:2, 68:7, 70:17, 71:23, 78:6, 80:5, 81:18, 84:4, 86:8, 93:24, 95:13, 131:13

## C

**CA** [3] - 2:6, 2:12, 2:16
**CALIFORNIA** [6] - 1:2, 1:17, 1:24, 4:1, 131:6, 131:9
**California** [1] - 28:1
**cannot** [2] - 129:20, 130:8
**capture** [8] - 23:16, 23:21, 24:9, 24:12, 25:21, 29:14, 41:11, 86:23
**captured** [3] - 17:1, 17:2, 18:21
**captures** [1] - 31:7
**car** [1] - 99:12
**caravan** [1] - 117:17
**carefully** [1] - 101:19
**case** [34] - 12:22, 22:3, 22:6, 24:19, 25:7, 30:17, 41:16, 44:5, 47:8, 52:23, 53:14, 53:15, 64:8, 89:20, 90:12, 91:4, 97:7, 101:20, 101:21, 101:23, 109:23, 110:16, 110:24, 113:11, 113:16, 114:22, 119:18, 119:25, 125:14, 126:15
**CASE** [1] - 1:8
**case-in-chief** [2] - 119:18, 119:25
**cash** [1] - 101:1
**caveat** [1] - 55:14
**cell** [1] - 23:9
**center** [3] - 14:9, 30:4, 40:7
**CENTRAL** [2] - 1:2, 131:9
**certain** [4] - 16:14, 58:12, 87:2, 87:9
**certainly** [4] - 43:24, 56:9, 64:17, 111:14
**CERTIFICATE** [1] - 131:2

13:7
**clearest** [1] - 6:15
**clearly** [1] - 114:7
**client** [19] - 114:2, 114:3, 116:7, 116:8, 116:9, 119:16, 120:2, 120:11, 121:25, 122:9, 124:23, 125:10, 126:25, 127:3, 128:8, 129:1, 129:14, 130:16
**client's** [5] - 113:9, 113:10, 113:24, 122:18, 126:23
**cloth** [1] - 128:9
**Coast** [2] - 97:23, 98:1
**coast** [2] - 98:5, 98:9
**coconspirator** [2] - 33:14, 107:14
**code** [3] - 116:23, 122:19, 122:24
**collect** [1] - 4:16
**college** [1] - 125:23
**colon** [2] - 71:13, 71:14
**column** [8] - 49:20, 95:21, 95:24, 96:8, 96:18, 97:4, 106:10
**com** [1] - 26:15
**combined** [2] - 56:2, 56:3
**coming** [3] - 23:6, 23:7, 100:3
**comment** [1] - 28:4
**commented** [1] - 34:4
**comments** [5] - 24:14, 24:15, 24:18, 24:19, 112:24
**commit** [3] - 34:10, 34:11, 122:12
**communicant** [1] - 93:16
**communicate** [1] - 67:1
**communicating** [2] - 77:12, 108:14
**communication** [4] - 69:16, 72:17, 94:6, 95:25
**communications** [5] - 91:1, 91:3, 91:11, 91:22, 93:6
**compare** [1] - 123:5
**comparison** [1] - 113:21
**complaint** [1] - 127:22
**completely** [3] -

115:23, 119:8, 129:4
**completeness** [1] - 58:7
**Computer** [1] - 7:23
**computer** [11] - 19:13, 20:20, 20:22, 21:7, 22:13, 79:6, 80:14, 89:9, 92:11, 92:16, 94:19
**COMPUTER** [1] - 131:13
**COMPUTER-AIDED** [1] - 131:13
**computers** [4] - 21:14, 88:7, 90:25, 92:14
**concept** [1] - 115:8
**concepts** [1] - 121:3
**concerned** [2] - 110:25, 128:25
**concluded** [1] - 130:23
**conditioning** [1] - 19:22
**conduct** [2] - 88:16, 89:11
**confer** [1] - 43:23
**confidential** [1] - 114:19
**confirm** [1] - 54:4
**confused** [5] - 126:1, 129:9, 129:11, 129:18, 129:25
**connection** [3] - 32:18, 32:24, 120:2
**consequences** [1] - 127:19
**consider** [1] - 34:12
**consist** [1] - 34:3
**consistent** [3] - 8:18, 15:14, 74:19
**conspiracy** [2] - 87:16, 126:16
**conspirator** [1] - 75:21
**conspiring** [1] - 125:20
**contact** [2] - 27:8, 99:12
**contain** [4] - 11:15, 16:2, 55:15, 88:25
**contained** [3] - 34:6, 75:10, 104:23
**containing** [2] - 15:18, 54:3
**content** [6] - 50:15, 51:3, 51:10, 58:20, 59:2, 59:23
**contents** [7] - 7:25, 8:6, 12:9, 14:11,

14:18, 62:11, 88:22
**context** [3] - 51:19, 93:16, 125:3
**continue** [4] - 4:6, 56:18, 59:17, 68:17
**CONTINUED** [1] - 4:8
**continues** [5] - 46:22, 51:22, 68:20, 82:11, 99:2
**continuing** [5] - 59:12, 59:20, 68:22, 99:5, 100:16
**contract** [1] - 128:1
**contradicted** [3] - 116:24, 124:25, 126:11
**contradiction** [2] - 117:1, 117:3
**contradictory** [2] - 124:21, 126:4
**contradicts** [2] - 116:3, 117:25
**contrary** [24] - 113:17, 113:24, 113:25, 114:17, 114:24, 115:3, 115:8, 116:18, 119:20, 120:12, 120:16, 121:1, 121:6, 121:22, 121:23, 124:6, 124:12, 125:25, 127:1, 127:4, 127:5, 127:11, 128:7
**contributed** [1] - 109:19
**controlled** [1] - 89:18
**conversation** [6] - 58:22, 81:23, 99:2, 122:17, 122:22, 124:5
**conversations** [4] - 73:9, 75:8, 76:25, 123:20
**copies** [9] - 21:20, 21:23, 22:2, 22:10, 22:21, 54:5, 73:12, 73:16, 94:18
**copy** [14] - 8:6, 12:12, 41:20, 45:16, 47:25, 57:12, 57:15, 64:4, 70:6, 77:17, 79:15, 83:19, 85:18, 93:5
**corner** [8] - 26:13, 26:14, 37:17, 38:13, 40:16, 41:4, 95:15, 102:6
**CORRECT** [1] - 131:14

**CERTIFY** [2] - 131:10, 131:14
**CFL** [4] - 8:20, 14:6, 14:23, 15:15
**chance** [2] - 88:1, 130:14
**change** [21] - 22:16, 28:22, 28:24, 30:8, 39:5, 83:9, 85:2, 85:15, 85:19, 86:2, 103:12, 104:13, 104:14, 104:16, 105:4, 106:4, 106:5, 107:3
**Change** [1] - 39:2
**changed** [7] - 29:3, 29:4, 29:5, 29:6, 83:7, 85:4
**changes** [5] - 63:13, 63:18, 85:7, 105:1, 105:3
**changing** [1] - 108:22
**charged** [2] - 34:10, 125:20
**charges** [1] - 126:9
**chat** [8] - 91:22, 92:8, 92:9, 94:6, 94:10, 94:12, 94:14, 101:21
**check** [3] - 51:14, 56:6, 60:18
**chef** [1] - 35:25
**chief** [2] - 119:18, 119:25
**Chino** [1] - 16:15
**CHIU** [4] - 2:4, 43:22, 53:21, 54:2
**Chris** [1] - 53:22
**CHRISTOPHER** [1] - 2:4
**CHS** [21] - 4:13, 4:16, 5:9, 6:18, 9:24, 12:10, 115:5, 116:15, 116:22, 116:23, 117:1, 117:6, 118:13, 118:21, 118:25, 121:14, 124:1, 124:2, 124:5, 124:14
**circle** [6] - 27:23, 43:13, 43:14, 119:16, 120:10, 127:2
**circled** [2] - 27:25, 36:11
**circling** [1] - 127:22
**city** [1] - 99:8
**clarify** [1] - 22:25
**clear** [3] - 59:19, 67:15, 75:7
**clearer** [2] - 13:6,

**correct** [69] - 6:14, 6:15, 8:3, 8:4, 9:17, 9:24, 9:25, 10:3, 12:7, 12:8, 22:20, 23:19, 23:20, 23:21, 30:12, 32:11, 33:12, 33:20, 34:24, 34:25, 41:20, 43:16, 43:17, 45:16, 46:11, 46:18, 46:19, 47:25, 49:1, 49:2, 49:10, 50:24, 52:7, 57:12, 57:15, 62:12, 64:4, 70:6, 71:25, 72:1, 72:8, 72:9, 73:12, 73:16, 74:7, 77:17, 79:15, 80:25, 83:19, 85:8, 85:18, 86:24, 87:3, 87:8, 89:9, 91:24, 92:2, 92:3, 92:20, 93:5, 94:16, 94:18, 95:9, 97:21, 98:3, 104:17, 106:8, 129:1, 130:5

**correctly** [5] - 18:8, 19:3, 19:8, 19:19, 93:12

**COUNSEL** [1] - 2:1

**counsel** [9] - 4:4, 43:23, 53:19, 73:21, 86:6, 102:4, 108:2, 112:10, 130:16

**counsel's** [2] - 74:10, 75:8

**counter** [1] - 119:24

**countries** [1] - 40:14

**COUNTY** [1] - 131:4

**County** [1] - 7:23

**couple** [2] - 51:16, 82:7, 99:20, 103:1, 112:24, 112:25, 113:5, 113:19, 115:14, 121:7

**course** [4] - 19:25, 33:8, 86:9, 102:7

**court** [12] - 44:12, 45:6, 47:18, 57:7, 57:25, 64:3, 67:12, 70:2, 87:22, 102:18, 104:3, 128:12

**COURT** [175] - 1:1, 1:23, 4:3, 6:22, 6:25, 7:2, 8:24, 9:2, 9:4, 12:25, 15:2, 15:5, 26:1, 26:4, 26:6, 29:18, 29:21, 29:23, 32:9, 32:20, 32:23, 33:6, 33:10, 33:15, 33:21, 33:23, 33:25, 41:25, 42:3, 42:6, 42:8, 43:21, 43:24,

45:23, 45:25, 46:2, 46:4, 48:6, 48:9, 53:9, 53:18, 54:1, 55:12, 56:5, 56:13, 56:17, 57:21, 57:24, 58:4, 58:6, 62:25, 64:14, 64:17, 64:20, 64:24, 65:21, 65:24, 68:1, 68:4, 70:11, 70:14, 71:22, 73:21, 73:24, 74:3, 74:6, 74:8, 74:11, 74:16, 74:21, 74:23, 75:1, 75:13, 75:18, 75:21, 75:24, 78:1, 78:4, 79:24, 80:2, 81:13, 81:16, 83:24, 84:2, 85:23, 85:25, 86:5, 86:7, 87:13, 87:17, 87:24, 88:2, 93:2, 93:8, 93:11, 93:20, 94:23, 95:2, 95:8, 95:10, 101:13, 102:2, 102:21, 103:4, 103:7, 103:15, 104:6, 104:15, 104:19, 105:7, 105:10, 105:13, 105:21, 106:2, 106:7, 106:13, 106:17, 106:20, 106:25, 107:5, 107:10, 108:6, 108:20, 108:24, 109:3, 109:6, 109:13, 109:21, 110:23, 111:3, 111:9, 111:12, 111:18, 111:20, 111:24, 112:11, 112:17, 112:21, 113:2, 114:7, 114:10, 115:25, 118:4, 118:14, 118:17, 118:19, 119:4, 119:11, 119:21, 120:7, 120:14, 121:23, 123:1, 123:3, 123:13, 124:9, 124:18, 125:12, 126:3, 126:19, 127:7, 127:14, 128:22, 128:24, 129:6, 129:10, 129:17, 129:24, 130:4, 130:6, 130:9, 130:13, 130:19, 131:9, 131:22

**Court** [11] - 32:22, 53:7, 101:10, 105:1, 107:16, 107:17, 108:23, 112:25, 113:4, 113:20, 127:21

**Court's** [3] - 74:25,

93:18, 129:20

**COURTHOUSE** [1] - 2:5

**courtroom** [1] - 87:23

**cover** [3] - 35:15, 51:18, 111:22

**covered** [2] - 55:17, 93:19

**covering** [1] - 56:19

**CR** [1] - 1:9

**crazy** [1] - 101:7

**create** [1] - 107:23

**crime** [2] - 34:7, 122:13

**crimes** [2] - 34:10, 34:12

**criticizing** [1] - 105:13

**cross** [3] - 111:4, 111:9, 111:15

**CROSS** [1] - 3:3

**cross-examination** [1] - 111:15

**cross-examining** [1] - 111:4

**CSR** [2] - 1:22, 131:21

**cumulative** [5] - 33:11, 85:24, 108:5, 108:11, 108:18

**cursor** [1] - 36:23

**cut** [1] - 62:7

# D

**dance** [1] - 120:22

**Dar** [1] - 40:9

**data** [2] - 89:9, 104:2

**date** [52] - 4:15, 4:19, 8:16, 8:18, 9:9, 9:10, 9:12, 9:13, 13:15, 14:20, 14:22, 15:11, 15:13, 15:14, 24:10, 37:6, 38:4, 38:10, 38:22, 38:23, 40:1, 40:5, 50:10, 62:19, 62:22, 63:7, 63:8, 63:9, 63:10, 65:15, 65:17, 66:12, 67:19, 84:9, 84:10, 84:11, 86:1, 86:2, 86:3, 87:2, 87:4, 87:5, 87:7, 87:9, 87:15, 87:16, 95:20, 95:21, 97:19

**DATE** [1] - 131:18

**dated** [26] - 54:10, 54:11, 54:12, 54:13, 54:14, 54:15, 54:16, 54:17, 54:18, 54:19,

54:20, 54:21, 54:22, 54:23, 54:24, 54:25, 55:1, 55:2, 55:3, 55:4, 55:5, 55:6, 55:7, 55:8, 55:10, 77:21

**dates** [1] - 102:15

**DAVID** [1] - 2:15

**days** [1] - 33:2

**dead** [1] - 118:2

**deal** [2] - 101:10, 129:13

**death** [1] - 43:7

**debate** [1] - 110:17

**decide** [1] - 127:21

**declaration** [1] - 37:18

**defend** [1] - 123:7, 123:9, 123:15

**defendant** [2] - 114:6, 127:16

**DEFENDANT** [2] - 2:8, 2:13

**defendant's** [1] - 121:14

**defendants** [12] - 4:4, 19:21, 19:25, 53:19, 110:15, 110:18, 118:2, 123:20, 124:23, 125:15, 128:4, 130:21

**DEFENDANTS** [1] - 1:11

**DEFENDER** [1] - 2:9

**DEFENDERS** [1] - 2:11

**defense** [7] - 22:11, 125:14, 125:19, 127:11, 128:3, 128:4

**definitively** [1] - 87:6

**DeLeon** [73] - 1:10, 2:13, 12:20, 12:22, 25:11, 25:14, 27:20, 27:24, 30:20, 31:14, 31:19, 31:24, 32:1, 32:18, 33:4, 34:11, 36:8, 36:17, 37:22, 39:18, 41:19, 43:9, 43:10, 43:11, 43:12, 47:11, 47:17, 48:1, 49:12, 49:13, 49:16, 50:7, 50:22, 51:7, 51:9, 52:2, 52:12, 52:22, 91:7, 92:24, 93:16, 94:7, 94:17, 96:15, 97:10, 97:13, 97:15, 98:20, 98:22, 98:24, 99:7, 99:11, 99:15, 99:24, 100:2, 100:5, 100:12, 100:13, 100:17,

