UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES -- GENERAL

Case No.   ED CR 12-00092-(B)-VAP                              Date: September 15, 2014
=====================================================================
PRESENT:  HONORABLE VIRGINIA A. PHILLIPS, UNITED STATES DISTRICT JUDGE

| Marva Dillard | None Present | Susan J. DeWitt |
| Deputy Clerk | Court Reporter | Christopher D. Grigg |
| | | Allen W. Chiu |
| | | Asst. U.S. Attorneys |
| | | Not Present |

=====================================================================
U.S.A. vs (Defendants listed below)        Attorneys for Defendants

(1) SOHIEL OMAR KABIR                (1)  Jeffrey Aaron, Angela Viramontes,
(2) RALPH KENNETH DELEON                  Matthew Larson, DFPDs
                                     (2)  David J. Thomas, CJA
    Not Present
                                          Not Present

_____

**PROCEEDINGS:  MINUTE ORDER DENYING DEFENDANT DELEON'S REQUEST FOR AN ENTRAPMENT DEFENSE JURY INSTRUCTION (IN CHAMBERS)**

The five-count Second Superseding Indictment charges Defendants with (1) conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count 1); (2) conspiring to provide material support and resources to Al-Qa'ida, in violation of 18 U.S.C. § 2339B (Count 2); (3) conspiring to commit murder, kidnaping or maiming overseas, in violation of 18 U.S.C. § 956(a) (Count 3); (4) conspiring to receive military-type training from Al-Qa'ida, in violation of 18 U.S.C. § 371 (Count 4); and (5) conspiring to kill officers and employees of the United States Government, in violation of 18 U.S.C. § 1117 (Count 5).

EDCR12-92-VAP-(B)
UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.
MINUTE ORDER of September 15, 2014

On September 11 and 15, 2014, after the Government had rested its case, the Court heard argument outside of the presence of the jury on Defendant Deleon's oral request for a jury instruction on an entrapment defense.[1]  After considering the arguments advanced by Defendant Deleon and the Government, the Court DENIES Deleon's Motion.

## I. BACKGROUND

On June 11, 2014, the Court granted in part the Government's Motion in Limine to Preclude an Entrapment Defense by Each Defendant.  (See Doc. No. 357.)  In that Order, the Court ruled that, in light of the evidence proffered, Deleon could not refer to or discuss the concept of "entrapment" in opening statement, but was permitted to "introduce any evidence that may ultimately support an instruction on an entrapment defense . . . ."  (June 11, 2014 Order at 10.)  The Court then indicated that it would "determine whether an instruction on the entrapment defense is appropriate and supported by the law and the evidence," at the charging conference.  (Id.)[2]  The charging conference was held on September 15, 2014.

## II. LEGAL STANDARD

"The entrapment defense has two elements: '(1) the defendant was induced to commit the crime by a government agent, and (2) he was not otherwise predisposed to commit the crime.'"  United States v. Spentz, 653 F.3d 815, 818 (9th Cir. 2011) (citing United States v. Barry, 814 F.2d 1400, 1401 (9th Cir. 1987)); United States v. Si, 343 F.3d 1116, 1125 (9th Cir. 2003); United States v. Rhodes, 713 F.2d 463, 467 (9th Cir. 1983).  "A defendant is not entitled to have the issue of entrapment submitted to the jury in the absence of evidence showing some inducement by a government agent *and* a lack of predisposition by the defendant."  Rhodes, 713 F.2d at 467 (emphasis in original).[3]

---

[1] Defendant Deleon filed a proposed Jury Instruction re Entrapment on September 12, 2014 (Doc. No. 641).

[2] The Court also rejected defendant Kabir's attempt to advance a derivative entrapment defense.  Id.

[3] Deleon argued that he only needed to show one of the two entrapment elements.  He cited no case to support this proposition other than Greene, which as the Court explains below, (1) is not an entrapment case and (2) does not change the well-established law in this Circuit that both lack of predisposition and government inducement are required elements of an entrapment defense.

