STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
SUSAN J. DE WITT (Cal. Bar No. 132462)
CHRISTOPHER D. GRIGG (Cal. Bar No. 220243)
Deputy Chief, National Security Section
ALLEN W. CHIU (Cal. Bar No. 240516)
Assistant United States Attorneys
National Security Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-4496/5429
        Facsimile: (213) 894-6436
        E-mail: susan.dewitt@usdoj.gov
                christopher.grigg@usdoj.gov
                allen.chiu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ED No. CR 12-00092(B)-VAP |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION REGARDING SENTENCING FOR DEFENDANT RALPH KENNETH DELEON |
| v. | |
| SOHIEL OMAR KABIR, et al., | |
| Defendants. | Hearing Date: February 23, 2015 Hearing Time: 9:00 a.m. Place: Courtroom of the Honorable Virginia A. Phillips |

        The United States of America, by and through its undersigned

counsel, hereby submits its position regarding sentencing for

defendant Ralph Kenneth Deleon.

        The government's position rests on the evidence admitted at

trial, the jury's verdicts, the United States Probation Officer's

Presentence Investigation Report ("PSR"), Revised PSR, First Addendum

to the PSR, sentencing recommendation letter, and revised sentencing

recommendation letter, the attached declaration of Christopher D.

Grigg and Exhibit A, the files and records in this case, and on such

additional argument or evidence as the Court may allow.

Dated: February 9, 2015            Respectfully submitted,

                                   STEPHANIE YONEKURA
                                   Acting United States Attorney

                                   ROBERT E. DUGDALE
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                         /s/
                                   _____
                                   SUSAN J. DE WITT
                                   CHRISTOPHER D. GRIGG
                                   ALLEN W. CHIU
                                   Assistant United States Attorneys
                                   National Security Section

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION AND SUMMARY OF THE GOVERNMENT'S RECOMMENDATION**

Defendant Ralph Kenneth Deleon ("Deleon") stands convicted of conspiring to provide material support to terrorists in violation of 18 U.S.C. § 2339A; conspiring to murder, kidnap, or maim overseas in violation of 18 U.S.C. § 956(a); and conspiring to kill officers and employees of the United States in violation of 18 U.S.C. §§ 1117 and 1114.  Such federal crimes of terrorism are among the most serious offenses proscribed by law.  Accordingly, Deleon and co-defendant Sohiel Omar Kabir ("Kabir") face statutory maximum penalties and advisory guidelines sentences of life imprisonment.

Deleon's conduct was particularly egregious.  Inspired by an extremist interpretation of Islam espoused by radical cleric Anwar Al-Awlaki and others that exalted over all else hatred and violence toward the United States, its allies, and other perceived enemies, Deleon chose to abandon his studies, his family, and his life in the United States to join Kabir overseas in order to seek out the Taliban and opportunities to fight and kill Americans and others.  The trial evidence, including recordings of Deleon's own statements, showed that he wanted to join the ranks of the mujahideen and die as a martyr in order to obtain a jihadist version of heavenly paradise.

Deleon took multiple steps to prepare for violent jihad and, while Kabir relocated to Afghanistan, acted as the emir (leader) for a small group of southern California men, including Miguel Santana ("Santana"), Arifeen Gojali ("Gojali"), and a person who, unbeknownst to defendants, was a confidential human source ("CHS") for the Federal Bureau of Investigation ("FBI").

Through Deleon's initiative, the group engaged in physical

1

exercise, participated in paintball activities to simulate combat, and practiced firing assault weapons at firing ranges Deleon located. Deleon consulted a local imam about traveling to engage in violent jihad, coordinated travel plans with Kabir, and ultimately purchased tickets for the group to travel from Mexico to the Middle East to rendez vous with Kabir and carry out their plans.

During the plot, Deleon sought to recruit others to join the plans to fight and kill.  As Deleon told Gojali in a recorded conversation, Deleon actively searched for potential new recruits, including while attending the defendants' mosque in Pomona.  Exh. 532; 8/27/14 RT PM Session 87-90.[1]  Deleon was effective and personally radicalized and recruited Gojali.  As Gojali testified and Deleon admitted to the FBI, Deleon introduced Gojali to extremist jihadi doctrine, including Al-Awlaki's teachings, and convinced him to abandon his infant daughter and his life in the United States to join Deleon's plan to travel overseas to fight.  See Exh. 527; 8/27/14 RT AM Session 72-74, 78-87; 8/27/14 RT PM Session 30.

Deleon's conduct stands apart from that of his co-conspirators and is particularly insidious and troubling.  So too is his willingness to take initiative in other aspects of the plot, including recruiting a driver to transport the conspirators on the first leg of their journey.  Absent Deleon's leadership and resolve, he, Gojali, and Santana might not have been arrested heading for the border with Mexico en route to the Middle East on November 16, 2012.

The importance--and consequences--of Deleon's role in this case

---

[1] Exhibit numbers refer to exhibits admitted at trial.  The government filed an appendix of recording transcripts in support of its oppositions to defendants' new trial motions.  See CR 729.

cannot be overstated and his sentence must hold him accountable for it. The seriousness of his crimes and the need to promote respect for the law and afford just punishment necessitate a substantial term of incarceration. So too does the need to protect the public because Deleon remains a danger. His murderous intent was driven by an extremist ideology ostensibly rooted in his religious beliefs such that his willingness to take up arms remains a grave concern. Deleon was intent on reaching the battlefield and was only foiled in this case by the actions of the FBI.

Lastly, to the extent that others may sympathize with the defendants' extremist views or hold real or perceived grievances of their own, this case is a compelling example of the need to impose a substantial sentence in order to deter individuals from embracing violence and, as Deleon did here, recruiting others to do so.

Accordingly, the government agrees with the Probation Officer and recommends that the Court sentence Deleon to 35 years imprisonment. This term is well below the statutory maximum and the Guidelines range (both of which are life imprisonment) and is sufficient but no greater than necessary to comply with the mandate of 18 U.S.C. § 3553(a).

**II. THE OFFENSE CONDUCT**

The government agrees with, and requests that the Court adopt, as a summary of the facts in this case, the statement of offense conduct set forth in the United States Probation Officer's Revised Presentence Investigation Report ("R-PSR"). <u>See</u> R-PSR ¶¶ 7-20. The full scope of defendants' conduct is set forth in pre-trial filings and the evidence admitted at trial and is partially recounted here.

In approximately August 2010, Kabir influenced Deleon and

Santana to convert to Islam and introduced them to violent jihadist doctrine, including the teachings of Al-Qa'ida spokesman Anwar Al-Awlaki.  Deleon and Santana planned to go overseas to fight ever since they were converted to Islam by Kabir.  See 8/27/14 RT PM Session 8-9; Exhs. 580, 603.  Deleon admitted to the FBI that Kabir introduced him and Santana to Islam, that the group trusted Kabir, and that the idea for joining the Taliban and Al-Qa'ida was Kabir's.  Deleon 302 at 3-4.  Deleon also admitted that the group's plan became possible when Kabir left (Kabir left for Germany in December 2011).  Id.; see 8/26/14 RT AM Session 96-100; Exhs. 694, 696.

