1

2

3                                                    O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF        )   Case No. ED CR 12-00092-(B)-
    AMERICA,                )   VAP
12                          )
                 Plaintiff, )   **ORDER DENYING DELEON'S**
13                          )   **MOTION FOR POST-VERDICT**
          v.                )   **JUDGMENT OF ACQUITTAL OR A**
14                          )   **NEW TRIAL (DOC. NO. 714)**
    (1) SOHIEL OMAR KABIR   )
15  (2) RALPH KENNETH DeLEON)   **[Motion filed on January 12,**
                            )   **2015]**
16                          )
                 Defendants.)
17  _____)

18

19       On September 25, 2014, a jury convicted Defendant Ralph

20  Kenneth Deleon ("Deleon") of conspiring to provide material

21  support to terrorists in violation of 18 U.S.C. § 2339A;

22  conspiring to murder, kidnap, or maim overseas in violation

23  of 18 U.S.C. § 956(a); and conspiring to kill officers and

24  employees of the United States in violation of 18 U.S.C. §§

25  1117 and 1114.

26

27       On January 12, 2015, Deleon filed a Motion for Post-

28  Verdict Judgment of Acquittal or a New Trial.  (Doc. No.

714 ("Motion").)   After considering all the briefing as well as the arguments advanced at the hearing conducted on February 9, 2015, the Court DENIES the Motion.

## I. BACKGROUND

Before trial, on June 11, 2014, the Court addressed the Government's Motion in Limine to Preclude an Entrapment Defense.  (Doc. No. 357 ("MIL Order").)  Even if Deleon's proffered evidence met the low threshold entitling him to an entrapment defense, the Court determined it "need not make a final determination until all the evidence has been introduced by the end of the trial."  (Id. at 9.)  Deleon could "introduce the evidence [he] claims would ultimately support an instruction on . . . entrapment," and then, "at the appropriate time during the charging conference," the Court would "determine whether an instruction on the entrapment defense is appropriate and supported by the law and the evidence."  (Id.)  The Court therefore allowed Deleon to present evidence pertaining to an entrapment defense throughout trial.

After the Government rested its case, the Court heard from Deleon on his request for an entrapment instruction; the Court denied that request on September 15, 2014, in a written Order.  (Doc. No. 660 ("Entrapment Order").)  The Court considered all the facts Deleon now presents in this Motion in that Entrapment Order, but of course did not

consider a Seventh Circuit, en banc decision -- United States v. Mayfield, 771, F.3d 417 (7th Cir. 2014) (en banc) -- because it was decided after the jury delivered a verdict in this case.  Deleon's Motion asks that this Court reconsider its Entrapment Order in light of Mayfield.

Mayfield, a Seventh Circuit decision, is not binding precedent.  Furthermore, the case does not change the law on entrapment and does not alter the Entrapment Order's holding.  It is, moreover, easily distinguishable.

## II. LEGAL STANDARD

### A.  Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 provides that a court may set aside a guilty verdict and enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29(a), (c)(2).

In reviewing a post-conviction challenge to the sufficiency of the evidence, the court must first "consider the evidence presented at trial in the light most favorable to the prosecution."  United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).  Next, "after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow 'any

rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" <u>Id.</u> (emphasis in original) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)).  It must resolve conflicting evidence in favor of the jury's verdict, and draw all reasonable inferences in favor of the government. <u>United States v. Corona-Verbera</u>, 509 F.3d 1105, 1117 (9th Cir. 2007) (citations omitted).

In performing this analysis, the court "may not 'ask itself whether <i>it</i> believes that the evidence at the trial established guilt beyond a reasonable doubt,' only whether '<i>any</i>' rational trier of fact could have made that finding." <u>Nevils</u>, 598 F.3d at 1164 (quoting <u>Jackson</u>, 443 U.S. at 318-19 (citation omitted) (emphasis in original).  Further, it is the exclusive domain of the jury "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Jackson</u>, 443 U.S. at 319.

