1  David J. Thomas, (SBN: 175180)
   HANNA, BROPHY, MacLEAN, McALEER & JENSEN, LLP
2  1500 Iowa Avenue, Suite 220
   Riverside, CA  92507
3  Telephone: (951) 824-2984
   Facsimile : (951) 779-9494
4  E-mail: dthomas@hannabrophy.com

5  Attorney for Defendant RALPH KENNETH DELEON

6
                 UNITED STATES DISTRICT COURT
7
                 CENTRAL DISTRICT OF CALIFORNIA
8
                 EASTERN DIVISION
9

10  UNITED STATES OF AMERICA,              ED CR 12-00092-VAP-2

11                         Plaintiff,      **DEFENDANT'S SENTENCING
                                           MEMORANDUM**[1]
12  vs.
                                           Sentencing Hearing:
13  RALPH KENNETH DELEON                   Date: 2/23/15
                                           Time: 9:00 a.m.
14                         Defendant.

15

16        Defendant, RALPH KENNETH DELEON, by and through his counsel, David J.

17  Thomas, Hanna, Brophy, MacLean, McAleer & Jensen, LLP, submits this memorandum

18  in order to provide information to assist the Court in fashioning a sentence "sufficient but

19  not greater than necessary" to achieve the statutory purposes of punishment, as

20  required by 18 U.S.C. § 3553(a) in light of United States v. Booker, 125 S. Ct. 738

21  (2005).

22

23  _____

24        [1] Counsel apologizes for the tardiness of this submission.  I've been trying for a few
    months now to get a report from one of the Defense expert consultants to submit in
25  connection with this Sentencing Memorandum.  Unfortunately, due to the expert's
    worsening health problems, which resulted in a series of hospitalizations – including as
26  recent as two weeks ago – he has been unable to provide that report.  A couple of weeks
    ago, counsel filed an ex parte application for a 3-week continuance of the sentencing
27  hearing to allow additional time for CJA to provide funds for another expert to assist with
    providing that report; however, counsel recently learned that the CJA fund request was not
28  approved.

**I.  INTRODUCTION**

Defendant disagrees with the advisory United States Sentencing Guidelines (USSG) range of life in jail, as calculated by the United States Attorney's Office (USAO) and the United States Probation Office (USPO) – based on a total offense level of 43 and a criminal history category of VI.  Defendant contends that the proper USSG range is 135-168, based on a total offense level of 33 and a criminal history category of I, for the reasons stated below.

Pursuant to the 18 U.S.C. § 3553(a) factors, Defendant contends that a sentence of 10 years (120 months) jail accomplishes a sufficient, but not greater than necessary, sentence.

**II.  PRESENTENCE REPORT**[2]

**A.    FACTUAL OBJECTIONS**

**Paragraphs 10, 12 and 14.**  Defendant disagrees with the inclusion of "Al-Qa'ida" in these paragraphs.  Deleon contended that he did not seek to join or support Al-Qa'ida, and the jury was unable to reach a verdict with respect to Counts 2 and 4, which specifically dealt with Al-Qa'ida.

**Paragraph 21.**  Defendant vehemently disagrees with this statement and contends that it is not factually supported by the evidence.  There were many potential "victims" in the numerous ramblings and non-specific ideas discussed among the co-defendants in this case, and to say that the "intended victims in this case were American soldiers and personnel" is clearly not accurate.  This fact is even recognized by the USPO in paragraph 25 of the Presentence Report (PSR), where they state that "the victims of each count are broad and specific victims are not identified."  PSR ¶25.

**Paragraph 26.**  I believe the USPO meant to change the offense level of "52" in this paragraph to "47", in keeping with the other changes it made in the Revised PSR, disclosed on 2/3/15, that are reflected in paragraph 37 of the PSR.

---

[2] Except as otherwise noted, Defendant is referring to the Revised Presentence Report, dated February 2, 2015, and disclosed to the parties on February 3, 2015.

1   **Paragraphs 27, 28 & 31.**  Defendant objects to the 12-level increase in

2   Defendant's offense level, per USSG § 3A1.4.  This will be described in further detail

3   below.

4   **Paragraph 37**.  Defendant contends that the proper Adjusted Offense Level is

5   <u>35</u>, not 47, as described in further detail below.

