1  STEPHANIE YONEKURA
   Acting United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   SUSAN J. DE WITT (Cal. Bar No. 132462)
4  Acting Executive Assistant U.S. Attorney
   CHRISTOPHER D. GRIGG (Cal. Bar No. 220243)
5  Deputy Chief, National Security Section
   ALLEN W. CHIU (Cal. Bar No. 240516)
6  Assistant United States Attorneys
   National Security Section
7       1300 United States Courthouse
        312 North Spring Street
8       Los Angeles, California 90012
        Telephone: (213) 894-4496/5429
9       Facsimile: (213) 894-6436
        E-mail: susan.dewitt@usdoj.gov
10              christopher.grigg@usdoj.gov
                allen.chiu@usdoj.gov
11
   Attorneys for Plaintiff
12 UNITED STATES OF AMERICA

13                    UNITED STATES DISTRICT COURT

14               FOR THE CENTRAL DISTRICT OF CALIFORNIA

15
   UNITED STATES OF AMERICA,          ED No. CR 12-00092(B)-VAP
16
                                      GOVERNMENT'S RESPONSE TO DEFENDANT
17              Plaintiff,            RALPH KENNETH DELEON'S SENTENCING
                                      MEMORANDUM
18         v.

19 SOHIEL OMAR KABIR, et al.,

20
                                      Hearing Date: February 23, 2015
21              Defendants.           Hearing Time: 9:00 a.m.
                                      Place: Courtroom of the Honorable
22                                    Virginia A. Phillips

23

24      The United States of America, by and through its undersigned

25 counsel, hereby submits its response to defendant Ralph Kenneth

26 Deleon's sentencing memorandum (CR 746).

27      The government's response and its position regarding sentencing

28 rest on the evidence admitted at trial, the jury's verdicts, the

United States Probation Officer's Presentence Investigation Report ("PSR"), Revised PSR, Addenda to the PSR, sentencing recommendation letter, revised sentencing recommendation letter, the attached declaration of Christopher D. Grigg, the attached Exhibits, the files and records in this case, and on such additional argument or evidence as the Court may allow.

Dated: February 19, 2015          Respectfully submitted,

                                  STEPHANIE YONEKURA
                                  Acting United States Attorney

                                  ROBERT E. DUGDALE
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  _____/s/_____
                                  SUSAN J. DE WITT
                                  CHRISTOPHER D. GRIGG
                                  ALLEN W. CHIU
                                  Assistant United States Attorneys
                                  National Security Section

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

On February 13, 2015, defendant Ralph Kenneth Deleon ("Deleon") filed a sentencing memorandum (CR 746) raising several arguments, almost all of which the government previously addressed in its sentencing position filed February 9, 2015 (CR 739).  Here, the government responds to three discreet arguments, none of which support the severely reduced sentence defendant now seeks.

**II.  ARGUMENT**

**A.   Defendant's Disparity Argument Lacks Merit**

Defendant argues that certain cases he lists offer "some perspective on sentences given by other courts for similar conduct." (Deleon Sentencing Memorandum at 13.)  However, merely listing cases with lower sentences than defendant faces does not establish an unwarranted sentencing disparity and does not support the severely reduced sentence defendant seeks.  As the government noted in its response to defendant Sohiel Omar Kabir's sentencing memorandum, when a defendant challenges a sentence on the ground of disparity under 18 U.S.C. § 3553(a)(6), it is the defendant's burden to establish disparity among similarly situated defendants with similar records who have been found guilty of similar conduct.  <u>See e.g.</u>, <u>United States v. Frantz</u>, 234 Fed. Appx 729, 735 (9th Cir. 2007).  As with similar arguments by defendant Sohiel Kabir, defendant fails to show that the defendants in the cases he cites are similarly situated.

First, as detailed below, of the nine cases defendant cites, all but one resulted in guilty pleas.  As in other circuits, Ninth Circuit law makes clear that defendants who proceed to trial are not similarly situated to those who plead guilty.  <u>United States v.</u>

1

1   *Ressam*, 679 F.3d 1069, 1094-95 (9th Cir. 2012) (United States v.

2   Meskini, 319 F.3d 88, 91 (2d Cir. 2003) (district court erred in

3   considering sentences of other defendants who were not similarly

4   situated, including those of defendants who pleaded guilty)); see

5   also United States v. Garro, 517 F.3d 1163, 1171-1172 (9th Cir.

6   2008).  Moreover, the sole defendant who did not plead guilty, Salim

7   Hamdan, was not tried in a United States district court but in a

8   military commission in Guantanamo Bay, Cuba, after being held there

9   as an unlawful enemy combatant for several years.  See Hamdan v.

10  United States, 696 F.3d 1238, 1240 (D.C. Cir. 2012), overruled by Al

11  Bahlul v. United States, 767 F.3d 1, 11 (D.C. Cir. 2014) (en banc)

12  (vacating in part and remanding in part Guantanamo Bay detainee's

13  convictions resulting in a life sentence).  As a result, defendant

14  cannot show that, when fashioning Hamdan's sentence, the commission

15  was required, as the Court is here, to start with the Guidelines and

16  fashion a sentence that complies with the purposes set forth in 18

17  U.S.C. § 3553.  See United States v. Carty, 520 F.3d 984, 993 (9th

18  Cir. 2008) (en banc)).[1]

19      Second, none of the cases defendant cites involve the same

20  counts of conviction that defendant faces.  For example, defendants

21  in three of the cases pled guilty to crimes carrying much lower

22  statutory maximum sentences than Deleon faces here, including making

23  false statements in violation of 18 U.S.C. § 1001 (two cases) and

24  conspiracy in violation of 18 U.S.C. § 371 (one case).  Defendants in

25

26      [1] In military commissions, sentencing is left to the discretion
    of the commission and may include the maximum penalty set forth in
27  Part IV of the Military Commissions Manual or any lesser punishment.
    See Rule 1002, Department of Defense Manual for Military Commissions
28  (2012).

two cases pled guilty to offenses with ten-year statutory maximums, including contracting to buy oil from Iraq in violation of 50 U.S.C. § 1705[2] and destroying trees and vandalizing government vehicles in violation of 18 U.S.C. § 1361.  Defendants in two other cases pled guilty to violations of 18 U.S.C. § 2339B, which carries a maximum penalty of fifteen years and generally yields lower Guidelines calculations than defendant's counts of conviction.  In one case, a defendant pled guilty to obstructing justice by making false statements in violation of 18 U.S.C. § 1512(c)(2).

Most importantly, none of the defendants in the cases Deleon cites recruited others to fight and kill United States and Allied personnel as Deleon did.  Setting aside the defendants whose offenses amounted to false statements, buying oil, and destroying trees, even the cases relating to terrorist groups did not involve warfare, fighters, or recruiters, including Hamdan.  One case involved an agreement to transport money to a terrorist group.  Another involved an agreement to sell drugs in order to fund the purchase of equipment that would later be sold to a terrorist group.  In another case, the defendant aided a person seeking a visa renewal and filed an affidavit with the Immigration and Naturalization Service in support of an employment petition.

The following list summarizes just some of the discrepancies between the cases Deleon cites and his own case:

- Hamdan v. United States, 696 F.3d 1238 (D.C. Cir. 2012): Defendant, Usama Bin Laden's personal assistant, was tried

---

[2] The 2002 offense at issue in United States v. Al-Hanooti, No. 2:08-CR-2083, E.D. Mich., carried a ten-year statutory maximum sentence.  In 2007, the maximum for that offense was raised to 20 years.  See 50 U.S.C. § 1705, Pub.L. 110-96, § 2(a), Oct. 16, 2007, 121 Stat. 1011.

in a military commission after years of detention at Guantanamo Bay.  (See Exh. A.)[3]

- United States v. Abdallah, No. CR-08-00947-PHX-NVW (D. Ariz.): Defendant pled guilty to making false statements.  During a 2007 interview with law enforcement, defendant falsely denied raising funds for a foundation ten years earlier. (See Exhs. B-1 at 6, B-2.)

- United States v. Abdoulah, No. 01CR3240-W (S.D. Cal.): Defendant pled guilty to making false statements. Defendant falsely claimed in an asylum application that he entered the United States via New York on an Italian passport when he in fact entered from Canada on Yemeni passport.  (See Exhs. C-1 at 5-6, C-2.)

- United States v. Abdow, No. Crim. 09-292 (JMR/SRN) (D. Minn.): Defendant pled guilty to obstructing justice by making false statements to law enforcement.  Defendant falsely denied knowing the names of persons who accompanied him on a road trip to Las Vegas or knowing who paid for the rental car.  (See Exhs. D-1, D-2.)

- United States v. Akl, et al., No. 3:10-CR-251 (N.D. Ohio): Defendant and her husband pled guilty to conspiring to provide material support to Hezbollah.  Defendant and her husband[4] agreed to a scheme to transport cash to Hezbollah in Lebanon.  (See Exhs. E-1 at 9-20, E-2, E-3, E-4.)

- United States v. Shah, et al., No. 02 CR 2912 L (S.D. Cal.): Defendants pled guilty to conspiring to sell heroin and hashish to an undercover agent and to conspiring to buy stinger missiles from the undercover agent with the intent to sell them to the Taliban, which defendants equated with Al-Qa'ida.  (See Exhs. F-1, Exh. F-2, F-3.)

- United States v. Al-Arian, No. 8:03-CR-77-30TBM (M.D. Fla.): Defendant pled guilty to a § 371 conspiracy for aiding a person affiliated with a terrorist group who was seeking a visa renewal and for filing an affidavit with the Immigration and Naturalization Service in support of an

---

[3] Lettered exhibits refer to the court records, including appellate opinions, indictments, plea agreements, and judgment and commitment orders, attached as exhibits hereto.

[4] Defendant Hor Akl pled guilty to additional counts, including money laundering.  (See Exh. E-4.)

employment petition. (<u>See</u> Exhs. G-1 at 10-14, G-2.)

- <u>United States v. Al-Hanooti</u>, No. 08CR20083-1 (E.D. Mich.):
  Defendant pled guilty to entering a contract to purchase
  oil from Iraq without a license to do so. (<u>See</u> Exhs. H-1
  at 10, H-2.)

- <u>United States v. Christianson</u>, 586 F.3d 532 (7th Cir. 2009):[5]
  Defendants pled guilty in 2008 to destroying trees and
  vandalizing U.S. Forest Service vehicles in 2000. (<u>See</u>
  Exhs. I-1, I-2, I-3, I-4.)

In short, all but one of these cases resulted in guilty pleas. None involve the same counts of conviction or similar offense conduct. Accordingly, none of the cases involve defendants who similarly situated to Deleon.

## B. Defendant Deserves No Credit For Proffering

Deleon argues for a two-level reduction to his Guidelines calculations for acceptance of responsibility merely because he participated in a post-indictment proffer session. (<u>See</u> Sentencing Memorandum at 5.) The commentary to U.S.S.G. § 3E1.1, however, expressly states that a reduction for acceptance of responsibility is not intended to apply to a defendant who puts the government to its burden of proof at trail by denying the essential factual elements of guilt and later expresses remorse. U.S.S.G. § 3E1.1, comment. (n.2). Nevertheless, the commentary notes that in rare circumstances a defendant who clearly accepts responsibility but proceeds to trial may receive the reduction, for example where, unlike here, a defendant goes to trial to preserve issues that do not relate to factual guilt such as a constitutional challenge to a statute. <u>Id.</u>

---

[5] Co-defendant Rivera, referenced in the Seventh Circuit's opinion, pled guilty in <u>United States v. Rivera</u>, No. 08-CR-107-C-03 (W.D. Wis.). (<u>See</u> Exh. I-4.)

1    Although Deleon made certain admissions to the government, he
2   has never accepted responsibility for his role in the plot.  He has
3   never acknowledged that he was the emir (leader) of the group while
4   in the United States and that, but for his initiative and leadership,
5   neither he, nor Santana, nor Gojali would have been arrested heading
6   for the border with Mexico en route to joining mujahideen fighters
7   overseas.  Instead, Deleon has consistently sought to shirk
8   responsibility and assign all of the blame to the informant in this
9   case.  As Deleon effectively admits in his sentencing memorandum,
10  that is precisely the reason he went to trial.  However, proceeding
11  to trial to deflect blame onto another person is the opposite of
12  accepting responsibility for one's own conduct.  Accordingly, Deleon
13  is not entitled to, and does not deserve, any reduction to his
14  Guidelines offense level.

15      **C.   Defendant's Purported Recent Change of Views Does Not
        Justify Evading Responsibility For His Conduct**
16

17      Deleon argues that his religious views merit leniency in this
18  case.  He argues that his motivations in this case were "purely
19  religious" (Sentencing Memorandum at 4), but that he recently changed
20  his views while incarcerated in this case (id. at 12).  In support of
21  his argument, he offers statements by inmates who are awaiting trial
22  or serving sentences and only met Deleon after his arrest and
23  detention in this case.  (See id. at 12-13).

24      None of these persons observed Deleon's character when Deleon
25  was unaware that his behavior was being monitored.  Rather, they have

26

27

28

only observed Deleon as he wished to be seen.[6]  None of them can comment on Deleon's zeal for violent jihad because none have witnessed it.  For example, none can account for Deleon's declaration during the course of the conspiracy that "You can lie when you are in war. . . . And I believe right now we are in a state of war."  (Exh. 652A at 1.)[7]  None can account for his directions to Gojali to kill female U.S. army personnel.  (See Exh. 531A.)  None can account for the fact that he rejected alternatives to violent jihad, remained committed to taking up arms, and dedicated 99.9% of his prayers to becoming a martyr.  (See, e.g., Exhs. 595A, 605A, 635A, 636A, 637A; 9/2/14 RT 79.)  None can account for the numerous additional examples demonstrating the depth of Deleon's commitment to violent jihad. Moreover, none can account for the fact that, even during trial, Deleon apparently marked his cell multiple times with the word "ISIS," referring to the Islamic State In Syria, an alias for the Islamic State in the Levant ("ISIL"), an extremely violent terrorist army and designated foreign terrorist organization that has repeatedly beheaded Americans and others captured during combat operations in Syria and elsewhere.  See R-PSR ¶ 61.

     Deleon's family members were similarly unaware of his radicalization and the fact he was planning and preparing to become a mujahideen fighter.  Even Deleon's father, who acknowledged that Deleon became more serious upon converting to Islam, testified at trial that he did not know who converted Deleon to Islam or that

---

[6] For example, consistent with Deleon's efforts to avoid responsibility for his actions, statements from one inmate indicate that Deleon falsely told the inmate that this case involved a ruse that was part of a sting.  See Revised PSR ¶ 64.

[7] The government previously filed under separate cover transcripts the recordings played at trial.  (See CR 729.)

1    Deleon: listened to recordings by Anwar Al-Awlaki; reviewed such

2    materials on a computer; read Inspire magazine; or that he sold his

3    car (which his father had given him) and obtained a refund of his

4    college tuition money in furtherance of the conspiracy.  (9/16/14 RT

5    AM Session 38-41.)  At best, Deleon's family members can only

6    describe the person Deleon deliberately chose to leave behind despite

7    the comforts and opportunities his family afforded him.

8         Deleon's argument that he has changed his mind and now has a new

9    view of his faith does not excuse his conduct in this case.  If

10   anything, such an argument again reflects an interest in avoiding the

11   full consequences of his behavior.  Rewarding such an argument with a

12   reduced sentence would in essence invite every defendant convicted of

13   a terrorism offense or a violent crime motivated by religious or

14   political beliefs to claim, quite conveniently, at the time of

15   sentencing that he has changed his mind.  Such claims are inherently

16   suspect and unverifiable.  Deleon's argument in particular is highly

17   suspect given its timing and the profound depth of his commitment to

18   jihadi doctrine as demonstrated by the abundant proof at trial.  As

19   such, it does not merit the extremely reduced sentence he seeks.

20   **III. CONCLUSION**

21        For the foregoing reasons and the reasons set forth in the

22   government's sentencing position, the Court should reject Deleon's

23   arguments and sentence him to the term recommended by both the

24   ///

25   ///

26   ///

27

28

1   government and the Probation Office, namely 420 months' imprisonment,

2   followed by a lifetime of supervised release.

3   Dated: February 19, 2015          Respectfully submitted,

4                                     STEPHANIE YONEKURA
                                      Acting United States Attorney
5
                                      ROBERT E. DUGDALE
6                                     Assistant United States Attorney
                                      Chief, Criminal Division
7

8                                     _____/s/_____
                                      SUSAN J. DE WITT
9                                     CHRISTOPHER D. GRIGG
                                      ALLEN W. CHIU
10                                    Assistant United States Attorneys

11                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  STEPHANIE YONEKURA
   Acting United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   SUSAN J. DE WITT (Cal. Bar No. 132462)
4  Acting Executive Assistant U.S. Attorney
   CHRISTOPHER D. GRIGG (Cal. Bar No. 220243)
5  Deputy Chief, National Security Section
   ALLEN W. CHIU (Cal. Bar No. 240516)
6  Assistant United States Attorneys
   National Security Section
7       1300 United States Courthouse
        312 North Spring Street
8       Los Angeles, California 90012
        Telephone: (213) 894-4496/5429
9       Facsimile: (213) 894-6436
        E-mail: susan.dewitt@usdoj.gov
10              christopher.grigg@usdoj.gov
                allen.chiu@usdoj.gov
11
   Attorneys for Plaintiff
12 UNITED STATES OF AMERICA

13                  UNITED STATES DISTRICT COURT

14               FOR THE CENTRAL DISTRICT OF CALIFORNIA

15
   UNITED STATES OF AMERICA,        ED No. CR 12-00092(B)-VAP
16
                                    DECLARATION OF CHRISTOPHER D.
17              Plaintiff,          GRIGG IN SUPPORT OF GOVERNMENT'S
                                    RESPONSE TO DEFENDANT RALPH
18         v.                       KENNETH DELEON'S SENTENCING
                                    MEMORANDUM; EXHIBITS
19 SOHIEL OMAR KABIR, et al.,

20
                                    Hearing Date: February 23, 2015
21              Defendants.         Hearing Time: 9:00 a.m.
                                    Place: Courtroom of the Honorable
22                                  Virginia A. Phillips

23

24
          The United States of America, by and through its undersigned
25
   counsel, hereby submits the declaration of Christopher D. Grigg and
26
   ///
27
   ///
28

1  attached Exhibits in support of its response to defendant Ralph

2  Kenneth Deleon's sentencing memorandum.

3  Dated: February 19, 2015          Respectfully submitted,

4                                    STEPHANIE YONEKURA
                                     Acting United States Attorney
5
                                     ROBERT E. DUGDALE
6                                    Assistant United States Attorney
                                     Chief, Criminal Division
7

8                                    _____/s/_____
                                     SUSAN J. DE WITT
9                                    CHRISTOPHER D. GRIGG
                                     ALLEN W. CHIU
10                                   Assistant United States Attorneys
                                     National Security Section
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**DECLARATION OF CHRISTOPHER D. GRIGG**</u>

I, Christopher D. Grigg, hereby declare and state as follows:

1.   I am an attorney for the government licensed to practice law in the State of California and am assigned to the matter of <u>United States v. Sohiel Omar Kabir, et al.</u>, ED CR No. 12-00092(B)-VAP.   I make this declaration in support of the government's response to defendant Ralph Kenneth Deleon's sentencing memorandum.

2.   In his sentencing memorandum, defendant Deleon cites nine cases in support of a sentencing disparity argument.   True and correct copies of records relating to those cases obtained via PACER and other electronic means are attached to the government's response and this affidavit as follows:

a.   Exhibit A, the court's opinion in <u>Hamdan v. United States</u>, 696 F.3d 1238 (D.C. Cir. 2012);

b.   Exhibit B-1, the defendant's plea agreement in <u>United States v. Abdallah</u>, No. CR-08-00947-PHX-NVW (D. Ariz.);

c.   Exhibit B-2, the judgment and commitment order in <u>Abdallah</u>;

d.   Exhibit C-1, the indictment in <u>United States v. Abdoulah</u>, No. 01CR3240-W (S.D. Cal.);

e.   Exhibit C-2, the judgment and commitment order in <u>Abdoulah</u>;

f.   Exhibit D-1, the information in <u>United States v. Abdow</u>, No. Crim. 09-292 (JMR/SRN) (D.Minn.);

g.   Exhibit D-2, the judgment and commitment order in <u>Abdow</u>;

h.   Exhibit E-1, defendant Amera A. Akl's plea agreement in <u>United States v. Akl, et al.</u>, No. 3:10-CR-251 (N.D. Ohio);

1

1              i.    Exhibit E-2, defendant Hor I. Akl's plea agreement in

2 Akl;

3              j.    Exhibit E-3, defendant Amera A. Akl's judgment and

4 commitment order in Akl;

5              k.    Exhibit E-4, defendant Hor I. Akl's judgment and

6 commitment order in Akl;

7              l.    Exhibit F-1, the indictment in United States v. Shah,

8 et al., No. 02 CR 2912 L (S.D. Cal.);

9              m.    Exhibit F-2, defendant Ali's judgment and commitment

10 order in Shah;

11             n.    Exhibit F-3, defendant Durrani's judgment and

12 commitment order in Shah;

13             o.    Exhibit G-1, the plea agreement in United States v.

14 Al-Arian, No. 8:03-CR-77-30TBM (M.D. Fla.) (this document was

15 originally filed in camera but was subsequently unsealed and filed

16 publicly);

17             p.    Exhibit G-2, the judgment and commitment order in Al-

18 Arian;

19             q.    Exhibit H-1, the indictment in United States v. Al-

20 Hanooti, No. 08CR20083-1 (E.D. Mich.);

21             r.    Exhibit H-2, the judgment and commitment order in Al-

22 Hanooti;

23             s.    Exhibit I-1, the court's opinion in United States v.

24 Christianson, 586 F.3d 532 (7th Cir. 2009);

25             t.    Exhibit I-2, the indictment in Christianson;

26             u.    Exhibit I-3, defendant Christianson's judgment and

27 commitment order in Christianson; and

28             v.    Exhibit I-4, defendant Rivera's judgment and

2

commitment order in <u>United States v. Rivera</u>, No. 08-CR-107-C-03 (W.D. Wis.).

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed February 19, 2015 at Los Angeles, California.


_____/s/_____
Christopher D. Grigg

EXHIBIT A

696 F.3d 1238
United States Court of Appeals,
District of Columbia Circuit.

Salim Ahmed HAMDAN, Petitioner
v.
UNITED STATES of America, Respondent.

No. 11–1257. | Argued May 3, 2012. | Decided Oct.
16, 2012.

**Synopsis**
**Background:** Defendant was convicted, in a trial convened at the U.S. Naval Station at Guantanamo Bay, Cuba, before a military commission, Captain Keith J. Allred, JAGC, U.S. Navy, military commission judge, on five specifications of providing material support for terrorism, in violation of the Military Commissions Act of 2006 (MCA). Defendant appealed. The United States Court of Military Commission Review, 801 F.Supp.2d 1247, affirmed. Defendant appealed.

**Holdings:** The Court of Appeals, Kavanaugh, Circuit Judge, held that:

[1] direct appeal of military commission conviction was not moot;

[2] Military Commissions Act of 2006 did not authorize retroactive prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing United States law as a war crime triable by military commission; and

[3] material support for terrorism was not international-law war crime when defendant was charged with such conduct from 1996 to 2001.

Reversed.

Ginsburg, Senior Circuit Judge, filed concurring opinion.

West Headnotes (13)

[1]     **War and National Emergency**

👈 Validity of continued detention

In war, when the United States captures or takes custody of alien enemy combatants or their substantial supporters, it may detain them for the duration of hostilities.

Cases that cite this headnote

[2]     **War and National Emergency**
👈 Detention of Enemy Combatants; Military Commissions

United States may try unlawful alien enemy combatants before military commissions for their war crimes.

1 Cases that cite this headnote

[3]     **War and National Emergency**
👈 Enemy combatants

Generally speaking, enemy soldiers or combatants are considered unlawful enemy combatants when they, for example, join or support an organization waging unlawful war or they commit specific "acts which render their belligerency unlawful."

Cases that cite this headnote

[4]     **War and National Emergency**
👈 Review

Direct appeal of military commission conviction was not moot, although defendant had been released from custody. UCMJ, Art. 21, 10 U.S.C.A. § 821.

1 Cases that cite this headnote

[1]     **War and National Emergency**

**Hamdan v. U.S., 696 F.3d 1238 (2012)**

402 U.S.App.D.C. 471

[5]    **Federal Courts**
🔑Mootness

Mootness is a jurisdictional question that a court must independently consider.

Cases that cite this headnote

[6]    **Criminal Law**
🔑Grounds of dismissal in general

In the criminal context, a direct appeal of a criminal conviction is not mooted by a defendant's release from custody.

Cases that cite this headnote

[7]    **Military Justice**
🔑In general; nature and elements

The proscription against "aiding the enemy" generally requires breach of a duty of loyalty as well as aid to the enemy. UCMJ, Art. 104, 10 U.S.C.A. § 904.

Cases that cite this headnote

[8]    **War and National Emergency**
🔑Detention of Enemy Combatants; Military Commissions

Military Commissions Act of 2006 did not authorize retroactive prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing United States law as a war crime triable by military commission. UCMJ, Art. 21, 10 U.S.C.A. § 821.

1 Cases that cite this headnote

[9]    **Constitutional Law**
🔑Penal laws in general
**Constitutional Law**
🔑Punishment in general

Among other things, the Ex Post Facto Clause bars laws that retroactively punish conduct that was not previously prohibited, or that retroactively increase punishment for already prohibited conduct; thus, the Ex Post Facto Clause prevents Congress and the Executive from retroactively applying a federal criminal statute to conduct committed before the statute was enacted. U.S.C.A. Const. Art. 1, § 9, cl. 3.

Cases that cite this headnote

[10]    **War and National Emergency**
🔑Detention of Enemy Combatants; Military Commissions

Congress explicitly referred to international law and explicitly incorporated international norms into domestic United States law by means of the express cross-reference to the "law of war" in Military Commissions Act of 2006. UCMJ, Art. 21, 10 U.S.C.A. § 821.

1 Cases that cite this headnote

[11]    **International Law**
🔑Nature and authority in general
**War and National Emergency**
🔑Nature and incidents in general

The term "law of war" in the United States Code and precedent generally refers to the international law of war.

1 Cases that cite this headnote

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

[12]    **War and National Emergency**
🔑 Crimes and criminal prosecutions
**War and National Emergency**
🔑 Detention of Enemy Combatants;  Military Commissions

Material support for terrorism was not international-law war crime when defendant was charged with such conduct from 1996 to 2001, in violation of Military Commissions Act of 2006 (MCA), and thus defendant's conviction for material support for terrorism had to be vacated; neither major conventions on law of war, nor prominent modern international tribunals and leading international-law experts, had identified material support for terrorism as war crime, no person had ever been tried by international-law war crimes tribunal for material support for terrorism, and United States government conceded that material support for terrorism was not recognized international-law war crime. UCMJ, Art. 21, 10 U.S.C.A. § 821.

2 Cases that cite this headnote

[13]    **International Law**
🔑 Sources and scope

United States precedents may inform the content of international law.

Cases that cite this headnote

**Attorneys and Law Firms**

*1239 Joseph M. McMillan argued the cause for petitioner. With him on the briefs were Harry H. Schneider Jr., Charles C. Sipos, Angela R. Martinez, Abha Khanna, Adam Thurschwell, and Jahn C. Olson.

J. Wells Dixon, Shayana D. Kadidal, and Pardiss Kebriaei were on the brief for amicus curiae Center for Constitutional Rights in support of petitioner.

David C. Lachman was on the brief for amicus curiae International Legal Scholars Terry D. Gill and Gentian

Zyberi in support of petitioner.

John S. Summers and Michael J. Newman were on the brief for amicus curiae Professor David W. Glazier in support of petitioner.

*1240 Gene C. Schaerr and Kimball R. Anderson were on the brief for amicus curiae Constitutional Law Scholars in support of petitioner.

Jonathan Hafetz and David Cole were on the brief for amicus curiae Japanese American Citizens League, et al. in support of petitioner.

John F. De Pue, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were Lisa O. Monaco, Assistant Attorney General for National Security, Jeffrey M. Smith, Attorney, Edward S. White, Captain, JAGC, U.S. Navy Appellate Counsel, and Francis A. Gilligan, Appellate Counsel, Office of the Prosecutor for Military Commissions.

Before: SENTELLE, Chief Judge, KAVANAUGH, Circuit Judge, and GINSBURG, Senior Circuit Judge.

**Opinion**

Opinion for the Court filed by Circuit Judge KAVANAUGH, with whom Chief Judge SENTELLE joins except as to footnote 6, and with whom Senior Judge GINSBURG joins except as to footnotes 3, 6, and 8.

Concurring Opinion filed by Senior Circuit Judge GINSBURG.

KAVANAUGH, Circuit Judge:

**473 The United States is at war against al Qaeda, an international terrorist organization. Al Qaeda's stated goals are, among other things, to drive the United States from posts in the Middle East, to devastate the State of Israel, and to help establish radical Islamic control over the Greater Middle East. Al Qaeda uses terror to advance its broad objectives. Al Qaeda terrorists do not wear uniforms, and they target American civilians and members of the U.S. Military, as well as U.S. allies. After al Qaeda's attacks on the United States on September 11, 2001, Congress authorized the President to wage war against al Qaeda. That war continues.

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

[1] [2] In war, when the United States captures or takes custody of alien enemy combatants or their substantial supporters, it may detain them for the duration of hostilities. Moreover, the United States may try *unlawful* alien enemy combatants before military commissions for their war crimes. *See Hamdi v. Rumsfeld,* 542 U.S. 507, 518–24, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004); *Ex parte Quirin,* 317 U.S. 1, 26–45, 63 S.Ct. 2, 87 L.Ed. 3 (1942).

This case raises questions about the scope of the Executive's authority to prosecute war crimes under current federal statutes.

This particular dispute involves the military commission conviction of Salim Hamdan, an al Qaeda member who worked for Osama bin Laden. In 2001, Hamdan was captured in Afghanistan. He was later transferred to the U.S. Naval Base at Guantanamo Bay, Cuba.

Hamdan was not just detained at Guantanamo as an enemy combatant. He was also accused of being an *unlawful* enemy combatant and was tried and convicted by a military commission for "material support for terrorism," a war crime specified by the Military Commissions Act of 2006. *See* 10 U.S.C. § 950t(25); *see also* 10 U.S.C. § 950v(b)(25) (2006) (previous codification of same provision). Hamdan's conviction was based on actions he took from 1996 to 2001—*before* enactment of the Military Commissions Act. At the time of Hamdan's conduct, the extant federal statute authorized and limited military commissions to try violations of the "law of war." 10 U.S.C. § 821.

As punishment for his war crime, Hamdan was sentenced by the military commission to 66 months' imprisonment, with **474 *1241 credit for some time already served. Hamdan's sentence expired in 2008. Although the United States may have continued to detain Hamdan until the end of hostilities pursuant to its wartime detention authority, *see Hamdi,* 542 U.S. at 518–22, 124 S.Ct. 2633, Hamdan was transferred in late 2008 to Yemen and then released there. Even after his release, Hamdan has continued to appeal his U.S. war crimes conviction.

This appeal presents several issues. First, is the dispute moot because Hamdan has already served his sentence and been released from U.S. custody? Second, does the Executive have authority to prosecute Hamdan for material support for terrorism on the sole basis of the 2006 Military Commissions Act—which specifically lists material support for terrorism as a war crime triable by military commission—even though Hamdan's conduct occurred from 1996 to 2001, before enactment of that

Act? Third, if not, did the pre-existing statute that authorized war-crimes military commissions at the time of Hamdan's conduct—a statute providing that military commissions may try violations of the "law of war," 10 U.S.C. § 821—proscribe material support for terrorism as a war crime?

We conclude as follows:

First, despite Hamdan's release from custody, this case is not moot. This is a direct appeal of a conviction. The Supreme Court has long held that a defendant's direct appeal of a conviction is not mooted by the defendant's release from custody.

Second, consistent with Congress's stated intent and so as to avoid a serious Ex Post Facto Clause issue, we interpret the Military Commissions Act of 2006 not to authorize *retroactive* prosecution of crimes that were not prohibited as war crimes triable by military commission under U.S. law at the time the conduct occurred. Therefore, Hamdan's conviction may be affirmed only if the relevant statute that was on the books at the time of his conduct—10 U.S.C. § 821—encompassed material support for terrorism.

Third, when Hamdan committed the relevant conduct from 1996 to 2001, Section 821 of Title 10 provided that military commissions may try violations of the "law of war." The "law of war" cross-referenced in that statute is the *international* law of war. *See Quirin,* 317 U.S. at 27–30, 35–36, 63 S.Ct. 2. When Hamdan committed the conduct in question, the international law of war proscribed a variety of war crimes, including forms of terrorism. At that time, however, the international law of war did *not* proscribe material support for terrorism as a war crime. Indeed, the Executive Branch acknowledges that the international law of war did not—and still does not—identify material support for terrorism as a war crime. Therefore, the relevant statute at the time of Hamdan's conduct—10 U.S.C. § 821—did not proscribe material support for terrorism as a war crime.

Because we read the Military Commissions Act not to retroactively punish new crimes, and because material support for terrorism was not a pre-existing war crime under 10 U.S.C. § 821, Hamdan's conviction for material support for terrorism cannot stand. We reverse the judgment of the Court of Military Commission Review and direct that Hamdan's conviction for material support for terrorism be vacated.[1]

402 U.S.App.D.C. 471

**\*\*475 \*1242 I**

In 1996, Salim Hamdan traveled from his native Yemen to Pakistan and then to Afghanistan to participate in jihad. In Afghanistan, Hamdan attended an al Qaeda training camp. At the camp, Hamdan received weapons training, met Osama bin Laden, and listened to bin Laden's lectures.

Later in 1996, Hamdan became an al Qaeda driver. His duties included transporting personnel, supplies, and weapons between an al Qaeda guesthouse and al Qaeda's al Farouq training camp in Afghanistan. Eventually, Hamdan became Osama bin Laden's personal driver and bodyguard.

In August 1996, Osama bin Laden publicly declared war on the United States. That declaration came after various al Qaeda terrorist attacks, including the 1993 bombing of the World Trade Center. In 1998, bin Laden issued a fatwa calling for the indiscriminate killing of Americans, including American civilians. Hamdan was fully aware of bin Laden's public statements targeting the United States.

In August 1998, al Qaeda operatives bombed U.S. Embassies in Kenya and Tanzania, killing 257 people, including 12 Americans. Hamdan was generally aware that such an attack was planned. Around the time of the attack, Hamdan assisted Osama bin Laden in evacuating from Kandahar and moving around Afghanistan.

Later in August 1998, asserting the President's Article II power of self-defense, President Clinton ordered the U.S. Military to bomb targets in Afghanistan in an attempt to kill bin Laden. Bin Laden narrowly avoided being killed in that military action.

In October 2000, at the direction of bin Laden and senior al Qaeda leaders, al Qaeda bombed the U.S.S. Cole off the coast of Yemen, killing 17 Americans and injuring many others. Around that time, Hamdan returned to Afghanistan from Yemen.

In August 2001, Hamdan drove bin Laden to various planning meetings in Afghanistan. Several days before September 11, 2001, bin Laden told Hamdan that they had to evacuate their compound because of an impending operation. Hamdan drove bin Laden to Kabul. They later moved to a series of locations around Afghanistan.

On September 11, 2001, al Qaeda attacked the United States, killing thousands of civilians and causing massive long-term damage to the American economy and way of life.

In the days following the attacks of September 11, 2001, Congress passed and President George W. Bush signed the Authorization for Use of Military Force. That law authorized the President

> to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107–40, 115 Stat. 224 (2001).

Consistent with the 2001 Authorization for Use of Military Force, President Bush directed the use of force to kill or capture and detain al Qaeda operatives, and where **\*\*476 \*1243** appropriate to try unlawful al Qaeda combatants who had committed war crimes. On October 7, 2001, as part of the overall operation, President Bush ordered U.S. troops into Afghanistan to wage war against al Qaeda there, as well as against the Taliban government that was in control of Afghanistan and had been supporting and harboring al Qaeda.

On November 13, 2001, the President issued an executive order establishing military commissions to try al Qaeda members and aiders and abettors who had committed war crimes as defined under the "laws of war" or other "applicable laws." Military Order of Nov. 13, 2001, 66 Fed. Reg. 57,833; 57,833–34. The executive order did not purport to rely solely on the President's constitutional authority; rather, it cited two separate statutes as congressional authorization for the President to employ military commissions: the 2001 Authorization for Use of Military Force and 10 U.S.C. § 821, the long-standing statute that authorized military commissions to try violations of the "law of war."

In November 2001, Hamdan was captured in Afghanistan while driving toward Kandahar. The car he was driving contained two anti-aircraft missiles. Also in the car was an al Qaeda-issued document that authorized the bearer to carry a weapon in Afghanistan. Hamdan's captors turned him over to U.S. authorities. He was later transferred to Guantanamo Bay, Cuba, and the U.S. Military detained him there as an enemy combatant.

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

[3] At Guantanamo, Hamdan not only was detained as an enemy combatant but also was eventually charged with one count of conspiracy and was to be tried before a military commission as an *unlawful* enemy combatant who had committed war crimes.[2] Hamdan raised various legal objections to the prosecution, and the case ultimately wound its way to the Supreme Court. The Supreme Court held that the military commission rules then in place contravened statutory limits because the rules did not comply in certain respects with statutory restrictions contained in 10 U.S.C. § 836. *See Hamdan v. Rumsfeld,* 548 U.S. 557, 613–35, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). The Court split 4–3 on and thus did not decide a separate issue: whether conspiracy was a cognizable charge in a military commission under the "law of war" for purposes of 10 U.S.C. § 821. *Compare Hamdan,* 548 U.S. at 595–612, 126 S.Ct. 2749 (Stevens, J., plurality opinion) (conspiracy is not a law of war crime), *with id.* at 697–706, 126 S.Ct. 2749 (Thomas, J., dissenting) (conspiracy is a law of war crime). (Justice Kennedy did not address that issue; Chief Justice Roberts did not participate in the case.)

In the *Hamdan* case, several Justices specifically invited Congress to clarify the scope of the President's statutory authority to use military commissions to try unlawful alien enemy combatants for war crimes. *See Hamdan,* 548 U.S. at 636, 126 S.Ct. 2749 (Breyer, J., concurring); *id.* at 636–37, 126 S.Ct. 2749 (Kennedy, J., concurring).

In the wake of the Supreme Court's decision in *Hamdan,* Congress enacted a new military commissions statute. *See* Military Commissions Act of 2006, Pub. L. No. 109–366, 120 Stat. 2600. Of particular relevance here, Congress expanded military commissions beyond prosecuting violations **477 *1244** of the generic "law of war," spying, and aiding the enemy, which were the crimes listed by statute at the time. *See* 10 U.S.C. §§ 821, 904, 906. Of most importance here, Congress alleviated some of the uncertainty highlighted in *Hamdan* about the phrase "law of war" in 10 U.S.C. § 821 by listing a large number of specific war crimes that could be charged by military commission, including conspiracy and material support for terrorism. *See* § 3(a), 120 Stat. at 2630. (In 2009, Congress enacted a new Military Commissions Act; that law did not make changes relevant to this case. *See* Pub. L. No. 111–84, 123 Stat. 2574.)

After passage of the 2006 Military Commissions Act, Hamdan was charged anew before a U.S. military commission on one charge of conspiracy and one charge, containing eight specifications, of material support for terrorism.

At his military commission trial, Hamdan was acquitted of conspiracy but convicted of five specifications of material support for terrorism. In August 2008, he was sentenced to 66 months' confinement and credited for having already served most of that time.

When his sentence ended later in 2008, the war against al Qaeda had not ended. Therefore, the United States may have continued to detain Hamdan as an enemy combatant. *See Hamdan,* 548 U.S. at 635, 126 S.Ct. 2749; *Hamdi v. Rumsfeld,* 542 U.S. 507, 518–24, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004). But in November 2008, Hamdan was transferred by the U.S. Military to Yemen, and he was then released on or about January 8, 2009, in Yemen.

After his release, Hamdan nonetheless continued to appeal his U.S. military commission conviction. On appeal to the en banc Court of Military Commission Review, Hamdan argued (i) that Congress lacked authority under Article I of the Constitution to make material support for terrorism a war crime triable by military commission; (ii) that in any event, the 2006 Military Commissions Act, which listed material support for terrorism as a war crime, could not be *retroactively* applied to him because his conduct occurred from 1996 to 2001; and (iii) that the statute in effect at the time of his alleged conduct—10 U.S.C. § 821, which limited military commissions to violations of the "law of war"—did not authorize prosecution of material support for terrorism as a war crime. In 2011, the Court of Military Commission Review affirmed the conviction. *See United States v. Hamdan,* 801 F.Supp.2d 1247 (C.M.C.R.2011) (en banc).

By statute, Hamdan has an automatic right of appeal to this Court. *See* 10 U.S.C. § 950g.

## II

[4] [5] We must first address the issue of mootness—that is, whether this appeal is moot because Hamdan has been released from U.S. custody. Although the parties agree that the appeal is not moot, mootness is a jurisdictional question that we must independently consider. *See United States v. Juvenile Male,* —— U.S. ——, 131 S.Ct. 2860, 2864–65, 180 L.Ed.2d 811 (2011); *Sibron v. New York,* 392 U.S. 40, 50 n. 8, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

[6] This case is a direct appeal of a military commission conviction. In the criminal context, a direct appeal of a criminal conviction is not mooted by a defendant's release

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

from custody. *See Sibron,* 392 U.S. 40, 88 S.Ct. 1889. The Supreme Court has so ruled in part because of the collateral legal consequences of a conviction—namely, the possibility that the defendant could commit or be tried for a new **478 *1245 offense, the punishment for which could take account of a past conviction. Those collateral consequences are of course present in virtually all criminal cases (other than, for example, when the defendant has died after the conviction and thus obviously cannot commit a new offense). The same collateral consequences are present in military commission conviction cases. *See, e.g.,* MANUAL FOR MILITARY COMMISSIONS, Rules 1001(a)(2), 1001(b)(1)(A) (2012) (in military commission sentencing, the prosecution may "introduce evidence of military or civilian convictions, foreign or domestic, of the accused" as an aggravating factor); 18 U.S.C. § 3553(a)(1) (sentencing courts shall take into account "the history and characteristics of the defendant").[3] Applying the relevant Supreme Court precedent, we therefore conclude that a direct appeal of a military commission conviction is likewise not mooted by the defendant's release.

To be sure, that principle generally does not apply to the habeas context where a detainee is challenging the basis for executive detention. Such a habeas case is sometimes moot after the detainee's release. *See Spencer v. Kemna,* 523 U.S. 1, 8–14, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *Gul v. Obama,* 652 F.3d 12, 17 (D.C.Cir.2011). In our recent habeas decision in *Gul,* where a former Guantanamo detainee objected to a military detention determination after his release, this Court dismissed the case as moot.

But Hamdan is not just a military detainee; he has been convicted of a war crime by military commission. Therefore, our recent decision in *Gul* does not control here. Rather, this case is controlled by the principle that a direct appeal of a conviction is not mooted by the defendant's release from custody.

This case is not moot.

### III

[7] Under a law now codified at 10 U.S.C. § 821, Congress has long authorized the Executive to use military commissions to try war crimes committed by the enemy. *See Ex parte Quirin,* 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942). That statute authorizes military commissions to try violations of the "law of war"—a term, as we explain below, that has long been understood to mean the

international law of war. *See Hamdan v. Rumsfeld,* 548 U.S. 557, 603, 610, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (plurality); *id.* at 641, 126 S.Ct. 2749 (Kennedy, J., concurring); *Quirin,* 317 U.S. at 27–30, 35–36, 63 S.Ct. 2. Two other longstanding statutes separately authorize military commission prosecutions for spying and aiding the enemy. *See* 10 U.S.C. §§ 904, 906.[4]

*1246 **479 After the Supreme Court's 2006 decision in *Hamdan,* Congress enacted a new military commissions statute that, among other things, clarified the scope of the Executive's authority to try war crimes. *See* Military Commissions Act of 2006, Pub. L. No. 109–366, 120 Stat. 2600. Of particular relevance here, Congress expanded military commissions beyond trying violations of the generic "law of war," spying, and aiding the enemy. Congress instead also listed a large number of specific war crimes that could be tried by military commission, including conspiracy and material support for terrorism. *See id.* § 3(a), 120 Stat. at 2630 (now codified at 10 U.S.C. § 950t).

[8] Hamdan argues that Congress lacked authority under Article I of the Constitution—namely, the Define and Punish Clause—to define material support for terrorism as a war crime subject to trial by a U.S. military commission.[5] Hamdan maintains that Congress's authority under the Define and Punish Clause is limited to proscribing offenses that are already illegal under international law. And Hamdan contends that material support for terrorism is not a recognized international-law war crime. The Government responds that Hamdan's focus on the Define and Punish Clause alone is misplaced. According to the Government, the Declare War Clause and other war clauses in Article I, as supplemented by the Necessary and Proper Clause, independently authorize Congress to establish military commissions to try an enemy's war crimes. And the Government further contends that Congress's broad authority under the Declare War Clause is not constrained by the evolving and often difficult to discern standards of international law. Therefore, as the Government sees it, Congress has authority to make material support for terrorism a war crime triable by military commission.

We do not decide that antecedent question. Even assuming arguendo that Congress had authority under its various Article I war powers to establish material support for terrorism as a war crime in the Military Commissions Act of 2006,[6] we **480 *1247 conclude that the Act did not authorize *retroactive* prosecution for conduct that was committed before the Act's enactment and was not prohibited by U.S. law at the time the conduct occurred. Here, Hamdan's conduct occurred from 1996 to

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

2001—before enactment of the Military Commissions Act. And as we will explain, the federal statute in effect at the time of Hamdan's conduct—10 U.S.C. § 821—did *not* authorize prosecution for material support for terrorism.


**A**

As is clear from the text of the Military Commissions Act of 2006, Congress was quite concerned about the ex post facto implications of retroactively prosecuting someone under the Act for conduct committed before its enactment. Congress tried to deal with any ex post facto problem by declaring in the text of the statute that "[t]he provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission." § 3(a), 120 Stat. at 2624. The Act continued: "Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter." *Id.*

[9] As Congress well understood when it appended this unusual statement to the statute, the U.S. Constitution bars Congress from enacting punitive ex post facto laws. *See* U.S. CONST. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."). Among other things, the Ex Post Facto Clause bars laws that retroactively punish conduct that was not previously prohibited, or that retroactively increase punishment for already prohibited conduct. *See Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); *Calder v. Bull,* 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798) (opinion of Chase, J.). The Ex Post Facto Clause thus prevents Congress and the Executive from retroactively applying a federal criminal statute to conduct committed before the statute was enacted.

As Congress itself recognized in the statutory text, retroactive prosecution by military commission could similarly raise serious constitutional issues, at the very least. As stated in the statutory text, however, Congress believed that the Act codified no new crimes and thus posed no ex post facto problem. As we explain below, Congress's premise was incorrect. The statute does codify some new war crimes, including material support for terrorism. The question for ex post facto purposes is this: If Congress had known that the Act was codifying some new crimes, would Congress have wanted the new crimes

to be enforced retroactively? To begin with, the statutory text reveals a tight causal link between (i) Congress's **\*\*481 \*1248** belief that the statute codified only crimes under pre-existing law and (ii) Congress's statement that the statute could therefore apply to conduct before enactment. That causal link suggests that Congress would *not* have wanted *new* crimes to be applied retroactively. The Executive Branch agrees with that interpretation of the statute, stating: "Congress incorporated ex post facto principles into the terms of the MCA itself." Brief for the United States at 66. At a minimum, we know that the statutory text does not contemplate or address the possibility of retroactively applying new crimes, leaving us with at least something of an ambiguity. And courts interpret ambiguous statutes to avoid serious questions of unconstitutionality. *See Rapanos v. United States,* 547 U.S. 715, 738, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (plurality opinion of Scalia, J.) (constitutional avoidance where statute "raises difficult questions" of constitutionality); *Cherokee Nation of Oklahoma v. Leavitt,* 543 U.S. 631, 646, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005) (avoiding an interpretation that "may violate the Constitution"). To avoid the prospect of an Ex Post Facto Clause violation here, we interpret the Military Commissions Act of 2006 so that it does not authorize *retroactive* prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing U.S. law as a war crime triable by military commission. In this case, therefore, Hamdan's conviction stands or falls on whether his conduct was prohibited by the pre-existing statute, 10 U.S.C. § 821, at the time he committed the conduct.[7]


**B**

Before enactment of the Military Commissions Act in 2006, U.S. military commissions could prosecute war crimes under 10 U.S.C. § 821 for violations of the "law of war." The Government suggests that at the time of Hamdan's conduct from 1996 to 2001, material support for terrorism violated the "law of war" referenced in 10 U.S.C. § 821. It is true that in the text of the Military Commissions Act of 2006, Congress declared its belief that material support for terrorism was a pre-existing crime under the law of war and thus under 10 U.S.C. § 821. *See* § 3a, 120 Stat. at 2624. But exercising our independent review, as we must when considering the ex post facto implications of a new law, *see Calder v. Bull,* 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798) (opinion of Chase, J.); *Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803), we conclude otherwise. Material support for terrorism was not a war crime under the law

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

of war referenced in 10 U.S.C. § 821 at the time of Hamdan's conduct.

[10] [11] Analysis of this issue begins by determining what body of law is encompassed by the term "law of war" in 10 U.S.C. § 821. The Supreme Court's precedents tell us: The "law of war" referenced in 10 U.S.C. § 821 is the international law of war.[8] *See Hamdan,* 548 U.S. at 603, 126 S.Ct. 2749 (plurality) (act is law **\*482 \*1249** of war offense when " universal agreement and practice both in this country and internationally" recognize it as such) (internal quotation marks omitted); *id.* at 610, 126 S.Ct. 2749 (analyzing international sources to determine whether conspiracy was "recognized violation of the law of war"); *id.* at 641, 126 S.Ct. 2749 (Kennedy, J., concurring) ("the law of war" referenced in 10 U.S.C. § 821 "derives from rules and precepts of the law of nations" and is " the body of international law governing armed conflict") (internal quotation marks omitted); *Quirin,* 317 U.S. at 29, 63 S.Ct. 2 ("law of war" referenced in 10 U.S.C. § 821 is a "branch of international law"); *id.* at 27–28, 63 S.Ct. 2 (The "law of war" is "that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals."); *see also* Instructions for the Government of Armies of the United States in the Field (Lieber Code), General Orders No. 100, arts. 27 & 40 (Apr. 24, 1863) (describing the law of war as a "branch" of the "law of nations"); O.L.C. Memorandum from Patrick F. Philbin to Alberto R. Gonzales 5 (Nov. 6, 2001) ("laws of war" are "considered a part of the 'Law of Nations' "); *id.* at 29, 63 S.Ct. 2 ("the term 'law of war' used in 10 U.S.C. § 821 refers to the same body of international law now usually referred to as the 'laws of armed conflict' ").[9]

We turn, then, to the question whether material support for terrorism is an international-law war crime.

[12] It is true that international law establishes at least some forms of *terrorism,* **\*483 \*1250** including the intentional targeting of civilian populations, as war crimes. *See, e.g.,* Rome Statute of the International Criminal Court art. 8(2)(b), July 17, 1998, 2187 U.N.T.S. 90; Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva IV), art. 33, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; COMMISSION OF RESPONSIBILITIES, CONFERENCE OF PARIS 1919, VIOLATION OF THE LAWS AND CUSTOMS OF WAR 17 (Clarendon Press 1919) (the Allied Nations condemned Germany for "the execution of a system of terrorism" after World War I).

But the issue here is whether *material support for*

*terrorism* is an international-law war crime. The answer is no. International law leaves it to individual nations to proscribe material support for terrorism under their domestic laws if they so choose. There is no international-law proscription of material support for terrorism.

To begin with, there are no relevant international *treaties* that make material support for terrorism a recognized international-law war crime. Neither the Hague Convention nor the Geneva Conventions—the sources that are "the major treaties on the law of war"—acknowledge material support for terrorism as a war crime. *See Hamdan,* 548 U.S. at 604, 126 S.Ct. 2749 (plurality); Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva IV), Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Hague Convention (IV) Respecting the Laws and Customs of War on Land and Its Annex, Oct. 18, 1907, 36 Stat. 2277.

Nor does customary international law otherwise make material support for terrorism a war crime. Customary international law is a kind of common law; it is the body of international legal principles said to reflect the consistent and settled practice of nations. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2) (1987) ("Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation"). It is often difficult to determine what constitutes customary international law, who defines customary international law, and how firmly established a norm has to be to qualify as a customary international law norm. *Cf. Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).[10]

**\*1251 \*\*484** But here, the content of customary international law is quite evident. Material support for terrorism was not a recognized violation of the international law of war as of 2001 (or even today, for that matter). As we have noted, the Geneva Conventions and the Hague Convention do not prohibit material support for terrorism. The 1998 Rome Statute of the International Criminal Court, which catalogues an extensive list of international war crimes, makes no mention of material support for terrorism. *See* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90. Nor does the Statute of the International Tribunal for the Former Yugoslavia, the Statute of the International Tribunal for Rwanda, or the Statute of the Special Court for Sierra Leone. *See* Statute of the International Tribunal for the Former Yugoslavia, adopted by S.C. Res. 827, U.N. Doc. S/RES/827 (1993), reprinted in 32 I.L.M. 1159, 1192; Statute of the

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. Doc. S/ RES/955 (1994), reprinted in 33 I.L.M. 1598, 1602 (includes terrorism itself as a crime); Statute of the Special Court for Sierra Leone art. 3(d), Jan. 16, 2002, 2178 U.N.T.S. 138 (same). Nor have any international tribunals exercising common-law-type power determined that material support for terrorism is an international-law war crime.

Commentators on international law have similarly explained that material support for terrorism is not an international-law war crime. *See, e.g.,* ANDREA BIANCHI & YASMIN NAQVI, INTERNATIONAL HUMANITARIAN LAW AND TERRORISM 244 (2011) ("there is little evidence" that a proscription of "material support for terrorism" is "considered to be part of the laws and customs of war"). Nor is the offense of material support for terrorism listed in the JAG handbook on the law of war. *See* U.S. ARMY JAG, LAW OF WAR HANDBOOK (Maj. Keith E. Puls ed., 2005); *see also* Jennifer K. Elsea, *The Military Commissions Act of 2006: Analysis of Procedural Rules and Comparison with Previous DOD Rules and the Uniform Code of Military Justice* 12 (CRS, updated Sept. 27, 2007) ("defining as a war crime the 'material support for terrorism' does not appear to be supported by historical precedent") (footnote omitted).

In short, neither the major conventions on the law of war nor prominent modern international tribunals nor leading international-law experts have identified material support for terrorism as a war crime. Perhaps most telling, before this case, no person has ever been tried by an international-law war crimes tribunal for material support for terrorism.

Not surprisingly, therefore, even the U.S. Government concedes in this case that material support for terrorism is not a recognized international-law war crime. No treaty that the Government has cited or that we are aware of identifies material support for terrorism as a war crime. And the Government further admits: The "offense of providing material support to terrorism, like spying and aiding the enemy, has not attained international recognition at this time as a violation of customary international law." Brief for the United States at 48; *see also id.* at 55–56 (same).

To be sure, there is a strong argument that aiding and abetting a recognized international-law war crime such as terrorism is itself an international-law war crime. And there are other similar war crimes. **\*\*485 \*1252** But Hamdan was not charged with aiding and abetting terrorism or some other similar war crime. He was charged with material support for terrorism. And as the Government acknowledges, aiding and abetting terrorism prohibits different conduct, imposes different mens rea requirements, and entails different causation standards than material support for terrorism. If the Government wanted to charge Hamdan with aiding and abetting terrorism or some other war crime that was sufficiently rooted in the international law of war (and thus covered by 10 U.S.C. § 821) at the time of Hamdan's conduct, it should have done so.

[13]   The Government latches on to a few isolated precedents from the Civil War era to prop up its assertion that material support for terrorism was a pre-existing war crime as of 2001 for purposes of 10 U.S.C. § 821. There are several independent reasons that those cases fail to support the Government's argument. *First,* the Civil War cases did not involve any charges of material support for terrorism. Instead, several cases involve guerillas who were punished for taking up "arms" as "insurgents"—that is, for direct attacks rather than material support. *See, e.g.,* G.O. No. 15, HQ, Dep't of the Mississippi (Apr. 3, 1862), 1 OR ser. II, at 472–76. Others were convicted of "joining, and assisting a band of robbers and bandits"—in other words, what we would likely call aiding and abetting, not material support. G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862), 1 OR ser. II, at 478. In short, those precedents are at best murky guidance here. *Cf. Hamdan,* 548 U.S. at 602, 126 S.Ct. 2749 (plurality) (requiring "plain and unambiguous" precedent). *Second,* those Civil War commissions were in part military tribunals governing certain territory—which are a separate form of military commission subject to a separate branch of law, and not the kind of law-of-war military commission at issue here. As others have suggested, their precedential value is therefore limited. *See Hamdan,* 548 U.S. at 596 n. 27, 126 S.Ct. 2749; *id.* at 608, 126 S.Ct. 2749 (plurality) (The "military commissions convened during the Civil War functioned at once as martial law or military government tribunals and as law-of-war commissions. Accordingly, they regularly tried war crimes and ordinary crimes together.") (citation omitted). *Third,* and perhaps most to the point, those cases do not establish that material support for terrorism was a war crime recognized under *international law* as of 1996 to 2001 when Hamdan committed his conduct, which is the relevant inquiry under 10 U.S.C. § 821. The Government contends that those Civil War precedents illuminate what it calls the "U.S. common law of war"—not the international law of war. But the statutory constraint here imposed by 10 U.S.C. § 821 is the international law of war. As the Government told the Supreme Court in *Quirin,* "This 'common law of war' is a centuries-old body of largely unwritten rules and

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

principles of *international* law which governs the behavior of both soldiers and civilians during time of war." Brief for the United States at 29, in *Quirin,* 317 U.S. 1, 63 S.Ct. 2 (emphasis added) (citation omitted). To be sure, U.S. precedents may inform the content of international law. But those Civil War precedents fail to establish material support for terrorism as a war crime under the international law of war as of 1996 to 2001. And even the Government admits that material support for terrorism was not an international-law war crime as of 1996 to 2001.

In short, material support for terrorism was not an international-law war crime **486 *1253 under 10 U.S.C. § 821 at the time Hamdan engaged in the relevant conduct.

* * *

Because we read the Military Commissions Act not to sanction retroactive punishment for new crimes, and because material support for terrorism was not a pre-existing war crime under 10 U.S.C. § 821, Hamdan's conviction for material support for terrorism cannot stand. We reverse the decision of the Court of Military Commission Review and direct that Hamdan's conviction for material support for terrorism be vacated.

*So ordered.*

GINSBURG, Senior Circuit Judge, concurring:

I join the decision of the Court but, with respect to its holding Mr. Hamdan's appeal of his criminal conviction by military commission is not moot, I do so only because precedent so dictates. I write separately to explain the unfortunate state of that precedent, which requires us to review the conviction of a man long since transferred to Yemen who, even if his conviction were overturned and he were to hear of it, would not be affected in any way by the result. Because today's decision has no actual consequence for Mr. Hamdan, his case is moot in fact, though, curiously, not in law.

The Supreme Court "presumes" the appeal of a criminal conviction is not moot unless "it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *see United States v. Juvenile Male,* ——— U.S. ———, 131 S.Ct. 2860, 2864, 180 L.Ed.2d 811 (2011) (per curiam) ("When the defendant challenges his underlying *conviction,* this Court's cases have long presumed the existence of collateral consequences"). The

Government concedes, as Hamdan's counsel contends, that it cannot show there is "no possibility" Hamdan's conviction will have a collateral legal consequence for him. The parties' mutual desire to have the court decide this case on its merits is of no moment, however; an Article III court has an "independent obligation to be sure [it] ha[s] jurisdiction," *High Plains Wireless, LP v. FCC,* 276 F.3d 599, 605 (D.C.Cir.2002), which here requires us to determine whether the case has become moot on appeal.

A criminal conviction may and often does have consequences beyond the penalties imposed in the sentence. In *Sibron,* the Court held the defendant's appeal of his conviction was not moot, even though his sentence had expired during the pendency of the appeal, because that conviction, left undisturbed, could increase his sentence if he were later to be convicted of another crime. 392 U.S. at 56, 88 S.Ct. 1889; *accord United States v. Morgan,* 346 U.S. 502, 512–13, 74 S.Ct. 247, 98 L.Ed. 248 (1954) ("Although the term has been served, the results of the conviction may persist. Subsequent convictions may carry heavier penalties"). Similarly, in *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), the Court concluded that a continuing civil disability stemming from a criminal conviction, such as a bar to voting in state elections or to serving as a juror, also keeps a criminal appeal from becoming moot. Even an adverse immigration consequence, including a bar on re-entering United States, may suffice to keep a case alive and hence to preserve appellate jurisdiction. *See, e.g., United States v. Hamdi,* 432 F.3d 115, 121 (2d Cir.2005).

Although, in considering a challenge to a **487 *1254 criminal conviction,[*] "the Court [has] abandoned all inquiry into the actual existence of specific collateral consequences and in effect presumed that they exist [ ]," *Sibron,* 392 U.S. at 55, 88 S.Ct. 1889, the presumption is rebutted if the alleged collateral consequences are foreclosed as a matter of law. In *Perez v. Greiner,* 296 F.3d 123 (2d Cir.2002), the Second Circuit held moot the direct appeal of a criminal conviction on the ground there was "no material possibility that [the defendant] will suffer collateral consequences on the basis of the challenged conviction," *id.* at 125. The defendant in that case had been deported when his appeal was heard and was ineligible to reenter the country because of an earlier conviction. With the defendant "permanently barred from this country on a wholly separate ground, the currently challenged ... conviction [could] have no meaningful effect on his admissibility and hence [could not] serve as a possible collateral consequence." *Id.* at 126.

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

Hamdan and the Government each point to a collateral consequence of Hamdan's conviction. Hamdan claims his conviction for material support of terrorism makes him subject to permanent mandatory exclusion from the United States. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I), (V). For its part, the Government claims Hamdan's conviction may expose him to an enhanced sentence if in the future he commits a new offense and is tried therefore in a civilian or military court of the United States. *See* DEP'T OF DEFENSE, MANUAL FOR MILITARY COMMISSIONS, Rule 1001(b)(1)(A) (2010) ("The trial counsel may introduce [in a sentencing proceeding] evidence of [prior] military or civilian convictions, foreign or domestic, of the accused"); 18 U.S.C. § 3553(a)(1) (sentencing court shall consider "the history and characteristics of the defendant"). The adverse collateral consequence raised by Hamdan is foreclosed as a matter of law. The adverse collateral consequence posed by the Government is so far-fetched that application of the *Sibron* presumption in this case risks making our opinion merely advisory.

The adverse immigration consequence alleged by Hamdan is impossible as a matter of law because Hamdan is already subject to mandatory exclusion from the United States regardless whether his conviction stands. The Immigration and **488 *1255 Naturalization Act (INA) provides: "Any alien who ... has engaged in a terrorist activity ... is inadmissible." 8 U.S.C. § 1182(a)(3)(B)(i)(I). The Government provided overwhelming evidence, none of which Hamdan bothers to dispute, demonstrating that he engaged in "terrorist activity" within the meaning of the INA, including the provision of material support for terrorism.* The INA makes Hamdan inadmissible not for his conviction, which we reverse,* but rather for having knowingly supported terrorist activities, a historical fact we cannot reverse. *Cf. Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 135, 3 L.Ed. 162 (1810) ("The past cannot be recalled by the most absolute power"). Nor is it conceivable that an immigration court, which applies a standard of proof much more favorable to the Government than does a military commission, *compare* 8 U.S.C. § 1229a(c) (2) ("In the proceeding [for deciding whether an alien is admissible,] the alien has the burden of establishing ... the alien is clearly and beyond doubt entitled to be admitted"), *with* 10 U.S.C. § 949l (4) (in a military commission "the burden of proof to establish the guilt of the accused beyond a reasonable doubt is upon the United States"), would find Hamdan in fact had not provided any of the five types of material support for which he was convicted and therefore may be admitted to the United States.* Because Hamdan is already barred from entering the United States due to his past involvement in terrorism, his current conviction has

no incremental **489 *1256 effect upon his admissibility and hence the immigration consequence he proffers cannot serve as a basis for our jurisdiction. *Cf. Gul,* 652 F.3d at 19–20 (where detention at Guantanamo Bay, rather than designation as enemy combatant, is the ground for inadmissibility, immigration consequence of challenge to designation "too speculative to sustain the exercise of our jurisdiction").

The only other collateral consequence alleged is the Government's preposterously hypothetical prospect of an enhanced sentence if Hamdan is in the future convicted in the United States for committing another crime. The Supreme Court held in *Sibron* that the hypothetical future sentencing enhancement is sufficient to support the presumption that the conviction being appealed will have an adverse collateral consequence and hence to keep the appeal from being moot. *Sibron,* 392 U.S. at 56, 88 S.Ct. 1889. Subsequent cases, however, cast doubt upon the continuing validity of *Sibron* as applied to this case. In *Spencer v. Kemna* the Court declined to extend the *Sibron* presumption to the appeal of a parole revocation because any collateral consequence in a future sentencing "was contingent upon [the defendant again] violating the law, getting caught, and being convicted." 523 U.S. 1, 15, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *see also Lane v. Williams,* 455 U.S. 624, 633 n. 13, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982) ("The parole violations that remain a part of respondents' records cannot affect a subsequent parole determination unless respondents again violate state law, are returned to prison, and become eligible for parole. Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring").

That is, although in *Sibron* a conviction was presumed to have adverse consequences for the defendant in a future hypothetical sentencing, in *Spencer* the hypothetical sentencing consequences of a defendant's parole revocation were held insufficient to keep his case from being moot because such consequences are speculative and depend upon future unlawful conduct by the defendant. Both holdings were categorical; they did not depend at all upon the particular defendant's probability of recidivating. Therefore, the defendants' future crimes, apprehension, and conviction were equally speculative in both cases. It is entirely unclear, therefore, how the hypothetical sentencing consequences of a parole revocation could be too speculative to support a finding of collateral consequences, while the hypothetical sentencing consequences of a conviction could be concrete and certain enough to support the presumption of collateral consequences, and hence Article III jurisdiction, in all criminal appeals.

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

Nonetheless, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Accordingly, because Hamdan's case is a direct appeal of his criminal conviction rather than review of a parole revocation as in *Spencer,* the Court is bound to hold the *Sibron* presumption applies and therefore the hypothetical future sentencing consequences of Hamdan's conviction are sufficient to keep his appeal from being moot.

Finally, I note that although this is an "appeal of a criminal conviction," we have strayed far from the familiar territory of *Sibron* and its progeny, which deemed sentencing consequences the antidote to mootness. The criminal conviction in each of those cases was entered in a regularly **490 *1257** constituted civilian court, and the criminal defendant served time in a domestic prison before being released into the sovereign territory of the United States. As such, upon his release the defendant was subject to the criminal laws of the United States and of the State in which he was located. Recidivism being common in the United States, it is unfortunately reasonable to suppose such a defendant may again be convicted for violating a state or federal law.* By contrast, Hamdan is presumably in Yemen and is certainly not in the United States; so far as the record shows, he has never entered the United States nor expressed any desire to do so; and he is barred, both legally and physically, from entering the United States. As a result, the only possible future sentencing consequence of his conviction by a military commission would be through extraterritorial application of our criminal law to a federal crime yet to be committed, or through a successive prosecution in a military commission for a future violation of the law of war. It is, to say the least, far more speculative that Hamdan may find himself again being sentenced in the United States than it is an domestic criminal may recidivate and find himself before a domestic criminal court.

**Parallel Citations**

402 U.S.App.D.C. 471

Footnotes

1 Our judgment would not preclude detention of Hamdan until the end of U.S. hostilities against al Qaeda. Nor does our judgment preclude any future military commission charges against Hamdan—either for conduct prohibited by the "law of war" under 10 U.S.C. § 821 or for any conduct since 2006 that has violated the Military Commissions Act. Nor does our judgment preclude appropriate criminal charges in civilian court. Moreover, our discussion concerns only the commission's legal authority. We do not have occasion to question that, as a matter of fact, Hamdan engaged in the conduct for which he was convicted.

2 Generally speaking, enemy soldiers or combatants are considered *unlawful* enemy combatants when they, for example, join or support an organization waging unlawful war or they commit specific "acts which render their belligerency unlawful." *Ex parte Quirin,* 317 U.S. 1, 31, 63 S.Ct. 2, 87 L.Ed. 3 (1942). For purposes of the war against al Qaeda, this concept is now defined by statute. *See* 10 U.S.C. § 948a.

3 In his concurring opinion, Judge Ginsburg calls for a change to existing Supreme Court mootness doctrine. In doing so, Judge Ginsburg suggests that Hamdan is in Yemen and has little chance of landing in future trouble in the U.S. legal system. Maybe. Maybe not.

4 The "aiding the enemy" proscription in 10 U.S.C. § 904, which was first codified in the Articles of War of 1806, *see* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 102–03, 981 (rev. 2d ed. 1920), generally requires breach of a duty of loyalty as well as aid to the enemy. *See Hamdan,* 548 U.S. at 600–01 n. 32, 126 S.Ct. 2749 (plurality) ("aiding the enemy may, in circumstances where the accused owes allegiance to the party whose enemy he is alleged to have aided, be triable by military commission"). The breach of loyalty requirement is made explicit in the 2006 Military Commissions Act, which re-codified the crime. 10 U.S.C. § 950t(26) ("Any person subject to this chapter who, *in breach of an allegiance or duty to the United States,* knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.") (emphasis added).

5 The Define and Punish Clause provides that Congress has the power: "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. CONST. art. I, § 8, cl. 10.

6 Judge Kavanaugh alone concurs in this footnote. Because the question of Congress's Article I power to make material support for terrorism a war crime has been thoroughly briefed and argued, because that question is logically antecedent to the ex post facto

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works. 13

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

issue, and because of the importance of deciding wartime cases in a way that provides clear guidance, Judge Kavanaugh believes it appropriate to address the antecedent question—as the Supreme Court itself did in resolving similar antecedent issues in both *Hamdi* and *Hamdan. See Hamdi,* 542 U.S. at 516–24, 533–34, 124 S.Ct. 2633 (resolving several "threshold" questions, including whether enemy combatants may be detained for the duration of hostilities, before concluding that the procedures used to detain Hamdi were insufficient); *Hamdan,* 548 U.S. at 593–94, 126 S.Ct. 2749 (resolving antecedent question whether relevant statutes generally authorized military commissions, before concluding that the commission in Hamdan's case contravened separate statutory limits). Here, Judge Kavanaugh would conclude that Congress has authority under Article I, § 8 to establish material support for terrorism as a war crime that, when committed by an alien, may be tried by military commission. Although material support for terrorism is not yet an international-law war crime, Congress's war powers under Article I are not defined or constrained by international law. The Declare War Clause and the other Article I war powers clauses do not refer to international law, unlike the Define and Punish Clause. Moreover, Congress has long prohibited war crimes beyond those specified by international law. *See* 10 U.S.C. § 904 (aiding the enemy); *id.* § 906 (spying); *cf. Quirin,* 317 U.S. 1, 63 S.Ct. 2. The U.S. Constitution does not give the international community—either directly, or indirectly through the vehicle of international law—a judicially enforceable veto over Congress's exercise of its war powers. Put simply, the United States may be a leader in the international community, not just a follower, when Congress authorizes war against a terrorist organization or makes crimes such as material support for terrorism war crimes triable by military commission. To be sure, it is often prudent for Congress and the President to coordinate closely with the international community and pay careful attention to international law when authorizing war and enacting war crimes. But those policy factors, political realities, and international-law considerations are not *constitutional* constraints incorporated into the Article I war powers clauses and thereby enforceable in U.S. courts.

[7]   To be clear, we do not here decide whether or how the Ex Post Facto Clause might apply to this case. As we interpret the statute, that ultimate constitutional question need not be decided.

[8]   It has been suggested that courts should not use international law as a free-floating tool to alter how the courts would otherwise interpret a domestic U.S. statute *when the statute does not incorporate or refer to international law. See Al–Bihani v. Obama,* 619 F.3d 1, 5–8 (D.C.Cir.2010) (Brown, J., concurring in denial of rehearing en banc); *id.* at 9–23 (Kavanaugh, J., concurring in denial of rehearing en banc). But that interpretive issue is not implicated in this case. As Congress has often done, and as explained in an *Al–Bihani* concurrence, Congress here *explicitly* referred to international law and *explicitly* incorporated international norms into domestic U.S. law in 10 U.S.C. § 821 by means of the express cross-reference to the "law of war." *See id.* at 10, 13–15 (Kavanaugh, J., concurring in denial of rehearing en banc) (explaining that distinction).

[9]   *See also* Curtis A. Bradley & Jack L. Goldsmith, *The Constitutional Validity of Military Commissions,* 5 GREEN BAG 2d 249, 256 (2002) ("As noted above, President Bush's Military Order, 10 U.S.C. § 821, and Supreme Court precedent all indicate that the jurisdiction of military commissions extends (at least) to violations of the international laws of war."); Maj. Michael A. Newton, *Continuum Crimes: Military Jurisdiction Over Foreign Nationals Who Commit International Crimes,* 153 MIL. L. REV. 1, 21 (1996) ("Therefore, the entire scope of history and American jurisprudence compel the conclusion that Article 21 grants jurisdiction *only* over violations of the international laws of war. The text of Article 21 leads to the same conclusion."); Ruth Wedgwood, *Al Qaeda, Terrorism, and Military Commissions,* 96 AM. J. INT'L L. 328, 334 (2002) ("This statutory language" in 10 U.S.C. § 821 "acknowledges that the jurisdiction of military commissions is defined by the norms of the customary law of nations, namely, the law of war.").

Even outside the context of 10 U.S.C. § 821, the term "law of war" in the U.S. Code and precedent generally refers to the international law of war. *See Madsen v. Kinsella,* 343 U.S. 341, 354, 72 S.Ct. 699, 96 L.Ed. 988 (1952) (The "law of war" includes that part of "the law of nations" which "defines the powers and duties of belligerent powers."); *Prize Cases,* 67 U.S. 635, 667, 2 Black 635, 17 L.Ed. 459 (1863) ("The laws of war, as established among nations, have their foundation in reason, and all tend to mitigate the cruelties and misery produced by the scourge of war."); *Hearings on H.R. 2498 (UCMJ) Before the H. Comm. on Armed Servs.,* 81st Cong. 959 (1949) (Representative Overton Brooks, Chairman, House Subcommittee No. 1 on Armed Services: "What is a law of war?" Colonel John P. Dinsmore: " 'Law of war' is set out in various treaties like the Geneva convention and supplements to that." Representative Brooks: "International law." Colonel Dinsmore: "Yes, sir."); U.S. ARMY JAG, LAW OF WAR HANDBOOK 20 (Maj. Keith E. Puls ed., 2005) (identifying "customary international law"—that is, "the 'unwritten' rules that bind all members of the community of nations" during war as one of the two major sources of the law of war, along with conventional international law); MANUAL FOR COURTS–MARTIAL UNITED STATES, at I–1 (2012) ("The sources of military jurisdiction include the Constitution and international law. International law includes the law of war.").

[10]   Although customary international law, including the customary international law of war, contains some well-defined prohibitions at the core, the contours of customary international law are imprecise. That imprecision provides good reason for Congress and the Executive, when they want to outlaw violations of perceived international-law norms, to enact statutes outlawing specific conduct, rather than simply prohibiting violation of something as vague as "international law" or "the law of nations" or the "law of war." Congress has done so in many recent statutes, including the Military Commissions Act of 2006. Pub. L. No. 109–366, 120 Stat. 2600 (2006). *See also* War Crimes Act of 1996, Pub. L. No. 104–192, 110 Stat. 2104; Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73 (1992); Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94–583, 90 Stat. 2891.

At the same time, the imprecision of customary international law calls for significant caution by U.S. courts before permitting

Hamdan v. U.S., 696 F.3d 1238 (2012)

402 U.S.App.D.C. 471

civil or criminal liability premised on violation of such a vague prohibition. *Cf. Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). A general prohibition against violations of "international law" or the "law of nations" or the "law of war" may fail in certain cases to provide the fair notice that is a foundation of the rule of law in the United States. Therefore, as the Supreme Court required in an analogous context in *Sosa,* and as the plurality suggested in *Hamdan,* imposing liability on the basis of a violation of "international law" or the "law of nations" or the "law of war" generally must be based on norms firmly grounded in international law. *See Sosa,* 542 U.S. at 724–38, 124 S.Ct. 2739; *Hamdan,* 548 U.S. at 602–03 & n. 34, 605, 126 S.Ct. 2749 (plurality). In this case, the asserted norm has no grounding in international law, much less firm grounding.

\* Contrary to the Court's reading of the relevant precedents, Ct. Op. at 12, the Supreme Court does not distinguish between direct review of a criminal conviction and a collateral attack on a criminal conviction, by way of a petition for a writ of habeas corpus or otherwise. The Supreme Court has, on several occasions, indicated the *Sibron* presumption applies in a collateral proceeding for post-conviction relief. *See, e.g., Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) (holding habeas challenge to criminal conviction not moot due to "collateral consequences" of conviction); *Lane v. Williams,* 455 U.S. 624, 634, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982) (Marshall, J., dissenting) ("The majority recognizes that in habeas corpus challenges to criminal convictions, the case 'is moot only if it is shown there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction' " (quoting *Sibron* )). *Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), and *Gul v. Obama,* 652 F.3d 12, 19 (D.C.Cir.2011), were habeas cases that did not apply the *Sibron* presumption, but the inapplicability of the presumption did not depend upon a distinction between direct review and habeas. In *Spencer,* the petitioner challenged not a criminal conviction but rather the revocation of his parole. In *Gul,* the petitioner challenged not a criminal conviction but rather his designation as an enemy combatant. Neither decision rested merely upon the ground the case sounded in habeas. The present Court's different view of the matter is of no moment, however; as explained below, binding precedent unfortunately but unambiguously dictates the *Sibron* presumption applies to the direct review of a criminal conviction, such as Hamdan presents here.

\* The INA defines "[e]ngage in terrorist activity" to include committing "an act that the actor knows, or reasonably should know, affords material support ...:

(aa) for the commission of a terrorist activity;

(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity; [or]

(cc) to a terrorist organization ... [designated as such by the Secretary of State]...."

*Id.* § 1182(a)(3)(B)(iv)(VI). A military commission, the Convening Authority, and the Court of Military Commission Review each separately found beyond a reasonable doubt that Hamdan provided material support generally to al Qaeda, and specifically for an act of terrorism by, among other things, serving as Osama bin Laden's driver and bodyguard from 1996 to 2001, with the knowledge Hamdan "was protecting the leader of al Qaeda" and was "facilitating communication and planning used for acts of terrorism," *United States v. Hamdan,* 801 F.Supp.2d 1247, 1259 (C.M.C.R.2011); *see also id.* at 1254, 1258, 1323. Al Qaeda has been designated as a "foreign terrorist organization" by the State Department since 1999. *See* Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,012, 55,012 (Oct. 8, 1999) (initial designation); 66 Fed. Reg. 51,088, 51,089 (Oct. 5, 2001) (redesignation).

\* Although we reverse Hamdan's criminal conviction for material support, we do so not for lack of evidence but rather because the Military Commissions Act of 2006 does not authorize retroactive prosecution for an act that was not criminal when done. There is no comparable bar to retroactivity that prevents the Government from attaching to those same acts adverse immigration consequences. *See Marcello v. Bonds,* 349 U.S. 302, 314, 75 S.Ct. 757, 99 L.Ed. 1107 (1955) ("the prohibition of the ex post facto clause does not apply to deportation").

\* In addition to that statutory basis for Hamdan's permanent exclusion, Hamdan would not be physically able to re-enter the country because of his automatic inclusion, as a former Guantanamo detainee, on the 'No Fly List.' *See* 49 U.S.C. § 44903(j)(2)(C)(v); *cf. Gul v. Obama,* 652 F.3d 12, 19 (D.C.Cir.2011) (former detainees are "barred from flights entering the United States regardless whether a court declares they were unlawfully detained. An order granting a detainee's habeas petition would not mean his exoneration, nor would it be a determination he does not pose a threat to American interests; it would mean only that the Government has not proven the detainee more likely than not 'materially support[ed]' " terrorism).

\* Recidivism rates of convicts released from prisons in the United States are well-known and substantial. *See* DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, RECIDIVISM OF PRISONERS RELEASED IN 1994 1 (June 2002) (using a sample of 272,111 former prisoners in 15 states, study showed 46.9% were convicted of another offense within three years of release). Recidivism rates among Guantanamo detainees are comparatively speculative, but, insofar as they are known, are rather modest. *See* DIRECTOR OF NATIONAL INTELLIGENCE, SUMMARY OF THE REENGAGEMENT OF DETAINEES FORMERLY HELD AT GUANTANAMO BAY, CUBA 1 (March 1, 2012) (of 599 detainees released from Guantanamo, 4.7% detained again and "confirmed of reengaging" in hostilities over a nine-year period). Presuming that collateral consequences arise from a conviction by a military commission for violating the law of war and persist after the convict is released into a foreign country,

**Hamdan v. U.S., 696 F.3d 1238 (2012)**

402 U.S.App.D.C. 471

therefore, hardly seems justified. *Cf. Gul,* 652 F.3d at 17 ("not[ing] detention at Guantanamo and designation as an enemy combatant are recent phenomena; [therefore a court] ha[s] no basis for inferring they routinely have collateral consequences").

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT B-1

```
___ FILED        ___ LODGED
___ RECEIVED     ___ COPY

        MAY 0 6 2009

    CLERK U S DISTRICT COURT
      DISTRICT OF ARIZONA
BY_____ DEPUTY
```

```
✓ FILED          ___ LODGED
___ RECEIVED     ___ COPY

        MAR 0 4 2010

   CLERK U S DISTRICT COURT
     DISTRICT OF ARIZONA
BY_____ DEPUTY
```

DIANE J. HUMETEWA
United States Attorney
District of Arizona

DAVID A. PIMSNER
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Arizona State Bar No. 007480
Telephone (602) 514-7500
david.pimsner@usdoj.gov

BARRY JONAS
Trial Attorney
Counter Terrorism Section
Department of Justice
10th and Constitution Avenue NW
Washington, D.C. 20530
barry.jonas@usdoj.gov

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>    v.<br><br>Akram Musa Abdallah,<br>a.k.a. Abu Saiaf,<br><br>        Defendant. | CR-08-0947-PHX-NVW<br><br>**PLEA AGREEMENT** |

Plaintiff, United States of America, and defendant, Akram Musa Abdallah, hereby agree to the following disposition of this matter:

## PLEA

Defendant will plead guilty to Count 1 of the Indictment charging defendant with False Statements to a Government Agency, in violation of Title 18, United States Code, Section 1001(a)(2), a Class D felony offense.

## TERMS

Defendant understands that the Court is required to consider the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") among other factors in determining defendant's sentence. Defendant understands, however, that the Sentencing Guidelines are only advisory, and that after considering the Sentencing Guidelines, the Court may be free to exercise

SCANNED

its discretion to impose any reasonable sentence up to the maximum set by statute for the crimes of conviction.

## 1.   **MAXIMUM PENALTIES**

a.   A violation of Title 18, United States Code, Section 1001(a)(2), is punishable by a maximum fine of $250,000.00, a maximum term of imprisonment of eight years, or both and a term of supervised release of three years.

b.   According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the court shall:

(1)   Order the defendant to make restitution to any victim of the offense unless, pursuant to Title 18, United States Code, Section 3663, the court determines that restitution would not be appropriate in this case;

(2)   Order the defendant to pay a fine, which may include the costs of probation, supervised release or incarceration, unless, pursuant to Title 18, United States Code, Section 3572, the Court finds upon consideration of the factors therein and in Section 3553 that a fine is not appropriate;

(3)   Order the defendant, pursuant to Title 18, United States Code, Section 3583 to serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed, and the court may impose a term of supervised release in all other cases.

c.   Pursuant to Title 18, United States Code, Section 3013, the court is required to impose a special assessment on the defendant of $100.00. The special assessment is due at the time the defendant enters the plea of guilty, but in no event shall it be paid later than the time of sentencing.

## 2.   **AGREEMENTS REGARDING SENTENCING**

a.   Assuming the defendant makes full and complete disclosure to the Probation Department of the circumstances surrounding the defendant's commission of the offense, if the defendant would be eligible for a recommended two-point reduction pursuant to Section 3E1.1 of the Guidelines and, if the defendant demonstrates an acceptance of responsibility for this

offense up to and including the time of sentencing, and provided defendant accepts the terms of this agreement no later than May 19, 2009 the United States will stipulate to a three-point reduction in the advisory sentencing guideline offense level, as set forth in Section 3E.1 of the Guidelines.

b.     Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the defendant shall be sentenced to the Bureau of Prisons for a term of imprisonment between 18 and 24 months.

c.     Additionally, pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that U.S.S.G. § 2J1.2(a) and (b)(1)(C) is the applicable guideline section for defendant's offense conduct.

d.     The United States retains the unrestricted right to make any and all statements it deems appropriate to the Probation Office and to make factual and legal responses to any statements made by the defendant or defense counsel or objections to the presentence report or to questions by the court at the time of sentencing.

e.     If the court, after reviewing this plea agreement, concludes that any provision is inappropriate, it may reject the plea agreement, giving defendant, in accordance with Fed. R. Crim. P. 11(c)(5), and the government an opportunity to withdraw the guilty plea.

**3.     AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a.     This office will not prosecute the defendant for any offenses committed by the defendant, and known by the government, in connection with any other false statements made by the defendant to special agents of the Federal Bureau of Investigation or the Internal Revenue Service on January 24, 2007 and January 27, 2007.  In addition, the government will not file criminal charges in connection with the criminal investigation conducted by the Internal Revenue Service in connection with tax years 2004 and 2005. This agreement does not preclude the Internal Revenue Service from proceeding with and/or initiating any civil or administrative action relating to tax years 2004 and 2005.

b.     This agreement does not, in any manner, restrict the actions of the United States in any other district nor bind any other United States Attorney's Office.

**4.    WAIVER OF DEFENSES AND APPEAL RIGHTS**

The defendant waives any and all motions, defenses, probable cause determinations, and objections which the defendant could assert to the indictment or information or to the Court's entry of judgment against the defendant and imposition of sentence upon the defendant, providing the sentence is consistent with this agreement. The defendant further waives: (1) any right to appeal the Court's entry of judgment against defendant; (2) any right to appeal the imposition of sentence upon defendant under Title 18, United States Code, Section 3742 (sentence appeals); and (3) any right to collaterally attack defendant's conviction and sentence under Title 28, United States Code, Section 2255, or any other collateral attack. The defendant acknowledges that this waiver shall result in the dismissal of any appeal or collateral attack the defendant might file challenging his conviction or sentence in this case.

**5.    PERJURY AND OTHER FALSE STATEMENT OFFENSES OR OTHER OFFENSES**

Nothing in this agreement shall be construed to protect the defendant in any way from prosecution for perjury, false declaration or false statement, or any other offense committed by defendant after the date of this agreement. Any information, statements, documents, and evidence which defendant provides to the United States pursuant to this agreement may be used against the defendant in all such prosecutions.

**6.    REINSTITUTION OF PROSECUTION**

If defendant's guilty plea is rejected, withdrawn, vacated, or reversed at any time, the United States will be free to prosecute the defendant for all charges of which it has knowledge, and any charges that have been dismissed because of this plea agreement will be automatically reinstated. In such event, defendant waives any objections, motions, or defenses based upon the Statute of Limitations, the Speedy Trial Act or constitutional restrictions in bringing of the later charges or proceedings. The defendant understands that any statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial or proceeding as permitted by Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

//

4

**7.    DISCLOSURE OF INFORMATION TO U.S. PROBATION OFFICE**

a.    The defendant will cooperate fully with the United States Probation Office. Such cooperation will include truthful statements in response to any questions posed by the Probation Department including, but not limited to:

(1)    All criminal history information, i.e., all criminal convictions as defined under the Sentencing Guidelines.

(2)    All financial information, e.g., present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

(3)    All history of drug abuse which would warrant a treatment condition as part of sentencing.

(4)    All history of mental illness or conditions which would warrant a treatment condition as a part of sentencing.

**8.    FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

a.    Nothing in this agreement shall be construed to protect the defendant from civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture.

b.    Further, this agreement does not preclude the United States from instituting any civil or administrative proceedings as may be appropriate now or in the future.

**ELEMENTS**

As to Count 1:

On or between January 24, 2007, and January 27, 2007, in the District of Arizona:

1.    The defendant made a false statement in a matter within the jurisdiction of the Federal Bureau of Investigation;

2.    The defendant acted willfully, that is deliberately and with knowledge that the statement was untrue; and

3.    The statement was material to the Federal Bureau of Investigation's activities or decisions.

A statement is material if it could have influenced the agency's decisions or activities.

5

## FACTUAL BASIS

I further admit that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

On or between January 24, 2007, and January 27, 2007, in the District of Arizona, in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), an agency of the United States, I, Akram Musa Abdallah, knowingly and willfully made a false, fraudulent, and fictitious material statement to special agents of the FBI. On those dates, I was being interviewed by FBI agents in connection with the federal investigation and prosecution of the Holy Land Foundation for Relief & Development (HLF) and its officers. At the time of my interviews, I knew the HLF was a Specially Designated Terrorist organization. I also knew that when I was interviewed, the HLF and its officers were pending trial in the Northern District of Texas for crimes including providing material support to a foreign terrorist organization.

During the interviews, I represented to the FBI agents that I was not involved in fund raising activities for the HLF. When, in fact, between approximately 1994 and 1997, I was involved in numerous fund raising activities, including collecting donations, organizing, facilitating and coordinating fund raising events on behalf of the HLF in the Phoenix metropolitan area.

## DEFENDANT'S APPROVAL AND ACCEPTANCE

I have read each of the provisions of the entire plea agreement with the assistance of counsel and understand its provisions.

I have discussed the case and my constitutional and other rights with my attorney. I understand that by entering my plea of guilty I will be giving up my rights to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in my defense, to remain silent and refuse to be a witness against myself by asserting my privilege against self-incrimination -- all with the assistance of counsel -- and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter my guilty plea as indicated above on the terms and conditions set forth in this agreement.

1    I have been advised by my attorney of the nature of the charges to which I am entering
2    my guilty plea.  I have further been advised by my attorney of the nature and range of the
3    possible sentence and that my ultimate sentence will be determined after consideration of the
4    advisory Sentencing Guidelines.

5    My guilty plea is not the result of force, threats, assurances or promises other than the
6    promises contained in this agreement.  I agree to the provisions of this agreement as a voluntary
7    act on my part and I agree to be bound according to its provisions.

8    I fully understand that, if I am granted probation or placed on supervised release by the
9    court, the terms and conditions of such probation/supervised release are subject to modification
10   at any time.  I further understand that, if I violate any of the conditions of my
11   probation/supervised release, my probation/supervised release may be revoked and upon such
12   revocation, notwithstanding any other provision of this agreement, I may be required to serve
13   a term of imprisonment or my sentence may otherwise be altered.

14   I agree that this written plea agreement contains all the terms and conditions of my plea
15   and that promises made by anyone (including my attorney), and specifically any predictions as
16   to the guideline range applicable, that are not contained within this written plea agreement are
17   without force and effect and are null and void.

18   I am satisfied that my defense attorney has represented me in a competent manner.

19   I am fully capable of understanding the terms and conditions of this plea agreement.  I
20   am not now on or under the influence of any drug, medication, liquor, or other intoxicant or
21   depressant, which would impair my ability to fully understand the terms and conditions of this
22   plea agreement.

23   I have carefully reviewed every part of this agreement with my attorney.  I understand
24   it, and I voluntarily agree to it.

25
26   5/6/09                                          AK  Abdull
     Date                                            AKRAM MUSA ABDALLAH
27                                                   Defendant
28

7

1

## DEFENSE ATTORNEY'S APPROVAL

2       I have discussed this case and the plea agreement with my client, in detail and have

3  advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional

4  and other rights of an accused, the factual basis for and the nature of the offense to which the

5  guilty plea will be entered, possible defenses, and the consequences of the guilty plea including

6  the maximum statutory sentence possible. I have further discussed the concept of the advisory

7  sentencing guideline with the defendant. No assurances, promises, or representations have been

8  given to me or to the defendant by the United States or by any of its representatives which are

9  not contained in this written agreement. I concur in the entry of the plea as indicated above and

10  on the terms and conditions set forth in this agreement as in the best interests of my client. I

11  agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all

12  the requirements of Fed. R. Crim. P. 11.

13

14 _May 6, 2009_
Date

15                   JOSEPH SHEMARIA
Attorney for Defendant

16

17

## UNITED STATES' APPROVAL

18       I have reviewed this matter and the plea agreement. I agree on behalf of the United States

19  that the terms and conditions set forth are appropriate and are in the best interests of justice.

20

21                   DIANE J. HUMETEWA
United States Attorney

22                   District of Arizona

23 _5/6/09_

24 Date                 DAVID A. PIMSNER
Assistant U.S. Attorney

25

26 _5/6/09_

27 Date                 BARRY JONAS
Trial Attorney
Department of Justice

28

8

# COURT'S ACCEPTANCE

3-4-10
_____
Date

_Neil V Wake_
_____
HONORABLE NEIL V. WAKE
United States District Judge

9

EXHIBIT B-2

### UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

**United States of America**

**v.**

**Akram Musa Abdallah**

## JUDGMENT IN A CRIMINAL CASE
(For Offenses Committed on or After November 1, 1987)

**No. CR 08 -00947-001-PHX-NVW**

Joseph Shemaria (Retained)
Attorney for Defendant

USM#: 88821-008

**THE DEFENDANT ENTERED A PLEA OF** Guilty on 5/6/09 to the one-count Indictment.

**ACCORDINGLY, THE COURT HAS ADJUDICATED THAT THE DEFENDANT IS GUILTY OF THE FOLLOWING OFFENSE(S):** violating Title 18, U.S.C. §1001(a)(2), False Statements, a Class D Felony offense, as charged in the Indictment.

**IT IS THE JUDGMENT OF THIS COURT THAT** the defendant is hereby committed to the custody of the Bureau of Prisons for a term of **EIGHTEEN (18) MONTHS**. Upon release from imprisonment, the defendant shall be placed on supervised release for a term of **THREE (3) YEARS**. The Court recommends that the defendant be placed in an institution in Arizona or as close thereto as possible.

### CRIMINAL MONETARY PENALTIES

The defendant shall pay to the Clerk the following total criminal monetary penalties:

**SPECIAL ASSESSMENT:** $100.00     **FINE:** $0.00     **RESTITUTION:** $0.00

The defendant shall pay a total of $ 100 in criminal monetary penalties, due immediately. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows: Defendant is to make one payment of $100 within 60 days after the release from imprisonment to a term of supervised release.

The Court finds the defendant does not have the ability to pay a fine and orders the fine waived.

If incarcerated, payment of criminal monetary penalties are due during imprisonment at a rate of not less than $25 per quarter and payment shall be made through the Bureau of Prisons' Inmate Financial Responsibility Program. Criminal monetary payments shall be made to the Clerk of U.S. District Court, Attention: Finance, Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118. Payments should be credited to the various monetary penalties imposed by the Court in the priority established under 18 U.S.C. § 3612(c). The total special assessment of $100.00 shall be paid pursuant to Title 18, United States Code, Section 3013 for the Indictment.

Any unpaid balance shall become a condition of supervision and shall be paid within 90 days prior to the expiration of supervision. Until all restitutions, fines, special assessments and costs are fully paid, the defendant shall immediately notify the Clerk, U.S. District Court, of any change in name and address. The Court hereby waives the imposition of interest and penalties on any unpaid balances.

Case 5:12-cr-00092-VAP Document 753 Filed 03/19/15 Page 46 of 225 Page ID #:12597
Case 2:08-cr-00947-NVW Document 92 Filed 03/05/10 Page 2 of 4

CR 08 -00947-001-PHX-NVW                                                    Page 2 of 4
USA vs. Akram Musa Abdallah

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant is placed on supervised release for a term of **THREE (3) YEARS**.

The defendant shall report to probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The drug testing condition is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.

It is the order of the Court that, pursuant to General Order 05-36, which incorporates the requirements of USSG §§5B1.3 and 5D1.2, you shall comply with the following conditions:
1)  You shall not commit another federal, state, or local crime during the term of supervision.
2)  You shall not leave the judicial district or other specified geographic area without the permission of the Court or probation officer.
3)  You shall report to the Probation Office as directed by the Court or probation officer, and shall submit a truthful and complete written report within the first five days of each month.
4)  You shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
5)  You shall support your dependents and meet other family responsibilities.
6)  You shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
7)  You shall notify the probation officer at least ten days prior to any change of residence or employment.
8)  You shall refrain from excessive use of alcohol and are subject to being prohibited from the use of alcohol if ordered by the Court in a special condition of supervision.
9)  You shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 801) or any paraphernalia related to such substances, without a prescription by a licensed medical practitioner.  Possession of controlled substances will result in mandatory revocation of your term of supervision.
10) You shall not frequent places where controlled substances are illegally sold, used, distributed or administered, or other places specified by the Court.
11) You shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
12) You shall permit a probation officer to visit at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.
13) You shall immediately notify the probation officer (within forty-eight (48) hours if during a weekend or on a holiday) of being arrested or questioned by a law enforcement officer.
14) You shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.
15) As directed by the probation officer, you shall notify third parties of risks that may be occasioned by your criminal record or personal history or characteristics, and shall permit the probation officer to make such notification and to confirm your compliance with such notification requirement.
16) If you have ever been convicted of a felony, you shall refrain from possessing a firearm, ammunition, destructive device, or other dangerous weapon.  If you have ever been convicted of a misdemeanor involving domestic violence, you shall refrain from possession of any firearm or ammunition.  Possession of a firearm will result in mandatory revocation of your term of supervision.  This prohibition does not apply to misdemeanor cases that did not entail domestic violence, unless a special condition is imposed by the Court.
17) Unless suspended by the Court, you shall submit to one substance abuse test within the first 15 days of supervision and thereafter at least two, but no more than two periodic substance abuse tests per year of supervision, pursuant to 18 U.S.C. §§ 3563(a)(5) and 3583(d);

18) If supervision follows a term of imprisonment, you shall report in person to the Probation Office in the district to which you are released within seventy-two (72) hours of release.

19) You shall pay any monetary penalties as ordered by the Court. You will notify the probation officer of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

20) If you have ever been convicted of any qualifying federal or military offense (including any federal felony) listed under 42 U.S.C. § 14135a(d)(1) or 10 U.S.C. § 1565(d), you shall cooperate in the collection of DNA as directed by the probation officer pursuant to 42 U.S.C. § 14135a(a)(2).

The following special conditions are in addition to the conditions of supervised release or supersede any related standard condition:

1. You shall participate as instructed by the probation officer in a program of substance abuse treatment which may include testing for substance abuse. You shall contribute to the cost of treatment in an amount to be determined by the probation officer.

2. You shall provide the probation officer access to any requested financial information.

3. You are prohibited from making major purchases, incurring new financial obligations, or entering into any financial contracts without the prior approval of the probation officer.

4. You shall cooperate with the Internal Revenue Service and pay all tax liabilities. You shall file timely, accurate and lawful income tax returns and provide proof to the probation officer.

**THE COURT FINDS** that you have been sentenced in accordance with the terms of the plea agreement and that you have waived your right to appeal and to collaterally attack this matter. The waiver has been knowingly and voluntarily made with a factual basis and with an understanding of the consequences of the waiver.

The Court may change the conditions of probation or supervised release or extend the term of supervision, if less than the authorized maximum, at any time during the period of probation or supervised release. The Court may issue a warrant and revoke the original or any subsequent sentence for a violation occurring during the period of probation or supervised release.

**IT IS FURTHER ORDERED** that the Clerk of the Court deliver two certified copies of this judgment to the United States Marshal of this district.

The Court orders commitment to the custody of the Bureau of Prisons and recommends that the defendant be placed in an institution in Arizona or as close thereto as possible. The defendant shall self-surrender for service of sentence at the institution designated by the Bureau of Prisons or to the United States Marshal by 12:00 p.m. on 6/1/10.

Date of Imposition of Sentence: **Thursday, March 4, 2010**

DATED this 4th day of March, 2010. _____

Neil V. Wake
United States District Judge

CR 08 -00947-001-PHX-NVW                                                    Page 4 of 4
USA vs. Akram Musa Abdallah

**RETURN**

I have executed this Judgment as follows:_____

Defendant delivered on _____ to _____ at _____, the
institution designated by the Bureau of Prisons, with a certified copy of this judgment in a Criminal case.

_____         By:_____
United States Marshal                                    Deputy Marshal

# EXHIBIT C-1

Case 5:12-cr-00092-VAP Document 753 Filed 02/19/15 Page 50 of 225 Page ID #:12601
Case 3:01-cr-03240-W Document 23 Filed 06/28/02 Page 1 of 2

















ANDY   7/1/02   9:56

3:01-CR-03240   USA V. ABDOULAH

*25*

*CRINDISPS.*

```
FILED

02 JUN 28  AM 11: 57

CLERK, U.S. DISTRICT C...
SOUTHERN DISTRICT OF CALIFORNIA

BY:              DEPUTY
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

August 2001 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. __01CR3240-W__ |
| Plaintiff, | I N D I C T M E N T<br>(Superseding) |
| v. | Title 18, U.S.C., Sec. 371; |
| AL-MOHDAR MOHAMED<br>AL-MOHDAR ZEID (1),<br>aka Mohdar Mohamed Abdullah,<br>ABDULLAHI JAMA AMIR (2),<br>ALI SAID DAWALEH (3),<br>AHMED SHARIF ALIWE (4); | Conspiracy; Title 18, U.S.C.,<br>Sec. 1546 - False Statement<br>in Immigration Application;<br>Title 18, U.S.C., Sec. 1001 -<br>False Statements; Title 18,<br>U.S.C., Sec. 2 - Aiding and<br>Abetting |
| Defendants. | |

The grand jury charges:

Count 1

Beginning at a date unknown to the grand jury and continuing up to and including July 24, 2001, within the Southern District of California, and elsewhere, defendants AL-MOHDAR MOHAMED AL-MOHDAR ZEID aka Mohdar Mohamed Abdullah, ABDULLAHI JAMA AMIR, ALI SAID DAWALEH, and AHMED SHARIF ALIWE, did knowingly and willfully combine, conspire, and agree together and with each other and with other persons unknown to the grand jury to knowingly commit offenses against the United

MGW:cks:San Diego
6/27/02

States, namely, to make false statements in immigration documents, in violation of Title 18, United States Code, Section 1546, and to make false statements to the Immigration and Naturalization Service, in violation of Title 18, United States Code, Section 1001.

OVERT ACTS

In furtherance of said conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed within the Southern District of California, and elsewhere:

1.  On or about December 16, 1998, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, went to the United States Embassy in Ottawa, Canada, presented his Yemeni passport (No. 00076187), applied for and received a single entry B-2 visitor's visa to enter the United States.

2.  On or about December 16, 1998, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, entered the United States at Los Angeles, California from Canada, as a B-2 visitor.

3.  On or about December 24, 1998, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, filed an "Application for Asylum and for Withholding of Removal" [INS Form I-589] with the Immigration and Naturalization Service [INS], claiming to have entered the United States without inspection on December 7, 1998, through New York, New York.

//
//
//
//

4.   On or about January 7, 1999, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, requested defendants ABDULLAHI JAMA AMIR, ALI SAID DAWALEH, and AHMED SHARIF ALIWE, to provide him with statements showing that he [Defendant AL-MOHDAR] was born in Somalia.

5.   On or before January 7, 1999, in San Diego, California, defendant ABDULLAHI JAMA AMIR prepared and signed a letter, on Horn of Africa letterhead, claiming that defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was born in Somalia, and was fleeing the civil war in Somalia.

6.   On or after January 7, 1999, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah submitted, and caused to be submitted, to the INS defendant ABDULLAHI JAMA AMIR's January 7, 1999, letter, on Horn of Africa letterhead claiming that defendant AL-MOHDAR was born in Somalia, and was fleeing the civil war in Somalia.

7.   On or about February 23, 1999, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, stated to an INS Asylum Officer that he entered the United States without inspection on December 7, 1998, through New York, New York, using an Italian passport in the name of Franco de Pollo.

8.   On or before May 3, 2000, in San Diego, California, defendant AHMED SHARIF ALIWE executed an "Affidavit of Birth Certificate," filed with defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah's Adjustment

3

Application (INS Form I485) claiming defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was born in Somalia.

9.  On or after May 3, 2000, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah submitted, and caused to be submitted, to the INS defendant AHMED SHARIF ALIWE's May 3, 2000, "Affidavit of Birth Certificate," claiming defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was born in Somalia.

10. On or before May 4, 2000, in San Diego, California, defendant ALI SAID DAWALEH executed an Affidavit of Birth Certificate filed with defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID's, aka Mohdar Mohamed Abdullah's Adjustment Application (INS Form I485) claiming defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was born in Somalia.

11. On or after May 4, 2000, in San Diego, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah submitted, and caused to be submitted, to the INS defendant ALI SAID DAWALEH's May 4, 2000, "Affidavit of Birth Certificate," claiming defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was born in Somalia.

//
//
//
//

4

12. On or about May 5, 2000, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, filed an Application to Register as a Permanent Resident [INS Form I-485], claiming to have entered the United States without inspection on December 7, 1998.

All in violation of Title 18, United States Code, Section 371.

### Count 2

On or about December 24, 1998, in the Southern District of California, the defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, did knowingly present to the Immigration and Naturalization Service an application required under the immigration laws, and regulations prescribed thereunder, to wit, an application for asylum and withholding of removal [Form I-589], which contained a statement, to wit, that he last entered the United States without inspection on December 7, 1998, through New York, New York; which the defendant then and there knew was false, in that in truth and in fact he entered the United States on December 10, 1998, from Canada, on a Yemeni passport with a valid United States B-2 visitor's visa; in violation of Title 18, United States Code, Section 1546(a).

### Count 3

On or about February 23, 1999, in the Southern District of California, in a matter within the jurisdiction of Immigration and Naturalization Service, an agency of the United States, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, did knowingly and willfully make and caused to be made a false, fictitious, and fraudulent material statement and representation, to wit, that he last entered the United States without inspection on

December 7, 1998, through New York, New York, on an Italian passport; which the defendant then and there knew was false, in that in truth and in fact he entered the United States on December 10, 1998, from Canada, on a Yemeni passport with a valid United States B-2 visitor's visa; in violation of Title 18, United States Code, Section 1001.

<u>Count 4</u>

On or about May 5, 2000, in the Southern District of California, the defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, did knowingly present to the Immigration and Naturalization Service an application required under the immigration laws, and regulations prescribed thereunder, to wit, an Application to Register as a Permanent Resident [INS Form I-485], which contained a statement, to wit, that he last entered the United States without inspection on December 7, 1998; which the defendant then and there knew was false, in that in truth and in fact he entered the United States on December 10, 1998, from Canada, on a Yemeni passport with a valid United States B-2 visitor's visa; in violation of Title 18, United States Code, Section 1546(a).

DATED: June 28, 2002.

A TRUE BILL:

_____
Foreperson

PATRICK K. O'TOOLE
United States Attorney

By: _____
MICHAEL G. WHEAT
Assistant U.S. Attorney

6

EXHIBIT C-2

















ANDY    10/9/02    12:46

3:01-CR-03240   USA V. ABDOULAH

*55*

*CRJGMCOMXC.*

●AO 245B   (Rev. 9/00) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| | (For Offenses Committed On or After November 1, 1987) |
| v. | |
| MAHDAR MOHAMED ABDOULAH (01) | Case Number: 01CR3240-W |

AKA AL-MOHDAR MOHAMED AL-MOHDAR ZEID       KERRY STEIGERWALT
                                                                                      Defendant's Attorney

REGISTRATION NO. 80604-198

THE DEFENDANT:

X    pleaded guilty to count(s)    three of the superseding indictment.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offenses:

| Title & Section | Nature of Offense | Count Number(s) |
| --- | --- | --- |
| 18 USC 1001 | FALSE STATEMENTS | S3 |

The defendant is sentenced as provided in pages 2 through  4  of this  judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

X    Count(s)   remaining & the underlying indictment       are    dismissed on the motion of the United States.

X    Assessment : $ 100.00 ordered waived.

X    Fine ordered waived.

IT IS ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

OCTOBER 2, 2002
Date of Imposition of Sentence

THOMAS J. WHELAN
UNITED STATES DISTRICT JUDGE

Entered Date: 10·2·02

I hereby certify that this is a true, correct and full copy of the original document on file in my legal custody.
W. Samuel Hamrick, Jr.
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEFENDANT: MAHDAR MOHAMED ABDOULAH (01)
CASE NUMBER: 01CR3240-W

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of time served.

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

I have executed within _Time Served_
Judgement and Commitment on _10 9 02_
United States Marshal
By: _____
USMS Criminal Section

[seal: I hereby attest and certify that this is a true, correct and full copy of the original document on file in my legal custody. W. Samuel Hamrick, Jr. CLERK, U.S. DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA]

DEFENDANT: MAHDAR MOHAMED ABDOULAH (01)
CASE NUMBER: 01CR3240-W

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 3 years.

## MANDATORY CONDITIONS

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court . The defendant shall also comply with any special conditions imposed.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT:    MAHDAR MOHAMED ABDOULAH (01)
CASE NUMBER:    01CR3240-W

## SPECIAL CONDITIONS OF SUPERVISION

_X_    The defendant shall not possess firearms, explosive devices, or other dangerous weapons.

_X_    The defendant shall submit to search of person, property, residence, abode or vehicle, at a reasonable time and in a reasonable manner, by the probation officer.

_X_·    The defendant shall report all vehicles owned, operated, or in which the defendant has an interest to the probation officer.

_X_    If deported, excluded or allowed to voluntarily return to another country, the defendant shall not reenter the United States of America illegally and shall report to the probation officer within 24 hours of any entry. Supervision waived upon deportation or exclusion.

_X_    The defendant shall provide complete disclosure of personal and business financial records to the probation officer as requested.

I hereby attest and certify that this is a true, correct and full copy of the original document on file in my legal custody.

W. Samuel Hamrick, Jr.
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

EXHIBIT D-1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 09-292 (JMR/SRN)

**RECEIVED**

MAY 04 2010

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INFORMATION** |
| | ) | |
| Plaintiff, | ) | (18 U.S.C. § 1512(c)(2)) |
| | ) | |
| v. | ) | |
| | ) | |
| ABDOW MUNYE ABDOW, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THE UNITED STATES ATTORNEY CHARGES THAT:

### COUNT 1
(Obstruction of Justice)

On or about October 8, 2009, in the State and District of Minnesota, the defendant,

**ABDOW MUNYE ABDOW,**

did knowingly, intentionally, and corruptly obstruct and impede official proceedings, that is, an FBI investigation and a federal grand jury investigation into ethnic Somali males traveling from Minnesota to Somalia, by making the following false statements to two special agents of the FBI: that he had traveled from Minnesota to Las Vegas, Nevada, and back; that he did not know the names of the occupants of the vehicle in which he was riding; and that he did not know who had paid for the rental car.  In truth, the defendant had driven from Minnesota to San Diego, California, with four other passengers and had dropped off three of the passengers in San Diego; the defendant knew the names or nicknames of the

SCANNED

MAY 04 2010

U.S. DISTRICT COURT MPLS

FILED  MAY 04 2010
RICHARD D. SLETTEN
JUDGMENT ENTD _____
DEPUTY CLERK _____

United States v. Abdow Munye Abdow

occupants of the vehicle; and the defendant knew who had paid for the rental vehicle because he had provided his debit card to a person known to the government to be used to rent the vehicle. The defendant agrees that the official proceedings, that is, an FBI investigation and a federal grand jury investigation, were reasonably foreseeable to him at the time he made the false statements to the FBI agents.

B. TODD JONES
United States Attorney

BY: W. ANDERS FOLK
Assistant U.S. Attorney
Attorney ID No. 311388

BY: WILLIAM M. NARUS
Trial Attorney
U.S. Department of Justice

2

EXHIBIT D-2

AO 245B (Rev. 06/05) Sheet 1 - Judgment in a Criminal Case

RECEIVED

JAN 26 2011

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

# United States District Court

### District of Minnesota

UNITED STATES OF AMERICA

v.

**Abdow Munye Abdow**

**AMENDED JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)
Case Number: 09-CR-292(01)(JMR/SRN)
USM Number: 14909-041
Social Security Number: 2556
Date of Birth: **1984**

**Earl P. Gray**
Defendant's Attorney

**THE DEFENDANT:**

[x]  pleaded guilty to **Count 1 of the Information.**
[]   pleaded nolo contendere to counts(s)  which was accepted by the court.
[]   was found guilty on count(s)  after a plea of not guilty.
The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1512(c)(2) | Obstruction of Justice | October 9, 2009 | |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[]   The defendant has been found not guilty on counts(s) .
[X]  **The Indictment is dismissed on motion of the United States.**

**A special assessment in the amount of $100.00 is due in full and immediately.**

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in the economic circumstances.

A true printed copy in __4__ sheet(s)
of the electronic record filed on 7-27-10
in the United States District Court
for the District of Minnesota
CERTIFIED, July 27 , 2010.
RICHARD D. SLETTEN
BY: _____ Farmer
Deputy Clerk

**July 16, 2010**
Date of Imposition of Judgment

s/ JAMES M. ROSENBAUM
Signature of Judge

JAMES M. ROSENBAUM, United States District Judge
Name & Title of Judge

**July 27, 2010**
Date
Nunc pro tunc: July 21, 2010

SCANNED
JAN 27 2011
U.S. DISTRICT COURT MPLS

AO 245B (Rev. 06/05) Sheet 2 - Imprisonment

DEFENDANT:      **ABDOW MUNYE ABDOW**
CASE NUMBER:     09-CR-292(01)(JMR/SRN)

# IMPRISONMENT

     The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **120 days.**

[]      The court makes the following recommendations to the Bureau of Prisons:

[]      The defendant is remanded to the custody of the United States Marshal.

[]      The defendant shall surrender to the United States Marshal for this district.
         [] at   on .
         [] as notified by the United States Marshal.

[X]     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
         [X] on or before January 3, 2011, at 2:00 p.m. If no designation has been made by January 3, 2011, defendant shall report to the United States Marshal for this District on January 3, 2011, at 2:00 p.m.
         [] as notified by the United States Marshal.
         [] as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

     Defendant delivered on _01-03-2011_ to _FCI Sandstone_
a _Sandstone  MN_ , with a certified copy of this Judgment.

                           _Scott P. Fisher/Wade_
                               United States Marshal

         By _____ _CSU_
                         Deputy United States Marshal

AO 245B (Rev. 06/05) Sheet 3 - Supervised Release

DEFENDANT: **ABDOW MUNYE ABDOW**
CASE NUMBER: **09-CR-292(01)(JMR/SRN)**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **3 years.**

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

[]  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

[X]  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

[X]  The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

[]  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

[]  The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this Judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without permission of the court or probation officer;
2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4)  the defendant shall support his or her dependants and meet other family responsibilities;
5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 06/05) Sheet 3A - Supervised Release

DEFENDANT: **ABDOW MUNYE ABDOW**
CASE NUMBER: **09-CR-292(01)(JMR/SRN)**

## SPECIAL CONDITIONS OF SUPERVISION

a   The defendant shall not commit any crimes, federal, state, or local.

b   The defendant shall abide by the standard conditions of supervised release recommended by the Sentencing Commission.

c   The defendant shall refrain from possessing a firearm, ammunition, destructive device, or other dangerous weapon.

d   The defendant shall comply with all rules and regulations of the probation office.

e   The defendant shall cooperate in the collection of DNA as directed by the probation officer.  18 U.S.C. §§ 3563(a) and 3583(d).

f   The first 120 days of supervised release shall be served in home confinement, with electronic monitoring, and release privileges for religious and medical reasons.

g   If not employed at a regular lawful occupation, as deemed appropriate by the probation officer, the defendant may be required to perform up to 20 hours of community service per week until employed.  The defendant may also participate in training, counseling, daily job search, or other employment-related activities, as directed by the probation officer.

EXHIBIT E-1





IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:10-CR-251 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES G. CARR |
| v. | ) | |
| | ) | |
| AMERA A. AKL, | ) | |
| | ) | PLEA AGREEMENT |
| Defendant. | ) | |

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in

consideration of the mutual promises set forth below, the United States Attorney's Office for the

Northern District of Ohio (hereinafter "USAO") and the United States Department of Justice

National Security Division (hereinafter "NSD"), by and through its undersigned attorney(s), and

the defendant, **AMERA A. AKL** (hereinafter "Defendant"), agree as follows:

### MAXIMUM PENALTIES AND OTHER
### CONSEQUENCES OF PLEADING GUILTY

1.     **Waiver of Constitutional Trial Rights.** Defendant understands that Defendant

has the right to plead not guilty and go to trial. At trial, Defendant would be presumed innocent,

have the right to trial by jury or, with the consent of the United States, to trial by the Court, the

right to the assistance of counsel, the right to confront and cross-examine adverse witnesses and

Plea Agreement of AMERA A. AKL

subpoena witnesses to testify for the defense, and the right to be protected from compelled self-incrimination. Defendant understands that Defendant has the right to an attorney at every stage of the proceedings and, if necessary, one will be appointed to represent Defendant. Defendant understands that by pleading guilty, Defendant specifically and voluntarily waives each of these trial rights, except the right to counsel. Defendant understands that a guilty plea is a complete admission of guilt and if the Court accepts the guilty plea, the Court will find Defendant guilty without a trial.

2. **Statutory Penalties.** Defendant understands that the statutory maximum penalties, and minimum penalties if applicable, for the count(s) to which Defendant agrees to plead guilty is/are as follows:

| Count | Statute and Description of Offense | Statutory Sentence Per Count |
|-------|-----------------------------------|------------------------------|
| One | 18 U.S.C. § 2339B (Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization) | Maximum imprisonment: 15 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: Life<br>Special assessment: $ 100 |

3. **Minimum sentence must include imprisonment.** The sentence for the offenses charged in count, One and Two may not be satisfied by a term of probation and must include some period of imprisonment. [18 U.S.C. § 3561(a)(3) and U.S.S.G. § 5B1.1].

4. **Special Assessment.** In addition to the penalty listed above, Defendant will be required to pay a mandatory special assessment of $100 for each count of conviction, for a total of $200, due immediately upon sentencing.

Defendant's Initials

Plea Agreement of AMERA A. AKL

5. **Forfeiture.**

a. By agreeing to plead guilty to Count One of the Indictment in this case
(Conspiracy to Provide Material Support and Resources to a Designated Foreign
Terrorist Organization, in violation of 18 U.S.C. § 2339B), and pursuant to 18
U.S.C. § 981(a)(1)(G)(i) and 28 U.S.C. § 2461, Defendant agrees to the forfeiture
of the following properties to the United States:

1) 2004 Chevrolet Trailblazer LS 2 Wheel Drive, VIN:
1GNDS13SX42392596;

2) $6,629.40 in U.S. currency;

3) $511.00 in U.S. currency;

b. Defendant further agrees:

a) The 2004 Chevrolet Trailblazer LS 2 Wheel Drive, VIN:
1GNDS13SX42392596, was titled to Defendant and is currently titled in
the name of Excellerate Auto Sales;

b) The $6,629.40 in U.S. currency is the property of Defendant and
her husband, co-defendant Hor I. Akl. A total of $6,629.40 was recovered
by law enforcement authorities during the execution of a search warrant at
the residence (3911 Brookfield Drive, Toledo, Ohio) of Defendant and
Hor I. Akl on June 3, 2010.

c) The $511.00 in U.S. currency is the property of Defendant and her
husband, co-defendant Hor I. Akl. The $511.00 was recovered by law
enforcement authorities during the execution of a search warrant at the

Defendant's Initials

Plea Agreement of AMERA A. AKL

residence (3911 Brookfield Drive, Toledo, Ohio) of Defendant and Hor I.

Akl on June 3, 2010. Particularly, the $511.00 was recovered from a

vehicle located on the premises.

c.     Defendant waives any rule and statute, including Rule 32.2(a) of the

Federal Rules of Criminal Procedure, which require the government to

provide notice, in the indictment, that forfeiture will be sought.

6.     **Costs.** The Court may order Defendant to pay the costs of prosecution and

sentence, including but not limited to imprisonment, community confinement, home detention,

probation, and supervised release.

7.     **Restitution.** The Court may order Defendant to pay restitution as a condition of

the sentence, probation, and/or supervised release.

8.     **Violation of Probation/Supervised Release.** If Defendant violates any term or

condition of probation or supervised release, such violation could result in a period of

incarceration or other additional penalty as imposed by the Court. In some circumstances, the

combined term of imprisonment under the initial sentence and additional period of incarceration

could exceed the maximum statutory term.

## PLEA(S) AND OTHER CHARGE(S)

9.     **Agreement to Plead Guilty.** Defendant agrees to plead guilty to Count One of

the Indictment in this case.

10.    **Dismissal of Counts.** Upon sentencing, the USAO will move to dismiss the

charges against Defendant in Counts Two and Six of the Indictment in this case.

Defendant's Initials

Plea Agreement of AMERA A. AKL

11. **Agreement Contingent Upon Plea of Co-Defendant.** Defendant understands that this agreement is contingent upon entry of a plea of guilty by her co-defendant, Hor I. Akl, and that the USAO and NSD may withdraw from the terms of this agreement should Hor I. Akl fail or refuse to enter into a plea agreement in this case, fail or refuse to plead guilty under the terms of any plea agreement in this case, seek to withdraw any plea of guilty entered under the terms of any plea agreement in this case, or otherwise violate the terms of any plea agreement in this case.

12. **Agreement Not to Bring Certain Other Charges.** The USAO and NSD will not bring any other criminal charges against Defendant

-- for violations known to the USAO and NSD on the date of the execution of this agreement as it relates to this investigation.

-- for conduct disclosed to the USAO and NSD by Defendant during proffers, if any.

-- relating to conduct charged in the Indictment and/or described in the Factual Basis section of this agreement based on facts currently within the knowledge of the USAO and NSD.

## ELEMENTS OF THE OFFENSE

13. The elements of the offense(s) to which Defendant will plead guilty are:

| Count One: 18 U.S.C. § 2339B, Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization | |
|---|---|
| One: | The Defendant unlawfully and knowingly agreed with other persons, known and unknown, to provide material support and resources, including, but not limited to, currency and monetary instruments, tangible property, personnel (including the Defendant himself), and services to Hizballah; |
| Two: | That the Defendant did so knowing that Hizballah was a designated terrorist organization and engaged or engages in terrorist activity. |

Defendant's Initials

Plea Agreement of AMERA A. AKL

## SENTENCING STIPULATIONS AND AGREEMENTS

14.     **Sentencing Guidelines.** Defendant understands that sentencing rests within the discretion of the Court; that federal sentencing law requires the Court to impose a sentence which is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a), and that the Court must consider among other factors the advisory United States Sentencing Guidelines in effect at the time of sentencing.

15.     **Presentence Report.** Defendant understands that the advisory guideline range will be determined by the Court at the time of sentencing, after a presentence report has been prepared by the U.S. Probation Office and reviewed by the parties. Defendant further understands that it is the obligation of the government to provide to the U.S. Probation Office all known information regarding Defendant's conduct subject to its limited use under U.S.S.G. §1B1.8 and not protected under the proffer agreement if any.

16.     **Joint Recommendation to Use the Advisory Sentencing Guidelines Computation.** After considering the factors in 18 U.S.C. §3553(a), the parties agree to recommend that the Court impose a sentence within the range and of the kind specified pursuant to the advisory Sentencing Guidelines in accordance with the computations and stipulations set forth below. Neither party will recommend or suggest in any way that a departure or variance is appropriate, either regarding the sentencing range or regarding the kind of sentence.

17.     **Right of Allocution.** Defendant understands and agrees that the USAO reserves the opportunity to speak at Defendant's sentencing. The USAO agrees that Defendant reserves the right of allocution at sentencing.

Page 6 of 24

Defendant's Initials

18.    **Stipulated Guideline Computation.** The parties agree that the following calculation, using the current advisory Sentencing Guidelines Manual (dated November 1, 2010), represents the correct computation of the applicable offense level.

### Count One: 18 U.S.C. § 2339B (Material Support to Foreign Terrorist Organization)

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2M5.3 of the United States Sentencing Guidelines applies to Count One of the Indictment. Under U.S.S.G. § 2M5.3, the base offense level for Count One is 26.

Mitigating Role

Pursuant to U.S.S.G. § 3B1.2(b), the defendant was a minor participant in the criminal activity in Count One. According, the total offense level for Count One is 24.

The parties agree that no other Guideline adjustments apply.

19.    **Acceptance of Responsibility.** The USAO has no reason to believe at this time that Defendant has not clearly and affirmatively accepted personal responsibility for Defendant's criminal conduct. The USAO agrees to recommend a three (3) level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), provided Defendant's conduct continues to reflect Defendant's acceptance of responsibility. Defendant understands it will be up to the Court at the time of sentencing to determine whether a reduction for acceptance of responsibility is appropriate.

20.    **Criminal History Category.** The parties have no agreement about the Criminal History Category applicable in this case. Defendant understands that the Criminal History

Defendant's Initials

Plea Agreement of AMERA A. AKL

Category will be determined by the Court after the completion of a Pre-Sentence Investigation by the U.S. Probation Office.

## WAIVER OF APPEAL AND POST-CONVICTION ATTACK

21.    **Waiver of Appellate Rights.** Defendant acknowledges having been advised by counsel of Defendant's rights, in limited circumstances, to appeal the conviction or sentence in this case, including the appeal right conferred by 18 U.S.C. § 3742, and to challenge the conviction or sentence collaterally through a post-conviction proceeding, including a proceeding under 28 U.S.C. § 2255. Defendant expressly and voluntarily waives those rights, except as specifically reserved below. Defendant reserves the right to appeal: (a) any punishment in excess of the statutory maximum; (b) any sentence to the extent it exceeds the greater of any mandatory minimum sentence or the maximum of the sentencing range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the Court; or (c) the Court's determination of Defendant's Criminal History Category. Nothing in this paragraph shall act as a bar to Defendant perfecting any legal remedies Defendant may otherwise have on appeal or collateral attack with respect to claims of ineffective assistance of counsel or prosecutorial misconduct.

22.    **Waiver of Statute of Limitations.** Defendant waives all defenses based on the statute of limitations with respect to any prosecution that is not already time-barred by the applicable statute of limitation on the date of Defendant's signing of this agreement and that is commenced within *one year* after any of the following events: (1) Defendant fails to plead guilty at the plea proceeding or the Court refuses to accept a guilty plea by Defendant pursuant to this agreement; (2) the Court permits Defendant to withdraw a guilty plea entered pursuant to this

Defendant's Initials

agreement or otherwise vacates such a guilty plea; or (3) the conviction obtained pursuant to this

agreement is vacated, overturned, or otherwise set aside. Defendant understands the waiver of

the statute of limitations is effective immediately upon Defendant's signing of this agreement

and is not conditioned upon the approval of this agreement by the Court.

## FACTUAL BASIS AND RELEVANT CONDUCT

23.     Defendant agrees that the following summary fairly and accurately sets forth

Defendant's offense conduct and a factual basis for the guilty plea. Defendant further agrees that

the facts set forth in the summary are true and could be established beyond a reasonable doubt if

the case were to proceed to trial:

> a.      Defendant and her husband, Hor I. Akl (hereinafter, "Hor Akl"), were
> residents of Toledo, Ohio from as early as 1994 and continuing through the
> present. Defendant was a citizen of the United States during this same time
> period; Hor Akl was a dual citizen of the United States and Lebanon during this
> same time period. Defendant's brother-in-law (hereinafter "Hor Akl's brother"),
> who is the brother of Hor Akl, lived in Lebanon between January 2009 and June
> 2010. Defendant's brother (hereinafter "Hor Akl's brother-in-law"), was a
> resident of Ohio between January 2009 and July 2010. Between approximately
> January 2009 and June 2010, both Defendant and Hor Akl were acquainted with a
> person working on behalf of the Federal Bureau of Investigation (hereinafter
> "FBI") as a confidential human source of information (hereinafter "the CHS").
>
> b.      Hizballah was designated by the Secretary of State as a Foreign Terrorist
> Organization, pursuant to Section 219 of the Immigration and Nationality Act, on
> or about October 8, 1997, and has remained so designated since that time.
> Accordingly, donations of money or other forms of material support to Hizballah
> were and are prohibited.
>
> c.      Federal law establishes a $10,000 reporting requirement related to the
> transportation of monetary instruments into, or out of, the United States as set
> forth in Title 31, United States Code, Section 5316 and Title 31, Code of Federal
> Regulations, Section 103.23;
>
> d.      Federal law establishes a $3,000 reporting requirement related to
> verification of the identity of persons purchasing monetary instruments for

Defendant's Initials

currency (e.g. wire transfers, money orders, etc.) as set forth in Title 31, Code of Federal Regulations, Section 103.29;

e.     On August 30, 2009, Defendant met with the CHS in Toledo, Ohio and stated that she was willing to transport funds to Hizballah in Lebanon on behalf of the CHS. Defendant asked what was "in it" for her. Defendant also asked the CHS to which part of Hizballah the funds should go – the army or the families. Defendant then stated, in sum and substance, that she could personally transport $20,000 per trip to Lebanon and suggested methods by which Hizballah could provide a receipt for the funds. Defendant offered to approach Hor Akl in order to secure his assistance in transporting the funds to Hizballah. With respect to the transfer of funds to Hizballah, Defendant stated, "I can lead the way." On this date, Defendant also stated that she dreamed of dressing like Hizballah, carrying a gun, and dying as a martyr. Following this conversation with the CHS, Defendant relayed the nature of the discussion to Hor Akl.

f.     On September 2, 2009, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl stated to CHS that he had spoken to Defendant about the August 30, 2009 conversation outlined in Paragraph 23e. Hor Akl further stated that he had previously transported funds from the United States to Lebanon on his own behalf and on behalf of others. Hor Akl offered to personally transport funds on behalf of CHS. Hor Akl further stated that he was "well-connected" in Lebanon. Hor Akl asked whether the total amount to be transferred was more than $1 million or approximately $500,000. Hor Akl also asked what percentage of the total amount to be transferred he would receive as a fee, stating that if his fee was approximately $300,000 to $400,000, then he would probably not return from Lebanon after transporting the funds. Hor Akl also proposed transporting funds by purchasing vehicles in the United States, then selling the vehicles in Lebanon for a profit. Defendant was not present during this discussion between Hor Akl and the CHS.

g.     On September 3, 2009, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated that there were many options for transporting the funds to Lebanon, including through the purchase and sale of vehicles and electric generators. Hor Akl stated that in order to transport the funds, he would first need to travel to Lebanon. Hor Akl also stated that sending the money to Lebanon would have a "cost." Hor Akl also stated that he knew individuals in Lebanon who were associated with, or members of, Hizballah and that his brother was an important person in Lebanon. In Hor Akl's presence, Defendant stated that everyone would get their "cut" for participating and that "you do it the right way or you don't do it." Defendant also stated that they could have transferred $500,000 if they had been asked earlier in 2009, such as at the beginning of summer, when the travel to Lebanon would have coincided with well-established travel patterns.

Defendant's Initials

Plea Agreement of AMERA A. AKL

h.     On September 10, 2009, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl, in the presence of Defendant, stated that he understood the funds were being transported to the "terrorists." Hor Akl also stated that he understood the funds would be sent to a designated terrorist organization and used to target Israel. Hor Akl also detailed methods of transporting the funds to Lebanon, including purchasing and re-selling vehicles, and using individuals to carry the funds on their persons. Hor Akl stated that any individuals who carried funds on their persons would carry less than $10,000 in order to avoid a reporting requirement. Hor Akl stated that he was also familiar with the $3,000 reporting requirement related to money orders and Western Union wire transfers. Hor Akl also suggested methods by which Hizballah could provide a receipt for the funds. Hor Akl also stated that he would charge a fee of thirty percent on a transfer of one million dollars. Defendant stated, in the presence of Hor Akl, that she and Hor Akl had transported cash from the United States to Lebanon on prior occasions by concealing the cash on their persons and in magazines.

i.     On October 20, 2009, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl stated to CHS that transporting funds to Hizballah would result in him making money and "gaining some merits" at the same time. Hor Akl also suggested methods by which Hizballah could provide a receipt for the funds. Hor Akl also stated that he knew individuals in the military branch of Hizballah and that he could arrange a meeting with a named Hizballah official. Hor Akl stated that his brother operated a recreation club in Lebanon that was used frequently by Hizballah in order to conduct meetings. Hor Akl stated that Defendant knew that Hizballah used the recreation club in order to conduct meetings. Hor Akl also stated that he would need to travel to Lebanon and return with names, information, and a plan for transporting the funds. Hor Akl also stated that he had well-established connections with Hizballah, in that Hizballah had stored artillery, firearms, and rockets in the family home of Hor Akl in Lebanon. Defendant was not present during this discussion between Hor Akl and the CHS.

j.     On November 3, 2009, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl stated that he would travel to Lebanon and return with contact information for individuals within Hizballah. Hor Akl again stated that he could meet with a named Hizballah official during a trip to Lebanon. Hor Akl also detailed various methods for transporting funds to Lebanon, including the use of post office boxes and offshore accounts in order to deposit money orders in amounts less than the $3,000 reporting requirement. Hor Akl also proposed using wealthy individuals in the United States who owned property in Lebanon to operate as unlicensed money transmittal services. Hor Akl also stated that his objective was to make money and to perform good deeds. Defendant was not present during this discussion between Hor Akl and the CHS.

k.     On December 7, 2009, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl stated that he was ready to move forward with the plan to transport funds to Hizballah. Hor Akl discussed the timing of his departure to Lebanon and

Defendant's Initials

explained that he was going to Lebanon in order to personally meet with a named Hizballah official, or Hizballah representatives, in order to ensure that the funds would be received by Hizballah. Hor Akl also proposed using a business owned and operated by Defendant's family (hereinafter, "Business #1") in order to over-report cash income received, which would then be taxed and therefore "legitimate," as these funds could subsequently be declared, as required by federal law, during transport to Lebanon and forwarded on to Hizballah. Hor Akl stated that he and his brother were "well-connected" in Lebanon. Defendant was not present during this discussion between Hor Akl and the CHS.

l.      On December 16, 2009, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl discussed taking a trip to Lebanon and reviewed at least two methods of transporting funds to Lebanon, including shipping vehicles and using an offshore account in another country. Hor Akl stated that he had discussed these methods of transporting funds with his brother-in-law and that they were the brother-in-law's ideas. Hor Akl also discussed how he would communicate with persons in the United States while he was in Lebanon. Hor Akl further stated that he could be reached at certain telephone numbers in Lebanon. Defendant was not present during this discussion between Hor Akl and the CHS.

m.      On December 22, 2009, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl stated that he was willing to travel to Lebanon anytime after the New Year. Hor Akl also discussed how he would communicate with persons in the United States while he was in Lebanon. Hor Akl further stated that telephone coverage in Lebanon was good and that there were telephone numbers in Lebanon where he could be reached. Defendant was not present during this discussion between Hor Akl and the CHS.

n.      On January 12, 2010, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl stated that he had consulted on several occasions with his brother-in-law about transferring funds to Lebanon. Hor Akl further stated that his brother-in-law had devised numerous methods to transfer funds to Lebanon. Hor Akl agreed to arrange a meeting with the CHS and Hor Akl's brother-in-law the next day in order to discuss the transfer of funds to Hizballah. Defendant was not present during this discussion between Hor Akl and the CHS.

o.      On January 13, 2010, Hor Akl, his brother-in-law, and the CHS met in Toledo, Ohio. On this date, Hor Akl's brother-in-law stated that he understood that the point was to move money from the United States to Lebanon without anyone knowing about it. When told that the funds would be transferred to Hizballah, Hor Akl's brother-in-law stated, "I support Hizballah." Hor Akl's brother-in-law further stated that he had no problem with the fact that the funds would go to support Hizballah's military activities. Hor Akl and his brother-in-law proposed using couriers to carry cash, in amounts less than the $10,000 reporting requirement, to Lebanon. Hor Akl's brother-in-law asked whether the funds were currently "clean," meaning not derived from criminal activity, held in

Defendant's Initials

Plea Agreement of AMERA A. AKL

a bank account, and on which taxes had been paid. Hor Akl's brother-in-law also asked whether the funds were derived from criminal activity and held in cash. Hor Akl also proposed purchasing 15 to 20 pickup trucks to be resold in Lebanon as a method of transferring funds. Hor Akl and his brother-in-law stated that a receipt signaling that the money had been received would be important. Hor Akl's brother-in-law again stated that Hizballah as the ultimate destination of funds was acceptable to him. Defendant was not present during this discussion.

p.      On January 22, 2010, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl confirmed that his brother-in-law was an additional participant in the money transfer operation. On this date, the CHS told Hor Akl that the money was "clean" and existed in a bank account, to which Hor Akl responded that this might mean he could transfer funds electronically to Lebanon. Hor Akl then produced a deposit receipt for a bank account in Lebanon in the name of Hor Akl's brother. Hor Akl stated the importance of his trip to Lebanon was to make connections. Hor Akl also stated that Hizballah trusts Hor Akl's brother because they are already doing business together. As a result of this relationship, Hor Akl stated that he too would be trusted by Hizballah. Defendant was not present during this discussion between Hor Akl and the CHS.

q.      On January 28, 2010, Hor Akl, his brother-in-law, and the CHS met in Toledo, Ohio. On this date, Hor Akl and Hor Akl's brother-in-law were told that the funds existed in a bank account and totaled almost one million dollars. Hor Akl then stated that it was a "done deal" that he was going to Lebanon. Hor Akl also proposed transferring the funds using other individuals to wire transfer amounts less than the $3,000 reporting requirement. Hor Akl stated that the first step was for him to go to Lebanon in order to arrange a meeting with Hizballah representatives. Hor Akl's brother-in-law stated that an easy method of transferring funds was to send five couriers with cash to a third country, where the funds would be deposited into an offshore bank account and sent to Lebanon via wire transfer. Hor Akl and his brother-in-law discussed how they would communicate while Hor Akl was in Lebanon in order to evade government surveillance, agreeing that Hor Akl would only call from a number in Lebanon with which his brother-in-law had an already-established call pattern, such as with a relative. Hor Akl and his brother-in-law also agreed to use code words involving work and business travel in order to conceal the true subject matter of their conversations. Hor Akl also stated that Hizballah needed trucks to carry rockets. Hor Akl stated that he would not tell anyone about travelling to Lebanon. Hor Akl stated that he would use his brother in order to arrange meetings with Hizballah representatives in Lebanon. Hor Akl also stated that the likelihood was "100 percent" that he would meet with a "big boss," including a named Hizballah official, during any trip to Lebanon. Hor Akl's brother-in-law stated that he would not accompany Hor Akl on the first trip to Lebanon, but that he would be available to go any other time that was necessary. Hor Akl then stated that he would be available to travel to Lebanon in March. Defendant was not present during this discussion.

Page 13 of 24

Defendant's Initials

Plea Agreement of AMERA A. AKL

r.    On February 9, 2010, Hor Akl, his brother-in-law, and the CHS met in
Toledo, Ohio. Hor Akl's brother-in-law stated that they could use individuals
employed at Business #1 to carry cash, in an amount less than the $10,000
reporting requirement, to a third country. Hor Akl's brother-in-law further stated
that the employees of Business #1 would receive wire transfers, in amounts less
than the $3,000 reporting requirement, while the employees were in the third
country. Hor Akl stated that the funds could then be transferred from the third
country to accounts in Lebanon opened under the name of Hor Akl's brother,
mother and sister. Hor Akl stated that he would travel to Lebanon in order to
withdraw the funds. Hor Akl's brother-in-law stated that he could travel to the
third country to research the feasibility of this plan in person, as he would not
research the plan over the Internet or while he was in the United States.
Defendant was not present during this discussion.

s.    On February 13, 2010, Defendant met with the CHS in Toledo, Ohio.
Defendant stated that she knew the details of the proposed transfer of funds and of
Hor Akl's trip to Lebanon in order to arrange a meeting with Hizballah
representatives. Defendant stated that Hor Akl and Hor Akl's brother-in-law
could accomplish this part of the plan with no problem. Following this meeting,
Defendant telephoned Hor Akl and relayed details of this discussion to the Hor
Akl.

t.    On February 17, 2010, Hor Akl met with the CHS in Toledo, Ohio. Hor
Akl agreed to travel to Lebanon in early March, 2010. Hor Akl identified the
travel agent that he would use in order to make the travel arrangements. Hor Akl
also stated that he would fly via Air France and would purchase the ticket in cash
one week before his travel date. Hor Akl proposed an additional method of
transferring funds to Lebanon, using appliances to hide cash and then shipping
these appliances to Lebanon, where Hor Akl would then retrieve the cash. Hor
Akl stated that he had assisted an individual with smuggling approximately
$100,000 using this method and that the same individual had previously smuggled
over two million dollars and weapons to Lebanon using this same method. Hor
Akl also proposed sending three refrigerators, each concealing approximately
$200,000 in cash, to Lebanon where Hor Akl would meet each shipment in order
to retrieve the cash. Hor Akl stated that his brother-in-law would be useful in
transferring the funds to Hizballah because of his good credit, personal wealth,
salaried job, and fluent English. Hor Akl also discussed the connections he
planned to make in Lebanon with Hizballah and stated that his brother would take
Hor Akl to meet a named Hizballah official. Hor Akl also stated that he believed
it would be possible to meet "the boss" while in Lebanon, referring to a named
Hizballah official. Defendant was not present during this discussion.

u.    On February 18, 2010, Hor Akl and Defendant met with the CHS in
Toledo, Ohio. Defendant stated, in the presence of Hor Akl, that she made the
reservation for Hor Akl's trip to Lebanon. Hor Akl stated that he intended to

Page 14 of 24

Defendant's Initials

Plea Agreement of AMERA A. AKL

meet representatives of Hizballah upon arrival in Lebanon and might be able to return early to the United States. Hor Akl also described his desire to have the funds available upon his return from Lebanon. Hor Akl once again proposed using appliances in order to conceal cash and stated that Hor Akl's brother-in-law would purchase the appliances and make the shipping arrangements. Hor Akl stated that while he was in Lebanon, he would communicate only with Defendant or Hor Akl's brother-in-law by telephoning them from a relative's home in Lebanon.

v.    On February 23, 2010, Hor Akl and Defendant drove with the CHS to an identified travel agency in Michigan where they purchased a round-trip ticket from Detroit to Beirut, Lebanon for approximately $1,060 in cash, a portion of which was paid for by Hor Akl and Defendant. On this date, Hor Akl again explained his plan to conceal the funds in appliances purchased and shipped to Lebanon by Hor Akl's brother-in-law. Defendant stated, in the presence of Hor Akl, that Hor Akl would telephone Defendant directly while he was in Lebanon and that Defendant could then relay any messages from Hor Akl.

w.    On February 27, 2010, Hor Akl met with the CHS in Toledo, Ohio. Hor Akl stated that he had spoken with his brother via telephone. Hor Akl further stated that he had instructed his brother to keep the fact of Hor Akl's travel to Lebanon a secret.

x.    On March 1, 2010, Hor Akl boarded an Air France flight at Detroit Metro Airport and departed for Beirut via Paris, France.

y.    Between March 1, 2010, and March 3, 2010, Hor Akl and Defendant spoke via telephone and confirmed that Hor Akl had arrived safely in Lebanon. Between March 1, 2010, and March 5, 2010, Hor Akl told Defendant, in coded language, that he would be meeting with a highly-placed person in Hizballah.

z.    On March 10, 2010, Hor Akl arrived at Detroit Metro Airport on an Air France flight from Beirut via Paris, France. Upon arrival in the United States, Hor Akl made false statements to officials of the United States Customs and Border Patrol regarding the nature of his trip to Lebanon and the source of the funds used to pay for his travel. On this date, Hor Akl and Defendant met with the CHS. Hor Akl stated that after several days in Lebanon, he and his brother met with representatives of Hizballah, including a named Hizballah official. Hor Akl further stated that Hizballah was willing to receive funds from the CHS and would provide receipt of the funds by posting a pre-arranged message in a named, Hizballah-controlled publication. Hor Akl further stated that the plan was still to conceal the funds inside appliances and that "we are ready" to send all the funds in one shipment.

aa.    On March 12, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl again stated, in the presence of Defendant, that he had arranged

Page 15 of 24

Defendant's Initials

for a specific message to appear in a named, Hizballah-controlled publication upon receipt of the funds from the CHS. Hor Akl also stated that he would meet with his brother-in-law on this same date in order to update him on the details of the Lebanon trip and the plan to transfer funds.

bb.     On March 18, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated that he was still willing to transfer the funds to Hizballah, but that he was waiting for the funds to arrive. Hor Akl then explained, in the presence of Defendant, that the situation was very dangerous and that he would like to deliver the funds by May 8, 2010. Hor Akl further stated that if the funds were not delivered by that date, then both Hor Akl and his brother would be questioned due to their meeting with Hizballah leaders. Hor Akl once again stated that the funds would be transported using appliances to conceal them. Hor Akl further stated that his brother-in-law would purchase the appliances and make the shipping arrangements. Hor Akl also stated that he could acquire a signal from Hizballah before receiving the funds, but that he would only arrange this for a fee of $10,000. On this date, Defendant stated, in the presence of Hor Akl, that Hizballah would investigate Hor Akl's activities and would know with whom he has been in contact.

cc.     On March 26, 2011, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated, in the presence of Defendant, that he would arrange a signal from Hizballah before receiving the funds, but that he was reluctant to do so without providing some monetary contribution to Hizballah. Hor Akl proposed sending Hizballah an amount of $10,000 composed of $5,000 contributed by CHS and $5,000 that Hor Akl would borrow from his brother-in-law.

dd.     On March 30, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated that he would conceal the funds inside the Akls' truck (the 2008 Dodge Ram) and then ship the vehicle to Lebanon. Hor Akl explained that his brother-in-law would make the shipping arrangements for the truck. On this date, Defendant met with a representative from the leasing company holding the title to the Akls' truck in order to arrange for a purchase of the vehicle and a transfer of title to Defendant in order to facilitate shipping the vehicle to Lebanon.

ee.     On April 15, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. When asked what denomination of funds would be required in order to effectuate the money transfer, Hor Akl stated that they would need $100 bills. On this date, Hor Akl also outlined a plan to transfer the funds by concealing them inside a Jeep Wrangler vehicle. Hor Akl stated that he would purchase a Jeep Wrangler at an auto auction in Toledo, Ohio with the assistance of a named local car dealer. Hor Akl then stated that the funds would be concealed inside this Jeep Wrangler, which would then be shipped to Lebanon via the named car dealer. Hor Akl also stated that depending upon the volume and size of the cash to be transferred, they may use a vehicle owned by Defendant (the 2004 Chevrolet Trailblazer) in order to conceal the cash. Hor Akl stated that if two vehicles were

Defendant's Initials

Plea Agreement of AMERA A. AKL

necessary, then Hor Akl's brother-in-law would provide the necessary funds to purchase a vehicle and obtain the title in order to ship the vehicle to Lebanon. Hor Akl further stated that once the vehicle was shipped, he would purchase a plane ticket to Lebanon and would receive the vehicle with his brother, who would assist Hor Akl in removing the funds and providing the cash to Hizballah. On this date, Defendant stated that she supported the transfer and just wanted to get it done.

ff.     On April 18, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated, in the presence of Defendant, that he had spoken with the identified car dealer about shipping vehicles to Lebanon; the identified car dealer had suggested sending the vehicle inside a shipping container if they wished to limit scrutiny from customs officials. Hor Akl further stated that the identified car dealer had scheduled, pre-arranged shipping containers that depart approximately every fifteen days. Hor Akl further stated that his brother-in-law would purchase a vehicle, currently registered in the name of Defendant, (the 2004 Chevrolet Trailblazer) in order to allow it to be shipped to Lebanon. Hor Akl further stated that he would buy side-step rails for the vehicle, conceal the funds inside the side-step rails, and then attach the side-step rails to the vehicle. Hor Akl used a stack of one dollar bills in order to demonstrate the method that would be used to roll the funds and how the funds would sit inside the side-step rail. Hor Akl further stated that he would cover the window in his garage with wood, in order to prevent anyone from observing him while he concealed the funds.

gg.     On April 26, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated, in the presence of Defendant, that he would purchase a Jeep Wrangler upon receipt of the funds to be transferred. Hor Akl further stated that the identified car dealer could ship a vehicle every week, so the vehicle could be shipped upon receipt of the funds. Hor Akl further stated that he had recently spoken to his brother via telephone. Hor Akl further stated that he was concerned about the need to complete the transfer of funds because one does not mess with Hizballah because they are dangerous. Hor Akl further stated that he had the best plan for transferring the money. Hor Akl further stated that he would cover the window in his garage with wood on the next day.

hh.     Between April 26, 2010, and May 5, 2010, Hor Akl covered a window in his garage with wood in order to prevent others from observing any activities within the garage. This action was consistent with Hor Akl's statements on April 18, 2010 and April 26, 2010, that he would cover a window in the garage in order to prevent individuals from observing him while he concealed the funds within a vehicle or vehicle accessories.

ii.     On May 5, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl detailed, in the presence of Defendant, the steps to be taken in order to transfer funds to Hizballah, including purchasing a vehicle at an auto auction, concealing the funds inside the vehicle at the Akl residence, using a

Defendant's Initials

Plea Agreement of AMERA A. AKL

shipping company to send the vehicle to Lebanon, and travelling to Lebanon in order to recover the funds from the vehicle. Hor Akl further stated that he would arrange to have the vehicles shipped from an identified car dealership on the same date that the vehicle would be dropped off at the dealership. Hor Akl estimated that it would take three to four days to conceal the cash inside the vehicle. Hor Akl also stated that the Akls would use their percentage of the funds to pay bills and start a business, but that this money would be left in the United States with Defendant.

jj.    On May 12, 2010, Hor Akl and Defendant went to an identified auto parts store in the Toledo, Ohio area, where Hor Akl and Defendant located the side-step rails that would be used to conceal cash and obtained a parts catalog.

kk.    On May 13, 2010, Defendant spoke to the CHS via telephone. During this conversation, Defendant related the trip to the auto parts store on May 12. Defendant spoke using code words in order to conceal the true meaning of her conversation from law enforcement, including the use of code words such as "egg" and "chicken" in order to indicate dollar amounts and the transfer of funds.

ll.    On May 14, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated that he and Defendant would need five days in order to obtain title to the Dodge Ram pickup truck, but that the title could be obtained by paying the full amount owed on the truck. At some point prior to this date, Hor Akl purchased two "running boards" and two side-rails for the Dodge Ram pickup truck for approximately $700 in order to conceal the cash for transport to Lebanon. Also on this date, Hor Akl and Defendant demonstrated on their laptop computer the location of the Hizballah-controlled website where a pre-arranged phrase would be printed in order to signal receipt of the funds by Hizballah.

mm.    On May 17, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Defendant stated that she would arrange to pay off the remaining balance on her 2004 Chevrolet Trailblazer in order to obtain title to the vehicle, thereby enabling Hor Akl to conceal the cash inside this vehicle and allowing the vehicle to be shipped to Lebanon. Hor Akl stated that he would purchase additional vehicle accessories in order to fit the 2004 Chevrolet Trailblazer for the concealment of cash.

nn.    On May 18, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated that Defendant had arranged to pay the balance remaining on the 2004 Chevrolet Trailblazer and would do so the next day. Hor Akl stated that they would have the title to the 2004 Chevrolet Trailblazer and the accessories, including a front grill and side-step rails, for this vehicle by May 21, 2010. Hor Akl also used a ruler and a stack of 100 one dollar bills in order to estimate the amount of cash that could be concealed within the vehicle accessories that would be purchased for the 2004 Chevrolet Trailblazer.

Defendant's Initials

oo.    On May 20, 2010, the state of Ohio re-issued a title to Defendant for the 2004 Chevrolet Trailblazer. This title was issued to Defendant after the lien attached by Fifth Third Bank was removed, indicating that full payment had been made on the outstanding balance owed on the 2004 Chevrolet Trailblazer.

pp.    On May 24, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated that he was ready and that he had obtained the parts that they need. On this date, Hor Akl possessed the side-step rails that would be used to conceal the funds on the Chevy Trailblazer. Hor Akl further demonstrated that, using the side-step rails, he could conceal $60,000 in each of the two steps on one rail; $100,000 in the curved area of the side-step rail; and an additional $150,000 in the area of the side rail between the two steps. Hor Akl further stated that he planned to place expanding foam in the end of the side-step rail and glue the black cap back on the end of the side-step rail. Hor Akl further stated that he could conceal additional funds inside the back door of the Chevy Trailblazer. On this date, Hor Akl and Defendant possessed a title to the Chevy Trailblazer that had been obtained by Defendant after full payment had been made on the vehicle, thereby obtaining a title that was clear of any liens and, as a result, eligible to be shipped to Lebanon.

qq.    On May 30, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated that he was going to purchase household items that would be shipped in a container along with the 2004 Chevy Trailblazer to Lebanon in order to avoid additional scrutiny from customs officials. Hor Akl further stated that he would have an identified car dealer order the shipping container for June 3, 2010. Hor Akl further stated that if the funds were received on June 3, then the cash would be concealed within vehicle accessories on that date, the vehicle accessories would be installed on to the vehicle the next day, and the vehicle would be in the custody of the shipping company by June 4, 2010. Hor Akl further expressed his intent to arrive in Lebanon two weeks prior to the delivery of the vehicle.

rr.    On June 1, 2010, Hor Akl and Defendant met with the CHS in Toledo, Ohio. Hor Akl stated that he had visited the identified car dealer on this date and provided 300 dollars to reserve a shipping container. Hor Akl further stated that the shipping container would be delivered on June 4, 2010, and would be picked up by the shipping company later on that date. Hor Akl further stated that he would meet with the identified car dealer on June 2, 2010, in order to transfer title to the car dealer to allow for shipping the 2004 Chevy Trailblazer to Lebanon. Hor Akl further stated that he would use latex gloves when handling the cash to be transferred. Hor Akl further stated that he would use coffee grounds inside the vehicle accessories in order to disguise the cash from canines used by customs officials.

ss.    On June 2, 2010, Hor Akl and Defendant made flight arrangements with an identified travel agency. Hor Akl was scheduled to depart Detroit on June 5,

Page 19 of 24

Defendant's Initials

Plea Agreement of AMERA A. AKL

2010 and arrive in Beirut on June 6, 2010, travelling via Paris, France. Hor Akl was scheduled to return from Beirut to Detroit, via Paris, on September 15, 2010.

tt.    On June 3, 2010, the CHS delivered $200,000 in cash to Hor Akl and Defendant at their residence in Toledo, Ohio. Shortly thereafter, Hor Akl and Defendant were observed inside their residence wearing latex/rubber gloves in possession of approximately $200,000 in cash. Hor Akl and Defendant were located within close proximity to various automobile accessories, plastic wrap, latex/rubber gloves, duct tape, and fragrant insect repellant sticks. Hor Akl had prepared a portion of the money had been prepared for concealment into the automobile accessories, as it was wrapped in plastic and taped into a bundle.

24.    Defendant acknowledges that the above summary of Defendant's conduct does not set forth each and every fact that the USAO could prove at trial, nor does it encompass all of the acts which Defendant committed in furtherance of the offense(s) to which Defendant is pleading guilty.

## OTHER PROVISIONS

25.    **Financial Statement.** Defendant agrees to submit to the USAO, prior to the date of sentencing, a complete and accurate financial statement on government form OBD-500.

26.    **Agreement Silent About Matters Not Expressly Addressed.** This agreement is silent about all aspects of the determination of sentence not expressly addressed herein, and the parties are free to advise the Court of facts and to make recommendations to the Court with respect to all aspects of sentencing not agreed to herein.

27.    **Sentencing Guidelines.** Defendant understands that sentencing rests within the discretion of the Court; that federal sentencing law requires the Court to impose a sentence which is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a), and that the Court must consider among other factors the advisory United States Sentencing Guidelines in effect at the time of sentencing.

Defendant's Initials

28. **Consequences of Breaching the Plea Agreement.** Defendant understands that if Defendant breaches any promise in this agreement or if Defendant's guilty plea is rejected by the Court or is vacated or set aside, the USAO will be released from all of its obligations under this agreement and may institute or maintain any charges and make any recommendations with respect to sentencing that otherwise would be prohibited under the terms of the agreement. Defendant understands, however, that a breach of the agreement by Defendant will not entitle Defendant to withdraw, vacate, or set aside Defendant's guilty plea or conviction.

29. Defendant agrees not to accept remuneration or compensation of any sort, directly or indirectly, for the dissemination through books, articles, speeches, interviews, or any other means, of information regarding the transactions alleged in the above-captioned Indictment, or the investigation or prosecution of any civil or criminal cases against Defendant (if applicable).

30. **Agreement not Binding on other Jurisdictions and Agencies.** Defendant understands that this plea agreement is binding only on the United States Attorney's Office for the Northern District of Ohio and the National Security Division, Counterterrorism Section of the Department of Justice. It does not bind any other United States Attorney, any other federal agency, or any state or local government.

31. **Defendant is Satisfied with Assistance of Counsel.** Defendant makes the following truthful statements: I have discussed this case and this plea agreement in detail with my attorney who has advised me of my Constitutional and other trial and appeal rights, the nature of the charges, the elements of the offenses the United States would have to prove at trial, the evidence the United States would present at such trial, possible defenses, the advisory Sentencing Guidelines and other aspects of sentencing, and other potential consequences of pleading guilty in this case. I have had sufficient time and opportunity to discuss all aspects of

Page 21 of 24

Defendant's Initials

Plea Agreement of AMERA A. AKL

the case in detail with my attorney and have told my attorney everything I know about the charges, any defenses I may have to the charges, and all personal and financial circumstances in possible mitigation of sentence. I am satisfied with the legal services and advice provided to me by my attorney.

32. **Agreement Is Complete and Voluntarily Entered.** Defendant and Defendant's undersigned attorney state that this agreement is the entire agreement between Defendant and the USAO and that no other promises or inducements have been made, directly or indirectly, by any agent or representative of the United States government concerning any plea to be entered in this case. In particular, no promises or agreements have been made with respect to any actual or prospective civil or administrative proceedings or actions involving Defendant, except as expressly stated herein. In addition, Defendant states that no person has threatened or coerced Defendant to do or to refrain from doing anything in connection with this case, including Defendant's decision to enter a guilty plea. Finally, Defendant acknowledges that this agreement cannot be modified unless in writing and subject to approval by the Court.

## SIGNATURES

Defendant's Initials

Plea Agreement of AMERA A. AKL

**Defendant:** I have read *(or have had read to me)* this entire plea agreement and have discussed it with my attorney. I have initialed each page of the agreement to signify that I understand and approve the provisions on that page. I am entering this agreement voluntarily and of my own free will. No threats have been made to me, nor am I under the influence of anything that could impair my ability to understand this agreement.

_Amera Ali Akl_ _____     _5/23/2011_ _____

Amera Ali Akl          Date

**Defense Counsel:** I have read this plea agreement and concur in Defendant pleading in accordance with terms of the agreement. I have explained this plea agreement to Defendant, and to the best of my knowledge and belief, Defendant understands the agreement.

_____     _5/23/2011_ _____

Sanford A. Schulman       Date
Counsel for Defendant

**United States Attorney's Office:** I accept and agree to this plea agreement on behalf of the United States Attorney for the Northern District of Ohio.

_____     _5/23/2011_ _____

Justin E. Herdman        Date
Assistant U.S. Attorney

**National Security Division, United States Department of Justice:** I accept and agree to this plea agreement on behalf of the National Security Division, United States Department of Justice.

_____     _5/23/2011_ _____

S. Elisabeth Poteat        Date
Trial Attorney, Counterterrorism Section

The within Rule 11(c)(1)(C) binding plea agreement between the United States of America and the defendant, AMERA A. AKL, consisting of 23 typewritten pages, is hereby

**APPROVED AND ACCEPTED:**

Page 23 of 24

_____
Defendant's Initials

Plea Agreement of AMERA A. AKL

_Honorable James G. Carr_
UNITED STATES DISTRICT JUDGE

5/23/11
Date

Page 24 of 24

Defendant's Initials

EXHIBIT E-2

GOVERNMENT
EXHIBIT
A

F I L E D

2011 MAY 23  AM 11: 20

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OHIO

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 3:10-CR-251 |
| ) | |
| Plaintiff, ) | |
| ) | JUDGE JAMES G. CARR |
| v.  ) | |
| ) | |
| HOR I. AKL, ) | |
| ) | PLEA AGREEMENT |
| Defendant. ) | |

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in consideration of the mutual promises set forth below, the United States Attorney's Office for the Northern District of Ohio (hereinafter "USAO") and the United States Department of Justice National Security Division (hereinafter "NSD"), by and through its undersigned attorney(s), and the defendant, **HOR I. AKL** (hereinafter "Defendant"), agree as follows:

### MAXIMUM PENALTIES AND OTHER
### CONSEQUENCES OF PLEADING GUILTY

1.      **Waiver of Constitutional Trial Rights.** Defendant understands that Defendant has the right to plead not guilty and go to trial. At trial, Defendant would be presumed innocent, have the right to trial by jury or, with the consent of the United States, to trial by the Court, the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses and

subpoena witnesses to testify for the defense, and the right to be protected from compelled self-incrimination. Defendant understands that Defendant has the right to an attorney at every stage of the proceedings and, if necessary, one will be appointed to represent Defendant. Defendant understands that by pleading guilty, Defendant specifically and voluntarily waives each of these trial rights, except the right to counsel. Defendant understands that a guilty plea is a complete admission of guilt and if the Court accepts the guilty plea, the Court will find Defendant guilty without a trial.

   2.    **Statutory Penalties.** Defendant understands that the statutory maximum penalties, and minimum penalties if applicable, for the count(s) to which Defendant agrees to plead guilty is/are as follows:

| Count | Statute and Description of Offense | Statutory Sentence Per Count |
|---|---|---|
| One | 18 U.S.C. § 2339B (Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization) | Maximum imprisonment: 15 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: Life<br>Special assessment: $ 100 |
| Two | 18 U.S.C. § 1956(h) (Conspiracy to Violate Money Laundering Statutes) | Maximum imprisonment: 20 years<br>Statutory fine: $500,000<br>Maximum period of supervised release: 3 years<br>Special assessment: $ 100 |
| Three | 18 U.S.C. § 157(1) (Bankruptcy Fraud) | Maximum imprisonment: 5 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: 3 years<br>Special assessment: $ 100 |
| Four | 18 U.S.C. § 1621(1) (Perjury) | Maximum imprisonment: 5 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: 3 years<br>Special assessment: $ 100 |

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

| Count | Statute and Description of Offense | Statutory Sentence Per Count |
|-------|-----------------------------------|------------------------------|
| Five  | 18 U.S.C. § 152(7) (Bankruptcy Fraud) | Maximum imprisonment: 5 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: 3 years<br>Special assessment: $ 100 |

3.     **Minimum sentence must include imprisonment.** The sentence for the offenses charged in count, One, Two, Three, Four, and Five may not be satisfied by a term of probation and must include some period of imprisonment. [18 U.S.C. § 3561(a)(3) and U.S.S.G. § 5B1.1].

4.     **Special Assessment.** In addition to the penalty listed above, Defendant will be required to pay a mandatory special assessment of $100 for each count of conviction, for a total of $500, due immediately upon sentencing.

5.     **Forfeiture.**

a.     By agreeing, *inter alia*, to plead guilty to Count One of the Indictment in this case (Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B), and pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and 28 U.S.C. § 2461, Defendant agrees to the forfeiture of the following properties to the United States:

1)     2004 Chevrolet Trailblazer LS 2 Wheel Drive, VIN: 1GNDS13SX42392596;

2)     $6,629.40 in U.S. currency;

3)     $511.00 in U.S. currency;

b.     Defendant further agrees:

1)     The 2004 Chevrolet Trailblazer LS 2 Wheel Drive, VIN: 1GNDS13SX42392596, was titled to Defendant's wife, co-defendant

Page 3 of 28

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

Amera A. Akl, and is currently titled in the name of Excellerate Auto
Sales;

2)    The $6,629.40 in U.S. currency is the property of Defendant and
his wife, co-defendant Amera A. Akl.  A total of $6,629.40 was recovered
by law enforcement authorities during the execution of a search warrant at
the residence (3911 Brookfield Drive, Toledo, Ohio) of Defendant and
Amera Akl on June 3, 2010.

3)    The $511.00 in U.S. currency is the property of Defendant and his
wife, co-defendant Amera A. Akl.  The $511.00 was recovered by law
enforcement authorities during the execution of a search warrant at the
residence (3911 Brookfield Drive, Toledo, Ohio) of Defendant and Amera
Akl on June 3, 2010.  Particularly, the $511.00 was recovered from a
vehicle located on the premises.

c.    Defendant waives any rule and statute, including Rule 32.2(a) of the
Federal Rules of Criminal Procedure, which require the government to
provide notice, in the indictment, that forfeiture will be sought.

6.    **Costs.**  The Court may order Defendant to pay the costs of prosecution and
sentence, including but not limited to imprisonment, community confinement, home detention,
probation, and supervised release.

7.    **Restitution.**  The Court may order Defendant to pay restitution as a condition of
the sentence, probation, and/or supervised release.

8.    **Violation of Probation/Supervised Release.**  If Defendant violates any term or
condition of probation or supervised release, such violation could result in a period of

H. I. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

incarceration or other additional penalty as imposed by the Court. In some circumstances, the combined term of imprisonment under the initial sentence and additional period of incarceration could exceed the maximum statutory term.

### PLEA(S) AND OTHER CHARGE(S)

9. **Agreement to Plead Guilty.** Defendant agrees to plead guilty to Counts One, Two, Three, Four and Five of the Indictment in this case.

10. **Dismissal of Counts.** Upon sentencing, the USAO will move to dismiss the charges against Defendant in Count Six of the Indictment in this case.

11. **Agreement Contingent Upon Plea of Co-Defendant.** Defendant understands that this agreement is contingent upon entry of a plea of guilty by his co-defendant, Amera A. Akl, and that the USAO and NSD may withdraw from the terms of this agreement should Amera A. Akl fail or refuse to enter into a plea agreement in this case, fail or refuse to plead guilty under the terms of any plea agreement in this case, seek to withdraw any plea of guilty entered under the terms of any plea agreement in this case, or otherwise violate the terms of any plea agreement in this case.

12. **Agreement Not to Bring Certain Other Charges.** The USAO and NSD will not bring any other criminal charges against Defendant

--     for violations known to the USAO and NSD on the date of the execution of this agreement as it relates to this investigation.

--     for conduct disclosed to the USAO and NSD by Defendant during proffers, if any.

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

--      relating to conduct charged in the Indictment and/or described in the Factual Basis

section of this agreement based on facts currently within the knowledge of the

USAO and NSD.

### **ELEMENTS OF THE OFFENSE**

13.      The elements of the offense(s) to which Defendant will plead guilty are:

| Count One: 18 U.S.C. § 2339B, Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization | |
|---|---|
| One: | The Defendant unlawfully and knowingly agreed with other persons, known and unknown, to provide material support and resources, including, but not limited to, currency and monetary instruments, tangible property, personnel (including the Defendant himself), and services to Hizballah; |
| Two: | That the Defendant did so knowing that Hizballah was a designated terrorist organization and engaged or engages in terrorist activity. |
| **Count Two: 18 U.S.C. § 1956(h), Conspiracy to Violate Money Laundering Statutes** | |
| One: | The Defendant unlawfully and knowingly with other persons, known and unknown, to conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce; |
| Two: | That the property involved in the financial transaction was represented to be property used to conduct and facilitate a specified unlawful activity, to wit, providing material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B; |
| Three: | That the Defendant intended to promote the carrying on of specified unlawful activity and intended to avoid a transaction reporting requirement under state and federal law. |
| **Count Three: 18 U.S.C. § 157(1), Bankruptcy Fraud** | |
| One: | The Defendant devised a scheme and artifice to defraud; |
| Two: | That for the purpose of executing the scheme, the Defendant filed a petition under Title 11 of the United States Code, to wit, a fraudulent petition for personal bankruptcy. |
| **Count Four: 18 U.S.C. § 1621(1), Perjury** | |
| One: | The Defendant testified under oath at the meeting of creditors held under Section 341 of Title 11, United States Code, regarding the defendant's bankruptcy petition; |
| Two: | That the testimony was false; |

H. A.

Defendant's Initials

Plea Agreement of HOR I. AKL

| Three: | That at the time he testified, the Defendant knew the testimony was false; |
|--------|---------------------------------------------------------------------------|
| Four: | That the Defendant voluntarily and intentionally gave the false testimony; |
| Five: | That the false testimony was material. |
| **Count Five: 18 U.S.C. § 152(7), Bankruptcy Fraud** | |
| One: | A bankruptcy proceeding existed under Title 11, United States Code; |
| Two: | That with the intent to defeat the provisions of Title 11, United States Code, the Defendant transferred and concealed property which would have belonged to the bankrupt estate; |
| Three: | That the Defendant transferred and concealed the property knowingly and fraudulently. |

## SENTENCING STIPULATIONS AND AGREEMENTS

14. **Sentencing Guidelines.** Defendant understands that sentencing rests within the discretion of the Court; that federal sentencing law requires the Court to impose a sentence which is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a), and that the Court must consider among other factors the advisory United States Sentencing Guidelines in effect at the time of sentencing.

15. **Presentence Report.** Defendant understands that the advisory guideline range will be determined by the Court at the time of sentencing, after a presentence report has been prepared by the U.S. Probation Office and reviewed by the parties. Defendant further understands that it is the obligation of the government to provide to the U.S. Probation Office all known information regarding Defendant's conduct subject to its limited use under U.S.S.G. §1B1.8 and not protected under the proffer agreement if any.

16. **Joint Recommendation to Use the Advisory Sentencing Guidelines Computation.** After considering the factors in 18 U.S.C. §3553(a), the parties agree to recommend that the Court impose a sentence within the range and of the kind specified pursuant

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

to the advisory Sentencing Guidelines in accordance with the computations and stipulations set forth below. Neither party will recommend or suggest in any way that a departure or variance is appropriate, either regarding the sentencing range or regarding the kind of sentence.

17. **Right of Allocution.** Defendant understands and agrees that the USAO reserves the opportunity to speak at Defendant's sentencing. The USAO agrees that Defendant reserves the right of allocution at sentencing.

18. **Stipulated Guideline Computation.** The parties agree that the following calculation, using the current advisory Sentencing Guidelines Manual (dated November 1, 2010), represents the correct computation of the applicable offense level.

**Count One: 18 U.S.C. § 2339B (Material Support to Foreign Terrorist Organization)**

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2M5.3 of the United States Sentencing Guidelines applies to Count One of the Indictment. Under U.S.S.G. § 2M5.3, the base offense level for Count One is 26.

**Count Two: 18 U.S.C. § 1956(h) (Conspiracy to Violate U.S. Money Laundering Statutes )**

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2S1.1(a)(1) of the United States Sentencing Guidelines applies to Count Two of the Indictment. Under the operation of U.S.S.G. § 2S1.1(a)(1), the base offense level for Count One (U.S.S.G. § 2M5.3) is incorporated; as a result, the base offense level is 26. Under U.S.S.G. § 2S1.1(b)(2)(B), an enhancement of 2 levels applies, as the defendant will be convicted under 18 U.S.C. § 1956. Accordingly, the total offense level for Count Two is 28.

H. A.
Defendant's Initials

### Grouping of Closely Related Counts: Counts One and Two

Pursuant to Section 3D1.2 of the United States Sentencing Guidelines, all counts involving substantially the same harm or transaction shall be grouped together into a single Group. Accordingly, the Guidelines provision for multiple counts provide that the combined offense level for Counts One and Two is 28, pursuant to U.S.S.G. § 3D1.3(a).

### Aggravating Role

Pursuant to U.S.S.G. § 3B1.1(c), the defendant was an organizer, leader, manager and supervisor in the criminal activity in Counts One and Two. According, the combined offense level for Counts One and Two is 30.

**Count Three and Count Five: 18 U.S.C. § 157(1) and 152(7) (Bankruptcy Fraud)**

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2B1.1(a)(2) of the United States Sentencing Guidelines applies to Counts Three and Five of the Indictment. Under the operation of U.S.S.G. §2B1.1(a)(2), the base offense level for Counts Three and Five is 6. Under U.S.S.G. § 2B1.1(b)(8), an enhancement of 2 levels applies, as the offense involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding, resulting in an adjusted offense level of 8. As the resulting offense level is less than level 10, the offense level is increased to level 10, pursuant to § 2B1.1(b)(8). Accordingly, the total adjusted offense level for Count Three is 10, and the total adjusted offense level for Count Five is 10.

**Count Four: 18 U.S.C. 1621(1) (Perjury)**

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2J1.3(a) of the United States Sentencing Guidelines applies to Count Four of the Indictment. Under the operation of

Defendant's Initials

Plea Agreement of HOR I. AKL

U.S.S.G. § 2J1.3(a), the base offense level for Count Four is 14.

<u>Grouping of Closely Related Counts: Counts Three, Four and Five</u>

Pursuant to Section 3D1.2 of the United States Sentencing Guidelines, all counts involving substantially the same harm or transaction shall be grouped together into a single Group. Accordingly, the Guidelines provision for multiple counts provide that the combined offense level for Counts Three, Four and Five is 14, pursuant to U.S.S.G. § 3D1.3(a).

**Determining the Combined Offense Level**

Pursuant to U.S.S.G. § 3D1.4, the combined offense level is determined by taking the offense level applicable to the Group with the highest offense level, and increasing that offense level by pre-determined amounts relating to the seriousness of the other Groups. The parties to this Plea Agreement stipulate and agree that the highest offense level is 30.

Pursuant to U.S.S.G. § 3D1.4(c), any Group that is 9 or more levels less serious than the Group with the highest offense level is disregarded.[1] Accordingly, the combined offense level for Counts One, Two, Three, Four and Five is 30.

The parties agree that no other Guideline adjustments apply.

19. **Acceptance of Responsibility.** The USAO has no reason to believe at this time that Defendant has not clearly and affirmatively accepted personal responsibility for Defendant's criminal conduct. The USAO agrees to recommend a three (3) level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), provided Defendant's conduct continues to reflect Defendant's acceptance of responsibility. Defendant understands it will be up to the

---

[1]While such Groups will not increase the offense level, they may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level. *See* U.S.S.G. § 3D1.4(c).

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

Court at the time of sentencing to determine whether a reduction for acceptance of responsibility is appropriate.

20. **Criminal History Category.** The parties have no agreement about the Criminal History Category applicable in this case. Defendant understands that the Criminal History Category will be determined by the Court after the completion of a Pre-Sentence Investigation by the U.S. Probation Office.

## WAIVER OF APPEAL AND POST-CONVICTION ATTACK

21. **Waiver of Appellate Rights.** Defendant acknowledges having been advised by counsel of Defendant's rights, in limited circumstances, to appeal the conviction or sentence in this case, including the appeal right conferred by 18 U.S.C. § 3742, and to challenge the conviction or sentence collaterally through a post-conviction proceeding, including a proceeding under 28 U.S.C. § 2255. Defendant expressly and voluntarily waives those rights, except as specifically reserved below. Defendant reserves the right to appeal: (a) any punishment in excess of the statutory maximum; (b) any sentence to the extent it exceeds the greater of any mandatory minimum sentence or the maximum of the sentencing range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the Court; or (c) the Court's determination of Defendant's Criminal History Category. Nothing in this paragraph shall act as a bar to Defendant perfecting any legal remedies Defendant may otherwise have on appeal or collateral attack with respect to claims of ineffective assistance of counsel or prosecutorial misconduct.

22. **Waiver of Statute of Limitations.** Defendant waives all defenses based on the statute of limitations with respect to any prosecution that is not already time-barred by the

Defendant's Initials

Plea Agreement of HOR I. AKL

applicable statute of limitation on the date of Defendant's signing of this agreement and that is commenced within *one year* after any of the following events: (1) Defendant fails to plead guilty at the plea proceeding or the Court refuses to accept a guilty plea by Defendant pursuant to this agreement; (2) the Court permits Defendant to withdraw a guilty plea entered pursuant to this agreement or otherwise vacates such a guilty plea; or (3) the conviction obtained pursuant to this agreement is vacated, overturned, or otherwise set aside. Defendant understands the waiver of the statute of limitations is effective immediately upon Defendant's signing of this agreement and is not conditioned upon the approval of this agreement by the Court.

## FACTUAL BASIS AND RELEVANT CONDUCT

23.     Defendant agrees that the following summary fairly and accurately sets forth Defendant's offense conduct and a factual basis for the guilty plea. Defendant further agrees that the facts set forth in the summary are true and could be established beyond a reasonable doubt if the case were to proceed to trial:

      a.     Defendant and his wife, Amera Akl, were residents of Toledo, Ohio from as early as 1994 and continuing through the present. Defendant was a dual citizen of the United States and Lebanon during this same time period; Amera Akl was a citizen of the United States during this same time period. Defendant's brother (hereinafter "brother") lived in Lebanon between January 2009 and June 2010. Defendant's brother-in-law, who is the brother of Amera Akl (hereinafter "brother-in-law"), was a resident of Ohio between January 2009 and July 2010. Between approximately January 2009 and June 2010, both Defendant and Amera Akl were acquainted with a person working on behalf of the Federal Bureau of Investigation (hereinafter "FBI") as a confidential human source of information (hereinafter "CHS").

      b.     Hizballah was designated by the Secretary of State as a Foreign Terrorist Organization, pursuant to Section 219 of the Immigration and Nationality Act, on or about October 8, 1997, and has remained so designated since that time. Accordingly, donations of money or other forms of material support to Hizballah were and are prohibited.

      c.     Federal law establishes a $10,000 reporting requirement related to the transportation of monetary instruments into, or out of, the United States as set

H . A .
Defendant's Initials

forth in Title 31, United States Code, Section 5316 and Title 31, Code of Federal Regulations, Section 103.23;

d.      Federal law establishes a $3,000 reporting requirement related to verification of the identity of persons purchasing monetary instruments for currency (e.g. wire transfers, money orders, etc.) as set forth in Title 31, Code of Federal Regulations, Section 103.29;

e.      On August 30, 2009, Amera Akl met with the CHS in Toledo, Ohio and stated that she was willing to transport funds to Hizballah in Lebanon on behalf of the CHS. Amera Akl asked what was "in it" for her. Amera Akl also asked the CHS to which part of Hizballah the funds should go – the army or the families. Amera Akl then stated, in sum and substance, that she could personally transport $20,000 per trip to Lebanon and suggested methods by which Hizballah could provide a receipt for the funds. Amera Akl offered to approach Defendant in order to secure his assistance in transporting the funds to Hizballah. With respect to the transfer of funds to Hizballah, Amera Akl stated, "I can lead the way." On this date, Amera Akl also stated that she dreamed of dressing like Hizballah, carrying a gun, and dying as a martyr. Following this conversation with the CHS, Amera Akl relayed the nature of the discussion to Defendant.

f.      On September 2, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated to CHS that he had spoken to Amera Akl about the August 30, 2009 conversation outlined in Paragraph 23e. Defendant further stated that he had previously transported funds from the United States to Lebanon on his own behalf and on behalf of others. Defendant offered to personally transport funds on behalf of CHS. Defendant further stated that he was "well-connected" in Lebanon. Defendant asked whether the total amount to be transferred was more than $1 million or approximately $500,000. Defendant also asked what percentage of the total amount to be transferred he would receive as a fee, stating that if his fee was approximately $300,000 to $400,000, then he would probably not return from Lebanon after transporting the funds. Defendant also proposed transporting funds by purchasing vehicles in the United States, then selling the vehicles in Lebanon for a profit. Amera Akl was not present during this discussion between Defendant and the CHS.

g.      On September 3, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated that there were many options for transporting the funds to Lebanon, including through the purchase and sale of vehicles and electric generators. Defendant stated that in order to transport the funds, he would first need to travel to Lebanon. Defendant also stated that sending the money to Lebanon would have a "cost." Defendant also stated that he knew individuals in Lebanon who were associated with, or members of, Hizballah and that his brother was an important person in Lebanon. In Defendant's presence, Amera Akl stated that everyone would get their "cut" for participating and that "you do it the right way or you don't do it." Amera Akl also stated that they could have transferred

H. I. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

$500,000 if they had been asked earlier in 2009, such as at the beginning of summer, when the travel to Lebanon would have coincided with well-established travel patterns.

h.      On September 10, 2009, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant, in the presence of Amera Akl, stated that he understood the funds were being transported to the "terrorists." Defendant also stated that he understood the funds would be sent to a designated terrorist organization and used to target Israel. Defendant also detailed methods of transporting the funds to Lebanon, including purchasing and re-selling vehicles, and using individuals to carry the funds on their persons. Defendant stated that any individuals who carried funds on their persons would carry less than $10,000 in order to avoid a reporting requirement. Defendant stated that he was also familiar with the $3,000 reporting requirement related to money orders and Western Union wire transfers. Defendant also suggested methods by which Hizballah could provide a receipt for the funds. Defendant also stated that he would charge a fee of thirty percent on a transfer of one million dollars. Amera Akl stated, in the presence of Defendant, that she and Defendant had transported cash from the United States to Lebanon on prior occasions by concealing the cash on their persons and in magazines.

i.      On October 20, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated to CHS that transporting funds to Hizballah would result in him making money and "gaining some merits" at the same time. Defendant also suggested methods by which Hizballah could provide a receipt for the funds. Defendant also stated that he knew individuals in the military branch of Hizballah and that he could arrange a meeting with a named Hizballah official. Defendant stated that his brother operated a recreation club in Lebanon that was used frequently by Hizballah in order to conduct meetings. Defendant stated that Amera Akl knew that Hizballah used the recreation club in order to conduct meetings. Defendant also stated that he would need to travel to Lebanon and return with names, information, and a plan for transporting the funds. Defendant also stated that he had well-established connections with Hizballah, in that Hizballah had stored artillery, firearms, and rockets in the family home of Defendant in Lebanon. Amera Akl was not present during this discussion between Defendant and the CHS.

j.      On November 3, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated that he would travel to Lebanon and return with contact information for individuals within Hizballah. Defendant again stated that he could meet with a named Hizballah official during a trip to Lebanon. Defendant also detailed various methods for transporting funds to Lebanon, including the use of post office boxes and offshore accounts in order to deposit money orders in amounts less than the $3,000 reporting requirement. Defendant also proposed using wealthy individuals in the United States who owned property in Lebanon to operate as unlicensed money transmittal services. Defendant also stated that his

Page 14 of 28

H. A.
Defendant's Initials

objective was to make money and to perform good deeds. Amera Akl was not present during this discussion between Defendant and the CHS.

k.       On December 7, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated that he was ready to move forward with the plan to transport funds to Hizballah. Defendant discussed the timing of his departure to Lebanon and explained that he was going to Lebanon in order to personally meet with a named Hizballah official, or Hizballah representatives, in order to ensure that the funds would be received by Hizballah. Defendant also proposed using a business owned and operated by Amera Akl's family (hereinafter, "Business #1") in order to over-report cash income received, which would then be taxed and therefore "legitimate," as these funds could subsequently be declared, as required by federal law, during transport to Lebanon and forwarded on to Hizballah. Defendant stated that he and his brother were "well-connected" in Lebanon. Amera Akl was not present during this discussion between Defendant and the CHS.

l.       On December 16, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant discussed taking a trip to Lebanon and reviewed at least two methods of transporting funds to Lebanon, including shipping vehicles and using an offshore account in another country. Defendant stated that he had discussed these methods of transporting funds with Defendant's brother-in-law and that they were the brother-in-law's ideas. Defendant also discussed how he would communicate with persons in the United States while he was in Lebanon. Defendant further stated that he could be reached at certain telephone numbers in Lebanon. Amera Akl was not present during this discussion between Defendant and the CHS.

m.       On December 22, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated that he was willing to travel to Lebanon anytime after the New Year. Defendant also discussed how he would communicate with persons in the United States while he was in Lebanon. Defendant further stated that telephone coverage in Lebanon was good and that there were telephone numbers in Lebanon where he could be reached. Amera Akl was not present during this discussion between Defendant and the CHS.

n.       On January 12, 2010, Defendant met with the CHS in Toledo, Ohio. Defendant stated that he had consulted on several occasions with Defendant's brother-in-law about transferring funds to Lebanon. Defendant further stated that his brother-in-law had devised numerous methods to transfer funds to Lebanon. Defendant agreed to arrange a meeting with the CHS and Defendant's brother-in-law the next day in order to discuss the transfer of funds to Hizballah. Amera Akl was not present during this discussion between Defendant and the CHS.

o.       On January 13, 2010, Defendant, his brother-in-law, and the CHS met in Toledo, Ohio. On this date, Defendant's brother-in-law stated that he understood that the point was to move money from the United States to Lebanon without anyone knowing about it. When told that the funds would be transferred to

Defendant's Initials

Plea Agreement of HOR I. AKL

Hizballah, Defendant's brother-in-law stated, "I support Hizballah." Defendant's brother-in-law further stated that he had no problem with the fact that the funds would go to support Hizballah's military activities. Defendant and his brother-in-law proposed using couriers to carry cash, in amounts less than the $10,000 reporting requirement, to Lebanon. Defendant's brother-in-law asked whether the funds were currently "clean," meaning not derived from criminal activity, held in a bank account, and on which taxes had been paid. Defendant's brother-in-law also asked whether the funds were derived from criminal activity and held in cash. Defendant also proposed purchasing 15 to 20 pickup trucks to be resold in Lebanon as a method of transferring funds. Defendant and his brother-in-law stated that a receipt signaling that the money had been received would be important. Defendant's brother-in-law again stated that Hizballah as the ultimate destination of funds was acceptable to him. Amera Akl was not present during this discussion.

p.      On January 22, 2010, Defendant met with the CHS in Toledo, Ohio. Defendant confirmed that his brother-in-law was an additional participant in the money transfer operation. On this date, the CHS told Defendant that the money was "clean" and existed in a bank account, to which Defendant responded that this might mean he could transfer funds electronically to Lebanon. Defendant then produced a deposit receipt for a bank account in Lebanon in the name of Defendant's brother. Defendant stated the importance of his trip to Lebanon was to make connections. Defendant also stated that Hizballah trusts Defendant's brother because they are already doing business together. As a result of this relationship, Defendant stated that he too would be trusted by Hizballah. Amera Akl was not present during this discussion between Defendant and the CHS.

q.      On January 28, 2010, Defendant, his brother-in-law, and the CHS met in Toledo, Ohio. On this date, Defendant and Defendant's brother-in-law were told that the funds existed in a bank account and totaled almost one million dollars. Defendant then stated that it was a "done deal" that he was going to Lebanon. Defendant also proposed transferring the funds using other individuals to wire transfer amounts less than the $3,000 reporting requirement. Defendant stated that the first step was for him to go to Lebanon in order to arrange a meeting with Hizballah representatives. Defendant's brother-in-law stated that an easy method of transferring funds was to send five couriers with cash to a third country, where the funds would be deposited into an offshore bank account and sent to Lebanon via wire transfer. Defendant and Defendant's brother-in-law discussed how they would communicate while Defendant was in Lebanon in order to evade government surveillance, agreeing that Defendant would only call from a number in Lebanon with which Defendant's brother-in-law had an already-established call pattern, such as with a relative. Defendant and Defendant's brother-in-law also agreed to use code words involving work and business travel in order to conceal the true subject matter of their conversations. Defendant also stated that Hizballah needed trucks to carry rockets. Defendant stated that he would not tell anyone about travelling to Lebanon. Defendant stated that he would use his

Page 16 of 28

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

brother in order to arrange meetings with Hizballah representatives in Lebanon. Defendant also stated that the likelihood was "100 percent" that he would meet with a "big boss," including a named Hizballah official, during any trip to Lebanon. Defendant's brother-in-law stated that he would not accompany Defendant on the first trip to Lebanon, but that he would be available to go any other time that was necessary. Defendant then stated that he would be available to travel to Lebanon in March. Amera Akl was not present during this discussion.

r.        On February 9, 2010, Defendant, his brother-in-law, and the CHS met in Toledo, Ohio. Defendant's brother-in-law stated that they could use individuals employed at Business #1 to carry cash, in an amount less than the $10,000 reporting requirement, to a third country. Defendant's brother-in-law further stated that the employees of Business #1 would receive wire transfers, in amounts less than the $3,000 reporting requirement, while the employees were in the third country. Defendant stated that the funds could then be transferred from the third country to accounts in Lebanon opened under the name of Defendant's brother, mother and sister. Defendant stated that he would travel to Lebanon in order to withdraw the funds. Defendant's brother-in-law stated that he could travel to the third country to research the feasibility of this plan in person, as he would not research the plan over the Internet or while he was in the United States. Amera Akl was not present during this discussion.

s.        On February 13, 2010, Amera Akl met with the CHS in Toledo, Ohio. Amera Akl stated that she knew the details of the proposed transfer of funds and of Defendant's trip to Lebanon in order to arrange a meeting with Hizballah representatives. Amera Akl stated that Defendant and Defendant's brother-in-law could accomplish this part of the plan with no problem. Following this meeting, Amera Akl telephoned Defendant and relayed details of this discussion to the Defendant.

t.        On February 17, 2010, Defendant met with the CHS in Toledo, Ohio. Defendant agreed to travel to Lebanon in early March, 2010. Defendant identified the travel agent that he would use in order to make the travel arrangements. Defendant also stated that he would fly via Air France and would purchase the ticket in cash one week before his travel date. Defendant proposed an additional method of transferring funds to Lebanon, using appliances to hide cash and then shipping these appliances to Lebanon, where Defendant would then retrieve the cash. Defendant stated that he had assisted an individual with smuggling approximately $100,000 using this method and that the same individual had previously smuggled over two million dollars and weapons to Lebanon using this same method. Defendant also proposed sending three refrigerators, each concealing approximately $200,000 in cash, to Lebanon where Defendant would meet each shipment in order to retrieve the cash. Defendant stated that his brother-in-law would be useful in transferring the funds to Hizballah because of his good credit, personal wealth, salaried job, and fluent English. Defendant also discussed the connections he planned to make in

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

Lebanon with Hizballah and stated that his brother would take Defendant to meet a named Hizballah official. Defendant also stated that he believed it would be possible to meet "the boss" while in Lebanon, referring to a named Hizballah official. Amera Akl was not present during this discussion.

u.      On February 18, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Amera Akl stated, in the presence of Defendant, that she made the reservation for Defendant's trip to Lebanon. Defendant stated that he intended to meet representatives of Hizballah upon arrival in Lebanon and might be able to return early to the United States. Defendant also described his desire to have the funds available upon his return from Lebanon. Defendant once again proposed using appliances in order to conceal cash and stated that Defendant's brother-in-law would purchase the appliances and make the shipping arrangements. Defendant stated that while he was in Lebanon, he would communicate only with Amera Akl or Defendant's brother-in-law by telephoning them from a relative's home in Lebanon.

v.      On February 23, 2010, Defendant and Amera Akl drove with the CHS to an identified travel agency in Michigan where they purchased a round-trip ticket from Detroit to Beirut, Lebanon for approximately $1,060 in cash, a portion of which was paid for by Defendant and Amera Akl. On this date, Defendant again explained his plan to conceal the funds in appliances purchased and shipped to Lebanon by Defendant's brother-in-law. Amera Akl stated, in the presence of Defendant, that Defendant would telephone Amera Akl directly while he was in Lebanon and that Amera Akl could then relay any messages from Defendant.

w.      On February 27, 2010, Defendant met with the CHS in Toledo, Ohio. Defendant stated that he had spoken with his brother via telephone. Defendant further stated that he had instructed his brother to keep the fact of Defendant's travel to Lebanon a secret.

x.      On March 1, 2010, Defendant boarded an Air France flight at Detroit Metro Airport and departed for Beirut via Paris, France.

y.      Between March 1, 2010, and March 3, 2010, Defendant and Amera Akl spoke via telephone and confirmed that Defendant had arrived safely in Lebanon. Between March 1, 2010, and March 5, 2010, Defendant told Amera Akl, in coded language, that he would be meeting with a highly-placed person in Hizballah.

z.      On March 10, 2010, Defendant arrived at Detroit Metro Airport on an Air France flight from Beirut via Paris, France. Upon arrival in the United States, Defendant made false statements to officials of the United States Customs and Border Patrol regarding the nature of his trip to Lebanon and the source of the funds used to pay for his travel. On this date, Defendant and Amera Akl met with the CHS. Defendant stated that after several days in Lebanon, he and his brother met with representatives of Hizballah, including a named Hizballah official.

Defendant's Initials

Plea Agreement of HOR I. AKL

Defendant further stated that Hizballah was willing to receive funds from the CHS and would provide receipt of the funds by posting a pre-arranged message in a named, Hizballah-controlled publication. Defendant further stated that the plan was still to conceal the funds inside appliances and that "we are ready" to send all the funds in one shipment.

aa.    On March 12, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant again stated, in the presence of Amera Akl, that he had arranged for a specific message to appear in a named, Hizballah-controlled publication upon receipt of the funds from the CHS. Defendant also stated that he would meet with his brother-in-law on this same date in order to update him on the details of the Lebanon trip and the plan to transfer funds.

bb.    On March 18, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he was still willing to transfer the funds to Hizballah, but that he was waiting for the funds to arrive. Defendant then explained, in the presence of Amera Akl, that the situation was very dangerous and that he would like to deliver the funds by May 8, 2010. Defendant further stated that if the funds were not delivered by that date, then both Defendant and his brother would be questioned due to their meeting with Hizballah leaders. Defendant once again stated that the funds would be transported using appliances to conceal them. Defendant further stated that his brother-in-law would purchase the appliances and make the shipping arrangements. Defendant also stated that he could acquire a signal from Hizballah before receiving the funds, but that he would only arrange this for a fee of $10,000. On this date, Amera Akl stated, in the presence of Defendant, that Hizballah would investigate Defendant's activities and would know with whom he has been in contact.

cc.    On March 26, 2011, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated, in the presence of Amera Akl, that he would arrange a signal from Hizballah before receiving the funds, but that he was reluctant to do so without providing some monetary contribution to Hizballah. Defendant proposed sending Hizballah an amount of $10,000 composed of $5,000 contributed by CHS and $5,000 that Defendant would borrow from his brother-in-law.

dd.    On March 30, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he would conceal the funds inside the Akls' truck (the 2008 Dodge Ram) and then ship the vehicle to Lebanon. Defendant explained that his brother-in-law would make the shipping arrangements for the truck. On this date, Amera Akl met with a representative from the leasing company holding the title to the Akls' truck in order to arrange for a purchase of the vehicle and a transfer of title to Amera Akl in order to facilitate shipping the vehicle to Lebanon.

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

ee.     On April 15, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. When asked what denomination of funds would be required in order to effectuate the money transfer, Defendant stated that they would need $100 bills. On this date, Defendant also outlined a plan to transfer the funds by concealing them inside a Jeep Wrangler vehicle. Defendant stated that he would purchase a Jeep Wrangler at an auto auction in Toledo, Ohio with the assistance of a named local car dealer. Defendant then stated that the funds would be concealed inside this Jeep Wrangler, which would then be shipped to Lebanon via the named car dealer. Defendant also stated that depending upon the volume and size of the cash to be transferred, they may use a vehicle owned by Amera Akl (the 2004 Chevrolet Trailblazer) in order to conceal the cash. Defendant stated that if two vehicles were necessary, then Defendant's brother-in-law would provide the necessary funds to purchase a vehicle and obtain the title in order to ship the vehicle to Lebanon. Defendant further stated that once the vehicle was shipped, he would purchase a plane ticket to Lebanon and would receive the vehicle with his brother, who would assist Defendant in removing the funds and providing the cash to Hizballah. On this date, Amera Akl stated that she supported the transfer and just wanted to get it done.

ff.     On April 18, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated, in the presence of Amera Akl, that he had spoken with the identified car dealer about shipping vehicles to Lebanon; the identified car dealer had suggested sending the vehicle inside a shipping container if they wished to limit scrutiny from customs officials. Defendant further stated that the identified car dealer had scheduled, pre-arranged shipping containers that depart approximately every fifteen days. Defendant further stated that his brother-in-law would purchase a vehicle, currently registered in the name of Amera Akl, (the 2004 Chevrolet Trailblazer) in order to allow it to be shipped to Lebanon. Defendant further stated that he would buy side-step rails for the vehicle, conceal the funds inside the side-step rails, and then attach the side-step rails to the vehicle. Defendant used a stack of one dollar bills in order to demonstrate the method that would be used to roll the funds and how the funds would sit inside the side-step rail. Defendant further stated that he would cover the window in his garage with wood, in order to prevent anyone from observing him while he concealed the funds.

gg.     On April 26, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated, in the presence of Amera Akl, that he would purchase a Jeep Wrangler upon receipt of the funds to be transferred. Defendant further stated that the identified car dealer could ship a vehicle every week, so the vehicle could be shipped upon receipt of the funds. Defendant further stated that he had recently spoken to his brother via telephone. Defendant further stated that he was concerned about the need to complete the transfer of funds because one does not mess with Hizballah because they are dangerous. Defendant further stated that he had the best plan for transferring the money. Defendant further stated that he would cover the window in his garage with wood on the next day.

Defendant's Initials

Plea Agreement of HOR I. AKL

hh.     Between April 26, 2010, and May 5, 2010, Defendant covered a window in his garage with wood in order to prevent others from observing any activities within the garage. This action was consistent with Defendant's statements on April 18, 2010 and April 26, 2010, that he would cover a window in the garage in order to prevent individuals from observing him while he concealed the funds within a vehicle or vehicle accessories.

ii.     On May 5, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant detailed, in the presence of Amera Akl, the steps to be taken in order to transfer funds to Hizballah, including purchasing a vehicle at an auto auction, concealing the funds inside the vehicle at the Akl residence, using a shipping company to send the vehicle to Lebanon, and travelling to Lebanon in order to recover the funds from the vehicle. Defendant further stated that he would arrange to have the vehicles shipped from an identified car dealership on the same date that the vehicle would be dropped off at the dealership. Defendant estimated that it would take three to four days to conceal the cash inside the vehicle. Defendant also stated that the Akls would use their percentage of the funds to pay bills and start a business, but that this money would be left in the United States with Amera Akl.

jj.     On May 12, 2010, Defendant and Amera Akl went to an identified auto parts store in the Toledo, Ohio area, where Defendant and Amera Akl located the side-step rails that would be used to conceal cash and obtained a parts catalog.

kk.     On May 13, 2010, Amera Akl spoke to the CHS via telephone. During this conversation, Amera Akl related the trip to the auto parts store on May 12. Amera Akl spoke using code words in order to conceal the true meaning of her conversation from law enforcement, including the use of code words such as "egg" and "chicken" in order to indicate dollar amounts and the transfer of funds.

ll.     On May 14, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he and Amera Akl would need five days in order to obtain title to the Dodge Ram pickup truck, but that the title could be obtained by paying the full amount owed on the truck. At some point prior to this date, Defendant purchased two "running boards" and two side-rails for the Dodge Ram pickup truck for approximately $700 in order to conceal the cash for transport to Lebanon. Also on this date, Defendant and Amera Akl demonstrated on their laptop computer the location of the Hizballah-controlled website where a pre-arranged phrase would be printed in order to signal receipt of the funds by Hizballah.

mm.     On May 17, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Amera Akl stated that she would arrange to pay off the remaining balance on her 2004 Chevrolet Trailblazer in order to obtain title to the vehicle, thereby enabling Defendant to conceal the cash inside this vehicle and allowing for the

Page 21 of 28

H.A.
Defendant's Initials

vehicle to be shipped to Lebanon. Defendant stated that he would purchase additional vehicle accessories in order to fit the 2004 Chevrolet Trailblazer for the concealment of cash.

nn.     On May 18, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that Amera Akl had arranged to pay the balance remaining on the 2004 Chevrolet Trailblazer and would do so the next day. Defendant stated that they would have the title to the 2004 Chevrolet Trailblazer and the accessories, including a front grill and side-step rails, for this vehicle by May 21, 2010. Defendant also used a ruler and a stack of 100 one dollar bills in order to estimate the amount of cash that could be concealed within the vehicle accessories that would be purchased for the 2004 Chevrolet Trailblazer.

oo.     On May 20, 2010, the state of Ohio re-issued a title to Amera Akl for the 2004 Chevrolet Trailblazer. This title was issued to Amera Akl after the lien attached by Fifth Third Bank was removed, indicating that full payment had been made on the outstanding balance owed on the 2004 Chevrolet Trailblazer.

pp.     On May 24, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he was ready and that he had obtained the parts that they need. On this date, Defendant possessed the side-step rails that would be used to conceal the funds on the Chevy Trailblazer. Defendant further demonstrated that, using the side-step rails, he could conceal $60,000 in each of the two steps on one rail; $100,000 in the curved area of the side-step rail; and an additional $150,000 in the area of the side rail between the two steps. Defendant further stated that he planned to place expanding foam in the end of the side-step rail and glue the black cap back on the end of the side-step rail. Defendant further stated that he could conceal additional funds inside the back door of the Chevy Trailblazer. On this date, Defendant and Amera Akl possessed a title to the Chevy Trailblazer that had been obtained by Amera Akl after full payment had been made on the vehicle, thereby obtaining a title that was clear of any liens and, as a result, eligible to be shipped to Lebanon.

qq.     On May 30, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he was going to purchase household items that would be shipped in a container along with the 2004 Chevy Trailblazer to Lebanon in order to avoid additional scrutiny from customs officials. Defendant further stated that he would have an identified car dealer order the shipping container for June 3, 2010. Defendant further stated that if the funds were received on June 3, then the cash would be concealed within vehicle accessories on that date, the vehicle accessories would be installed on to the vehicle the next day, and the vehicle would be in the custody of the shipping company by June 4, 2010. Defendant further expressed his intent to arrive in Lebanon two weeks prior to the delivery of the vehicle.

H , A ,
Defendant's Initials

Plea Agreement of HOR I. AKL

rr.     On June 1, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he had visited the identified car dealer on this date and provided 300 dollars to reserve a shipping container. Defendant further stated that the shipping container would be delivered on June 4, 2010, and would be picked up by the shipping company later on that date. Defendant further stated that he would meet with the identified car dealer on June 2, 2010, in order to transfer title to the car dealer to allow for shipping the 2004 Chevy Trailblazer to Lebanon. Defendant further stated that he would use latex gloves when handling the cash to be transferred. Defendant further stated that he would use coffee grounds inside the vehicle accessories in order to disguise the cash from canines used by customs officials.

ss.     On June 2, 2010, Defendant and Amera Akl made flight arrangements with an identified travel agency. Defendant was scheduled to depart Detroit on June 5, 2010 and arrive in Beirut on June 6, 2010, travelling via Paris, France. Defendant was scheduled to return from Beirut to Detroit, via Paris, on September 15, 2010.

tt.     On June 3, 2010, the CHS delivered $200,000 in cash to Defendant and Amera Akl at their residence in Toledo, Ohio. Shortly thereafter, Defendant and Amera Akl were observed inside their residence wearing latex/rubber gloves in possession of approximately $200,000 in cash. Defendant and Amera Akl were located within close proximity to various automobile accessories, plastic wrap, latex/rubber gloves, duct tape, and fragrant insect repellant sticks. Defendant had prepared a portion of the money had been prepared for concealment into the automobile accessories, as it was wrapped in plastic and taped into a bundle.

uu.     From at least as early as December 10, 2007, and continuing through the date of this Plea Agreement, Defendant devised a scheme and artifice to defraud his creditors, including Bank of America, Chase, Discover, and Fifth Third Bank, and the bankruptcy trustee in his bankruptcy case. For the purpose of executing this scheme and artifice to defraud:

    i.      On or about December 10, 2007, Defendant requested and received an increase on his line of credit in his Bank of America account (BA 1369, hereinafter) from $4,000 to $26,600;

    ii.     On or about December 12, 2007, Defendant transferred $14,000 from account BA 1369 to his Huntington Bank account (H 1967, hereinafter);

    iii.    On or about December 20, 2007, Defendant transferred $11,000 from account BA 1369 to account H 1967;

    iv.     On or about December 26, 2007, Defendant issued a check to cash, in the amount of $766, from account H 1967;

Page 23 of 28

Defendant's Initials

Plea Agreement of HOR I. AKL

    v.       On or about January 4, 2008, Defendant issued a check to cash in the amount of $10,000, from account H 1967;

    vi.     On or about January 7, 2008, Defendant issued a check to cash in the amount of $3,000 from account H 1967;

    vii.   On or about January 12, 2008, Defendant transferred, in two separate transactions, $5,400 and $3,900 from his JP Morgan Chase credit card account, (JP 4293, hereinafter), to Amera Akl's Discover card account, DC 4112; and Sears credit card account (S 4461), respectively; on that same date, Defendant made two additional separate transfers from his other JP Morgan Chase credit card account, (JP 8279, hereinafter), totaling $8,250, into Amera Akl's Bank of America credit card account (BA 9982), and Sears credit card account (S 4461);

    viii.   On or about January 15, 2008, Defendant obtained a $500 cash advance from account BA 1369;

    ix.    Defendant transferred ownership interest in personal and real property to family members' names, in anticipation of filing for bankruptcy in the United States;

    x.     On or about August 28, 2008, Defendant caused the filing of a petition for personal bankruptcy under Title 11 of the United States Code, in the United States Bankruptcy Court for the Northern District of Ohio;

    xi.    Defendant verified that the information provided in the petition and attachments was true and correct, under penalty of perjury.

vv.    From August 29, 2008 and continuing to the date of this Plea Agreement, Defendant provided false material information, concealed assets, and failed to disclose transfers of assets, including funds and real property, on his bankruptcy petition and related documents, and during official bankruptcy proceedings.

ww.    On October 27, 2008, Defendant, while under oath that he would testify, declare and depose truly as a witness and petitioner at the meeting of creditors held under Section 341 of Title 11 (the U.S. Bankruptcy Code), conducted by the trustee appointed by the U.S. Trustee's office regarding the defendant's bankruptcy case, and having taken the oath before the trustee in a bankruptcy case in which United States law authorized the administration of the oath, willfully and contrary to such oath gave testimony concerning a material matter which he did not believe to be true, in that the defendant, when asked by the trustee whether he had "given away, sold or transferred any property in the past year" and whether he had "made any payments or transferred any property to friends or family members within the past four years," answered "NO" to each question, and this

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

testimony, as the defendant then well knew and believed, was false in that the defendant had transferred his property, including but not limited to funds, to family members within a year of said testimony.

24.     Defendant acknowledges that the above summary of Defendant's conduct does not set forth each and every fact that the USAO could prove at trial, nor does it encompass all of the acts which Defendant committed in furtherance of the offense(s) to which Defendant is pleading guilty.

## OTHER PROVISIONS

25.     **Financial Statement.** Defendant agrees to submit to the USAO, prior to the date of sentencing, a complete and accurate financial statement on government form OBD-500.

26.     **Agreement Silent About Matters Not Expressly Addressed.** This agreement is silent about all aspects of the determination of sentence not expressly addressed herein, and the parties are free to advise the Court of facts and to make recommendations to the Court with respect to all aspects of sentencing not agreed to herein.

27.     **Sentencing Guidelines.** Defendant understands that sentencing rests within the discretion of the Court; that federal sentencing law requires the Court to impose a sentence which is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a), and that the Court must consider among other factors the advisory United States Sentencing Guidelines in effect at the time of sentencing.

28.     **Consequences of Breaching the Plea Agreement.** Defendant understands that if Defendant breaches any promise in this agreement or if Defendant's guilty plea is rejected by the Court or is vacated or set aside, the USAO will be released from all of its obligations under this agreement and may institute or maintain any charges and make any recommendations with respect to sentencing that otherwise would be prohibited under the terms of the agreement.

Page 25 of 28

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

Defendant understands, however, that a breach of the agreement by Defendant will not entitle Defendant to withdraw, vacate, or set aside Defendant's guilty plea or conviction.

29.     Defendant agrees not to accept remuneration or compensation of any sort, directly or indirectly, for the dissemination through books, articles, speeches, interviews, or any other means, of information regarding the transactions alleged in the above-captioned Indictment, or the investigation or prosecution of any civil or criminal cases against Defendant (if applicable).

30.     **Agreement not Binding on other Jurisdictions and Agencies.** Defendant understands that this plea agreement is binding only on the United States Attorney's Office for the Northern District of Ohio and the National Security Division, Counterterrorism Section of the Department of Justice.  It does not bind any other United States Attorney, any other federal agency, or any state or local government.

31.     **Defendant is Satisfied with Assistance of Counsel.** Defendant makes the following truthful statements: I have discussed this case and this plea agreement in detail with my attorney who has advised me of my Constitutional and other trial and appeal rights, the nature of the charges, the elements of the offenses the United States would have to prove at trial, the evidence the United States would present at such trial, possible defenses, the advisory Sentencing Guidelines and other aspects of sentencing, and other potential consequences of pleading guilty in this case.  I have had sufficient time and opportunity to discuss all aspects of the case in detail with my attorney and have told my attorney everything I know about the charges, any defenses I may have to the charges, and all personal and financial circumstances in possible mitigation of sentence.  I am satisfied with the legal services and advice provided to me by my attorney.

Page 26 of 28

Defendant's Initials

Plea Agreement of HOR I. AKL

32. **Agreement Is Complete and Voluntarily Entered.** Defendant and Defendant's undersigned attorney state that this agreement is the entire agreement between Defendant and the USAO and that no other promises or inducements have been made, directly or indirectly, by any agent or representative of the United States government concerning any plea to be entered in this case. In particular, no promises or agreements have been made with respect to any actual or prospective civil or administrative proceedings or actions involving Defendant, except as expressly stated herein. In addition, Defendant states that no person has threatened or coerced Defendant to do or to refrain from doing anything in connection with this case, including Defendant's decision to enter a guilty plea. Finally, Defendant acknowledges that this agreement cannot be modified unless in writing and subject to approval by the Court.

## SIGNATURES

**Defendant:**   I have read *(or have had read to me)* this entire plea agreement and have discussed it with my attorney. I have initialed each page of the agreement to signify that I understand and approve the provisions on that page. I am entering this agreement voluntarily and of my own free will. No threats have been made to me, nor am I under the influence of anything that could impair my ability to understand this agreement.

_____          05 - 23 - 2011
Hor Ibrahim Akl                            Date

**Defense Counsel:** I have read this plea agreement and concur in Defendant pleading in accordance with terms of the agreement. I have explained this plea agreement to Defendant, and to the best of my knowledge and belief, Defendant understands the agreement.

_____          May 23, 2011
Jeffrey J. Helmick                         Date
Counsel for Defendant

Page 27 of 28

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

_David L. Doughten_
Counsel for Defendant

_5-23-11_
Date

**United States Attorney's Office:** I accept and agree to this plea agreement on behalf of the United States Attorney for the Northern District of Ohio.

_Justin E. Herdman_
Assistant U.S. Attorney

_5/23/2011_
Date

**National Security Division, United States Department of Justice:** I accept and agree to this plea agreement on behalf of the National Security Division, United States Department of Justice.

_S/Elisabeth Poteat_
Trial Attorney, Counterterrorism Section

_5/23/2011_
Date

The within Rule 11(c)(1)(C) binding plea agreement between the United States of America and the defendant, HOR I. AKL, consisting of 28 typewritten pages, is hereby

**APPROVED AND ACCEPTED:**

_Honorable James G. Carr_
UNITED STATES DISTRICT JUDGE

_5/23/11_
Date

Page 28 of 28

Defendant's Initials

EXHIBIT E-3

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| Amera Akl | ) | Case Number:  3:10cr251-02 |
| | ) | USM Number:  44025-060 |
| | ) | |
| | ) | Sanford Schulman |
| | | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)      1 (one)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 2339B | Material Support to a Designated Foreign Terrorist Organization | 6/7/2010 | 1 |
| | | | |
| | | | |

☐ See additional count(s) on page 2

The defendant is sentenced as provided in pages  2  through  6   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)      2 & 6             ☐ is    ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

June 22, 2011
Date of Imposition of Judgment


s/ James G. Carr
Signature of Judge


James G. Carr          United States District Judge
Name of Judge                    Title of Judge


June 23, 2011
Date

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
        Sheet 2 — Imprisonment

DEFENDANT:  Amera Akl                                    Judgment Page: 2 of 6
CASE NUMBER:  3:10cr251-02

# IMPRISONMENT

        The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a
total term of:

 40 months

☑  The court makes the following recommendations to the Bureau of Prisons:

        That the defendant be designated to Alderson, WV, and if deemed appropriate, that the defendant receive drug
treatment counseling.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

        ☐  at _____  ☐ a.m.  ☐ p.m.  on _____

        ☐  as notified by the United States Marshal.

☑  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

        ☐  before _____ on _____

        ☑  as notified by the United States Marshal.

        ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

        Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
                        UNITED STATES MARSHAL

                By _____
                        DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | |
|---|---|
| DEFENDANT:  Amera Akl | Judgment Page: 3 of 6 |
| CASE NUMBER:  3:10cr251-02 | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

   3 years

   The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑    The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐    The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

   If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

   The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall comply with the  Northern District of Ohio Offender Employment Policy which may include participation in training, education, counseling and/or daily job search as directed by the pretrial services and probation officer. If not in compliance with the condition  of supervision requiring full-time employment at a lawful occupation, the defendant may be directed to perform up to 20 hours of community service per week until employed, as approved or directed by the pretrial services and probation officer.

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or  a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

"Upon finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.  These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them."

Dated: _____

_____
Defendant

_____
U.S. Probation Officer

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
           Sheet 3C — Supervised Release

DEFENDANT:  Amera Akl                                    Judgment Page: 4 of 6
CASE NUMBER:  3:10cr251-02

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall provide the probation officer with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

The defendant shall submit her person, residence, place of business, computer or vehicle to a warrantless search, conducted and controlled by the U.S. Probation officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall inform any other residents that the premises may be subject to a search pursuant to this condition.

The defendant shall participate in an approved program of outpatient, inpatient or detoxification substance abuse treatment, which will include drug and alcohol testing to determine if the defendant has reverted to substance abuse.

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

DEFENDANT:  Amera Akl                                                  Judgment Page: 5 of 6
CASE NUMBER:  3:10cr251-02

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ 0.00 |

☐  The determination of restitution is deferred until _____ .  An *Amended Judgement in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $0.00 | $0.00 |  |

☐  See page 5A for additional criminal monetary conditions.

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the    ☐  fine    ☐  restitution.

☐  the interest requirement for the    ☐  fine    ☐  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B     (Rev. 09/08) Judgment in a Criminal Case
    Sheet 6 — Schedule of Payments

DEFENDANT:  Amera Akl
CASE NUMBER:  3:10cr251-02

Judgment Page: 6 of 6

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐   Lump sum payment of $ _____ due immediately, balance due

     ☐   not later than _____ , or
     ☐   in accordance   ☐ C,   ☐ D,   ☐   E, or   ☐ F below; or

**B** ☐   Payment to begin immediately (may be combined with   ☐ C,    ☐ D, or   ☐ F below); or

**C** ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
     term of supervision; or

**E** ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑   Special instructions regarding the payment of criminal monetary penalties:
     ☑ A special assessment of $ 100.00   is due in full immediately as to count(s) 1      .
     PAYMENT IS TO BE MADE PAYABLE AND SENT TO THE CLERK, U.S. DISTRICT COURT.

     ☐ After the defendant is released from imprisonment, and within 30 days of the commencement of the term of supervised release, the probation
     officer shall recommend a revised payment schedule to the Court to satisfy any unpaid balance of the restitution. The Court will enter an order
     establishing a schedule of payments.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

EXHIBIT E-4

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA )
    **v.** )
Hor I. Akl )
  )
  )
  )
  )
  )

**JUDGMENT IN A CRIMINAL CASE**

Case Number:  3:10cr251-01

USM Number:  44026-060

Jeffrey Helmick and David Doughten
Defendant's Attorney

## THE DEFENDANT:

☑ pleaded guilty to count(s)    1-5

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 2339B | Material Support to a Designated Foreign Terrorist Organization | 6/7/2010 | 1 |
| 18 USC 1956(h) | Money Laundering Conspiracy | 6/7/2010 | 2 |
| 18 USC 157(1) and 2 | Bankruptcy Fraud | 6/7/2010 | 3 |
| 18 USC 1621(1) | Perjury | 10/27/2008 | 4 |
| 18 USC 152(7) | Concealment of Assets | 8/29/2008 | 5 |

☐ See additional count(s) on page 2

    The defendant is sentenced as provided in pages  2  through  6  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)    6    ☑ is    ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

May 21, 2012
Date of Imposition of Judgment

s/ James G. Carr
Signature of Judge

James G. Carr    United States District Judge
Name of Judge    Title of Judge

May 22, 2012
Date

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:  Hor I. Akl                                     Judgment Page: 2 of 6
CASE NUMBER:  3:10cr251-01

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

75 months as to Counts 1 and 2 and a term of 60 months on each  of Counts 3-5, to be served concurrently

☑ The court makes the following recommendations to the Bureau of Prisons:

the defendant be designated to Milan, Michigan, Elkton, Ohio or Morgantown, WV.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m.   on _____

☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before             on _____

☑ as notified by the United States Marshal.   The defendant shall not self surrender until after July 10, 2012.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
            Sheet 3 — Supervised Release

DEFENDANT:  Hor I. Akl                                            Judgment Page: 3 of 6
CASE NUMBER:  3:10cr251-01

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

> 10 years as to Count 1 and 3 years as to counts 2-5, to be served concurrently

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☑  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑  The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐  The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐  The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or the probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall comply with the Northern District of Ohio Offender Employment Policy which may include participation in training, education, counseling and/or daily job search as directed by the pretrial services and probation officer. If not in compliance with the condition of supervision requiring full-time employment at a lawful occupation, the defendant may be directed to perform up to 20 hours of community service per week until employed, as approved or directed by the pretrial services and probation officer.

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

"Upon finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.  These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them."

Dated: _____

_____          _____
Defendant                                        U.S. Probation Officer

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 3C — Supervised Release

DEFENDANT: Hor I. Akl                                    Judgment Page: 4 of 6
CASE NUMBER: 3:10cr251-01

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall pay restitution in the amount of $70,533.81, through the Clerk of the U.S. District Court. Restitution is due and payable immediately. Should the defendant be unable to pay in full immediately, the balance should be paid at a minimum rate of 25% of the defendant's gross income per month, through the Federal Bureau of Prisons Inmate Financial Responsibility Program. If a restitution balance remains upon release from imprisonment, payment is to commence no later than 60 days following release from imprisonment to a term of supervised release (in equal monthly payments, or a minimum of 10% of the defendant's gross monthly income) during the term of supervised release and thereafter as prescribed by law.

Notwithstanding establishment of a payment schedule, nothing shall prohibit the United States from executing or levying upon property of the defendant discovered before and after the date of this Judgement.

The Court waives the interest requirement in this case.

The defendant shall submit his person, residence, place of business, computer, or vehicle to a warrantless search, conducted and controlled by the U.S. Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall inform any other residents that the premises may be subject to a search pursuant to this condition.

The defendant shall apply all monies received from income tax refunds, lottery winnings, judgments, and/or any other anticipated or unexpected financial gains to the outstanding court-ordered financial obligation.

The defendant shall provide the probation officer with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

DEFENDANT: Hor I. Akl                                          Judgment Page: 5 of 6
CASE NUMBER: 3:10cr251-01

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 500.00 | $ | $ 70,533.81 |

☐ The determination of restitution is deferred until _____. An *Amended Judgement in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| DFS Services, LLC  Attn:  Acct ending in 0102<br>PO Box 6106<br>Carol Stream, IL  60197-6106 | | $15,587.34 | |
| Ali Ibrahim, c/o Atty Kenneth Wenninger<br>5658 N. Main Street, Ste 101<br>Sylvania, OH  43560 | | $45,000.00 | |
| T II, LLC c/ o Susan Hartman Muska<br>1 S. St. Clair Street, Ste 2-C<br>Toledo, OH  43604-8786 | | $9,946.47 | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $0.00 | $70,533.81 | |

☐ See page 5A for additional criminal monetary conditions.

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the   ☐ fine   ☑ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
       Sheet 6 — Schedule of Payments

Judgment Page: 6 of 6

DEFENDANT:  Hor I. Akl
CASE NUMBER:  3:10cr251-01

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $ _____ due immediately, balance due

        ☐ not later than _____ , or
        ☐ in accordance    ☐ C,   ☐ D,   ☐   E, or   ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with   ☐ C,    ☐ D, or   ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
    ☑ A special assessment of $ 500.00 _____ is due in full immediately as to count(s) 1-5 _____ .
    PAYMENT IS TO BE MADE PAYABLE AND SENT TO THE CLERK, U.S. DISTRICT COURT.

    ☐ After the defendant is released from imprisonment, and within 30 days of the commencement of the term of supervised release, the probation officer shall recommend a revised payment schedule to the Court to satisfy any unpaid balance of the restitution. The Court will enter an order establishing a schedule of payments.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
    Per plea agreement and Final Order of Forfeiture filed September 26, 2011

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

EXHIBIT F-1

USDC SCAN INDEX SHEET
Case 3:02-cr-02912-LC Document 1 Filed 10/30/02 Page 5 of 5

















SUI  10/31/02 9:43

3:02-CR-02912  USA V. SHAH

*1*

*CRINDI.*

FILED

02 OCT 30  PM 2:26

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

SECRET
Unsealed
11/6/06

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

July 2002 Grand Jury

| UNITED STATES OF AMERICA, | ) | Criminal Case No. '02 CR 2912 L |
|---|---|---|
| Plaintiff, | ) ) ) | I N D I C T M E N T |
| v. | ) ) | Title 21, U.S.C., Secs. 846 and 841(a) - Conspiracy to |
| SYED MUSTAJAB SHAH (1), aka Syed Saadar Ali Shah, aka Badshah Khan, aka Syed Saadat Ali Faraz, aka Shajee, MUHAMMED ABID AFRIDI (2), aka Sunny, aka Saifullah Durrani, ILYAS ALI (3), | ) ) ) ) ) ) ) ) ) ) ) | Distribute Heroin and Hashish; Title 21, U.S.C., Secs. 952, 960 and 963 - Conspiracy to Import Heroin and Hashish; Title 18, U.S.C., Sec. 2339B - Providing Material Support to Terrorists |
| Defendants. | ) ) | |

The grand jury charges:

Count 1

Beginning at a date unknown and continuing up to and including September 20, 2002, within the Southern District of California, and elsewhere, defendants SYED MUSTAJAB SHAH, aka Syed Saadar Ali Shah, aka Badshah Khan, aka Syed Saadat Ali Faraz, aka Shajee, MUHAMMED ABID AFRIDI, aka Sunny, aka Saifullah Durrani, and ILYAS ALI did knowingly and intentionally conspire together and with each other and with other

TWR:nlv(1):San Diego
10/30/02

persons known and unknown to distribute 1 kilogram and more of heroin, a Schedule I Controlled Substance, and 1,000 kilograms and more of hashish, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

OVERT ACTS

In furtherance of the above conspiracy and to effect and accomplish the objects thereof, the following overt acts, among others, were committed within the Southern District of California, and elsewhere:

1.   On or about April 11, 2002, within the Southern District of California, defendant ILYAS ALI, acting on behalf of defendants SYED MUSTAJAB SHAH and MUHAMMED ABID AFRIDI, negotiated with an undercover law enforcement officer for the sale of ton quantities of hashish and multiple kilogram quantities of heroin.

2.   On or about September 15, 2002, defendants SYED MUSTAJAB SHAH, MUHAMMED ABID AFRIDI and ILYAS ALI traveled from Karachi, Pakistan, to Hong Kong, People's Republic of China, to meet with undercover law enforcement officers from the United States and to negotiate for the sale of ton quantities of hashish and multiple kilogram quantities of heroin.

3.   On or about September 16, 2002, at a hotel in Hong Kong, People's Republic of China, defendants SYED MUSTAJAB SHAH, MUHAMMED ABID AFRIDI and ILYAS ALI negotiated with undercover law enforcement officers from the United States for the sale of 5 metric tons of hashish and 600 kilograms of heroin.

2

4. On or about September 16, 2002, at a hotel in Hong Kong, People's Republic of China, defendants SYED MUSTAJAB SHAH, MUHAMMED ABID AFRIDI and ILYAS ALI agreed that the purchase price of the 5 metric tons of hashish and 600 kilograms of heroin could be offset against the cost of 4 "Stinger" anti-aircraft missiles, which the defendants stated they were interested in purchasing from the undercover law enforcement officers.

5. On or about September 18, 2002, at a hotel in Hong Kong, People's Republic of China, defendants SYED MUSTAJAB SHAH, MUHAMMED ABID AFRIDI and ILYAS ALI told undercover law enforcement officers from the United States that they intended to sell the "Stinger" anti-aircraft missiles discussed during the meeting on September 16, 2002, to members of the Taliban, an organization which the defendants indicated was the same as Al-Qaeda.

All in violation of Title 21, United States Code, Section 846.

<u>Count 2</u>

Beginning at a date unknown and continuing up to and including September 20, 2002, within the Southern District of California, and elsewhere, defendants SYED MUSTAJAB SHAH, aka Syed Saadar Ali Shah, aka Badshah Khan, aka Syed Saadat Ali Faraz, aka Shajee, MUHAMMED ABID AFRIDI, aka Sunny, aka Saifullah Durrani, and ILYAS ALI did knowingly and intentionally conspire together and with each other and with other persons known and unknown to import 1 kilogram and more of heroin, a Schedule I Controlled Substance, and 1,000 kilograms and more of hashish, a Schedule I Controlled Substance, into the United States from a place outside thereof; in violation of Title 21, United States Code, Sections 952 and 960.

3

1    OVERT ACTS

2        In furtherance of the above conspiracy and to effect and

3    accomplish the objects thereof, the overt acts alleged in Count 1,

4    realleged herein by reference, among others, were committed within the

5    Southern District of California, and elsewhere.

6    All in violation of Title 21, United States Code, Section 963.

7                              Count 3

8        Beginning at a date unknown and continuing up to and including

9    September 20, 2002, within the Southern District of California, and

10   elsewhere, and subject to the jurisdiction of the United States,

11   defendants SYED MUSTAJAB SHAH, aka Syed Saadar Ali Shah, aka Badshah

12   Khan, aka Syed Saadat Ali Faraz, aka Shajee, MUHAMMED ABID AFRIDI,

13   aka Sunny, aka Saifullah Durrani, and ILYAS ALI did knowingly and

14   intentionally attempt and conspire together and with each other and

15   with other persons known and unknown to provide material support and

16   resources to a foreign terrorist organization, to wit, Al-Qaeda; in

17   violation of Title 18, United States Code, Sections 2339B(a)(1)

18   and (d).

19                            OVERT ACTS

20       In furtherance of the above conspiracy and to effect and

21   accomplish the objects thereof, the overt acts alleged in Count 1,

22   realleged herein by reference, among others, were committed within the

23   Southern District of California, and elsewhere.

24       DATED: October 30, 2002.

25                                      A TRUE BILL:

26                                      _A.Q. Nais_
                                        Foreperson

27   CAROL C. LAM
     United States Attorney

28   By: _Todd Robinso_
         TODD W. ROBINSON
         Assistant U.S. Attorney

                              4

EXHIBIT F-2

Case 3:02-cr-02912 Document 126 Filed 05/10/06 Page 1 of 8

USDC SCAN INDEX SHEET

















GAC    5/10/06    13:27

3:02-CR-02912    USA V. SHAH

*126*

*CRJCAMD.*

☐ AO 245B    (Rev. 9/00) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

06 MAY 10  AM 8: 42

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| v. | (For Offenses Committed On or After November 1, 1987)  DEPUTY |
| ILYAS ALI (3) | Case Number: 02CR2912-L |
|  | BERNARD G. SKOMAL |
|  | Defendant's Attorney |

REGISTRATION NO. 90279022

☐

THE DEFENDANT:

☒ pleaded guilty to count(s)    1 AND 3 OF THE INDICTMENT

☐ was found guilty on count(s) _____

after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 21 USC 846, 841(a)(1) | CONSPIRACY TO DISTRIBUTE HEROIN AND HASHISH | 1 |
| 18 USC 2339B(a)(1) and (d) | CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO TERRORISTS | 3 |

The defendant is sentenced as provided in pages 2 through   **4**   of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ Count(s) REMAINING _____ is ☒ are ☐ dismissed on the motion of the United States.

☒ Assessment : $ 200.00 DUE FORTHWITH

☒ Fine waived    ☐ Property forfeited pursuant to order filed _____ , included herein.

IT IS ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

APRIL 10, 2006
Date of Imposition of Sentence

HON. M. JAMES LORENZ
UNITED STATES DISTRICT JUDGE

Entered Date: 5 - 20 - 06

02CR2912-L

126

AO 245B     (Rev. 9/00) Judgment in Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page   **2**   of   **4**

DEFENDANT: ILYAS ALI (3)
CASE NUMBER: 02CR2912-L

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of

CT 1: FIFTY-SEVEN (57) MONTHS
CT 3: FIFTY-SEVEN (57) MONTHS TO RUN CONCURRENT TO CT 1

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

     ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

     as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐ before _____

     ☐ as notified by the United States Marshal.

     ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
           DEPUTY UNITED STATES MARSHAL

02CR2912-L

AO 245B   (Rev. 9/00) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page   3   of   4

DEFENDANT: ILYAS ALI (3)
CASE NUMBER: 02CR2912-L

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:

CT 1: FIVE (5) YEARS; CT 3: THREE (3) YEARS TO RUN CONCURRENT TO CT 1

## MANDATORY CONDITIONS

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

The defendant shall cooperate as directed in the collection of a DNA sample, pursuant to 18 USC 3583(d).

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter. Testing requirements will not exceed submission of more than    4    drug tests per month during the term of supervision, unless otherwise ordered by court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court . The defendant shall also comply with any special conditions imposed.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

02CR2912-L

AO 245B    (Rev. 9/00) Judgment in a Criminal Case
           Sheet 3 — Continued 2 — Supervised Release

Judgment—Page   4   of   4

DEFENDANT: ILYAS ALI (3)
CASE NUMBER: 02CR2912-L

## SPECIAL CONDITIONS OF SUPERVISION

[x] Not possess any firearm, explosive device or other dangerous weapon.

[x] Submit to a search of person, property, residence, abode or vehicle, at a reasonable time and in a reasonable manner, by the probation officer.

[ ] The defendant shall violate no laws, federal, state and local, minor traffic excepted.

[x] If deported, excluded, or allowed to voluntarily return to Pakistan, not reenter the United States illegally and report to the probation officer within 24 hours of any reentry to the United States; supervision waived upon deportation, exclusion, or voluntary departure.

[ ] Not transport, harbor, or assist undocumented aliens.

[ ] Not associate with undocumented aliens or alien smugglers.

[ ] Not reenter the United States illegally.

[x] Not travel outside the United States without written permission of the Court or probation officer.

[x] Report all vehicles owned or operated, or in which you have an interest, to the probation officer.

[ ] Not possess any narcotic drug or controlled substance without a lawful medical prescription.

[ ] Not associate with known users of, smugglers of, or dealers in narcotics, controlled substances, or dangerous drugs in any form.

[ ] Participate in a program of mental health treatment as directed by the probation officer, take all medications as prescribed by a psychiatrist/physician, and not discontinue any medication without permission. The Court authorizes the release of the presentence report and available psychological evaluations to the mental health provider, as approved by the probation officer. The defendant may be required to contribute to the costs of services rendered in an amount to be determined by the probation officer, based on the defendant's ability to pay.

[ ] Take no medication containing a controlled substance without valid medical prescription, and provide proof of prescription to the probation officer, if directed.

[ ] Participate in a mental health treatment program as directed by the probation office.

[x] Provide complete disclosure of personal and business financial records to the probation officer as requested.

[ ] Be prohibited from opening checking accounts or incurring new credit charges or opening additional lines of credit without approval of the probation officer.

[ ] Seek and maintain full time employment and/or schooling or a combination of both.

[ ] Resolve all outstanding warrants within          days.

[ ] Complete          hours of community service in a program approved by the probation officer within

[ ] Reside in a Community Corrections Center (CCC) as directed by the probation officer for a period of

[ ] Reside in a Community Corrections Center (CCC) as directed by the Bureau of Prisons for a period of commencing upon release from imprisonment.

[ ] Remain in your place of residence for a period of          , except while working at verifiable employment, attending religious services or undergoing medical treatment.

[ ] Not engage in any form of telemarketing, as defined in 18 USC 2325, without the written permission of the probation officer.

[ ] Comply with the conditions of the Home Confinement Program for a period of          months and remain at your residence except for activities or employment as approved by the court or probation officer. Wear an electronic monitoring device and follow procedures specified by the probation officer. Pay the total cost of electronic monitoring services, or a portion if deemed appropriate by the probation officer.

[ ] Participate in a program of drug or alcohol abuse treatment, including urinalysis testing and counseling, as directed by the probation officer. The defendant may be required to contribute to the costs of services rendered in an amount to be determined by the probation officer, based on the defendant's ability to pay.

02CR2912-L

EXHIBIT F-3

USDC SCAN INDEX SHEET

















GAC    5/10/06    10:43

3:02-CR-02912    USA V. SHAH

*125*

*CRJCAMD.*

☐ AO 245B  (Rev. 9/00) Judgment in a Criminal Case
       Sheet 1

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MAY 10  AM 8:42

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| **v.** | (For Offenses Committed On or After November 1, 1987) |
| SAIFULLAH DURRANI (2)<br>chgd as: Muhammed Abid Afridi | Case Number: 02CR2912-L |
| | *JOHN G. COTSIRILOS* |
| | Defendant's Attorney |

**REGISTRATION NO.** 90278022

☐

THE DEFENDANT:
- ☒ pleaded guilty to count(s)    1 AND 3 OF THE INDICTMENT

- ☐ was found guilty on count(s) _____
  after a plea of not guilty.
  Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 21 USC 846, 841(a)(1) | CONSPIRACY TO DISTRIBUTE HEROIN AND HASHISH | 1 |
| 18 USC 2339B(a)(1) and (d) | CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO TERRORISTS | 3 |

    The defendant is sentenced as provided in pages 2 through   **4**   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

- ☐ The defendant has been found not guilty on count(s) _____
- ☒ Count(s) REMAINING _____ is ☒ are ☐ dismissed on the motion of the United States.

- ☒ Assessment : $ 200.00 DUE FORTHWITH
- ☒ Fine waived    ☐ Property forfeited pursuant to order filed _____ , included herein.

    IT IS ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

APRIL 3, 2006
Date of Imposition of Sentence

HON. M. JAMES LORENZ
UNITED STATES DISTRICT JUDGE

Entered Date:   5-10-06

02CR2912-L

1254

AO 245B     (Rev. 9/00) Judgment in Criminal Case
            Sheet 2 — Imprisonment

Judgment — Page __2__ of __4__

DEFENDANT: SAIFULLAH DURRANI (2)
CASE NUMBER: 02CR2912-L

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of

CT 1:  FIFTY-SEVEN (57) MONTHS
CT 3:  FIFTY-SEVEN (57) MONTHS TO RUN CONCURRENT TO CT 1

☐  The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____  ☐ a.m.  ☐ p.m.  on _____ .

   as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before _____

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

02CR2912-L

DEFENDANT: SAIFULLAH DURRANI (2)
CASE NUMBER: 02CR2912-L

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:

CT 1: FIVE (5) YEARS; CT 3: THREE (3) YEARS TO RUN CONCURRENT TO CT 1

## MANDATORY CONDITIONS

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

The defendant shall cooperate as directed in the collection of a DNA sample, pursuant to 18 USC 3583(d).

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter. Testing requirements will not exceed submission of more than ___4___ drug tests per month during the term of supervision, unless otherwise ordered by court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court . The defendant shall also comply with any special conditions imposed.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

02CR2912-L

AO 245B    (Rev. 9/00) Judgment in a Criminal Case
           Sheet 3 — Continued 2 — Supervised Release

Judgment—Page    4    of    4

DEFENDANT: SAIFULLAH DURRANI (2)
CASE NUMBER: 02CR2912-L

## SPECIAL CONDITIONS OF SUPERVISION

[x] Not possess any firearm, explosive device or other dangerous weapon.

[x] Submit to a search of person, property, residence, abode or vehicle, at a reasonable time and in a reasonable manner, by the probation officer.

[ ] The defendant shall violate no laws, federal, state and local, minor traffic excepted.

[x] If deported, excluded, or allowed to voluntarily return to Pakistan, not reenter the United States illegally and report to the probation officer within 24 hours of any reentry to the United States; supervision waived upon deportation, exclusion, or voluntary departure.

[ ] Not transport, harbor, or assist undocumented aliens.

[ ] Not associate with undocumented aliens or alien smugglers.

[ ] Not reenter the United States illegally.

[ ] Not enter the Republic of Mexico without written permission of the Court or probation officer.

[ ] Report all vehicles owned or operated, or in which you have an interest, to the probation officer.

[ ] Not possess any narcotic drug or controlled substance without a lawful medical prescription.

[ ] Not associate with known users of, smugglers of, or dealers in narcotics, controlled substances, or dangerous drugs in any form.

[ ] Participate in a program of mental health treatment as directed by the probation officer, take all medications as prescribed by a psychiatrist/physician, and not discontinue any medication without permission. The Court authorizes the release of the presentence report and available psychological evaluations to the mental health provider, as approved by the probation officer. The defendant may be required to contribute to the costs of services rendered in an amount to be determined by the probation officer, based on the defendant's ability to pay.

[ ] Take no medication containing a controlled substance without valid medical prescription, and provide proof of prescription to the probation officer, if directed.

[ ] Participate in a mental health treatment program as directed by the probation office.

[ ] Provide complete disclosure of personal and business financial records to the probation officer as requested.

[ ] Be prohibited from opening checking accounts or incurring new credit charges or opening additional lines of credit without approval of the probation officer.

[ ] Seek and maintain full time employment and/or schooling or a combination of both.

[ ] Resolve all outstanding warrants within          days.

[ ] Complete          hours of community service in a program approved by the probation officer within

[ ] Reside in a Community Corrections Center (CCC) as directed by the probation officer for a period of

[ ] Reside in a Community Corrections Center (CCC) as directed by the Bureau of Prisons for a period of commencing upon release from imprisonment.

[ ] Remain in your place of residence for a period of                    , except while working at verifiable employment, attending religious services or undergoing medical treatment.

[ ] Not engage in any form of telemarketing, as defined in 18 USC 2325, without the written permission of the probation officer.

[ ] Comply with the conditions of the Home Confinement Program for a period of                    months and remain at your residence except for activities or employment as approved by the court or probation officer. Wear an electronic monitoring device and follow procedures specified by the probation officer. Pay the total cost of electronic monitoring services, or a portion if deemed appropriate by the probation officer.

[ ] Participate in a program of drug or alcohol abuse treatment, including urinalysis testing and counseling, as directed by the probation officer. The defendant may be required to contribute to the costs of services rendered in an amount to be determined by the probation officer, based on the defendant's ability to pay.

02CR2912-L

EXHIBIT G-1

**SEALED**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 8:03-CR-77-T-30TBM

SAMI AMIN AL-ARIAN

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Paul I.

Perez, United States Attorney for the Middle District of Florida, and the defendant, Sami

Amin Al-Arian, and the attorneys for the defendant, William B. Moffitt and Linda G.

Moreno, mutually agree as follows:

A. **Particularized Terms**

1. Counts Pleading To

The defendant shall enter a plea of guilty to Count Four of the

Superseding Indictment. Count Four charges the defendant with Conspiracy to make or

receive contributions of funds, goods or services to or for the benefit of the Palestinian

Islamic Jihad, a Specially Designated Terrorist, in violation of 18 U.S.C. § 371.

Defendant's Initials _____

AF Approval _____

## 2. Maximum Penalties

Count Four carries a maximum sentence of five years imprisonment, a
fine of $250,000, and a term of supervised release of not more than three years. Each
count carries a special assessment of $50 per felony count for offenses committed prior
to April 24, 1996, $100 per felony count thereafter; for organizations the amounts are
"$200" and "$400" respectively, said special assessment to be due on the date of
sentencing.

## 3. Elements of the Offenses

The defendant acknowledges understanding the nature and elements of
the offenses with which defendant has been charged and to which defendant is
pleading guilty. The elements of Count Four are:

| | |
|---|---|
| First: | That two or more persons, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan; |
| Second: | That the object of the plan was to make or receive a contribution of funds, goods, or services, to, or for the benefit of, a Specially Designated Terrorist; |
| Third: | That the defendant, knowing the unlawful purpose of the plan, willfully joined in it; |
| Fourth: | That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the "overt acts" described in the Superseding Indictment; and |
| Fifth: | That such "overt act" was knowingly committed at or about the time alleged in an effort to carry out or accomplish some object of the conspiracy. |

Defendant's Initials ___*SA*___       2

4. Utilization of the Sentencing Guidelines

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the Court determine the defendant's applicable guidelines range and defendant's guidelines sentence, with any applicable departures, pursuant to the United States Sentencing Guidelines.

5. Counts Dismissed

At the time of sentencing, the remaining counts against the defendant, Counts One, Three, Seven, Nine, Thirty-Eight through Forty and Forty-Four will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

6. No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida and the Counterterrorism Section of the United States Department of Justice agree not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office or the Counterterrorism Section at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

7. Sentencing Guideline Range

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agree that the appropriate disposition of this case is a sentence within the guideline range of 46-57 months. The parties agree that the adjusted guideline level for the offense to which the defendant is pleading guilty is Level 26, to be reduced by 3 levels for acceptance of responsibility to a Level 23, and a criminal history of Category One. The Court may accept or reject this agreement, or defer a decision until it has had an opportunity to

Defendant's Initials _____ 3

consider the presentence report prepared by the United States Probation Office. If the Court rejects this agreement, it must give the defendant an opportunity to withdraw the plea of guilty and advise the defendant personally that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the defendant than the plea agreement contemplated.

8. Deportation by the United States Immigration and Customs Enforcement - Stipulation and Cooperation

The defendant agrees to stipulate to deportation pursuant to section 238(c)(5) of the Immigration and Nationality Act (codified at 8 U.S.C. § 1228(c)(5)), and to cooperate with and provide to the United States Immigration and Customs Enforcement (ICE) prior to his transfer to ICE custody, any documentation necessary for the defendant's deportation to a country outside and not contiguous to the United States, including a travel document, validly issued by a country to the defendant. The defendant further agrees to arrange that said travel document will remain valid until the defendant has been successfully removed to the country that issued the travel document. The defendant agrees that the Court may make these provisions a condition of any sentence of probation or supervised release. Representatives of the Department of Justice agree to recommend to the Bureau of Immigration and Customs Enforcement that it expedite its efforts to execute the judicial order of deportation to be entered by the Court.

9. Recommendation as to Fine

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), at the time of sentencing, the United States agrees to make no recommendation as to the imposition or amount of a

Defendant's Initials _____ 4

fine. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

> 10. Recommendation as to Facility

The parties understand that: a) the defendant is free to ask the Court to recommend that the Bureau of Prisons designate a particular facility or type of facility in which the defendant should be detained for the remainder of his sentence in this matter; and b) the government defers to the Bureau of Prison to designate the facility and type of facility in which the defendant should be detained for the remainder of his sentence in this matter.

> 11. Low End

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), at the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a sentence at the low end of the applicable guideline range, as calculated by the Court. The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Defendant's Initials _____          5

## B. **Standard Terms and Conditions**

### 1. Monetary Penalties

The defendant understands that the Court will inform and determine that the defendant understands the maximum monetary penalties pursuant to Fed. R. Crim. P. 11(b)(1)(H - L). On each count to which a plea of guilty is entered, the Court shall impose a special assessment, to be payable to the Clerk's Office, United States District Court, and due on date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

### 2. Supervised Release

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

### 3. Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

Defendant's Initials _____   6

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii),

the defendant agrees to complete and submit to the United States Attorney's Office and

the United States Probation Office, upon execution of this plea agreement, an affidavit

reflecting the defendant's financial condition.

4. <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor

bound by this agreement. The Court may accept or reject the agreement, or defer a

decision until it has had an opportunity to consider the presentence report prepared by

the United States Probation Office. The defendant understands and acknowledges that,

although the parties are permitted to make recommendations and present arguments to

the Court, the sentence will be determined solely by the Court, with the assistance of

the United States Probation Office. Defendant further understands and acknowledges

that any discussions between defendant or defendant's attorney and the attorney or

other agents for the government regarding any recommendations by the government

are not binding on the Court and that, should any recommendations be rejected,

defendant will not be permitted to withdraw defendant's plea pursuant to this plea

agreement. The government expressly reserves the right to support and defend any

decision that the Court may make with regard to the defendant's sentence, whether or

not such decision is consistent with the government's recommendations contained

herein.

5. <u>Appeal of Sentence-Waiver</u>

The defendant agrees that this Court has jurisdiction and authority to

impose any sentence up to the statutory maximum and expressly waives the right to

Defendant's Initials _____ 7

appeal defendant's sentence or to challenge it collaterally on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by Title 18, United States Code, Section 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by Title 18, United States Code, Section 3742(a).

6.    Department of Justice Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and the Counterterrorism Section of the Department of Justice and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

7.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

Defendant's Initials ⎯⎯⎯⎯⎯                    8

8.    Voluntariness

The defendant acknowledges that defendant is entering into this
agreement and is pleading guilty freely and voluntarily without reliance upon any
discussions between the attorney for the government and the defendant and
defendant's attorney and without promise of benefit of any kind (other than the
concessions contained herein), and without threats, force, intimidation, or coercion of
any kind. The defendant further acknowledges defendant's understanding of the nature
of the offense or offenses to which defendant is pleading guilty and the elements
thereof, including the penalties provided by law, and defendant's complete satisfaction
with the representation and advice received from defendant's undersigned counsel (if
any). The defendant also understands that defendant has the right to plead not guilty or
to persist in that plea if it has already been made, and that defendant has the right to be
tried by a jury with the assistance of counsel, the right to confront and cross-examine
the witnesses against defendant, the right against compulsory self-incrimination, and
the right to compulsory process for the attendance of witnesses to testify in defendant's
defense; but, by pleading guilty, defendant waives or gives up those rights and there will
be no trial. The defendant further understands that if defendant pleads guilty, the Court
may ask defendant questions about the offense or offenses to which defendant
pleaded, and if defendant answers those questions under oath, on the record, and in
the presence of counsel (if any), defendant's answers may later be used against
defendant in a prosecution for perjury or false statement. The defendant also

Defendant's Initials _____          9

understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

9.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt:

## FACTS

a.    During the period of the late 1980s, and early to mid-1990s, defendant Al-Arian was associated with several organizations, including the Palestinian Islamic Jihad. Defendant Al-Arian knew that co-defendants Ramadan Abdullah Shallah (Shallah), Bashir Musa Mohammed Nafi (Nafi) and Mazen Al-Najjar (Al-Najjar) were also associated with the Palestinian Islamic Jihad.

b.    On or about January 23, 1995, President William Clinton issued Executive Order 12947, which declared a national emergency regarding the grave acts of violence committed by foreign terrorists that disrupted the Middle East Peace Process. Executive Order 12947 prohibited certain transactions, including the making or receiving or any contribution of funds, goods, or services, to or for the benefit of organizations and individuals who were declared "Specially Designated Terrorists." Executive Order 12947 also made unlawful any transaction that evaded or avoided, or had the purpose of evading or avoiding, or attempted to violate, any of the prohibitions

Defendant's Initials _____                    10

set forth in the Order. By January 24, 1995, the United States had designated the Palestinian Islamic Jihad, Sheik Abd Al Aziz Awda and Fathi Shiqaqi as Specially Designated Terrorists. Later that year, in November, 1995, the United States designated Ramadan Shallah as a Specially Designated Terrorist.

     c.    Defendant Al-Arian performed services for the PIJ in 1995 and thereafter.

     d.    Such services included filing for Immigration benefits for individuals associated with the PIJ, hiding the identities of individuals associated with the PIJ, and providing assistance for an individual associated with the PIJ in an United States Court proceeding. The services are described with more particularity in the following paragraphs.

     e.    On or about February 6, 1995, defendant Al-Arian had a telephone conversation with a co-conspirator and discussed the recent Presidential Executive Order against terrorists.

     f.    Defendant Al-Arian was aware that the PIJ achieved its objectives by, among other means, acts of violence.

     g.    On or about August 25, 1995, defendant Al-Arian filed a visa renewal petition with the INS on behalf of co-defendant Nafi.

     h.    On or about September 1, 1995, co-defendant Al-Najjar wrote a $5,000 check drawn on the Muslim Women Society (MWS) account, payable to World and Islam Studies Enterprise (WISE) which was deposited into the WISE account.

     i.    On or about October 25, 1995, co-defendant Al-Najjar executed an Affidavit filed with the INS in support of Nafi's alien employment petition. In the Affidavit,

Defendant's Initials  $\underline{S/\!\!+}$               11

Al-Najjar stated that he and defendant Al-Arian had sufficient financial means to fund Nafi's salary. Al-Najjar further stated that in 1993, he contributed $36,000 to WISE and that in January and February 1994, he had in excess of $50,000 available to support the operations of WISE.

        j.      On or about October 30, 1995, in the early morning hours, defendant Al-Arian received a telephone call from a co-conspirator in which the co-conspirator asked whether defendant Al-Arian had heard that Fathi Shiqaqi had been killed. Defendant Al-Arian indicated that he had heard and then refused to talk. Later that day, he had a telephone conversation with Al-Najjar. Defendant Al-Arian indicated he wanted to meet with Al-Najjar.

        k.      On or about October 30, 1995, co-defendant Nafi made a telephone call to defendant Al-Arian. Nafi whispered during this conversation and defendant Al-Arian said the matter had been complicated and inquires had begun.

        l.      On or about October 30, 1995, defendant Al-Arian had a telephone conversation with a journalist with The St. Petersburg Times. When the journalist asked about Shallah being named the Secretary General of the PIJ, defendant Al-Arian falsely stated that Shallah's name must have been mixed up with someone else and falsely stated he only knew Ramadan Abdullah Shallah as Ramadan Abdullah. Later, defendant Al-Arian had another telephone conversation with a journalist with The St. Petersburg Times. During this conversation, defendant Al-Arian expressed shock and surprise and falsely stated there was nothing Shallah had done while at WISE to indicate any political affiliation. Defendant Al-Arian falsely stated that Shallah was not

Defendant's Initials   _$A_        12

involved in any political activities while at WISE and that Shallah had been engaged in only scholarly work.

m.     On or about October 31, 1995, defendant Al-Arian and co-defendant Al-Najjar caused a facsimile to be sent from WISE which explained its mission and its experience with Shallah and falsely denied any knowledge of Shallah's association or affiliation with any political group in the Middle East.

n.     On or about August 7, 2000, defendant Al-Arian, who was in the Middle District of Florida, had a telephone conversation with co-defendant Nafi, who was in England, about utilizing a contact of Nafi's in Egypt to obtain travel documents for Al-Najjar. They then spoke about Nafi's problems with his immigration status in the United States. Then they had a coded conversation about the account to which Nafi had sent money to assist in the defense of co-defendant Al-Najjar's ongoing INS proceeding.

o.     On or about August 8, 2000, defendant Al-Arian, who was in the Middle District of Florida, called a co-conspirator, who was outside the State of Florida. When defendant Al-Arian asked co-conspirator if any thing was deposited in his account or his wife's account, the co-conspirator replied there were "ten shirts" (referring to a sum of money). Defendant Al-Arian then directed the co-conspirator to send nine of them to the account of another co-conspirator.

p.     Later in the day on August 8, 2000, defendant Al-Arian, who was in the Middle District of Florida, had a telephone conversation with co-defendant Nafi, who was outside the State of Florida, and told Nafi that the issue of "the magazines" (referring to a sum of money) was resolved, but the travel document had not been

Defendant's Initials _____                    13

received from Egypt. They then discussed utilizing the press to support Al-Najjar in his INS hearing by setting up an interview with Abd Al Aziz Awda (Awda) to show that he had the permission of the Israelis to reside in the Gaza Strip. Defendant Al-Arian then asked Nafi for Awda's telephone number. Nafi told him to call back the next day to get the number. Additionally, they discussed Nafi's response to allegations in the press that he was a member of the PIJ.

q.     On or about August 8, 2000, defendant Al-Arian directed co-defendant Hatem Naji Fariz (Fariz) to arrange a newspaper interview with Awda.

r.     On or about August 9, 2000, defendant Al-Arian and co-defendant Fariz had a telephone conversation about causing one or more newspaper articles to be written on Awda. They desired to utilize these articles in the INS hearing regarding Al-Najjar and wanted them to portray Awda as a religious figure with no relation to the PIJ.

10.     Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _____     14

11.  Certification

The defendant and defendant's counsel certify that this plea agreement

has been read in its entirety by (or has been read to) the defendant and that defendant

fully understands its terms.

DATED this _28th_ day of _February_, 2006.

PAUL I. PEREZ
United States Attorney

Sami Amin Al-Arian
Defendant

By: _____
Terry A. Zitek
Executive Assistant United States Attorney

William B. Moffitt
Attorney for Defendant

James R. Klindt
First Assistant United States Attorney

Linda G. Moreno
Attorney for Defendant

15

# EXHIBIT G-2

# *UNITED STATES DISTRICT COURT*

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

UNITED STATES OF AMERICA

vs.

SAMI AMIN AL-ARIAN

## JUDGMENT IN A CRIMINAL CASE

CASE NUMBER: 8:03-cr-77-T-30TBM
USM NUMBER: 40939-018

Defendant's Attorney: Linda Moreno, ret.

THE DEFENDANT:

X  pleaded guilty to count(s) FOUR of the Superseding Indictment.

__ pleaded nolo contendere to count(s) which was accepted by the court.

__ was found guilty on count(s) after a plea of not guilty.

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Make and Receive Contributions of Funds, Goods, or Services to or for the Benefit of Specially Designated Terrorists | September 21, 2004 | Four |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

__ The defendant has been found not guilty on count(s)

X  Count(s) ONE, THREE, SEVEN, NINE, THIRTY-EIGHT, THIRTY-NINE, FORTY, AND FORTY-FOUR of the Superseding Indictment and the counts in the underlying indictment are dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in economic circumstances.

Date of Imposition of Sentence: May 1, 2006

JAMES S. MOODY, JR.

UNITED STATES DISTRICT JUDGE

DATE: May _____, 2006

AO 245B (Rev 12/03) Sheet 2 - Imprisonment

| | | |
|---|---|---|
| Defendant: | SAMI AMIN AL-ARIAN | Judgment - Page 2 of 3 |
| Case No.: | 8:03-cr-77-T-30TBM | |

## IMPRISONMENT

After considering the advisory sentencing guidelines and all of the factors identified in Title 18 U.S.C. §§ 3553(a)(1)-(7), the court finds that the sentence imposed is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of FIFTY-SEVEN (57) MONTHS as to Count Four of the Superseding Indictment. The defendant will be given credit for time previously served.

 X  The court makes the following recommendations to the Bureau of Prisons: The defendant shall be placed at FCI Coleman (Florida), if possible.

 X  The defendant is remanded to the custody of the United States Marshal.
___ The defendant shall surrender to the United States Marshal for this district.

    ___ at ___ a.m./p.m. on ___.
    ___ as notified by the United States Marshal.

___ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons.

    ___ before 2 p.m. on ___.
    ___ as notified by the United States Marshal.
    ___ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____ at

_____, with a certified copy of this judgment.

_____
United States Marshal

By:_____

Deputy Marshal

AO 245B (Rev. 12/03) Sheet 3 - Supervised Release

| Defendant: | SAMI AMIN AL-ARIAN | Judgment - Page 3 of 6 |
|---|---|---|
| Case No.: | 8:03-cr-77-T-30TBM | |

## SUPERVISED RELEASE

**Upon release from imprisonment, the defendant shall be on supervised release for a term of THREE (3) YEARS as to Count Four of the Superseding Indictment.**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime. The defendant shall not illegally possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance.

X    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. However, the Court authorizes the probation officer to conduct random drug testing not to exceed 104 tests per year.

X    The defendant, having been convicted of a qualifying felony,  shall cooperate in the collection of DNA as directed by the probation officer.

If this judgment imposes a fine or a restitution it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 12/03) Sheet 3C - Supervised Release

| | |
|---|---|
| Defendant: SAMI AMIN AL-ARIAN | Judgment - Page _4_ of _6_ |
| Case No.: 8:03-cr-77-T-30TBM | |

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall also comply with the following additional conditions of supervised release:

__X__ If the defendant be deported, he shall not be allowed to re-enter the United States without the express permission of the appropriate governmental authority.*

__X__ The mandatory drug testing provisions pursuant to the Violent Crime Control Act are waived. However, the Court authorizes the probation officer to conduct random drug testing not to exceed 104 tests per year.

*The Court has entered a Judicial Order of Removal (Dkt. 1573) and hereby incorporates the order to this judgment.

AO 245B (Rev 12/03) Sheet 5 - Criminal Monetary Penalties

| Defendant: | SAMI AMIN AL-ARIAN | Judgment - Page _5_ of _6_ |
|---|---|---|
| Case No.: | 8:03-cr-77-T-30TBM | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Total Restitution** |
|---|---|---|---|
| **Totals:** | $100.00 | Waived | N/A |

___ The determination of restitution is deferred until ____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

___ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| | | | |
| Totals: | $ | $ | |

___ Restitution amount ordered pursuant to plea agreement  $_____.

___ The defendant shall pay interest on any fine or restitution of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

___ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

___ the interest requirement is waived for the ___ fine ___ restitution.

___ the interest requirement for the ___ fine ___ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for the offenses committed on or after September 13, 1994, but before April 23, 1996.

| | |
|---|---|
| Defendant: SAMI AMIN AL-ARIAN | Judgment - Page  6  of  6 |
| Case No.:  8:03-cr-77-T-30TBM | |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A.    __X__    Lump sum payment of $ _100.00_ due immediately, balance due

         ___ not later than _____. or

         ___ in accordance  ___ C.  ___ D,  ___ E or  ___ F below: or

B.    ___    Payment to begin immediately (may be combined with  ___ C.  ___ D. or  ___ F below); or

C.    ___    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ days (e.g., 30 or 60 days) after the date of this judgment: or

D.    ___    Payment in equal _____ (e.g., weekly, monthly. quarterly) installments of $ _____ over a period of _____. (e.g., months or years) to commence _____ (e.g. 30 or 60 days) after release from imprisonment to a term of supervision; or

E.    ___    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time. or

F.    ___    Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise. if this judgment imposes a period of imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

___    Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number). Total Amount, Joint and Several Amount, and corresponding payee. if appropriate:

___    The defendant shall pay the cost of prosecution.

___    The defendant shall pay the following court cost(s):

___    The defendant shall forfeit the defendant's interest in the following property to the United States:

The Court orders that the defendant forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture. which are in the possession or control of the defendant or the defendant's nominees.

Payments shall be applied in the following order:  (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO.: 8:03-CR-77-T-30-TBM

SAMI AMIN AL-ARIAN

_____/

## JUDICIAL ORDER OF REMOVAL

This cause comes before the Court upon the oral motion of the United States for

entry of a judicial order of removal for defendant Sami Amin Al-Arian, pursuant to 8 U.S.C.

§ 1228(c)(5). The Court, having considered the motion and having heard the arguments

of counsel on May 1, 2006, finds that the motion should be granted.

It is therefore ORDERED AND ADJUDGED that United States' motion for a judicial

order of removal for defendant Sami Amin Al-Arian is GRANTED. The defendant is hereby

ordered removed from the United States pursuant to the terms of his plea agreement, as

accepted by the Court on April 17, 2006 (Dkt. #1566).

DONE and ORDERED in Tampa, Florida on ___1 May___, 2006.

JAMES S. MOODY, JR.
United States District Judge

Copies furnished to:
Counsel/Parties of Record

# EXHIBIT H-1

*15*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff

- v. -

MUTHANNA AL-HANOOTI,

Defendant.

_____/

Case: 2:08-cr-20083
Judge: Borman, Paul D
Referral MJ: Morgan, Virginia M
Filed: 02-13-2008 At 04:38 PM
INDI USA V. SEALED MATTER 1DFT (DA)

VIOLATIONS: 18 U.S.C. §§ 371,
1001(a)(2); 50 U.S.C. § 1705

## INDICTMENT

The Grand Jury charges:

## COUNT ONE

**(Conspiracy - 18 U.S.C. §§ 371, 951(a))**

D-1  MUTHANNA AL-HANOOTI

## I. INTRODUCTORY ALLEGATIONS

At all times material to this Indictment:

**A.**    **The Defendant**

1.    Defendant MUTHANNA AL-HANOOTI, a naturalized United States citizen born in Iraq, was a resident of the Eastern District of Michigan.

2.    From approximately 1994 through 1999, 2001 through 2002, and 2005 through mid-2006, defendant AL-HANOOTI was employed by Life for Relief and Development (LRD) as its public relations coordinator responsible for, among other things, LRD's lobbying efforts.

3.    LRD is an organization based in Southfield, Michigan that has been granted tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.  LRD was created after the

first Gulf War in response to the economic sanctions that were imposed by the United States on

Iraq. LRD has offices in various locations across the world, and it opened an office in Baghdad,

Iraq in the late 1990s.

4.      From approximately 2000 through 2005, many of LRD's political activities in the

United States were handled by an entity called Focus on American and Arab Interests and

Relations (FAAIR). This entity was funded and controlled by LRD. The President of FAAIR

was defendant AL-HANOOTI.

**B.      The Government of Iraq**

5.      The Government of Iraq (GOI) is a foreign government. From 1979 to

approximately March 2003, Iraq was ruled by Saddam Hussein and his regime.

6.      Beginning in or about 1990 and continuing until in or about July 2004, the United

States viewed the GOI as a threat to its national security and declared a national emergency with

regard to the GOI.

7.      The Iraqi Intelligence Service (IIS) was the foreign intelligence arm of the GOI

under Saddam Hussein.

8.      Unindicted co-conspirator number one is a former officer of the IIS.

9.      At no time was defendant AL-HANOOTI:

(a) a duly accredited diplomatic or consular officer of a foreign government,

recognized by the United States Department of State;

(b) an officially and publicly acknowledged and sponsored official or

representative of a foreign government; or

(c) an officially and publicly acknowledged and sponsored member of the staff of,

2

or employee of, any such officer, official, or representative of a foreign government.

**C.**   **The Iraqi Sanctions Regulations**

10.      Under the International Emergency Economic Powers Act (Title 50, United States

Code, Sections 1701 through 1706) (IEEPA), the President of the United States has the authority

to deal with any unusual or extraordinary threat, arising in whole or substantial part outside the

United States, to the national security,  foreign policy or economy of the United States.  IEEPA

authorizes the President, upon declaring a national emergency with respect to such a threat, to

take steps to deal with the national emergency, including investigating, regulating, and

prohibiting any transaction involving any property in which a foreign country or national thereof

has any interest.  The President's formal directives in this regard are issued through Executive

Orders which have the force and effect of law.

11.      On or about August 2, 1990, under the authority of IEEPA, and following

Iraq's invasion of Kuwait, President George H. W. Bush issued Executive Order 12722,

which declared a national emergency with respect to Iraq.  According to the directive, the

policies and actions of the Government of Iraq constituted an unusual and extraordinary

threat to the national security and foreign policy of the United States.  Executive Order 12722

proscribed specific conduct related to these national security concerns.  On or about August 9,

1990, the President, acting under the authority of IEEPA and the United Nations Participation

Act (22 U.S.C. § 287c) issued Executive Order 12724, taking additional steps with respect to the

national emergency declared in Executive Order 12722.  Both Executive Orders empowered the

Secretary of the Treasury to promulgate regulations and take other action necessary to fully

realize the purposes of these Executive Orders.  Thereafter, Presidents of the United States

3

continued, on an annual basis, the national emergency with respect to Iraq.

12. Pursuant to this authority, the Secretary of Treasury issued the Iraqi Sanctions Regulations, Title 31, Code of Federal Regulations, Part 575. These regulations are administered and enforced by the Department of Treasury's Office of Foreign Assets Control (OFAC) and state, in relevant part:

(a) "[N]o property or interests in property of the Government of Iraq that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, may be transferred, paid, exported, withdrawn or otherwise dealt in." 31 C.F.R. 575.201(a). This prohibition applies "to transactions by U.S. persons in locations outside the United States with respect to property in which the U.S. person knows, or has reason to know, that the Government of Iraq has or has had an interest." 31 C.F.R. 575.408(a). For example, "a U.S. person may not, within the United States or abroad, purchase, sell, finance, insure, transport, act as a broker for the sale or transport of, or otherwise deal in, Iraqi crude oil or petroleum products refined in Iraq." 31 C.F.R. 575.408(c)(1);

(b) "[N]o U.S. person may deal in property of Iraqi origin exported from Iraq after August 6, 1990, property intended for exportation to Iraq, or property intended for exportation from Iraq to any other country, nor may any U.S. person engage in any activity that promotes or is intended to promote such dealing." 31 C.F.R. 575.206;

(c) "[N]o U.S. person may commit or transfer, directly or indirectly, funds or other financial or economic resources to the Government of Iraq or any person in Iraq." 31 C.F.R. 575.210 ; and,

(d) "Any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of, any of the prohibitions set forth in this subpart, is hereby prohibited. Any attempt to violate the prohibitions set forth in this part is hereby prohibited. Any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is hereby prohibited." 31 C.F.R. 575.211.

13. On or about May 23, 2003, after the fall of the Saddam Hussein regime, OFAC issued a General License that suspended most economic sanctions against Iraq, including those

described herein.  On or about July 29, 2004, the President issued Executive Order 13350, which, among other things, terminated the national emergency declared in Executive Order 12722 and revoked Executive Orders 12722 and 12724.

## D.   **Oil for Food Program**

14.     On or about August 6, 1990, the United Nations imposed economic sanctions on the GOI.  These sanctions prohibited member states of the United Nations from, among other things, trading in any Iraqi commodities or products.  The United Nations continued to enforce these sanctions up to and including in or about 2003.  On or about April 14, 1995, the Security Council of the United Nations adopted Resolution 986, which authorized the GOI to sell oil under certain conditions.  The United Nations Office of Iraq Programme, Oil-for-Food (Oil-for-Food Program) was subsequently established to administer, among other things, the sale of oil and purchase of humanitarian goods by Iraq.

15.     During the operation of the Oil-for-Food Program, federal law prohibited United States companies and individuals from engaging in a variety of transactions with the Government of Iraq unless they received a license issued by the Department of Treasury's Office of Foreign Assets Control.

16.     Under the Oil-for-Food Program, the GOI alone had the power to select the companies and individuals who received the rights to purchase Iraqi oil.  Officials at the highest levels of the GOI selected a group of companies and individuals to receive the rights to purchase certain quantities of Iraqi oil (frequently referred to as "allocations" of oil).  These companies and individuals were able to profit by selling their allocations to brokers and/or companies capable of transporting the oil to a refinery.  GOI oil contracts were granted through the State Oil

Marketing Organization (SOMO), which was established and controlled by the Ministry of Petroleum of the GOI.

## II. **THE CONSPIRACY**

17.     Beginning in or about 1999 and continuing until in or about March, 2003, in the Eastern District of Michigan, Southern Division and elsewhere, defendant MUTHANNA AL-HANOOTI conspired and agreed with others known and unknown to the Grand Jury, to commit an offense against the United States, to wit:  to knowingly act in the United States as an agent of a foreign government, specifically, the GOI, without prior notification to the Attorney General as required by law, in violation of Title 18, United States Code, Sections 371 and 951(a).

A.     **Manner and Means**

It was part of the conspiracy that:

18.     Defendant AL-HANOOTI would travel to Iraq and meet in Iraq with co-conspirators who were officers of the IIS.

19.     Defendant AL-HANOOTI would communicate with co-conspirators who were officers of the IIS.

20.     Defendant AL-HANOOTI would receive direction from, and act under the control of, co-conspirators who were officers of the IIS.

21.     Defendant AL-HANOOTI would report to the IIS information about members of the United States Congress who were of interest to the IIS.

22.     Defendant AL-HANOOTI would organize delegations from the United States Congress to travel to Iraq.

23.     Defendant AL-HANOOTI would travel with delegations from the United States

6

Congress on trips to Iraq.

24.     Defendant AL-HANOOTI would receive compensation for services that he had provided to the IIS.

25.     Defendant AL-HANOOTI would misrepresent, conceal, hide, and cause to be misrepresented, concealed, and hidden, for the purposes of and acts done in furtherance of the conspiracy, to avoid detection and apprehension by law enforcement authorities.

**B.     Overt Acts**

26.     In furtherance of the conspiracy, and for the purpose of effecting its unlawful objectives, defendant AL-HANOOTI and other unindicted co-conspirators committed overt acts, in the Eastern District of Michigan, Southern Division, and elsewhere, including but not limited to the following:

a.      In the late 1990s, the IIS targeted LRD and defendant AL-HANOOTI to cooperate with and serve the IIS.

b.      In or about 1999 or 2000, defendant AL-HANOOTI met in Iraq with unindicted co-conspirator number one.  During this meeting, unindicted co-conspirator number one requested that LRD and defendant AL-HANOOTI publicize within the United States the negative effects that the Iraqi Sanctions Regulations had upon the people of Iraq, and that defendant AL-HANOOTI bring to Iraq delegations from the United States Congress.

c.      Between in or about 1999 and 2002, defendant AL-HANOOTI provided to the IIS a list of members of the United States Congress whom AL-HANOOTI believed favored lifting of the Iraqi Sanctions Regulations.

d.      Between in or about 1999 and 2002, AL-HANOOTI provided to the IIS a

7

written strategy on how to obtain the lifting of the Iraqi Sanctions Regulations.

       e.    Between in or about 1999 and September 2002, defendant AL-HANOOTI met again in Iraq with the IIS, which again requested that defendant AL-HANOOTI coordinate a delegation to Iraq to include members of the United States Congress.

       f.    In or about September 2002, defendant AL-HANOOTI helped to organize a delegation to Iraq, which included three members of the United States Congress (2002 Congressional Delegation).

       g.    In or about September & October 2002, an IIS officer directed an intermediary in the Eastern District of Michigan (the intermediary) to pay the 2002 Congressional Delegation's travel expenses.

       h.    On or about September 24, 2002, the intermediary paid LRD $24,000 to pay for the 2002 Congressional Delegation's travel expenses.

       i.    In or about October 2002, defendant AL-HANOOTI traveled to Iraq with the 2002 Congressional Delegation.

       j.    On or about October 15, 2002, the intermediary paid LRD $10,000, to pay additional travel expenses of the 2002 Congressional Delegation.

       k.    As compensation for services that defendant AL-HANOOTI had rendered to the Government of Iraq, including his organizing and leading the 2002 Congressional Delegation, with the concurrence of unindicted co-conspirator number one, on or about December 22, 2002 the Vice President of Iraq directed the Iraqi Minister of Petroleum to allocate to defendant AL-HANOOTI a quantity of two million barrels of oil.

       l.    On or about January 23, 2003, defendant AL-HANOOTI advised SOMO

that he had assigned his two million barrel allocation of oil to LARU LTD. LARU LTD. was a company incorporated in the Country of Cyprus.

       m.     On or about February 9, 2003, defendant AL-HANOOTI contacted SOMO to discuss the assignment of his oil allocation to LARU LTD., and he was informed by a SOMO official that SOMO was willing to execute a contract with LARU LTD. acting on his behalf.

       n.     On or about February 23, 2003, a SOMO official acting on behalf of SOMO, and LARU LTD., acting on behalf of defendant AL-HANOOTI, entered into a contract with entitling LARU LTD. to purchase two million barrels of Iraqi oil (the Oil Contract).

       o.     On or about February 27, 2003, the GOI Minister of Petroleum ratified the Oil Contract.

    All in violation of Title 18 United States Code, Sections 371 and 951(a).

## COUNT TWO

### (Contract to Purchase Iraqi Oil – 50 U.S.C. § 1705)

D-1 MUTHANNA AL-HANOOTI

27.     Paragraphs 1 through 26 of Count One of this Indictment are hereby re-alleged and incorporated by reference as though set forth fully herein.

28.     At no time did defendant MUTHANNA AL-HANOOTI receive a license or other authorization from OFAC to procure, transfer, or resell Iraqi oil or any interest in Iraqi oil.

29.     In or about December 2002, through in or about February 2003, in the Eastern District of Michigan and elsewhere, defendant MUTHANNA AL-HANOOTI, unlawfully, knowingly, and willfully caused a contract between SOMO and LARU LTD. to be procured on his behalf, committing LARU LTD. to transfer money to the Government of Iraq in exchange for two million barrels of Iraqi oil, without having obtained prior authorization from OFAC.

All in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 575.201, 575.206, 575.210, & 575.211; Title 18, United States Code, Section 2.

10

## COUNT THREE

### (False Statement – 18 U.S.C. § 1001(a)(2))

D-1 MUTHANNA AL-HANOOTI

30.     Paragraphs 1 through 26 of Count One of this Indictment are hereby re-alleged and incorporated by reference as though set forth fully herein

31.     On or about March 27, 2007, defendant MUTHANNA AL-HANOOTI was interviewed by the Federal Bureau of Investigation.  In that interview, defendant AL-HANOOTI stated that (a) he had never met with any person whom he knew to be an IIS official; (b) the IIS had never asked him to do anything for them; (c) he had never been offered an oil contract by the GOI.

32.     On or about March 27, 2007, in the Eastern District of Michigan, in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the Executive Branch of the Government of the United States, defendant MUTHANNA AL-HANOOTI knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation to agents of the FBI, to wit: that he had never met with any person whom he knew to be an IIS official when, in fact, defendant AL-HANOOTI then and there knew that he had previously met with one or more IIS officials.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT FOUR

### (False Statement – 18 U.S.C. § 1001(a)(2))

D-1 MUTHANNA AL-HANOOTI

33.     Paragraphs 1 through 26 of Count One, and paragraph 31 of Count Three, of this Indictment are hereby re-alleged and incorporated by reference as though set forth fully herein

34.     On or about March 27, 2007, in the Eastern District of Michigan, in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the Executive Branch of the Government of the United States, defendant MUTHANNA AL-HANOOTI knowingly and willfully made materially false, fictitious, and fraudulent statements and representations to agents of the FBI, to wit: that the IIS had never asked him to do anything for them when, in fact, defendant AL-HANOOTI then and there knew that the IIS had asked him to arrange for delegations from the United States Congress to travel to Iraq.

All in violation of Title 18, United States Code, Section 1001(a)(2).

12

_____
KARL A. SANDOVAL
Trial Attorney
U.S. Department of Justice


Dated: February 13, 2008

## COUNT FIVE

### (False Statement – 18 U.S.C. § 1001(a)(2))

D-1 MUTHANNA AL-HANOOTI

35.     Paragraphs 1 through 26 of Count One, and paragraph 31 of Count Three, of this Indictment are hereby re-alleged and incorporated by reference as though set forth fully herein

36.     On or about March 27, 2007, in the Eastern District of Michigan, in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the Executive Branch of the Government of the United States, defendant MUTHANNA AL-HANOOTI knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation to agents of the FBI, to wit:  that he had never been offered an oil contract by the GOI when, in fact, defendant AL-HANOOTI then and there knew that the GOI had awarded him a two million barrel allocation of Iraqi oil and that he had arranged for LARU LTD. to enter into a contract with a GOI entity to purchase these two million barrels of oil on his behalf.

All in violation of Title 18, United States Code, Section 1001(a)(2).

THIS IS A TRUE BILL

S/Grand Jury Foreperson

MICHAEL J. MULLANEY
Acting United States Attorney

S/

MICHAEL D. TAXAY
Trial Attorney
U.S. Department of Justice

13

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover | Case: 2:08-cr-20083<br>Judge: Borman, Paul D<br>Referral MJ: Morgan, Virginia M<br>Filed: 02-13-2008 At 04:38 PM<br>INDI USA V. SEALED MATTER 1DFT (DA) |
| --- | --- | --- |

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complet

| Companion Case Information | Companion Case Number: 2:07-cr-20438 |
| --- | --- |
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: Cleland/Scheer |
| x **Yes**    ☐ **No** | AUSA's Initials:  MDT |

**Case Title:** USA v. MUTHANNA AL-HANOOTI

**County where offense occurred :** Oakland County

**Check One:**      **X Felony**          ☐ **Misdemeanor**          ☐ **Petty**

　　_X_ Indictment/_____ Information --- **no** prior complaint.
　　_____ Indictment/_____ Information --- based upon prior complaint
　　_____ Indictment/_____ Information --- based upon **LCrR 57.10 (d)**

## Superseding Case Information:

**Superseding to Case No:** _____     **Judge:** _____

☐　　Original case was terminated; no additional charges or defendants.
☐　　Corrects errors; no additional charges or defendants.
☐　　Involves, for plea purposes, different charges or adds counts.
☐　　Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** |
| --- | --- |
| Muthanna Al-Hanooti | 18 U.S.C. §§ 371, 1001(a)(2); 50 U.S.C. § 1705; |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

February 13, 2008
Date

*Michael D. Taxay*

MICHAEL D. TAXAY
Trial Attorney
10th & Constitution Ave., N.W.
Washington, D.C.  20530
Phone:  (202) 514-9473
Fax: (202) 514-8714
E-Mail address:  michael.taxay@usdoj.gov

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5/20/04

# EXHIBIT H-2

AO245B [Rev. 09/11 Judgment in a Criminal Case
Sheet 1

Case 5:12-cr-20066-JCO-PJK Document 753 Filed 02/10/15 Page 198 of 225 Page ID #:12749
Case 2:08-cr-20083-PDB-VMM Doc # 64 Filed 08/21/11 Pg 1 of 4 Pg ID 695

Judgment-Page 1 of 4

# United States District Court
## Eastern District of Michigan

| United States of America | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| V. | |
| MUTHANNA AL-HANOOTI | Case Number: 08CR20083-1 |
| | USM Number: 42562-039 |

Linda G. Moreno
Defendant's Attorney

**THE DEFENDANT:**

■ Pleaded guilty to count(s)  **2**.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 50 USC 1705 | Contract to Purchase Iraqi Oil (Violation of the International Emergency Economic Powers Act) | February 2003 | 2 |

The defendant is sentenced as provided in pages **2 through 4** of this judgment.  This sentence is imposed pursuant to the Sentencing Reform Act of 1984

■ Count(s)  **1, 3-5**  are  dismissed on the motion of the United States after a plea of not guilty.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/18/2011
Date of Imposition of Judgment

s/Paul D Borman
United States District Judge

03/21/2011
Date Signed

DEFENDANT:  MUTHANNA AL-HANOOTI
CASE NUMBER:  08CR20083-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:  **12 months and 1 day**

The defendant shall surrender for service of sentence at the instituition designated by the Bureau of Prison: **as notified by the United States Marshal.**

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ a
_____, with a certified copy of this judgment.

_____
United States Marshal

_____
Deputy United States Marshal

DEFENDANT: MUTHANNA AL-HANOOTI
CASE NUMBER: 08CR20083-1

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: **24 months.**

   The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

   The defendant shall not commit another federal, state or local crime.

   If the defendant is convicted of a felony offense, DNA collection is required by Public Law 108-405.

   The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court. Revocation of supervised release is mandatory for possession of a controlled substance.

◼ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

     If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

     The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

**1)** the defendant shall not leave the judicial district without the permission of the court or probation officer;

**2)** the defendant shall report ot the probation officer and shall submit a truthful and complete written report within the first five days of each month;

**3)** the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

**4)** the defendant shall support his or her dependents and meet other family responsibilities;

**5)** the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

**6)** the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

**7)** the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

**8)** the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

**9)** the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

**10)** the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

**11)** the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

**12)** the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

**13)** as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

**14)** the defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. Revocation of supervised release is mandatory for possession of a firearm.

Case 5:12-cr-20083-PDB-VMM Doc # 64 Filed 08/21/12 Pg 4 of 4 Pg ID 696
Case 5:08-cr-20083-PDB Document 753 Filed 02/19/15 Page 201 of 225 Page ID #:12752

Judgment-Page 4 of 4

DEFENDANT:  MUTHANNA AL-HANOOTI
CASE NUMBER:  08CR20083-1

# CRIMINAL MONETARY PENALTIES

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS:** | $ 100.00 | $ 0.00 | $ 0.00 |

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| **TOTALS:** | $ 0.00 | $ 0.00 | |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

EXHIBIT I-1

586 F.3d 532
United States Court of Appeals,
Seventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Katherine CHRISTIANSON and Bryan Rivera,
Defendants-Appellants.

Nos. 09-1526, 09-1615. | Nov. 9, 2009. | Argued
Sept. 24, 2009. | Decided Nov. 9, 2009.

**Synopsis**
**Background:** Defendants pled guilty in the United States
District Court for the Western District of Wisconsin,
Barbara B. Crabb, Chief Judge, to destroying government
property. Defendants appealed.

**Holdings:** The Court of Appeals, Manion, Circuit Judge,
held that:

[1] Forest Service suffered a loss;

[2] district court did not commit clear error in determining
amount of loss;

[3] evidence sufficiently defined defendant as terrorist; and

[4] terrorism sentencing enhancement did not require that
the crime transcend national boundaries.

Affirmed.

West Headnotes (9)

[1]     **Criminal Law**
        👉 Sentencing

        The sentencing court's assessment of the
        amount of loss is a factual finding, which the
        Court of Appeals will not disturb unless it is
        clearly erroneous.

        1 Cases that cite this headnote

[2]     **Sentencing and Punishment**
        👉 Value of loss or benefit

        United States Forest Service suffered a loss, for
        sentencing purposes, when defendants'
        destroyed several trees at Forest Service facility
        which was conducting several
        genetic-engineering experiments on trees, even
        though funding for experiment had been
        terminated; trees' value was not defined in
        relation to their continued funding, trees were
        essential part of 20-year experiment the fruits of
        which were never realized, and if not destroyed,
        the trees would still be there and the prior
        decades of research and toil would not have
        been lost. U.S.S.G. § 2B1.1, 18 U.S.C.A.

        Cases that cite this headnote

[3]     **Sentencing and Punishment**
        👉 Amount and degree of loss or injury

        At defendants' sentencing for destroying
        government property, district court did not
        commit clear error by determining that amount
        of loss associated with defendants' destruction
        of several trees at Forest Service facility which
        was conducting genetic-engineering experiments
        on trees was $424,361; research plant scientist at
        facility testified to costs associated with the
        experiments based on what he knew from his
        work on project and testimony was in accord
        with report prepared a month after the damage.
        18 U.S.C.A. § 1361; U.S.S.G. § 2B1.1, 18
        U.S.C.A.

        Cases that cite this headnote

[4]     **Sentencing and Punishment**
        👉 Value of loss or benefit

        A district court's loss-amount calculation at

sentencing need only be a reasonable estimate of loss. U.S.S.G. § 2B1.1, 18 U.S.C.A.

1 Cases that cite this headnote

[5]   **Criminal Law**
      Sentencing

The Court of Appeals reviews the district court's loss-amount calculation at sentencing for clear error. U.S.S.G. § 2B1.1, 18 U.S.C.A.

1 Cases that cite this headnote

[6]   **Criminal Law**
      Sentencing

When reviewing a sentence, the Court of Appeals defers to the district court's determination of witness credibility, which can virtually never be clear error.

Cases that cite this headnote

[7]   **Sentencing and Punishment**
      Terrorism

Evidence sufficiently defined defendant as terrorist, supporting imposition of terrorism enhancement at his sentencing for destroying government property; defendant, with others, destroyed over 500 trees at facility operated by United States Forest Service to protest genetic-engineering experiments being conducted on trees and ruined decades of work, several vehicles were also vandalized, defendant was member of domestic environmental protest group and the destruction was to further group's political agenda, group had been involved in numerous terror attacks, and the destruction intimidated workers at facility. U.S.S.G. § 3A1.4, 18 U.S.C.A.

3 Cases that cite this headnote

[8]   **Sentencing and Punishment**
      Terrorism

Terrorism sentencing enhancement, which applies if crime involved or was intended to promote a federal crime of terrorism, did not require that the crime transcend national boundaries. U.S.S.G. § 3A1.4, 18 U.S.C.A.

2 Cases that cite this headnote

[9]   **Criminal Law**
      Review De Novo

The Court of Appeals reviews a district court's application of the Sentencing Guidelines de novo.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*534** Meredith P. Duchemin, Attorney (argued), Office of the United States Attorney, Madison, WI, for Plaintiff-Appellee.

Mark Maciolek, Attorney (argued), Madison, WI, for Defendants-Appellants.

Reed Cornia, Attorney (argued), Cornia Law, LLC, Madison, WI, for Defendant-Appellant Bryan Rivera.

Before POSNER, MANION, and TINDER, Circuit Judges.

**Opinion**

MANION, Circuit Judge.

In the summer of 2000, defendants Katherine Christianson and Bryan Rivera were members of the

Earth Liberation Front, identified by the FBI as a domestic eco-terrorist group. Besides attending meetings and protests, they also found time to destroy several research projects at a U.S. Forest Service facility in Rhinelander, Wisconsin. They were not prosecuted until eight years later when they were indicted for and pleaded guilty to destroying government property. The district court sentenced Christianson to 24 months' and Rivera to 36 months' imprisonment respectively; both sentences were substantially lower than the recommended guideline range but the government does not contest them. On appeal, the defendants challenge the district court's loss-amount calculation; Rivera also argues that the district court erred in applying the terrorism enhancement. We affirm.

## I.

In July 2000, Katherine Christianson went to the Earth First! Rendevous in Tennessee with her then-boyfriend of several years, Ian Wallace.[1] There they met Daniel McGowan and Bryan Rivera. During the Rendevous, the four discussed vandalizing the U.S. Forest Service ("Forest Service") facility in Rhinelander, Wisconsin, where the Forest Service was conducting several genetic-engineering experiments on trees.

After the Rendevous, the four traveled to Minneapolis, Minnesota, to demonstrate at the International Society of Animal Genetics conference. During their time at the conference, they traveled to Rhinelander and conducted reconnaissance of the facility. After seeing the site, they determined that four people would be needed to effectively carry out their mission. Needing a fifth person to act as a driver, Wallace recruited a friend from high school.

On the night of July 20, 2000, the four entered the facility and damaged or destroyed more than 500 trees, either by cutting them down or by girdling them. Girdling, or as it is more commonly known "ring barking," consists of completely removing a strip of bark around a tree's outer circumference, causing the tree's eventual death. XIII *Oxford English Dictionary* 958 (2d ed. 1989). In addition to destroying the trees, they used etching cream and spray paint to leave their "calling card" on several Forest Service vehicles. **\*535** The group, however, had to cut short its sortie after fearing they would be discovered by a security guard. Although they left in haste, they were careful to dispose of their clothes and tools on the way back to Eau Claire, Wisconsin, where they dropped off their driver before returning to Minneapolis.[2]

The next day, Christianson and McGowan issued a press release in the name of the Earth Liberation Front ("ELF") and on behalf of native forests everywhere. In the communique, they claimed responsibility for the attack and admonished their allies

> to cease quibbling with the Forest Service over details of their genocidal plans.... The sooner we realize that the Forest Service, like industry, are capitalists driven by insane desire to make money and control life, the better. Than [sic] we can start taking more appropriate action.

What they meant by "more appropriate action" is not clear, but from ELF's other attacks, it could be read as foreshadowing further acts of violence against the Forest Service. From there, the case went cold.

Eventually, in January 2007, Wallace was implicated in an attempted bombing on the campus of Michigan Tech University. He subsequently cooperated with the authorities and shared the details of the attack on the Rhinelander facility. Christianson and Rivera were ultimately indicted and pleaded guilty to willfully injuring property belonging to the United States, causing damage greater than $1000, in violation of 18 U.S.C. §§ 2 and 1361. The government initially estimated the loss amount was between half a million and a million dollars.

At sentencing, Christianson challenged the loss calculation. To support its position, the government called Don Riemschneider to testify; he was a research plant scientist at the Rhinelander facility in the summer of 2000. After the attack, Riemschneider had prepared a report for his supervisor and the FBI on the damage from the attack. In it, he estimated a total loss amount in excess of $420,000 based on the damage caused to the Western Black Cottonwood ("Cottonwood") experiment and an advanced generation clone experiment that was destroyed. For various reasons, he did not include estimates for any of the other experiments that were destroyed by the defendants. At sentencing, he produced his report and repeated his initial estimates, further explaining their bases. He estimated that to replicate the Cottonwood experiment it would cost $400,000. He based this total on the project's costs between 1983-1993, when it was most active; during those years he estimated the project cost at $40,000 per year. In support of this total, he cited three specific expenses that made up the bulk of the costs: the gathering of samples for the experiment, the costs of

maintaining the experiment and the cost of hiring a technician to assist in collecting measurements during two years of the experiment. Riemschneider also stressed that this amount was calculated using costs between 1983-1993, and it would be much higher today. He also added that funding for the project was discontinued in 2000; it is unclear whether the defendants' conduct had anything to do with that decision.

After hearing Riemschneider's testimony and the arguments of counsel, the district court adopted Riemschneider's estimate of $424,361 as the loss amount **\*536** attributable to Christianson's conduct, noting this was "a very very conservative [estimate] and lower than what was actually experienced." It also found that Christianson's crime was among those listed in the terrorism enhancement under U.S.S.G. § 3A1.4 and that she committed those acts to influence or affect the conduct of government by intimidation or coercion. The application of the terrorism enhancement automatically raised her offense level to 29, with acceptance of responsibility, and her criminal history to a Category VI. Her guideline range was then calculated at 151-188 months. After consulting the factors at 18 U.S.C. § 3553, the district court sentenced Christianson to 24 months in prison.

The same district court sentenced Rivera. At sentencing, Rivera agreed to the loss amount calculated at Christianson's hearing but argued that the terrorism enhancement was inapplicable. The district court overruled his objection. He had the same guideline range as Christianson: 151-188 months. But after noting his lack of an apology or some form of regret, the district court sentenced him to 36 months' imprisonment.

## II.

On appeal, both defendants challenge the district court's loss findings. Their argument is two-fold. First, they contend that the Forest Service did not suffer a loss because the Cottonwood experiment was terminated and thus worthless. Second, they claim the district court erred in calculating the loss amount at $424,361 because the evidence presented for the value of the Cottonwood experiment and the advanced generation clone experiment was unreliable. They do not dispute the figures tied to the vehicles.

[1] [2] This is a mixed question of fact and law. "The district court's assessment of the amount of loss is a factual finding, which we will not disturb unless it is

clearly erroneous." *United States v. Berheide,* 421 F.3d 538, 540 (7th Cir.2005). However, the district court's conclusion that the destruction of the Cottonwood experiment caused the Forest Service to suffer a "loss," as that term is used in U.S.S.G. § 2B1.1, is reviewed de novo. *Id.* Defendants' argument on this point hinges on the fact that the Cottonwood experiment's funding was discontinued in 2000. They argue that once the funding was cut the experiment and the trees ceased to have any value. This is obviously not so. The fact that the experiment's funding was cut in 2000 does not mean that the experiment was worthless or that the Forest Service did not suffer a loss. The trees' value was not defined in relation to their continued funding, nor was there any evidence they would be ring-barked the moment funding was discontinued. Rather, the trees were an essential part of a twenty-year experiment, the fruits of which were never realized because of defendants' conduct. If the defendants chose a different method of protest that night, the trees would still be there and the prior decades of research and toil would not be lost. The district court did not err in holding that defendants' conduct caused the Forest Service to suffer a loss.[3]

**\*537** [3] The crux of defendants' challenge to the loss-amount total is that the district court erred when it accepted Riemschneider's testimony and found that the cost of replacing the experiment was $424,361. At Christianson's sentencing, the government presented evidence of the loss amount through Riemschneider's testimony and the report he prepared in August 2000. He testified to the costs associated with the Cottonwood experiment and the advanced generation clone experiment and based these estimates on what he knew from his work on the project. His testimony and estimates were in accord with the report he prepared a month after the damage. And after listening to the testimony and making its own inquiries, the district court credited Riemschneider's testimony, finding that his estimates were at least reasonable: "this estimate is actually a very very conservative one and lower than what was actually experienced."

[4] [5] A district court's loss-amount calculation "need only be a reasonable estimate of loss." *United States v. Watts,* 535 F.3d 650, 658 (7th Cir.2008) (quotation omitted). And we review the finding for clear error. *Id.* To establish clear error, the defendant must show "that the court's loss calculations '[were] not only inaccurate but outside the realm of permissible computations.' " *United States v. Radziszewski,* 474 F.3d 480, 486 (7th Cir.2007) (quoting *United States v. Lopez,* 222 F.3d 428, 437 (7th Cir.2000) (further citation omitted)).

[6]  In this case, the district court's finding was well justified: Riemschneider's testimony was supported by a report he prepared shortly after the attack, and the district court credited Riemschneider's testimony. We defer to "the district court's determination of witness credibility, which can virtually never be clear error." *United States v. Acosta,* 534 F.3d 574, 584 (7th Cir.2008) (quotation omitted). Further, a review of the sentencing transcript assures us that "the district court's inquiries were sufficiently searching to ensure the probable accuracy of the available evidence." *United States v. Lopez,* 222 F.3d 428, 438 (7th Cir.2000). There is also no showing that the loss amount was inaccurate, and it is certainly not outside the realm of permissible computations. *Id.* at 437. Accordingly, we find that the district court did not commit clear error in calculating the loss amount.

### III.

Rivera also appeals the district court's finding that the terrorism enhancement under U.S.S.G. § 3A1.4 applies to his conduct. He makes two arguments for why that enhancement does not apply. The first is visceral and rests on the assumption that he is not a terrorist because his only motivation was "the hope of saving our earth from destruction" and redressing "the misdeeds and injustice that [he] felt industry inflicted on the natural world." The second rests on statutory interpretation grounds. Both lack merit.

[7]  Turning to the first argument, this much has to be clear: ELF and its members are not to be confused with the typical environmental protestor denouncing and peacefully demonstrating against such things as nuclear power, strip coal mining, cutting old-growth timber, offshore drilling, damming wild rivers, and so on. Rather, ELF members are of a different sort, and to group them with the well-meaning complainers of controversial projects **\*538** is both inaccurate and purposely misleading.

ELF's members take their activism to unconscionable levels: since ELF's inception in 1987, its members have been responsible for bombings, arson, vandalism, and a host of other crimes. In fact, between 2000 and 2005, 43 of the 57 reported terrorist attacks committed on American soil were done by ELF members or their sister organization, the Animal Liberation Front.[4] ELF's terror attacks have caused over fifty million dollars in damage to public and private property, including the arson of condominium complexes, multiple university research facilities, a ski resort, logging facilities, a high-voltage energy tower, and almost a score of other pieces of private property.[5] A perfunctory survey of some of the cases involving ELF shows the breadth of its destructive force, including a conspiracy stretching over five states and involving nineteen separate acts of arson.[6] Just as telling is the fate of the two uncharged coconspirators in this case: Wallace is incarcerated for the attempted bombing of a university building, and McGowan is serving 84 months for arson and a host of other crimes. These people are not peaceful protestors.

Here, the defendants' actions were of the same sort, only they refrained from using explosives: they conducted reconnaissance and determined that to be effective they needed another person; they trespassed onto the facility and destroyed over 500 trees that were part of several experiments, ruining in a single night decades of others' work; they vandalized several vehicles with the ominous threat that "WE ARE WATCHING" and "THE ELVES ARE WATCHING." And that was all before they were scared away by a security guard. Far more havoc may have been done had they not been interrupted.

Beyond the damage inflicted, it is impossible to calculate how these acts would have intimidated the workers of the Rhinelander facility. Arriving at work the next day, employees were greeted with "F\* \* \* U USFS" and "F\* \* \* TREE BIOTECH" spray-painted on their work vehicles. And as the employees surveyed the facility, they discovered that valuable experiments they spent decades working on had been destroyed. The employees would be familiar with ELF, and the communique about the attack the next day foreshadowing "more appropriate action" would likely make employees think twice before they stayed late at work or came in on the weekend to finish some project. Such behavior is not in the same genus of non-destructive and non-violent protests that can be honestly described as well meaning but misguided.

Simply put, a terrorist is "any one who attempts to further his views by a system **\*539** of coercive intimidation." XVII *Oxford English Dictionary* 821 (2d ed. 1989); *accord Webster's Third New International Dictionary* 2361 (1981) ("an advocate or practitioner of terror as a means of coercion."). The *Oxford English Dictionary* goes on to explain that the "term now usually refers to a member of a clandestine or expatriate organization aiming to coerce an established government by acts of violence against it or its subjects." *Id.* The Guidelines provide a practical definition for what constitutes an act of terrorism, and thereby establishes a very workable definition of who is a terrorist. It looks at the crime involved and the perpetrator's motive. If the act is among the litany of crimes listed in § 2332b(g)(5)(B), which

include a bevy of the most harmful and odious acts in the criminal code, including everything from murder and torture to the destruction of government property, and it was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," then it is a federal crime of terrorism. *Id.* And for all intents and purposes at sentencing, that person is a terrorist.

Here, the purpose behind defendants' actions was to further ELF's political agenda: the end to industrial society. The method they chose to communicate this desire was not a peaceful protest with speeches, songs, and a petition outside the facility but instead a violent attack against the facility and the experiments. Because the defendants do not look the part of our current conception of a terrorist does not separate them from that company. Indeed, it doesn't matter why the defendants oppose capitalism and the United States government-if they use violence and intimidation to further their views, they are terrorists. Despite Rivera's denial that he is a person who uses violence and intimidation to serve his political ends, the evidence sufficiently defines him as a terrorist, and the enhancement is appropriate.

[8] [9] Alternatively, Rivera argues that the district court erred in applying the terrorism enhancement to his conduct because his crime was purely domestic and did not transcend national boundaries. We review a district court's application of the Guidelines de novo. *United States v. Lacey,* 569 F.3d 319, 324 (7th Cir.2009). The terrorism enhancement at § 3A1.4 of the Guidelines applies if the crime "involved, or was intended to promote, a federal crime of terrorism." U.S.S.G § 3A1.4. The Guidelines define "federal crime of terrorism" with reference to 18 U.S.C. § 2332b(g)(5). That subsection has two requirements. The first is that the crime was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). There is no question about that here. The second is that the crime is among those listed in § 2332b(g)(5)(B); among the crimes listed there is the destruction of government property under § 1361. And that is what Rivera pleaded guilty to.

Rivera, however, argues that § 3A1.4 could not simply incorporate the definition provided in § 2332b(g)(5) without incorporating all of § 2332b, which is titled "Acts of Terrorism Transcending National Boundaries." Much of this rests on Rivera's belief that by only incorporating § 2332b(g)(5) and not all of § 2332b, the sentencing commission is discarding much of § 2332b as meaningless or surplus. Notwithstanding Rivera's

argument, nothing prohibits the Sentencing Commission from defining a term by referencing a particular definition in a statute while ignoring the rest of the statute. It, in fact, does it throughout the Guidelines. *E.g.,* U.S.S.G. § 2M6.1 app. n. 1.; *id.* § 3b1.3, **\*540** app. n. 2(b) & 5(a); *id.* § 3B1.5 app. n. 1 (defining "Drug trafficking crime" as that term is defined in 18 U.S.C. § 924(c)(2)).

A defendant who does not meet the requirements for a conviction under § 2332b may still fall under the provisions of § 2332b(g)(5) and in turn warrant the terrorism enhancement. *United States v. Arnaout,* 431 F.3d 994, 1002 (7th Cir.2005). We have previously noted that § 3A1.4 applies "where a defendant is convicted of a federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)(5)(B) *or where* the district court finds that the purpose or intent of the defendant's substantive offense of conviction or relevant conduct was to promote a federal crime of terrorism as defined by § 2332b(g)(5)(B)." *United States v. Hale,* 448 F.3d 971, 988 (7th Cir.2006) (quoting *Arnaout,* 431 F.3d at 1001) (internal alterations omitted); *see also United States v. Ashqar,* 582 F.3d 819 (7th Cir.2009) (upholding the enhancement applying to a defendant convicted of criminal contempt). On this point the Fifth Circuit has observed that of the crimes listed in § 2332b(g)(5)

> none ... has as an element requiring conduct transcending national boundaries. All that section 3A1.4 requires for an upward adjustment to apply is that one of the enumerated offenses was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

*United States v. Harris,* 434 F.3d 767, 773 (5th Cir.2005) (quotation omitted). Thus, we reject Rivera's argument that for the terrorism enhancement under § 3A1.4 to apply, his conduct must meet the jurisdictional element to § 2332b, *i.e.,* that the crime transcend national boundaries. 18 U.S.C. § 2332b(b).

## IV.

The district court did not err in finding that the destruction of two experiments and the vandalism of several Forest Service vehicles caused the government to suffer a loss nor did it err in calculating the loss amount at $424,361. Further, there is no merit to Rivera's argument that he's

U.S. v. Christianson, 586 F.3d 532 (2009)

not the sort of person who should be labeled a terrorist and that the terrorism enhancement does not apply unless his crime transcended national boundaries. Thus, we AFFIRM.

Footnotes

1   As noted in the pre-sentence report submitted to the district court, Earth First! is an environmental advocacy group that emerged in the southwestern United States in the late 1970s. It holds annual meetings, or Rendezvouses, to discuss environmental issues. During its early years, much of its activities involved peaceful "sit-in" type protests. But in the late 1980s its focus shifted to "direct action," including criminal activity to combat forms of development that they associated with the destruction of wildlife habitats. This changed emphasis attracted many new members, some with anarchist political backgrounds. In the early 1990s, Earth First!'s focus again shifted as it became a mainstream movement. And the members who refused to abandon criminal activity and take up a petition formed a militant off-shoot called the Earth Liberation Front.

2   The driver, Aaron Ellringer, pleaded guilty to a misdemeanor and was sentenced to four days of incarceration.

3   The real issue at this point would still be present regardless of whether the funding was cut: how does a court determine the value of an ongoing experiment, the fruits of which could be worth a lot, a little, or something in between? The Guidelines anticipate such impossible situations by providing a less onerous and speculative method of calculating the loss involved: the cost of replacing the experiment. U.S.S.G. § 2B1.1, app. n. 3(C)(i); *see United States v. Galvez,* 108 F.Supp.2d 1369, 1374 (S.D.Fla.2000) (noting problems calculating lost profit with any degree of accuracy and instead choosing to use the replacement cost as a loss figure). Here, the district court applied such a calculation.

4   Federal Bureau of Investigation, *Terrorism 2002-2005* 64-65 (2005), *available at* http://www.fbi.gov/publications/terror/terrorism2002_ 2005.pdf.; *see also id.* at 41 ("The majority of domestic terrorism incidents from 1993 to 2001 were attributable to the left-wing special interest movements the Animal Liberation Front (ALF) and the Earth Liberation Front (ELF).").

5   *Id.* at 3-4, 22, 29; *see also id.* at 7-9, 29 (noting five attacks that caused over fifty-five million dollars in damage).

6   *E.g., United States v. Tankersley,* 537 F.3d 1100, 1103-05 (9th Cir.2008) (noting defendants' conspiracy involving arson and bombings); *see also id.* at 1103, n. 2 (summarizing the arsons committed in the conspiracy); *United States v. Thurston,* 2007 WL 1500176 **1-4 (D.Or. May 21, 2007) (detailing a multi-defendant conspiracy across five states focusing on arson and bombings of private property); *United States v. McDavid,* 2006 WL 734877, *3 (E.D.Cal.2006) (noting defendant's advocacy for Molotov cocktails and threats to kill a confidential source).

---

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT I-2

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

2008 JUN 26 AM 8: 58

CLERK US DIST COURT
WD OF WI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | INDICTMENT |
| | ) | 08 CR 107 C |
| v. | ) | Case No. _____ |
| | ) | 18 U.S.C. § 1361 |
| KATHERINE CHRISTIANSON and, AARON ELLRINGER | ) | |
| | ) | |
| Defendants. | ) | |

THE GRAND JURY CHARGES:

<u>COUNT 1</u>

On or about July 20, 2000, in the Western District of Wisconsin, defendants

KATHERINE CHRISTIANSON
and
AARON ELLRINGER

willfully injured and committed depredation against property belonging to the United

States Forest Service, an agency of the United States, such damage exceeding $1000.

(In violation of Title 18, United States Code, Section 1361).

A TRUE BILL

_____
PRESIDING JUROR

_____
ERIK C. PETERSON
United States Attorney

Indictment returned: _6 - 2 5 - 0 8_

# EXHIBIT I-3

# United States District Court

## Western District of Wisconsin

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|
| | (for offenses committed on or after November 1, 1987) |
| V. | **Case Number:** 08-CR-107-C-01 |
| KATHERINE CHRISTIANSON | **Defendant's Attorney:** Mark Maciolek |

The defendant, Katherine Christianson, pleaded guilty to count 2 of the superseding indictment.

Count 1 of the superseding indictment is dismissed on the motion of the United States.

**ACCORDINGLY**, the court has adjudicated defendant guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C §§ 1361 and 2 | Depredation Against Property Belonging to the United States, a Class C felony | July 20, 2000 | 2 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.**

| | |
|---|---|
| **Defendant's Date of Birth:** ▮▮▮▮▮ | February 19, 2009 |
| **Defendant's USM No.:** 40794-051 | Date of Imposition of Judgment |
| **Defendant's Residence Address:** c/o Daralyn Bobbitt (mother) ▮▮▮▮▮ | |
| | /s/ Barbara B. Crabb |
| **Defendant's Mailing Address:** c/o Daralyn Bobbitt (mother) 4172 Chaparron Place Santa Fe, NM 87507 | Barbara B. Crabb District Judge |
| | February 25, 2009 |
| | Date Signed: |

Case 5:12-cr-00092-VAP Document 753 Filed 03/12/15 Page 214 of 225 Page ID #:12765

# IMPRISONMENT

As to count two of the superseding indictment, it is adjudged that defendant is committed to the custody of the Bureau of Prisons for imprisonment for a term of 24 months.

I recommend that defendant be afforded the opportunity for substance abuse treatment and pre-release placement in a residential reentry center with work release privileges.

Defendant is neither a flight risk nor a danger to the community. Accordingly, execution of the sentence of imprisonment only is stayed until March 10, 2009, between the hours of noon and 2:00 p.m., when defendant is to report to an institution to be designated by further court order. The present release conditions are continued until March 10, 2009.

# RETURN

**I have executed this judgment as follows:**

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____

Deputy Marshal

# SUPERVISED RELEASE

The term of imprisonment is to be followed by a two-year term of supervised release, subject to the standard conditions.

Defendant shall report to the probation office in the district to which defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

Defendant shall not commit another federal, state, or local crime.

Defendant shall not illegally possess a controlled substance.

If defendant has been convicted of a felony, defendant shall not possess a firearm, destructive device, or other dangerous weapon while on supervised release.

Defendant shall cooperate with the collection of DNA by the U.S. Justice Department and/or the U.S. Probation and Pretrial Services Office as required by Public Law 108-405.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Financial Penalties sheet of this judgment.

Defendant shall comply with the standard conditions that have been adopted by this court (set forth on the next page).

In light of the nature of the offense and defendant's history of substance abuse, defendant is to:

(1)   Register with local law enforcement agencies and the state attorney general as directed by the supervising U.S. probation officer;

(2)   Submit her person, property, residence, office or vehicle to a search conducted by a U.S. probation officer at a reasonable time and in a reasonable manner, whenever the probation officer has reasonable suspicion of contraband or of the violation of a condition of release; failure to submit to a search may be a ground for revocation; defendant shall warn any other residents that the premises she is occupying may be subject to searches pursuant to this condition;

(3)   Abstain from the use of alcohol and illegal drugs and from association with drug users and sellers and participate in substance abuse treatment.  Defendant shall submit to drug testing beginning within 15 days of her release and 60 drug tests annually thereafter.  The probation office may utilize the Administrative Office of the U.S. Courts' phased collection process; and

(4)   Provide the supervising U.S. probation officer any and all requested financial information, including copies of state and federal tax returns.

# STANDARD CONDITIONS OF SUPERVISION

1)  Defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  Defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)  Defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  Defendant shall support his or her dependents and meet other family responsibilities;

5)  Defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  Defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  Defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances except as prescribed by a physician;

8)  Defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  Defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10)  Defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11)  Defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  Defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)  As directed by the probation officer, defendant shall notify third parties of risks that may be occasioned by defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm defendant's compliance with such notification requirement.

Case 5:12-cr-90092-VAP Document 753 Filed 03/12/15 Page 217 of 225 Page ID #:12768
Case 3:08-cr-00107-bbc Document 154 Filed 02/25/2009 Page 5 of 6

AO 245 B (Rev. 3/01)(N.H. Rev.)                          CASE NUMBER:     08-CR-107-C-01                          Judgment   Page 5

# CRIMINAL MONETARY PENALTIES

Defendant shall pay the following total financial penalties in accordance with the schedule of payments set forth below.

| Count | Assessment | Fine | Restitution |
|-------|-----------|------|-------------|
| 2 | $25.00 | $0.00 | $424,361.00 |
| **Total** | $25.00 | $0.00 | $424,361.00 |

It is adjudged that defendant is to pay a $100 criminal assessment penalty to the Clerk of Court for the Western District of Wisconsin immediately following sentencing.

Defendant is to pay restitution in the amount of $424,361.00 to the Clerk of Court for the Western District of Wisconsin for disbursement to the U.S. Forestry Service, ASC-Restitution, Attn: Collections' Office, 101-B Sun Avenue NE, Albuquerque, New Mexico 81109. Defendant's restitution obligation is joint and several with that of her co-defendant, Bryan Rivera.  No interest is to accrue on the unpaid portion of the restitution obligation.

Defendant is to make restitution payments while she is in the custody of the Bureau of Prisons and during the term of supervised release.

Defendant does not have the economic resources to pay restitution in full in the foreseeable future under any reasonable schedule of payments. Under 18 U.S.C. § 3664(f)(3)(B), she is to begin making nominal payments of a minimum of $100 each month within 30 days of her release from custody.

Defendant does not have the means to pay a fine under § 5E1.2(c) without impairing her ability to support herself and satisfy the court-ordered restitution in this case.  Therefore, no fine is ordered.

# RESTITUTION

| NAME OF PAYEE | TOTAL AMOUNT OF LOSS | AMOUNT OF RESTITUTION ORDERED | PRIORITY ORDER OF PAYMENT |
|---------------|----------------------|-------------------------------|---------------------------|
| U.S. Forestry Service | $     424,361.00 | $          424,361.00 | |
| Totals: | $     424,361.00 | $          424,361.00 | |

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order:

                 (1) assessment;
                 (2) restitution;
                 (3) fine principal;
                 (4) cost of prosecution;
                 (5) interest;
                 (6) penalties.

The total fine and other monetary penalties shall be due in full immediately unless otherwise stated elsewhere.

Unless the court has expressly ordered otherwise in the special instructions above, if the judgment imposes a period of imprisonment, payment of monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

In the event of a civil settlement between victim and defendant, defendant must provide evidence of such payments or settlement to the Court, U.S. Probation office, and U.S. Attorney's office so that defendant's account can be credited.

# EXHIBIT I-4

AO 245 B (Rev. 03/01)(N.W. Wisconsin) Sheet 1 - Judgment in a Criminal Case

Case: 5:12-cr-00092-VAP Document 753 Filed 02/19/15 Page 220 of 225 PageID #:12771
Case: 3:08-cr-00107-bbc Document #: 04/17/15 Page 2/27/09 Page 1 of 1 Page 1

# United States District Court

## Western District of Wisconsin

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| | (for offenses committed on or after November 1, 1987) |
| V. | **Case Number:**   08-CR-107-C-03 |
| BRYAN RIVERA | **Defendant's Attorney:**   Reed Cornia |

The defendant, Bryan Rivera, pleaded guilty to count 2 of the superseding indictment.

Count 1 of the superseding indictment dismissed on the motion of the United States.

**ACCORDINGLY**, the court has adjudicated defendant  guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C § 1361 and 2 | Depredation Against Property Belonging to the United States, a Class C felony | July 20, 2000 | 2 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.**

| | |
|---|---|
| **Defendant's Date of Birth:**   ████, 1977 | February 25. 2009 |
| **Defendant's USM No.:**   ████ | Date of Imposition of Judgment |
| **Defendant's Residence Address:**   Olympia, WA ████ | |
| | /s/ Barbara B. Crabb |
| **Defendant's Mailing Address:**   ████ Olympia, WA ████ | Barbara B. Crabb |
| | District Judge |
| | February 27, 2009 |
| | Date Signed: |

# IMPRISONMENT

As to count two of the superseding indictment, it is adjudged that defendant is committed to the custody of the Bureau of Prisons for imprisonment for a term of 36 months.

I recommend that he be afforded the opportunity for substance abuse treatment and pre-release placement in a residential re-entry center with work release privileges.

Defendant is neither a flight risk nor a danger to the community. Accordingly, execution of the sentence of imprisonment is stayed until March 17, 2009, between the hours of noon and 2:00 p.m., when defendant is to report to an institution to be designated by further court order. The present release conditions are continued until March 17, 2009.

# RETURN

**I have executed this judgment as follows:**

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
                                        UNITED STATES MARSHAL

By _____
                                        Deputy Marshal

# SUPERVISED RELEASE

The term of imprisonment is to be followed by a two-year term of supervised release, subject to the standard conditions.

Defendant shall report to the probation office in the district to which defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

Defendant shall not commit another federal, state, or local crime.

Defendant shall not illegally possess a controlled substance.

If defendant has been convicted of a felony, defendant shall not possess a firearm, destructive device, or other dangerous weapon while on supervised release.

Defendant shall cooperate with the collection of DNA by the U.S. Justice Department and/or the U.S. Probation and Pretrial Services Office as required by Public Law 108-405.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Financial Penalties sheet of this judgment.

Defendant shall comply with the standard conditions that have been adopted by this court (set forth on the next page).

In light of the nature of the offense and his history of substance abuse, defendant is to:

(1)    Register with local law enforcement agencies and the state attorney general as directed by the supervising U.S. probation officer;

(2)    Submit his person, property, residence, office or vehicle to a search conducted by a U.S. probation officer at a reasonable time and in a reasonable manner, whenever the probation officer has reasonable suspicion of contraband or of the violation of a condition of release; failure to submit to a search may be a ground for revocation; defendant shall warn any other residents that the premises he is occupying may be subject to searches pursuant to this condition;

(3)    Abstain from the use of alcohol and illegal drugs and from association with drug users and sellers and participate in substance abuse treatment.  Defendant shall submit to drug testing beginning within 15 days of his release and 60 drug tests annually thereafter.  The probation office may utilize the Administrative Office of the U.S. Courts' phased collection process; and

(4)    Provide the supervising U.S. probation officer any and all requested financial information, including copies of state and federal tax returns.

# STANDARD CONDITIONS OF SUPERVISION

1)   Defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   Defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   Defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   Defendant shall support his or her dependents and meet other family responsibilities;

5)   Defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   Defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   Defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances except as prescribed by a physician;

8)   Defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   Defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10)   Defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11)   Defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   Defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)   As directed by the probation officer, defendant shall notify third parties of risks that may be occasioned by defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm defendant's compliance with such notification requirement.

AO 245 B (Rev. 3/01)(N.H. Rev.) | CASE NUMBER: **08-CR-107-C-03** | Judgment - Page 5

# CRIMINAL MONETARY PENALTIES

Defendant shall pay the following total financial penalties in accordance with the schedule of payments set forth below.

| Count | Assessment | Fine | Restitution |
|-------|-----------|------|-------------|
| 2 | $100.00 | $0.00 | $424,361.00 |
| **Total** | $100.00 | $0.00 | $424,361.00 |

Defendant does not have the means to pay a fine under § 5E1.2(c) without impairing his ability to support himself and to satisfy the court-ordered restitution in this case. Therefore, no fine is ordered.

It is adjudged that defendant is to pay a $100 criminal assessment penalty to the Clerk of Court for the Western District of Wisconsin immediately following sentencing.

Defendant is to pay restitution in the amount of $424,361.00 to the U.S. Clerk of Court for the Western District of Wisconsin for disbursement to:

USDA Forest Service
ASC-Restitution
Attn: Collection Officer
101-B Sun Avenue NE
Albuquerque, NM 87109

Defendant's restitution obligation is joint and several with that of Katherine Christianson. No interest is to accrue on the unpaid portion of the restitution obligation.

Under 18 U.S.C. § 3664(f)(3)(B), defendant is to begin making minimum payments toward restitution in the amount of $100 each month beginning within 30 days of his release from custody.

# RESTITUTION

| NAME OF PAYEE | TOTAL AMOUNT OF LOSS | AMOUNT OF RESTITUTION ORDERED | PRIORITY ORDER OF PAYMENT |
|---------------|---------------------|-------------------------------|---------------------------|
| USDA Forest Service | $ 424,361.00 | $ 424,361.00 | |
| Totals: | $ 424,361.00 | $ 424,361.00 | |

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order:

(1) assessment;
(2) restitution;
(3) fine principal;
(4) cost of prosecution;
(5) interest;
(6) penalties.

The total fine and other monetary penalties shall be due in full immediately unless otherwise stated elsewhere.

Unless the court has expressly ordered otherwise in the special instructions above, if the judgment imposes a period of imprisonment, payment of monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

In the event of a civil settlement between victim and defendant, defendant must provide evidence of such payments or settlement to the Court, U.S. Probation office, and U.S. Attorney's office so that defendant's account can be credited.