100:25, 101:3, 113:17, 114:17, 114:25, 118:7, 118:8, 118:10, 118:20, 123:14, 123:15, 123:17, 124:13, 125:4

**DeLeon's** [7] - 38:14, 39:7, 52:14, 86:10, 86:23, 86:25, 116:20

**deleted** [2] - 104:24, 106:11

**deliberately** [1] - 121:5

**denied** [1] - 13:1

**depict** [3] - 6:17, 36:12, 39:14

**depicted** [12] - 7:9, 14:3, 25:17, 29:7, 35:5, 35:7, 41:13, 43:1, 46:6, 84:19, 84:20, 94:5

**depiction** [8] - 29:13, 35:13, 36:24, 42:12, 86:24, 87:3, 87:8, 92:20

**depictions** [1] - 31:10

**depicts** [4] - 31:23, 36:13, 45:10, 47:16

**DEPUTY** [1] - 2:11

**describe** [1] - 19:2

**described** [3] - 4:21, 14:1, 74:2

**designed** [1] - 90:7

**detail** [3] - 110:4, 110:10, 120:16

**device** [26] - 4:16, 4:22, 4:23, 5:1, 8:14, 8:19, 11:11, 11:16, 14:23, 15:14, 17:4, 17:7, 18:4, 18:7, 19:3, 19:5, 19:8, 19:11, 20:5, 21:6, 79:1, 79:4, 88:11, 88:23, 90:18, 90:19

**devices** [11] - 4:13, 16:13, 16:15, 16:22, 17:10, 17:12, 21:24, 23:9, 88:7, 91:12, 109:11

**DeWITT** [17] - 2:3, 55:20, 56:9, 109:15, 112:14, 112:19, 112:24, 113:4, 114:8, 114:11, 116:4, 118:6, 118:16, 118:18, 118:20, 119:5, 127:15

**DeWitt's** [1] - 124:19

**dhur** [2] - 52:16, 52:19

**Dhur** [1] - 52:20
**diametrically** [2] - 115:10, 119:8
**different** [19] - 23:3, 23:4, 23:25, 24:18, 29:1, 29:11, 29:12, 32:15, 37:9, 37:10, 42:18, 43:14, 55:25, 84:18, 84:20, 88:5, 95:17, 103:23, 115:23
**digital** [1] - 102:18
**dignity** [1] - 46:24
**direct** [10] - 10:12, 21:8, 58:13, 72:19, 74:24, 109:8, 111:7, 111:8, 117:1, 117:3
**DIRECT** [2] - 3:3, 4:8
**directing** [28] - 10:13, 13:3, 15:10, 26:8, 26:16, 28:12, 34:22, 37:20, 38:12, 39:10, 41:4, 41:7, 44:24, 47:2, 49:3, 58:18, 61:1, 61:15, 61:19, 65:4, 66:3, 70:22, 79:7, 84:5, 85:9, 93:17, 93:25, 95:14
**Directing** [1] - 43:3
**directly** [22] - 19:5, 19:15, 20:14, 44:4, 44:11, 44:16, 45:17, 47:6, 65:12, 67:1, 67:2, 85:6, 86:12, 103:25, 113:17, 114:17, 114:24, 115:7, 116:11, 117:7, 117:19, 117:24
**directory** [2] - 96:24, 96:25
**discovery** [1] - 89:2, 111:6
**discuss** [4] - 53:14, 67:21, 101:20, 102:8
**discussed** [4] - 21:25, 62:18, 72:17, 88:13
**discusses** [1] - 106:23
**discussing** [3] - 56:22, 73:9, 96:17
**discussion** [4] - 60:21, 77:1, 99:18, 100:5
**disk** [3] - 4:25, 5:3, 5:4
**display** [7] - 7:4, 47:22, 96:7, 96:10, 96:14, 97:13, 108:23
**displayed** [8] - 9:6,

24:11, 29:25, 51:12, 58:14, 58:16, 84:23, 97:5
**disseminated** [1] - 34:4
**distorts** [1] - 58:2
**DISTRICT** [5] - 1:1, 1:2, 1:4, 131:9
**DIVISION** [1] - 1:2
**DO** [2] - 131:10, 131:13
**document** [12] - 5:23, 8:10, 45:21, 95:1, 95:2, 103:16, 104:8, 104:16, 104:20, 105:22, 107:24, 108:10
**documentary** [1] - 110:20
**documentation** [1] - 108:4
**documents** [2] - 86:2, 88:25
**done** [5] - 14:8, 17:12, 31:7, 44:12, 116:22
**dot** [1] - 26:15
**double** [1] - 111:17
**doubt** [2] - 108:12, 108:13
**down** [16] - 10:13, 27:4, 43:15, 49:20, 50:8, 50:13, 50:17, 51:3, 51:5, 51:10, 51:14, 52:16, 99:20, 118:25, 123:17, 129:22
**downloading** [1] - 4:22
**draw** [2] - 27:22, 126:2
**drawn** [1] - 43:14
**drive** [28] - 5:9, 6:9, 6:17, 7:13, 7:15, 7:17, 7:21, 7:23, 8:1, 9:14, 9:23, 10:7, 12:10, 12:11, 12:12, 12:15, 12:20, 12:22, 13:14, 13:20, 13:23, 14:9, 14:11, 14:17, 14:18, 15:24, 15:25, 101:19
**drives** [1] - 23:9
**during** [6] - 42:22, 86:9, 90:25, 94:15, 100:5, 121:24

---

# E

**early** [5] - 53:8, 53:9, 84:13, 101:11, 112:22

**ease** [1] - 27:3
**easily** [1] - 102:16
**East** [1] - 98:1
**EASTERN** [1] - 1:2
**easy** [3] - 101:2, 101:4, 101:5
**ED** [1] - 1:9
**edition** [3] - 35:11, 35:13, 37:12
**editions** [1] - 35:8
**effect** [1] - 128:25
**eight** [2] - 98:7, 98:8
**either** [2] - 77:2, 97:25
**electronic** [2] - 79:1, 109:11
**elephant** [1] - 120:22
**Elias** [3] - 111:1, 111:7, 112:9
**ELIAS** [4] - 1:22, 131:8, 131:20, 131:21
**elm** [1] - 42:24
**email** [10] - 27:8, 27:10, 27:13, 48:20, 49:24, 59:15, 60:3, 60:6, 74:6, 74:21
**emails** [1] - 57:22
**emoticon** [1] - 71:9
**emoticons** [1] - 71:11
**employee** [2] - 17:22, 18:1
**end** [5] - 65:1, 85:16, 86:3, 109:12, 114:22
**enjoyed** [1] - 110:20
**enormous** [1] - 102:16
**entered** [8] - 7:24, 14:9, 19:25, 20:3, 20:10, 61:11, 127:24, 128:1
**entering** [1] - 19:21
**entire** [5] - 21:20, 22:24, 57:22, 113:8, 124:19
**entitled** [1] - 129:3
**entry** [2] - 46:10, 97:1
**eour** [1] - 101:4
**ESQ** [1] - 2:15
**essence** [3] - 49:9, 49:10, 106:15
**essentially** [4] - 12:1, 21:16, 93:13, 113:21
**establish** [2] - 104:4, 113:9
**established** [1] - 106:12
**estimate** [1] - 110:25

**events** [2] - 83:8, 114:13
**everlasting** [1] - 46:25
**everywhere** [1] - 72:14
**evidence** [19] - 6:21, 22:1, 32:8, 34:3, 34:8, 34:12, 63:4, 110:7, 110:21, 116:2, 120:1, 121:4, 121:14, 122:16, 122:24, 125:14, 125:15, 125:16, 128:5
**exact** [2] - 73:25, 84:11
**exactly** [5] - 5:12, 56:17, 74:18, 87:6, 102:19
**examination** [1] - 111:15
**EXAMINATION** [1] - 4:8
**examine** [1] - 53:20
**examining** [1] - 111:4
**example** [11] - 17:25, 28:4, 52:21, 56:4, 76:2, 96:2, 96:4, 96:20, 109:25, 110:11, 110:17
**examples** [1] - 89:15
**except** [6] - 65:22, 68:2, 70:12, 75:3, 75:21, 94:24
**exception** [4] - 74:13, 75:17, 75:22, 103:20
**excerpt** [1] - 58:1
**excerpts** [3] - 54:6, 55:16, 56:15
**exchange** [37] - 47:17, 48:25, 51:22, 52:21, 57:5, 57:9, 59:17, 60:21, 61:20, 65:10, 66:18, 67:11, 67:21, 68:17, 70:1, 70:3, 70:20, 71:24, 74:22, 76:5, 77:8, 77:9, 77:18, 77:21, 78:9, 79:11, 79:16, 79:19, 80:23, 80:25, 81:3, 81:6, 94:18, 95:22, 98:19, 100:6, 100:19
**exchanges** [7] - 52:23, 52:25, 56:23, 57:15, 73:7, 73:10, 95:15
**exclude** [1] - 130:3

**excluding** [1] - 76:22
**exclusive** [2] - 37:18, 125:20
**excuse** [5] - 10:17, 11:5, 30:6, 69:12, 103:15
**excused** [1] - 53:16
**exhibit** [67] - 5:16, 7:5, 10:2, 13:16, 14:19, 25:18, 28:16, 28:23, 29:13, 35:11, 37:21, 39:22, 41:7, 45:1, 45:16, 47:13, 47:15, 47:16, 53:7, 54:4, 56:2, 57:2, 57:8, 57:9, 63:9, 63:24, 64:1, 65:7, 67:5, 67:7, 67:9, 69:23, 72:25, 74:1, 75:5, 77:5, 77:7, 77:13, 77:15, 77:17, 80:20, 85:2, 85:10, 86:22, 88:13, 88:17, 91:19, 91:21, 91:22, 92:10, 92:16, 92:18, 92:20, 92:24, 93:11, 93:18, 94:3, 94:5, 94:10, 94:11, 94:12, 95:4, 104:1, 104:23, 105:2, 105:8
**Exhibit** [89] - 5:18, 5:21, 5:22, 6:21, 7:1, 7:7, 8:23, 9:3, 9:7, 13:4, 13:9, 13:12, 13:13, 23:12, 25:25, 26:5, 26:10, 28:13, 29:17, 29:22, 34:18, 37:3, 38:1, 39:12, 40:20, 41:8, 41:24, 42:3, 42:5, 44:24, 45:22, 46:3, 46:8, 47:3, 47:13, 48:11, 54:10, 54:11, 54:12, 54:13, 54:14, 54:15, 54:16, 54:17, 54:18, 54:19, 54:20, 54:21, 54:22, 54:23, 54:24, 54:25, 55:1, 55:2, 55:3, 55:4, 55:5, 55:6, 55:7, 55:8, 55:9, 57:20, 58:10, 63:21, 65:5, 65:20, 66:1, 67:4, 68:6, 70:9, 70:16, 74:4, 76:4, 78:5, 79:7, 79:23, 80:4, 81:12, 81:17, 83:13, 84:3, 84:6, 86:17, 86:20, 88:9, 93:1, 94:22, 95:12
**exhibits** [25] - 30:25, 31:4, 31:23, 32:3,

32:22, 32:25, 33:1, 33:3, 34:2, 36:7, 54:3, 54:9, 55:15, 55:17, 56:20, 72:20, 75:15, 76:23, 101:10, 101:15, 102:14, 103:22, 103:25, 109:10, 112:6
**EXHIBITS** [2] - 3:6
**Exhibits** [4] - 15:1, 15:7, 33:22, 75:25
**existed** [3] - 22:17, 34:10, 115:5
**Expect** [1] - 36:5
**expect** [2] - 111:7, 112:1
**expected** [2] - 111:5, 111:6
**expiration** [3] - 62:19, 63:9, 63:10
**explain** [1] - 111:14
**explains** [1] - 39:5
**explanation** [1] - 7:22
**exposed** [1] - 114:5
**expounds** [1] - 40:13
**extent** [3] - 55:18, 108:15, 127:17

**F**

**face** [3] - 71:9, 71:10, 71:12
**Facebook** [116] - 23:11, 23:17, 23:18, 23:22, 23:25, 24:10, 25:6, 25:13, 25:21, 25:23, 26:15, 27:2, 27:5, 27:16, 28:3, 28:7, 28:19, 28:21, 29:14, 30:15, 30:22, 32:2, 33:2, 33:5, 35:1, 35:6, 37:22, 38:2, 38:14, 39:7, 39:19, 39:24, 39:25, 40:23, 41:11, 41:21, 44:7, 44:11, 44:19, 44:20, 45:7, 45:10, 45:18, 47:5, 47:7, 47:16, 47:18, 48:21, 49:19, 49:23, 56:22, 57:5, 57:6, 57:13, 63:18, 64:2, 64:5, 65:10, 65:13, 67:2, 67:10, 67:12, 67:17, 70:1, 70:2, 70:7, 73:7, 73:14, 73:17, 77:9, 77:19, 79:11, 79:17, 80:23, 80:25, 81:1,

83:7, 83:10, 83:16, 83:20, 85:2, 85:5, 85:6, 85:13, 85:14, 85:16, 85:19, 86:10, 86:23, 86:25, 87:8, 103:2, 104:1, 104:2, 104:12, 104:13, 105:18, 105:19, 106:4, 106:16, 106:19, 107:4, 107:6, 107:7, 107:13, 107:21, 108:14, 108:22, 109:1
**facebook.com@me5r1** [1] - 27:7
**facility** [4] - 48:18, 48:19, 105:18
**fact** [16] - 4:25, 7:7, 34:1, 36:6, 106:3, 107:20, 113:20, 113:23, 115:1, 116:13, 121:25, 124:4, 125:23, 127:16
**fact-for-fact** [1] - 113:20
**facts** [3] - 113:22, 113:25, 115:2
**fair** [4] - 84:24, 84:25, 113:21, 115:9
**faith** [2] - 52:20, 101:4
**fall** [3] - 39:17, 40:6, 90:4
**Fall** [1] - 37:12
**familiar** [6] - 11:12, 11:22, 59:5, 77:5, 78:24, 88:11
**family** [2] - 84:21, 121:14
**fantasy** [2] - 124:24, 124:25
**far** [6] - 17:19, 74:20, 97:4, 119:15, 125:25, 128:24
**faster** [1] - 110:12
**fault** [1] - 109:18
**FBI** [29] - 16:14, 17:22, 18:1, 19:7, 44:5, 44:11, 44:16, 44:20, 45:6, 45:17, 47:6, 47:18, 57:6, 57:13, 63:17, 64:2, 65:12, 67:2, 70:7, 73:14, 73:17, 77:18, 79:16, 81:1, 85:5, 85:19, 90:6, 104:1, 104:2
**feature** [1] - 27:24
**features** [1] - 48:14
**FEDERAL** [4] - 1:23,