**EDCR12-92-VAP-(B)**
**UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.**
**MINUTE ORDER of September 15, 2014**

The Ninth Circuit has identified five factors to consider in determining whether a defendant was predisposed to commit the charged crimes: (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of the criminal activity was initially made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the Government. United States v. Cortes, No. 12-50137, 2014 WL 998403, at *5 (9th Cir. Mar. 17, 2014) (citing Spentz, 653 F.3d at 819). "Although none of these factors is controlling, the defendant's reluctance to engage in criminal activity is the most important." United States v. Busby, 780 F.2d 804, 807 (9th Cir. 1986).

"Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." United States v. Davis, 36 F.3d 1424, 1430 (9th Cir. 1994).

It is proper "for the government to use a 'sting' . . . . Without this kind of law enforcement weapon, it would prove difficult, or impossible, to stop certain serious criminal activity, particularly . . . crimes in which no direct participant wants the crime detected." United States v. Vega, 102 F.3d 1301, 1305 (1st Cir. 1996). "The Government may use informants and pay them. To win a suspect's confidence, an informant must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to establish a rapport with the subject." United States v. Slaughter, 891 F.2d 691, 695 (9th Cir. 1989) (citations and quotations omitted).

A defendant need only present "slight evidence" of entrapment to present the defense to the jury. United States v. Gurolla, 333 F.3d 944, 956 (9th Cir. 2003). "Only slight evidence will create the factual issue necessary to get the defense to the jury, even though the evidence is weak, insufficient, inconsistent, or of doubtful credibility." Id. at 951 (citing United States v. Becerra, 992 F.2d 960, 963 (9th Cir. 1993)). Again, however, the defendant must show slight evidence of both elements. Id.

### III. DISCUSSION

Deleon fails to present the "slight evidence" required to support an entrapment defense.

EDCR12-92-VAP-(B)
UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.
MINUTE ORDER of September 15, 2014

## A.     Greene and the "Objective" Test

As a preliminary matter, the Court addresses Greene v. United States, 454 F.2d 783 (9th Cir. 1971), a case Deleon relied on heavily when arguing he was entitled to an entrapment instruction. According to Deleon, Greene and its progeny entitle him to an instruction on "entrapment as a matter of law."

In fact, Greene did not address entrapment squarely. Greene, 454 F.2d at 786. Instead, Greene determined that a unique combination of facts made the Government's involvement in that case "substantially more intensive and aggressive than the level of such activity charged against the Government in numerous entrapment cases . . . ." Id. at 787. Greene itself says that it is not an entrapment case. Id. at 786 ("the usual entrapment defense is therefore not available" in this case); id. at 787 ("this is not an entrapment case"). See also United States v. Russell, 411 U.S. 423, 427 (1973) (recognizing "outrageous government conduct" as an "objective constitutional defense" for the first time,[4] and characterizing the rationale laid out in Greene as a "nonentrapment rationale").

Greene is more appropriately characterized as an outrageous government conduct case. See United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013) (noting that Greene is one of only "two reported decisions in which federal appellate courts have reversed convictions under [the outrageous government conduct] doctrine"). Thus, Deleon relies on

---

[4]The Court notes the "outrageous government conduct defense" is not accurately termed "a defense," but rather, a claim that government conduct violated due process. See United States v. Hampton, 425 U.S. 484 (1976). As many cases describe it as such, however, the Court adopts the term for conformity's sake.

The "subjective view" of entrapment will exonerate a criminal defendant who would not have committed the offense but for the government's inducement. Under this view, a showing that the defendant is predisposed to commit the crime will defeat an entrapment defense. See Russell, 411 U.S. at 429 (plurality opinion). Thus, the entrapment defense focuses on "the intent or predisposition of the defendant to commit the crime." Id.

On the other hand, the "objective view" of entrapment, also known as the outrageous government conduct defense, examines the government's conduct. See Russell, 411 U.S. at 440-45 (Stewart, J., dissenting); United States v. Garza-Juarez, 992 F.2d 896, 903 (9th Cir. 1993), cert. denied, 114 S. Ct. 724 (1994). Under the "extremely high standard" required to invoke this doctrine, an indictment should be dismissed "only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." Garza-Juarez, 992 F.2d at 903 (quoting United States v. Ramirez, 710 F.2d 535, 539 (9th Cir. 1983) and United States v. Smith, 924 F.2d 889, 897 (9th Cir. 1991)).