Gojali, whom Deleon radicalized and recruited into the plot in approximately September 2012 (8/26/14 RT AM Session 21; 8/27/14 AM Session RT 82-88) testified that he first met Kabir, Deleon, and Santana at their local mosque (8/27/14 RT AM Session 70).  During one of Gojali's first interactions with Deleon, Deleon brought out his laptop and showed him a photograph of Al-Awlaki firing an AK-47 in the desert.  8/27/14 RT AM Session 73.  Before Deleon showed Gojali the photo, Gojali had never before seen Al-Awlaki or a copy of Al-Qa'ida's Inspire magazine, from which the photo came.  Id. at 73, 80.

Deleon and Santana first met the CHS in early 2012.  9/2/14 RT AM Session 55.  Soon thereafter, the FBI, through the CHS and later through the use of recording devices in an apartment, began recording the defendants in numerous conversations.  In one recorded conversation with Gojali, Deleon stated Kabir had been planning jihad for years and that he, Deleon, had been scouting for potential recruits at their mosque, where he developed four candidates, including the CHS, Gojali, and Badal Afman (aka "ABD," whom Deleon later persuaded to drive the conspirators to Mexico).  Exhs. 532,

561; see 8/27/14 RT AM Session 87-88; 8/13/14 RT AM Session 33, 37. In Deleon's words, he scouted and sought to recruit "[e]veryone! Everyone!  Everyone!"  Exh. 532.

Deleon first revealed his intentions to the CHS during a road trip to Las Vegas in May 2012, when, using coded language that he, Santana, and Kabir previously adopted, he told the CHS about his plan to go overseas to fight.  8/27/14 RT AM Session 88; 9/2/14 RT 57; Exhs. 588-91.  Deleon explained that Kabir was then in Germany en route to Afghanistan, where Deleon and Santana intended to go to join Kabir.  Exhs. 588-91; see 8/26/14 RT AM Session 21.

Deleon also introduced the CHS to Al-Awlaki's teachings and routinely espoused jihadist doctrine when talking to the CHS and others.  Deleon and Santana collected Al-Awlaki lectures, recordings of which Deleon often played from his laptop computer while riding in the CHS's car.  See Exhs. 569, 570, 575, 577, 578, 584, 598, 688, 688A-F, 689, 689A-C; 9/2/14 RT 96-105, 112-13.  Moreover, Deleon gave copies of the Al-Awlaki materials to the CHS in the form of a USB thumb-drive (Exhs. 91, 91A, 92, 92A; 8/20/14 RT AM Session 95-99; 8/20/14 RT PM Session 5-16; 9/2/14 RT 96-105, 112-13) and admitted to the FBI that he did so (8/26/14 RT AM Session 23).  Like Gojali, the CHS had never heard Al-Awlaki's lectures before Deleon played them or provided the thumb-drive.  9/2/14 RT 105.[2]

Considerable evidence, including recordings of Deleon's own statements, shows that Deleon subscribed wholeheartedly to the extremist ideology of Al-Awlaki and other terrorist figures who

---

[2] Gojali testified that Deleon's thumb-drive contained lectures about fighting, jihad and "a whole bunch of lectures with Anwar Al-Awlaki," and that Deleon had given it out to several other people at the mosque.  8/27/14 RT AM Session 73-74.

espoused violent jihad against the West, particularly against the United States, as a means to retaliate against the United States for its perceived treatment of Muslims.  Deleon admitted that he listened to Al-Awlaki's lectures, including the more radical lectures, and that he liked Al-Awlaki's passion.  8/26/14 RT AM Session 23.

Deleon regularly discussed Al-Awlaki's teachings throughout the conspiracy.  He knew Al-Awlaki's lectures well, often referring to them by name, including "44 Ways to Support Fisabilillah," "Reviver," "State of the Ummah," "The Dust Will Never Settle Down," "Battle of the Hearts and Minds," and others.  Exh. 570.[3]  As Gojali testified, Deleon looked up to both Al-Awlaki and Al-Qa'ida founder Usama Bin Laden (as well as to Kabir).  8/27/14 RT AM Session 90-91.  During a recorded conversation, Deleon told Gojali that he believed Bin Laden was the greatest shahid (martyr) of all, referring to Al-Qa'ida's war against, and Bin Laden's death at the hands of, the United States.  See Exh. 530; 8/27/14 RT AM Session 75-77, 90-91.  When Gojali expressed reservations about traveling for jihad, Deleon persuaded him by playing a passage from an Al-Awlaki lecture advising would-be jihadists who had children not to worry about their families because God would take care of them.  8/27/14 RT AM Session 81-82.

---

[3]  In a recorded conversation, Deleon stated that he downloaded almost all of the lectures available on a website that disseminates jihadi propaganda (kalumallah.com) and that he had more than 300 hours of lectures.  Exh. 578.  Expert witness Evan Kohlmann testified extensively about Al-Awlaki, his lectures, and their influence as violent jihadist propaganda.  Among other things, Kohlmann explained that, according to Al-Awlaki, it would be difficult to engage in jihad without first making hijrah (emigrating) to Muslim lands and that the concepts are closely intertwined and cannot be separated. 9/9/14 RT AM Session 34-35.  That principle applies directly to this case.  As defense expert Dr. Marc Sageman acknowledged, Al-Awlaki has factored in almost every plot resulting in terrorism charges since approximately 2008.  9/10/14 RT AM Session 85-87.

In addition to the thumb-drive Deleon gave to the CHS, Deleon possessed an extensive collection of jihadist propaganda and Al-Awlaki materials, including lectures and photos of terrorists inspired or tasked by Al-Awlaki such as Nidal Hassan (the Fort Hood shooter) and Umar Farouk Abdulmutallab (the "Underwear Bomber"), on his laptop.  See Exh. 504; 8/19/14 RT AM Session 66-83; 8/20/14 RT AM Session 77-79; 9/5/14 RT AM Session 100-104.

Deleon's online activities mirrored his immersion in radical jihadist doctrine.[4]  For example, Al-Awlaki's lecture "Allah Is Preparing Us For Victory" can be heard in the video "The Light 46: The Black Flags of Khorasan" (Exh. 215), which Deleon posted on Santana's Tumblr webpage in December 2011 (Exh. 486) and also appeared on Kabir's Facebook page in December 2011 (Exh. 712). 8/20/14 RT AM Session 61-64; 9/9/14 RT AM Session 35-42.  In the video, jihadist preachers discuss their vision of the return of a great military leader under the jihadist battle standard (the black flag), the anticipated conquest of the Middle East, and the retaking of Jerusalem.  Exh. 215.  The video includes narration by Al-Awlaki from his lecture "Allah is Preparing Us For Victory," describing the locations where jihads are being fought (Afghanistan, Iraq, Palestine, al-Sham [greater Syria, aka the Levant], and Yemen) and the modern culture of martyrdom that originated in Palestine wherein dead fighters were not mourned but celebrated as in a wedding

---

[4] Deleon's adherence to violent extremist views appeared to continue even during trial in September 2014, when custody officials found that he had marked his cell multiple times with the word "ISIS," referring to the "Islamic State," an extremely violent terrorist army operating under the black flag that has repeatedly beheaded Americans and other foreigners that it captured during combat operations in Syria and elsewhere.  See R-PSR ¶ 61.

celebration.  9/9/14 RT AM Session 42.  Throughout the conspiracy, Deleon, Santana, and Kabir continued to disseminate and discuss extremist jihadist propaganda advocating violence and warfare, including Al-Awlaki's works, postings relating to Sheikh Abdullah Azzam (the "godfather" of contemporary violent jihad; see 9/5/14 RT PM Session 69-72), postings relating to Bin Laden, Al-Qa'ida videos, multiple issues of Al-Qa'ida's Inspire Magazine, Taliban news updates on the war in Afghanistan, and many similar items.  See, e.g., Exhs. 200, 203, 207, 219, 224, 234, 256, 340, 374, 386, 395, 396, 398, 400, 403, 404, 414, 464, 493, 496, 713, 6002, 6003; 9/5/14 RT PM Session 69-72, 79-80.