**B.  Motion for New Trial**

Rule 33 permits the court to grant a defendant's motion for new trial when the "interest of justice so requires." Fed. R. Crim. P. 33(a).  "A district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal." <u>United States v. Alston</u>, 974 F.2d 1206, 1211 (9th Cir. 1992) (citations omitted).  Although the decision on a motion for

new trial is entrusted to the sound discretion of the trial court, the discretion is not unconstrained and a new trial may only be granted if "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 1985) (citations omitted).

Deleon's Motion does not fit within the Rule 29 framework because he does not argue the evidence is insufficient to sustain a conviction. He only argues this Court erred when it did not grant his request for an entrapment jury instruction. His Motion therefore is analyzed within the Rule 33 framework.

**C.   Entrapment**

"The entrapment defense has two elements: '(1) the defendant was induced to commit the crime by a government agent, and (2) he was not otherwise predisposed to commit the crime.'" United States v. Spentz, 653 F.3d 815, 818 (9th Cir. 2011) (citing United States v. Barry, 814 F.2d 1400, 1401 (9th Cir. 1987)); United States v. Si, 343 F.3d 1116, 1125 (9th Cir. 2003); United States v. Rhodes, 713 F.2d 463, 467 (9th Cir. 1983). "A defendant is not entitled to have the issue of entrapment submitted to the jury in the absence of evidence showing some inducement by a government agent *and* a lack of predisposition by the

defendant." <u>Rhodes</u>, 713 F.2d at 467 (emphasis in original).

The Ninth Circuit has identified five factors to consider in determining whether a defendant was predisposed to commit the charged crimes: (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of the criminal activity was initially made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the Government. <u>United States v. Cortes</u>, 757 F.3d 850, 858 (9th Cir. 2014) (quoting <u>United States v. Busby</u>, 780 F.2d 804, 807 (9th Cir. 1986)). "Although none of these factors is controlling, the defendant's reluctance to engage in criminal activity is the most important." <u>Id.</u> (quoting <u>Busby</u>, 780 F.2d at 807).

"Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or

friendship." <u>United States v. Davis</u>, 36 F.3d 1424, 1430 (9th Cir. 1994).

It is proper "for the government to use a 'sting' . . . . . Without this kind of law enforcement weapon, it would prove difficult, or impossible, to stop certain serious criminal activity, particularly . . . crimes in which no direct participant wants the crime detected." <u>United States v. Vega</u>, 102 F.3d 1301, 1305 (1st Cir. 1996). "The Government may use informants and pay them. To win a suspect's confidence, an informant must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to establish a rapport with the subject." <u>United States v. Slaughter</u>, 891 F.2d 691, 695 (9th Cir. 1989) (citations and quotations omitted).

A defendant need only present "slight evidence" of entrapment to present the defense to the jury. <u>United States v. Gurolla</u>, 333 F.3d 944, 956 (9th Cir. 2003). "Only slight evidence will create the factual issue necessary to get the defense to the jury, even though the evidence is weak, insufficient, inconsistent, or of doubtful credibility." <u>Id.</u> at 951 (citing <u>United States v. Becerra</u>, 992 F.2d 960, 963 (9th Cir. 1993)). Again, however, the defendant must show slight evidence of both elements. <u>Id.</u>

**III. DISCUSSION**

The Court begins with an analysis of the facts in the Entrapment Order.  It then discusses the law on entrapment as laid out in <u>Mayfield</u> and compares that to the law the Court previously applied in the Entrapment Order.  Finally, the Court shows why <u>Mayfield</u> is distinguishable from this case.

**A.   The Entrapment Order**

In the Entrapment Order, the Court held Deleon could not show slight evidence of either element of entrapment. Deleon's discussion of the facts in his Motion does not alter the Entrapment Order's holding.  (<u>See</u> Motion at 11-17.)