6   **Paragraph 39.**  Defendant contends that he should be entitled to a 2-level

7   reduction for acceptance of responsibility, for his post-arrest and proffer statements to

8   the Government, which were introduced by the Government at trial.  Defendant mainly

9   went to trial to assert an entrapment defense, which is an issue that "does not relate to

10  factual guilt," and is contemplated by USSG § 3E1.1, Application Note 2.

11  **Paragraph 40**.  Defendant contends that the Total Offense Level is 33.

12  **Paragraph 46**.  Defendant contends that USSG § 3A1.4(b) does not apply, and

13  defendant's criminal history category should remain I, based on 0 criminal history

14  points.

15  **Paragraphs 53 & 55**.  Mr. Deleon's brother's name is spelled "Marc" not "Mark".

16  **Paragraph 58**.  Defendant resided in Chino, not Ontario, at the time of the arrest.

17  **Paragraph 63**.  In the 2nd to last sentence there is a typographical error.  The

18  word "lea" should read "led".

19  **B.   USSG. CALCULATIONS**

20  **1.   The 12-Level Increase per USSG § 3A1.4 Does <u>Not</u> Apply to this case.**

21  As noted by the USPO, in order for this 12-level increase to apply, the offense

22  must be a "felony that involved, or was intended to promote, a federal crime of

23  terrorism".  PSR ¶31.  Application Note of § 3A1.4 states that for purposes of this

24  guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. §

25  2332b(g)(5).  18 U.S.C. §2332b(g)(5) states "the term "Federal crime of terrorism"

26  means an offense that (A) is calculated to influence or affect the conduct of

27  government by intimidation or coercion, or to retaliate against government

28  conduct; **and** (B) is a violation of .....2339A (relating to providing material

1  support to terrorists).  PSR ¶31.  Defendant concedes that one of the 2 requirements of

2  18 U.S.C. § 2332b(g)(5) was met, i.e., that he was convicted ot 18 U.S.C. § 2339A;

3  however, defendant denies that the offense conduct was "calculated to influence or

4  affect the conduct of government by intimidation or coercion, or to retaliate against

5  government conduct."  18 U.S.C. § 2332b(g)(5)(A).

6      The USPO simply states the instant offense is a felony that was intended to

7  promote a Federal crime of terrorism, and therefore a 12-level increase applies;

8  however, this analysis overlooks the facts of this case, and that Defendant had no

9  political motivations in this case, nor did he intend to influence or affect the conduct of

10  the Government.  Defendant's motivations, albeit misguided, were solely religious in

11  nature, and done in an effort to follow what defendant thought was required of being a

12  strict Muslim.

13      To the extent that the Government contends that it is not Mr. Deleon's personal

14  motivation that matters, but rather what the motivations of the designated terrorist

15  organization were, it's extremely important to note that the jury in this case ***did not***

16  ***reach verdicts with respect to Counts 2 and 4, that dealt specifically with Al-***

17  ***Qa'ida, a designated foreign terrorist organization.***  The Government may have a

18  strong argument that Al-Qa'ida has political motivations and intends to affect the

19  conduct of government; however, the jury found that the evidence was insufficient to link

20  Mr. Deleon's motivations to those of Al-Qa'ida – as seen by the lack of verdicts on

21  Counts 2 and 4, which specifically referenced Al-Qa'ida.

22      In this case, we know what Mr. Deleon's motivations were, as he told the

23  Government in a proffer session on April 25, 2013.  His motivations – albeit radical and

24  misguided – were purely religious, and not at all political:

25      "Deleon wanted to immigrate to a Muslim land for "***hijrah***.[3]"  Deleon was
        going to join the fighting if the opportunity was there to defend the

26

27  _____

28      [3] the migration or journey of the Islamic prophet Muhammad and his followers from
    Mecca to Medina.  Wikipedia, http://en.wikipedia.org/wiki/Hijra_(Islam).

***Ummah***[4]. . . . The general plan of the group was to go and fight. Deleon believed there are certain circumstances in which it is acceptable for one to give up his life. . . . Deleon said that he was down with giving his life for ***religion***. Deleon believed that by giving up your life in service, one would gain ***rewards in the afterlife***. People get ***rewards*** for acting with good intentions. . . . . Deleon said that he thought that al Qaeda was fighting for other political reasons. The Taliban were fighting for the ***religion***. Deleon believed the ***Mahdi***[5] was going to return with the Taliban (emphasis added).