2:9, 2:11, 131:22
**feed** [6] - 19:11, 21:6, 21:13, 21:15, 21:17, 23:5
**few** [2] - 96:2, 105:15
**fight** [15] - 115:16, 115:19, 116:16, 117:12, 118:3, 119:6, 122:2, 123:8, 123:9, 123:10, 123:17, 124:3, 126:7
**fighting** [4] - 123:7, 123:14, 125:9, 126:5
**file** [6] - 9:22, 10:14, 11:5, 11:10, 11:18, 12:7
**filed** [1] - 130:2
**files** [18] - 9:21, 9:23, 10:5, 10:6, 10:10, 10:17, 11:11, 11:15, 15:18, 16:2, 16:6, 16:7, 16:11, 88:24, 88:25, 102:19
**fill** [1] - 108:16
**final** [1] - 69:6
**finalised** [1] - 99:15
**finally** [1] - 55:9
**fine** [4] - 53:10, 109:21, 112:17, 112:21
**finish** [3] - 56:5, 109:14, 123:13
**finished** [1] - 78:12
**finishes** [2] - 89:3, 89:4
**fins** [1] - 72:13
**first** [42] - 9:7, 10:20, 13:16, 15:10, 15:11, 17:16, 26:9, 29:25, 31:21, 34:17, 36:4, 36:5, 37:14, 39:11, 39:22, 44:18, 46:12, 49:3, 58:13, 68:11, 68:22, 70:18, 73:13, 74:25, 76:4, 80:6, 80:7, 84:6, 95:14, 96:2, 96:4, 103:10, 114:4, 114:12, 116:23, 122:18, 123:6, 124:14, 124:19, 125:2, 126:14
**Fitness** [2] - 51:14, 57:9
**five** [1] - 38:25
**flights** [1] - 100:14
**flip** [1] - 44:25, 60:20, 72:19
**flood** [1] - 101:18
**focus** [7] - 9:9, 23:10, 30:3, 49:8,

116:1, 122:15, 127:3
**focused** [1] - 113:20
**focusing** [1] - 77:4
**folks** [1] - 82:12
**follow** [5] - 4:23, 13:25, 14:5, 60:16, 82:9
**follow-up** [2] - 60:16, 82:9
**followed** [1] - 14:8, 67:15
**following** [2] - 54:9, 130:22
**follows** [1] - 60:18
**FOR** [3] - 3:2, 131:8, 131:9
**FOREGOING** [1] - 131:11
**Forensic** [1] - 7:24
**forensic** [3] - 9:13, 12:9, 92:13
**forensics** [1] - 88:6
**forever** [1] - 121:18
**forgive** [2] - 18:16, 105:11
**forgot** [1] - 4:15
**FORM** [1] - 131:13
**format** [3] - 11:25, 57:8, 58:19
**forth** [4] - 48:1, 61:20, 110:9, 110:15
**FORTH** [1] - 131:12
**forward** [4] - 44:25, 45:1, 47:3, 88:4
**foundation** [10] - 33:14, 55:19, 55:24, 56:14, 87:15, 93:4, 94:25, 103:21, 104:4, 104:6
**foundational** [3] - 53:23, 54:8
**fourth** [1] - 96:7
**frame** [1] - 94:8
**free** [3] - 43:24, 46:23, 52:6
**friend** [2] - 106:1, 106:23
**friends** [10] - 106:4, 106:15, 106:17, 106:19, 107:4, 107:6, 107:7, 107:20, 107:22, 108:4
**front** [38] - 5:15, 5:18, 9:6, 13:4, 13:9, 14:12, 23:11, 23:13, 23:17, 26:9, 27:22, 28:13, 28:20, 30:25, 31:1, 35:7, 35:14, 39:10, 46:6, 47:3, 53:5, 57:1, 57:2,

63:22, 63:23, 65:5, 67:5, 68:8, 69:21, 72:24, 79:8, 80:18, 91:14, 94:1, 119:6, 123:16, 126:6, 128:9
**full** [7] - 10:21, 22:24, 52:17, 101:4, 118:16, 123:6, 123:13
**fully** [1] - 11:18
**function** [3] - 21:7, 21:19, 22:13
**functioning** [2] - 18:8, 19:8
**functions** [1] - 21:16
**funds** [1] - 82:3
**FURTHER** [1] - 131:14
**furtherance** [1] - 115:6

**G**

**game** [7] - 113:16, 116:9, 116:21, 117:10, 117:11, 119:1, 124:24
**games** [4] - 125:6, 125:9, 125:18, 125:23
**gaps** [1] - 55:22
**gas** [1] - 68:24
**general** [1] - 123:16
**generalities** [1] - 115:10
**generated** [7] - 7:25, 8:13, 9:15, 14:10, 14:16, 90:23, 90:24
**gentlemen** [5] - 34:1, 43:25, 101:15, 108:4, 114:22
**gist** [3] - 120:13, 124:20, 124:21
**given** [3] - 21:13, 34:1, 111:6
**globally** [1] - 119:14
**glory** [1] - 46:25
**glossary** [2] - 52:19, 82:13
**Gmail** [1] - 44:7
**God** [1] - 82:15
**Gojali** [2] - 115:6, 118:7
**goldsmith** [1] - 89:18
**gonna** [15] - 10:1, 10:12, 12:23, 15:9, 18:15, 19:11, 30:24, 72:19, 100:23, 108:10, 110:6, 121:13, 122:24, 124:7, 124:15
**Google** [1] - 101:20

**gotta** [2] - 66:16, 80:13

**governing** [1] - 89:20

**Government** [1] - 57:20

**government** [60] - 6:21, 8:23, 15:1, 25:25, 29:17, 32:7, 41:24, 45:21, 48:5, 56:8, 57:19, 64:13, 65:20, 67:24, 70:9, 73:20, 75:7, 77:25, 79:23, 81:12, 83:23, 85:21, 87:12, 92:25, 94:22, 108:3, 112:4, 114:1, 114:16, 114:20, 114:23, 115:9, 115:23, 116:6, 116:8, 116:19, 117:2, 117:14, 117:20, 117:21, 117:22, 118:1, 118:24, 119:15, 119:16, 119:22, 120:19, 121:7, 121:9, 121:16, 121:17, 121:21, 122:9, 122:17, 124:4, 124:13, 125:24, 127:1

**GOVERNMENT** [1] - 3:2

**government's** [8] - 54:4, 75:10, 108:15, 119:25, 120:15, 120:23, 124:10, 124:18

**Government's** [27] - 7:7, 8:23, 9:7, 25:25, 28:13, 29:17, 34:18, 37:2, 37:25, 38:16, 39:12, 39:22, 40:20, 42:12, 46:8, 53:4, 67:25, 76:4, 77:25, 79:23, 81:12, 83:13, 84:5, 86:17, 86:20, 91:14, 93:1

**government-initiated** [1] - 118:1

**Greenwich** [3] - 98:2, 98:3, 98:6

**GRIGG** [109] - 2:4, 3:5, 4:7, 4:9, 6:20, 7:3, 8:22, 9:5, 13:2, 13:5, 14:25, 15:8, 25:24, 26:7, 29:16, 29:24, 32:6, 32:12, 32:21, 32:25, 33:20, 33:24, 34:16, 41:23, 42:7, 42:10, 43:20, 44:2, 45:20, 46:5,

48:4, 48:12, 53:6, 56:19, 57:19, 58:11, 63:2, 64:12, 64:21, 65:3, 65:19, 66:2, 67:24, 68:7, 70:9, 70:17, 71:23, 73:19, 74:9, 74:13, 74:18, 74:22, 74:24, 75:17, 75:23, 76:2, 77:24, 78:6, 79:22, 80:5, 81:11, 81:18, 83:22, 84:4, 85:21, 86:1, 86:8, 87:11, 87:19, 88:1, 88:3, 92:25, 93:14, 93:24, 94:21, 95:5, 95:9, 95:13, 101:9, 102:13, 102:23, 103:6, 103:9, 103:21, 104:11, 104:18, 104:22, 105:9, 105:11, 105:17, 105:24, 106:3, 106:9, 106:14, 106:19, 106:22, 107:2, 107:7, 108:19, 108:21, 108:25, 109:5, 109:9, 109:19, 110:19, 111:2, 112:1, 112:10, 130:18

**Grigg** [5] - 53:22, 102:12, 107:20, 109:25, 112:5

**grounds** [1] - 58:3

**group** [4] - 95:20, 118:8, 123:16, 126:6

**guess** [3] - 20:20, 73:13, 102:22

**guilty** [1] - 126:23

**guys** [6] - 66:15, 83:3, 99:23, 100:23, 113:15, 125:8

# H

**hailing** [1] - 101:18

**half** [4] - 51:12, 59:19, 111:12

**halfway** [2] - 5:17, 43:15

**hammas** [1] - 101:7

**hand** [3] - 26:14, 37:17, 43:15

**handcuff** [1] - 127:17

**handle** [3] - 61:13, 62:3, 76:24

**hanging** [1] - 114:5

**HANNA** [1] - 2:14

**happy** [3] - 56:11, 74:13

**Harb** [1] - 40:9

**hard** [3] - 35:12, 99:8, 120:24

**hav** [1] - 101:4

**head** [6] - 99:23, 100:14, 101:6, 101:7, 103:19, 110:11

**hear** [4] - 19:22, 114:15, 121:13, 121:16

**heard** [9] - 8:2, 16:15, 18:9, 18:14, 48:14, 64:25, 89:18, 98:1, 128:23

**hearing** [2] - 120:5, 120:8

**hearsay** [15] - 12:24, 33:13, 33:16, 64:18, 75:11, 75:13, 103:7, 103:10, 103:14, 104:18, 104:19, 104:22, 105:5, 108:9, 108:11

**held** [3] - 115:12, 127:25, 128:14

**help** [1] - 112:4

**helped** [2] - 112:7

**helpful** [1] - 127:9

**HEREBY** [1] - 131:10

**HEREINBEFORE** [1] - 131:11

**high** [1] - 46:23

**highlight** [1] - 36:9

**hijra** [1] - 101:6

**himself** [2] - 115:5, 117:4

**hit** [1] - 78:12

**hmm** [1] - 18:17

**hold** [1] - 130:13

**hole** [1] - 128:9

**home** [1] - 101:19

**Honor** [123] - 4:7, 6:20, 6:23, 6:24, 8:22, 8:25, 9:1, 12:23, 13:5, 14:25, 15:3, 15:4, 25:24, 26:2, 26:3, 29:16, 29:19, 32:6, 32:10, 32:12, 32:14, 32:21, 33:20, 33:24, 41:23, 43:20, 43:22, 44:2, 45:20, 45:24, 46:1, 48:4, 48:7, 48:8, 53:6, 53:21, 55:9, 55:11, 55:14, 55:20, 56:21, 57:19, 57:22, 58:5, 58:11, 64:12, 64:15, 64:21, 65:3, 65:19, 65:23, 67:24, 70:10, 70:13, 73:19, 73:25, 74:9, 74:22, 75:6, 75:23, 77:24,

78:3, 79:22, 79:25, 80:1, 81:11, 81:14, 81:15, 83:22, 83:25, 84:1, 85:21, 86:1, 87:11, 87:19, 93:3, 93:9, 93:14, 94:21, 94:25, 95:5, 95:9, 101:9, 102:13, 103:1, 103:6, 103:9, 103:21, 105:9, 105:11, 105:24, 106:19, 107:11, 107:19, 108:1, 109:5, 109:10, 109:16, 110:19, 111:2, 111:5, 112:3, 112:14, 115:14, 116:5, 116:11, 118:7, 118:18, 119:13, 119:14, 120:18, 123:24, 125:2, 125:22, 126:13, 126:22, 127:10, 127:15, 129:8, 130:8, 130:12, 130:18

**HONORABLE** [1] - 1:4

**hookah** [3] - 114:6, 125:16, 125:18

**hope** [3] - 107:17, 110:11, 129:10

**hopefully** [1] - 110:20

**hoping** [1] - 112:8

**hour** [2] - 109:10, 111:10

**hours** [1] - 98:5

# I

**Ia** [4] - 82:11, 82:13, 98:22, 98:23

**iA** [5] - 99:9, 99:12, 99:15, 100:3, 101:3

**idea** [6] - 109:13, 111:20, 118:22, 123:22, 126:7, 126:10

**identifier** [1] - 49:19

**identify** [2] - 88:16, 110:8

**illustrated** [1] - 49:14

**illustrator** [1] - 36:9

**image** [17] - 7:15, 12:9, 13:8, 23:21, 24:15, 25:12, 25:17, 26:22, 34:20, 35:5, 35:7, 41:13, 41:20, 42:18, 42:19, 42:20, 43:3

**images** [2] - 42:19, 59:9

**imagine** [1] - 111:22

**immunity** [1] - 119:17

**impeach** [1] - 119:19

**important** [10] - 53:13, 78:13, 113:1, 113:6, 113:7, 113:14, 122:11, 125:7, 128:3

**impression** [1] - 109:17

**IN** [1] - 131:8

**inapposite** [3] - 116:12, 117:7, 117:19

**include** [2] - 35:14, 56:2

**included** [1] - 56:8

**including** [2] - 25:13, 119:25

**incorporate** [1] - 107:25

**index** [1] - 10:7

**INDEX** [1] - 3:1

**indicate** [28] - 8:16, 14:19, 28:23, 31:13, 31:18, 33:1, 33:3, 37:22, 38:7, 38:13, 39:18, 41:15, 45:8, 46:13, 49:5, 50:19, 51:23, 63:7, 64:22, 66:25, 85:2, 85:15, 92:10, 92:16, 95:25, 96:25, 102:19

**indicated** [18] - 9:10, 26:25, 27:3, 34:23, 42:16, 43:9, 44:5, 50:3, 56:1, 66:20, 84:7, 95:24, 96:13, 97:11, 100:20, 102:5, 105:18, 106:10

**indicates** [10] - 26:15, 27:16, 32:3, 36:7, 38:8, 49:21, 50:5, 50:18, 92:18, 106:1

**indicating** [1] - 36:25

**indication** [4] - 36:9, 39:7, 41:5, 97:22

**individual** [7] - 12:2, 17:17, 17:18, 28:3, 28:21, 29:6, 103:23

**individuals** [5] - 17:20, 17:21, 20:9, 25:5

**infer** [1] - 122:23

**informant** [15] - 6:10, 7:14, 7:18, 7:21, 12:13, 12:19, 12:21, 13:21, 22:1, 115:17, 121:12, 121:14, 122:7, 122:21, 122:22

**information** [32] - 19:10, 21:9, 24:3, 27:8, 42:16, 44:6, 44:15, 45:6, 45:17, 47:6, 57:12, 63:14, 63:17, 63:19, 64:2, 64:4, 70:6, 83:6, 85:6, 85:18, 86:25, 87:22, 89:12, 92:13, 102:15, 103:25, 105:4, 105:17, 106:9, 108:16, 108:25, 111:17
**initiated** [12] - 78:9, 115:8, 116:6, 116:15, 116:19, 116:23, 117:13, 117:20, 118:1, 122:7, 123:21, 124:5
**initiates** [2] - 80:6, 80:7
**initiating** [1] - 116:8
**initiative** [1] - 119:7
**inquire** [1] - 13:7
**inserted** [1] - 8:14
**inside** [6] - 18:1, 19:5, 63:4, 90:8, 90:10, 90:11
**insofar** [1] - 129:13
**Inspire** [24] - 31:8, 31:10, 32:2, 34:23, 35:2, 35:8, 35:13, 37:3, 37:4, 37:10, 38:1, 38:9, 38:17, 39:14, 40:3, 40:23, 41:2, 41:12, 41:20, 42:13, 59:6, 59:8
**inspire** [1] - 59:9
**installation** [2] - 16:22, 17:9
**installed** [1] - 17:7
**instance** [2] - 88:23, 90:7
**instruct** [1] - 34:8
**instructed** [2] - 12:19, 13:21
**instruction** [2] - 33:25, 42:7
**insufficiency** [1] - 128:4
**integrity** [1] - 18:3
**intend** [3] - 55:17, 55:21, 56:7
**intended** [2] - 109:15, 126:25
**intent** [2] - 34:11, 122:11
**interacted** [1] - 36:8
**interacting** [1] - 33:5
**interaction** [1] -