**EDCR12-92-VAP-(B)**
**UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.**
**MINUTE ORDER of September 15, 2014**

it in vain, as he has not raised an outrageous government conduct defense beyond a brief mention of the "objective test," and it does not appear he can meet the "extremely high standard" required to invoke this doctrine. United States v. Garza-Juarez, 992 F.2d 896, 903 (9th Cir. 1993), cert. denied, 114 S. Ct. 724 (1994) (quoting United States v. Ramirez, 710 F.2d 535, 539 (9th Cir. 1983) and United States v. Smith, 924 F.2d 889, 897 (9th Cir. 1991)). The Ninth Circuit has confined the outrageous conduct defense to cases where the facts demonstrate that the "underlying arrest and prosecution are so 'extreme' as to 'violate fundamental fairness' or are 'so grossly shocking as to violate the universal sense of justice." Black, 733 F.3d at 298 (quoting United States v. Stinson, 647 F.3d 1196, 1209 (9th Cir. 2011)). An outrageous government conduct defense may be appropriate, for example, when the government agents "engineer[] and direct[] a criminal enterprise from start to finish," United States v. Williams, 547 F.3d 1187, 1199 (9th Cir. 2008) (internal quotation marks omitted), or when the government uses "'excessive physical or mental coercion' to convince an individual to commit a crime, (Black, 733 F.3d 302 (quoting United States v. McClelland, 72 F.3d 717, 721 (9th Cir. 1995)). The defense is not appropriate, however, "when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture." United States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003).

"Although cases of improper government coercion are similar to entrapment cases, there are two differences between them." McClelland, 72 F.3d at 721 n.1. One of these differences is significant: an assertion of outrageous government conduct "must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." Id. (citing United States v. Bogart, 783 F.2d 1428, 1435 (9th Cir. 1986)). Although Deleon suggests he is able to meet the "objective" test under Greene and related cases – or the outrageous government conduct defense, as the doctrine has developed since Greene –, the Court finds Deleon fails to do so. He is unable to establish even one element of the entrapment defense. See infra.

**B.    Entrapment Defense: Predisposition**
Defendant Deleon failed to show he can satisfy the requirement of showing even slight evidence of "lack of predisposition," the first element of an entrapment defense.

In arguing he was entitled to a jury instruction on this defense, Deleon first cited his lack of criminal history, and lack of any financial or profit motive for the alleged criminal conduct in this case. Although the Ninth Circuit has identified these as factors to consider, their absence alone does not suffice; otherwise, all first time offenders whose charged

EDCR12-92-VAP-(B)
UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.
MINUTE ORDER of September 15, 2014

crime did not involve a financial motivation would be entitled <u>per se</u> to a finding of a lack of predisposition.

    Next, Deleon referred to the initial report from the Confidential Informant ("CI") to the FBI describing Deleon as non-violent, interested in finishing his undergraduate degree, very "career-minded," and interested in working with his uncle in Saudi Arabia.  This report of the CI's initial impressions of Deleon, however, was made <u>before</u> Deleon told the CI of the group's plan to travel to the Middle East to fight.  Furthermore, even in that early report, the CI noted that Deleon was sympathetic to those who wished to carry out violent jihad.  In any event, once Deleon disclosed the plan to go to Afghanistan and fight with the mujahadin, the CI's initial impression dissolved.

    In essence, Deleon argued that before the CI's involvement, Deleon was a college student, living at home with his parents and siblings, planning to graduate and go to Saudi Arabia to work with his uncle; but for the CI's involvement,[5] he would never have sold his car and withdrawn from college shortly before graduating to finance the group's travel to Afghanistan.  This argument is belied by the evidence actually introduced at trial, however.