Deleon admitted to the FBI that his intent was to leave the United States and to take initiative and that he was prepared to die for his beliefs and did not want it to be just talk.  8/26/14 RT AM Session 23-25.  In fact, Deleon did take the initiative, particularly after Kabir informed him that Kabir made arrangements for the men to join him in Afghanistan.  On August 26, 2012, Kabir sent Santana an email saying "everything's set up for you guys out here.  Now you just gotta come."  8/20/14 RT PM Session 65-66; Exh. 429.  On August 31, 2012, Deleon, Santana, and the CHS participated in the "Students" and "Professors" Skype conversation with Kabir, who was then in Kabul, during which Kabir reported that he had contacted the Taliban and made arrangements for Deleon and company to join him.  Exh. 621.

Thereafter, Deleon, acting as emir (leader) took several steps on behalf of the group.  For example, Deleon researched and selected the shooting ranges at which the group later trained, including on one occasion when Deleon specifically did not invite the CHS.  See, e.g., Exh. 95-98, 631.  Deleon decided to obtain a tuition refund and

1    sell his car in order to fund their trip.  See, e.g., Exhs. 519, 550.

2    Deleon also consulted Kabir about obtaining passports and visas (see,

3    e.g., Exhs. 367, 540, 545, 547, 677, 678; 8/26/14 RT AM Session 31-

4    33, 54-55) and later helped Gojali obtain a U.S. passport under false

5    pretenses.  On several occasions, including on October 18, 2012,

6    Deleon informed the group that Kabir stated that physical preparation

7    involving squats was necessary for building lower body and leg

8    strength.  Exh. 524.  As Gojali testified, the group (excluding the

9    CHS) began physical preparations by hiking, running, and going to the

10    gym to work on their legs.  8/27/14 RT PM Session 10.

11    Deleon also personally recruited Gojali to the plot.  As Gojali

12    testified and as Deleon admitted to the FBI, Deleon introduced Gojali

13    to extremist jihadi doctrine, including Al-Awlaki's teachings, and

14    convinced him to abandon his infant daughter and his life in the

15    United States to join Deleon's plan to fight and kill.  See Exh. 527;

16    8/27/14 RT AM Session 72-74, 78-87; 8/27/14 RT PM Session 30.

17    As the defendants' preparations continued, Deleon never wavered.

18    Both he and Santana agreed that violent jihad (which they referred to

19    as jihad fisabilillah) was mandatory.  Exh. 571.  On multiple

20    occasions, the CHS attempted to offer Deleon alternatives to violent

21    jihad, but Deleon expressly rejected those offers and remained

22    committed to taking up arms, even dedicating 99.9% of his prayers to

23    become a martyr.[5]  See, e.g., Exhs. 595, 605, 635, 636, 637; 9/2/14

24    RT 79.  When asked about how he would feel about killing someone,

25

26        [5] In rejecting one of the CHS's suggestions that he obtain a job

27  in marketing, Deleon laughed and said "I studied I did all this
homework and I am just picking up an AK. . . . It is the truth. I
don't care I'll plant a C-4 on me, whatever Allah . . . . That's it

28  man."  Exh. 605.

Deleon answered "man, I, I am so ready."  Exh. 596.  In another conversation about the group's plans for jihad, Deleon explained his view that they "might do time in hellfire" if they did not seek to join the fighting.  Exh. 602.  In October 2012, Deleon, when discussing his views on suicide attacks, explained that suicide bombings were, in his view, justified because "when you press the button, you're trying to kill as many people as you can," and that such an act was not, in fact, suicide because "my intention is to give my life for Allah."  Exh. 515.  Similarly, as Deleon continued to indoctrinate Gojali, Deleon instructed Gojali that if he encountered female U.S. army personnel, he should kill them.  See Exh. 531.  On October 31, 2012, Deleon told a friend that he wanted to die in a drone strike.  Exh. 534.  A week later, as the defendants' departure date approached, when Kabir informed Deleon that Kabir was going on a one-way suicide mission involving explosives, Deleon said he would pray for Kabir and that he, Deleon, was "down with that," meaning would do the same thing.  Exh. 548.

Deleon was resolute and continued to move the group forward.  As he admitted to the FBI, it was he who bought plane tickets for the group to fly to the Middle East.  8/26/14 RT AM Session 26-27.  He then recruited ABD to drive the group to Mexico on the first leg of their journey to engage in violent jihad.  See, e.g., Exh. 559 (recording of Afman discussing driving the men to the border).

## III.  SENTENCING ANALYSIS

When fashioning a sentence, the court must consider the statutory factors set forth in 18 U.S.C. § 3553(a) in light of the "totality of circumstances" relating to the crime and the defendant. United States v. Reyes, 764 F.3d 1184, 1198 (9th Cir. 2014) (quoting

United States v. Carty, 520 F.3d 984, 993 (9th Cir. 2008) (en banc)).

The court must begin by correctly calculating the applicable sentencing range under the United States Sentencing Guidelines, which, although advisory, are "the starting point and the initial benchmark and are to be kept in mind throughout the process." Carty, 520 F.3d at 991 (internal quotation and citation omitted).  After considering the parties' arguments, the court must then determine whether a departure or variance is warranted and, if so, to what extent.  Id.

As discussed below, no departure or variance is warranted here other than the government's recommended term of 420 months, which is no greater than necessary to reflect the serious of Deleon's offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

**A.   The Guidelines Calculations**

The government agrees with, and requests that the Court adopt, the USPO's guidelines calculations as stated in its first PSR, see PSR ¶¶ 24-40, which include the following base offense levels:

Count One, 18 U.S.C. § 2339A: Level 38   USSG §§ 2X2.1, 2A1.2

Count Three, 18 U.S.C. § 956: Level 33   USSG § 2A1.5

Count Five, 18 U.S.C. § 1117: Level 33   USSG § 2A1.5

Because the defendants here intended to kill, and provide material support to the killing of, American and allied forces, the government does not object to the USPO's recommended grouping of the offenses in this case.  See PSR ¶ 25, R-PSR ¶ 25.[6]  Accordingly,

---

[6] Because facts differ from case to case, such grouping is not necessarily appropriate in any other case involving similar counts of conviction.

1    under USSG § 3D1.3(a) the base offense level is derived from Count

2    One.  <u>See</u> PSR ¶ 26, R-PSR 26.

3        The USPO properly assesses that, given Deleon's role as an

4    organizer and leader in the defendants' plot, discussed above and

5    extensively at trial, a two-level increase is warranted under USSG

6    § 3B1.2(c).  <u>See</u> PSR ¶¶ 33-35, R-PSR ¶¶ 32-35.