**1.   Predisposition**

Deleon failed to show he can satisfy the requirement of showing even slight evidence of "lack of predisposition," the first element of an entrapment defense.

In arguing he was entitled to a jury instruction on this defense, Deleon first cited his lack of criminal history, and lack of any financial or profit motive for the alleged criminal conduct in this case.  Although the Ninth Circuit has identified these as factors to consider, their absence alone does not suffice; otherwise, all first time offenders whose charged crime did not involve a financial

1 motivation would be entitled _per se_ to a finding of a lack

2 of predisposition.

3

4     Next, Deleon referred to the initial report from the

5 Confidential Informant ("CI") to the FBI describing Deleon

6 as non-violent, interested in finishing his undergraduate

7 degree, very "career-minded," and interested in working

8 with his uncle in Saudi Arabia.  This report of the CI's

9 initial impressions of Deleon, however, was made _before_

10 Deleon told the CI of the group's plan to travel to the

11 Middle East to fight.  Furthermore, even in that early

12 report, the Court found, the CI noted that Deleon was

13 sympathetic to those who wished to carry out violent jihad.

14 In any event, once Deleon disclosed the plan to go to

15 Afghanistan and fight with the mujahidin, the CI's initial

16 impression dissolved.

17

18     In essence, Deleon argued that before the CI's

19 involvement, Deleon was a college student, living at home

20 with his parents and siblings, planning to graduate and go

21 to Saudi Arabia to work with his uncle; but for the CI's

22 involvement,[1] he would never have sold his car and withdrawn

23 from college shortly before graduating to finance the

24 group's travel to Afghanistan.  The Court held this

25

26 _____

27     [1]None of the Defendants in this case had any direct
contact with law enforcement agents before their arrests,
28 so any suggestion of contact to support an entrapment
defense must be based on their interactions with the CI.

1  argument was belied by the evidence actually introduced at
2  trial.

3

4      First, the Government introduced evidence which was
5  never disputed that Deleon had formed the intent to go
6  overseas and fight months before he met the CI in February
7  2012.  For example, Deleon told Gojali he had been planning
8  to go to the Middle East and fight ever since Kabir had
9  converted him to Islam in September of 2010.  (RT 8/27/14
10 PM Session at 8 (Testimony of Gojali); 8/26/14 AM Session
11 at 23 (Testimony of SA Lee).)   FBI SA Wade Lee testified
12 that Deleon admitted to him that Deleon, Santana, and Kabir
13 had formed their plan to travel to Afghanistan in order to
14 fight "in the front lines" months before any of them met
15 the CI.  (RT, 8/26/14 AM Session at 20-21 (Testimony of SA
16 Lee).)  Deleon told the CI during the group's trip to Las
17 Vegas in May 2012 about the plan to go abroad and fight;
18 the CI testified to the same effect at trial.  (RT, 9/02/14
19 AM Session at 57 (Testimony of CI Hammad); RT, 8/26/14 AM
20 Session at 20-27 (Testimony of SA Nader); Exs. 588-591.)

21

22     Deleon introduced no evidence that the CI initially
23 suggested the criminal activity in this case.  Although the
24 group's plan was refined later, it was not one that was
25 suggested or initiated by the CI.  The CI did not introduce
26 Deleon (or the other Defendants) to the teachings of Anwar
27 Al-Awlaki; rather, Deleon gave a USB thumb drive with Al-

28

Awlaki's lectures to the CI. (RT, 8/20/14 PM Session at 12 (Testimony of SA Nader).)  And when Deleon recruited Gojali to join the group, the group's plan was "to meet up with Mr. Kabir in Afghanistan." (RT, 8/28/14 AM Session at 89 (Testimony of Gojali).)  Furthermore, the evidence was uncontradicted that Deleon was posting videos of Al-Awlaki lectures on social media, including lectures advocating the killing of Americans and others in the course of violent jihad, months before he met the CI. (See Exs. 486, 511.)