## 2.   2-Level Reduction for Acceptance of Responsibility, per § 3E1.1, Application Note 2

As argued above, Defendant contends that Mr. Deleon qualifies for a 2-level reduction for acceptance of responsibility, based on his post-arrest and proffer statements to the Government. This was a major focus of the Government's prosecution, and they consistently referred to Mr. Deleon as having already admitted his misconduct. It was clear at trial that the focus of the Defense strategy was to argue for an entrapment instruction, and in doing so the Defense specifically did not challenge the veracity of Mr. Deleon's proffer statements. Since Mr. Deleon did exercise his Constitutional right to proceed to trial and try to raise an entrapment defense, we are not arguing for the third acceptance point.

## III.   APPROPRIATE SENTENCE – PER 18 U.S.C. 3553(a) FACTORS

### A.   Applicable Law

In determining the appropriate sentence for Mr. Deleon, the Court must consider all of statutory sentencing factors set forth at 18 U.S.C. § 3553(a), including, among other factors, the nature and circumstances of the offense; the history and characteristics of the offender; the need to reflect the seriousness of the offense,

---

[4] In the Quran the ummah typically refers to a single group that shares common religious beliefs, specifically those that are the objects of a divine plan of salvation. Wikipedia, http://en.wikipedia.org/wiki/Ummah.

[5] In Islamic eschatology, the Mahdi is the prophesied redeemer of Islam who will rule for seven, nine, or nineteen years (according to differing interpretations) before the Day of Judgment and will rid the world of evil. Wikipedia, http://en.wikipedia.org/wiki/Mahdi.

1    promote respect for the law, provide just punishment, and afford adequate deterrence;

2    the need to provide the defendant with needed education, vocational training, medical

3    care or other correctional treatment; the applicable sentencing range under the advisory

4    sentencing guidelines; and the need to avoid unwarranted sentencing disparities. 18

5    U.S.C. § 3553(a); United Slates v. Booker, 543 U.S. 220 (2005). The district court may

6    not employ a presumption that the advisory guideline range is the reasonable or

7    appropriate sentence. United States v. Gall, 128 S.Ct. 586,596-97 (2007); see also

8    United States v. Rita, 127 S.Ct. 2456, 2465 (2007), and "extraordinary circumstances

9    are not needed to justify a sentence outside the guidelines range." United States v. Ruff,

10   535 F.3d 999, 1002 (9th Cir. 2008).  Instead, the guidelines are but one of many factors

11   for the Court to consider when imposing sentence, and § 3553(a)(3) directs the judge to

12   consider sentences other than imprisonment." Gall at 602. The task for the Court is to

13   impose a reasonable sentence, based on the individual defendant and the facts and

14   circumstances of the particular case at hand, that is "sufficient, but not greater than

15   necessary," to achieve the statutory purposes of sentencing. 18 U.S.C. § 3553(a).

16   **B.    Relevant Sentencing Factors**

17        **1.    Nature and Circumstances of the Offense**

18        Terrorism normally connotes violence, or the threat of violence, in order to bring

19   about some sort of political change; however, that's not at all what Mr. Deleon's case

20   was about.  This case was about religious fanaticism and misguided zealousness by a

21   young man who's only knowledge of what it meant to be a Muslim came from the most

22   extreme and radical tenets of the religion.

23        Prior to meeting Mr. Kabir in August of 2010, Mr. Deleon had lived his entire 21

24   years of life as a strict Catholic, in a close knit family who went to church every week

25   together and could afford to send him to an exclusive Catholic school while they lived in

26   the Philippines.  However, during the middle of his college years, and after spending

27   more and more time away from his family, and less time at his church, Mr. Deleon

28   began questioning his Catholic upbringing and was introduced to radical and extremist

DEFENDANT'S SENTENCING MEMORANDUM

Muslims.   He became so captivated by the Muslim way of life and their promise for heavenly rewards, that he converted to Islam only a couple short months after meeting Mr. Kabir.  Unfortunately, his formerly close-knit and supportive family rejected his decision to leave the Catholic faith, and shunned him and his Muslim faith – which only drove Mr. Deleon to learn more and more about his newfound Muslim religion, and become strict and extreme in his beliefs.