30:16, 30:19, 31:13, 31:19
**interactions** [1] - 31:23
**interested** [1] - 101:11
**Internet** [1] - 34:5
**interrupt** [1] - 113:2
**interruption** [1] - 112:5
**interruptions** [1] - 112:8
**interview** [1] - 123:6
**introduce** [2] - 55:21, 75:11
**introduced** [1] - 114:16, 114:18, 117:4, 118:11, 121:3, 121:9, 121:11, 121:17
**introducing** [3] - 114:2, 117:2
**introduction** [1] - 81:20
**investigation** [4] - 20:2, 86:9, 89:15, 114:3
**invoke** [1] - 121:5
**involve** [1] - 92:23
**involved** [3] - 20:2, 24:17, 24:19
**involvement** [1] - 114:23
**involving** [2] - 47:20, 91:4
**IOWA** [1] - 2:15
**irrelevant** [1] - 85:24
**IS** [1] - 131:14
**Islam** [1] - 118:9
**Islamic** [1] - 52:20
**Israel** [1] - 101:6
**issuance** [1] - 63:8
**issue** [25] - 22:3, 37:8, 37:9, 37:10, 37:11, 38:8, 38:9, 38:10, 38:24, 39:16, 41:2, 56:10, 62:19, 62:22, 63:7, 112:16, 119:15, 127:18, 128:24, 129:2, 129:6, 129:16, 129:19, 129:21, 129:23
**Issue** [5] - 38:25, 39:17, 41:3, 59:7
**issues** [3] - 59:8, 110:16, 113:4
**Istanbul** [1] - 97:18
**item** [13] - 7:9, 7:12, 13:6, 24:4, 24:6, 45:3, 45:5, 45:14, 46:7, 65:12, 89:2, 103:2,

104:4
**items** [14] - 9:19, 9:21, 67:2, 76:22, 88:6, 90:3, 90:4, 90:5, 90:8, 93:19, 97:3, 97:4
**Items** [1] - 10:14
**itself** [4] - 7:15, 34:7, 50:16, 50:21
**iz** [3] - 83:3, 101:2, 101:8

---

## J

**jail** [1] - 130:21
**JEFFREY** [1] - 2:9
**jihad** [9] - 11:9, 11:22, 11:25, 12:2, 46:21, 46:22, 46:23, 46:25, 89:16
**Jihad** [2] - 36:5, 46:24
**join** [10] - 86:6, 87:18, 93:9, 118:8, 118:23, 123:8, 123:9, 123:14, 126:5, 126:8
**joining** [3] - 123:22, 126:7, 126:10
**jokes** [1] - 53:15
**Juan** [4] - 59:1, 61:12, 96:12, 106:12
**juan.ton21** [1] - 61:12
**juanton.21** [2] - 96:4, 96:10
**JUDGE** [1] - 1:4
**July** [2] - 63:8, 63:10
**jumped** [1] - 118:7
**June** [2] - 13:15, 57:16
**jurisprudence** [1] - 128:14
**Juror** [1] - 102:4
**jurors** [2] - 102:4, 102:8
**jury** [10] - 4:4, 53:19, 56:6, 65:1, 93:22, 102:3, 112:22, 116:1, 124:17, 128:9
**Jury** [1] - 102:1

---

## K

**KABIR** [2] - 1:9, 2:8
**Kabir** [98] - 32:19, 32:24, 33:1, 33:9, 34:11, 53:1, 56:23, 57:6, 57:17, 59:1, 59:12, 59:22, 60:12, 60:18, 61:6, 61:8,

61:13, 61:24, 62:2, 62:3, 64:11, 64:23, 65:10, 66:9, 66:14, 66:15, 66:17, 66:23, 66:24, 67:1, 67:11, 67:22, 68:11, 68:25, 69:10, 69:14, 69:17, 70:2, 70:4, 70:25, 71:2, 71:15, 71:24, 72:3, 72:5, 72:18, 76:8, 76:18, 76:21, 77:8, 77:12, 77:18, 78:15, 78:16, 79:11, 79:16, 80:16, 80:23, 81:6, 81:8, 81:21, 82:1, 82:2, 82:17, 91:7, 94:6, 94:17, 98:15, 98:20, 98:23, 99:5, 99:10, 99:14, 99:19, 99:23, 100:8, 100:16, 100:23, 101:2, 101:8, 105:3, 105:23, 106:8, 106:11, 106:24, 107:13, 108:14, 114:6, 117:6, 117:18, 118:9, 118:24, 119:11, 123:23, 125:5, 125:10, 126:10
**Kabir's** [13] - 60:23, 69:6, 72:10, 72:15, 80:15, 82:22, 82:24, 83:2, 98:17, 103:12, 104:24, 105:1, 106:15
**keep** [3] - 99:12, 113:7, 121:4
**KENNETH** [1] - 1:10
**key** [2] - 89:14, 90:6
**Khan** [1] - 37:15
**kids** [1] - 125:23
**kill** [3] - 116:16, 118:3, 122:12
**killed** [1] - 101:7
**kind** [2] - 52:16, 110:10
**kinds** [2] - 16:2, 121:15
**kiosk** [12] - 7:24, 7:25, 8:2, 8:5, 8:14, 8:15, 8:19, 9:14, 14:10, 14:17, 15:16
**Kitchen** [1] - 35:25
**kno** [2] - 99:6, 100:23
**Kursi** [1] - 11:7

---

## L

**Lab** [1] - 7:24
**lab** [1] - 9:13

**label** [2] - 11:18, 50:13
**ladies** [4] - 34:1, 43:25, 101:15, 114:22
**laggers** [1] - 82:24
**laid** [1] - 103:22
**lake** [1] - 33:14
**land** [2] - 115:20, 123:9
**lands** [1] - 46:24
**laptop** [13] - 18:2, 18:5, 88:10, 88:24, 90:14, 91:10, 91:12, 92:19, 93:19, 94:13, 94:15, 95:8, 96:21
**large** [1] - 11:16
**largest** [1] - 35:18
**LARSEN** [1] - 2:10
**last** [6] - 13:16, 37:21, 52:14, 98:15, 102:5, 111:15
**late** [5] - 84:13, 112:14, 129:8, 129:10, 129:24
**LAURA** [4] - 1:22, 131:8, 131:20, 131:21
**lay** [1] - 55:19
**lead** [1] - 39:1
**leading** [2] - 62:24, 62:25
**least** [2] - 104:9, 126:9, 129:17
**leave** [1] - 101:5
**leaving** [1] - 100:13
**lectures** [4] - 11:14, 11:16, 16:9, 118:10
**Lee** [4] - 111:2, 111:25, 112:1, 112:9
**leeway** [1] - 110:24
**left** [17] - 5:12, 10:13, 26:13, 26:14, 35:6, 36:1, 36:4, 37:14, 49:7, 49:21, 95:15, 95:20, 95:21, 97:4, 99:20, 119:11, 122:14
**left-hand** [1] - 26:14
**legal** [3] - 89:19, 99:5
**lemme** [1] - 99:6
**less** [2] - 32:16, 111:21
**letter** [2] - 119:17, 119:24
**letters** [1] - 82:13
**license** [3] - 128:6, 128:8
**lie** [2] - 128:6, 128:20
**life** [2] - 118:25, 123:17
**likewise** [2] - 42:2, 68:3

**limited** [6] - 21:10, 34:9, 34:13, 42:9, 125:3, 128:25
**limiting** [1] - 33:25
**line** [9] - 7:10, 49:20, 50:8, 50:17, 51:11, 84:22, 84:23, 93:18, 115:21
**lined** [1] - 113:13
**lines** [4] - 99:20, 119:6, 123:16, 126:6
**lineup** [1] - 109:16
**link** [1] - 103:13
**linkage** [3] - 104:17, 104:20, 105:23
**linked** [4] - 64:23, 104:10, 104:11, 107:23
**linking** [1] - 103:4
**links** [1] - 60:9
**list** [10] - 49:9, 54:4, 56:2, 73:20, 74:18, 76:24, 77:11, 90:8, 112:6, 112:8
**listed** [27] - 9:19, 9:21, 10:6, 10:14, 27:8, 35:14, 35:22, 36:2, 37:14, 37:16, 43:4, 50:21, 50:22, 56:7, 58:25, 59:2, 63:9, 85:1, 90:5, 95:20, 96:7, 96:11, 96:14, 96:17, 96:24, 98:8, 109:20
**listen** [2] - 121:15, 124:17
**listened** [4] - 34:4, 114:4, 117:5, 117:6
**litigated** [1] - 127:20
**live** [1] - 21:17
**loan** [1] - 12:21
**located** [3] - 71:25, 92:11, 92:16
**location** [1] - 110:9
**log** [1] - 21:8
**logistics** [1] - 69:17
**look** [8] - 24:24, 28:7, 51:22, 88:24, 89:12, 100:25, 117:8, 124:7
**looked** [2] - 52:18, 59:9
**looking** [8] - 24:21, 24:22, 26:13, 26:14, 95:18, 95:19, 97:3, 118:4
**looks** [1] - 71:12
**loose** [1] - 7:24, 7:25, 8:2, 8:6, 8:13, 8:14, 8:19, 9:14,

14:10, 14:17, 15:15
**LOS** [4] - 1:17, 1:24, 2:6, 131:4
**lounge** [2] - 125:16, 125:18
**lump** [1] - 76:24
**lumped** [1] - 77:10

**M**

**mag** [2] - 59:4, 59:5
**magazine** [8] - 35:8, 35:9, 35:13, 37:10, 38:9, 38:17, 39:14, 40:3
**Magazine** [2] - 59:6, 59:8
**main** [3] - 35:17, 37:14, 117:8
**maintained** [1] - 32:17
**man** [2] - 52:5, 78:23
**manipulate** [1] - 21:9
**manners** [1] - 12:1
**marked** [21] - 5:16, 8:8, 13:4, 23:12, 28:13, 45:1, 48:5, 53:3, 57:2, 63:3, 63:21, 64:13, 65:4, 67:4, 77:4, 79:7, 80:17, 83:12, 85:22, 86:19, 91:13
**marking** [1] - 49:14
**marshals** [1] - 130:20
**Marvin** [1] - 37:18
**massive** [1] - 108:4
**match** [1] - 75:4
**material** [4] - 26:16, 44:10, 102:17, 102:18
**materials** [2] - 34:4, 34:6
**matter** [3] - 33:16, 112:12, 130:16
**matters** [1] - 102:24
**MATTHEW** [1] - 2:10
**me5r1** [1] - 26:15
**mean** [11] - 20:15, 60:15, 106:18, 106:20, 118:6, 120:21, 122:19, 124:6, 125:20, 126:24
**meaning** [1] - 21:8
**meaningless** [1] - 127:13
**MEANS** [1] - 131:13
**means** [4] - 87:19, 93:7, 122:19, 126:8
**meant** [2] - 50:12, 107:25

**meantime** [4] - 43:22, 98:2, 98:4, 98:6
**Media** [1] - 60:8
**media** [13] - 7:24, 7:25, 8:2, 8:6, 8:13, 8:15, 8:19, 9:14, 14:10, 14:17, 15:15, 23:10, 44:4
**meet** [3] - 4:16, 13:22, 117:17
**members** [3] - 4:4, 53:19, 102:3
**memory** [1] - 130:11
**mention** [7] - 77:2, 120:20, 121:1, 124:4, 127:5, 127:6, 127:7
**mentioned** [20] - 5:8, 20:4, 20:14, 21:13, 26:12, 27:20, 28:21, 30:3, 46:13, 47:19, 48:25, 81:25, 83:6, 91:23, 92:1, 96:21, 97:13, 97:20, 121:22, 122:22
**mentions** [1] - 124:16
**mess** [1] - 23:5
**message** [60] - 45:11, 47:16, 48:25, 49:5, 50:12, 50:15, 51:1, 51:21, 52:21, 52:22, 56:23, 57:5, 57:9, 57:15, 58:19, 59:20, 59:23, 61:2, 61:5, 61:8, 61:19, 61:21, 65:10, 66:3, 66:14, 66:17, 66:20, 67:11, 67:18, 67:19, 67:21, 68:11, 68:12, 70:1, 70:3, 70:20, 70:22, 70:23, 71:3, 71:4, 74:22, 76:5, 77:15, 77:17, 77:18, 77:21, 78:14, 79:15, 79:19, 80:6, 80:7, 80:23, 80:25, 81:3, 94:18, 96:13
**messages** [24] - 44:6, 47:7, 47:10, 47:25, 49:23, 58:2, 67:1, 73:7, 73:12, 73:14, 73:16, 75:10, 92:4, 92:8, 92:9, 92:10, 92:21, 93:15, 94:14, 94:17, 96:18, 97:7, 98:8, 99:18
**messaging** [2] - 44:15, 44:19
**met** [3] - 12:14,

114:19, 117:5
**Mexico** [2] - 100:13, 100:14
**MICHAEL** [1] - 3:4
**microphone** [3] - 18:4, 18:7, 18:10
**microphones** [11] - 16:24, 16:25, 18:12, 18:13, 18:14, 18:16, 18:22, 18:24, 21:5, 54:3, 55:22
**middle** [4] - 35:21, 38:6, 42:19, 52:19, 58:18, 66:4, 109:2, 120:22
**might** [8] - 82:12, 103:19, 105:15, 109:19, 110:12, 111:24, 111:25
**Miguel** [7] - 46:16, 50:7, 50:19, 50:23, 51:9, 84:17, 85:4
**mik** [1] - 97:17
**Mikaeel** [6] - 27:1, 36:13, 36:18, 41:5, 58:24, 84:15
**Mikes** [1] - 17:24
**MILLER** [3] - 1:22, 131:20, 131:21
**min** [2] - 68:24, 78:19
**mind** [1] - 101:22, 113:7, 121:4
**minds** [1] - 53:16
**mindset** [13] - 113:10, 113:15, 115:23, 116:6, 116:16, 116:20, 117:9, 118:2, 119:1, 124:23, 125:7, 125:10
**mine** [1] - 113:13
**minute** [4] - 9:10, 46:7, 78:19, 91:16
**minutes** [2] - 53:12, 105:15
**missing** [1] - 56:11
**misunderstanding** [1] - 104:22
**MK** [6] - 27:1, 36:13, 36:18, 41:5, 58:24, 84:15
**Mom** [1] - 35:25
**moment** [6] - 5:17, 43:20, 64:16, 74:15, 95:6, 123:1
**morning** [6] - 42:23, 88:14, 101:16, 101:24, 110:1, 112:25
**mosque** [1] - 125:4
**most** [4] - 93:4,