    First, the Government introduced evidence which was never disputed that Deleon had formed the intent to go overseas and fight months before he met the CI in February 2012.  For example, Deleon told Gojali he had been planning to go to the Middle East and fight ever since Kabir had converted him to Islam in September of 2010.  (RT 8/27/14 PM Session at 8 (Testimony of Gojali); 8/26/14 AM Session at 23 (Testimony of SA Lee).)  FBI SA Wade Lee testified that Deleon admitted to him that Deleon, Santana, and Kabir had formed their plan to travel to Afghanistan in order to fight "in the front lines" months before any of them met the CI.  (RT, 8/26/14 AM Session at 20-21 (Testimony of SA Lee).)  Deleon told the CI during the group's trip to Las Vegas in May 2012 about the plan to go abroad and fight; the CI testified to the same effect at trial.  (RT, 9/02/14 AM Session at 57 (Testimony of CI Hammad); RT, 8/26/14 AM Session at 20–27 (Testimony of SA Nader); Exs. 588-591.)

    Deleon cited to no evidence that the CI initially suggested the criminal activity in this case.  Although the group's plan was refined later, it was not one that was suggested or

---

[5] None of the Defendants in this case had any direct contact with law enforcement agents before their arrests, so any suggestion of contact to support an entrapment defense must be based on their interactions with the CI.

CR-11 (09/98)                                                     Initials of Deputy Clerk __md__
CRIMINAL MINUTES - GEN         Page 6

```
EDCR12-92-VAP-(B)
UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.
MINUTE ORDER of September 15, 2014
```

initiated by the CI. The CI did not introduce Deleon (or the other Defendants) to the teachings of Anwar Al-Awlaki; rather, Deleon gave a USB thumb drive with Al-Awlaki's lectures to the CI . (RT, 8/20/14 PM Session at 12 (Testimony of SA Nader).)  And when Deleon recruited Gojali to join the group, the group's plan was "to meet up with Mr. Kabir in Afghanistan."  (RT, 8/28/14 AM Session at 89 (Testimony of Gojali).)  Furthermore, the evidence was uncontradicted that Deleon was posting videos of al-Awlaki lectures on social media, including lectures advocating the killing of Americans and others in the course of violent jihad, months before he met the CI.  (See Exs. 486, 511.)

In fact, Deleon told the FBI agents that although at first the group did not have a concrete plan on how to get training from the Taliban, "as things progressed, a plan became possible later on."   This testimony was corroborated by Gojali, who testified that the plans to go overseas started to become more real, and the group began to prepare themselves by training for the terrain in Afghanistan; by going to firing ranges to train for combat in Afghanistan; going to paintball ranges to train because, according to Deleon, this was "the closest thing to live combat," which Gojali understood meant training for "if they were to go to Afghanistan and fight."  (RT, 8/28/14 AM Session at 102-104 (Gojali Testimony).)  Gojali also testified that the group's plan was to "go out there and defend the Muslims," by which he meant "go out there and [fight] the American soldiers, British, Australian, UN . . . [to] go out there and fight."  (Id. at 88 (Gojali Testimony).)   At Deleon's direction, Gojali also began to train at the gym, specifically to build up strength in his legs because Kabir had said they needed to "work out our legs to carry dead weight or to carry weapons . . . in Afghanistan."  (Emphasis added.)

Deleon also told the FBI agents the many steps that he took to carry out the group's plan to travel overseas to fight:
- he obtained a Phillippines passport;
- he and codefendant Gojali decided to provide false information to the U.S. passport authorities in order to obtain a passport for Gojali on an expedited basis;
- he and Gojali obtained a falsified itinerary to present in connection with the effort to obtain the expedited passport;
- in anticipation of the group's departure, he modified and sanitized his Facebook page in order to "keep under the radar";
- he researched and booked tickets for the group to travel to Istanbul, having decided it was safer to transit through Turkey rather than Dubai en route to Afghanistan, and

EDCR12-92-VAP-(B)
UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.
MINUTE ORDER of September 15, 2014

paid for the tickets[6] by selling his vehicle and getting a refund of his tuition after withdrawing from his college courses;

- he arranged for members of the group to become familiar with the types of weapons used in Afghanistan (according to what he was told by Kabir) by going to firing ranges and practicing with those weapons; and
- he began to train for military combat by working out at a gym and hiking.