7        Lastly, as discussed in more detail below, the USPO correctly

8    recognizes that a 12-level increase under USSG § 3A1.4 applies in

9    this case.  <u>See</u> PSR ¶ 32, R-PSR ¶ 31.  As a result, the USPO

10   initially found that the adjusted total adjusted offense level is 52.

11   <u>See</u> PSR ¶¶ 30, 32, 35, 37.  The USPO later found in the revised PSR

12   that the total adjusted offense level is 47.  R-PSR ¶¶ 29, 37.[7]

13   Although paragraph 29 of the revised PSR correctly recites the

14   guidelines provisions applicable to the underlying predicate

15   offenses, including the fact that USSG § 2A1.2 is among the

16   provisions applicable to a violation § 2332(a) (one of the predicates

17   here), the paragraph nonetheless concludes that the lesser provision,

18   USSG § 2A1.5, applies.  <u>See</u> R-PSR ¶ 29.  The revised PSR thus does

19   not account for the § 2332(a) predicate or explain why not.

20       The revised approach is inappropriate.  If the § 2339A

21   conspiracy charged in count 1 had as its only predicate a violation

22   of § 2332(a) (<u>i.e.</u>, a conspiracy to provide material support in

23   furtherance of killing), USSG § 2A1.2 would apply.  The fact that

24   § 2332(a) is not the only predicate here does not justify ignoring it

25   altogether, especially when it remains the most serious.

26   _____

27       [7] It appears that paragraph 26 of the revised PSR, which still
     concludes the total offense level is 52, was overlooked in the
28   revision.

12

In any event, the government agrees, and requests that the Court find, that the total adjusted offense level is the same regardless of whether § 2A1.2 or § 2A1.5 controls.  Under either provision, the resulting offense level is higher than the highest level in the sentencing table (level 43) (see PSR ¶¶ 37-40; R-PSR ¶¶ 37-40) and thus is artificially reduced to level 43.  See USSG Ch. 5, Part A, comment. (n.2); PSR ¶ 40.  By operation of USSG § 3A1.4, Deleon's criminal history category is VI.  See R-PSR at 4, R-PSR ¶ 46. Accordingly, Deleon's guidelines sentencing range is life.[8]

### 1.   The Terrorism Enhancement Applies To All Counts

The government agrees with the probation officer that the terrorism enhancement in USSG § 3A1.4 applies in this case, see R-PSR ¶ 31, not only to the offense resulting in the most serious guidelines range, but to all offenses.  Section 3A1.4 applies to felonies that involved, or were intended to promote, a federal crime of terrorism.  USSG § 3A1.4.  For purposes of the enhancement, a "federal crime of terrorism" means: (a) an offense calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (b) is listed in 18 U.S.C. § 2332b(g)(5).  USSG § 3A1.4, comment. (n.1); 18 U.S.C. § 2332b(g)(5).

> a.   *Each Count Involved Or Was Intended to Promote A § 2332b(g)(5) Offense*

Each of Deleon's counts of conviction involved or was intended to promote terrorism offenses enumerated in § 2332b(g)(5), namely, violations of § 2339A, conspiracy to provide material support (Count

---

[8] The range would be the same even if Deleon's criminal history category was category I.

One); § 956(a), conspiracy to murder overseas (Count Three); and § 1117, conspiracy to murder officers and employees of the United States (the crime Deleon conspired to commit in Count 5).  See 18 U.S.C. § 2332b(g)(5).

> **b.**   *Each Offense Was Intended to Influence, Affect,*
> *Or Retaliate Against Government Conduct*

To satisfy the first prong of the "federal crime of terrorism" definition, the evidence need only prove[9] that the *offense* was calculated to influence or affect government conduct by intimidation or coercion, or to retaliate against government conduct.  Application of § 3A1.4(a) does not require a finding that the defendant was *personally* motivated by a desire to influence or affect the conduct of government, or to retaliate against government conduct.  See United States v. Awan, 607 F.3d 306, 316-318 (2d Cir. 2010) (the government need not show defendant was personally motivated to

---

[9] "The preponderance of evidence standard is generally the appropriate standard for factual findings used at sentencing." United States v. Felix, 561 F.3d 1036, 1045 (9th Cir. 2009). However, in the Ninth Circuit, "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, the government may have to prove the factor by clear and convincing evidence.  Id. (internal quotation marks and citations omitted).  The government recognizes that under current Ninth Circuit law, it must prove the application of USSG § 3A1.4 by clear and convincing evidence.  See United States v. Tankersley, 537 F.3d 1100, 1106 & n.5 (9th Cir. 2008)(assuming, without deciding, that "clear and convincing" standard of proof applies to determination of facts underlying application of USSG § 3A1.4); United States v. Thurston, 2007 WL 1500176, *19 (D. Or. 2007)(finding that "clear and convincing" standard of proof applies to determination of facts underlying application of USSG § 3A1.4).  The government submits that it has done this.  However, for purposes of preserving its position on appeal, and due to the circuit split on this issue, the government argues that the standard of proof for all sentencing factors should be proof by a preponderance of the evidence.  See, e.g., United States v. Graham, 275 F.3d 490, 517 n.19 (6th Cir. 2001)(holding that preponderance of evidence standard of proof applies to determination of facts for application of USSG § 3A1.4).

influence government if it shows that he intended to promote a crime
calculated to have such an effect); United States v. Jayyousi, 657
F.3d 1085, 1114-15 (11th Cir. 2011) (holding that the first prong of
USSG § 3A1.4(a) focuses on the "the intended outcome of the
defendant['s] unlawful acts--i.e., what the activity was calculated
to accomplish, not what the defendant['s] claimed motivation behind
it was . . . . [d]efendant's motive 'is simply not relevant.'");
accord United States v. El-Mezain, 664 F.3d 467, 571 (5th Cir. 2011)
(citing with approval both Awan and Jayyousi); see also United States
v. Chandia, 675 F.3d 329, 340-341 (4th Cir. 2012) (affirming
application of terrorism adjustment where the court reasonably
inferred that the defendant intended to advance the terrorist
organization's purpose based on the defendant's knowledge about the
terrorist organization).

Here, considerable evidence shows that Deleon subscribed
wholeheartedly to the extremist ideology of Al-Awlaki and other
terrorist leaders who espoused violent jihad against the West,
particularly against the United States, as a means to retaliate
against the United States for its perceived treatment of Muslims.
Deleon looked up to both Al-Awlaki and Al-Qa'ida founder Usama Bin
Laden (as well as to Kabir).  8/27/14 RT AM Session 90-91.  For
example, during a recorded conversation played at trial, Deleon told
Gojali that he believed Al-Qa'ida founder Usama Bin Laden was the
greatest shahid (martyr) of all, referring to Al-Qa'ida's conflict
with, and Bin Laden's death at the hands of, the United States.  See
Exh. 530; 8/27/14 RT AM Session 75-77, 90-91.  Deleon frequently
invoked and discussed the teachings of Al-Awlaki, whose lectures (as
well as information about Al-Awlaki disciples and terrorists Nidal

1   Hassan and Umar Farouk Abdulmutallab) he collected on his laptop
2   computer, played during road trips, and referenced during discussions
3   of jihad and the conflict with the United States.  See, e.g., Exhs.
4   486, 570, 572, 577, 584, 602, 606, 608, 612, 636, 640, 688, 688A-F,
5   689, 689A-C, 690, 691, 691-1; 8/13/14 RT AM Session 90; 8/19/14 RT AM
6   Session 73-82; 8/21/14 RT AM Session 77-79; 8/27/14 RT AM Session 73-
7   74; 9/5/14 RT PM Session 100-03; 9/9/14 RT AM Session 35-45.