In fact, Deleon told the FBI agents that although at first the group did not have a concrete plan on how to get training from the Taliban, "as things progressed, a plan became possible later on."  This testimony was corroborated by Gojali, the Court found, who testified that the plans to go overseas started to become more real, and the group began to prepare themselves by training for the terrain in Afghanistan; by going to firing ranges to train for combat in Afghanistan; going to paintball ranges to train because, according to Deleon, this was "the closest thing to live combat," which Gojali understood meant training for "if they were to go to Afghanistan and fight."  (RT, 8/28/14 AM Session at 102-104 (Gojali Testimony).)  Gojali also testified that the group's plan was to "go out there and defend the Muslims," by which he meant "go out there and [fight] the American soldiers, British, Australian, UN . . . . [to] go out there and fight."  (Id. at 88 (Gojali

Testimony).)   At Deleon's direction, Gojali also began to train at the gym, specifically to build up strength in his legs because Kabir had said they needed to "work out our legs to carry dead weight or to carry weapons . . . in Afghanistan." (Id. (emphasis added).)

The Court noted Deleon also told the FBI agents the many steps that he took to carry out the group's plan to travel overseas to fight:

- he obtained a Phillippines passport;
- he and codefendant Gojali decided to provide false information to the U.S. passport authorities in order to obtain a passport for Gojali on an expedited basis;
- he and Gojali obtained a falsified itinerary to present in connection with the effort to obtain the expedited passport;
- in anticipation of the group's departure, he modified and sanitized his Facebook page in order to "keep under the radar";
- he researched and booked tickets for the group to travel to Istanbul, having decided it was safer to transit through Turkey rather than Dubai en route to Afghanistan, and paid for the tickets[2] by selling his

_____

[2]The defense attempted to argue the CI paid for the tickets, but the Court found this was not so.  When Deleon attempted to pay for the airline tickets with his credit card, the charge was declined due to his low credit limit.  The tickets were then charged to the CI's credit card, and Deleon immediately withdrew funds from
(continued...)

vehicle and getting a refund of his tuition after withdrawing from his college courses;

●he arranged for members of the group to become familiar with the types of weapons used in Afghanistan (according to what he was told by Kabir) by going to firing ranges and practicing with those weapons; and

●he began to train for military combat by working out at a gym and hiking.

All of these are affirmative steps Deleon took, without prodding, persuasion, or inducement from the CI. Finally, Deleon specifically told the agents he intended to leave the country to fight, to take the initiative, and "he didn't want it to be just talk." (RT, 8/26/14 AM Session at 20-41 (Testimony of SA Lee).)

In short, the Court found no evidence that the CI made the initial suggestion of criminal conduct; rather, Deleon invited him to join a conspiracy in existence months before the CI met Deleon or Santana. Even after meeting the CI, moreover, Deleon continued to take the initiative to define and implement the group's plan.

As to the fourth and fifth factors noted by the Ninth Circuit in Cortes, the Court found that the only evidence

---

[2](...continued)
his checking account and reimbursed the CI for the cost of the tickets.

Deleon cited as showing any reluctance on his part to commit the charged criminal conduct, overcome by persistent persuasion by the CI, was (1) a conversation regarding the group's destination during which the CI "persuaded" him that the group should travel to Afghanistan to fight, and (2) statements from Deleon that he originally intended only to engage in defensive fighting to protect his fellow Muslims.   Again, the Court held the actual evidence introduced at trial belied the contention regarding this purported "slight evidence" of lack of predisposition.