All of the energy and passion with which Mr. Deleon had approached his life, his sports and his studies in high school was turned into misguided religious zealousness as he dove deeper in to the extremist bowels of the Muslim religion.  He became obsessed with finding, cataloging and listening to every Anwar Al-Awlaki video and audio lecture ever created and he learned an extremist Muslim ideology almost as quickly as he left Catholicism.

Mr. Deleon began to surround himself with others who shared similar extremist Muslim viewpoints, and this turned him further and further away from his family, his Catholic past, and his college and professional aspirations.   Eventually Mr. Deleon spent most of his time consumed with fantasies of becoming a jihadist and defending Muslims in the Middle East in their struggles against the infidels – as he truly believed that supporting jihad was required of all Muslims.

However, at this point in time, Mr. Deleon had never been to the Middle East, had never fired a weapon, had never known a terrorist or had any connections to anyone who was even loosely affiliated with a terrorist organization or had ever committed any violent acts.  This all changed when he met Mr. Hammad – who we all know was a government informant posing as a Muslim extremist with perceived connections to terrorists and money to spend on travels overseas.

Mr. Deleon is a non-violent, friendly, caring and extremely sociable person, who was extremely naive about the Muslim religion and about living in the Middle East.  He had no idea of what it really meant to be a jihadist, and would have had no chance whatsoever of joining any type of religious organization overseas and fighting to defend

1  Muslims.  He likely would have been killed, tortured or held for ransom and would have

2  quickly realized that training to be a religious freedom fighter in a Muslim country was

3  not like the video games he had played nor the website propaganda videos he had

4  watched in the comfort of his own home.

5          **2.      History and Characteristics of Mr. Deleon**

6              **a.      Lack of Criminal History**

7          One of the most significant factors with respect to Mr. Deleon's potential for

8  rehabilitation and likelihood of recidivism is his complete lack of criminal history – not a

9  single arrest or conviction prior to the instant offense.  The primary reason for the

10  Sentencing Guidelines to advise higher guideline sentence for each increase in criminal

11  history category (CHC) is that guideline offenders in higher CHCs are more likely to re-

12  offend within two years of release from prison or upon entering probation status.  Under

13  the primary recidivism measure, offenders in CHC I have a substantially lower risk of

14  recidivating within two years (13.8%) than do offenders in CHC VI (55.2%).[6]

15  Additionally, criminal history points represent the purest form in which the guidelines

16  measure recidivism risk, and offenders with zero (0) criminal history points, like Mr.

17  Deleon, only have a 10% likelihood of recidivating within two years.[7]

18              **b.      Family Circumstances**

19          Mr. Deleon had a very stable and comfortable childhood in the Philippines, during

20  the first 13 years of his life.  His birth parents were married for this entire time, and his

21  childhood was not only good, but somewhat privileged – as Mr. Deleon attended an

22  exclusive Catholic school.  Even after Mr. Deleon's parents divorced and he moved to

23  the United States at age 13, he appeared to have adjusted very well.  Mr. Deleon was

24  described as very fun-loving, popular and sociable in high school – where he

25

26      [6] Measuring Recidivism: The Criminal History Computation of the Federal
Sentencing Guidelines – A Component ot the Fifteen Year Report on the U.S. Sentencing
27  Commissions Legislative Mandate, United States Sentencing Commission, May 2004, page
6 of 38.
28

        [7] Id, at page 7 of 38.

DEFENDANT'S SENTENCING MEMORANDUM

1    participated in sports (e.g., football) and other extra curricular activities (e.g., student

2    council).  (PSR ¶¶54-55.)

3         Mr. Deleon's general reputation in high school was as someone who was very

4    friendly and sociable, and even famous, according to his sister, who went to the same

5    high school and knew many of his friends.  He also hung out a lot at home with his

6    friends, played video games and talked about sports.  In addition to being very friendly

7    and sociable, he was also very grounded spiritually.  While in high school, he continued

8    to go to church every week with his family, and even went through catechism classes

9    and went through a confirmation ceremony at his family's Catholic church.  (Reporter's

10   Transcript ("RT"), Trial Day 21, September 16, 2014, Testimony of Melchor Deleon,

11   pages 25-29.)