105:25, 128:3, 128:4
**mother** [1] - 84:21
**motion** [2] - 13:1, 130:2
**motions** [2] - 120:5, 120:7
**mouse** [1] - 36:23
**move** [9] - 8:23, 12:24, 65:20, 67:24, 77:25, 81:12, 83:23, 87:12, 88:4
**moved** [1] - 74:17
**moves** [6] - 6:21, 15:1, 25:25, 29:17, 32:7, 41:24, 45:21, 48:5, 57:20, 64:13, 70:9, 73:20, 79:23, 85:22, 92:25, 94:22
**moving** [3] - 39:6, 51:5, 110:21
**MP-3** [7] - 10:5, 10:10, 10:14, 10:17, 11:5, 15:19, 15:20
**MR** [203] - 3:5, 4:7, 4:9, 6:20, 6:23, 6:24, 7:3, 8:22, 8:25, 9:1, 9:5, 12:23, 13:2, 13:5, 14:25, 15:3, 15:4, 15:8, 25:24, 26:2, 26:3, 26:7, 29:16, 29:19, 29:20, 29:24, 32:6, 32:10, 32:12, 32:14, 32:21, 32:25, 33:7, 33:13, 33:20, 33:24, 41:23, 42:1, 42:2, 42:7, 42:10, 43:20, 43:22, 44:2, 45:20, 45:24, 46:1, 46:5, 48:4, 48:7, 48:8, 48:12, 53:6, 53:21, 54:2, 55:13, 55:14, 56:14, 56:19, 57:19, 57:22, 58:1, 58:5, 58:11, 62:24, 63:2, 64:12, 64:15, 64:18, 64:21, 65:3, 65:19, 65:22, 65:23, 66:2, 67:24, 68:2, 68:3, 68:7, 70:9, 70:12, 70:13, 70:17, 71:23, 73:19, 73:23, 73:25, 74:4, 74:7, 74:9, 74:12, 74:13, 74:15, 74:18, 74:22, 74:24, 75:3, 75:6, 75:17, 75:19, 75:23, 76:2, 77:24, 78:2, 78:3, 78:6, 79:22, 79:25, 80:1, 80:5, 81:11, 81:14, 81:15, 81:18,

83:22, 83:25, 84:1, 84:4, 85:21, 85:24, 86:1, 86:6, 86:8, 87:11, 87:14, 87:18, 87:19, 88:1, 88:3, 92:25, 93:3, 93:9, 93:14, 93:24, 94:21, 94:24, 94:25, 95:5, 95:9, 95:13, 101:9, 102:13, 102:23, 103:6, 103:9, 103:21, 104:11, 104:18, 104:22, 105:9, 105:11, 105:17, 105:24, 106:3, 106:9, 106:14, 106:19, 106:22, 107:2, 107:7, 107:11, 107:19, 107:25, 108:19, 108:21, 108:25, 109:5, 109:9, 109:19, 110:19, 111:2, 111:5, 111:11, 111:13, 111:19, 111:22, 112:1, 112:3, 112:10, 119:13, 120:4, 120:9, 120:18, 122:6, 123:2, 123:12, 123:24, 124:10, 125:2, 125:22, 126:13, 126:22, 127:10, 128:23, 129:2, 129:8, 129:15, 129:18, 130:3, 130:5, 130:8, 130:12, 130:18

**MS** [16] - 55:20, 56:9, 109:15, 112:14, 112:19, 112:24, 113:4, 114:8, 114:11, 116:4, 118:6, 118:16, 118:18, 118:20, 119:5, 127:15

**Mueller** [2] - 103:24, 105:20

**multi** [1] - 15:18

**multi-page** [1] - 15:18

**multiple** [4] - 5:23, 5:25, 23:19, 89:13

**Muslim** [1] - 115:20

**Muslims** [3] - 40:15, 123:7, 123:9

**must** [2] - 34:12, 46:21

**mutually** [1] - 125:19

**MY** [1] - 131:15

**N**

**Naa** [1] - 59:15

**NADER** [1] - 3:4

**Nader** [10] - 4:10, 13:9, 15:9, 23:8, 44:3, 58:12, 111:4, 111:6, 112:2, 112:6

**name** [34] - 26:21, 26:22, 26:25, 27:1, 30:5, 30:6, 30:7, 35:1, 35:6, 35:17, 36:18, 49:11, 49:13, 50:3, 60:23, 60:24, 84:6, 84:15, 96:7, 96:10, 96:14, 97:11, 97:13, 104:24, 104:25, 105:1, 105:3, 106:5, 106:10, 106:11, 110:8

**named** [1] - 11:18

**names** [9] - 9:22, 26:22, 28:23, 36:16, 50:5, 50:6, 63:14, 99:4, 106:7

**nature** [1] - 104:23

**necessarily** [1] - 104:14

**necessary** [1] - 110:10

**need** [19] - 13:6, 47:21, 51:17, 51:20, 71:18, 72:13, 72:14, 73:21, 78:12, 79:1, 109:22, 112:12, 112:19, 119:16, 122:23, 122:24, 130:15, 130:20

**negate** [1] - 128:17

**never** [2] - 128:12, 128:17

**new** [6] - 30:11, 30:12, 37:18, 71:4, 104:25, 106:11

**next** [32] - 8:9, 11:4, 14:13, 23:11, 24:22, 24:23, 30:25, 41:7, 49:20, 50:8, 50:17, 51:5, 51:18, 52:2, 52:7, 53:4, 62:4, 62:6, 62:12, 67:4, 68:19, 68:20, 72:8, 72:9, 86:19, 95:24, 96:5, 112:16, 112:25, 111:2, 123:19, 123:22

**night** [1] - 111:15

**nine** [1] - 41:3

**NO** [1] - 1:8

**non** [2] - 104:18, 104:19

**non-hearsay** [2] - 104:18, 104:19

**none** [10] - 6:23, 8:25, 15:3, 26:2,

45:24, 65:22, 68:2, 70:12, 75:3, 94:24

**NORTH** [2] - 1:23, 2:6

**note** [1] - 108:2

**noted** [1] - 115:14

**NOTES** [1] - 131:15

**notes** [1] - 113:3

**nothing** [8] - 33:7, 116:10, 117:20, 118:1, 121:10, 125:21, 126:12, 127:8

**notice** [4] - 30:16, 30:19, 83:9, 104:12

**noticing** [1] - 55:23

**notification** [2] - 103:2, 103:3

**notwithstanding** [1] - 119:22

**November** [4] - 38:11, 94:9, 98:9, 98:13

**now's** [2] - 53:9, 112:17

**nowhere** [1] - 124:13

**number** [19] - 5:4, 5:6, 8:3, 11:19, 11:21, 48:16, 49:15, 49:18, 49:19, 88:10, 96:21, 96:24, 97:3, 101:13, 105:8, 105:20, 114:21, 115:7

**Number** [2] - 38:25, 39:17

**numbers** [7] - 31:20, 48:15, 76:24, 90:18, 96:17, 103:22, 103:24

**numerical** [1] - 105:10

**O**

**object** [6] - 12:23, 58:2, 64:18, 87:14, 107:15, 129:21

**objection** [44] - 6:22, 8:24, 29:18, 29:20, 32:15, 32:16, 32:23, 33:9, 33:11, 33:12, 41:25, 45:23, 45:25, 48:6, 53:11, 58:5, 58:6, 58:7, 58:8, 64:14, 64:24, 65:2, 65:21, 68:1, 70:11, 70:13, 75:1, 75:4, 75:11, 75:13, 78:1, 79:24, 81:13, 87:13, 87:25, 93:21, 94:23, 94:25, 102:25, 103:8, 103:10, 104:7, 108:1,

108:10

**objection's** [2] - 12:25, 42:3

**objections** [21] - 15:2, 26:1, 32:9, 33:6, 33:10, 33:17, 33:18, 42:1, 57:21, 65:24, 68:5, 73:24, 73:25, 75:14, 83:24, 85:23, 86:7, 93:2, 93:22, 95:10, 107:16

**observe** [1] - 16:22

**observed** [1] - 20:19

**obtained** [3] - 63:17, 95:4, 95:6

**obviously** [2] - 118:24, 120:5

**occupied** [1] - 46:24

**occurred** [2] - 32:2, 84:12

**OCR** [4] - 8:19, 14:5, 14:23, 15:15

**October** [3] - 4:16, 4:20, 4:23

**ocuntry** [1] - 101:5

**OF** [15] - 1:1, 1:2, 1:6, 1:14, 2:1, 2:2, 2:8, 2:9, 2:13, 131:2, 131:4, 131:6, 131:9, 131:13, 131:15

**offensive** [1] - 34:6

**offer** [2] - 93:16, 103:17

**offered** [11] - 33:16, 64:19, 64:20, 64:22, 93:12, 103:5, 103:13, 106:14, 107:21, 108:9, 120:1

**offering** [11] - 103:10, 103:16, 103:17, 104:8, 104:15, 104:16, 104:21, 105:22, 107:6, 108:15

**OFFICE** [1] - 2:9

**office** [6] - 19:7, 19:12, 20:12, 20:15, 21:1

**OFFICIAL** [3] - 1:23, 131:8, 131:22

**often** [1] - 118:8

**old** [1] - 106:10

**OMAR** [1] - 1:9

**Omar** [1] - 106:11

**ON** [3] - 2:2, 2:8, 2:13

**once** [6] - 7:21, 12:14, 19:7, 19:25, 43:7, 98:24

**one** [58] - 6:13, 6:14,

10:23, 17:17, 17:20, 17:21, 22:24, 25:7, 26:21, 27:6, 27:10, 28:5, 31:9, 31:23, 35:8, 36:4, 36:5, 36:15, 40:10, 41:2, 49:4, 51:11, 52:14, 53:24, 55:14, 64:16, 72:21, 74:15, 74:16, 74:24, 76:2, 78:19, 79:4, 88:19, 89:13, 91:16, 92:1, 96:5, 99:17, 102:4, 103:4, 104:9, 104:24, 104:25, 106:4, 107:4, 108:23, 109:7, 110:2, 110:11, 112:3, 114:1, 121:7, 122:7, 122:18, 124:1, 126:9, 130:1

**ones** [2] - 27:10, 74:3

**online** [2] - 79:13, 99:11

**open** [3] - 5:18, 121:24, 122:14

**opening** [14] - 113:5, 113:7, 116:18, 117:13, 119:9, 120:15, 120:20, 120:24, 121:10, 121:18, 121:24, 123:4, 124:20, 126:14

**opportunity** [5] - 10:9, 102:23, 112:16, 123:8, 123:15

**opposed** [2] - 115:11, 119:8

**opposite** [1] - 115:22

**oppressed** [1] - 46:23

**Orange** [1] - 7:23

**ORC** [7] - 90:17, 90:18, 92:18, 94:12, 96:16, 96:21, 96:24

**order** [19] - 22:10, 23:2, 30:24, 45:7, 47:18, 50:17, 51:5, 52:2, 52:8, 57:7, 64:3, 67:12, 70:2, 88:10, 104:3, 105:10, 105:12, 105:14, 109:17

**ordered** [20] - 6:25, 9:2, 15:5, 26:4, 29:21, 33:21, 42:4, 46:2, 48:9, 58:9, 65:25, 68:4, 70:14, 75:15, 75:23, 78:4, 80:2, 81:16, 84:2, 95:11

**orient** [1] - 49:4

**original** [5] - 22:2, 22:18, 22:21, 23:5, 23:6
  **originally** [1] - 130:2
  **outlined** [1] - 90:4
  **outside** [11] - 17:18, 18:2, 18:5, 19:6, 65:1, 90:4, 90:8, 90:10, 93:22, 102:3, 130:16
  **overall** [1] - 124:20
  **overruled** [11] - 12:25, 33:18, 42:3, 58:6, 58:8, 65:24, 68:5, 70:14, 75:13, 75:15, 95:11
  **own** [4] - 60:16, 103:19, 115:12, 115:24

**P**

**p.m** [3] - 98:12, 98:13, 130:23
**P.M** [2] - 1:15, 4:1
**Pacific** [1] - 97:23
**page** [145] - 5:23, 6:1, 6:4, 6:5, 6:14, 7:4, 9:7, 10:1, 10:12, 10:14, 14:19, 15:10, 15:11, 15:18, 23:17, 23:18, 23:19, 23:22, 23:25, 24:4, 24:10, 24:20, 24:23, 24:24, 25:1, 25:4, 25:6, 25:12, 25:13, 25:16, 25:17, 25:22, 25:23, 26:9, 27:15, 28:19, 28:20, 29:14, 29:25, 30:4, 30:15, 31:8, 31:10, 32:2, 34:17, 34:20, 34:23, 35:2, 35:6, 35:7, 35:14, 35:15, 35:18, 35:21, 36:8, 37:4, 37:17, 38:2, 38:18, 38:20, 38:21, 39:8, 39:11, 39:22, 40:3, 40:23, 40:24, 41:11, 41:21, 43:15, 45:11, 45:18, 45:21, 46:10, 47:7, 48:14, 49:4, 50:17, 51:21, 58:13, 58:18, 59:16, 59:20, 59:21, 60:20, 61:2, 61:7, 61:9, 61:15, 61:20, 62:7, 62:12, 66:4, 68:19, 68:20, 68:22, 70:18, 70:22, 70:23, 72:7, 72:8, 81:25, 82:19, 82:20, 83:16,

83:20, 84:6, 85:3, 85:14, 86:10, 86:12, 86:15, 86:23, 86:25, 87:9, 95:15, 100:16, 105:4, 107:1, 113:13, 114:7, 114:8, 114:9, 114:12, 114:15, 115:15, 118:7, 118:8, 118:15, 118:7, 118:8, 118:18, 118:20, 118:22, 119:4, 119:5, 119:23, 123:4, 123:5
  **pages** [12] - 5:24, 5:25, 10:2, 32:25, 33:3, 33:4, 59:25, 61:3, 62:4, 62:6, 111:16, 113:13
  **paint** [7] - 47:20, 47:23, 51:20, 57:9, 89:16, 110:2, 110:18
  **Palestine** [2] - 99:19, 100:3
  **palestine** [1] - 99:23
  **paragraph** [6] - 118:12, 118:16, 121:13, 123:6, 123:14, 125:11
  **parallel** [3] - 7:10, 126:2, 126:9
  **parentheses** [1] - 49:15
  **part** [12] - 10:20, 10:23, 11:3, 11:16, 30:4, 44:18, 71:1, 104:9, 118:21, 122:1, 123:25, 125:13
  **participants** [3] - 95:25, 96:3, 101:22
  **particular** [24] - 4:15, 24:2, 25:5, 30:19, 36:14, 37:1, 38:8, 48:21, 55:24, 56:3, 65:15, 74:3, 83:9, 88:8, 88:23, 89:14, 90:7, 91:6, 91:7, 92:11, 92:23, 92:24, 93:15, 93:17
  **particularly** [1] - 114:21
  **parties** [2] - 53:22, 54:6
  **parts** [1] - 23:25
  **party** [5] - 32:16, 75:14, 75:19, 75:20, 107:14
  **pass** [2] - 71:8, 72:14
  **passage** [1] - 93:17
  **passport** [2] - 61:16, 62:18, 63:5
  **password** [3] - 23:1,