All of these are affirmative steps Deleon took, without prodding, persuasion, or inducement from the CI.  Finally, Deleon specifically told the agents he intended to leave the country to fight, to take the initiative, and "he didn't want it to be just talk."  (RT, 8/26/14 AM Session at 20-41 (Testimony of SA Lee).)

In short, there is no evidence that the CI made the initial suggestion of criminal conduct; rather, Deleon invited him to join a conspiracy in existence months before the CI met Deleon or Santana.  Even after meeting the CI, moreover, Deleon continued to take the initiative to define and implement the group's plan.

As to the fourth and fifth factors noted by the Ninth Circuit in Spentz and Cortes, the only evidence Deleon cited as showing any reluctance on his part to commit the charged criminal conduct, overcome by persistent persuasion by the CI, was (1) a conversation regarding the group's destination during which the CI "persuaded" him that the group should travel to Afghanistan to fight, and (2) statements from Deleon that he originally intended only to engage in defensive fighting to protect his fellow Muslims.  Again, the actual evidence introduced at trial belies the contention regarding this purported "slight evidence" of lack of predisposition.

Deleon and the other defendants did discuss possible destinations other than Afghanistan during the course of the planning and preparation, including Syria, Yemen, Saudi Arabia, and Palestine. There was evidence that Kabir may have wanted to travel with the rest of the group to Yemen eventually.  Insofar as Deleon argues the record contains evidence that he evinced any reluctance to engage in the charged conduct, however, that contention simply lacks factual support.  In one conversation with several members of the

---

[6]The defense attempts to argue the CI paid for the tickets, but this is not so.  When Deleon attempted to pay for the airline tickets with his credit card, the charge was declined due to his low credit limit.  The tickets were then charged to the CI's credit card, and Deleon immediately withdrew funds from his checking account and reimbursed the CI for the cost of the tickets.

EDCR12-92-VAP-(B)
UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.
MINUTE ORDER of September 15, 2014

group who were discussing the merits of various destinations, the CI asked questions about who they intended to fight in Yemen, for example, and pointed out the disadvantages of some of the choices under consideration. During this conversation – as well as others when the details of the travel overseas was discussed – Deleon never expressed reluctance to engage in any of the charged criminal conduct, however. And as discussed above, the record is filled with evidence, for example, that (1) Deleon led the group in training and preparation for travel to Afghanistan, preparation that included firearms practice to use weaponry used in that country and physical training for the terrain in Afghanistan; (2) he planned to travel to Afghanistan from the time he, Kabir and Santana first developed the plot; and (3) when he recruited Gojali to join the group, he told Gojali the plan was to join Kabir in Afghanistan. Whether the group would have traveled to a different country after Afghanistan is a different and irrelevant question.

Deleon also argued there was evidence he only intended to engage in "defensive" fighting to protect Muslims, and the plan to engage in combat was the result of persuasion by the CI. Again, this argument is supported by no evidence in the record, which actually suggests otherwise. Gojali testified that the group's plan was to "go out there and defend the Muslims," by which he meant "go out there and [fight] the American soldiers, British, Australian, UN . . . [to] go out there and fight." (RT, 8/28/14 AM Session at 88 (Gojali testimony).) In Deleon's own words in multiple conversations, he expressed his desire to die as a martyr, and to marry so that he could increase his rewards when he did so. The evidence during this trial simply does not support the argument that Deleon expressed or evinced reluctance only overcome by the CI's persuasion.

In fact, the CI took steps to try to dissuade Deleon from engaging in the planned criminal conduct. The CI offered to begin a business relationship with Deleon. He encouraged him to get married and raise a family as an alternative form of jihad. As mentioned above, however, Deleon stated he was only interested in marrying because he thought his heavenly rewards would be greater if he was married when he died while committing jihad. In other words, despite the CI's efforts to deflect him, Deleon remained fervent in his desire to engage in violent jihad.