8       Deleon specifically sought to become a fighter in order to kill
9   his perceived enemies, including American forces viewed as infidels
10   occupying Muslim lands.  In rejecting the CHS's suggested
11   alternatives to violent jihad, Deleon remained committed to taking up
12   arms and dedicated 99.9% of his prayers to becoming a martyr.  See,
13   e.g., Exhs. 595, 605, 635, 636, 637; 9/2/14 RT 79.[10]

14       At trial, Mr. Kohlmann testified extensively about the context
15   of the jihadi movement that Deleon sought to join and the movement's
16   antipathy toward the United States and its allies.  9/9/14 RT AM
17   Session 21-24.  That context leaves no doubt as to the intended
18   effect of the defendants' conduct in this case.

19       The extensive propaganda circulated by the defendants including
20   the teachings of key figures in the global jihadi movement such as
21   Sheikh Abdullah Azzam, the godfather of contemporary violent jihad
22   who taught that the United States is the enemy of the jihadi movement
23   and should be fought.  See, e.g., Exh. 386 (an image of Azzam posted
24   by Deleon with the quote "Death is only but once, so let it be in the

25

26   _____

27       [10] After his arrest, Deleon apparently also viewed the CHS as an
    enemy, as he reportedly asked a fellow inmate whether he would be
    acquitted if the CHS were killed.  See attached Declaration of
28   Christopher D. Grigg at ¶¶ 3-4, 6, and attached Exhibit A at 5.

path of Allah."); 9/5/14 RT PM Session 69-72.[11]   Kohlmann also discussed the history of violent movements like the Taliban and Al-Qa'ida, in their efforts to fight against Soviet, and later American, occupation of the historically Muslim country of Afghanistan.   9/5/14 RT PM Session 77-85.   Kohlmann also noted that the United States military has remained in Afghanistan since the invasion of 2001 (id. at 84), about which Kabir posted (and Deleon liked) reporting of updates by the Taliban about its fight against the U.S. and others, (see, e.g., Exhs. 207 at 19 and 200 at 8).

Kohlmann explained that the invasion of Iraq by the United States and its allies in 2003 and 2004 lent credibility to jihadists' rhetoric and that they used images from the war, such as at Abu Ghraib, as recruiting tools to encourage individuals to fight. 9/5/14 RT PM Session 27-29.[12]   Further, Kohlmann testified that a video posted on Kabir's Facebook Page in January 2012, the Du'a of Sheikh Mohaisany, which Kabir labeled a "powerful prayer" and which Deleon liked, featured graphic images of the 9/11 attacks on the World Trade Center and photos of U.S. leaders with an audio recording of a prayer released soon after the invasion of Iraq literally calling for God to destroy the United States.   9/5/14 RT PM Session 27; Exhs. 224, 493.   The invasion of Iraq resulted in a wave of jihadi fighters going to the Middle East to join the fighting.   Id. at 29.   This is the movement that Deleon and his co-defendants planned to join.

---

[11]   In a recorded conversation, when discussing fighting enemies, presumably the West, Deleon paraphrased a quote published by Al-Qa'ida's media wing and said "No, we love death more than they love life."   Exh. 643; see Exh. 394 (posted on Santana's Tumblr page).

[12]   Dr. Sageman's testimony was similar.   See 9/10/14 RT AM Session 66-70.

The doctrine of Deleon's biggest influence, Al-Awlaki, is particularly instructive.  Al-Awlaki taught that, like his brothers in Al Qa'ida, he came to the conclusion that violent jihad is obligatory upon all Muslims.  9/9/14 RT AM Session 33-34; see Exh. 234.  Kohlmann also testified that Al-Awlaki posted materials condemning Muslims for voting in the American presidential election and ordered Muslims never to vote and instead to participate in violent jihad.  9/5/14 RT PM Session 98-100.  According to Al-Awlaki, it would be difficult to engage in jihad without first making hijrah (emigrating) to Muslim lands and that the concepts are closely intertwined and cannot be separated.  9/9/14 RT AM Session 34-35.

Kohlmann testified about additional works by Al-Awlaki that appear in the defendants' social media and Deleon's digital devices, including a passage of an Al-Awlaki lecture that can be heard in the video "The Light 46: The Black Flags of Khorasan" (Exh. 215), which, as discussed above, both Deleon and Kabir posted online in December 2011 (Exhs. 486, 712).  9/9/14 RT AM Session 35-42.  Kohlmann also discussed another of Al-Awlaki's lectures appearing in the evidence, "The Battle of the Hearts and Minds," in which Al-Awlaki argues that violent jihad is an essential part of the Muslim faith.  Id. at 43.

At trial defense expert Dr. Marc Sageman corroborated much of Kohlmann's testimony.  Among other things, Dr. Sageman confirmed the jihadi movement's antipathy toward the West, including Bin Laden's and Al-Qa'ida's declarations of war against the United States. 9/10/14 RT AM Session 66-70.  According to Dr. Sageman, "the main objection" underlying Al-Qa'ida's calls for war against Americans was the United States' presence on Saudi soil, the land of the two holiest cities in Islam.  Id. at 66.  Dr. Sageman acknowledged that,

18

1   since the U.S. invasions of Afghanistan and Iraq, the Al-Qa'ida

2   movement had flourished.  Id. at 70-71.  According to Dr. Sageman,

3   neo-jihadis viewed the calls by Al-Qa'ida to fight off the American

4   occupiers in Afghanistan and Iraq as religiously obligatory calls to

5   jihad.  9/10/14 RT AM Session 89-90.

6        It was precisely this global jihadist movement's fight against

7   the United States and others that the defendants sought to join

8   here.[13]  Their agreement to do so — and to fight and kill on the

9   battlefield — was undertaken in retaliation for the conduct of the

10  United States and its allies, specifically in occupying Muslim lands

11  in Afghanistan, Iraq, and elsewhere and the perceived oppression of

12  Muslims, and was intended to affect the government conduct by

13  attriting, demoralizing, and driving out the occupiers.

14       **B.   A 420-Month Sentence Represents An Appropriate Variance**

15       The government's recommended sentence of 420 months dramatically

16  varies downward from the guidelines range of life, recognizing in

17  part the nature of the offenses and Deleon's history and

18  circumstances.  The Probation Officer's recommendation does the same.

19  See Revised Rec. Letter at 6.[14]  No further variance is appropriate.

20

21       [13] To the extent that defendant has suggested before and during
    trial that his motive was to defend through violence Muslims in
22  Muslim lands (so-called "defensive jihad"), it is his purpose, not
    his motive that matters.  Jayyousi, 657 F.3d at 1115.  Where, as
23  here, "'that purpose is to promote a terrorism crime, the enhancement
    is triggered.'"  Id. (quoting United States v. Mandhai, 375 F.3d
24  1243, 1248 (11th Cir. 2004).  The fact that defendant believed his
    violent cause was righteous makes the application of § 3A1.4 and a
25  substantial sentence even more appropriate.