Deleon and the other defendants did discuss possible destinations other than Afghanistan during the course of the planning and preparation, including Syria, Yemen, Saudi Arabia, and Palestine.   There was evidence that Kabir may have wanted to travel with the rest of the group to Yemen eventually.   Insofar as Deleon argued the record contains evidence that he evinced any reluctance to engage in the charged conduct, however, the Court held that contention simply lacked factual support.   In one conversation with several members of the group who were discussing the merits of various destinations, the CI asked questions about who they intended to fight in Yemen, for example, and pointed out the disadvantages of some of the choices under consideration.   During this conversation – as well as others when the details of the travel overseas were discussed – the Court found Deleon never expressed

14

reluctance to engage in any of the charged criminal conduct, however. It determined the record was filled with evidence, for example, that (1) Deleon led the group in training and preparation for travel to Afghanistan, preparation that included firearms practice to use weaponry used in that country and physical training for the terrain in Afghanistan; (2) Deleon planned to travel to Afghanistan from the time he, Kabir and Santana first developed the plot; and (3) when Deleon recruited Gojali to join the group, he told Gojali the plan was to join Kabir in Afghanistan. Whether the group would have traveled to a different country after Afghanistan was a different and irrelevant question, the Court determined.

Deleon also argued there was evidence he only intended to engage in "defensive" fighting to protect Muslims, and the plan to engage in combat was the result of persuasion by the CI. Again, the Court found this argument was supported by no evidence in the record, which actually suggested otherwise. Gojali testified that the group's plan was to "go out there and defend the Muslims," by which he meant "go out there and [fight] the American soldiers, British, Australian, UN . . . [to] go out there and fight." (RT, 8/28/14 AM Session at 88 (Gojali testimony).) In Deleon's own words in multiple conversations, he expressed his desire to die as a martyr, and to marry so that he could increase his rewards when he did so. The evidence

presented during trial simply did not support the argument that Deleon expressed or evinced reluctance only overcome by the CI's persuasion.

In fact, the CI took steps to try to dissuade Deleon from engaging in the planned criminal conduct. The CI offered to begin a business relationship with Deleon. He encouraged him to get married and raise a family as an alternative form of jihad. As mentioned above, however, Deleon stated he was only interested in marrying because he thought his heavenly rewards would be greater if he was married when he died while committing jihad. In other words, despite the CI's efforts to deflect him, Deleon remained fervent in his desire to engage in violent jihad.

As in the instant Motion, Deleon previously suggested the nature of the persuasion or inducement used by the CI was "subtle" or "manipulation." The examples of this manipulation consisted of the age difference between the two men; an instance when the CI, at Deleon's request, picked up his younger brother Michael from high school to protect him from bullying and gave Michael advice about fighting and told Michael he could call him (the CI) "Babba," which Michael understood to be the Arabic word for "guardian;" and a time at the Shabreen mosque when the CI hosted a banquet for a purported dead relative. This type

of conduct, contended Deleon, made him look up to the CI, and easily manipulated by him.

The Court held this evidence does not consist of even slight evidence of inducement or persuasion to commit the charged criminal conduct.  It may have been a way for the CI to gain Deleon's trust, but the Government is permitted to use such tactics.  <u>See</u> <u>Vegra</u>, 102 F.3d at 1305.  Here, the CI gained trust and sympathy to infiltrate and gain information about the conspiracy, the Court found.  He did not use that trust and sympathy to induce or influence the conspiracy.

## 2.   Inducement

Although the absence of evidence to support lack of predisposition was enough to doom Deleon's request for an entrapment instruction, the Court considered as well whether there was slight evidence of inducement, the other required element.

Deleon argued the CI engaged in "subtle" inducement, as detailed above.  Again, the Court held this argument failed as the Government is entitled to infiltrate and gain information about a conspiracy.  The conduct here only enabled the CI to gather information – not influence the conspiracy.  The evidence cited by Deleon as inducement did not affect the conspiracy's goals.

Deleon also contended that the CI paid for "everything." That, the Court found, was not so. In fact, the evidence at trial showed that the CI contributed toward the expenses for the group's trips to the paintball and firing range, paid for some meals, and paid for a hotel room during trips to Las Vegas and San Diego that the group had already planned. The major expense – plane tickets to Turkey – was borne by Deleon, who dropped out of school, got a tuition refund, and sold his car to finance the tickets. He did those things at the suggestion and with the encouragement of defendant Kabir, not the CI. Even with respect to outings to the paintball and shooting ranges, it was Deleon who came up with the plans of where and when to go. The CI may have helped defray some of the expenses, but Deleon researched, planned and led the outings.