12        However, while Mr. Deleon's sociability continued through college, his spirituality

13   did not.  Although he was still living at home while attending college at California State

14   San Bernardino, he stopped regularly attending church with his family.  Instead, he

15   would hang out with his friends on the weekends – either on campus or at their

16   apartments off campus.  He also started dating, partying a lot, and using recreational

17   drugs, like marijuana, cocaine and ecstasy.  (PSR ¶68.)

18        His continued use of marijuana eventually led him to Hooka bars, where he met

19   Mr. Kabir and was introduced to Islam.  In a likely attempt to search for "answers",

20   according to Mr. Deleon's father, Mr. Deleon began questioning his Catholic religion.  At

21   first, Mr. Deleon's father argued with him, and told him he should remain a Catholic.

22   (PSR ¶56.)  His father was so surprised and disappointed that he didn't really want to

23   talk to Mr. Deleon.  In fact, his father insisted that they not talk about religion at home,

24   since it was so upsetting to he and his wife, Ralph's stepmother.  The discord in the

25   Deleon household became even more profound when Mr. Deleon started talking to his

26   younger brother, Michael, regarding his conversion to Islam.  This caused Mr. Deleon's

27   father to feel betrayed.  (RT, Trial Day 21, September 16, 2014, Testimony of Melchor

28   Deleon, pages 32-35.)

DEFENDANT'S SENTENCING MEMORANDUM

1    It's uncontested that Mr. Deleon's conversion to Islam, and his daily practicing of

2  his Muslim faith, caused huge problems for his family life.  Although Mr. Deleon's

3  parents did what they could to accept their son's conversion and tolerate his newfound

4  beliefs, the closeness that Mr. Deleon shared with his father for his entire life was gone,

5  and Mr. Deleon looked elsewhere for acceptance.  This caused Mr. Deleon the leave

6  home on many occasions and spend days and nights with his friends – especially his

7  new Muslim friends.  This drove Mr. Deleon to isolate himself from his family and devote

8  all of his time and energy to his Muslim faith – which only deepened the divide between

9  his former life and his new Muslim life.

10    There is no doubt that this family strife started the chain reaction of events that

11 lead to Mr. Deleon's conduct and conviction in this case.  As stated by Mr. Deleon's

12 stepmother in her sentencing recommendation letter, her relationship with Mr. Deleon

13 drifted apart when he became a Muslim, and that "made her change her attitude

14 towards him."  She "started hating him and had arguments because as a devout

15 Catholic it was very frustrating to know that [she] failed" in teaching him to be a "good

16 Catholic."  Mr. Deleon's stepmother described the situation perfectly when she said as

17 follows: Mr. Deleon was a "boy that got lost somewhere, a boy that needed love from

18 his parents" where, instead, me and my husband became "distant to him after he

19 converted to Islam."  (Sentencing Recommendation Letter or Arlene De Leon.)

20    However, through all of the drama of awaiting trial, and going to trial in this case,

21 Mr. Deleon very much mended his relationship with his father and family – so much so

22 that Mr. Deleon talks daily on the phone with both of his parents and his father and

23 siblings visit him in custody regularly.  (PSR ¶57.)  As stated by Mr. Deleon's mother in

24 her sentencing recommendation letter, she is in touch with him daily, and he, as always,

25 remains very warm and engaging with his mother and his family.  (Sentencing

26 Recommendation Letter of Rebecca Caceres, dated 1/31/15.)

27 //

28 //

DEFENDANT'S SENTENCING MEMORANDUM

### c.      Lack of Violent Tendencies

Mr. Deleon's family members describe him as someone who is peaceful, respectful, caring and non-violent – and that they have never once seen him involved in a physical confrontation nor involved in a violent act with anyone.  His family members all struggle with how Mr. Deleon took a path so inconsistent with his prior life and actions, as he's never shown any behavior that would confirm allegations of him wanting to hurt or kill innocent people.  (Sentencing Recommendation Letters from Mr. Deleon's mother, father, aunt, and brothers.)

### d.      Remorse for his Behavior

In the attached letter from Mr. Deleon, he explains that he has "no excuse" for his actions and believed that he was following the correct version of Islam, which was extreme and radical.  Mr. Deleon understands in his conversion from Catholicism to Islam he became "overzealous" and tended to ignore common sense and over-reacted. He admits that his actions were "senseless" and he is ready to face the consequences for those actions.  He's not mad at the Government, or the informant, but at himself – the "blame is solely on me," he says.  (Sentencing Recommendation Letter from Ralph Deleon, dated 10/20/14, pages 1-2.)