23:2, 23:4
  **passwords** [1] - 23:3
  **path** [2] - 43:8, 97:1
  **patience** [1] - 101:17
  **Patrick** [1] - 53:24
  **paused** [1] - 42:23
  **PDF** [3] - 11:9, 11:25, 12:8
  **PDFs** [1] - 16:11
  **people** [13] - 24:17, 24:19, 25:8, 27:20, 34:6, 36:24, 37:1, 46:23, 48:13, 83:3, 100:24, 110:20, 117:18
  **per** [1] - 89:1
  **perhaps** [2] - 6:13, 101:11
  **period** [1] - 56:20
  **permission** [1] - 95:18
  **person** [9] - 21:3, 26:17, 27:19, 30:13, 35:2, 43:1, 92:23, 104:13, 116:23
  **persons** [1] - 20:4, 34:3, 52:23
  **pertains** [1] - 106:23
  **PH** [1] - 1:24
  **PHILLIPS** [1] - 1:4
  **phone** [2] - 60:6, 79:3
  **phones** [1] - 23:9
  **photocopy** [1] - 63:4
  **photograph** [8] - 5:22, 6:1, 6:16, 7:5, 13:13, 25:22, 26:17, 29:7
  **photographs** [9] - 6:6, 6:9, 6:11, 6:17, 13:16, 14:1, 14:3, 47:20, 110:21
  **pick** [1] - 100:21
  **picks** [1] - 58:22
  **picture** [13] - 25:22, 29:2, 29:11, 29:12, 30:8, 30:11, 30:12, 83:17, 84:18, 84:19, 110:5, 123:25
  **pictures** [4] - 28:22, 88:25, 110:2, 110:15
  **piece** [2] - 51:6, 104:2
  **pin** [1] - 113:22
  **PIN** [5] - 48:15, 48:16, 103:22, 103:24, 105:19
  **pink** [1] - 120:21
  **piped** [4] - 19:12, 19:15, 21:1, 106:15

**place** [4] - 69:10, 69:13, 72:2, 100:25
**PLACE** [1] - 131:11
**places** [2] - 114:12, 114:21
**PLAINTIFF** [2] - 1:7, 2:2
**plan** [15] - 115:4, 115:6, 116:14, 116:16, 117:16, 117:24, 118:1, 118:13, 118:21, 118:22, 119:9, 119:10, 123:16, 126:6
**play** [5] - 20:16, 20:18, 20:22, 110:18, 118:9
**playback** [1] - 20:19
**played** [3] - 125:8, 125:17, 125:18
**player** [2] - 15:19, 15:20
**playing** [2] - 125:6, 125:23
**plus** [1] - 51:17
**point** [43] - 5:12, 6:20, 8:22, 13:18, 14:25, 16:14, 25:24, 29:16, 45:20, 48:4, 64:12, 65:2, 65:19, 66:23, 66:24, 73:19, 74:10, 77:24, 79:22, 81:11, 83:22, 85:21, 87:11, 87:24, 92:25, 93:21, 94:21, 101:12, 107:15, 108:5, 108:13, 110:13, 112:15, 113:1, 113:6, 113:7, 113:8, 117:8, 124:19, 127:10, 128:10, 128:18, 130:11
  **pointed** [1] - 113:4
  **pointing** [1] - 113:22
  **poor** [2] - 18:12, 35:10
  **popped** [1] - 36:21
  **populations** [2] - 40:9, 40:14
  **portion** [2] - 24:2, 105:25
  **portions** [1] - 20:18
  **portrayed** [1] - 96:20
  **posed** [2] - 76:5, 76:9, 81:25
  **poses** [4] - 76:7, 81:8, 82:1, 82:2
  **position** [2] - 115:16, 122:3
  **possess** [1] - 13:20

**possible** [2] - 21:13, 119:10
**possibly** [1] - 108:13
**post** [9] - 25:5, 32:1, 36:14, 37:1, 38:4, 40:1, 44:14, 50:10, 50:12
**postdate** [1] - 40:25
**posted** [3] - 25:23, 38:17, 59:9
**posting** [5] - 37:4, 37:6, 38:22, 38:23, 41:25
**posts** [5] - 25:8, 32:4, 33:5, 42:12, 44:3
**pot** [4] - 125:6, 125:8, 125:17, 125:18
**ppl** [3] - 82:8, 83:3, 100:23
**prayer** [2] - 52:20
**pre** [1] - 115:5
**pre-existed** [1] - 115:5
**precise** [1] - 90:17
**predated** [1] - 116:15
**preparing** [2] - 10:22, 11:2
**prescribed** [1] - 12:1
**presence** [6] - 4:4, 53:18, 65:1, 93:22, 102:3, 130:16
**present** [5] - 4:5, 16:18, 17:9, 53:20, 102:1
**PRESIDING** [1] - 1:4
**pretend** [2] - 128:12, 128:17
**pretty** [1] - 126:9
**previous** [8] - 50:25, 57:8, 59:20, 61:9, 67:10, 85:9, 98:14, 108:1
**previously** [16] - 6:10, 7:13, 26:21, 27:6, 33:17, 40:19, 63:3, 65:22, 68:2, 70:12, 74:1, 75:3, 77:10, 91:23, 92:1, 94:24
**problem** [2] - 125:12, 129:4
**procedure** [5] - 4:21, 4:23, 13:25, 14:5, 14:8
**procedures** [1] - 99:5
**proceed** [1] - 74:13
**proceeding** [2] - 119:24, 120:2

proceedings [1] - 130:22
PROCEEDINGS [2] - 1:14, 131:11
Proceedings [1] - 130:23
proceeds [1] - 113:16
process [2] - 19:2, 104:3
produced [1] - 89:5
producing [1] - 89:6
product [1] - 85:13
professors [1] - 116:25
proffer [58] - 112:16, 113:18, 113:24, 114:4, 114:9, 114:18, 114:25, 115:2, 115:4, 115:11, 115:18, 115:21, 116:3, 116:12, 116:13, 116:17, 116:24, 117:4, 117:11, 117:15, 118:4, 118:8, 118:17, 119:17, 120:17, 120:19, 120:25, 121:1, 121:6, 122:1, 122:9, 122:10, 122:15, 123:5, 123:21, 123:24, 124:2, 124:5, 124:10, 124:13, 124:16, 124:21, 125:1, 125:25, 126:1, 126:4, 126:18, 126:20, 126:24, 127:2, 127:9, 127:12, 127:19, 127:23, 128:10, 128:19, 130:4
proffers [1] - 127:17
profile [21] - 23:17, 24:1, 24:2, 24:3, 24:12, 25:3, 27:16, 28:8, 28:22, 29:2, 30:3, 30:8, 30:11, 30:12, 63:14, 83:6, 83:10, 84:18, 84:19, 87:2, 108:23
projected [2] - 51:15, 68:8
projector [2] - 39:10, 40:21
promise [1] - 120:11
proper [1] - 120:6
protect [1] - 46:24
Proud [1] - 37:15
provide [3] - 13:7, 22:11, 67:17
provided [19] -

44:15, 45:6, 47:17, 57:6, 57:13, 63:19, 64:2, 64:5, 67:2, 67:11, 67:16, 70:2, 70:7, 73:14, 73:17, 85:13, 85:14, 85:19, 88:21
providers [1] - 44:6
PUBLIC [2] - 2:9, 2:11
publish [19] - 7:2, 9:4, 15:6, 26:6, 29:23, 33:23, 42:6, 46:4, 48:10, 58:9, 65:25, 68:5, 70:15, 75:16, 77:8:4, 80:3, 81:16, 84:2, 95:11
pulled [1] - 92:13
purpose [7] - 34:9, 34:14, 103:14, 104:18, 104:19, 105:5, 107:23
purposes [6] - 33:3, 34:13, 42:9, 53:24, 54:8, 56:14
pursuant [1] - 95:3
put [7] - 9:14, 24:18, 102:7, 105:11, 105:14, 128:9
putting [1] - 18:12

Q

Qa'ida [4] - 118:23, 123:23, 126:8, 126:10
quality [4] - 18:3, 19:24, 20:1
questioning [1] - 109:25
questions [17] - 63:1, 75:8, 111:23, 115:17, 115:18, 116:2, 121:20, 121:25, 122:2, 122:6, 122:8, 122:10, 122:11, 123:3, 124:2, 124:8
quick [1] - 56:20
quickly [3] - 109:9, 110:22, 130:19
quite [4] - 74:5, 89:9, 115:2, 115:3
quote [7] - 43:4, 43:6, 43:7, 44:14, 46:17, 46:20, 46:21

R

Rafiq [4] - 28:1, 80:14, 96:6, 97:11

Raheem [3] - 28:1, 96:6, 97:11
Rahlmullah [1] - 47:1
raise [1] - 127:11
raised [2] - 46:23, 58:8
RALPH [1] - 1:10
Ralph [2] - 96:15, 97:13
random [1] - 71:18
randomly [1] - 89:25
ranging [1] - 12:2
reach [1] - 56:11
reached [1] - 53:23
read [16] - 34:2, 35:10, 35:12, 37:11, 50:5, 51:13, 53:25, 55:15, 84:15, 84:16, 98:19, 99:4, 100:19, 120:19, 123:22, 124:9
reading [1] - 76:16
reads [3] - 84:17, 85:4, 104:9
ready [1] - 53:10
real [2] - 21:14, 119:15
reality [1] - 127:18
realize [2] - 113:14, 125:7
really [7] - 78:12, 103:17, 108:12, 110:3, 110:10, 127:20, 129:18
reason [3] - 22:7, 22:8, 109:24
receive [1] - 107:8
received [22] - 6:10, 7:14, 7:18, 7:21, 7:22, 8:18, 9:24, 12:10, 12:20, 14:22, 21:25, 44:5, 45:17, 65:12, 77:19, 79:17, 81:1, 85:6, 88:9, 95:2, 104:2
receives [2] - 103:11, 104:12
recent [2] - 85:1, 109:1
recess [4] - 53:17, 101:15, 102:5, 112:21
recessing [1] - 101:11
recipient [7] - 49:22, 49:25, 50:21, 50:22, 51:8, 58:20, 58:25
recited [1] - 73:22
recognize [31] - 5:21, 6:6, 8:9, 11:20, 14:13, 14:15, 24:6,

25:1, 25:17, 26:17, 28:16, 29:6, 31:4, 34:17, 35:5, 38:1, 40:20, 41:8, 45:3, 47:13, 53:21, 63:24, 65:7, 67:7, 69:23, 80:20, 83:13, 85:10, 86:19, 91:19, 94:3
recollection [4] - 5:7, 8:21, 87:20, 102:14
record [15] - 18:11, 18:13, 53:18, 53:25, 55:20, 56:1, 86:4, 95:17, 102:2, 103:18, 103:20, 106:22, 107:2, 107:15, 108:22
recorded [1] - 122:22
recorder [1] - 21:17
recording [20] - 4:25, 16:13, 16:14, 18:11, 18:14, 18:21, 19:13, 19:15, 19:18, 20:5, 20:12, 20:14, 21:18, 21:20, 22:7, 22:14, 22:17, 22:18, 23:8, 124:7
recordings [10] - 18:9, 19:11, 21:25, 23:6, 54:5, 54:7, 55:23, 55:25, 69:8, 69:12
records [5] - 66:25, 91:1, 91:3, 95:17, 102:19
recovered [10] - 5:1, 5:9, 6:18, 90:15, 91:8, 91:11, 92:21, 94:14, 94:18
recovering [2] - 4:12, 61:16
RECROSS [1] - 3:3
recruited [2] - 115:6, 117:18
Red [2] - 18:24, 54:6
redactions [1] - 129:21
REDIRECT [1] - 3:3
REDUCED [1] - 131:12
refer [2] - 17:4, 82:14
reference [40] - 27:4, 27:19, 27:24, 28:1, 30:9, 42:23, 46:12, 59:5, 59:6, 60:7, 60:8, 60:23, 64:7, 71:20, 72:2, 77:3, 77:11, 79:13, 79:19, 92:7, 96:16, 98:1, 98:3, 102:16, 105:20,

114:7, 114:9, 118:22, 121:8, 122:8, 122:15, 122:17, 122:21, 125:9, 125:10, 125:22, 126:13, 126:17, 126:20
referenced [11] - 9:9, 22:17, 27:2, 27:6, 27:18, 35:2, 46:7, 48:18, 48:19, 81:19, 107:20
references [4] - 30:16, 44:21, 77:11, 121:7
referencing [2] - 92:7, 95:22
referred [1] - 33:11
referring [5] - 17:5, 71:21, 82:13, 90:18, 121:19
refers [1] - 113:12
reflect [2] - 4:3, 53:18
reflected [3] - 63:19, 94:11, 94:12
reflecting [5] - 85:6, 85:19, 103:2, 105:1, 106:3
reflects [1] - 45:14
refrain [1] - 62:25
refresh [1] - 87:20
refreshing [1] - 102:14
refute [1] - 119:24
Regional [1] - 7:23
relate [3] - 54:8, 65:15, 70:3
related [1] - 101:23
relating [9] - 44:16, 46:17, 47:23, 69:17, 72:18, 75:9, 81:3, 91:1, 91:3
relevance [6] - 32:16, 33:13, 85:25, 87:14, 93:10, 107:5
relevant [3] - 89:1, 89:12, 105:25
reliability [1] - 93:7
religion [3] - 114:13, 119:1, 123:17
religious [1] - 85:4
rely [1] - 22:2
remainder [1] - 76:23
remains [1] - 89:2
remember [2] - 101:20, 130:8
reorient [1] - 48:13
repeat [5] - 18:15, 44:18, 57:24, 69:11,

75:11, 91:25
**replies** [3] - 72:13, 76:21, 83:1
**reply** [10] - 52:2, 52:4, 52:5, 69:2, 72:12, 76:18, 76:20, 82:17, 82:19, 82:25
**report** [13] - 7:25, 8:13, 8:16, 9:15, 9:20, 9:21, 14:10, 14:16, 14:18, 15:12, 15:13, 15:15, 15:18
**REPORTED** [1] - 131:10
**REPORTER** [4] - 1:23, 131:2, 131:8, 131:22
**reporter** [1] - 57:25
**REPORTER'S** [1] - 1:14
**reports** [2] - 9:16, 92:13
**representation** [1] - 120:1
**represents** [3] - 49:22, 88:9, 102:18
**requests** [1] - 81:6
**require** [1] - 87:21
**research** [2] - 53:14, 101:24
**respect** [10] - 74:10, 85:5, 95:1, 101:14, 102:14, 102:25, 103:1, 103:9, 108:21, 121:20
**respond** [14] - 32:20, 52:12, 59:12, 68:13, 71:5, 72:5, 78:16, 80:10, 81:9, 82:4, 98:15, 99:24, 100:12, 127:14
**responding** [1] - 60:18
**responds** [16] - 52:7, 60:4, 60:5, 60:12, 62:17, 68:21, 76:13, 76:15, 78:20, 80:13, 80:16, 82:7, 98:18, 98:23, 100:2, 100:13
**response** [42] - 50:25, 51:3, 51:4, 51:23, 51:25, 52:1, 52:10, 52:14, 60:2, 60:17, 62:4, 62:6, 62:9, 62:14, 62:16, 68:15, 68:23, 68:24, 68:25, 69:6, 71:7, 71:8, 72:7, 72:10, 72:15, 76:15, 76:16, 78:22, 78:23, 80:15,