Deleon suggested the nature of the persuasion or inducement used by the CI was "subtle" or "manipulation." The examples of this manipulation consisted of the age difference between the two men; an instance when the CI, at Deleon's request, picked up his younger brother Michael from high school to protect him from bullying and gave Michael advice about fighting and told Michael he could call him (the CI) "Babba," which Michael understood to be the Arabic word for "guardian;" and a time at the Shabreen mosque when

**EDCR12-92-VAP-(B)**
**UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.**
**MINUTE ORDER of September 15, 2014**

the CI hosted a banquet for a purported dead relative. This type of conduct, contended Deleon, made him look up to the CI, and easily manipulated by him.

This does not consist of even slight evidence of inducement or persuasion to commit the charged criminal conduct, however. It may have been a way for the CI to gain Deleon's trust, but the Government is permitted to use such tactics. How else could an undercover informant interject him or herself into a conspiracy, especially one to commit terrorist activities abroad? See Vegra, 102 F.3d at 1305 (the Government can use an undercover sting operation). Here, the CI gained trust and sympathy to infiltrate and gain information about the conspiracy. He did not use that trust and sympathy to induce or influence the conspiracy.

**C.    Inducement**

Although the absence of evidence to support lack of predisposition is enough to doom Deleon's request for an entrapment instruction, the Court considers as well whether there was slight evidence of inducement, the other required element.

Deleon argued the CI engaged in "subtle" inducement, as detailed above. Again, this argument fails as the Government is entitled to set up sting operations. The conduct here only enabled the CI to gather information – not influence the conspiracy. The evidence cited by Deleon as inducement did not affect the conspiracy's goals.

Deleon also contended that the CI paid for "everything." That is not so. In fact, the evidence at trial showed that the CI contributed toward the expenses for the group's trips to the paintball and firing range, paid for some meals, and paid for a hotel room during trips to Las Vegas and San Diego that the group had already planned. The major expense – plane tickets to Turkey – was borne by Deleon, who dropped out of school, got a tuition refund, and sold his car to finance the tickets. He did those things at the suggestion and with the encouragement of defendant Kabir, not the CI. Even with respect to outings to the paintball and shooting ranges, it was Deleon who came up with the plans of where and when to go. The CI may have helped defray some of the expenses, but Deleon researched, planned and led the outings.

The Government also points out that the CI suggested to the conspirators that they engage in non-violent jihad. Deleon and the others flatly rejected this suggestion.

Deleon points to three United States Supreme Court cases to demonstrate that subtle governmental pressure can amount to inducement. See Jacobson v. United States,

**EDCR12-92-VAP-(B)**
**UNITED STATES OF AMERICA v. SOHIEL OMAR KABIR, et al.**
**MINUTE ORDER of September 15, 2014**

503 U.S. 540 (1992); Sherman v. United States, 356 U.S. 369 (1958); Sorrells v. United States, 287 U.S. 435 (1932). Each of these is distinguishable: in each, the Government was the first to reach out to the defendant about committing the illegal action. See Jacobson, 503 U.S. at 552-53; Sherman, 356 U.S. at 372-373; Sorrells, 287 U.S. at 439-40. That simply did not happen here.

**C.    Other Arguments**

Deleon raises a few other arguments. None are convincing.

Deleon asserts that a conversation the CI had only with Gojali should be considered as to whether the CI induced Deleon to engage in criminal conduct. Even accepting for the sake of argument that statements to Gojali could show inducement to Deleon, Deleon has mischaracterized the relevant conversation the CI had with Gojali. In fact, the conversation Deleon cites is one where the CI is attempting to prod and question to ensure Gojali was serious about engaging in criminal activity.

Deleon also argues that the CI used inflammatory language, including cursing, to get the conspirators "fired up." Suffice it to say the record does not support this assertion.

Finally, Deleon cites to a number of other cases for support for his request for an entrapment instruction. See United States v. Fleishman, 684 F.2d 1329 (9th Cir. 1982); United States v. Anglada, 524 F.2d 296 (2d Cir. 1975); United States v. Riley, 363 F.2d 955 (2d Cir. 1966). These cases are outdated, two are not from this Circuit, and none are helpful.

## IV. CONCLUSION

For the foregoing reasons, Deleon's request to instruct the jury as to an entrapment defense is DENIED.