26       [14] To the extent that the USPO suggests that "Deleon's young age
    at the time of the instant offense" is a factor favoring a reduced
27  sentence, see Revised Rec. Letter at 6, the government strongly
    disagrees.  There is nothing about Deleon's age that is so unusual to
28  distinguish this case from any other.  If anything, given the need to
                                    *(footnote cont'd on next page)*

                                    19

Deleon may seek to minimize the seriousness of his offense in an effort to obtain a greater variance by arguing that his crimes were merely conspiracies and that no one succeeded in joining terrorists or terrorist groups and no one died.  However, the defendants here failed to reach a battlefield despite their intent and plans, not because of them.  Their plot was disrupted by the FBI, for whose actions defendants cannot be credited.  See United States v. Abu Ali, 528 F.3d 210, 264-65 (4th Cir. 2008) (lack of completion of the crime does not justify a lower sentence where it resulted from arrest, not a change of heart).

In any event, the court should reject the notion that Deleon should receive a lower sentence because he did not actually kill, or support someone else in successfully killing, another person.  First, the Guidelines specifically exclude decreases for conspiracies involving or promoting federal crimes of terrorism.  See id. (citing USSG § 2X1.1).  Second, requiring an actual attack or death raises the bar too high by imposing consequences of completed offenses, not conspiracies such as those charged here.  See id. (actual harm not required to impose a life sentence in a conspiracy case).

Lastly, Deleon may argue that he is a religious person and thus deserves a further downward variance.  Piety, however, is not necessarily a virtue.  United States v. Ressam, 679 F.3d 1069, 1097 (9th Cir. 2012).  "Ordinarily, religious faith is a positive influence, but [Deleon]'s extreme and warped beliefs motivated him to wage war on this country and to try to kill innocent people.  That does not justify a lighter sentence, either."  Id.  If anything, the

protect the public, Deleon's age weighs in favor of a longer sentence.

1   fact that he sought to spread his jihadist beliefs and encourage

2   others to join the conspiracy justifies a tougher sentence than the

3   government recommends here.  Finally, any argument that Deleon

4   deserves credit because he sought to wage war against U.S. and allied

5   forces merely as a means to "defend" Muslims is bankrupt.  A further

6   downward variance would only condone, reward, and thus encourage such

7   rationalizations for violence.  The Court should decline to do so.

8   **C.   The § 3553 Factors Support A Sentence Of At Least 35 years**

9         **1.   Deleon's Offenses Were Extremely Serious**

10       The applicable Guidelines' range of life illustrates the

11  seriousness of the offenses here.  Terrorism offenses represent a

12  particularly grave threat "because of the dangerousness of the crime

13  and the difficulty of deterring and rehabilitating the criminal."

14  United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).  Thus,

15  Congress and the Sentencing Commission were right to conclude "that

16  terrorists and their supporters should be incapacitated for a longer

17  period of time."  Id.  The Ninth Circuit, when reversing a

18  substantively unreasonable sentence in a terrorism case for the

19  second time, expressly shared a similar concern raised by the

20  Eleventh Circuit:

21      [a]lthough recidivism ordinarily decreases with age, we
        have rejected this reasoning as a basis for a sentencing
22      departure for certain classes of criminals, namely sex
        offenders. We also reject this reasoning here. "Terrorists,
23      even those with no prior criminal behavior, are unique
        among criminals in the likelihood of recidivism, the
24      difficulty of rehabilitation, and the need for
        incapacitation."
25
        Ressam, 679 F.3d at 1090 (quoting Jayyousi, 657 F.3d at 1117)
26
    (emphasis added).
27
        Deleon's crimes, particularly his role in recruiting others to
28

1    the plot to join terrorists and kill Americans and others, were

2    extremely serious.  He chose to embrace a violent ideology and, as he

3    told the FBI, take initiative rather than merely talk.  Deleon thus

4    began preparing for war by, among other things, engaging in physical

5    fitness, participating in paintball activities, and shooting assault

6    rifles, including AK-47s, at firearms ranges Deleon specifically

7    sought for that purpose.

8         That Deleon planned to fight and kill overseas rather conduct

9    attacks within the United States is immaterial.  To suggest otherwise

10   wrongly implies that potential victims' lives are somehow worth less

11   if they are located overseas.  Further, the fact that Deleon's choice

12   appears to conform with Al-Awlaki's teachings on the importance of

13   emigrating to Muslim lands before joining a violent jihad against the

14   West only reinforces the gravity of Deleon's conduct here.

15        In its revised recommendation letter, the USPO does not

16   specifically address a significant aggravating factor that sets

17   Deleon apart, namely his efforts to spread extremist jihadi

18   propaganda and recruit others to his violent cause.  Beyond simply

19   taking the initiative to prepare on his own, Deleon took steps on

20   behalf of the group, and, worse, personally recruited Gojali into the

21   plot and sought to recruit others as well.  Although Gojali is

22   responsible for his own actions, Deleon in essence capitalized on the

23   turmoil in Gojali's personal life regarding his infant daughter and

24   her mother, and indoctrinated him with jihadist propaganda.  But for

25   Deleon's efforts, Gojali may never have joined the plot to travel

26   overseas to fight and kill Americans.

27        Deleon's conduct starkly illustrates the Supreme Court's view

28   that the crime of conspiracy is a "distinct evil" that

poses a "threat to the public" over and above the threat of the commission of the relevant substantive crime - both because the "[c]ombination in crime makes more likely the commission of [other] crimes" and because it "decreases the probability that the individuals involved will depart from their path of criminality." Callanan v. United States, 364 U.S. 587, 593-594, 81 S.Ct. 321, 5 L. Ed. 2d 312 (1961); see also United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915) (conspiracy "sometimes quite outweigh[s], in injury to the public, the mere commission of the contemplated crime").

United States v. Jimenez-Recio, 537 U.S. 270, 274-75 (2003).

### 2.   A Lengthy Sentence Is Required to Protect the Public and Deter Similar Crimes

As Dr. Sageman testified at trial, "the greatest threat facing America today comes from terrorist wanna-be[]s who gather information on the Internet and dare each other to take action."  9/10/14 RT AM Session 79, 108.  This is particularly true as "those persons least likely to do harm individually are best able to do so collectively." Id. at 108.  In the terrorism context, the need to deter adherents of neo-jihadi and other violent ideologies from dangerously crossing the line between radicalization (merely embracing extremist doctrine) and mobilization toward violent action, whether individually or in groups, is stronger than in almost any other type of criminal case. The need is particularly acute where a defendant like Deleon not only chooses violence for himself but seeks to recruit others to join him.

Deleon's radicalization while in his early twenties supports the government's recommendation.  His strongly held beliefs, his willingness to go to war in furtherance of those beliefs, and the fact that law enforcement thwarted his efforts, raises a genuine concern that he will continue to pose a threat in the future. Failure to protect against that threat is among the factors that can render a sentence substantively unreasonable.  See Ressam, 679 F.3d

at 1090 ("Concern for the threat that Ressam could pose to our nation is particularly powerful because under the district court's sentence, he would be only 51 years old upon his release from prison.  Most people are sufficiently active and capable at age 51 to do considerable damage, if they are so inclined, and Ressam demonstrated strongly held beliefs and a willingness to attack American interests.").