The Government also pointed out that the CI suggested to the conspirators that they engage in non-violent jihad. Deleon and the others flatly rejected this suggestion.

Deleon pointed to three United States Supreme Court cases to demonstrate that subtle governmental pressure can amount to inducement. See Jacobson v. United States, 503 U.S. 540 (1992); Sherman v. United States, 356 U.S. 369 (1958); Sorrells v. United States, 287 U.S. 435 (1932). Each of these, the Court held, is distinguishable: in each,

the Government was the first to reach out to the defendant about committing the illegal action.  See Jacobson, 503 U.S. at 552-53; Sherman, 356 U.S. at 372-373; Sorrells, 287 U.S. at 439-40.  That simply did not happen here.

### 3.   Other Arguments

Deleon raised a few other arguments.  The Court found none convincing.

Deleon asserted that a conversation the CI had only with Gojali should be considered as to whether the CI induced Deleon to engage in criminal conduct.  Even accepting for the sake of argument that statements to Gojali could show inducement to Deleon, the Court found Deleon had mischaracterized the relevant conversation the CI had with Gojali.  In fact, the conversation Deleon cites is one where the CI is attempting to prod and question to ensure Gojali was serious about engaging in criminal activity.

Deleon also argued that the CI used inflammatory language, including cursing, to get the conspirators "fired up."  The record, the Court found, did not support this assertion.

Finally, Deleon cited to a number of other cases for support for his request for an entrapment instruction.  See

1 | <u>United States v. Fleishman</u>, 684 F.2d 1329 (9th Cir. 1982);
2 | <u>United States v. Anglada</u>, 524 F.2d 296 (2d Cir. 1975);
3 | <u>United States v. Riley</u>, 363 F.2d 955 (2d Cir. 1966).  The
4 | Court noted these cases are outdated, two are not from this
5 | Circuit, and none are helpful.

**B.   <u>Mayfield</u> Does Not Change the Law on Entrapment**

On November 13, 2014, after the jury delivered a verdict in this case, the Seventh Circuit issued an <u>en banc</u> decision in <u>Mayfield</u>.  That case, of course, is not binding precedent.  Moreover, it does not cite or discuss Ninth Circuit authority.  Finally, it does not fundamentally change the basic tenets of the law on entrapment.

In <u>Mayfield</u>, the court sought to clarify the Seventh Circuit's entrapment case law, which the court noted gave "conflicting signals" and "conflicting guidance about the meaning of 'inducement' and 'predisposition.'" <u>Mayfield</u>, 771 F.3d at 424, 431.  It confirmed that the defense has two elements -- predisposition and inducement -- which, although related, are formally distinct.  <u>Id.</u> at 430-31.