Mr. Deleon also expresses that he knows that "violence is not the solution to the world's ills today and that it is never too late to turn around and make up for everything that has happened."  He intends to work with an Islamic organization upon his release and speak about moderation and the peaceful teachings of the Qur'an."  (Sentencing Recommendation Letter from Ralph Deleon, dated 10/20/14, page 3.)

### e.      Mr. Deleon's Youth and Ability to be Rehabilitated

The first step towards rehabilitation for Mr. Deleon was to understand and appreciate how he ended up in his current situation.  Through a lot of self-reflection and discussions with his family and other inmates while detained awaiting trial and post-trial, he's gained that understanding.   Mr. Deleon understands that despite growing up in a strict Catholic environment and enjoying the privileges that his family afforded him he

1   was always searching for a higher calling and direction for his life.  As he left his home

2   for college and began spending less time with his family and his Catholic church friends,

3   his devotion to his Catholic religion – which under ideal conditions would provide

4   strength, direction and comfort – left Mr. Deleon lost and confused.  This was especially

5   true when he met friends who were zealous Muslims and Mr. Deleon saw their

6   relationship and connection to God as more direct and fulfilling.  (Sentencing

7   Recommendation Letter of inmate Regis Possino, pages 1-2.)

8          As Mr. Deleon learned more and more about being Muslim, and wanted to share

9   this with his family, they unfortunately turned him away – not out of hatred towards

10   Muslims, but simply because Ralph was considering leaving Catholicism.  He wanted to

11   explore his new religious ideals with his parents, with whom he's always been close, but

12   they shut him out and didn't want to discuss it at all.  This made him even more eager to

13   learn the tenets of Islam and made him more and more zealous to become a strict

14   Muslim.

15          As Mr. Deleon's father explained during his trial testimony, Mr. Deleon became

16   "obsessed" to be the "best possible Muslim he can be" so he "tried to really do what he

17   thinks would be the Muslim way."  (RT, Trial Day 21, September 16, 2014, Testimony of

18   Melchor Deleon, page 37.)  Unfortunately, the Muslim friends with whom Mr. Deleon

19   was introduced to the religion were embracing the more radical and violent parts of the

20   religion – which is all that Mr. Deleon knew about Islam at the time he was associating

21   with the co-defendants in this case.

22          However, in the past couple years of being incarcerated and sharing his views

23   and beliefs with others, Mr. Deleon has come to learn this peaceful side of the religion.

24   As described by fellow inmate, Regis Possino:

25          "I am pleased to report that the radicalized version of [Mr. Deleon] has
            seen the real light and has begun to disavow those who preach a gospel
26          of violence.  He has begun to explore areas in which he may be able to
            help other Muslims inclined towards violence, to seek more peaceful
27          means to deal with worldly issues.  He has reaffirmed his connection with
            God, and no longer sees the world full of infidels who must be converted
28          by any means.
            Most of all, [Mr. Deleon] has admitted to the errors of his ways, not out of

fear of a lengthy jail sentence, but due to what I perceive to be true conversion to that of a peaceful warrior. Ralph has seen the light, and as a result, the zeal with which he once pursued his Catholicism, then his practice of the Islam of Jihad, has been redirected to the Islam of peace and love, as originally intended by the prophet."
(Sentencing Recommendation Letter of inmate Regis Possino, page 3.)

Another fellow inmate of Mr. Deleon's, Robert Thompson, describes the following with respect to Mr. Deleon's rehabilitation:

"I spent 6 months with [Mr. Deleon], daily testing his character, as a way of proving to myself that he is somebody with an immensely high standard of integrity. Daily he would prove to take pleasure in doing the 'right-thing', by being 100% honest and maintaining the high-level of integrity with everyone. He does not put people down, he does not act from emotion, and is mature enough to admit when he is wrong . . . he looks towards being a positive influence for a new breed of potential extremists. His sincere belief in shaping young Muslim minds to understand what is pro-social and productive is a large asset to this Country." (Sentencing Recommendation Letter of inmate Robert Thompson, page 2.)