82:6, 82:9, 82:10, 82:16, 82:22, 82:23, 82:24, 83:2, 98:17, 100:1, 112:24, 113:20
**responsible** [1] - 116:8
**rest** [5] - 50:20, 74:5, 74:19, 98:19, 121:13
**restore** [1] - 46:24
**result** [1] - 89:6
**retrieve** [1] - 13:23
**returned** [1] - 19:6
**review** [6] - 10:9, 21:7, 86:10, 86:12, 89:3, 89:4
**reviewed** [2] - 54:2, 73:4
**reviewer** [1] - 22:12
**reviewers** [1] - 23:3
**reviewing** [11] - 11:11, 20:12, 21:4, 21:6, 22:13, 30:15, 44:10, 44:19, 47:5, 69:8, 88:21
**revolution** [1] - 39:4
**ribbon** [2] - 38:6, 38:8
**right-hand** [2] - 37:17, 43:15
**rite** [1] - 100:10
**RIVERSIDE** [3] - 2:12, 2:16, 4:1
**Rogers** [2] - 102:5, 102:8
**role** [2] - 123:15, 126:6
**ROOM** [1] - 1:23
**Room** [1] - 118:11
**room** [1] - 120:22
**roughly** [1] - 5:16
**rule** [1] - 58:7
**ruled** [5] - 129:6, 129:14, 129:25, 130:6, 130:10
**ruler** [1] - 7:11
**ruling** [5] - 40:13, 107:17, 107:18, 109:4, 130:14

## S

**Sacrificed** [1] - 35:19
**salutation** [1] - 81:20
**SAME** [1] - 131:12
**Samir** [1] - 37:15
**San** [1] - 28:2
**sanitize** [1] - 129:5
**sanitizing** [1] - 129:1
**Santana** [100] - 25:6, 26:20, 29:10, 30:14,

31:13, 31:19, 31:24, 32:1, 32:17, 33:4, 36:8, 36:19, 38:13, 39:7, 44:10, 44:17, 44:21, 45:9, 45:10, 45:12, 46:16, 47:8, 47:10, 47:17, 48:1, 48:24, 50:7, 50:19, 50:23, 51:9, 51:23, 52:7, 52:15, 52:22, 52:23, 52:25, 56:23, 57:5, 57:16, 58:24, 59:3, 60:4, 61:25, 62:10, 62:17, 64:22, 65:11, 66:11, 67:11, 67:21, 68:13, 68:16, 68:21, 69:2, 69:10, 69:13, 69:17, 70:1, 70:4, 70:25, 71:2, 71:5, 71:15, 71:25, 72:12, 72:13, 72:18, 73:8, 75:20, 76:10, 76:13, 77:8, 77:12, 77:18, 78:10, 78:11, 78:20, 79:12, 79:16, 80:7, 80:10, 80:13, 80:24, 81:7, 81:9, 81:21, 82:2, 82:4, 82:7, 82:11, 83:1, 83:4, 83:5, 84:17, 84:20, 86:15, 106:23, 107:12, 108:13, 108:22
**Santana's** [42] - 23:16, 23:22, 24:10, 25:13, 25:21, 27:16, 28:7, 28:19, 29:14, 30:15, 37:22, 39:19, 44:15, 44:20, 45:7, 45:18, 47:6, 61:16, 62:16, 62:18, 63:18, 64:5, 76:16, 82:16, 82:22, 82:25, 83:9, 83:16, 83:19, 85:2, 85:14, 85:15, 103:11, 104:12, 105:4, 105:18, 106:4, 106:16, 107:1, 107:3, 109:1
**sat** [2] - 125:8, 125:17
**saved** [3] - 89:3, 102:19, 102:20
**saw** [10] - 16:2, 37:8, 37:21, 44:14, 58:19, 60:9, 84:19, 86:14, 86:25, 97:25
**school** [1] - 125:5
**scope** [1] - 99:6
**screen** [43] - 9:6,

23:16, 23:21, 23:22, 24:9, 24:12, 25:21, 26:8, 26:12, 28:10, 28:19, 29:14, 30:1, 31:7, 36:22, 37:3, 41:11, 46:6, 49:14, 51:15, 58:14, 58:15, 58:16, 60:24, 66:5, 66:6, 66:20, 68:8, 70:18, 77:16, 78:7, 83:16, 84:10, 86:14, 86:23, 87:4, 87:5, 87:7, 96:20, 97:5, 105:15, 110:6
**scroll** [1] - 36:23
**seal** [1] - 130:22
**search** [11] - 88:16, 88:19, 89:17, 89:23, 89:24, 90:2, 90:3, 90:14, 90:25, 94:15
**searched** [2] - 90:5, 95:7
**searchs** [8] - 88:6, 88:9, 89:11, 89:14, 89:20, 90:19, 92:14, 109:11
**seated** [1] - 102:2
**second** [14] - 24:4, 49:8, 54:4, 61:20, 68:22, 70:22, 70:23, 72:25, 93:18, 95:21, 96:13, 96:17, 100:16, 123:7
**section** [2] - 95:7, 106:1
**see** [48] - 5:18, 7:5, 9:10, 10:14, 17:12, 20:11, 20:23, 23:12, 24:4, 24:15, 25:3, 25:5, 26:9, 26:22, 27:19, 29:25, 35:22, 43:4, 44:16, 44:20, 45:1, 47:7, 47:10, 48:16, 49:16, 50:2, 50:8, 51:11, 61:21, 62:14, 66:25, 68:8, 70:18, 76:4, 78:7, 84:6, 89:7, 95:15, 96:8, 97:4, 99:8, 101:16, 101:24, 106:9, 109:20, 124:7, 124:8, 124:11
**seeing** [3] - 49:5, 53:10, 53:11
**seeking** [1] - 75:10
**seem** [1] - 109:21
**seized** [3] - 88:7, 90:4, 90:8
**send** [2] - 60:16, 92:4

**sender** [3] - 59:21, 59:22, 61:23
**sending** [1] - 78:14
**sends** [4] - 59:23, 61:8, 66:14, 66:15
**sent** [4] - 44:11, 50:8
**sentence** [2] - 123:7, 126:14
**September** [16] - 15:13, 16:20, 48:2, 50:11, 70:4, 79:20, 81:4, 83:8, 83:10, 83:17, 83:20, 84:12, 84:13, 84:14, 85:16
**series** [1] - 49:7
**serious** [4] - 116:20, 117:10, 117:12, 118:3
**server** [9] - 19:13, 19:16, 19:18, 20:13, 20:15, 20:25, 21:8, 22:17, 22:21
**session** [13] - 113:18, 114:4, 115:11, 115:18, 115:21, 116:12, 116:13, 116:17, 116:24, 117:4, 117:11, 117:15, 128:10
**SESSION** [1] - 1:15
**set** [7] - 16:14, 18:11, 18:13, 18:18, 21:14, 49:3, 66:15
**SET** [1] - 131:11
**setting** [3] - 67:22, 72:18, 73:9
**seven** [4] - 31:21, 39:17, 98:7, 98:8
**several** [5] - 10:2, 11:15, 30:24, 72:19, 101:9
**sha** [8] - 82:14, 98:22, 98:23, 99:9, 99:12, 99:15, 100:3, 101:3
**share** [1] - 28:4
**Sheik** [11] - 35:19, 39:5, 40:13, 42:21, 42:23, 43:8, 44:14, 44:21, 45:9, 46:18, 46:25
**shooting** [1] - 89:16
**shorten** [1] - 49:24
**shorter** [1] - 112:1
**shot** [9] - 23:22, 26:12, 28:19, 37:3, 83:16, 84:10, 87:4, 87:5, 87:7
**shots** [2] - 28:10, 86:14

**show** [15] - 15:9, 23:25, 24:1, 87:2, 103:10, 103:16, 104:8, 104:15, 104:16, 105:21, 105:23, 106:14, 107:6, 110:14, 114:22
**showing** [13] - 25:13, 34:9, 37:2, 37:25, 38:16, 39:21, 40:19, 42:11, 63:3, 63:21, 67:4, 76:3, 110:1
**shows** [8] - 23:24, 24:2, 43:9, 103:13, 104:11, 104:20, 105:2, 105:3
**side** [4] - 32:22, 43:15, 49:7, 95:20
**similar** [7] - 9:16, 57:8, 60:9, 67:10, 76:25, 77:2, 108:22
**similarly** [1] - 21:24
**simply** [1] - 106:14
**single** [3] - 5:23, 45:21, 99:17
**single-page** [1] - 45:21
**sister** [1] - 84:21
**sit** [1] - 129:22
**sites** [2] - 34:5, 34:6
**sitting** [1] - 125:5
**situation** [2] - 13:5, 58:22
**six** [3] - 44:25, 62:17, 63:12
**sixth** [1] - 10:1
**sk.tefl.g@gmail. com** [1] - 60:3
**skip** [1] - 86:18
**skipping** [1] - 119:23
**Skype** [30] - 60:21, 60:23, 61:13, 67:22, 72:18, 73:9, 75:9, 76:12, 77:1, 77:2, 77:3, 77:10, 78:24, 79:1, 79:4, 79:5, 91:1, 91:3, 91:22, 91:23, 92:1, 92:5, 92:9, 92:21, 93:5, 93:14, 94:6, 94:10, 94:12, 94:14
**skype/ rafiqabdulraheem/ main.db** [1] - 97:2
**slash** [3] - 71:10, 71:13, 71:14
**slightly** [3] - 88:4, 95:17, 111:21
**slowly** [1] - 57:24
**small** [1] - 55:14

**smiley** [2] - 71:9, 71:10
**smoked** [3] - 125:8, 125:17, 125:18
**smoking** [1] - 125:6
**social** [2] - 23:10, 44:4
**software** [1] - 88:21
**SOHIEL** [1] - 1:9
**Sohiel** [1] - 106:11
**sold** [1] - 99:12
**sometimes** [1] - 49:24
**Sony** [7] - 88:10, 88:23, 91:8, 91:12, 92:19, 92:21, 93:19
**soon** [5] - 12:12, 12:13, 82:11, 82:16
**sorry** [36] - 10:20, 10:22, 10:24, 12:4, 13:22, 15:23, 16:7, 17:19, 17:21, 18:15, 21:5, 24:13, 24:21, 24:23, 29:5, 29:6, 31:20, 43:11, 44:18, 47:5, 50:12, 58:1, 64:15, 66:5, 71:11, 74:5, 91:25, 96:14, 98:13, 105:7, 106:25, 111:12, 115:25, 118:14, 118:18, 129:8
**sort** [6] - 39:1, 50:20, 103:19, 113:20, 113:22, 127:23
**Souls** [1] - 35:19
**sound** [1] - 17:2
**sounds** [1] - 100:3
**source** [2] - 93:6, 114:20
**span** [2] - 62:4, 82:19
**spans** [3] - 59:25, 61:2, 72:7
**speaks** [1] - 50:20
**Special** [2] - 4:10, 15:9
**special** [6] - 23:2, 38:9, 44:3, 58:12, 88:21, 111:2
**specific** [12] - 24:13, 47:10, 113:22, 115:5, 116:7, 116:14, 117:19, 119:7, 122:7, 122:21, 126:17, 126:20
**specifically** [16] - 23:24, 25:22, 45:11, 54:8, 61:1, 93:17, 113:12, 113:14, 113:25, 114:3,

115:15, 115:18, 117:17, 118:13, 120:25, 122:16
**speed** [1] - 112:5
**spot** [2] - 37:20, 43:14
**SPRING** [2] - 1:23, 2:6
**spring** [1] - 38:25
**square** [1] - 115:24
**SS** [1] - 131:5
**stage** [1] - 119:24
**stand** [2] - 4:5, 43:24
**standing** [5] - 129:7, 129:11, 129:12, 130:1, 130:7
**start** [3] - 31:18, 81:23, 119:14
**started** [4] - 23:8, 95:7, 109:12, 111:14
**starters** [1] - 122:16
**starting** [3] - 32:6, 97:1, 123:6
**STATE** [1] - 131:6
**State** [1] - 28:1
**statement** [28] - 67:16, 82:16, 98:15, 104:23, 105:6, 107:12, 107:13, 107:21, 113:5, 114:18, 114:20, 115:4, 116:3, 118:17, 120:1, 120:16, 120:17, 120:20, 121:1, 121:2, 121:10, 121:18, 122:9, 123:5, 123:21, 124:5, 125:3
**statement..** [1] - 118:5
**statements** [18] - 114:24, 115:7, 115:24, 116:7, 119:8, 119:18, 119:22, 120:11, 121:6, 127:4, 127:5, 127:6, 127:8, 128:9, 128:15, 128:16
**STATES** [7] - 1:1, 1:1, 1:4, 1:6, 2:5, 2:5, 131:9
**station** [1] - 68:24
**status** [3] - 24:1, 46:16, 103:12
**stay** [2] - 100:17, 100:20
**stayt** [1] - 100:23
**STENOGRAPHIC** [1] - 131:15
**STENOGRAPHICA LLY** [1] - 131:10
**steps** [1] - 87:21

**stick** [1] - 128:11
**still** [3] - 58:15, 74:4, 110:14
**stipulate** [1] - 54:7
**stipulated** [2] - 55:12, 55:13
**stipulation** [5] - 53:23, 55:17, 56:12, 110:13, 110:17
**stop** [3] - 12:4, 89:17, 122:23
**stored** [3] - 18:10, 19:18, 20:14
**stories** [1] - 128:7
**straight** [6] - 44:6, 44:7, 63:17, 86:18, 104:2
**STREET** [2] - 1:23, 2:6
**stretch** [1] - 43:25
**strike** [2] - 12:24, 13:1
**struggling** [1] - 108:7
**stuck** [1] - 128:13
**student** [1] - 122:19
**students** [1] - 116:25
**studied** [1] - 82:12
**studio** [2] - 110:3
**stuff** [1] - 99:6
**stumbling** [1] - 18:16
**sub** [1] - 97:1
**sub-path** [1] - 97:1
**subjects** [6] - 25:7, 25:10, 30:17, 41:15, 41:18, 97:15
**subsequently** [1] - 9:15
**substance** [2] - 113:23, 120:16
**subtext** [2] - 40:10, 40:12
**subtitle** [2] - 39:2, 39:3
**sufficient** [1] - 104:4
**suggesting** [5] - 116:1, 121:11, 121:24, 122:18, 124:11
**suggests** [4] - 99:19, 115:22, 125:24, 127:1
**SUITE** [1] - 2:12
**sum** [1] - 113:23
**summarize** [1] - 99:18
**summarized** [1] - 124:2
**summary** [3] - 93:13, 123:24, 124:11
**Summer** [1] - 35:13

**sun** [1] - 19:23
**sun-up** [1] - 19:23
**Sunday** [1] - 100:15
**sundown** [1] - 19:23
**support** [4] - 11:9, 11:22, 11:25, 12:2
**suppose** [2] - 97:16, 103:17
**supposedly** [1] - 32:17
**SUSAN** [1] - 2:3
**suspects** [5] - 24:19, 30:16, 47:8, 64:7, 91:4
**sustain** [4] - 64:24, 87:24, 93:20, 108:10
**sustained** [6] - 62:25, 65:2, 86:7, 93:23, 102:25, 103:8
**switched** [1] - 18:5
**system** [4] - 22:24, 22:25, 23:3, 54:6
**systems** [1] - 18:10

**T**

**tab** [5] - 8:9, 14:13, 23:11, 24:22, 45:1
**tabs** [5] - 5:17, 44:25, 47:2
**Taliban** [3] - 118:23, 122:19, 123:23, 126:7, 126:10
**talks** [9] - 113:14, 114:1, 117:2, 118:11, 118:12, 118:21, 118:25, 119:2
**tamper** [1] - 23:5
**Targeting** [1] - 40:9
**targeting** [1] - 40:13
**technical** [2] - 22:23, 86:1
**technician** [9] - 17:22, 18:1, 18:5, 19:4, 19:6, 20:10, 21:2, 22:23, 23:1
**technique** [1] - 88:19
**techniques** [1] - 90:21
**Telestrator** [1] - 27:22
**term** [7] - 19:12, 103:3, 114:15, 120:23, 121:16, 121:18, 124:14
**terms** [6] - 90:6, 107:5, 121:3, 121:5, 122:17, 128:1
**terrorist** [1] - 126:15
**test** [4] - 17:12,