As a leader and a recruiter, Deleon stands apart from Gojali and Santana, whose conduct was less serious.  Moreover, to the extent that Deleon might argue that the recommended sentence is disproportionate to the maximum terms that Gojali and Santana face under their plea agreements, under Ninth Circuit law Deleon is not similarly situated because they pleaded guilty (and did so early in the case), while he did not.  Ressam, 679 F.3d at 1094-95 (citing Meskini, 319 F.3d at 91) (district court erred in considering sentences of other defendants who were not similarly situated, including those of defendants who pleaded guilty).  Similarly, Deleon may argue that the recommended sentence is higher than the term offered by the government after his proffer session in 2013.  However, that offer was contingent upon Deleon's cooperation, which following his proffer interview, it appeared he was willing to give.  Obviously, circumstances changed.  Accordingly, the Court should not consider the previous offer either.  Id. (rejecting argument that district court should consider offer made when defendant appeared willing to cooperate).

The 420 month sentence that the USPO and the government recommend properly accounts for the seriousness of Deleon's conduct, which distinguishes him from Gojali and Santana.  Further, the

recommended term promotes respect for the law and protects the public from the continuing threat Deleon presents.  Lastly, the recommended sentence affords a measure of deterrence to others contemplating turning to violence in the sake of their beliefs.  A lesser sentence would reward Deleon's rationalizations for his behavior and undermine some if not all of the sentencing factors the Court must consider.  According, the recommended term is sufficient but not greater than necessary to achieve the objectives set forth in 18 U.S.C. § 3553.

**IV.   CONCLUSION**

For the foregoing reasons, the Court should sentence Deleon to a term of 420 months imprisonment followed by a lifetime of supervised release.

Dated: February 9, 2015              Respectfully submitted,

                                     STEPHANIE YONEKURA
                                     Acting United States Attorney

                                     ROBERT E. DUGDALE
                                     Assistant United States Attorney
                                     Chief, Criminal Division


                                     _____/s/_____
                                     SUSAN J. DE WITT
                                     CHRISTOPHER D. GRIGG
                                     ALLEN W. CHIU
                                     Assistant United States Attorneys

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
SUSAN J. DE WITT (Cal. Bar No. 132462)
CHRISTOPHER D. GRIGG (Cal. Bar No. 220243)
Deputy Chief, National Security Section
ALLEN W. CHIU (Cal. Bar No. 240516)
Assistant United States Attorneys
National Security Section
      1300 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-4496/5429
      Facsimile: (213) 894-6436
      E-mail: susan.dewitt@usdoj.gov
             christopher.grigg@usdoj.gov
             allen.chiu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                  UNITED STATES DISTRICT COURT

             FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,          ED No. CR 12-00092(B)-VAP

                                   DECLARATION OF CHRISTOPHER D.
                                   GRIGG IN SUPPORT OF GOVERNMENT'S
                Plaintiff,         POSITION REGARDING SENTENCING FOR
                                   DEFENDANT RALPH KENNETH DELEON;
           v.                      EXHIBIT A

SOHIEL OMAR KABIR, et al.,

                Defendants.        Hearing Date: February 23, 2015
                                   Hearing Time: 9:00 a.m.
                                   Place: Courtroom of the Honorable
                                   Virginia A. Phillips

     The United States of America, by and through its undersigned

counsel, hereby submits the declaration of Christopher D. Grigg and

attached Exhibit A in support of its position regarding sentencing

for defendant Ralph Kenneth Deleon.

///

1    Dated: February 9, 2015          Respectfully submitted,

2                                     STEPHANIE YONEKURA
                                      Acting United States Attorney
3
                                      ROBERT E. DUGDALE
4                                     Assistant United States Attorney
                                      Chief, Criminal Division
5

6                                     _____/s/_____
                                      SUSAN J. DE WITT
7                                     CHRISTOPHER D. GRIGG
                                      ALLEN W. CHIU
8                                     Assistant United States Attorneys
                                      National Security Section
9
                                      Attorneys for Plaintiff
10                                    UNITED STATES OF AMERICA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DECLARATION OF CHRISTOPHER D. GRIGG</u>

I, Christopher D. Grigg, hereby declare and state as follows:

1.   I am an attorney for the government licensed to practice law in the State of California and am assigned to the matter of <u>United States v. Sohiel Omar Kabir, et al.</u>, ED CR No. 12-00092(B)-VAP.  I make this declaration in support of the Government's Position Regarding Sentencing For Defendant Ralph Kenneth Deleon.

2.   After his arrest on November 16, 2012 and subsequent order of detention in this case, defendant Deleon was held in custody for a period of time at the San Bernardino Central Detention Center ("CDC").

3.   On or about January 2, 2012, a Riverside Police Department detective notified the Federal Bureau of Investigation ("FBI") that a CDC inmate had information relating to Deleon.  Approximately two days later, the detective and an FBI agent interviewed the inmate. The inmate also provided documents to law enforcement, including copies of notes ("kites") that Deleon had passed to the inmate while in custody and a handwritten statement by the inmate describing his interactions with Deleon.  <u>See</u> FBI Report Dated January 7, 2013, produced in discovery at Bates Number USA0040122.

4.   The documents obtained from the inmate appear to corroborate the inmate's reported contact with Deleon: the kites appeared to be written in Deleon's handwriting while the statement contained factual details about Deleon and this case that were not public.  The United States produced discovery to defense counsel in this case, including, among other things, copies of a report of the inmate interview, the kites Deleon passed to the inmate, and the inmate's handwritten statement.  <u>See, e.g.</u>, Discovery Materials Bates

1

numbered USA0040122 to USA0040133.

5.   While awaiting trial in this case, Deleon was later transferred from CDC to the Metropolitan Detention Center and thereafter had no further reported contact with the inmate, who remained housed at CDC.

6.   A true and correct copy of the inmate's handwritten statement is attached to the government's sentencing position regarding Deleon and to this declaration as Exhibit A.  At page 5 of the statement, the inmate writes that Deleon asked whether he, Deleon, would "be acquitted" if the "informant," referring to the confidential human source in this case, "were to be "killed.'"

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed February 8, 2015 at Los Angeles, California.


_____/s/_____
Christopher D. Grigg

EXHIBIT A

(1)

SINCE IVE BEEN HOUSED
IN CDC-1ADS-5 RALPH DELTON HAS
BEEN TRYING TO CONVERT ME TO
ISLAM. I FEEL HE IS A DANGER
TO THE UNITED STATES OF
AMERICA. HE HAS TOLD ME THAT
ALLAH ALONE WILL SAVE HIM BUT
HE'S ALSO REFERED TO MUJHADEEN,
JIHAD AND SCRIPTURE PASSAGES FROM
HIS QURAN. HE'S ALSO TRIED TO
RECRUIT ME AND OTHERS TO TURN
OUR BACKS ON OUR NATION WITH
VIOLENCE AND HATERED. HE'S ALSO
STATED THAT HE WAS GOING TO
SELL ALL HIS WORLDLY BELONGINGS
TO OBTAIN DISSCORDS FOR HIS
"MUJHADEEN" BROTHERS OF 12,000
TO FIGHT AGAINST THE UNITED STATES
AND ISREAL TO DEFEAT THE
ANTI-CHRIST AS HE CALLS THE U.S.
HE STATED ITS PROPHECIZED THAT
12,000 MUJHADEEN WILL DEFEAT THE
U.S. AND ITS ALLIES IN THE "ICEY
MOUNTAINS WITH THE BLACK FLAG"
WHICH HE LATER SAID WAS REFERING
TO PAKISTAN AND THE TALIBAN.
HE ALSO STATED HE HAD BEEN
RECIEVING TRAINING IN A