1        **1.   <u>Mayfield</u>: Predisposition**

2        Regarding predisposition, the <u>Mayfield</u> court endorsed

3  the nonexclusive five factor test used in the Ninth

4  Circuit, which the Court also applied in the Entrapment

5  Order.  <u>Id.</u> at 435.   As the Ninth Circuit has held, the

6  <u>Mayfield</u> court noted that while no one factor controls, the

7  "most significant is whether the defendant was reluctant to

8  commit the offense."  <u>Id.</u> (quotation omitted).   This Court

9  also emphasized the importance of reluctance in its

10 Entrapment Order.   (Entrapment Order at 3.)

11

12        <u>Mayfield</u> generally noted predisposition "refers to the

13 likelihood that the defendant would have committed the

14 crime without the government's intervention, or actively

15 wanted to but hadn't yet found the means."  <u>Mayfield</u> 771

16 F.3d at 436.   A "predisposed person is one who is presently

17 <u>ready and willing</u> to commit the crime."  <u>Id.</u> (internal

18 quotation omitted) (emphasis in original).   The court also

19 noted that "predisposition is measured <u>prior</u> to the

20 government's attempts to persuade the defendant to commit

21 the crime," <u>id.</u> (emphasis in original), and that evidence

22 of the defendant's conduct after contact with the

23 government is relevant, <u>id.</u> at 437.   Lastly, the court held

24 that the nature of the government inducement is also

25 relevant to predisposition, but reaffirmed that a

26 defendant's reluctance "looms large in the analysis."  <u>Id.</u>

27

28

These principles are consistent with the law that the Court applied in the Entrapment Order.

Deleon argues in his Motion that almost all of his actions relating to the conspiracy occurred after he met the informant, and therefore, he claims, were caused by the informant. (Motion at 12.) As the Government points out, this argument is a classic logical fallacy. See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (rejecting the "logical fallacy of post hoc, ergo properter hoc, literally, 'after this, therefore because of this'"). This argument is, moreover, belied by the evidence the Court discussed in the Entrapment Order. (See Entrapment Order at 6-8.) Deleon also argues much of the evidence the Court relied on in the Entrapment Order "were really issues of fact and involved issues of witness credibility, which are solely within the province of the jury to determine." (Motion at 14 (emphasis in original).) Deleon has not actually controverted any of the evidence, however, except through his own rhetoric. Furthermore, the Court accepted Deleon's proffered facts as true when deciding the MIL Order and the Entrapment Order.

####      2.   **Mayfield**: **Inducement**

**Mayfield** defined inducement as more than mere solicitation of the crime; "inducement means government solicitation of the crime <u>plus</u> some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." <u>Id.</u> at 434-35 (emphasis in original).  This is consistent with the Ninth Circuit's definition of inducement: "government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense," conduct which "consists of an opportunity <u>plus</u> something else." <u>United States v. Cortes</u>, 757 F.3d 850, 858 (9th Cir. 2014) (quoting <u>United States v. Williams</u>, 547 F.3d 1187, 1197 (9th Cir. 2008) and <u>United States v. Poehlman</u>, 217 F.3d 692, 701 (9th Cir. 2000)).  It therefore also affirms the Court's Entrapment Order.  (Entrapment Order at 3, 10-11.)


Deleon focuses on the examples of "other government conduct" <u>Mayfield</u> provided. (Motion at 15.)  By doing so, however, he ignores the first half of the definition of inducement: "solicitation." <u>See</u> <u>Mayfield</u>, 771 F.3d at 434-35 (inducement means "solicitation of the crime <u>plus</u> some other government conduct").  Moreover, the Court already considered the "other government conduct" Deleon points to and held these facts do not amount to even slight evidence

1   of inducement.  (Entrapment Order at 10-11.)  Mayfield does
2   not alter this analysis.

3

4   **C.   Mayfield Is Factually Distinguishable**

5        Finally, Mayfield is factually distinguishable from
6   Deleon's case.   Unlike here, Mayfield involved a sting.
7   The defendant, Mayfield, was not on the government's radar
8   until the informant, who worked with the Bureau of Alcohol,
9   Tobacco, Firearms, and Explosives to identify targets for
10  sting  operations,  brought  him  to  their  attention.
11  Mayfield, 771 F.3d at 420 & n.2.  Also unlike here, the
12  informant's first overture in Mayfield was to invite the
13  defendant to join him in the drug trade.   Id. at 421.
14  Mayfield rebuffed that offer, but the informant next
15  invited Mayfield to participate in a robbery of his
16  narcotics wholesaler.  Id.  Mayfield again rebuffed the
17  offer.  Id.  The informant persisted with daily attempts to
18  persuade Mayfield to join the robbery.  Id.  He even went
19  so far as to give Mayfield money to pay for car repairs,
20  only to make a veiled threat of harsh punishment by a gang
21  if Mayfield failed to repay that debt by agreeing to
22  participate in the robbery.  Id. at 421-22.  Each of the
23  informant's acts in Mayfield was specifically designed to
24  entice or pressure the defendant to commit a crime that the
25  informant proposed.