Finally, another fellow inmate of Mr. Deleon's, Mario Medina, described the following about Mr. Deleon's appreciation for the mistakes he's made, and his devotion to becoming a productive member of society:

"Like all young persons going through life, they are impressionable and make mistakes. Part of maturing is learning from mistakes. We have all made them and all of us are flawed. We learn and we grow. [Mr. Deleon] is young and has a long life ahead of him. He is intelligent, thoughtful and caring. He is not the person that he is portrayed to be. I have personally witnessed his caring, gentleness and compassion for others. He is a young man just entering adulthood. He has great potential and doesn't deserve to spend the rest of his life away from a supportive and caring family, and friends. He realizes the mistakes he has made and realizes what it takes to resist the pressures of others that want to sow discord in society. Like anyone who was led astray, he deserves another chance to be productive and become a positive influence."

**3.    Avoiding Unwanted Sentencing Disparities**

There are 3 other co-defendants in this case, that were all found to be in a criminal conspiracy – either by jury verdict or plea agreement. However, since no one else has been sentenced in this case, the defense will point to similar federal cases to give the Court some perspective on sentences given by other courts for similar conduct.

13

| **Case Name** | **Case Summary** | **Sentence** |
|---|---|---|
| Hamdan v. United States, 696 F.3d 1238, 1240 (D.C. Cir 2012) | Defendant was an Al Qaeda drive, who worked at Al Qaeda training camps, and eventually became the driver and personal assistant to Osama Bin Laden | 66 months |
| United States v. Abdallah Case No. 2:08-cr-0084-NVW | Defendant participated in fundraising for designated terrorist organization Holy Land Foundation for Relief and Development and lied about his participation to the FBI | 18 months |
| United States v. Addoulah Case No. 01CR3240-W | Defendant assisted the September 11, 2011 hijackers in arriving in San Diego | time served (after about 1 year in custody) |
| United States v. Abdow Case No. 09-292 JMR/SRN | Defendant obstructed FBI investigation into the recruitment of young men in the United States to train and fight for extremist groups in Somalia. | 4 months jail, 4 months house arrest |
| United States v Akl, et al Case No. 3:10CR251 | Husband and Wife co-defendants were involved in scheme to send hundreds of thousands of dollars to the terrorist group Hizballah over the course of almost a year | husband: 75 months; wife: 40 months |
| United States v. Ali Case No. 02CR2912-L<br><br>United States v. Durrani Case No. 02CR2912-L | Co-defendants conspired to distribute heroin and hashish for the purpose of providing material support to terrorist group Al-Qaeda, and traveled internationally in support of that conspiracy. | 57 months each |
| United States v. Al-Arian Case No. 8:03-CR-77-T-30TBM | Defendant conspired to make or receive contribution of funds, goods or services to or for the benefit of the terrorist group Palestinian Islamic Jihad | 57 months |
| United States v. Al-Hanooti Case No. 08CR20083-1 | Defendant entered into an illegal business relationship for oil with Saddam Hussein's government | 12 months and a day |
| United States v. Christianson, et al. 586 F.3d 532 (7th Cir. 2009) | Two co-defendant's who were members of the domestic eco-terrorist organization Earth Liberation Front committed $424,361 worth of damage at a facility belonging to the U.S. Forest Service | 24 months and 36 months |

DEFENDANT'S SENTENCING MEMORANDUM

| United States v. Conley<br>Case No. 1:14-cr-00163-RM | Defendant conspired to provide material support Al-Qaeda and ISIS; arrested at Denver airport en route to Syria; she had developed a close relationship with an avowed terrorist who invited her to join the jihad | 48 months |
|---|---|---|
| United States v. Hupper<br>Case No. 1:08-cr-20410-PCH | Defendant provided $20,000 to terrorist group Hamas and made a false passport application | 46 months |
| United States v. Wright, et al.<br>Case No. 1:12-cr-00238-DDD | Co-defendants conspired to bomb an Ohio bridge | 11 ½ years; other co-defendants received 8 years each |

## IV.  CONCLUSION

Defendant respectfully requests that Your Honor sentence Mr. Deleon to 10 years (120 months) of jail, with credit for time served.


DATED: February 12, 2015


Respectfully submitted,

HANNA, BROPHY, MacLEAN, McALEER and JENSEN, LLP

By: *David J. Thomas*
_____
David J. Thomas
Attorney for RALPH KENNETH DELEON

SBD00537|PT01

DEFENDANT'S SENTENCING MEMORANDUM