18:19, 19:3, 20:5
**tested** [6] - 17:16,
17:24, 17:25, 19:4,
19:7
**testified** [16] - 5:3,
23:18, 26:21, 28:3,
36:6, 36:15, 42:14,
47:20, 48:15, 49:23,
61:16, 62:19, 63:13,
86:2, 86:15, 95:3
**testifies** [2] - 119:19,
127:4
**testify** [1] - 105:12
**testimonial** [1] -
119:17
**testimony** [14] - 5:8,
5:10, 9:17, 16:15,
18:9, 27:18, 44:8,
48:15, 61:17, 63:15,
75:4, 88:8, 88:10,
101:22
**testing** [1] - 18:2
**text** [4] - 12:5, 58:2,
61:11, 92:4
**thaa** [1] - 101:2
**THAT** [3] - 131:10,
131:12, 131:14
**THE** [178] - 2:9, 3:2,
4:3, 6:22, 6:25, 7:2,
8:24, 9:2, 9:4, 12:25,
15:2, 15:5, 26:1, 26:4,
26:6, 29:18, 29:21,
29:23, 32:9, 32:20,
32:23, 33:6, 33:10,
33:15, 33:21, 33:23,
33:25, 41:25, 42:3,
42:6, 42:8, 43:21,
43:24, 45:23, 45:25,
46:2, 46:4, 48:6, 48:9,
53:9, 53:18, 54:1,
55:12, 56:5, 56:13,
56:17, 57:21, 57:24,
58:4, 58:6, 62:25,
64:14, 64:17, 64:20,
64:24, 65:21, 65:24,
68:1, 68:4, 70:11,
70:14, 71:22, 73:21,
73:24, 74:3, 74:6,
74:8, 74:11, 74:16,
74:21, 74:23, 75:1,
75:13, 75:18, 75:21,
75:24, 78:1, 78:4,
79:24, 80:2, 81:13,
81:16, 83:24, 84:2,
85:23, 85:25, 86:5,
86:7, 87:13, 87:17,
87:24, 88:2, 93:2,
93:8, 93:11, 93:20,
94:23, 95:2, 95:8,
95:10, 101:13, 102:2,

102:21, 103:4, 103:7,
103:15, 104:6,
104:15, 104:19,
105:7, 105:10,
105:13, 105:21,
106:2, 106:7, 106:13,
106:17, 106:20,
106:25, 107:5,
107:10, 108:6,
108:20, 108:24,
109:3, 109:6, 109:13,
109:21, 110:23,
111:3, 111:9, 111:12,
111:18, 111:20,
111:24, 112:11,
112:17, 112:21,
113:2, 114:7, 114:10,
115:25, 118:4,
118:14, 118:17,
118:19, 119:4,
119:11, 119:21,
120:7, 120:14,
121:23, 123:1, 123:3,
123:13, 124:9,
124:18, 125:12,
126:3, 126:19, 127:7,
127:14, 128:22,
128:24, 129:6,
129:10, 129:17,
129:24, 130:4, 130:6,
130:9, 130:13,
130:19, 131:8, 131:9,
131:10, 131:11,
131:12
**themselves** [1] -
127:17
**THEREAFTER** [1] -
131:12
**thereby** [1] - 115:12
**therefore** [2] - 34:12,
54:6
**they've** [1] - 127:21
**third** [4] - 32:16,
118:16, 123:13,
129:15
**THIS** [1] - 131:14
**Thomas** [8] - 55:22,
58:4, 86:5, 87:17,
93:8, 108:7, 119:12,
130:15
**THOMAS** [41] - 2:15,
6:24, 9:1, 12:23, 15:4,
26:3, 29:20, 33:7,
42:2, 46:1, 48:8,
55:14, 58:5, 65:23,
68:3, 70:13, 75:6,
78:3, 80:1, 81:15,
84:1, 86:6, 87:18,
93:9, 94:25, 107:19,
111:22, 119:13,

120:4, 120:9, 120:18,
122:6, 123:2, 123:12,
123:24, 124:10,
125:2, 125:22,
126:13, 126:22,
127:10
**thread** [2] - 74:6,
74:21
**three** [8] - 6:4, 6:5,
25:16, 25:17, 74:14,
76:24, 109:20, 111:18
**thumb** [27] - 5:9, 6:9,
6:17, 7:13, 7:15, 7:17,
7:21, 7:23, 8:1, 9:14,
9:23, 10:7, 12:10,
12:11, 12:12, 12:14,
12:20, 12:22, 13:14,
13:20, 13:23, 14:9,
14:11, 14:17, 14:18,
15:24, 23:9
**thumb's** [1] - 36:24
**tick** [1] - 72:21
**ticked** [1] - 76:25
**ticket** [1] - 98:25
**tickets** [5] - 89:16,
97:18, 99:13, 115:7,
117:18
**Tiger** [2] - 18:25,
54:6
**TIME** [1] - 131:11
**title** [8] - 10:18,
10:20, 10:21, 11:6,
11:7, 40:7, 40:8, 40:9
**TO** [1] - 131:12
**today** [4] - 56:6,
101:17, 111:17,
130:14
**together** [1] - 116:5
**tomorrow** [10] -
100:14, 101:16,
101:24, 102:11,
102:22, 110:12,
110:22, 110:25,
111:25, 130:10
**Ton** [3] - 59:1, 96:12,
106:12
**took** [15] - 7:23, 8:19,
13:16, 14:9, 14:17,
14:23, 15:14, 19:2,
34:20, 69:9, 69:13,
87:4, 109:21, 115:5,
117:17
**top** [19] - 14:19,
15:11, 26:13, 26:14,
30:4, 33:7, 34:22,
39:6, 46:10, 48:14,
51:22, 59:19, 61:7,
62:11, 82:20, 84:5,
85:1, 95:14, 105:20
**topic** [2] - 88:5,

109:11
**topics** [1] - 58:13
**Toshiba** [6] - 90:14,
91:12, 94:13, 94:15,
95:8, 96:21
**total** [1] - 129:18
**tourist** [2] - 99:8,
99:9
**towards** [3] - 85:16,
86:3, 89:3
**traditional** [1] -
49:24
**training** [1] - 119:10
**Traitor** [1] - 37:15
**TRANSCRIPT** [1] -
1:14
**transcript** [5] -
114:10, 114:11,
122:7, 123:4, 124:1
**TRANSCRIPTION** [2]
- 131:13, 131:14
**transcripts** [1] -
122:25
**travel** [4] - 69:18,
71:18, 89:15
**trial** [4] - 58:8,
119:25, 128:4, 128:21
**tried** [2] - 76:23,
90:12
**triggered** [1] -
127:21
**TRUE** [1] - 131:14
**true** [30] - 8:5, 22:20,
23:21, 25:12, 29:13,
31:9, 41:20, 45:16,
47:25, 54:5, 57:12,
57:15, 64:4, 70:6,
73:12, 73:16, 77:17,
79:15, 80:25, 83:19,
85:18, 86:24, 87:3,
87:8, 92:20, 93:5,
94:17, 116:23, 120:9
**trust** [2] - 101:4,
130:11
**truth** [8] - 33:16,
64:19, 75:9, 104:8,
107:21, 108:9,
115:11, 128:20
**try** [5] - 21:23, 36:12,
51:18, 99:11, 110:24
**trying** [10] - 27:23,
52:1, 82:7, 103:17,
107:23, 110:23,
113:22, 122:1,
122:12, 129:4
**Tsunami** [1] - 39:2
**Tuesday** [2] - 98:23,
100:2
**Tumblr** [1] - 23:19
**Turkey** [3] - 98:22,

100:2, 100:14
**turkey** [1] - 99:9
**turn** [3] - 10:1,
128:12, 128:20
**turning** [20] - 5:15,
6:1, 8:8, 14:12, 23:11,
24:4, 25:16, 27:15,
47:13, 51:21, 53:3,
61:7, 69:20, 80:17,
81:25, 83:12, 86:17,
91:13, 97:15, 109:11
**tweet** [1] - 101:21
**two** [29] - 6:1, 6:14,
7:4, 11:3, 21:16,
24:20, 24:24, 25:4,
27:15, 36:24, 37:1,
37:13, 47:2, 50:5,
51:21, 59:25, 62:4,
62:6, 74:10, 75:18,
104:9, 108:4, 109:10,
109:14, 111:18,
114:11, 116:11,
118:10, 127:15
**type** [4] - 16:5, 16:6,
35:18, 97:16
**typed** [2] - 18:24,
103:25
**types** [5] - 10:6,
16:11, 22:1, 103:25
**TYPEWRITTEN** [1] -
131:12

**U**

**Uhhmm** [1] - 72:11
**Ummah** [1] - 123:15
**under** [6] - 44:12,
104:3, 126:22,
127:24, 130:22
**underlying** [1] -
22:14
**underneath** [1] -
96:24
**unfolding** [1] - 39:4
**unique** [1] - 49:19
**unit** [1] - 19:22
**UNITED** [7] - 1:1,
1:1, 1:4, 1:6, 2:5, 2:5,
131:8
**UNIVERSITY** [1] -
2:11
**University** [1] - 28:2
**Unjust** [3] - 60:5,
60:7, 60:8
**unjustmedia.com**
[1] - 60:10
**unless** [3] - 120:12,
127:4, 130:17
**unnecessary** [1] -
110:5

**up** [46] - 9:9, 12:14, 16:14, 18:11, 18:13, 18:18, 19:23, 21:14, 36:21, 36:24, 39:6, 43:24, 47:5, 50:16, 51:4, 51:11, 53:15, 58:22, 60:16, 60:18, 66:5, 66:15, 67:22, 72:18, 73:9, 74:5, 78:12, 82:9, 100:21, 101:14, 101:22, 108:16, 110:5, 111:15, 112:13, 113:13, 117:17, 122:18, 124:14, 126:23, 126:24, 128:6, 128:7, 128:8, 130:17

**update** [1] - 103:11
**updated** [1] - 108:17
**updates** [1] - 107:8
**upper** [5] - 38:12, 40:16, 41:4, 42:16, 95:15
**ur** [1] - 98:25
**USB** [11] - 6:9, 7:13, 8:1, 8:14, 13:14, 14:9, 14:11, 14:17, 14:18, 15:22, 15:25
**user** [6] - 30:5, 83:7, 91:23, 96:14, 106:22
**users** [3] - 28:4, 28:22, 92:5
**uses** [1] - 90:6
**usual** [1] - 53:12
**UTC** [1] - 98:3

## V

**vague** [3] - 115:1, 121:5, 126:24
**vanity** [16] - 26:22, 26:25, 27:1, 28:22, 29:2, 30:5, 30:7, 36:16, 36:18, 63:13, 84:6, 84:15, 104:25, 105:2, 106:5
**various** [1] - 34:5
**vast** [1] - 89:9
**Velvet** [1] - 118:10
**verdict** [1] - 101:23
**verified** [2] - 18:6, 20:1
**verify** [2] - 19:19, 19:20
**version** [2] - 13:6, 127:11
**via** [3] - 30:22, 30:23, 108:14
**Viao** [7] - 88:10,

88:23, 91:8, 91:12, 92:19, 92:21, 93:19
**victory** [2] - 10:23, 11:3
**video** [30] - 17:2, 17:4, 17:7, 18:4, 18:7, 19:3, 19:5, 19:8, 19:10, 19:15, 19:24, 20:1, 20:5, 20:25, 21:6, 21:24, 22:7, 23:6, 42:22, 68:16, 69:5, 69:8, 69:9, 69:13, 91:24, 92:2, 125:6, 125:8, 125:18, 125:23
**view** [3] - 88:22, 108:8, 119:1
**viewed** [2] - 23:18, 34:4
**viewer** [1] - 21:11
**viewers** [1] - 49:4
**views** [1] - 85:4
**violate** [1] - 126:20
**violated** [1] - 126:23
**VIRAMONTES** [1] - 2:10
**VIRGINIA** [1] - 1:4
**visa** [3] - 71:18, 99:8, 99:9
**visited** [1] - 125:16
**visiting** [1] - 33:4
**visual** [1] - 55:24
**void** [2] - 126:24, 127:12
**voluntarily** [1] - 127:25
**VS** [1] - 1:8

## W

**w/visa** [1] - 99:6
**waiting** [2] - 58:15, 71:8
**walk** [1] - 113:22
**wall** [1] - 24:1
**Walmart** [1] - 51:20
**wana** [1] - 101:5
**wants** [5] - 115:19, 115:20, 119:5, 119:6
**war** [1] - 40:14
**warnings** [1] - 101:18
**warrant** [3] - 89:23, 89:24, 90:3
**WAS** [1] - 131:12
**watch** [3] - 21:14, 21:17, 21:18
**watched** [1] - 42:22
**water** [1] - 127:23
**wave** [1] - 39:5

**ways** [7] - 11:9, 11:22, 11:25, 12:1, 89:11, 89:13
**website** [3] - 26:14, 32:17, 60:8
**wedding** [1] - 101:6
**WEDNESDAY** [2] - 1:16, 4:1
**weird** [1] - 107:11
**West** [1] - 97:22
**west** [2] - 98:5, 98:9
**whatsoever** [1] - 32:18
**whenevers** [1] - 52:5
**whole** [9] - 34:2, 105:22, 107:23, 113:8, 113:16, 115:21, 127:18, 128:10, 128:18
**willing** [1] - 82:15
**wills** [1] - 99:1
**Winter** [1] - 41:3
**wish** [3] - 32:20, 32:22, 127:14
**wishes** [1] - 108:23
**witness** [21] - 4:5, 53:24, 74:2, 75:8, 86:2, 87:21, 93:4, 95:1, 95:3, 103:18, 103:20, 103:23, 105:12, 109:14, 109:22, 110:1, 110:8, 111:1, 111:7, 111:8
**WITNESSES** [1] - 3:2
**witnesses** [3] - 53:24, 109:17, 109:20
**wondering** [1] - 101:10
**word** [6] - 42:24, 46:22, 52:19, 89:14, 90:6, 124:24
**words** [10] - 51:16, 51:18, 87:3, 115:13, 116:24, 122:19, 122:23, 122:24, 125:17
**works** [2] - 49:24, 78:24
**world** [2] - 114:13, 119:1
**worshipped** [1] - 46:22
**write** [2] - 59:3, 97:15
**writing** [2] - 102:7, 102:11
**written** [1] - 111:15
**wrote** [1] - 49:5
**wuz** [1] - 71:4

## X

**Xbox** [1] - 125:6

## Y

**year** [1] - 62:22
**years** [3] - 62:17, 63:11, 63:12
**yesterday** [4] - 99:13, 103:23, 106:6, 109:13
**yesterday's** [1] - 53:24
**young** [1] - 125:23
**yourself** [2] - 20:3, 48:15
**Ys** [1] - 66:21

## Z

**zoom** [7] - 27:3, 27:23, 35:10, 36:12, 46:7, 51:18, 105:24
**zoom-in** [1] - 35:10
**zoomed** [2] - 7:15, 27:24
**zoomed-in** [2] - 7:15, 27:24
**zooming** [2] - 30:4, 37:21