DEADLY MUSLIM MARTIAL ART CALLED "SELOT", AND WAS TO OBTAIN MORE TRAINING ONCE HE ARRIVED IN PAKISTAN BY HIS MENTOR OMAR SOHIL. HE AND TWO OTHERS WERE TO ENTER MEXICO AND FLY TO TURKEY AND WAIT FOR RALPH DELEON'S UNCLE WHO IS A MUSLIM LIVING IN SAUDI ARABIA TO SUPPLY MONEY AND ASSISTANCE TO AL QAIDA FOR ISLAMIC JIHAD PURPOSES. RALPH DELEON WAS EXPLAINING STRAT- EGIC WAYS OF WINNING THE WAR AGAINST "THE UNBELIEVERS" AS HE REFERS TO ANYONE NON MUSLIM. HIS WAY OF WINNING THE WAR IS TO COMMIT ISLAMIC JIHAD OR OBTAIN WEAPONS OF MASS DESTRUCTION. ISLAMIC JIHAD HE SAID WOULD BE DONE AT MILITARY POST ALL OVER THE WORLD UNITED STATES, GERMANY, THE PHILIPPINES, AS WELL AS THE MIDDLE EAST. HE ALSO STATED HE WOULD KILL AND MAIM IN THE NAME OF ALLAH AND JIHAD MEANS

③

"SACRIFICE," IN WHICH HE WONT
HAVE TO WAIT till THE DAY OF
JUDGEMENT TO ENTER HEAVEN
WHICH HE DESCRIBES AS HIS
OWN PALACE IN THE UNIVERSE
WITH 300 ROOMS WITH 100
WOMEN IN EACH ROOM THAT
ARE HIS. HE ALSO STATED HE
WOULD BE DOING DRUGS IN
HEAVEN AS WELL.
        WHEN I ASKED HIM
ABOUT HIS LOVED ONES HE SAID
NO ONE WILL FEEL CONNECTED
ON THE DAY OF JUDGEMENT
AND ALL NONBELIEVERS ARE
GOING TO "HELL FIRE." HE'S
ALSO STATED THE MOSQUE IN
POMONA IS WHERE HE WAS
DIRECTED TO BY OMAR SOHIL
AND ITS A SPECIAL MOSQUE
WHERE HE WAS TRAINING IN
THE MARTIAL ART SELOT
WHICH ACCORDING TO HIM IS
BANNED IN THE UFC BECAUSE
ITS SO "DEADLY" AND CAN "KILL"
MULTIPLE ENEMIES AT A
TIME. HE HAS ALSO RECRUITED
OTHERS IN TO "HIS" ISLAMIC

Ⓐ

CULT AS WELL AS HIS CO-DEFEND-
ANTS. ONE OF THESE RECRUITS
WAS IN CELL 1-ADS-1 BY THE
MONIKER "SCRAPPY." HE WAS
ALSO TEACHING "SCRAPPY"
SELOT.

        RALPH DELEON PREYS
ON PEOPLE HE DEEMS AS WEAK
MINDED INDIVIDUALS, AS WELL
AS THE FAITHLESS. HE ALSO
REFERS TO VIOLENT PASSAGES
IN HIS QURAN WHICH HE HAS
TRIED TO HAVE ME READ ON
MULTIPLE OCCASIONS. HE HAS
ALSO TOLD ME TO GO TO THE
MOSQUE IN POMONA CALLED
"MASJID SABEREEN" OR "MOSQUE
OF THE PATIENT. HE ALSO
STATED I WOULD BE GOOD TO
HELP OUT THE "CAUSE" WITH
MY "UNDERWORLD" CONNECTIONS
AS FAR AS SELLING DRUGS
TO FINANCE AL QADA AS WELL
AS OBTAINING FAKE OR FORGED
DOCUMENTS FOR OTHERS
WHO ARE LAYING DOREMANT
"INTIL THE PROPER TIME
TO "STRIKE". HE ALSO SAYS

(5)

THAT 9/11 (TWIN TOWERS) WAS
REFERING TO A PASSAGE OUT OF
THE QURAN CHAPTER 9:111
WHICH TALKS ABOUT ISLAMIC
JIHAD. HE ALSO REFERED TO
CHAPTER 8:12,15,16,19,24,30,50,
74,75 CHAPTER 33:61 CHAPTER
47:4 AND CHAPTER 61:4,11,12.
WHEN I ASKED WHY THESE
CHAPTERS WERE SPECIAL HE
STARTED TO READ THEM AND I
NOTICED THEY WERE UNDER-
LINED HE STATED ITS A MESSAGE
FROM ALLAH. MR DELEON ALSO
ASKED IF THE INFORMANT
WERE TO BE "KILLED" WOULD HE
BE AQUITTED. HE REFERS TO
THE INFORMANT AS "CAMRY."
HE SAID "CAMRY" KNOWS ABOUT
200⁰⁰ DOLLARS HE SENT TO
OMAR SOHIL IN PAKISTAN TO
AID IN AL QADAS EFFORTS. HE
SAID THEY WERE USING THE
INFORMANT FOR ROOM AND
BORED AND AS A TAXI TO
LAS VEGAS AND CHICAGO.
WHEN I ASKED MR
DELEON WHAT WOULD HAPPEN

(6)

TO THE CHILDREN AND INNOCENT
PEOPLE IN THIS "WAR". HE
SAID THE CHILDREN WOULD GO
TO HEAVEN WHILE ALL NON-
BELIEVERS WILL GO TO "HELLFIRE"
HE ALSO SAID HE AND HIS CO-
CONSPIRATORS WERE HOPEING
TO DIE IN THE NAME OF ALLAH,
AND THAT ALL NON BELIEVERS
ARE SPEAKING bad about the
PROPHET MOHAMMD AND IN
ISLAM ITS SAY THEY SHOULD
BE KILLED. HE SAYS IT WILL
BE AN HONAR TO DIE IN THE
NAME OF ALLAH LIKE THE
MUJHADEEN AND JINADIST WHOS
CORPSE BARES SMILES BECAUSE
THEY'RE IN HEAVEN AND WHO
SOULS WILL BE THROWN BACK
INTO THEIR BODIES ON JUDGE-
MENT DAY TO GAURD "ALLAH" WHU
AKU 75.
          I KNOW I'M INCARCER-
ATED BUT I BELIEVE IN GOD
AND KNOW THERE IS EVIL
IN THIS WORLD NOW. I LOVE
MY COUNTRY AND MY WHOLE
FAMILY ARE AMERICANS

-7-

I DON'T MEAN TO CAST
JUDGEMENT ON MUSLIMS but
THIS ENCOUNTER HAS SHOWED
ME THE VIOLENT, CULT-LIKE
VIEWS THAT TERRORIZE OUR
NATION AND WORLD. I FEEL
ITS RIGHT FOR ME TO
REPORT THIS MATTER TO THE
PROPER AUTHORITIES AND
IF I CAN BE OF ANY MORE
ASSISTANCE FEEL FREE TO
ASK. THANK YOU.

SINCERLY