26

27

28

Unlike the informant in <u>Mayfield</u>, the informant here did not invite or pressure Deleon to join a conspiracy; the defendants' scheme here was well underway by the time the informant first met them.   In fact, Deleon recruited the informant to join the scheme.   The informant even suggested that Deleon pursue peaceful alternatives to violent jihad, but Deleon rejected those suggestions.   The informant did pay for items and took other measures to enable him to gather information, but unlike the informant in <u>Mayfield</u>, the informant here did not take these steps to entice or pressure Deleon to join the conspiracy.   In sum, the facts here are easily distinguishable from the facts in <u>Mayfield</u>.

## IV. CONCLUSION

The only question Deleon presents is whether the Court erred by not granting his request for an entrapment jury instruction.[3]   The Court finds no reason to disturb its

---

[3]Deleon must focus his arguments on the Court's denial of his request for an entrapment jury instruction because he cannot argue the Court prohibited him from presenting evidence of an entrapment defense during trial, or arguing the defense during closing arguments. Not only did Deleon focus on presenting an entrapment defense during trial, almost half of Deleon's closing argument focused on entrapment and pointed an accusatory finger at Mr. Hammad, the CI.   Within a minute of beginning his closing argument, Deleon's counsel stated, "Ladies and gentlemen, this case, I said it at opening, I said it during Mr. Hammad's cross, we would not be here but for Mr. Hammad.   This whole case was manufactured by him."   (RT, 9/17/14 at 94.)   The closing argument included the following, additional highlights:
- "And so [Mr. Hammad] went into attack mode, and he tried to turn Mr. Deleon and turn Mr. Kabir into terrorists.   That was his goal.   That was his plan."
(continued...)

holding in the Entrapment Order.  Accordingly, the Court DENIES the Motion.

**IT IS SO ORDERED.**

Dated: <u>February 13, 2015</u>

_Virginia a. Phillips_

<u>                                    </u>
VIRGINIA A. PHILLIPS
United States District Judge

---

[3](...continued)
(<u>Id.</u> at 97.)
- "Mr. Hammad tore Mr. Deleon up.  He ate up his weaknesses.  And that's what con artists do." (<u>Id.</u> at 101.)
- "Mr. Hammad injected himself as the now-surrogate father or surrogate older brother of Mr. Deleon at a time when he was weak and needed love and guidance. Mr. Hammad took on that role.  And that was manipulation, deception of the highest level." (<u>Id.</u> at 102.)
- "And then the informant goes [into the next phase of his plan], which is, I'm going to take over the parental and big brother role of Mr. Deleon.  You know, I know he's got friction with his family, and I know that as tough as it is for a close-knit family to push your son away, they did it.  And Mr. Hammad was there to be like, Oh, habibi.  Call me father. Call me your brother.  Come with me.  I'll teach you what you need to know." (<u>Id.</u> at 113.)
- "Because what if he had left Mr. Deleon alone? . . . I wonder if the Government ever thought about that. . . . But instead, they sent in Mr. Hammad . . . [who] manipulated, and he twisted, and he poisoned, and he reported back to the FBI, and he selectively recorded things, and he did all of this manipulation to help him." (<u>Id.</u> at 102-03.)
- "So if they wanted to go to a gun range, why didn't they do it between 2010 and 2012 before the informant came in?  Because that wasn't their agenda.  It was the informant's agenda." (<u>Id.</u> at 106.).
- "You know, there is all these things that Mr. Hammad had in his mind that he could do to try and turn these guys into terrorists, and he did it.  You know, lock, stock, and barrel, he followed every trick he knew in the book to try to get these guys to turn into terrorists, all right." (<u>Id.</u> at 106.)